# EXHIBIT A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **In re** | : **Chapter 11** |
| | : |
| **CENTAUR, LLC, et al.,**[1] | : **Case No. 10-10799 (KJC)** |
| | : |
| **Debtors.** | : **(Jointly Administered)** |
| | : |
| | : **Re: Docket No. 121 (Case No. 09-13760 (KJC))** |

## INTERIM ORDER (A) AUTHORIZING USE OF CASH COLLATERAL, (B) GRANTING ADEQUATE PROTECTION, (C) MODIFYING THE AUTOMATIC STAY, AND (D) SCHEDULING A FINAL HEARING

Upon the Motion, dated March 7, 2010 (the "**Motion**") of Centaur PA Land, LP

("**Centaur Land**") and its debtor affiliates, as debtors and debtors in possession (collectively,

the "**Debtors**"), in the above-captioned jointly administered chapter 11 cases (the "**Cases**"), for

an order pursuant to sections 105, 361, 362, 363 and 507 of title 11 of the United States Code

(the "**Bankruptcy Code**"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy

Procedure (the "**Bankruptcy Rules**"), and Rules 2002-1(b), 4001-2, 9006-1 and 9013-1 of the

Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

District of Delaware (the "**Local Rules**"), requesting entry of this interim order (the "**Interim**

**Order**") providing for the following relief:

> (a)    authorizing the Debtors' limited use of "cash collateral" (the "**Cash Collateral**"), as such term is defined in section 363(a) of the Bankruptcy Code, in which any of the Prepetition Secured Parties (as defined below)

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, if applicable, are: Centaur, LLC (8148); Centaur Colorado, LLC (9131); Centaur Indiana, LLC; Centaur Racing, LLC; Hoosier Park, L.P. (0820); HP Dining & Entertainment, LLC; Centaur Pennsylvania, LLC; VVD Properties General Partner, LLC; Valley View Downs GP, LLC; VVD Properties, LP (6808); Centaur PA Land Management, LLC; and Centaur PA Land General Partner, LP.

has an interest pursuant to any Prepetition Credit Document (as defined below);

(b)    granting adequate protection to each lender (collectively, the "**First Lien Lenders**") and each other Secured Party (as defined in the First Lien Credit Agreement) (together with the First Lien Lenders, the "**First Lien Secured Parties**") under and in connection with that certain First Lien Revolving Credit and Term Loan Agreement, dated as of October 30, 2007 (as has been or may be further amended, restated, supplemented or otherwise modified from time to time, the "**First Lien Credit Agreement**" and together with all other loan and security documents executed in connection therewith, including the Intercreditor Agreement (as defined below), the "**First Lien Credit Documents**"), by and among Centaur, LLC, as borrower (the "**Borrower**"), Centaur Gaming, LLC, a Delaware limited liability company ("**Holdings**") and the other Subsidiary Guarantors (such term having the meaning given to it in Article I of the First Lien Credit Agreement), as guarantors, the First Lien Lenders and Credit Suisse, as administrative agent (the "**First Lien Administrative Agent**") and collateral agent (in such capacity, the "**First Lien Collateral Agent**" and, together with the First Lien Administrative Agent, the "**First Lien Agent**");

(c)    granting adequate protection to each lender (collectively, the "**Second Lien Lenders**", and, together with the First Lien Lenders, the "**Prepetition Lenders**") under and in connection with that certain Second Lien Term Loan Agreement, dated as of October 30, 2007 (as has been or may be further amended, restated, supplemented or otherwise modified from time to time, the "**Second Lien Credit Agreement**" and together with all other loan and security documents executed in connection therewith, including the Intercreditor Agreement (as defined below), the "**Second Lien Credit Documents**" (such Second Lien Credit Documents, together with the First Lien Credit Documents, the "**Prepetition Credit Documents**")), by and among the Borrower, Holdings and the other Subsidiary Guarantors (such term having the meaning given to it in Article I of the Second Lien Credit Agreement), as guarantors, the Second Lien Lenders and Wells Fargo Bank, N.A., as successor administrative agent (in such capacity, the "**Second Lien Administrative Agent**") and collateral agent (in such capacity, the "**Second Lien Collateral Agent**" and, together with the Second Lien Administrative Agent, the "**Second Lien Agent**," and, together with the First Lien Agent, the "**Prepetition Agents**");

(d)    vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Interim Order; and

(e)     scheduling a final hearing (the "**Final Hearing**") to consider the relief requested in the Motion, the entry of a Final Order (as defined below) and approving the form of notice with respect to the Final Hearing;

all as more fully described in the Motion; and an interim hearing with respect to the Motion having been held on March 9, 2010 (the "**Interim Hearing**"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b) and (d), and 9014 and it appearing that no other or further notice need be provided; and the relief requested being within the guidelines for requests for the use of cash collateral set forth in Local Rule 4001-2; and the relief requested in the Motion being in the best interests of the Debtors and their estates and creditors; and the Court having reviewed the Motion and the First Day Declaration[2] filed contemporaneously with the Motion, and the evidence submitted or adduced and the arguments of counsel made at the Interim Hearing; and the appearances of all interested parties having been noted in the record of the Interim Hearing; and the Court having determined that the legal and factual bases set forth in the Motion and at the Interim Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor,

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.     On the October 28, 2009, Centaur Land, and Valley View Downs, LP ("**Valley View**"), each commenced in this Court a case under chapter 11 of the Bankruptcy Code and, on March 6, 2010, the Borrower and the remaining Debtors commenced their chapter 11 cases in this Court (the "**First Petition Date**" and the "**Second Petition Date**", respectively, and with respect to any Debtor, the date on which the chapter 11 case of such Debtor was commenced, the

---

[2]     Capitalized terms not otherwise defined herein shall have the meanings given to them in the Motion.

"**Petition Date**"). The Debtors are continuing to manage and operate their businesses and property as debtors and debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

B.     No trustee or examiner has been appointed in these Cases, and no official creditors' committee has been formed as of the date hereof.

C.     This Court has jurisdiction over these proceedings, and over the property affected hereby, pursuant to 28 U.S.C. §§ 157(b) and 1334. This is a core proceeding as defined in and pursuant to 28 U.S.C. § 157(b)(2). Venue for the Cases and for proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

D.     Without any finding by the Court, and without prejudice to the rights of parties-in-interest as set forth in paragraph 17 below, the Debtors admit, stipulate, acknowledge and agree that (collectively, paragraphs D(i) through D(x) below are referred to herein as the "**Debtors' Stipulations**"):

**First Lien Credit Facility**

(i)     Pursuant to the First Lien Credit Agreement, the First Lien Secured Parties made loans and advances to, issued letters of credit for and/or provided other financial accommodations to or for the benefit of the Debtors from time to time.

(ii)     On the First Petition Date, an Event of Default (as defined in the First Lien Credit Agreement) occurred under Article VII of the First Lien Credit Agreement when certain of the Debtors commenced their Cases in this Court. As a result of the occurrence and continuance of such Event of Default (and any related Events of Default under Article VII of the First Lien Credit Agreement caused thereby), the Loans (as defined in the First Lien Credit Agreement) were accelerated and from and after the First Petition Date, such Loans together with any interest

payments thereon and any fees or other amounts owed under the First Lien Credit Documents, began to bear interest at the default rate in accordance with Section 2.09 of the First Lien Credit Agreement.

(iii) Pursuant to the First Lien Credit Documents, the Debtors were, as of the Second Petition Date, without defense, counterclaim or offset of any kind, jointly and severally indebted and liable to the First Lien Agent, the First Lien Lenders and the other First Lien Secured Parties on account of First Lien Indebtedness (as defined below) in an amount of not less than $405,598,440.95. For purposes of this Interim Order, the term "**First Lien Indebtedness**" shall mean and include, without duplication, any and all amounts owing or outstanding under the First Lien Credit Documents (including, without limitation, all Obligations as defined in the First Lien Credit Agreement) and all interest on, fees and other costs, expenses and charges owing in respect of, such amounts (including, without limitation, any reasonable attorneys', accountants', financial advisors' and other fees and expenses that are chargeable or reimbursable under the applicable provisions of the First Lien Credit Documents and interest at the default rate in accordance with section 2.09 of the First Lien Credit Agreement) and any and all obligations and liabilities, contingent or otherwise, owed in respect of the letter of credit or other Obligations (as defined in the First Lien Credit Agreement) outstanding thereunder.

(iv) Pursuant to the First Lien Credit Documents, the Debtors granted to the First Lien Collateral Agent for the benefit of the First Lien Secured Parties first priority and continuing pledges, liens and security interests (the "**First Lien Security Interests**") to secure the First Lien Indebtedness and any guarantees thereof, in and upon substantially all of the Debtors' property and assets (other than Excluded Property (as defined below)), whether real or personal, tangible

or intangible and wherever located, whether now or hereafter existing or acquired, and all the proceeds, offspring, rents and profits thereof (the "**Prepetition Collateral**"). "**Excluded Property**" shall mean: (a) any license, permit or authorization issued by a Governmental Authority (as defined in the First Lien Credit Agreement) to any of the Debtors or their affiliates (a "**Pledgor**"), in each case, only to the extent and for so long as the terms of such license, permit or authorization or any requirement of law applicable thereto, validly prohibit the creation by such Pledgor of a security interest in such license, permit or authorization in favor of the First Lien Collateral Agent (after giving effect to Sections 9-406, 9-407, 9-408 or 9-409 of the UCC (or any successor provision or provisions) or any other applicable law (including the Bankruptcy Code) or principals of equity); (b) to the extent of any Debtor's direct right, title or interest therein, \$50 million in cash (the "**L/C Cash Collateral**") described in the L/C Agreement (as defined below), which is currently held by the L/C Issuer (as defined below) in an account in the name of the L/C Issuer to secure a letter of credit (the "**PA Gaming L/C**") issued for the benefit of the Pennsylvania Gaming Control Board of the Commonwealth of Pennsylvania (the "**Commonwealth**") as a condition to the approval of a gaming license (it being understood that to the fullest extent permitted under the Prepetition Credit Documents, Excluded Collateral (as defined below)) does not include any Debtor's right, title or interest in the L/C Agreement or any Debtor's right to receive any L/C Cash Collateral pursuant to the terms thereof) and (c) any other property that constitutes Excluded Collateral (as defined under Section 2.2 of that certain First Lien Pledge and Security Agreement (the "**Security Agreement**"), dated October 30, 2007, by and among the Borrower, the Grantors party thereto (as defined in the Security Agreement)) and the First Lien Collateral Agent; *provided, however*, that, Excluded Property shall not include any proceeds, substitutions or replacements of any Excluded Property referred to in clauses (a), (b)

6

and (c) (unless such proceeds, substitutions or replacements would otherwise constitute Excluded Collateral); provided, further, that to the fullest extent permitted under the Prepetition Credit Documents, the L/C Cash Collateral (to the extent not otherwise constituting Prepetition Collateral as a result of Debtor's right, title or interest in the L/C Agreement described above) shall cease to be Excluded Collateral and shall become Cash Collateral upon (x) the earlier of (i) the expiration date of the PA Gaming L/C and (ii) the release and return of the PA Gaming L/C by the Commonwealth to the L/C Issuer, and, in either such case, so long as all amounts due and payable to the L/C Issuer under the L/C Agreement shall have been duly paid, and (y) the L/C Issuer's release of its interest in the L/C Cash Collateral and return to the Debtors in accordance with the terms of the L/C Agreement.

(v)     As of the applicable Petition Date and immediately prior to giving effect to this Interim Order, (a) the First Lien Credit Documents are valid and binding agreements and obligations of the Debtors and the First Lien Security Interests (i) constitute valid, binding, enforceable and perfected first priority security interests and Liens, subject only to the Permitted Liens (as defined in the First Lien Credit Documents) under the First Lien Credit Agreement, but only to the extent such Permitted Liens are valid, enforceable, non-avoidable Liens and security interests that are perfected prior to the applicable Petition Dates (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code), which are not subject to avoidance, reduction, disallowance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law and which are senior in priority to the First Lien Security Interests under applicable law and after giving effect to any applicable subordination or intercreditor agreements (such liens, the "**Permitted Prior Liens**"), and (ii) are not subject to avoidance, reduction, recharacterization, disallowance, impairment or subordination, pursuant to

7

the Bankruptcy Code or applicable non-bankruptcy law; and (b) (i) the First Lien Indebtedness constitutes the legal, valid, and binding obligation of the Debtors, enforceable in accordance with the terms of the First Lien Credit Documents, (ii) no objection, offset, defense, or counterclaim of any kind or nature to any of the First Lien Indebtedness exists, and (iii) the First Lien Indebtedness, and any amounts paid at any time to any First Lien Secured Parties on account thereof with respect thereto, are not subject to avoidance, recharacterization, reduction, disallowance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

## Second Lien Credit Facility

(vi) Pursuant to the Second Lien Credit Agreement, the Second Lien Lenders made loans and/or provided other financial accommodations to or for the benefit of the Debtors from time to time.

(vii) On the First Petition Date, an Event of Default (as defined in the Second Lien Credit Agreement) occurred under Article VII of the Second Lien Credit Agreement when certain of the Debtors commenced their Cases in this Court. As a result of the occurrence and continuance of such Event of Default (and any related Events of Default under Article VII of the Second Lien Credit Agreement caused thereby), from and after the Second Petition Date, the Loans (as defined in the Second Lien Credit Agreement), together with any interest payments thereon and any fees or other amounts owed under the Second Lien Credit Documents, began to bear interest in accordance with Section 2.09 of the Second Lien Credit Agreement.

(viii) Pursuant to the Second Lien Credit Documents, the Debtors were, as of the Second Petition Date, without defense, counterclaim or offset of any kind, jointly and severally

indebted and liable to the Second Lien Agent and the Second Lien Lenders on account of Second Lien Indebtedness (as defined below) in an amount of not less than $206,942,094.63. For purposes of this Interim Order, the term "**Second Lien Indebtedness**" shall mean and include, without duplication, any and all amounts owing or outstanding under the Second Lien Credit Documents (including, without limitation, all Obligations as defined in the Second Lien Credit Agreement) and all interest on, fees and other costs, expenses and charges owing in respect of, such amounts (including, without limitation, any reasonable attorneys', accountants', financial advisors' and other fees and expenses that are chargeable or reimbursable under the applicable provisions of the Second Lien Credit Documents and interest at the default rate in accordance with section 2.09 of the Second Lien Credit Agreement) and any and all obligations and liabilities, contingent or otherwise, owed in respect of the letter of credit or other Obligations (as defined in the Second Lien Credit Agreement) outstanding thereunder (such Second Lien Indebtedness, together with the First Lien Indebtedness, the "**Prepetition Indebtedness**").

(ix)    Pursuant to the Second Lien Credit Documents, the Debtors granted to the Second Lien Collateral Agent for the benefit of the Second Lien Agent and Second Lien Lenders second priority and continuing pledges, liens and security interests (the "**Second Lien Security Interests**") to secure the Second Lien Indebtedness and any guarantees thereof, in to the Prepetition Collateral.

(x)    As of the applicable Petition Date and immediately prior to giving effect to this Interim Order, (a) the Second Lien Credit Documents are valid and binding agreements and obligations of the Debtors and the Second Lien Security Interests (i) constitute valid, binding, enforceable and perfected second priority security interests and Liens, subject only to the First

Lien Security Interests and the Permitted Prior Liens, and (ii) are not subject to avoidance, reduction, recharacterization or disallowance, pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and (b) (i) the Second Lien Indebtedness constitutes the legal, valid, and binding obligation of the Debtors, enforceable in accordance with the terms of the Second Lien Credit Documents, (ii) no objection, offset, defense, or counterclaim of any kind or nature to any of the Second Lien Indebtedness exists, and (iii) the Second Lien Indebtedness, and any amounts paid at any time to any Second Lien Agent or any Second Lien Lender on account thereof with respect thereto, are not subject to avoidance, recharacterization, reduction, disallowance or impairment pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

(xi) Nothing in this Interim Order shall be construed to prejudice or limit in any way the Debtors' right or ability to propose or obtain approval of the DIP Facility and the Debtors agree to work diligently with the First Lien Secured Parties to file a motion for approval of a the DIP Facility so that a final hearing thereon can be heard on or before March 31, 2010, so long as and to the extent consistent with the Debtors' fiduciary duties and obligations to their estates and creditors.

E. The Borrower, the First Lien Collateral Agent and the Second Lien Collateral Agent are parties to that certain intercreditor agreement, dated as of October 30, 2007 (as has been or may be further amended, restated, supplemented or otherwise modified from time to time, the "**Intercreditor Agreement**"), which governs the respective rights, obligations and priorities of the First Lien Lenders and the Second Lien Lenders with respect to the matters referred to therein.

10

F.　Pursuant to that certain Amended and Restated Letter of Credit and Reimbursement Agreement, dated October 30, 2007 (as has been or may be further amended, restated, supplemented or otherwise modified from time to time, the **"L/C Agreement"** and together with the order of the Court and any and all other related documents and agreements entered into in connection with or related to the L/C Agreement, the **"L/C Documents"**) between Valley View and Credit Suisse as issuing bank (in such capacity, the **"L/C Issuer"**), the L/C Issuer extended the PA Gaming L/C to the Commonwealth in connection with Valley View's application for a gaming license in Pennsylvania to secure Valley View's obligations thereunder.

G.　The PA Gaming L/C was set to expire by its terms on October 30, 2009. The Court approved an initial amendment of the PA Gaming L/C by the L/C Issuer to extend the term thereof until January 29, 2010 on an interim basis on October 30, 2009 [D.I. 15] and a final basis on November 23, 2009 [D.I. 50] (the **"Final L/C Order"**). The Court approved a further amendment of the PA Gaming L/C by the L/C Issuer to extend the term thereof for an additional ninety (90) days until April 29, 2010 by Order dated January 25, 2010 [D.I. 82] (the **"Supplemental L/C Order"** and together with the Final L/C Order, the **"Final L/C Orders"**).

H.　Pursuant to the L/C Documents, the Debtors granted to the L/C Issuer a first priority senior lien in the L/C Cash Collateral (the **"L/C Lien"**) and a superpriority administrative expense claim (the **"L/C Claim"** and together with the L/C Lien, the (**"L/C Security Interests"**) as security for the repayment and other obligations arising in connection with the PA Gaming L/C and the L/C Documents.

I.　Prior to the Second Petition Date, the Court, by interim and final orders, dated November 23, 2009 [D.I. 49] and December 4, 2009 [D.I. 60], respectively, authorized the Debtors to obtain unsecured postpetition financing from Centaur, LLC (in such capacity, the

"**Affiliate Lender**") to enable certain of the Debtors to continue to incur, on a postpetition basis, certain limited, but necessary, operating costs, obligations to vendors, consultants, and regulatory authorities related to their gaming license application pending in Pennsylvania, and to satisfy certain nominal prepetition expenses, including expenses related to the gaming license application (the "**Intercompany Financing**"). Pursuant to the final order authorizing the Intercompany Financing, the Affiliate Lender was granted a superpriority administrative expense claim (the "**Intercompany Claim**") with respect to all amounts incurred by the Debtors under the Intercompany Financing, which claim is junior to the L/C Claim and shall also be junior to the Carve-Out.

J.       The First Lien Secured Parties, the Second Lien Agent and the Second Lien Lenders (collectively, the "**Prepetition Secured Parties**") are entitled to receive adequate protection for any diminution in the value of their respective interests in the Prepetition Collateral (calculated in accordance with section 506(a) of the Bankruptcy Code), resulting from the (a) use of the Cash Collateral, (b) use, sale, lease, or depreciation or other diminution in value of the Prepetition Collateral, or (c) as a result of the imposition of the automatic stay under Section 362(a) of the Bankruptcy Code (the amount of any such diminution being referred to hereinafter as the "**Adequate Protection Obligations**"). Pursuant to sections 361, 363 and 507(b), as adequate protection for the Adequate Protection Obligations, the Debtors have agreed to provide the First Lien Secured Parties with the First Lien Adequate Protection and the Second Lien Agent and the Second Lien Lenders with the Second Lien Adequate Protection (each as defined below).

K.       Subject to the adequate protection arrangements provided herein being approved by the Court, the Prepetition Agents on behalf of their respective Prepetition Lenders do not

object to the Debtors' limited use of the Cash Collateral and the adequate protection arrangements contemplated by this Interim Order. The adequate protection and other treatment proposed to be provided by the Debtors pursuant to this Interim Order will minimize disputes and litigation over use of the Cash Collateral and facilitate the Debtors' ability to continue their business operations.

L.　　The Prepetition Secured Parties are entitled upon entry of a Final Order to: (a) a waiver of any "equities of the case" claims under section 552(b) of the Bankruptcy Code and (b) a waiver of the provisions of section 506(c) of the Bankruptcy Code.

M.　　The Debtors require the use of Cash Collateral in order to finance their operations, absent which immediate and irreparable harm will result to the Debtors, their estates and creditors, and the prospects for a successful conclusion of the Cases. In the absence of the use of Cash Collateral, it would be impossible for the Debtors to continue to operate their business, even for a limited period of time, and serious and irreparable harm to the Debtors, their estates and their creditors would occur. The Debtors do not have sufficient available sources of working capital and financing to operate their business in the ordinary course of business or to maintain their properties without the use of Cash Collateral. The relief requested in the Motion is, therefore, of the utmost significance and importance to the preservation and maintenance of the going concern value of the Debtors. The Debtors have negotiated at arms' length and in good faith regarding the terms of the Debtors' use of Cash Collateral hereunder to fund the continued operations of the Debtors for the period through the Termination Date (as defined below), all subject to the terms and conditions set forth in this Interim Order, including the protection afforded an entity acting in "good faith" under section 363(m) of the Bankruptcy Code. Based on the record presented to the Court at the Interim Hearing, the terms of the proposed adequate

protection arrangements and the use of the Cash Collateral are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and are supported by reasonably equivalent value and fair consideration. Entry of this Interim Order is in the best interests of the Debtors and their estates.

N.    At the Final Hearing, the Debtors will seek final approval of the relief requested in the Motion to become effective pursuant to a final order (the "**Final Order**"). Notice of the Final Hearing will be provided in accordance with this Interim Order.

O.    Notice of the Interim Hearing and the interim relief requested in the Motion has been provided by the Debtors to (each of the following, a "**Notice Party**," and collectively, the "**Notice Parties**"): (i) the Office of the United States Trustee for Region 3, serving the District of Delaware (the "**U.S. Trustee**"); (ii) the creditors (excluding insiders) holding the 30 largest unsecured claims on a consolidated basis against the Debtors; (iii) all of the Debtors' secured creditors of record, other than the Prepetition Lenders; (iv) counsel to the Prepetition Agents, for themselves and for the Prepetition Lenders; (v) the L/C Issuer, in its capacity as such; (vi) all of the Debtors' landlords, (vii) the Pennsylvania Harness Racing Commission; (viii) the Commonwealth, (ix) the Indiana Horse Racing Commission, (x) the Indiana Gaming Commission, (xi) the Colorado Limited Gaming Control Commission, (xii) all applicable federal, State and local taxing and environmental authorities, and (xiii) all parties requesting notice pursuant to Bankruptcy Rule 2002. Under the circumstances, the requisite notice of the Interim Hearing and the relief requested in the Motion has been provided in accordance with Bankruptcy Rule 4001, which notice is sufficient for all purposes under the Bankruptcy Code, including, without limitation, sections 102(1) and 364 of the Bankruptcy Code, and no other notice need be provided for entry of this Interim Order.

P.       The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2). Absent entry of this Interim Order, the Debtors' businesses, properties and estates will be immediately and irreparably harmed.

Q.       The consent of the First Lien Secured Parties granted herein, and the deemed consent of the Second Lien Secured Lenders and Second Lien Agent pursuant to the Intercreditor Agreement, is expressly limited to the Debtors' use of Cash Collateral solely on the terms and conditions set forth in this Interim Order. Nothing in this Interim Order, including, without limitation, any of the provisions herein with respect to adequate protection, shall constitute, or be deemed to constitute, a finding that the interests of the Prepetition Secured Parties are or will be adequately protected with respect to any non-consensual use of Cash Collateral.

Based upon the foregoing findings and conclusions, the Motion and the record before this Court with respect to the Motion, and good and sufficient cause appearing therefor, NOW, THEREFORE, IT IS HEREBY ORDERED that:

1.       Motion Granted. The Motion is granted, and the use of Cash Collateral on an interim basis is authorized, subject to the terms and conditions set forth in this Interim Order.

2.       Objections to Entry of Interim Order Overruled. All objections to the entry of this Interim Order, to the extent not withdrawn or resolved, are hereby overruled, except to the extent that such objections may pertain to the Final Order.

3.       Authorization to Use Cash Collateral. Subject to the terms and conditions of this Interim Order, pursuant to sections 363(c)(2) of the Bankruptcy Code, the Debtors are authorized to use Cash Collateral as set forth in the thirty (30) day budget, attached hereto as "Exhibit A", prepared and delivered to the First Lien Agent by the Debtors that reflects projected cash receipts, operating disbursements, payroll disbursements, non-operating disbursements,

maximum capital expenditures, and payment of certain professional fees for the First Lien

Agent, First Lien Lenders and, if appointed, the Committee (as defined below), and cash

balances on a weekly basis, during the period (the "**Specified Period**") from the Second Petition

Date through the earlier of (i) the day after the date on which the Final Hearing concludes and

(ii) the Termination Declaration Date (as defined below), which budget shall be in form and

substance acceptable to the First Lien Agent and Required Lenders (such term as used herein

shall have the meaning ascribed to it in the First Lien Credit Agreement) and may be updated

from time to time pursuant to amendments thereto as approved by the First Lien Agent and

Required Lenders as set forth in paragraph 6 (such budget, as amended, the "**Budget**"). Except

as otherwise expressly provided herein, Cash Collateral may be used during the Specified Period

strictly in accordance with the Budget, subject to the permitted variance described in paragraph

14(l) (the "**Permitted Variances**"). During the Remedies Notice Period (as defined herein), the

Debtors may use Cash Collateral hereunder in accordance with the terms and provisions of the

Budget (subject to Permitted Variances) solely to meet payroll obligations and to pay expenses

critical to the preservation of the Prepetition Collateral incurred during the Remedies Notice

Period, and to pay other expenses in accordance with the terms and conditions of the Budget

(subject to Permitted Variances) incurred prior to the Remedies Notice Period as agreed by the

First Lien Agent and Required Lenders in their reasonable discretion. Absent further order of the

Court, subject only to the preceding sentence, (i) the Debtors shall no longer be authorized

pursuant to this Interim Order to use Cash Collateral without the consent of the First Lien Agent

and Required Lenders, at the expiration of the Specified Period and (ii) if the Final Order is not

entered by March 31, 2010, then the Debtors shall no longer be authorized to use Cash Collateral

pursuant to this Interim Order after April 1, 2010. Nothing in this Interim Order shall be deemed

to authorize the use, sale, lease, encumbrance, or disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as permitted in this Interim Order or other "First Day" order of the Court (in each case consistent with this Interim Order and the Budget), with the prior written consent of the First Lien Agent and Required Lenders, and in accordance with the Budget (subject to Permitted Variances).

4.     Upon entry of an order by the Court on or about the date hereof approving the Debtors' *Motion for an Order (I) Authorizing Continued Use of Existing (A) Cash Management Systems, (B) Bank Accounts, and (C) Business Forms; (II) Granting Administrative Expense Priority Status to Certain Intercompany Transactions; and (III) Waiving Investment and Deposit Requirements* (the "**Cash Management Motion**"), the Debtors shall, subject to the terms of such order (the "**Cash Management Order**"), be authorized to continue the use of their cash management systems; provided, however, that notwithstanding anything to the contrary in the Cash Management Order, the Borrower shall, except as provided in Paragraph 11(a), cause each of the Restricted Subsidiaries to, deposit in an Investment Account (as such term is defined in the First Lien Credit Agreement) and, until utilized or disbursed, maintain on deposit in such an account, all available funds other than: (i) On-Site Cash (as defined in the First Lien Credit Agreement), (ii) funds required to be deposited into Gaming Reserves or Racing Reserves (each as defined in the First Lien Credit Agreement), (iii) funds held, pursuant to ordinary course operations, in payroll accounts of Persons (as defined in the First Lien Credit Agreement) providing the Debtors payroll services, (iv) funds on deposit in 401(k) and pension accounts established in the ordinary course of business, and (v) funds on deposit in one or more accounts

subject to Liens (as defined in the First Lien Credit Agreement) permitted pursuant to Section 6.02(r) of the First Lien Credit Agreement.

5.    Budget Maintenance. The Budget and any modifications to, or extensions, amendments or updates of, the Budget shall be in form and substance consented to and approved in writing by the First Lien Agent and Required Lenders, which consent and approval shall not be unreasonably withheld.

6.    First Lien Secured Parties' Adequate Protection. In consideration for the use of Cash Collateral (solely upon the terms and conditions of this Interim Order), the First Lien Secured Parties shall receive the following as adequate protection (the "**First Lien Adequate Protection**"):

(i)    Solely to the extent of any diminution in value of the interests of the First Lien Secured Parties in the Prepetition Collateral, calculated in accordance with section 506(a) of the Bankruptcy Code, the First Lien Secured Parties are hereby granted (effective and perfected as of the Second Petition Date and without the necessity of the execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements or other agreements) a valid and perfected replacement security interest in, and lien on (the "**First Lien Replacement Liens**"), all of the right, title and interest of the Debtors in, to and under all present and after-acquired property and assets of the Debtors of any nature whatsoever, whether real or personal, tangible or intangible, wherever located, including, without limitation, all cash and Cash Collateral of the Debtors (including, all Cash and Cash Equivalents (as such terms are defined in the First Lien Credit Agreement) described in subclauses (b)(i) through (b)(ix) of Section 5.16 of the First Lien Credit Agreement, unless any valid and enforceable rule of law, statute or regulation prohibits the creation, attachment or perfection of a lien or security interest therein) and any investment of

such cash and Cash Collateral, cash equivalents, bank accounts, accounts, deposit accounts, supporting obligations, all intercompany notes, intercompany claims, goods, cash-in-advance deposits, contracts, causes of action, general intangibles, accounts receivable, and other rights to payment, whether arising before or after the applicable Petition Date, chattel paper, documents, instruments, interests in leaseholds, real properties, plants, machinery, equipment, patents, copyrights, trademarks, trade names or other intellectual property, licenses, insurance proceeds, and tort claims, and any and all of the proceeds, products, offspring, rents and profits thereof, rights under letters of credit, capital stock and other equity or ownership interests held by the Debtors, including equity interests in subsidiaries and all other investment property, and the proceeds of all of the foregoing, whether now existing or hereafter acquired, in each case, unless any valid and enforceable rule of law, statute or regulation prohibits the creation, attachment or perfection of a lien or security interest therein (collectively, the "**Collateral**"), including, ~~upon~~ ~~entry of~~ the Final Order, the Debtors' claims and causes of action under section 544, 545, 547, 548, 549 or 550 of the Bankruptcy Code (collectively, the "**Avoidance Actions**") and the proceeds of the Avoidance Actions; and provided that the First Lien Replacement Lien or an additional lien pursuant to section 361(2) of the Bankruptcy Code shall encumber the L/C Cash Collateral (or any Cash Collateral that is the proceeds of the L/C Collateral) in an amount not to exceed $165,000 during the Specified Period which amount shall not be increased absent further order the Court. Subject to the Carve-Out (as defined below) and the Permitted Prior Liens, the First Lien Replacement Liens shall be (i) first priority perfected liens on all of the Collateral that is not otherwise encumbered by validly perfected, non-avoidable security interests or liens as of the Second Petition Date, (ii) first priority perfected liens on all of the Collateral as to which the First Lien Secured Parties had a valid and perfected first priority lien as of the Second Petition

Date, even if such Collateral is subject to a validly perfected lien that is junior to the lien of the First Lien Secured Parties, and (iii) junior perfected liens on all Collateral that is subject to a validly perfected lien with priority over the First Lien Secured Parties' liens as of the Second Petition Date;

a.       The First Lien Replacement Liens shall be enforceable against the Debtors, their estates and any successors thereto, including without limitation, any trustee or other estate representative appointed or elected in the Cases, or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "**Successor Cases**"). Except as provided herein, the First Lien Replacement Liens shall not be made subject to or *pari passu* with any lien or security interest by any court order heretofore entered in the Cases, and shall be valid and enforceable against any trustee appointed or elected in any of the Cases or any Successor Cases, or upon the dismissal of any of the Cases or Successor Cases. The First Lien Replacement Liens shall not be subject to sections 506(c) (effective upon entry of the Final Order), 510, 549, or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of any estate pursuant to section 551 of the Bankruptcy Code shall be made *pari passu* with or senior to the First Lien Replacement Liens;

(ii)     As further adequate protection, the First Lien Secured Parties are each hereby granted an allowed administrative claim (the "**First Lien Administrative Claim**") against the Debtors' estates under section 507(b) of the Bankruptcy Code to the extent that the First Lien Replacement Liens do not adequately protect the diminution in the value of the First Lien Secured Parties' interest in the Prepetition Collateral, which First Lien Administrative Claim, if any, shall be junior and subordinate only to the L/C Claim and the Carve-Out and shall have

priority over all administrative expense claims and unsecured claims against the Debtors or their

estates, which are now existing, of any kind or nature whatsoever, including, without limitation,

administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328,

330, 331, 364, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b),

546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 of the Bankruptcy Code;

provided that, nothing contained in this paragraph shall preclude any party in interest from

asserting that no section 507(b) administrative expense should be allowed against Valley View in

excess of $165,000 in the aggregate for the Specified Period but only to the extent that the

Intercreditor Agreement or a further order of the Court does not preclude such party from

making such assertion; and

(iii) The Debtors shall promptly pay the reasonable monthly fees and expenses, without

the necessity of any further application to the Court for approval or payment, of (i) Latham &

Watkins LLP, counsel to the First Lien Agent and the First Lien Lenders, (ii) Duane Morris LLP,

as Delaware legal counsel to the First Lien Agent and the First Lien Lenders, (iii) Ruben &

Aronson as Pennsylvania gaming counsel for the First Lien Agent and First Lien Lenders and (iv)

Barnes & Thornburg LLP as Indiana gaming counsel for the First Lien Agent and First Lien

Lenders; provided that none of such fees and expenses as adequate protection payments

hereunder shall be subject to approval by the Court or the United States Trustee Guidelines, but

such professional shall provide copies of summary invoices and statements (subject in all

respects to applicable privilege or work product doctrines) to the official committee of unsecured

creditors appointed in the Cases (the "**Committee**") and the U.S. Trustee and the Debtors shall

promptly pay all reasonable fees and expenses not subject to objection of the U.S. Trustee within

ten business days after the receipt of such invoices. No recipient of any such payment shall be

required to file with respect thereto any interim or final fee application with the Court; provided, however, that the Court shall have jurisdiction to determine any dispute concerning such invoices, and provided, further, however, that such payments shall be provisional in nature, and if and to the extent that any payment(s) is challenged by a party in interest under section 506(b) of the Bankruptcy Code and ultimately not allowed under such provision, such payment(s) may be recharacterized as a payment of principal on the First Lien Indebtedness or as the Court may otherwise order.

       7.     Second Lien Agent's and Second Lien Lenders' Adequate Protection. In consideration for the use of Cash Collateral and the priming of the Second Lien Agent's and Second Lien Lenders' liens, claims and interests in the Prepetition Collateral (solely upon the terms and conditions of this Interim Order), the Second Lien Agent and Second Lien Lenders shall receive the following as adequate protection (the "**Second Lien Adequate Protection**" and, together with the First Lien Adequate Protection, the "**Adequate Protection**"):

      (i)     Solely to the extent of any diminution in the value of the interest of the Second Lien Agent and the Second Lien Lenders in the Prepetition Collateral, calculated in accordance with section 506(a) of the Bankruptcy Code, the Second Lien Agent, for the benefit of the Second Lien Lenders, is granted replacement liens on the Collateral (the "**Second Lien Replacement Liens**," and together with the First Lien Replacement Liens, the "**Replacement Liens**"), which liens are valid, binding enforceable and fully perfected as of the date hereof and shall be subordinate only to the Permitted Prior Liens, the First Lien Security Interests, the First Lien Replacement Liens and the Carve-Out;

      a.     The Second Lien Replacement Liens shall be enforceable against the Debtors, their estates and any successors thereto, including without limitation, any trustee or

other estate representative appointed or elected in the Cases or any Successor Cases. Except as provided herein, the Second Lien Replacement Liens shall not be made subject to or *pari passu* with any lien or security interest by any court order heretofore entered in the Cases, and shall be valid and enforceable against any trustee appointed or elected in any of the Cases or Successor Cases, or upon the dismissal of any of the Cases or Successor Cases. The Second Lien Replacement Liens shall not be subject to sections 506(c) (~~effective upon entry of~~ the Final Order), 510, 549, or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of any estate pursuant to section 551 of the Bankruptcy Code shall be made *pari passu* with or senior to the Second Lien Replacement Liens; and

(ii)     An allowed administrative claim (the "**Second Lien Administrative Claim**") against the Debtors' estates under section 507(b) of the Bankruptcy Code to the extent that the Second Lien Replacement Liens do not adequately protect the diminution in the value of the interest of the Second Lien Lenders in the Prepetition Collateral, which Second Lien Administrative Claim, if any, shall be junior and subordinate only to the L/C Claim, the First Lien Administrative Claim and the Carve-Out and shall have priority over all administrative expense claims and unsecured claims against the Debtors or their estates, which are now existing, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c) (~~subject to entry of~~ the Final Order), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 of the Bankruptcy Code; provided that, nothing contained in this paragraph shall preclude any party in interest from asserting that no section 507(b) administrative expense should be allowed against Valley View in excess of \$165,000 in

the aggregate for the Specified Period but only to the extent that the Intercreditor Agreement or a further order of the Court does not preclude such party from making such assertion.

8.      Modification of Automatic Stay. The automatic stay under Bankruptcy Code section 362(a) is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to: (a) permit the Debtors to grant the Adequate Protection; (b) permit the Debtors to perform such acts as the First Lien Agent may request in its sole discretion to assure the perfection and priority of the liens granted herein; and (c) authorize the Debtors to make payments made in accordance with the terms of this Interim Order.

9.      Perfection of Adequate Protection Liens. This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the security interests and liens granted under this Interim Order, without the necessity of filing or recording any mortgage, financing statement or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement, the taking possession of any of the Collateral of the Debtors, the execution of any control, lock-box, deposit account, or the taking of any action to have security interests or liens noted on certificates of title or similar documents) to validate or perfect (in accordance with applicable non-bankruptcy law) the security interests and liens granted herein, or to entitle the Prepetition Secured Parties to the priorities granted herein. Notwithstanding the foregoing, the First Lien Agent may, in its sole discretion, file such financing statements, mortgages, deeds of trust, notices of lien, or similar instruments or otherwise confirm perfection of such liens, security interests, and mortgages without seeking modification of the automatic stay under section 362 of the Bankruptcy Code

and all such documents shall be deemed to have been filed or recorded at the time of and on the applicable Petition Date. Any entity holding property of the Debtors' estates shall cooperate promptly with the First Lien Agent in the execution of documents or other acts as the First Lien Agent may request in its sole discretion to confirm perfection of the liens granted to the First Lien Agent and the First Lien Lenders hereunder.

      10.    [Reserved].

      11.    <u>Debtors' Obligations.</u>· The Debtors shall:

      a.    After all amounts due and payable to the L/C Issuer under the L/C Agreement shall have been duly paid and upon the release of the L/C Cash Collateral by the L/C Issuer to the Debtors as described in <u>paragraph D(iv)</u> of this Interim Order and in accordance with the L/C Agreement, the Debtors upon the receipt thereof shall cause such amounts to be deposited upon further order of the Court into an account acceptable to Required Lenders.

      b.    Utilize Cash Collateral to pay the expenses of the operation of their business consistent with the Budget (subject to Permitted Variances);

      c.    Deliver to the First Lien Agent on or before the close of business on Friday of each week (and if such day is not a business day, then the next succeeding business day) a (i) comparison for the prior week of actual results of all items contained in the Budget to the amounts originally contained in the Budget and (ii) cumulative comparison for the period from the Second Petition Date through the end of the prior week of the actual results of all items contained in the Budget to the amounts originally contained in the Budget, in each case along with such supporting information as the First Lien Agent may request;

      d.    Provide the First Lien Agent with an updated Budget for the next succeeding thirty (30) day period within ten (10) days prior to the end of each calendar month

and, once in a form acceptable to the Debtors and the First Lien Agent, provide that updated Budget to the Committee and the Second Lien Agent;

      e.     Provide (i) the First Lien Agent with monthly, quarterly and annual financial reports in accordance with Section 5.01 of the First Lien Credit Agreement and such additional business, financial, corporate affairs and other information with respect to the business, financial condition, assets or results of operations of the Debtors as the First Lien Agent or the Required Lenders may from time to time reasonably request, including, without limitation, cash expenditures in relation to the Budget and (ii) the Second Lien Agent with monthly, quarterly and annual financial reports in accordance with Section 5.01 of the Second Lien Credit Agreement; and

      f.     Serve the First Lien Agent, the Committee (if appointed) and their respective counsel with a copy of each monthly report filed by the Debtors in these Cases as required by the Court, the U.S. Trustee or applicable law.

      12.     Cash Management. The Debtors shall maintain the cash management system set forth in the Cash Management Order (as may be amended or supplemented from time to time) during the period that this Interim Order is in effect, unless otherwise extended by the Court.

      13.     Disposition of Collateral. The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the Collateral without the prior written consent of the First Lien Agent.

      14.     Events of Default. The occurrence of any of the following events, unless waived by the First Lien Agent and Required Lenders, shall constitute an event of default (collectively, the "**Events of Default**"):

NEWYORK 7536454 v16 (2K)        26

a.       the failure by the Debtors to perform, in any respect, any of the terms, provisions, conditions, covenants, or obligations under this Interim Order, including, without limitation, the failure to make any payment required pursuant to paragraph 6(iii) of this Interim Order;

b.       the Debtors' obtaining of credit or the incurring of indebtedness without the consent of the First Lien Agent and Required Lenders that is (i) secured by a security interest, mortgage or other lien on all or any portion of the Collateral which is equal or senior to any security interest, mortgage or other lien of the First Lien Secured Parties, or (ii) entitled to priority administrative status which is equal or senior to that granted to the First Lien Secured Parties;

c.       any lien or security interest purported to be created under the Prepetition Credit Documents shall cease to be, or shall be asserted by any Debtor not to be, a valid and perfected lien on or security interest in any Collateral, with the priority required by the Prepetition Credit Documents or herein;

d.       the entry of an order by the Court granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (i) to allow any creditor to execute upon or enforce a lien on or security interest in any Collateral having a value in excess of $1,000,000, or (ii) with respect to any lien of or the granting of any lien on any Collateral to any state or local environmental or regulatory agency or authority, which in either case would have a material adverse effect on the business, operations, property, assets, or condition, financial or otherwise, of the Debtors;

e.       reversal, vacatur, or modification (other than a modification acceptable to the First Lien Agent and Required Lenders in accordance with the Final Order or a

modification with the express prior written consent of the First Lien Agent and Required Lenders) of this Interim Order;

        f.     dismissal of the Cases or conversion of the Cases to chapter 7 cases, or appointment or election in the Cases of a chapter 11 trustee or examiner with enlarged powers or other responsible person;

        g.     any misrepresentation of a material fact made after the Second Petition Date by any of the Debtors or their agents to the First Lien Secured Parties about the financial conditions of the Debtors, or any of them, the nature, extent, location or quality of any Collateral, or the disposition or use of any Collateral, including Cash Collateral;

        h.     a default by any of the Debtors (after a grace period of one business day) in reporting financial information as and when required under this Interim Order;

        i.     the sale of any material portion of any of the Debtors' assets outside the ordinary course of business without the prior written consent of the First Lien Agent and the Required Lenders in their sole discretion;

        j.     April 1, 2010 if the Final Order has not been entered by the Court by such date;

        k.     the filing of a chapter 11 plan in any of the Cases that fails to provide for the payment in full, in cash or as otherwise expressly authorized under any postpetition financing arrangement with the consent of the Required Lenders, of the First Lien Indebtedness, on the effective date of such plan;

        l.     the Debtors' total disbursements (excluding the line item disbursements for "gaming taxes" and "racing taxes" as set forth in the Budget), during any week, exceeds 110% of the aggregate amount of disbursements (excluding the line item

disbursements for "gaming taxes" and "racing taxes" as set forth in the Budget) projected in the Budget for such week, provided that any disbursement amount not expended during any week may be carried over to the following weeks covered in the then current Budget; or

m. any material increase in the gaming taxes or racing taxes payable by the Debtors that is not currently anticipated and which results from a change in the existing tax or regulatory scheme to which the Debtors are subject.

15. <u>Rights and Remedies Upon Event of Default</u>. Immediately upon the occurrence and during the continuation of an Event of Default, the First Lien Agent may declare a termination, reduction or restriction of the ability of the Debtors to use any Cash Collateral under this Interim Order, except for the limited use of Cash Collateral provided in Paragraphs 3 and 16 hereof (any such declaration, shall be referred to herein as a "**Termination Declaration**"). The Termination Declaration shall be given by facsimile (or other electronic means) to counsel to the Debtors, counsel to any Committee, and the U.S. Trustee (the earliest date any such Termination Declaration is made shall be referred to herein as the "**Termination Declaration Date**"). On the Termination Declaration Date, the Debtors' right to use Cash Collateral under this Interim Order shall automatically cease, except as provided in Paragraphs 3 and 16 hereof. Within five (5) business days after the Termination Declaration Date (the "**Remedies Notice Period**") the Debtors and/or the Committee (and it being a term of this Interim Order that no other party shall have standing to do so) shall be entitled to seek an emergency hearing with the Court, at which the only issue the Debtors and/or the Committee shall be allowed to assert in support of the Debtors' right to use Cash Collateral under this Interim Order is whether an Event of Default actually occurred. Unless the Court determines otherwise during the Remedies Notice Period, the Debtors shall no longer have the right to use or

seek to use Cash Collateral under this Interim Order on a consensual basis. Nothing in this Interim Order shall preclude or prejudice in any way the Debtors' and/or the Committee's right to seek nonconsensual use of Cash Collateral, or any right of parties in interest to oppose such request.

16. Carve Out.

a. Carve Out. Subject to the terms and conditions contained in this paragraph, the Adequate Protection Obligations, the liens and claims held by the Prepetition Secured Parties and the L/C Claim, which have the relative lien and payment priorities as set forth herein, shall, in any event, in all cases be subject and subordinate to a carve-out (the "**Carve-Out**"), which shall be comprised of the following: (i) all fees required to be paid to the Clerk of the Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930(a); (ii) subject to Court approval, the sum of (A) and (B), where (A) is the aggregate amount of the Debtors' professional fees and disbursements which have been incurred, accrued, or invoiced in accordance with the Budget (but remain unpaid) prior to the earlier of (i) the date on which the First Lien Agent provides written notice that an Event of Default has occurred and has triggered the Carve-Out (a "**Carve-Out Trigger Notice**") and (ii) the date on which a responsible officer of the Debtors becomes aware that an Event of Default has occurred (subclauses (i) and (ii), the "**Carve-Out Trigger Date**"), in either case, for any professional retained by an order of the Court under section 327 or 328 of the Bankruptcy Code, and (B) is the aggregate amount of fees and disbursements of the Debtors' retained professionals accrued in accordance with the Budget after the Carve-Out Trigger Date, up to $750,000, and (iii) subject in all cases to the limitations set forth in the Interim and Final Orders and to Court approval, the sum of (C) and (D), where (C) is the aggregate amount, of the Committee, if one is so appointed, professional fees and

disbursements which have been incurred, accrued or invoiced in accordance with the Budget (but remain unpaid) prior to the Carve-Out Trigger Date for any professional retained by an order of the Court under section 1102 of the Bankruptcy Code, and (D) is the aggregate amount of fees and disbursements of any Committee's retained professionals accrued after the Carve-Out Trigger Date, up to $100,000. The Carve-Out shall exist at all times, but only be triggered and payable (and, in the case where the Carve-Out Trigger Notice is delivered, may be delivered only) upon the occurrence of an Event of Default. In all cases, the Carve-Out, Cash Collateral and the L/C Cash Collateral shall not include, apply to, or be available for any fees or expenses incurred by any party, including the Debtors or the Committee, in connection with (i) the initiation or prosecution of any claims, causes of action, adversary proceedings, or other litigation against any of the Prepetition Secured Parties, including, without limitation, challenging the amount, validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim, or offset to the Prepetition Indebtedness or the Adequate Protection granted herein, and (ii) asserting any claims or causes of action, including, without limitation, claims or actions to hinder or delay the First Lien Agent's or First Lien Secured Parties' assertion, enforcement or realization on the Collateral in accordance with this Interim Order. The foregoing shall not be construed as consent to the allowance of any Professional Fees referred to above and shall not affect the right of the Debtors, the First Lien Agent, the First Lien Lenders, the Second Lien Agent, the Committee, the U.S. Trustee, or other parties-in-interest to object to the allowance and payment of such amounts. The Prepetition Secured Parties shall not be responsible for the direct payment or reimbursement of any Professional Fees incurred in connection with the Cases or any Successor Cases.

b.    Payment of any obligations within the Carve-Out shall not and shall not be deemed to reduce the Prepetition Indebtedness or the Adequate Protection Obligations and shall not and shall not be deemed to subordinate the Adequate Protection liens and claims granted to the Prepetition Secured Parties in this Interim Order to any junior prepetition or postpetition lien, interest, or claim in favor of any other party.

17.    Investigation Rights. Notwithstanding anything to the contrary in this Interim Order, including the Debtors' Stipulations and releases herein solely as they relate to the Prepetition Agents, the Prepetition Lenders and the Prepetition Credit Documents, the Committee, if appointed, and all non-Debtor parties-in-interest (including any trustee appointed or elected in the Cases prior to the Challenge Period Termination Date (as defined below)) and any trustee subsequently appointed or elected in the Cases shall have until the later of (i) seventy-five days from the date of entry of this Interim Order and (ii) sixty days from the date of the formation of the Committee (the "**Challenge Period**") to investigate the validity, perfection, and enforceability of the liens on the Prepetition Collateral issued pursuant to the Prepetition Credit Documents and the amount and allowability of the Prepetition Indebtedness, or to object to or assert any other claims or causes of action against any of the Prepetition Secured Parties (each, a "**Challenge**"). If the Committee or any non-Debtor party in interest determines that there may be a Challenge, such Committee or other non-Debtor party in interest shall be permitted to file and prosecute an objection or claim related thereto, on or before the expiration of the Challenge Period (the "**Challenge Period Termination Date**").[3] Such challenge shall include any action or adversary proceeding (including a motion seeking authority to file an

---

[3]    Until the occurrence of the Challenge Period Termination Date, the Debtors' stipulations and releases herein shall not be binding upon the Committee and any non-debtor parties in interest.

action, if required) on behalf of the Debtors' estates setting forth the basis of any such challenge, claim or cause of action. Upon either the Challenge Period Termination Date without the filing of a Challenge or, in the event that a Challenge is timely filed, the Court rules against the party asserting such Challenge, each stipulation, admission and agreement contained in this Interim Order, including, without limitation, the Debtors' Stipulations, shall be irrevocably binding on the Debtors and their estates (and any successor thereto), the Committee and all parties-in-interest (including, without limitation, any chapter 11 trustee, chapter 7 trustee, receiver, administrator, examiner or other estate representative appointed or elected in any of the Cases or in any Successor Case in any jurisdiction) without further action by any party or this Court and the Committee and any other party in interest (including, without limitation, any chapter 11 trustee, chapter 7 trustee, receiver, administrator, examiner or other estate representative appointed or elected in any of the Cases or in any Successor Case in any jurisdiction), under all circumstances and for all purposes. Notwithstanding anything to the contrary herein, if any such Challenge is properly and timely commenced, each stipulation, admission and agreement contained in this Interim Order, including, without limitation, the Debtors' Stipulations, shall nonetheless remain binding on all parties-in-interest and preclusive as provided above except to the extent that such stipulations, admissions and agreements are contested or disputed in such Challenge and a final non-appealable order is entered by the Court upholding such Challenge. Nothing in this Interim Order vests or confers on any Entity (as defined in the Bankruptcy Code), including the Committee or any other statutory committee appointed in the Cases, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including any Challenge with respect to the Prepetition Credit Documents or the Prepetition Indebtedness; provided, however, in the event that the Committee files a motion with the Court seeking

33

standing to bring a Challenge (the "**Standing Action**") prior to the expiration of the Challenge Period Termination Date, then the Challenge Period Termination Date with respect to the Committee only (and no other entity) will be tolled until ten (10) days after the date on which the Court enters an order granting or denying the Standing Action.

18. No Third Party Rights. Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

19. Limitation on Additional Surcharges. With the exception of the Carve-Out, upon entry of the Final Order, the Debtors (for themselves and for any trustee or estate representative appointed in the Cases or any Successor Case) waive for the benefit and in favor of the Prepetition Secured Parties the right to surcharge the Collateral, pursuant to section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the applicable Agent and no such consent shall be implied from any other action, inaction, or acquiescence by the Prepetition Secured Parties in this proceeding. Upon entry of the Final Order, the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral. Upon entry of a Final Order, the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral.

20. No Liability to Third Parties. In not objecting to the Debtors' use of Cash Collateral under the terms set forth herein or in taking any other actions related to this Interim Order, the Prepetition Secured Parties shall not owe any fiduciary duty to the Debtors, their

creditors or their estates. The Prepetition Secured Parties' relationship with any Debtor shall not constitute or be deemed to constitute a joint venture or partnership with any Debtor.

21. Rights Preserved. Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the First Lien Secured Parties' right to seek any other or supplemental relief in respect of any Debtor, including the right to seek additional adequate protection and the Second Lien Lenders' right to seek additional adequate protection to the extent expressly permitted under the Intercreditor Agreement (in each case, without prejudice to any other person's right to object to or otherwise oppose such additional adequate protection); or (b) any of the rights of any of the First Lien Secured Parties under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Cases or a Successor Case, conversion of any of the Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans. This Interim Order shall not be deemed to be an amendment or modification to the Intercreditor Agreement or Prepetition Credit Documents.

22. Section 507(b) Reservation. Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to any of the Prepetition Secured Parties hereunder is insufficient to compensate for any diminution in value of their interests in the Prepetition Collateral during the Cases or any Successor Cases; provided that such application shall be consistent with the priorities set forth in this Interim Order. Nothing contained herein shall be deemed a finding by the Court, or an acknowledgement by the Prepetition Secured Parties, that the adequate protection granted herein

does in fact adequately protect the Prepetition Secured Parties against any diminution in value of their respective interest in the Prepetition Collateral (including Cash Collateral).

23. No Waiver by Failure to Seek Relief. The failure of any of the Prepetition Secured Parties to seek relief or otherwise exercise its rights and remedies under this Interim Order or applicable law, as the case may be, shall not constitute a waiver of any rights hereunder, thereunder, or otherwise of the applicable Prepetition Secured Parties.

24. Proofs of Claim. None of the L/C Issuer or the Prepetition Secured Parties will be required to file proofs of claim in any of the Cases with respect to any obligations under the L/C Documents, the Prepetition Credit Documents or any other claims or liens granted hereunder or created hereby. The Prepetition Agents are hereby authorized and entitled, in their sole discretion, but not required, to file (and amend and/or supplement, as they see fit) aggregate proofs of claim in each of the Cases on behalf of (a) all of the First Lien Secured Parties and (b) all of the Second Lien Lenders, each in respect of the Prepetition Indebtedness. Any proof of claim so filed shall be deemed to be in addition and not in lieu of any other proof of claim that may be filed by any of the Prepetition Secured Parties. Any order entered by the Bankruptcy Court in relation to the establishment of a bar date in any of the Cases will so provide.

25. Good Faith. The Prepetition Secured Parties have acted in good faith in connection with this Interim Order and their reliance on this Interim Order is in good faith.

26. Binding Effect of Interim Order. The provisions of this Interim Order shall be binding upon all parties-in-interest in the Cases, including the L/C Issuer, the Prepetition Secured Parties, the Committee and any other statutory committee that may be appointed in the Cases, and the Debtors and their respective successors and assigns and shall inure to the benefit of the L/C Issuer, the Prepetition Secured Parties and the Debtors, and their respective successors

and assigns. Except as provided for in paragraph 17, to the extent permitted by applicable law, this Interim Order shall bind any trustee hereafter appointed or elected for the estate of any of the Debtors, whether in these Cases or in the event of the conversion of any of the Cases to a liquidation under chapter 7 of the Bankruptcy Code. Such binding effect is a benefit of the Prepetition Secured Parties' bargain in connection with the Debtors' use of Cash Collateral and is an integral part of this Interim Order. In the event of any inconsistency between the provisions of this Interim Order and any other order (including any "First Day" order), the provisions of this Interim Order shall govern and control. Any payments to be made under any order (including any "First Day" order) shall be made in accordance with this Interim Order and the Budget (subject to Permitted Variances).

27.     Survival. The provisions of this Interim Order and any actions taken pursuant hereto shall survive the entry of any order: (i) confirming any plan of reorganization in any of the Cases; (ii) converting any of the Cases to a chapter 7 case; or (iii) dismissing any of the Cases, and the terms and provisions of this Interim Order, including, for the avoidance of doubt the provisions in paragraph 17 of this Interim Order, as well as the Adequate Protection granted pursuant to this Interim Order shall continue in full force and effect notwithstanding the entry of any such order, and such claims and liens shall maintain their priority as provided by this Interim Order, and the Prepetition Credit Documents and to the maximum extent permitted by law until all of the First Lien Indebtedness is indefeasibly paid in full in cash, or as otherwise expressly authorized under any postpetition financing arrangement with the consent of the First Lien Agent and the Required Lenders, and discharged.

28.     Final L/C Orders. The Final L/C Orders shall remain in full force and effect.

29.    Subsequent Reversal. If any or all of the provisions of this Interim Order are hereafter modified, vacated, amended, or stayed by subsequent order of this Court or any other court without the consent of the First Lien Agent and Required Lenders: (i) such modification, vacatur, amendment, or stay shall not affect the validity of any obligation of any of the Prepetition Secured Parties that is or was incurred prior to the effective date of such modification, vacatur, amendment, or stay (the "**Effective Date**"), or the validity, enforceability or priority of the Adequate Protection or other grant authorized or created by this Interim Order; (ii) the Adequate Protection pursuant to this Interim Order arising prior to the Effective Date shall be governed in all respects by the original provisions of this Interim Order and the validity of any such credit extended or security interest granted pursuant to this Interim Order is and shall be protected by section 364(e) of the Bankruptcy Code; (iii) Adequate Protection furnished to the Prepetition Secured Parties pursuant to this Interim Order shall be governed in all respects by the original provisions of this Interim Order, the Intercreditor Agreement and the Prepetition Credit Documents.

30.    Effect of Dismissal of Cases. If the Cases are dismissed, converted or substantively consolidated, then neither the entry of this Interim Order nor the dismissal, conversion or substantive consolidation of these Cases shall affect the rights of the Prepetition Secured Parties (to the extent of Adequate Protection provided hereunder) under their respective documents or this Interim Order, and all of the respective rights and remedies thereunder of the Prepetition Secured Parties (to the extent of Adequate Protection provided hereunder) shall remain in full force and effect as if the Cases had not been dismissed, converted, or substantively consolidated. If an order dismissing any of the Cases is at any time entered, such order shall provide (in accordance with Sections 105 and 349 of the Bankruptcy Code) that (i) the Adequate

Protection granted to and conferred upon the Prepetition Secured Parties shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order and the Intercreditor Agreement until such Adequate Protection has been satisfied, (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purpose of enforcing the Adequate Protection referred to herein, and (iv) any hearing on a motion to dismiss any of the Cases shall require at least twenty days prior notice. The provisions of this Interim Order, and any actions taken pursuant hereto, shall survive the entry of and shall govern with respect to any conflict with any order that may be entered confirming any plan of reorganization or converting any of the Cases from Chapter 11 to Chapter 7.

31.     Findings of Fact and Conclusions of Law. This Interim Order constitutes findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon the entry thereof.

32.     Effect of this Interim Order. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon execution thereof. Notwithstanding anything to the contrary contained in this Interim Order, the Adequate Protection granted to the Prepetition Secured Parties pursuant to this Interim Order shall be granted for the period from the Second Petition Date through the date that the Debtors cease using the Cash Collateral.

33.     Final Hearing. A final hearing on the Motion shall be heard before this Court on March 29, 2010 at 10:00 a.m. (Prevailing Eastern Time) at the United States Bankruptcy Court for the District of Delaware, Bankruptcy Court, 824 North Market Street, 5th Floor, Courtroom 5, Wilmington, Delaware 19801.

34. **Adequate Notice.** The notice given by the Debtors of the Interim Hearing was given in accordance with Bankruptcy Rule 4001(c)(2). Within three business days after the Court's entry of this Interim Order, the Debtors shall mail copies of this Interim Order and notice of the Final Hearing to the Notice Parties and (i) known holders of a Lien against any of the Debtors' assets and (ii) all landlords of the Debtors. Any party-in-interest objecting to the relief sought in the Final Order shall submit any such objection in writing and file same with the Court (with a courtesy copy to chambers) and serve (so as to be received) such objection no later than March 22, 2010 at 4:00 p.m. on the following:

(a) Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801;

(b) Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022 (Attn: Mitchell A. Seider and Catherine M. Martin);

(c) Duane Morris LLP, Suite 1200, 1100 North Market Street, Wilmington, Delaware 19801 (Attn: Michael R. Lastowski);

(d) White & Case LLP, 1155 Avenue of the Americas, New York, New York 10036 (Attn: Gerard Uzzi);

(e) White & Case LLP, 200 South Biscayne Boulevard, Suite 4900, Miami, Florida 33131 (Attn: Michael C. Shepherd); and

(f) Fox Rothschild LLP, 919 North Market Street, Suite 1600, Wilmington, Delaware 19801 (Attn: Jeffrey M. Schlerf and L. Jason Cornell).

35.     Retention of Jurisdiction. The Court has and will retain jurisdiction to

enforce this Interim Order according to its terms.

Dated: March \\ , 2010
        Wilmington, Delaware

                                        _____
                                        UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT A

**Budget**

**Project Chieva**
Weekly Cash Flow Summary
*(in thousands)*

| Period<br>Week Ending | 1E<br>3/13/2010 | 2E<br>3/20/2010 | 3E<br>3/27/2010 | 4E<br>4/3/2010 | 5E<br>4/10/2010 | 6E<br>4/17/2010 | Cumulative |
|---|---|---|---|---|---|---|---|
| **Receipts** | | | | | | | |
| Casino [1] | $4,350 | $4,332 | $4,210 | $4,564 | $4,267 | $4,267 | $25,790 |
| Racing [2] | 517 | 452 | 504 | 573 | 637 | 637 | 3,320 |
| Food / Beverage / Retail [3] | 183 | 154 | 184 | 178 | 127 | 127 | 984 |
| Hotel [4] | 32 | 32 | 32 | 32 | 10 | 10 | 147 |
| Credit collection Fees, other operating receipts | 47 | 47 | 47 | 41 | 43 | 43 | 283 |
| Credit Card Deposits | 21 | 21 | 21 | 31 | 19 | 19 | 126 |
| **Total Receipts** | 5,150 | 5,068 | 4,998 | 5,216 | 5,106 | 5,106 | 30,645 |
| **Disbursements** | | | | | | | |
| Casino | 162 | 724 | 162 | 423 | 391 | 511 | 1,991 |
| Racing | 999 | 1,377 | 158 | 151 | 164 | 1,597 | 4,125 |
| Food / Beverage / Retail | 198 | 198 | 198 | 198 | 172 | 172 | 1,133 |
| Hotel | 8 | 8 | 8 | 8 | 4 | 4 | 40 |
| Payroll | 155 | 1,240 | 250 | 1,240 | 233 | 1,290 | 4,440 |
| Benefits | 142 | 123 | 142 | 303 | 156 | 142 | 1,012 |
| Marketing | 216 | 256 | 256 | 256 | 218 | 218 | 1,379 |
| General and Administrative | 330 | 167 | 332 | 167 | 310 | 162 | 1,467 |
| Valley View Divest Required Development Spending | | | | | | | |
| Other Opening | 38 | 38 | 38 | 98 | 39 | 39 | 251 |
| Capital Expenditures | | | 560 | | | 1,400 | 1,960 |
| Indiana State Payment | | 17 | 133 | | | 17 | 167 |
| Other Management Cash Disbts | 16 | 14 | 14 | 16 | | | 56 |
| AP Adjustment | 900 | | | | | | 900 |
| Utility Deposit | 300 | | | | | | 300 |
| **Total Disbursements (Excluding Statutory Taxes)** | 3,381 | 4,146 | 3,110 | 2,856 | 1,618 | 4,970 | 19,251 |
| Gaming Taxes | (106) | 1,188 | 1,149 | 1,199 | 1,179 | 1,179 | 5,788 |
| Racing Taxes | | 3,285 | | | | 3,329 | 6,534 |
| **Total Disbursements (Including Statutory Taxes)** | 3,275 | 8,539 | 3,309 | 4,055 | 2,867 | 9,478 | 31,573 |
| **Operating Cash Flow** | 1,875 | (3,471) | 1,639 | 1,161 | 2,241 | (4,370) | (929) |
| **Restructuring Activity** | | | | | | | |
| Debtor Professional Fees | | | | | | | |
| Senior Lender Professional Fees | | | 1,000 | | | | 1,000 |
| **Total Restructuring Costs** | | | 1,000 | | | | 1,000 |
| **Net Cash Flow** | $1,875 | $(3,471) | $639 | $1,161 | $2,241 | $(5,370) | $(1,929) |
| Beginning Available Cash [5] | 22,565 | 24,440 | 20,969 | 21,608 | 22,770 | 25,011 | 22,565 |
| Net Cash Flow | 1,875 | (3,471) | 639 | 1,161 | 2,241 | (5,370) | (1,929) |
| Ending Available Cash | $24,440 | $20,969 | $21,608 | $22,770 | $25,011 | $19,641 | $18,641 |
| Minimum Working Capital Levels for all Entities | 16,500 | 16,500 | 16,500 | 16,500 | 16,500 | 16,500 | 16,500 |

**Notes:**
For convenience at this time, the Cash Flow Summary does not reflect potential cash pay of interest under First Lien Credit Facilities.

[1] Such inflows represent proceeds remain under deductions with the lenders under the First Lien Credit Facilities.
[2] Net of payouts and on free play / cash redemptions / coupons / comps.
[3] Net of coupons and comps.
[4] Opening cash balance is net of all outstanding checks. An adjustment is expected to cash in the weeks of 3/13 and 3/20 to reflect checks not honored and actual effects of vendor term changes should a filing take place.

3/9/2010 12:41 AM

1

The Blackstone Group