# EXHIBIT A

[ENGAGEMENT LETTER]

September 21, 2009

Mr. Kurt E. Wilson
CFO
Centaur, LLC
10 West Market Street, Suite 200
Indianapolis, IN 46204

Dear Kurt:

This letter confirms the understanding and agreement (the "Agreement") between Blackstone Advisory Services L.P. ("Blackstone") and Centaur, LLC (together with its subsidiaries and Centaur Gaming, LLC, the "Company") regarding the retention of Blackstone by the Company effective as of September 16, 2009 (the "Effective Date") as its financial advisor for the purposes set forth herein.

Under this Agreement, Blackstone will provide financial advisory services to the Company in connection with a possible restructuring of certain liabilities of the Company and will assist the Company in analyzing, structuring, negotiating and effecting a Restructuring pursuant to the terms and conditions of this Agreement. As used in this Agreement, the term "Restructuring" shall mean, collectively, (i) any restructuring or reorganization (whether or not pursuant to Chapter 11 of the United States Bankruptcy Code) of the Company affecting existing or potential debt obligations or other claims, including, without limitation, senior debt, junior debt, trade claims and general unsecured claims (collectively, the "Obligations"), and/or (ii) any complete or material partial repurchase, material amendment or material extension by the Company of any of the Obligations or exchange offer involving the issuance of new securities in exchange for Obligations or conversion of Obligations into equity, but shall not involve any Financing[1] or Sale Transaction[2].

The financial advisory services to be rendered by Blackstone will include the following:

### Business Plan / Financial Model

---

[1] As used in this Agreement, the term "Financing" means any transaction or series of transactions, that is not a Restructuring or Sale Transaction, involving the public or private issuance, sale, or placement of equity, equity-linked, or debt securities, instruments, or obligations of the Company, including any debtor-in-possession financing or exit financing in connection with a case under the Bankruptcy Code.

[2] As used in this Agreement, the term "Sale Transaction" means any transaction or series of transactions, that is not a Restructuring or Financing, involving (a) an acquisition, merger, consolidation, or other business combination pursuant to which the business or assets of the Company are, directly or indirectly, combined with another company ; (b) the acquisition, directly or indirectly, by a buyer or buyers (which term shall include a "group" of persons as defined in Section 13(d) of the Securities Exchange Act of 1934, as amended), of equity interests or options, or any combination thereof constituting a majority of the then outstanding equity interests of the Company or possessing a majority of the then outstanding voting power of the Company (except as may occur with current Stakeholders as a result of a Restructuring); (c) any other purchase or acquisition, directly or indirectly, by a buyer or buyers of all or substantially all of assets, securities or other interests of the Company or (d) the formation of a joint venture or partnership with the Company or direct investment in the Company for the purpose of effecting a transfer of a majority interest in the Company to a third party.

(a) Assist in the evaluation of the Company's businesses and prospects;

(b) Assist in the development of the Company's long-term business plan and related financial projections;

(c) Assist in the development of financial data and presentations to the Company's governing board, various creditors and other third parties;

**Restructuring Design**

(d) Analyze various restructuring scenarios and the potential impact of these scenarios on the recoveries of those stakeholders impacted by the Restructuring;

(e) Provide strategic advice with regard to restructuring or refinancing the Company's Obligations;

(f) Evaluate the Company's debt capacity and alternative capital structures;

**Restructuring Implementation**

(g) Participate in negotiations among the Company and its creditors, suppliers, lessors and other interested parties;

(h) Value securities offered by the Company in connection with a Restructuring;

(i) Advise the Company and negotiate with lenders with respect to potential waivers or amendments of various credit facilities;

**Other**

(j) If specifically requested in writing by the Company, advise and assist the Company in evaluating a potential Financing, contact potential sources of capital and assist the Company in negotiating and consummating a Financing;

(k) Assist the Company in identifying, contacting and evaluating candidates for a potential Sale Transaction and assist the Company in negotiating and consummating a Sale Transaction;

(l) Analyze the Company's financial liquidity and evaluate alternatives to improve such liquidity;

(m) Assist in arranging debtor-in-possession ("DIP") financing for the Company, as requested;

(n) Provide expert witness testimony concerning any of the subjects encompassed by the other financial advisory services; and

(o) Provide such other advisory services as are customarily provided in connection with the analysis and negotiation of a Restructuring as requested and mutually agreed.

Notwithstanding anything contained in this Agreement to the contrary, Blackstone shall have no responsibility for designing or implementing any initiatives to improve the Company's operations, profitability, cash management or liquidity. Blackstone makes no representations or warranties about the Company's ability to (i) successfully improve its operations, (ii) maintain or secure sufficient liquidity to operate its business, or (iii) successfully complete a Restructuring. Blackstone is retained under this Agreement solely to provide advice regarding a Restructuring and is not being retained to provide "crisis management."

The Company will pay the following fees to Blackstone for its financial advisory services:

(i) a monthly advisory fee (the "Monthly Fee") in the amount of $200,000 in cash, with the first Monthly Fee payable upon the execution of this Agreement by both parties and additional installments of such Monthly Fee payable in advance on each monthly anniversary of the Effective Date. Fifty percent of all monthly fees paid starting with the effective date of the Agreement shall be credited, without duplication, against any Restructuring Fee, Financing Fee and Sale Transaction Fee described below, either previously paid or simultaneous or subsequently payable;

(ii) an additional fee (the "Restructuring Fee") equal to $5,000,000. Except as otherwise provided herein, a Restructuring shall be deemed to have been consummated upon (a) the binding execution and effectiveness of all necessary waivers, consents, amendments or restructuring agreements between the Company and its creditors involving the compromise of the face amount of such Obligations or the conversion of all or a material part of such Obligations into alternative securities, including equity, in the case of an out-of-court restructuring; or b) the execution, confirmation and consummation of a Plan of Reorganization pursuant to an order of the Bankruptcy Court, in the case of an in-court restructuring. The Restructuring Fee will be:

(I) earned on the earliest of:

(w) consummation of the Restructuring, and

(x) in the event that the Company attempts to implement the Restructuring by means of a prenegotiated plan of reorganization under chapter 11 of the United States Bankruptcy Code, the receipt of sufficient commitments, agreements or other expressions of intention to accept such plan that the Company elects to file a

chapter 11 case and therein represent to the Bankruptcy Court hearing such case that the Company will seek to confirm a plan based on the prenegotiated plan, and

(II)   payable, in immediately available funds, on the consummation of the Restructuring.

Notwithstanding the foregoing, (a) a Restructuring specifically shall be deemed to exclude any assumption at face value of Obligations in connection with the sale or disposition of any subsidiaries, joint ventures, assets or lines of business of the Company, (b) the restructured Obligations shall exclude any Obligations in respect of which a Restructuring Fee has previously been paid, and (c) no Restructuring Fee shall be payable in respect of a Restructuring solely of the Company's Obligations to one or more of PR Valley View Downs, L.P., PREIT-RUBIN, Inc., Churchill Downs Management Company and Churchill Downs Incorporated.

and

(iii)   reimbursement of all reasonable and necessary out-of-pocket expenses incurred during this engagement, including, but not limited to, reasonable travel and lodging as per firm policy which will be limited to coach class airfare (except for flight segments longer than 3 hours in duration which Blackstone shall be permitted to purchase airfare one class above coach level), direct identifiable data processing, document production, publishing services and communication charges, courier services, working meals (subject to cap of $50 per person per day), reasonable fees and expenses of Blackstone's counsel and other necessary expenditures, payable upon rendition of invoices setting forth in reasonable detail the nature and amount of such expenses; provided, however, that Company shall have no obligation to reimburse expenses incurred prior to the date hereof, and subject to the terms of the indemnification agreement attached as Attachment A, incurred after the termination or expiration of this letter. In connection therewith the Company shall pay Blackstone on the Effective Date and maintain thereafter a $25,000 expense advance for which Blackstone shall account upon termination of this Agreement.

(iv)   If other than in connection with a Restructuring, the Company consummates a Sale Transaction incorporating all or substantially all of the assets or all or a majority or controlling interest in the equity securities of the Company, Blackstone shall be paid a fee payable upon consummation of such sale (the "Sale Transaction Fee") equal to the fee calculated based on the Aggregate Consideration as set forth in Schedule I hereto; provided however, that no Sale Transaction Fee shall be paid with respect to a Sale Transaction to one or more of the holders of the Obligations or incorporating all or substantially all of the assets

or all or a majority or controlling interest in the equity securities of Centaur Colorado, LLC (including the Fortune Valley Hotel and Casino), Centaur Pennsylvania, LLC, VVD Properties, LP, VVD Properties General Partner, LLC, Centaur PA Land Management, LLC, Centaur PA Land General Partner, LP, Centaur PA Land, LP, Valley View Downs GP, LLC and/or Valley View Downs, LP (including the Valley View Downs racing business) (collectively, the "Excluded Properties"). Seventy-five percent of any Sales Transaction Fee(s) paid shall be credited, without duplication, against any Restructuring Fee or Financing Fee either previously paid or simultaneously or subsequently payable.

(v) A fee, payable upon consummation of a Financing (other than a Financing, whether debtor-in-possession or otherwise, from one or more Holders of the Obligations), equal to the amount set forth in Schedule II (the "Financing Fee"). Twenty-five percent of any Financing Fee(s) paid shall be credited, without duplication, against any Restructuring Fee or any Sale Transaction Fee either previously paid or simultaneously or subsequently payable.

In the event that the Company is or becomes a debtor under Chapter 11 of the Bankruptcy Code, the Company shall use best efforts to promptly apply to the bankruptcy court having jurisdiction over the Chapter 11 case or cases (the "Bankruptcy Court") for the approval pursuant to sections 327 and 328 of the Bankruptcy Code of (A) this Agreement, including the attached indemnification agreement, and (B) Blackstone's retention by the Company under the terms of this Agreement and subject to the standard of review provided in section 328(a) of the Bankruptcy Code and not subject to any other standard of review under section 330 of the Bankruptcy Code. The Company shall supply Blackstone with a draft of such application and any proposed order authorizing Blackstone's retention sufficiently in advance of the filing of such application and proposed order to enable Blackstone and its counsel to review and comment thereon. Blackstone shall have no obligation to provide any services under this Agreement in the event that the Company becomes a debtor under the Bankruptcy Code unless Blackstone's retention under the terms of this Agreement is approved under section 328(a) of the Bankruptcy Code by a final order of the Bankruptcy Court no longer subject to appeal, rehearing, reconsideration or petition for certiorari, and which order is acceptable to Blackstone in all respects. Blackstone acknowledges that in the event that the Bankruptcy Court approves its retention by the Company, Blackstone's fees and expenses shall be subject to the jurisdiction and approval of the Bankruptcy Court under section 328(a) of the Bankruptcy Code and any applicable fee and expense guideline orders; provided, however, that Blackstone shall not be required to maintain time records and, provided further, that Blackstone shall not be required to maintain receipts for expenses in amounts less than $75. In the event that the Company becomes a debtor under the Bankruptcy Code and Blackstone's engagement hereunder is approved by the Bankruptcy Court, the Company shall pay all fees and expenses of Blackstone hereunder as promptly as practicable in accordance with the terms hereof. Prior to commencing a Chapter 11 case, the Company shall pay all invoiced amounts to Blackstone in immediately available funds by wire transfer.

With respect to Blackstone's retention under sections 327 and 328 of the Bankruptcy Code, the Company acknowledges and agrees that Blackstone's restructuring expertise as well as its capital markets knowledge, financing skills and mergers and acquisitions capabilities, some or all of which may be required by the Company during the term of Blackstone's engagement hereunder, were important factors in determining the amount of the various fees set forth herein, and that the ultimate benefit to the Company of Blackstone's services hereunder could not be measured merely by reference to the number of hours to be expended by Blackstone's professionals in the performance of such services. The Company also acknowledges and agrees that the various fees set forth herein have been agreed upon by the parties in anticipation that a substantial commitment of professional time and effort will be required of Blackstone and its professionals hereunder over the life of the engagement, and in light of the fact that such commitment may foreclose other opportunities for Blackstone and that the actual time and commitment required of Blackstone and its professionals to perform its services hereunder may vary substantially from week to week or month to month, creating "peak load" issues for the firm. In addition, given the numerous issues which Blackstone may be required to address in the performance of its services hereunder, Blackstone's commitment to the variable level of time and effort necessary to address all such issues as they arise, and the market prices for Blackstone's services for engagements of this nature in an out-of-court context, the Company agrees that the fee arrangements hereunder (including the Monthly Fee and Restructuring Fee) are reasonable under the standards set forth in 11 U.S.C. Section 328(a).

The advisory services and compensation arrangement set forth in this Agreement do not encompass other investment banking services or transactions that may be undertaken by Blackstone at the request of the Company, including the arranging of debt or equity capital (except as provided above), issuing fairness opinions or any other specific services not set forth in this Agreement. The terms and conditions of any such investment banking services, including compensation arrangements, would be set forth in a separate written agreement between Blackstone and the appropriate party.

Subject to the terms and conditions of the Confidentiality Agreement between Centaur Gaming, LLC and Blackstone, dated June 3, 2009 attached to this Agreement as Attachment B, the Company will furnish or cause to be furnished to Blackstone such information as Blackstone believes appropriate to its assignment (all such information so furnished being the "Information"). The Company recognizes and confirms that Blackstone (a) will use and rely primarily on the Information and on information available from generally recognized public sources in performing the services contemplated by this Agreement without having independently verified the same, (b) does not assume responsibility for the accuracy or completeness of the Information and such other information, (c) is entitled to rely upon the Information without independent verification, and (d) will not make an appraisal of any assets in connection with its assignment. The foregoing not withstanding, Blackstone acknowledges and agrees that the Information provided to Blackstone may contain projections or other forward looking statements and represents at the time it is furnished the Company's then-current estimates and expectations, based upon information available to the Company's senior

management team. Blackstone consents to the disclosure of this Agreement and its engagement as required by the terms of the Obligations.

Except as required by applicable law or in the case of negotiation with holders of Obligations or other interested parties, any advice to be provided by Blackstone under this Agreement shall not be disclosed publicly or made available to third parties (other than the Company's other professional advisors or, if appropriate in the Company's judgment, in any filings in a Chapter 11 proceeding) without the prior written consent of Blackstone. All services, advice and information and reports provided by Blackstone to the Company in connection with this assignment shall be for the sole benefit of the Company and shall not be relied upon by any other person.

The Company acknowledges and agrees that Blackstone will provide its financial advice exclusively to the Company's governing board and senior management of the Company and not to the Company's shareholders or other constituencies. The Company's governing board and senior management will make all decisions for the Company regarding whether and how the Company will pursue a Restructuring and on what terms and by what process. In so doing, the Company's governing board and senior management will also obtain the advice of the Company's legal, tax and other business advisors and consider such other factors which they consider appropriate before exercising their independent business judgment in respect of a Restructuring, Sale Transaction and/or Financing. The Company further acknowledges and agrees that Blackstone has been retained to act solely as financial advisor to the Company and does not in such capacity act as a fiduciary for the Company or any other person. Blackstone shall act as an independent contractor and any duties of Blackstone arising out of its engagement pursuant to this Agreement shall be owed solely to the Company.

In consideration of Blackstone's agreement to provide financial advisory services to the Company in connection with this Agreement, it is agreed that the Company will indemnify Blackstone and its agents, representatives, members and employees pursuant to the indemnification agreement is attached to this Agreement as Attachment A.

In the event that, as a result of or in connection with Blackstone's engagement for the Company, Blackstone becomes involved in any legal proceeding or investigation or is required by government regulation, subpoena or other legal process to produce documents, or to make its current or former personnel available as witnesses at deposition or trial, the Company will reimburse Blackstone for the reasonable fees and expenses of its counsel incurred in responding to such a request. Nothing in this paragraph shall affect in any way the Company's obligations pursuant to the separate indemnification agreement attached hereto.

Blackstone's engagement hereunder will be terminated upon the consummation of any Restructuring and may be terminated upon 10 days' written notice without cause, by either the Company or Blackstone; termination for cause by either party will occur forthwith. Notwithstanding the foregoing, (a) the provisions relating to the payment of fees and expenses payable through the date of termination, the status of Blackstone as an independent contractor and the limitation as to whom Blackstone shall owe any duties will survive any such termination, (b) any such termination shall not affect the Company's obligations under the indemnification agreement attached as Attachment A or Blackstone's confidentiality obligations hereunder and (c) Blackstone shall be entitled to the Restructuring Fee in the event that a Restructuring on terms (including the parties thereto) that are substantially similar to the terms of a Restructuring proposal made in good faith by the Company or one or more Stakeholders prior to the termination of this Agreement is consummated at any time prior to the expiration of 6 months following the termination of this Agreement.

The Company does not appear on the Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control of the United States Department of the Treasury, nor is it a prohibited party according to other U.S. government regulatory or enforcement agencies.

Notwithstanding anything to the contrary provided elsewhere herein, none of the provisions of this letter shall in any way limit the activities of The Blackstone Group L.P. and its affiliates in their businesses distinct from the restructuring advisory business of The Blackstone Group L.P., provided that the Information is not made available to representatives of The Blackstone Group L.P. and its affiliates who are not involved in the restructuring advisory business of The Blackstone Group L.P. Should the Information be made available to a representative of The Blackstone Group L.P. and its affiliates who is not involved in restructuring advisory business of The Blackstone Group L.P., such representative shall be bound by the Confidentiality Agreement in accordance with its terms.

This Agreement (including the attached indemnification agreement) embodies the entire agreement and understanding between the parties hereto and supersedes all prior agreements and understandings relating to the subject matter hereof. If any provision of this Agreement is determined to be invalid or unenforceable in any respect, such determination will not affect the Agreement in any other respect, which will remain in full force and effect. No waiver, amendment or other modification of this Agreement shall be effective unless in writing and signed by each party to be bound thereby. This Agreement shall be governed by, and construed

in accordance with, the laws of the State of Delaware applicable to contracts executed in and to be performed in that state.

The parties hereby agree that any action or proceeding based hereon or arising out of Blackstone's engagement hereunder, shall be brought and maintained exclusively in the courts of the State of Delaware or in the United States District Court for the District of Delaware; provided, if the Company commences a Chapter 11 case, all legal proceedings pertaining to this engagement arising after such case is commenced may be brought in the Bankruptcy Court handling such case. The parties irrevocably submit to the jurisdiction of the courts of the State of Delaware and the United States District Court for the District of Delaware and appellate courts from any thereof for the purpose of any action or proceeding based hereon or arising out of Blackstone's engagement hereunder and irrevocably agree to be bound by any judgment rendered thereby in connection with such action or proceedings. The parties hereby irrevocably waive, to the fullest extent permitted by law, any objection they may have or hereafter may have to the laying of venue of any such action or proceeding brought in any such court referred to above and any claim that such action or proceeding has been brought in an inconvenient forum and agrees not to plead or claim the same.

Please confirm that the foregoing correctly sets forth our agreement by signing and returning to Blackstone the duplicate copy of this Agreement and the indemnification agreement attached hereto as Attachment A.

Very truly yours,

BLACKSTONE ADVISORY SERVICES L.P.

By: /s/ Steven Zelin

Name: Steven Zelin
Title: Senior Managing Director

Accepted and Agreed to as
of the date first written above:

CENTAUR, LLC

By: /s/ Kurt E. Wilson

Name: Kurt E. Wilson
Title: CFO

## SCHEDULE I

Fees for Sale Transactions

The following table outlines the Sale Transaction fee schedule. The total fee is calculated by breaking down the Aggregate Consideration and multiplying each increment by the corresponding incremental fee. For example, for a transaction in which the Aggregate Consideration paid is $60 million, the fee would be $500,000 + $375,000 + $125,000 which totals $1,000,000.

| Aggregate Consideration ($ in millions) | Incremental Fee % |
|---|---|
| $0 - $25 | 2.00% |
| >$25 - $50 | 1.50% |
| >$50 - $100 | 1.25% |
| >$100 - $200 | 1.00% |
| >$200 - $250 | 0.90% |
| >$250 - $400 | 0.85% |
| >$400 - $500 | 0.80% |
| >$500 - $600 | 0.78% |
| >$600 - $700 | 0.75% |
| >$700 - $750 | 0.73% |
| >$750 - $900 | 0.70% |
| >$900 + | 0.68% |

For purposes hereof, the term "Aggregate Consideration" means, without duplication, (x) the total amount of cash and the fair market value (on the date of payment) of all of the property paid or payable (including amounts paid into escrow) in connection with the Sale Transaction (or any related transaction), including amounts paid or payable in respect of convertible securities, preferred equity securities, warrants, stock appreciation rights, option or similar rights, whether or not vested, plus (y) without duplication of any amounts included in clause (x) above, in the case of a sale of equity, the product of the percentage of the equity of the Company or relevant Company entity, as applicable, acquired by the buyer(s) multiplied by the principal amount of all indebtedness for borrowed money or other liabilities of the Company or relevant Company entity, as applicable, remaining at closing of the Sale, or, in case of a sale of assets, all indebtedness for borrowed money or other liabilities assumed by the third party; provided however, that all amounts received by the Company or any of its affiliates and all amounts paid by a purchaser in respect of the $50 million letter of credit in favor of the Pennsylvania Gaming Control Board posted by Valley View Downs, LP (or any replacement thereof) shall be excluded from Aggregate Consideration. For purposes of calculating Aggregate Consideration, (i) all shares will be deemed transferred where a Sale Transaction is effected by the transfer of shares,

(a) constituting more than a majority of the then outstanding equity securities of or equity interest in the Company or relevant Company entity, as applicable, or (b) possessing more than a majority of the then outstanding voting power of the outstanding equity securities of or equity interest in the Company or relevant Company entity, as applicable, and (ii) the value of securities (whether debt or equity) that are freely tradable in an established public market will be determined on the basis of the average closing price in such market for the 10 trading days prior to the closing of the Sale Transaction (the "Valuation Date"); and the value of securities that have no established public market or other property will be the fair market value of such securities or other property on such Valuation Date and any restricted stock (i.e., stock in a public company not freely tradeable) received shall be valued at 85% of the public market price of such stock (as determined above). Aggregate Consideration shall also be deemed to include pension liabilities and guarantees by the Company of monies borrowed assumed directly or indirectly by the third party. If the Aggregate Consideration is subject to increase by contingent payments related to future events, the portion of our fee relating thereto shall be determined by the Company and us in good faith and paid to us upon consummation of the Sale Transaction.

## SCHEDULE II

Fees for Financings

The following table outlines the Financing Fees. The total Financing Fee shall be calculated by multiplying the applicable fee percentage by the total gross proceeds raised in each Financing.

| Funds Raised | Fee % |
| --- | --- |
| Senior Secured Debt | 1.75% |
| Senior Debt (including debtor-in possession financing) | 1.75% |
| Subordinated Debt | 2.25% |
| Convertible Debt | 2.75% |
| Convertible Preferred Equity | 3.25% |
| Common Equity | 5.00% |

ATTACHMENT A

September 21, 2009

Blackstone Advisory Services L.P.
345 Park Avenue
New York, NY 10154

INDEMNIFICATION AGREEMENT

Ladies and Gentlemen:

This letter will confirm that we have engaged Blackstone Advisory Services L.P. ("Blackstone") to advise and assist us in connection with the matters referred to in our letter of agreement dated as of September 16, 2009 (the "Engagement Letter"). In consideration of your agreement to act on our behalf in connection with such matters, we agree to indemnify and hold harmless you and your affiliates and your and their respective partners (both general and limited), members, officers, directors, employees and agents and each other person, if any, controlling you or any of your affiliates (you and each such other person being an "Indemnified Party") from and against any losses, claims, damages, expenses and liabilities whatsoever, whether they be joint or several, related to, arising out of or in connection with the engagement (the "Engagement") under the Engagement Letter and will reimburse each Indemnified Party for all expenses (including reasonable fees, expenses and disbursements of counsel) as they are incurred in connection with investigating, preparing, pursuing, defending or assisting in the defense of any action, claim, suit, investigation or proceeding related to, arising out of or in connection with the Engagement or this agreement, whether or not pending or threatened, whether or not any Indemnified Party is a party, whether or not resulting in any liability and whether or not such action, claim, suit, investigation or proceeding is initiated or brought by us; provided however, that we will not reimburse expenses as they are incurred in connection with any action, claim, suit, investigation or proceeding between an Indemnified Person and us in which the Company alleges bad faith, fraud, gross negligence or willful misconduct by such Indemnified Person; and provided further and subject to the following sentence, that the foregoing shall not affect the Company's obligation to indemnify such Indemnified Person at the final, non-appealable conclusion of such action, claim, suit, investigation or proceeding. We will not, however, be liable under the foregoing indemnification provision for any losses, claims, damages or liabilities (or expenses relating thereto) that are finally judicially determined by a court of competent jurisdiction to have primarily resulted from any Indemnified Person's bad faith, fraud, gross negligence or willful misconduct and in such event, any such Indemnified Person whose expenses were reimbursed shall promptly refund such reimbursements. We also agree that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to us or our owners, parents, affiliates, security holders or creditors for or in

connection with the Engagement except for any such liability for losses, claims, damages or liabilities incurred by us that are finally judicially determined by a court of competent jurisdiction to have primarily resulted from any Indemnified Person's bad faith, fraud, gross negligence or willful misconduct.

If the indemnification provided for in the preceding paragraph is for any reason unavailable to an Indemnified Party in respect of any losses, claims, damages or liabilities referred to herein, then, in lieu of indemnifying such Indemnified Party hereunder, we shall contribute to the amount paid or payable by such Indemnified Party as a result of such losses, claims, damages or liabilities (and expenses relating thereto) (i) in such proportion as is appropriate to reflect the relative benefits received (or anticipated to be received) by you, on the one hand, and us, on the other hand, from the Engagement or (ii) if and only if the allocation provided by clause (i) above is for any reason not available, in such proportion as is appropriate to reflect not only the relative benefits referred to in such clause (i) but also the relative fault of each of you and us, as well as any other relevant equitable considerations; provided, however, to the extent permitted by applicable law, in no event shall your aggregate contribution to the amount paid or payable exceed the aggregate amount of fees actually received by you under the Engagement Letter. For the purposes of this agreement, the relative benefits to us and you of the Engagement shall be deemed to be in the same proportion as (a) the total value paid or contemplated to be paid or received or contemplated to be received by us, our security holders and our creditors in the transaction or transactions that are subject to the Engagement, whether or not any such transaction is consummated, bears to (b) the fees paid or to be paid to Blackstone under the Engagement Letter (excluding any amounts paid as reimbursement of expenses).

No Indemnified Person will, without our prior written consent, settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification may be sought hereunder (a "Judgment"), whether or not we or any Indemnified Party are an actual or potential party to such claim, action, suit or proceeding. In the event that we seek to settle or compromise or consent to the entry of any Judgment, we agree that such settlement, compromise or consent (i) shall include an unconditional release of Blackstone and each other Indemnified Party hereunder from all liability arising out of such claim, action, suit or proceeding, (ii) shall not include a statement as to, or an admission of, fault, culpability or a failure to act by or on behalf of Blackstone or each other Indemnified Party, and (iii) shall not impose any continuing obligations or restrictions on Blackstone or each other Indemnified Party.

Promptly after receipt by an Indemnified Party of notice of any complaint or the commencement of any action or proceeding with respect to which indemnification is being sought hereunder, such person will notify us in writing of such complaint or of the commencement of such action or proceeding, but failure to so notify us will not relieve us from any liability which we may have hereunder or otherwise, except to the extent that such failure materially prejudices our rights. If we so elect or are requested by such Indemnified Party, we will assume the defense of such action or proceeding, including the employment of counsel

reasonably satisfactory to Blackstone and the payment of the fees and disbursements of such counsel.

In the event, however, such Indemnified Party reasonably determines in its judgment that having common counsel would present such counsel with a conflict of interest or if we fail to assume the defense of the action or proceeding in a timely manner, then such Indemnified Party may employ separate counsel reasonably satisfactory to us to represent or defend it in any such action or proceeding and we will pay the fees and disbursements of such counsel; provided, however, that we will not be required to pay the fees and disbursements of more than one separate counsel for all Indemnified Parties in any jurisdiction in any single action or proceeding. In any action or proceeding the defense of which we assume, the Indemnified Party will have the right to participate in such litigation and to retain its own counsel at such Indemnified Party's own expense.

The foregoing reimbursement, indemnity and contribution obligations of the Company under this agreement shall be in addition to any rights that an Indemnified Party may have at common law or otherwise, and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Company and such Indemnified Party.

The provisions of this agreement shall apply to the Engagement and any written modification of the Engagement and shall remain in full force and effect regardless of any termination or the completion of your services under the Engagement Letter.

This Agreement and the Engagement Letter shall be governed by and construed in accordance with the laws of the State of Delaware applicable to contracts executed in and to be performed in that state.

Very truly yours,

CENTAUR, LLC

By: _____
Name:   Kurt E. Wilson
Title:   CFO

Accepted and Agreed
to as of the date first
written above:
BLACKSTONE ADVISORY SERVICES L.P.

By: _____
    Senior Managing Director

ATTACHMENT B

CONFIDENTIALITY AGREEMENT