**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **In re** | **: Chapter 11** |
| | **:** |
| **CENTAUR, LLC, et al.,**[1] | **: Case No. 10-10799 (KJC)** |
| | **:** |
| Debtors. | **: (Jointly Administered)** |
| | **:** |
| **In re** | **: Chapter 11** |
| | **:** |
| **CENTAUR PA LAND, LP, et al.,**[2] | **: Case No. 09-13760 (KJC)** |
| | **:** |
| Debtors. | **: (Jointly Administered)** |
| | **:** |

**DISCLOSURE STATEMENT RELATING TO**
**THE JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR**
**CENTAUR PA LAND, LP AND ITS AFFILIATED DEBTORS**

Dated:  March 28, 2010

WHITE & CASE LLP    -and-  FOX ROTHSCHILD LLP
Gerard H. Uzzi (admitted pro hac vice)     Jeffrey M. Schlerf (No. 3047)
1155 Avenue of the Americas       Eric M. Sutty (No. 4007)
New York, New York  10036       Jay H. Strock (No. 4965)
(212) 819-8200           919 North Market Street, Suite 1600
                Wilmington, Delaware  19801
Michael C. Shepherd (admitted pro hac vice)  (302) 654-7444
Lane E. Begy (admitted pro hac vice)
200 South Biscayne Boulevard, Suite 4900
Miami, Florida  33131
(305) 371-2700

ATTORNEYS FOR THE DEBTORS AND DEBTORS-IN-POSSESSION

---

[1]  The Debtors in the cases jointly administered under Case No. 10-10799 (KJC), along with the last four digits of each Debtor's federal tax identification number, if applicable, are: Centaur, LLC (8148); Centaur Colorado, LLC (9131); Centaur Indiana, LLC; Centaur Racing, LLC; Hoosier Park, L.P. (0820); HP Dining & Entertainment, LLC; Centaur Pennsylvania, LLC; VVD Properties General Partner, LLC; Valley View Downs GP, LLC; VVD Properties, LP (6808); Centaur PA Land Management, LLC; and Centaur PA Land General Partner, LP.

[2]  The Debtors in the cases jointly administered under Case No. 09-13760 (KJC), along with the last four digits of each Debtor's federal tax identification number, if applicable, are: Valley View Downs, LP (1028) and Centaur PA Land, LP.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE (THE "BANKRUPTCY COURT") UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE FOR USE IN THE SOLICITATION OF ACCEPTANCES OF THE PLAN DESCRIBED HEREIN. ACCORDINGLY, THE FILING AND DISTRIBUTION OF THIS DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS A SOLICITATION OF ACCEPTANCES OF SUCH PLAN. THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON FOR ANY PURPOSE BEFORE A DETERMINATION BY THE BANKRUPTCY COURT THAT THIS DISCLOSURE STATEMENT CONTAINS "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE.[3]

---

[3] Legend to be removed upon entry by the Clerk of the Bankruptcy Court of Order of the Bankruptcy Court approving this Disclosure Statement.

NEWYORK 7411169 (2K)

# TABLE OF CONTENTS

Page

I.      INTRODUCTION .................................................................................................1

II.     NOTICE TO HOLDERS OF CLAIMS AND EQUITY INTERESTS ..............................1

III.    EXPLANATION OF CHAPTER 11 ......................................................................3

IV.     OVERVIEW OF THE PLAN.................................................................................4

        A.      Summary of the Terms of the Plan ..........................................................4

        B.      Summary of Distributions Under the Plan.................................................5

V.      GENERAL INFORMATION................................................................................10

        A.      The Businesses of the Debtors.............................................................10

        B.      Management.....................................................................................11

        C.      Prepetition Capital Structure................................................................12

                (a)     First Lien Debt .....................................................................12

                (b)     Second Lien Debt..................................................................13

                (c)     Pennsylvania Cash Collateralized L/C.......................................13

        D.      Events Leading to the Commencement of the Chapter 11 Cases ...........15

VI.     THE REORGANIZED COMPANY .......................................................................16

VII.    SELECTED FINANCIAL INFORMATION ..............................................................17

        A.      Consolidated and Year-to-Date Annual Financial Information for the
                Debtors.............................................................................................17

VIII.   FINANCIAL PROJECTIONS AND ASSUMPTIONS; VALUATION..........................17

        A.      Purpose and Objectives.......................................................................17

        B.      Consolidated Pro Forma Statement of Financial Position .......................17

        C.      Valuation...........................................................................................17

IX.     THE CHAPTER 11 CASES................................................................................18

        A.      Commencement of the Chapter 11 Cases .............................................18

| | | | |
|---|---|---|---|
| | B. | Continuation of Business after the Petition Date | 18 |
| | | (a) Letter of Credit | 18 |
| | | (b) Intercompany Financing | 18 |
| | | (c) Use of Cash Collateral | 19 |
| | | (d) Debtor-in-Possession Financing | 20 |
| | | (e) Business Operations and Bankruptcy-Related Relief | 20 |
| | C. | Representation of the Debtors | 23 |
| | D. | Formation and Representation of the Committee | 23 |
| | E. | Representation of the First Lien Lenders | 23 |
| | F. | Representation of the Second Lien Lenders | 23 |
| | G. | Matters Relating to Unexpired Leases and Executory Contracts | 23 |
| | H. | Exclusivity | 24 |
| | I. | Schedules | 24 |
| X. | | THE CHAPTER 11 PLAN | 25 |
| | A. | Introduction | 25 |
| | B. | General Description of the Treatment of Claims and Equity Interests | 25 |
| | | (a) Unclassified Claims | 25 |
| | | (b) Treatment of Administrative Expense Claims | 25 |
| | | (c) Treatment of Priority Tax Claims | 27 |
| | | (d) Classified Claims and Equity Interests | 27 |
| | C. | Treatment of Claims and Equity Interests | 28 |
| | D. | Acceptance or Rejection of the Plan; Effect of Rejection by One or More Classes of Claims | 28 |
| | | (a) Classes Entitled to Vote | 28 |
| | | (b) Class Acceptance Requirement | 28 |
| | | (c) Tabulation of Votes on a Non-Consolidated Basis | 28 |

(d)    Cramdown .................................................................................29

(e)    Feasibility ................................................................................29

(f)    Confirmation of All Cases ......................................................29

E.    The Letter of Credit .............................................................................29

F.    Management Incentive Plan .................................................................29

G.    Means of Implementation of the Plan .................................................29

(a)    Operations between the Confirmation Date and the Effective Date ..........29

(b)    Certain Transactions On or Prior to the Effective Date ...........................30

(c)    Corporate Action ....................................................................32

(d)    Termination of Certain Debt Obligations ..................................33

(e)    Continued Corporate Existence ...............................................34

(f)    Re-vesting of Assets ...............................................................34

(g)    Initial Managers .....................................................................34

(h)    Officers ..................................................................................34

(i)    Retention of Causes of Action/Reservation of Rights ..............35

(j)    Appointment of the Disbursing Agent .....................................35

H.    Distribution Provisions .......................................................................35

(a)    Plan Distributions ...................................................................35

(b)    Timing of Plan Distributions ..................................................36

(c)    Surrender and Cancellation of Instruments ..............................36

I.    Procedures for Resolving and Treating Contested Claims ..................37

(a)    Objection Deadline .................................................................37

(b)    Prosecution of Contested Claims ............................................37

(c)    Claims Settlement ...................................................................37

(d)    Entitlement to Plan Distributions Upon Allowance .................37

(e)      Contested Claims Reserve ........................................................................37

(f)      Estimation of Claims.................................................................................37

(g)      No Recourse Against the Debtors or the Reorganized Debtors.................38

J.      Conditions Precedent to Confirmation of Plan ....................................................38

K.      Conditions Precedent to Occurrence of the Effective Date ..................................39

L.      Waiver of Conditions............................................................................................39

M.      Effect of Non-Occurrence of the Effective Date ................................................39

N.      Exculpation of Debtors and Released Persons......................................................40

O.      Releases by the Debtors ........................................................................................40

P.      Release of Released Persons by Other Released Persons.....................................40

Q.      Indemnification of the Prepetition First Lien Agent ...........................................41

R.      Executory Contracts and Unexpired Leases ........................................................41

(a)      Executory Contracts and Unexpired Leases ..............................................41

(b)      Assumption and Rejection of Executory Contracts and Unexpired
Leases.........................................................................................................42

(c)      Cure............................................................................................................43

(d)      Claims Arising from Rejected Contracts ...................................................44

S.      Retention of Jurisdiction ......................................................................................44

T.      Other Material Provisions of the Plan..................................................................44

(a)      Payment of Statutory Fees .........................................................................44

(b)      Satisfaction of Claims ................................................................................44

(c)      Third Party Agreements; Subordination ....................................................45

(d)      Discharge of Liabilities..............................................................................45

(e)      Discharge of Debtors .................................................................................46

(f)      Exemption from Transfer Taxes ................................................................46

(g)      Retiree Benefits..........................................................................................46

| | (h) | Interest and Attorneys' Fees ................................................................47 |
|---|---|---|
| | (i) | Modification of the Plan ......................................................................47 |
| | (j) | Revocation of the Plan ........................................................................47 |
| | (k) | Setoff Rights .......................................................................................48 |
| | (l) | Compliance with Tax Requirements......................................................48 |
| | (m) | Injunctions...........................................................................................48 |
| | (n) | Binding Effect......................................................................................49 |
| | (o) | Severability .........................................................................................49 |
| | (p) | No Admissions .....................................................................................49 |
| | (q) | Dissolution of the Committee ..............................................................49 |
| | (r) | Potential Exclusion of the Pennsylvania Debtors and/or Centaur Colorado, LLC from the Plan ..............................................................50 |
| | (s) | Plan Controls.......................................................................................50 |

| XI. | RISK FACTORS ................................................................................................50 |
|---|---|
| | A. | Certain Bankruptcy Considerations ........................................................50 |
| | B. | The Reorganized Debtors' Actual Financial Results may Vary Significantly from the Projections Included in this Disclosure Statement..................................51 |
| | C. | Plan Consideration Reserved for Contested Claims may be Insufficient to Satisfy all Secured Claims upon Liquidation............................................51 |
| | D. | The Reorganized Debtors may not be able to Raise Additional Financing on Terms Favorable to the Debtors..............................................................51 |
| | E. | State Horse Racing and Gaming Laws and Regulations will Require that Holders of NewCo Membership Interests Become Licensed ...............................51 |
| | F. | Consummation of the Plan may Result in a Small Number of Holders Owing a Significant Percentage of the NewCo Membership Interests..................52 |
| | G. | Potential Changes in Legislation and Regulation ....................................52 |
| | H. | Taxation and Fees .................................................................................52 |

I.      The Debtors Could Lose Key Employees, Including Certain Members of the Existing Management ..........................................................52

J.      No Market for the Claim Securities .................................................................53

XII.    SECURITIES LAW MATTERS .....................................................................53

A.      Issuance of Claim Securities .............................................................53

B.      Subsequent Transfers of Claim Securities ...........................................54

        (a)     Section 1145 of the Bankruptcy Code ......................................54

        (b)     Resales of Claim Securities/Rule 144, Rule 144A, "Section 4(1½) Exemption" and Regulation S ..................................................55

C.      Delivery of Disclosure Statement .......................................................57

XIII.   CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES...................58

A.      Certain U.S. Federal Tax Consequences.................................................58

        (a)     U.S. Federal Income Tax Consequences to the Debtors, Class 8 – Intercompany Claims, Class 9 – Borrower Equity Interests and Centaur Inc.........................................................59

        (b)     Certain U.S. Federal Income Tax Consequences to the Holders of Allowed Claims That Are Paid in Cash in Full .......................60

        (c)     Consequences to Pre-Bankruptcy Holders of Class 6 – General Unsecured Claims .................................................................60

        (d)     U.S. Federal Income Tax Consequences to Holders of Allowed Claims That Are Paid Using Consideration Other Than Solely Cash ......60

        (e)     Consequences of Ownership of NewCo Membership Interests, First Lien Take Back Paper, Units and NewCo PIK Notes Issued Pursuant to the Plan ...............................................................62

        (f)     Information Reporting and Backup Withholding ......................68

XIV.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ...........................................................................................69

A.      Liquidation Under Chapter 7 of the Bankruptcy Code ...........................69

B.      Alternative Plans of Reorganization .................................................69

XV.     CONCLUSION.................................................................................71

# SCHEDULES AND EXHIBITS

List of Debtors ................................................................................................................Schedule 1

List of Assumed Executory Contracts and Unexpired Leases ........................................Schedule 2

Chapter 11 Plan of Reorganization .............................................................................. Exhibit "A"

Projections and Summary of Significant Assumptions Related Thereto....................Exhibit "B"

Pro Forma Statements ...................................................................................................Exhibit "C"

Terms of First Lien Take Back Paper and Exit Facility ........................................... Exhibit "D"

Terms of NewCo PIK Notes ..........................................................................................Exhibit "E"

Terms of NewCo Warrants ...........................................................................................Exhibit "F"

Liquidation Analysis .................................................................................................... Exhibit "G"

Terms of NewCo Operating Agreement ................................................................... Exhibit "H"

# I.

## INTRODUCTION

**All capitalized terms used in this Disclosure Statement and not otherwise defined herein shall have the meanings ascribed thereto in the Plan (see Article I of the Plan entitled "Definitions").**

THIS DISCLOSURE STATEMENT INCLUDES AND DESCRIBES THE JOINT CHAPTER 11 PLAN OF REORGANIZATION, DATED MARCH 28, 2010 (THE "PLAN"), A COPY OF WHICH IS ATTACHED HERETO AS EXHIBIT "A", FILED BY CENTAUR, LLC AND ITS AFFILIATED DEBTORS LISTED IN SCHEDULE 1 (THE "DEBTORS"). OTHER THAN CLASS 1 – PRIORITY NON-TAX CLAIMS, CLASS 4 – OTHER SECURED CLAIMS, CLASS 7 – CONVENIENCE CLAIMS, AND CLASS 10 – SUBSIDIARY EQUITY INTERESTS, WHICH ARE UNIMPAIRED UNDER THE PLAN AND ARE THEREFORE DEEMED TO HAVE ACCEPTED THE PLAN, AND CLASS 6 – GENERAL UNSECURED CLAIMS, CLASS 8 – INTERCOMPANY CLAIMS, AND CLASS 9 – BORROWER EQUITY INTERESTS WHICH ARE NOT ENTITLED TO A DISTRIBUTION UNDER THE PLAN AND ARE THEREFORE DEEMED TO HAVE REJECTED THE PLAN, ALL CLASSES ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN. ACCORDINGLY, THE DEBTORS ARE SOLICITING ACCEPTANCES OF THE PLAN FROM THE HOLDERS OF ALL CLAIMS AND INTERESTS, OTHER THAN THOSE HOLDING CLASS 1 – PRIORITY NON-TAX CLAIMS, CLASS 4 – OTHER SECURED CLAIMS, CLASS 6 – GENERAL UNSECURED CLAIMS, CLASS 7 – CONVENIENCE CLAIMS, CLASS 8 – INTERCOMPANY CLAIMS, CLASS 9 – BORROWER EQUITY INTERESTS AND CLASS 10 – SUBSIDIARY EQUITY INTERESTS.

THE DEBTORS BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF AND PROVIDES THE HIGHEST AND MOST EXPEDITIOUS RECOVERIES TO HOLDERS OF ALL CLASSES OF CLAIMS AND EQUITY INTERESTS. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN ARE URGED TO VOTE IN FAVOR OF THE PLAN. TO BE COUNTED, YOUR BALLOT MUST BE DULY COMPLETED, EXECUTED AND RECEIVED BY **4:00 P.M., EASTERN STANDARD TIME, ON [_____ __], 2010** (THE "VOTING DEADLINE").

FOR YOUR ESTIMATED PERCENTAGE RECOVERY UNDER THE PLAN, PLEASE SEE THE CHART SET OUT IN "OVERVIEW OF THE PLAN – SUMMARY OF DISTRIBUTIONS UNDER THE PLAN."

# II.

## NOTICE TO HOLDERS OF CLAIMS AND EQUITY INTERESTS

The purpose of this Disclosure Statement is to enable you, as a creditor whose Claim is impaired under the Plan, to make an informed decision in exercising your right to accept or reject the Plan.

**THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN.  PLEASE READ THIS DOCUMENT WITH CARE.**

**PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN AND TO THIS DISCLOSURE STATEMENT.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.  IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(b) OF THE BANKRUPTCY RULES AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER NON-BANKRUPTCY LAW.  THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION ("SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.**

**AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THE DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THE DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS AND DEBTORS-IN-POSSESSION IN THESE CHAPTER 11 CASES.**

Each holder of a Claim entitled to vote to accept or reject the Plan should read this Disclosure Statement and the Plan in their entirety before voting.  No solicitation of votes to accept or reject the Plan may be made <u>except</u> pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code.  <u>Except</u> for the Debtors and certain of the professionals those parties have retained, no person has been authorized to use or promulgate any information concerning the Debtors, their businesses, or the Plan other than the information contained in this Disclosure Statement and if given or made, such information may not be relied upon as having been authorized by the Debtors.  You should not rely on any information relating to the Debtors,

their businesses, or the Plan other than that contained in this Disclosure Statement and the exhibits hereto.

After carefully reviewing this Disclosure Statement, including the attached exhibits, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed Ballot and return the same to the address set forth on the Ballot, in the enclosed, postage prepaid, return envelope so that it will be received by the Balloting Agent, no later than the Voting Deadline.

**DO NOT RETURN ANY OTHER DOCUMENTS WITH YOUR BALLOT.**

You may be bound by the Plan if it is accepted by the requisite holders of Claims even if you do not vote to accept the Plan, or if you are the holder of an unimpaired Claim.

Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a Confirmation Hearing on **[_____ __], 2010 at [__]:[__] [__].m.,** Eastern Standard Time, before the Honorable Kevin J. Carey, United States Bankruptcy Judge. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed and served on or before **[_____ __], 2010 at 4:00 p.m.** Eastern Standard Time, in the manner described in the related order.

**THE DEBTORS SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF IMPAIRED CLAIMS TO ACCEPT THE PLAN.**

**III.**

**EXPLANATION OF CHAPTER 11**

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code, pursuant to which a debtor-in-possession may reorganize its business for the benefit of its creditors, equity holders, and other parties in interest. The formulation of a plan of reorganization is the principal purpose of a Chapter 11 case. The plan sets forth the means for satisfying the holders of claims against and interests in the debtor's estate.

Although referred to as a plan of reorganization, a plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of a debtor's assets. In either event, upon confirmation of the plan, it becomes binding on a debtor and all of its creditors and equity holders, and the obligations owed by a debtor to such parties are compromised and exchanged for the obligations specified in the plan.

After a plan of reorganization has been filed, the holders of impaired claims against and interests in a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires the debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. **This Disclosure Statement is presented to holders of Claims against and Equity Interests in the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code in connection with the solicitation of votes by the Debtors on the Plan.**

The bankruptcy court may confirm a plan of reorganization even though fewer than all the classes of impaired claims and equity interests accept such plan. For a plan of reorganization to be confirmed, despite its rejection by a class of impaired claims or equity interests, the plan must be accepted by at least one class of impaired claims (determined without counting the vote of insiders) and the proponent of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or equity interests that has not accepted the plan. **The Plan has been structured so that it will satisfy the foregoing requirements as to any rejecting class of Claims and can therefore be confirmed, if necessary, over the objection of any (but not all) classes of Claims.**

## IV.

## OVERVIEW OF THE PLAN

The Plan provides for the treatment of Claims against and Equity Interests in all of the Debtors in <u>In re Centaur, LLC, et al.</u>, Case No. 10-10799 (KJC) (Jointly Administered) and <u>In re Centaur PA Land, LP, et al.</u>, Case No. 09-13760 (KJC) (Jointly Administered).

## A.     Summary of the Terms of the Plan

The Plan implements and is built around the following key elements:

- the Plan will restructure the obligations under the Prepetition First Lien Credit Agreement and the Specified Hedging Agreements through (i) cancellation of such obligations, (ii) the issuance of new first lien debt of the Reorganized Debtors to the Prepetition First Lien Claimholders in an amount $115 million, less the amount of any exit financing necessary to fund the Debtors' emergence from chapter 11, secured by security interests in and liens upon all or substantially all of the assets of the Reorganized Debtors and (iii) the distribution to the Prepetition First Lien Claimholders of new payable-in-kind notes and non-detachable penny warrants to purchase new equity interests;

- the Plan will restructure the obligations under the Prepetition Second Lien Credit Agreement by cancelling such obligations in exchange for distribution to the Prepetition Second Lien Claimholders of new payable-in-kind notes;

- the Plan provides that the obligations to holders of Other Secured Claims will be reinstated;

- the Plan provides that holders of unsecured claims (other than Convenience Claims) against Valley View Downs, LP will be cancelled in exchange for a distribution of new payable-in-kind notes;

- the Plan provides that holders of unsecured claims equal to or less than $[__], or who elect to reduced the allowed amount of their claims, in their entirety, to $[__], will be paid 100 percent of their claims in cash; and

- the Plan provides that all other prepetition unsecured claims (other than priority claims) will be cancelled and will not receive a recovery under the Plan.

**B.      Summary of Distributions Under the Plan**

The following is a summary of the distributions under the Plan.  It is qualified in its entirety by reference to the full text of the Plan, which is attached to this Disclosure Statement as Exhibit "A".

The claim amounts set forth below reflect what the Debtors believe to be reasonable estimates of the likely resolution of outstanding disputed Claims.  The amounts utilized may differ from the outstanding filed claims amounts.

The following chart summarizes the distribution to unclassified and classified Claims under the Plan:

## UNCLASSIFIED CLAIMS

| Classes of Claims | Treatment of Classes of Claims |
|---|---|
| Administrative Expense Claims (includes costs of the chapter 11 proceedings for the Debtors and expenses of operation as specified in section 503(b) and 507(a)(2) of the Bankruptcy Code including Fee Claims, Section 503(b)(9) Claims, Claims arising after the Petition Date, obligations with respect to assumed executory contracts and leases, and any outstanding statutory fees), but not including DIP Claims.<br><br>Estimated Claims:  Approximately $[__] million | On the Distribution Date, each holder of an Allowed Administrative Expense Claim shall receive in full satisfaction of such Claims (i) the amount of such holder's Allowed Administrative Expense Claim in one Cash payment, or (ii) such other treatment as may be agreed upon in writing by the Debtors and such holder; provided, that such treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Administrative Expense Claim; provided, further, that an Administrative Expense Claim representing a liability incurred postpetition in the ordinary course of business of the Debtors may be paid at the Debtors' election in the ordinary course of business.<br><br>**Estimated Recovery:  100% of Allowed Claim.** |

| | |
|---|---|
| Priority Tax Claims<br><br>Estimated Claims: Approximately $[__] million | Each holder of an Allowed Priority Tax Claim will receive in full satisfaction of such holder's Allowed Priority Tax Claim, (i) on the Distribution Date, the amount of such holder's Allowed Priority Tax Claim in Cash; or (ii) such other treatment as may be agreed upon in writing by such holder; provided, that such agreed-upon treatment may not provide such holder with a return having a present value as of the Effective Date that is greater than the amount of such holder's Allowed Priority Tax Claim.<br><br>**Estimated Recovery: 100% of Allowed Claim.** |
| DIP Claims<br><br>Estimated Claims: Approximately $[__] million | All obligations of the Debtors under the DIP Loan Facility will be paid in full in Cash on the Effective Date from the proceeds of the Exit Facility.<br><br>**Estimated Recovery: 100% of Allowed Claim.** |
| Intercompany Financing Claims<br><br>Estimated Claims: Approximately $[__] | All Intercompany Financing Claims shall, notwithstanding the occurrence of the Effective Date, remain outstanding and be retained by Reorganized Centaur, LLC.<br><br>**Estimated Recovery: 100% of Allowed Claim.** |

<u>**CLASSIFIED CLAIMS AND INTERESTS**</u>

| <u>**Classes of Claims and Interests**</u> | <u>**Treatment of Classes of Claims and Interests**</u> |
|---|---|
| Class 1 – Priority Non-Tax Claims<br><br>Estimated Claims: Undetermined | Unimpaired.<br><br>Each Allowed Priority Non-Tax Claim shall be unimpaired under the Plan, and, pursuant to section 1124 of the Bankruptcy Code, all of the legal, equitable and contractual rights to which such Claim entitles the holder in respect of such Claim shall be fully reinstated and retained, and such Allowed Priority Non-Tax Claim (including any amounts to which such holder is entitled pursuant to section 1124(2) of the Bankruptcy Code) shall be paid in full in accordance with such reinstated rights on the Effective Date.<br><br>**Estimated Recovery: 100% of Allowed Claim.** |

| Class 2 – First Lien Claims | Impaired. |
|---|---|
| Estimated Claims:  Approximately $[__] million | Each holder of an Allowed First Lien Claim shall, on the Distribution Date, in full satisfaction of such holder's Allowed First Lien Claim, receive a Pro Rata Share, in accordance with that holder's Pro Rata Share of the Allowed First Lien Claims, of (i) the First Lien Take Back Paper, (ii) [97.8] percent of the NewCo PIK Notes, and (iii) the NewCo Warrants. |
| | **Estimated Recovery:  ___% of Allowed Claim.** |
| Class 3  – Second Lien Claims | Impaired. |
| Estimated Claims:  Approximately $[__] million | Each holder of an Allowed Second Lien Claim shall, on the Distribution Date, in full satisfaction of such holder's Allowed Second Lien Claim, receive a Pro Rata Share, in accordance with that holder's Pro Rata Share of the aggregate of the Allowed Second Lien Claims and Allowed Valley View Downs Unsecured Claims, of [2.2] percent of the NewCo PIK Notes.  This distribution of NewCo PIK Notes is being offered to the holders of Allowed Second Lien Claims solely in settlement of the controversy described in Section V.C.(c) below. |
| | **Estimated Recovery:  ___% of Allowed Claim.** |
| Class 4 – Other Secured Claims | Unimpaired. |
| Estimated Claims:  Approximately $[__] | Each holder of an Allowed Other Secured Claim shall, on the Distribution Date, be reinstated or rendered unimpaired in accordance with section 1124 of the Bankruptcy Code.  All Allowed Other Secured Claims not due and payable shall, at the Debtors' option in consultation with the Consenting First Lien Claimholders, be paid (i) in the ordinary course of business or (ii) by transfer of the collateral securing the Other Secured Claims. |
| | **Estimated Recovery:  100% of Allowed Claim.** |

| Class 5 – Valley View Downs Unsecured Claims | Impaired. |
|---|---|
| Estimated Claims: Approximately $[__] | Each holder of an Allowed Valley View Downs Unsecured Claim shall, on the Effective Date, in full satisfaction of such holder's Allowed Valley View Downs Unsecured Claim, receive a Pro Rata Share, in accordance with such holder's Pro Rata Share of the aggregate of the Allowed Second Lien Claims and Allowed Valley View Downs Unsecured Claims, of [2.2] percent of the NewCo PIK Notes. This distribution of NewCo PIK Notes is being offered to the holders of Allowed Valley View Downs Unsecured Claims solely in settlement of the controversy described in Section V.C.(c) below. |
| | **Estimated Recovery: ___% of Allowed Claim.** |
| Class 6 – General Unsecured Claims | Impaired. |
| Estimated Claims: Approximately $[__] million | On the Effective Date, all General Unsecured Claims will be cancelled and all holders of General Unsecured Claim will receive no distribution on account such claims. |
| | **Estimated Recovery: None.** |
| Class 7 – Convenience Claims | Unimpaired. |
| Estimated Claims: Approximately $[__][4] | Each holder of an Allowed Convenience Claim shall receive a single Cash payment equal to 100 percent of its Allowed Convenience Claim. |
| | **Estimated Recovery: 100% of Allowed Claim.** |

---

[4]     Pursuant to the Convenience Class Election, each holder of Valley View Downs Unsecured Claims or General Unsecured Claims may elect to reduce its Allowed Claims, in their entirety, to $[__], and thereby receive treatment in Class 7 – Convenience Claims in full satisfaction of all of its Allowed Claims. As such, the estimated amount of Allowed Convenience Claims may increase based on the number of creditors electing the Convenience Class Election.

| | |
|---|---|
| Class 8 – Intercompany Claims | Impaired. |
| Estimated Claims:  Approximately $[__] | On the Effective Date, all Intercompany Claims will be cancelled and all holders of Intercompany Claims will receive no distribution on account of such claims. |
| | **Estimated Recovery:  None.** |
| Class 9 – Borrower Equity Interests | Impaired. |
| | Borrower Equity Interests will be cancelled and the holders of Borrower Equity Interests will receive no distribution on account of such interests. |
| | **Estimated Recovery:  None.** |
| Class 10 – Subsidiary Equity Interests | Unimpaired. |
| | Each holder of an Allowed Subsidiary Equity Interest will be unimpaired under the Plan, and, pursuant to section 1124 of the Bankruptcy Code, all of the legal, equitable and contractual rights to which such Subsidiary Equity Interests entitle such holder in respect of such Subsidiary Equity Interests will be fully reinstated and retained on and after the Effective Date. |
| | **Estimated Recovery:  ___%.** |

# V.

## GENERAL INFORMATION

The Debtors consist of Centaur, LLC and thirteen (13) of its direct and indirect subsidiaries. The chart below depicts the corporate structure of non-debtor Centaur, Inc. and its subsidiaries, including the fourteen (14) Debtors, as of the date of this Disclosure Statement. The description in "General Information" of the Debtors and their business does not give effect to any changes in the corporate structure of the Debtors in connection with or under the Plan.



☐ = Non-Debtor

## A.    The Businesses of the Debtors

The Debtors are leading domestic horse racing, off-track betting ("OTB") and casino operators with approximately 219,000 square feet of combined gaming space. The Debtors currently own, operate, and/or have interests in racing and casino facilities in five distinct gaming markets in Indiana and Colorado, with a project in-progress in northwest Pennsylvania. The Debtors employ approximately 1,300 full and part-time individuals.

The Debtors own and operate Hoosier Park, a casino and horse racing track in Anderson, Indiana, along with three OTB facilities located in downtown Indianapolis, Fort Wayne, and Merrillville (collectively, the "OTB Facilities"). Hoosier Park is one of Indiana's

two horse racing tracks with seating capacity for 2,750 racing patrons and offering 143 days of live racing per year. Fully integrated with Hoosier Park's racing facilities is a Las Vegas-style 92,000 square-foot casino building with nine bars and restaurants. The single-level casino floor features 2,000 slot machines and electronic table games including craps, poker, blackjack, and roulette. The three OTB Facilities average 22,500 square feet and seat 400 patrons, on average.

The Debtors also own the Fortune Valley Hotel & Casino in Central City, Colorado ("Fortune Valley"), located approximately 35 miles west of Denver. Fortune Valley's 37,000 square feet of gaming space offers nearly 750 slots, video poker, video keno, and live table games including craps, roulette, blackjack, and poker. The two-floor complex also offers three restaurants, two bars and a multi-story hotel featuring 118 guest rooms and a parking garage.

The Debtors hold a racing, gaming, and entertainment development opportunity, to be known as "Valley View Downs", in Lawrence County, Pennsylvania, 55 miles northwest of Pittsburgh. The Debtors currently own approximately 250 acres of land upon which they plan to construct Valley View Downs. In September 2007, the Debtors secured a racing license for Valley View Downs which entitles the Debtors to a gaming license subject to securing certain necessary approvals. As of the Petition Date, the Debtors had not yet secured all necessary approvals and licenses for the completion of Valley View Downs. The Debtors intend, however, to continue to spend those amounts necessary to prepare, during the pendency of the Chapter 11 Cases, to construct the casino, racetrack and entertainment venues at Valley View Downs.

## B. Management

It is anticipated that the managers, limited and general partners, and officers of each of the Debtors who are serving as of the Confirmation Date will continue to serve in such capacities until the Effective Date. Entry of the Confirmation Order shall ratify and approve all actions taken by the managers, limited and general partners, and officers of the Debtors from the Petition Date through and until the Effective Date. Below is a list of the officers of the Debtors:

*Roderick J. Ratcliff.* Mr. Ratcliff currently serves as President and Chief Executive Officer of the Debtors. Mr. Ratcliff has served in this and other leadership positions within the Centaur group of companies since 1993.

*Kurt E. Wilson.* Mr. Wilson currently serves as Executive Vice President and Chief Financial Officer of the Debtors. Mr. Wilson has served in this and other leadership positions within the Centaur group of companies since 1993.

*Jeffrey M. Smith.* Mr. Smith currently serves as the General Manager of Racing at Hoosier Park and previously served as General Manager of Racing, Centaur, Inc. and Chief Executive Officer of Racing, Centaur, Inc. Mr. Smith has served in those positions since 2001.

*James L. Brown.* Mr. Brown currently serves as the General Manager of Gaming at Hoosier Park. Mr. Brown has served in that position since 2007.

*Joseph M. DeRosa*.  Mr. DeRosa currently serves as the General Manager of Gaming at Valley View Downs.  Mr. DeRosa has served in that position since 2008.

*Phil Bainbridge*.  Mr. Bainbridge currently serves as General Counsel of the Debtors.  Mr. Bainbridge has served in that position since 2006.

## C.    Prepetition Capital Structure

Centaur, LLC is the operating company that coordinates and manages the Hoosier Park (and related OTB Facilities, dining establishments and bars) operations, the Fortune Valley operations and the proposed Valley View Downs operations.  Centaur, LLC is wholly owned by Holdings, which itself is wholly-owned by Centaur, Inc.  Neither Centaur, Inc. nor Holdings is a Debtor in these chapter 11 cases.

In connection with guarantees of the First and Second Lien Debt (each as defined below) issued by Centaur, LLC's direct and indirect subsidiaries, there are thirteen restricted subsidiaries of Centaur, LLC, including Centaur Pennsylvania, LLC; VVD Properties General Partner, LLC; Valley View Downs GP, LLC; VVD Properties, LP; Valley View Downs, LP; Centaur PA Land Management, LLC; Centaur PA Land General Partner, LP; Centaur PA Land, LP; HP Dining & Entertainment, LLC; Hoosier Park, L.P.; Centaur Racing, LLC; Centaur Indiana, LLC; and Centaur Colorado, LLC (collectively, the "Restricted Subsidiaries"), and five unrestricted subsidiaries of Centaur, LLC (collectively, the "Unrestricted Subsidiaries").  The Restricted Subsidiaries own substantially all of the Company's material assets.  The Unrestricted Subsidiaries currently generate no revenue and hold no material assets other than approximately 194 acres of land in Pennsylvania.  The Unrestricted Subsidiaries are not Debtors in these chapter 11 cases.

### (a)    First Lien Debt

On or about September 17, 2008, Holdings, Centaur, LLC and the Restricted Subsidiaries entered into the Prepetition First Lien Credit Agreement, a $610 million revolving credit and term loan agreement, with Credit Suisse, Cayman Islands Branch ("Credit Suisse"), as administrative agent and collateral agent and certain lenders from time to time party thereto (collectively, the "First Lien Lenders").  The Prepetition First Lien Credit Agreement provides for (i) a first-lien security interest in, and lien on, substantially all property and assets of Centaur, LLC and the Restricted Subsidiaries (collectively, the "Collateral"), (ii) a first-lien guarantee of all obligations under the Prepetition First Lien Credit Agreement and related documents by the Restricted Subsidiaries and (iii) a first-lien equity pledge by Holdings of all its equity interests in Centaur, LLC.  In addition, Centaur, LLC entered into certain Interest Rate Swap Agreements (collectively, the "Swap") with Credit Suisse to manage the risk associated with the variable interest rate under the Prepetition First Lien Credit Agreement.  Obligations owing under the Swap are secured ratably with the obligations owing under the Prepetition First Lien Credit Agreement.

As of the Petition Date, not less than $382.5 million in principal amount was outstanding under the Prepetition First Lien Credit Agreement comprised of:  approximately $15.0 million outstanding under the revolving loan, approximately $338.8 million outstanding

under the term loan and approximately $28.7 million recorded as a liability under the Swaps (and with all accrued but unpaid interest, costs, fees, charges and expenses (including default interest, as applicable) owing under the First Lien Credit Agreement and the Swaps, collectively, the "First Lien Debt"). The First Lien Debt had accelerated prior to the date the Valley View Downs Debtors commenced their chapter 11 cases.

(b) **Second Lien Debt**

On or about September 17, 2008, Holdings, Centaur, LLC and the Restricted Subsidiaries entered into the Prepetition Second Lien Credit Agreement, a $180 million revolving term loan agreement, with Wells Fargo Bank, N.A. as successor administrative agent and collateral agent and certain lenders from time to time party thereto (collectively, the "Second Lien Lenders"). The Prepetition Second Lien Credit Agreement provides for (i) a second-lien security interest in, and lien on, the Collateral, (ii) a second-lien guarantee of all obligations under the Prepetition Second Lien Credit Agreement and related documents by the Restricted Subsidiaries and (iii) a second-lien equity pledge by Holdings of all its equity interests in Centaur, LLC.

As of the Petition Date, approximately $192 million in principal amount was outstanding under the Prepetition Second Lien Credit Agreement (the "Second Lien Debt"). The Second Lien Debt had not accelerated as of the date the Valley View Downs Debtors commenced their chapter 11 cases.

(c) **Pennsylvania Cash Collateralized L/C**

The Existing L/C was issued in October 2007 in the amount of $50 million to the Commonwealth of Pennsylvania in connection with the application for a gaming license in Pennsylvania to secure the Debtors' obligations thereunder. The L/C Issuer holds a $50 million cash deposit in an account in the name of the L/C Issuer to secure the Existing L/C (the "L/C Cash Collateral").

The Existing L/C was set to expire by its terms on October 30, 2009. The Debtors were unable to obtain an extension of the expiring Existing L/C absent the grant of protections that only the Bankruptcy Court could provide. As a consequence, the Valley View Downs Debtors (as defined below) filed chapter 11 cases in the Bankruptcy Court on October 28, 2009. The Bankruptcy Court approved an initial amendment of the Existing L/C by the L/C Issuer to extend the term thereof until January 29, 2010 on an interim basis on October 30, 2009 [Case No. 09-13760 (KJC), D.I. 15] and a final basis on November 23, 2009 [Case No. 09-13760 (KJC), D.I. 50]. The Bankruptcy Court approved a further amendment of the Existing L/C by the L/C Issuer to extend the term thereof for an additional ninety (90) days until April 29, 2010 by Order dated January 25, 2010 [Case No. 09-13760 (KJC), D.I. 82].

Pursuant to Sections 2.1 and 2.2 of the First Lien Pledge and Security Agreement and the Second Lien Pledge and Security Agreement, each dated October 30, 2007 (as each may have been amended, restated or modified from time to time, the "Prepetition Security Agreements"), and each among Centaur, LLC, as borrower, Centaur, LLC and the Restricted Subsidiaries, as grantors, and Credit Suisse, as collateral agent, the First Lien Lenders' and

Second Lien Lenders' security interests do not extend to certain "Excluded Collateral" (as defined in Section 2.2 of the Prepetition Security Agreements). The Prepetition First Lien Claimholders' and Prepetition Second Lien Claimholders' prepetition security interests do not presently extend to the L/C Cash Collateral to the extent that the L/C Cash Collateral falls within the definition of "Excluded Collateral."

Although the Prepetition First Lien Agent does not dispute that the L/C Cash Collateral is not encumbered by its security interests while pledged to secure the Existing L/C, the Prepetition First Lien Agent believes that as a result of its and the First Lien Lenders' rights under that certain Letter of Credit and Reimbursement Agreement, dated October 30, 2007 (as amended, restated, extended or otherwise modified from time to time, the "Reimbursement Agreement") among Valley View Downs, LP and the L/C Issuer, the Prepetition First Lien Agent's and First Lien Lenders' security interests would attach to the funds should the L/C Cash Collateral be returned to Valley View Downs, LP pursuant to the terms of the Reimbursement Agreement (for instance, upon the Commonwealth of Pennsylvania's rejection of the Pennsylvania Gaming License Application or expiration, without timely amendment and extension, of the Existing L/C).

The Prepetition Second Lien Agent and Goldman Sachs Specialty Lending Holdings, Inc. ("Goldman Sachs"), a Second Lien Lender, have taken the position that the L/C Cash Collateral is unencumbered. Moreover, the Debtors expect that the Prepetition Second Lien Agent and Goldman Sachs will dispute the Prepetition First Lien Agent's contention that the Prepetition First Lien Agent and First Lien Lenders would have a first priority lien on the L/C Cash Collateral in the event it reverts back to Valley View Downs, LP by virtue of the Prepetition First Lien Agent's and First Lien Lenders' rights under the Reimbursement Agreement.

The relative rights and priorities of the Prepetition First Lien Agent and the First Lien Lenders, on the one hand, and the Prepetition Second Lien Agent and the Second Lien Lenders, on the other, with respect to certain shared collateral are set forth in the Prepetition Intercreditor Agreement. It is the position of the Debtors and the Prepetition First Lien Agent that the terms of the Prepetition Intercreditor Agreement prohibit the Prepetition Second Lien Agent and the Second Lien Lenders from objecting to requests for the use of cash collateral where the Prepetition First Lien Agent and First Lien Lenders have consented to the use of cash collateral. See Prepetition Intercreditor Agreement § 6.1. Further, it is the position of the Debtors and the Prepetition First Lien Agent that, pursuant to the terms of the Prepetition Intercreditor Agreement, the Prepetition Second Lien Agent and the Second Lien Lenders expressly waived (1) the right to contest "the priority, validity, perfection or enforceability of a Lien held by or on behalf of any of the First Lien Claimholders in the First Lien Collateral," and, (2) subject to certain other provisions of the Prepetition Intercreditor Agreement, the right to "object to the manner in which the First Lien Collateral Agent or the First Lien Claimholders seek to enforce or collect the First Lien Obligations or the Liens securing the First Lien Obligations granted in any of the First Lien Collateral undertaken in accordance with the Prepetition Intercreditor Agreement, regardless of whether any action or failure to act by or on behalf of the First Lien Collateral Agent or First Lien Claimholders is adverse to the interest of the Second Lien Claimholders." See Prepetition Intercreditor Agreement §§ 2.2, 3.1(d)(2).

In a preliminary objection to certain of the Debtors' first day motions filed on March 9, 2010 [Case No. 09-13760 (KJC), D.I. 128] (the "Goldman Sachs Preliminary Objection"), Goldman Sachs took the position that the Prepetition Intercreditor Agreement deals with "collateral" the definition of which in the Prepetition Intercreditor Agreement does not include the L/C Cash Collateral or any gaming or racing license of Valley View Downs, LP. See Goldman Sachs Preliminary Objection ¶ 9. Consequently, Goldman Sachs takes the view that Second Lien Lenders have the right to object to the grant of any lien in favor of the Prepetition First Lien Agent and the First Lien Lenders on the L/C Cash Collateral, any proceeds thereof or any right of Valley View Downs, LP (or any other person) to receive such $50 million of cash. See id. Goldman Sachs has also asserted that the Second Lien Lenders and their agents are not prohibited from objecting to the terms of use of cash collateral where the Prepetition Second Lien Agent and the Second Lien Lenders are not provided the same adequate protection as the First Lien Lenders and that the Prepetition Intercreditor Agreement expressly permits the Second Lien Lenders to take any action and file any objection as unsecured creditors. See id. Notably, however, although counsel for Goldman Sachs made written and oral objections to the Debtors' use of cash collateral, the Prepetition Second Lien Agent did not object to the request for interim use of cash collateral. The acting duty judge, the Honorable Mary F. Walrath, declined to take up or rule on the correct interpretation of the Prepetition Intercreditor Agreement during the first day hearing on interim use of cash collateral.

**D.     Events Leading to the Commencement of the Chapter 11 Cases**

The Debtors have suffered substantial delays related to the licensing and construction of Valley View Downs. The lack of cash flow from this project, combined with the payment of a $250 million licensing fee in Indiana, and the weakened economy have created a situation where operations do not generate sufficient cash flow to support the interest expense under the Prepetition First Lien Credit Agreement and the Prepetition Second Lien Credit Agreement.

On October 27, 2009, scheduled interest payments were due under the Prepetition First Lien Credit Agreement and the Prepetition Second Lien Credit Agreement to the First Lien Lenders and the Second Lien Lenders. The Debtors failed to make such interest payments because they did not have sufficient liquidity to cover the interest payments and operate their businesses. Since then, the Debtors had been operating in default of their obligations under the Prepetition First Lien Credit Agreement and the Prepetition Second Lien Credit Agreement while engaging in negotiations with their lenders regarding a consensual, comprehensive restructuring of their debt and a recapitalization of their businesses.

Pursuant to the Prepetition Intercreditor Agreement, the Prepetition Second Lien Agent and Second Lien Lenders were prohibited from exercising any remedy for default under the Prepetition Second Lien Credit Agreement only until March 6, 2010—the 120th day following the date upon which the collateral agent under the Prepetition Second Lien Credit Agreement declared the existence of an event of default under the Prepetition Second Lien Credit Agreement (the "Standstill Period"). The Debtors determined that, once the Standstill Period expired, it would no longer be prudent to continue operating without the protection of the Bankruptcy Court. Consequently, to preserve the Debtors' businesses as going concerns and to facilitate the restructuring of their debt, the Debtors (other than Centaur PA Land, LP and Valley

View Downs, LP) commenced chapter 11 cases on March 6, 2010 to obtain the protection that only the Bankruptcy Court could provide.

## VI.

## THE REORGANIZED COMPANY

Pursuant to the Plan, immediately following the Effective Date, the Reorganized Debtors will be direct and indirect subsidiaries of NewCo, an [Indiana limited liability company] managed by a Board of Managers, the composition of which shall be acceptable to the Consenting First Lien Claimholders. The members of the Board of Managers will be required to be licensed by the [all required regulatory authorities]. The Board of Managers will have the authority to manage the business and direct the affairs of NewCo. The equity interests of NewCo will be distributed in a manner satisfactory to the Consenting First Lien Claimholders but will be subject to dilution upon the conversion of the NewCo Warrants to be issued to holders of Allowed First Lien Claims.

The Plan also provided for the issuance by NewCo of the NewCo PIK Notes having an aggregate face amount of $[__] million and bearing interest of [__] percent per annum, which shall be payable-in-kind. Certain of the holders of the NewCo PIK Notes will also receive non-detachable penny warrants to purchase up to [__] percent of the NewCo Membership Interests, calculated on a fully-diluted basis after the exercise of the NewCo Warrants, which will be [(i) exercisable by a holder thereof in accordance with the terms of the NewCo Warrants and upon such holder becoming licensed by the [all required regulatory authorities], and (ii) transferrable, subject to any applicable securities and other laws and in accordance with the terms of the NewCo Warrants.]

The Plan further contemplates that the Reorganized Debtors will issue the First Lien Take Back Paper, which will be new first lien debt in an amount equal to $115 million, less the amount of the Exit Facility, which debt will be structured in such a manner as to allow for the incurrence of senior debt pursuant to the Exit Facility. The terms of the First Lien Take Back Paper are described more fully in Exhibit "D" hereto. The First Lien Take Back Paper shall be in substantially the form filed with the Bankruptcy Court as a Plan Document.

The Reorganized Debtors also intend to enter into the Exit Facility, which will be a first priority secured facility extended to Reorganized Centaur, LLC, as borrower and NewCo and the Subsidiary Guarantors, as guarantors. The Exit Facility will be in an amount agreed upon by the Debtors and the Consenting First Lien Claimholders. The proceeds of the Exit Facility will be used to, among other things, repay any DIP Claims in full in Cash on the Effective Date and pay the costs associated with the Debtors' emergence from the Chapter 11 Cases. The terms of the Exit Facility are described more fully in Exhibit "D" hereto. The Exit Facility shall be in substantially the form filed with the Bankruptcy Court as a Plan Document.

# VII.

## SELECTED FINANCIAL INFORMATION

**A.     Consolidated and Year-to-Date Annual Financial Information for the Debtors**

[TO COME]

# VIII.

## FINANCIAL PROJECTIONS AND ASSUMPTIONS; VALUATION

**A.     Purpose and Objectives**

The Debtors' long term business plan (the "<u>Business Plan</u>") and the underlying projections and assumptions serve as the basis for the Plan.  The Debtors believe that the assumptions that underlie the projections are reasonable under the circumstances and that achieving the projections set forth herein will maximize the value of the Debtors' businesses. The Debtors have prepared the projected operating and financial results (the "<u>Projections</u>") on a consolidated basis for the Reorganized Debtors for the period ending five years from the Effective Date.  The Projections and a summary of significant assumptions related thereto are attached to this Disclosure Statement as Exhibit "B".

**B.     Consolidated Pro Forma Statement of Financial Position**

The Debtors have prepared consolidated pro forma statements of financial position of the Reorganized Debtors (the "<u>Pro Forma Statements</u>").  The Pro Forma Statements are attached hereto as Exhibit "C" and reflect the Projections with respect to the consolidated financial position of the Reorganized Debtors assuming the effects of certain transactions that will occur in connection with and upon consummation of the Plan.

**C.     Valuation**

[TO COME]

# IX.

## THE CHAPTER 11 CASES

### A.    Commencement of the Chapter 11 Cases

On October 28, 2009, Centaur PA Land, LP and Valley View Downs, LP (the "Valley View Downs Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, the Honorable Kevin J. Carey presiding.  On March 6, 2010, the remaining Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the "Centaur Debtors").

### B.    Continuation of Business after the Petition Date

Since October 28, 2009 and March 6, 2010, the Valley View Downs Debtors and the Centaur Debtors, respectively, have continued to operate their businesses and manage their property as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As discussed in this section, during the period immediately following the date the Valley View Downs Debtors commenced their chapter 11 cases and the date the Centaur Debtors commenced their chapter 11 cases, the Debtors sought and obtained authority from the Bankruptcy Court with respect to a number of matters deemed by the Debtors to be essential to their smooth and efficient transition into chapter 11 and the stabilization of their operations.  As also described below, the Debtors intend to seek authority to obtain debtor-in-possession financing.

(a)    **Letter of Credit**

In October 2007, the Debtors had contracted with the L/C Issuer, to provide the $50 million Existing L/C to the Commonwealth of Pennsylvania for the purpose of securing the Debtors' application for a gaming license in Pennsylvania related to Valley View Downs.  The Existing L/C was scheduled to expire on October 30, 2009.  The Debtors were unable to obtain an extension of the expiring Existing L/C absent the grant of protections that only the Bankruptcy Court could provide.

As mentioned above, the Bankruptcy Court approved an initial amendment of the Existing L/C by the L/C Issuer to extend the term thereof until January 29, 2010 on an interim basis on October 30, 2009 [Case No. 09-13760 (KJC), D.I. 15] and a final basis on November 23, 2009 [Case No. 09-13760 (KJC), D.I. 50].  The Bankruptcy Court approved a further amendment of the Existing L/C by the L/C Issuer to extend the term thereof for an additional ninety (90) days until April 29, 2010 by Order dated January 25, 2010 [Case No. 09-13760 (KJC), D.I. 82].  Pursuant to the Plan, the Existing L/C will be further amended, and the term thereof extended, or replaced.

(b)    **Intercompany Financing**

The Bankruptcy Court, by interim and final Orders, dated November 23, 2009 [Case No. 09-13760 (KJC), D.I. 49] and December 4, 2009 [Case No. 09-13760 (KJC), D.I. 60] (the "Final Intercompany Financing Order"), respectively, authorized the Valley View Downs Debtors to obtain unsecured postpetition financing from the Valley View Downs Debtors'

indirect parent company, Centaur, LLC, to enable the Valley View Downs Debtors to continue to incur, on a postpetition basis, certain limited, but necessary, operating costs, obligations to vendors, consultants, and regulatory authorities related to their gaming license application pending in Pennsylvania, and to satisfy certain nominal prepetition expenses, including expenses related to the gaming license application (the "Intercompany Financing").  On or about March 16, 2010, the Bankruptcy Court entered an Order supplementing the Final Intercompany Financing Order, and, inter alia, authorizing the Valley View Downs Debtors to obtain up to an additional $165,000 of Intercompany Financing [Case No. 09-13760 (KJC), D.I. 164].

   The Intercompany Financing is necessary to maintain the Valley View Downs Debtors' relationships with their vendors, consultants and regulatory authorities and will permit the Debtors to preserve their racing, gaming and entertainment development opportunity at Valley View Downs.  Such intercompany borrowings are reflected on the Valley View Downs Debtors' books as a loan and are subordinate and subject in right of payment to the obligations of the First Lien Lenders and Second Lien Lenders pursuant to the terms of an intercompany subordinated demand and promissory note dated October 30, 2007.  The Intercompany Financing Claim is junior only to the superpriority administrative expense claim of the L/C Issuer with respect to the Valley View Downs Debtors' obligations pursuant to the Reimbursement Agreement.   All receivables arising from the Intercompany Financing are pledged to the Prepetition First Lien Agent and the First Lien Lenders.

   (c)  **Use of Cash Collateral**

   By motion filed shortly after the Petition Date (the "Cash Collateral Motion"), the Debtors sought emergency relief (i) authorizing the use of the First Lien Lenders' and Second Lien Lenders' cash collateral (ii) granting adequate protection and (iii) scheduling a final hearing.  As of the Petition Date, the Debtors' only source of liquidity was the First Lien Lenders' and Second Lien Lenders' cash collateral and the income generated by the Debtors' business operations.  Given that substantially all of the Debtors' assets are encumbered by the First Lien Lenders' and Second Lien Lenders' liens, the Debtors would have been unable to continue their business operations or fund their Chapter 11 Cases absent some form of immediate relief from the Bankruptcy Court.  The Cash Collateral Motion also proposed that certain adequate protection be provided to the First Lien Lenders' and Second Lien Lenders' including (i) replacement liens, (ii) superpriority claims under section 507(b) of the Bankruptcy Code, and (iii) certain financial reporting by the Debtors.

   On March 9, 2010, Goldman Sachs filed the Goldman Sachs Preliminary Objection and objected to, among other things, the Debtors' Cash Collateral Motion.  Among other things, Goldman Sachs argued in the Goldman Sachs Preliminary Objection that the relief requested in the Cash Collateral Motion should be denied because assets of Valley View Downs, LP should not be used for adequate protection for the use of cash collateral by Debtors other than Valley View Downs, LP where Valley View Downs, LP would get no benefit from such use and where it would be detrimental to creditors of Valley View Downs, LP.  See Goldman Sachs Preliminary Objection, at 11.  The predicate for this argument and other objections raised by Goldman Sachs in the Goldman Sachs Preliminary Objection is Goldman Sachs' assertion that the Prepetition First Lien Agent and the First Lien Lenders do not have a lien on the $50 million

cash deposit that the Debtors posted in connection with the Existing L/C.  See Goldman Sachs Preliminary Objection, at ¶¶ 1, 10.

By interim Orders entered March 11, 2010 [Case No. 10-10799 (KJC), D.I. 39] and March 22, 2010 [Case No. 09-13760 (KJC), D.I. 175], the Bankruptcy Court granted the relief requested in the Cash Collateral Motion with some modifications.

(d)    **Debtor-in-Possession Financing**

The Debtors anticipate seeking authority for the Debtors to enter into the DIP Loan Facility, a $[__] million term loan facility with the DIP Lender.  Under the Plan, all obligations of the Debtors under the DIP Loan Facility will be paid in full in Cash on the Effective Date with the proceeds of the Exit Facility.

(e)    **Business Operations and Bankruptcy-Related Relief**

The Debtors sought various types of "first day" relief, including among other things, orders (i) authorizing the Debtors to continue to use their existing cash management systems; (ii) authorizing the Debtors to pay certain prepetition obligations owing to the Debtors' employees, independent contractors and other third parties; (iii) prohibiting the Debtors' utility companies from altering, refusing or discontinuing service; (iv) authorizing the Debtors to honor certain prepetition customer programs; (v) authorizing the Debtors to pay certain prepetition taxes owed to taxing and regulating authorities in the ordinary course of business; (vi) authorizing the Debtors to pay certain obligations to maintain their insurance programs and insurance premium financing arrangements; and (vii) authorizing the Debtors to pay prepetition claims of certain essential suppliers.

The Debtors filed a motion (the "Cash Management Motion" pursuant to sections 363(c) and 345 of the Bankruptcy Code, seeking authority to, among other things, continue use of their current cash management systems (the "Cash Management Systems").  The Debtors also sought, among other things, (i) approval of the Debtors' continued use of their prepetition bank accounts and business forms, (ii) authority for the Debtors' banks to honor certain transfers and (iii) authority to continue certain intercompany transactions.  The Cash Management Systems are ordinary course, essential business practices of the Debtors and in light of certain regulatory requirements imposed due to the nature of the Debtors' racing and gaming operations, any disruption in their cash management procedures would hamper the Debtors' efforts to preserve the value of their estates.  On March 10, 2010 the Bankruptcy Court entered an Order granting the relief requested in the Cash Management Motion as modified in the Centaur Debtors' chapter 11 cases [Case No. 10-10799 (KJC), D.I. 30].  On March 11, 2010, the Bankruptcy Court entered an interim Order granting the relief requested in the Cash Management Motion as modified in the Valley View Downs Debtors' chapter 11 cases [Case No. 09-13760 (KJC), D.I. 153].

The Debtors also filed a motion (the "Employee Motion") for authority to, inter alia, pay certain prepetition obligations owing to the Debtors' employees, independent contractors and other third parties.  Among other things, the Debtors requested authority to pay or otherwise honor (i) prepetition employee wages, salaries, tips, vacation time and other accrued compensation (collectively, the "Compensation"); (ii) obligations relating to employee benefits

provided by the Debtors; (iii) amounts owed to administrators or providers of services with respect to the Debtors' payroll and employee benefits programs; (iv) certain workers' compensation obligations; and (v) other miscellaneous employee related expenses. By the Employee Motion, the Debtors also asked for authority to continue in the ordinary course, pay and otherwise honor any Compensation in the form of unused paid vacation time that, as of the Petition Date, had accrued but was not yet payable, if and when such Compensation becomes due and to pay cash in lieu of unused vacation time only where the Debtors believe they are required to do so by applicable state law. Moreover, the Debtors requested authority to remit prepetition amounts withheld or deducted from their employees' wages to the appropriate third parties and to make further payments in the ordinary course of or with respect to Compensation, employee benefits, workers' compensation obligations and obligations to administrative service providers. The Debtors deemed much of the relief sought in the Employee Motion critical to employee morale and future business needs. By Order entered March 10, 2010 in the Centaur Debtors' chapter 11 cases, the Bankruptcy Court granted the relief requested in the Employee Motion as modified [Case No. 10-10799 (KJC), D.I. 22].

The Debtors also filed a motion (the "<u>Utilities Motion</u>") seeking entry of an order pursuant to sections 105(a) and 366(b) of the Bankruptcy Code, prohibiting utility companies from altering, refusing or discontinuing service to the Debtors, providing for the payment of certain deposits as adequate assurance of future payment to those utility companies and establishing certain procedures for addressing requests by utility companies for additional adequate assurance. If the Debtors' utility companies are allowed to alter, refuse or discontinue service to the Debtors, the Debtors' ability to continue their operations and reorganize will be jeopardized. On March 10, 2010, the Bankruptcy Court entered an interim Order granting the relief requested in the Utilities Motion in the Centaur Debtors' chapter 11 cases [Case No. 10-10799 (KJC), D.I. 23].

The Debtors also filed a motion (the "<u>Customer Programs Motion</u>") seeking entry of an order pursuant to sections 105(a) and 363 of the Bankruptcy Code, authorizing, but not directing, the Debtors, in their business judgment, to continue to honor prepetition (i) obligations to customers and otherwise continue customer programs, and (ii) Horsemen Accounts (as defined below) that the Debtors maintained prior to the Petition Date to help the Debtors remain competitive in the markets in which they operate. Among other things, the Debtors requested authority to honor prepetition obligations related to outstanding wagering obligations, progressive slot and poker liabilities, cage accounts, patron reward programs, gift certificates and coupons and promotions. These customer programs are essential to provide the level of customer satisfaction and loyalty on which the Debtors' operations depend. As part of the Customer Programs Motion, the Debtors also asked for authority to honor obligations owed to, and continue to operate, accounts (the "<u>Horsemen Accounts</u>") set up for the owners (the "<u>Horsemen</u>") of the horses that win the races held at Hoosier Park. This relief is necessary to ensure that the Horsemen will continue to enter their horses in the races at Hoosier Park. By Order entered March 10, 2010 in the Centaur Debtors' chapter 11 cases, the Bankruptcy Court granted the relief requested in the Customer Programs Motion [Case No. 10-10799 (KJC), D.I. 21].

The Debtors also filed a motion (the "<u>Taxes and Fees Motion</u>") seeking entry of an order pursuant to sections 105(a) and 363 of the Bankruptcy Code, authorizing, but not

21

directing, the Debtors, in their business judgment, to continue to honor prepetition obligations owed to federal, state and local taxing and regulating authorities including, but not limited to, gaming and racing taxes and fees, hotel taxes, sales and use taxes, and "winnings" taxes (collectively, the "Taxes and Fees").  The Debtors operate racing, gaming and hotel facilities that are heavily regulated and which require periodic payment of the Taxes and Fees to maintain the licenses and rights to operate those facilities in the respective states.  If the Debtors fail to timely pay the necessary Taxes and Fees, their regulatory authorizations to operate their racing, gaming and hotel facilities could be suspended or revoked.  On March 10, 2010, the Bankruptcy Court entered an Order granting the relief requested in the Taxes and Fees Motion in the Centaur Debtors' chapter 11 cases [Case No. 10-10799 (KJC), D.I. 24].

The Debtors also filed a motion (the "Insurance Motion") seeking entry of any order pursuant to sections 105(a) and 363 of the Bankruptcy Code, authorizing, but not directing, the Debtors, in their business judgment, to continue their insurance programs and to pay certain prepetition obligations owed in connection therewith.  In connection with the daily operation of their businesses, the Debtors maintain certain insurance policies in respect of, among other things, property, commercial general liability, automobile and garagekeepers, participant accident, excess liability, criminal liability, employment practices and fiduciary liability and directors and officers liability.  A portion of the premiums are financed through premium financing arrangements.  The continuation of these insurance policies and premium financing arrangements is necessary to allow the Debtors to maintain a comprehensive range of coverage in full force and effect for the Debtors, their businesses and their properties.  By Order entered March 10, 2010 in the Centaur Debtors' chapter 11 cases [Case No. 10-10799 (KJC), D.I. 29] and by Order entered March 11, 2010 in the Valley View Downs Debtors' chapter 11 cases [Case No. 09-13760 (KJC), D.I. 154], the Bankruptcy Court granted the relief requested in the Insurance Motion.

The Debtors also filed a motion (the "Essential Supplier Motion") for, among other things, authority to pay prepetition claims of certain parties who supply goods or services critical to the continued operation of the Debtors' businesses (collectively, the "Essential Suppliers").  The Essential Suppliers that the Debtors sought to pay include (i) a supplier of goods and services related to simulcasting and wagering, (ii) a supplier of tickets and programs necessary in connection with simulcasting and wagering and (iii) a provider of specialized direct mail services.  Based on the lack of any executory contract with any of the Essential Suppliers and the importance of each Essential Supplier to the Debtors' operations, it is the Debtors' position that authorization to pay the claims of the Essential Suppliers, in the event they refuse to continue to provide goods and services, is necessary to prevent immediate and irreparable damage to the Debtors' business operations (and customer confidence therein), going concern value and ability to reorganize that would result from the Debtors' inability to obtain indispensable goods and services.  By the Essential Supplier Motion, the Debtors also sought authority to require, as a condition to any payment to an Essential Supplier, that the Essential Supplier agree to provide the Debtors with goods or services on credit, pricing or payment terms and order limits that are equal to, or better than, those provided to the Debtors prepetition (the "Trade Terms") and proposed consequences that will ensue if a supplier accepts an essential supplier payment and thereafter fails to provide the agreed upon Trade Terms.  On March 10, 2010, the Bankruptcy Court entered an Order granting the relief requested in the Essential Supplier Motion in the Centaur Debtors' chapter 11 cases [Case No. 10-10799 (KJC), D.I. 28].

## C.    Representation of the Debtors

In September 2009, the Debtors retained White & Case LLP as lead bankruptcy counsel to the Debtors in connection with the Chapter 11 Cases.  The Debtors also retained Fox Rothschild LLP to serve as bankruptcy co-counsel.  By separate orders entered January 25, 2010 in the Valley View Downs Debtors' chapter 11 cases, the Bankruptcy Court approved the retention applications of White & Case LLP [Case No. 09-13760 (KJC), D.I. 84] (the "White & Case Retention Order") and Fox Rothschild LLP [Case No. 09-13760 (KJC), D.I. 83] (the "Fox Rothschild Retention Order").  By Order entered March 10, 2010 in the Centaur Debtors' chapter 11 cases, the Bankruptcy Court made the White & Case Retention Order and the Fox Rothschild Retention Order applicable in the Centaur Debtors' chapter 11 cases [Case No. 10-10799 (KJC), D.I. 25].

By applications dated March 18, 2010 [Case No. 09-13760 (KJC), D.I. 168; Case No. 10-10799 (KJC), D.I. 65], the Debtors also sought approval from the Bankruptcy Court to retain Blackstone Advisory Services L.P. as the Debtors' investment banker and financial advisor.

## D.    Formation and Representation of the Committee

On or about March 17, 2010, the U.S. Trustee appointed the Committee [Case No. 09-13760 (KJC), D.I. 186, Case No. 10-10799 (KJC), D.I. 80].  The Committee retained as counsel the law firm of Blank Rome LLP.  In addition, the Committee retained Deloitte Financial Advisory Services LLP as its financial adviser.  The current members of the Committee include: Preit-Rubin, Inc. & PR Valley View Downs, L.P., Ames Construction, Inc., Churchill Downs, Inc., U.S. Food Service, Inc. and WMS Gaming, Inc.

## E.    Representation of the First Lien Lenders

Credit Suisse, as administrative agent and collateral agent for the First Lien Lenders, retained Latham & Watkins LLP and Duane Morris LLP as legal counsel in connection with the Chapter 11 Cases.

## F.    Representation of the Second Lien Lenders

Wells Fargo Bank, N.A., as administrative agent for the Second Lien Lenders, retained Ropes & Gray LLP, Schulte Roth and Zabel LLP, Richards, Layton & Finger, P.A., and Potter Anderson & Corroon LLP as legal counsel in connection with the Chapter 11 Cases.

## G.    Matters Relating to Unexpired Leases and Executory Contracts

Section 365 of the Bankruptcy Code grants a debtor the power, subject to the approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases. As amended, section 365(d)(4) of the Bankruptcy Code provides that if a debtor does not assume or reject an unexpired lease of nonresidential real property under which a debtor is the lessee (i) within 120 days after the petition date (the "365(d)(4) Deadline"), (ii) within an additional 90-day period as the bankruptcy court, for cause, may allow, or (iii) within such additional time as

the bankruptcy court may permit with the consent of the landlord of the leased premises, then such lease is deemed rejected.

By Order of the Bankruptcy Court entered February 23, 2010 [Case No. 09-13760 (KJC), D.I. 101], the Bankruptcy Court extended the initial 365(d)(4) Deadline for the Valley View Downs Debtors through and including May 26, 2010. The initial 365(d)(4) Deadline with respect to the Centaur Debtors is not scheduled to expire until early June 2010.

The Debtors are party to approximately [150] executory contracts and unexpired leases. The Plan contemplates the automatic rejection of executory contracts and unexpired leases, as of and subject to the occurrence of the Effective Date, except for [specific executory contracts and unexpired leases] and any executory contract or unexpired lease specifically designated for assumption.

With respect to the [specific executory contracts and unexpired leases], the Plan contemplates the assumption, as amended, of such contracts as of the Effective Date.

## H.    Exclusivity

Pursuant to sections 1121(b) and (c)(3) of the Bankruptcy Code, the Debtors have a certain amount of time within which (a) to file their Plan; and (b) to solicit acceptances of their timely filed Plan (the "Solicitation Period") before other parties in interest are permitted to file plans. The Debtors filed the Plan and this Disclosure Statement on March 28, 2010. Accordingly, no other party may file a plan unless the Solicitation Period expires or the Bankruptcy Court orders otherwise. By Order entered March 17, 2010 [Case No. 09-13760 (KJC), D.I. 166], the Valley View Downs Debtors received an extension of their Solicitation Period, through and including June 25, 2010. The initial Solicitation Period for the Centaur Debtors is not scheduled to expire until early September 2010.

## I.    Schedules

By Order entered March 10, 2010 in the Valley View Downs Debtors' chapter 11 cases [Case No. 09-13760 (KJC), D.I. 142], the Valley View Downs Debtors received an extension from the Bankruptcy Court of the time to file their Schedules. The Order granting the extension gave the Valley View Downs Debtors until March 31, 2010 to file their Schedules without prejudice to the Valley View Downs Debtors' right to seek additional extensions. Prior to this most recent extension, the Valley View Downs Debtors had received other extensions of time to file their Schedules. By Order dated December 2, 2009, the Bankruptcy Court granted the initial extension of the Valley View Downs Debtors' time to file their Schedules, extending the deadline through and including December 14, 2009 [Case No. 09-13760 (KJC), D.I. 56]. On January 4, 2010, the Bankruptcy Court granted a second extension of the Valley View Downs Debtors' time to file their Schedules, extending the deadline through and including January 13, 2010 [Case No. 09-13760 (KJC), D.I. 68]. Then, on January 25, 2010, the Bankruptcy Court granted a third extension of the Valley View Downs Debtors' time to file their Schedules, extending the deadline through and including March 15, 2010 [Case No. 09-13760 (KJC), D.I. 85].

By Order entered March 10, 2010 in the Centaur Debtors' chapter 11 cases [Case No. 10-10799 (KJC), D.I. 25], the deadline for the Centaur Debtors to file Schedules was extended until May 5, 2010.

<h1 style="text-align:center">X.</h1>

<h1 style="text-align:center">THE CHAPTER 11 PLAN</h1>

## A.      Introduction

The following is a summary of certain terms and provisions of the Plan.  This summary of the Plan is qualified in its entirety by reference to the full text of the Plan, which is annexed to this Disclosure Statement as Exhibit "A".

## B.      General Description of the Treatment of Claims and Equity Interests

### (a)      <u>Unclassified Claims</u>

Administrative Expense Claims and Priority Tax Claims are treated in accordance with sections 1129(a)(9)(A) and 1129(a)(9)(C) of the Bankruptcy Code.  Administrative Expense Claims and Priority Tax Claims are not designated as classes of Claims for the purposes of the Plan or for the purposes of sections 1123, 1124, 1125, 1126, or 1129 of the Bankruptcy Code.

### (b)      <u>Treatment of Administrative Expense Claims</u>

#### a.      <u>Administrative Expense Claims Defined</u>

Administrative Expense Claims are rights to payment constituting a cost or expense of administration of any of the Chapter 11 Cases allowed under sections 503(b) and 507(a)(2) of the Bankruptcy Code, <u>including</u>, without limitation, any actual and necessary costs and expenses of preserving the estates of each of the Debtors, any actual and necessary costs and expenses of operating the businesses of each of the Debtors, any indebtedness or obligations incurred or assumed by any of the Debtors in connection with the conduct of its business on or after the Petition Date, any allowances of compensation and reimbursement of expenses to the extent allowed by a Final Order under section 330 or 503 of the Bankruptcy Code, and any fees or charges assessed against the estates of the Debtors under 28 U.S.C. § 1930.

#### b.      <u>Time for Filing Administrative Expense Claims</u>

The holder of an Administrative Expense Claim, other than (i) a DIP Claim, (ii) a Fee Claim, (iii) a liability incurred and payable after the Petition Date in the ordinary course of business by a Debtor (and not past due), (iv) a Section 503(b)(9) Claim, (v) an Intercompany Financing Claim or (vi) an Administrative Expense Claim that has been Allowed on or before the Effective Date, must file with the Bankruptcy Court and serve on the Debtors, the Committee, and the U.S. Trustee, notice of such Administrative Expense Claim within forty (40) days after service of Notice of Confirmation or such other specific date as may be established by the Bankruptcy Court.  Such notice must include at a minimum (A) the name of the Debtor(s) which are purported to be liable for the Claim, (B) the name of the holder of the Claim, (C) the

amount of the Claim, and (D) the basis of the Claim (including any documentation evidencing or supporting such Claim). **THE FAILURE TO FILE NOTICE OF AN ADMINISTRATIVE CLAIM ON OR BEFORE THE ADMINISTRATIVE CLAIMS BAR DATE SHALL RESULT IN SUCH ADMINISTRATIVE CLAIM BEING FOREVER BARRED, DISALLOWED AND DISCHARGED WITHOUT FURTHER ORDER OF THE BANKRUPTCY COURT**.

    c.  <u>Time for Filing Fee Claims</u>

    Each Professional who holds or asserts a Fee Claim shall be required to file with the Bankruptcy Court, and serve on all parties required to receive notice, a Fee Application within forty-five (45) days after the Effective Date or such other specific date as may be established by the Bankruptcy Court. **THE FAILURE TO FILE TIMELY AND SERVE SUCH FEE APPLICATION SHALL RESULT IN THE FEE CLAIM BEING FOREVER BARRED AND DISCHARGED.**

    d.  <u>Time For Filing Section 503(b)(9) Claims</u>

    Each holder of a Section 503(b)(9) Claim is required to submit to the Claims Agent, with copies to counsel for the Debtors, a request for allowance of such Section 503(b)(9) Claim prior to the Section 503(b)(9) Bar Date. **THE FAILURE TO SUBMIT SUCH REQUEST BY THE SECTION 503(B)(9) BAR DATE SHALL RESULT IN THE SECTION 503(B)(9) CLAIM BEING DEEMED DISALLOWED AS AN ADMINISTRATIVE EXPENSE CLAIM.** Such disallowance does not prevent such Claim from being Allowed as a Claim other than as an Administrative Expense Claim to the extent otherwise allowable.

    e.  <u>Allowance of Administrative Expense Claims, Fee Claims, and Section 503(b)(9) Claims</u>

    An Administrative Expense Claim (other than a DIP Claim, a Fee Claim, an Intercompany Financing Claim or a Section 503(b)(9) Claim) with respect to which notice has been properly filed and served pursuant to <u>Section 6.2(a)</u> of the Plan, or a Section 503(b)(9) Claim with respect to which a request for allowance has been properly submitted pursuant to <u>Section 6.2(d)</u> of the Plan, shall become an Allowed Administrative Expense Claim if no objection is filed within thirty (30) days after the later of (i) the Effective Date, or (ii) the date of service of the applicable notice of Administrative Expense Claim or such later date as may be approved by the Bankruptcy Court on motion of a party in interest, without notice or a hearing. If an objection is filed within such 30-day period (or any extension thereof), the Administrative Expense Claim shall become an Allowed Administrative Expense Claim only to the extent allowed by Final Order. A Fee Claim in respect of which a Fee Application has been properly filed and served pursuant to <u>Section 6.2(b)</u> of the Plan shall become an Allowed Administrative Expense Claim only to the extent allowed by Final Order.

    f.  <u>DIP Claims</u>

    All amounts due on account of DIP Claims will be Allowed as superpriority Administrative Expense Claims pursuant to the DIP Order or otherwise are Allowed pursuant to

the Plan. All obligations of the Debtors under the DIP Loan Facility will be paid in full in Cash on the Effective Date from the proceeds of the Exit Facility.

      g.      Payment of Allowed Administrative Expense Claims

On the Distribution Date, each holder of an Allowed Administrative Expense Claim, excluding DIP Claims, which shall be satisfied in accordance with Section 6.2(e) of the Plan and Intercompany Financing Claims, which shall be treated in accordance with Section 6.2(g) of the Plan, shall receive in full satisfaction of such Claims (i) the amount of such holder's Allowed Administrative Expense Claim in one Cash payment, or (ii) such other treatment as may be agreed upon in writing by the Debtors and such holder; provided, that such treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Administrative Expense Claim; provided, further, that an Administrative Expense Claim representing a liability incurred in the ordinary course of business of the Debtors may be paid at the Debtors' election in the ordinary course of business.

      h.      Intercompany Financing Claims

All Intercompany Financing Claims, which are superpriority Administrative Expense Claims junior only to the superpriority Administrative Expense Claim of the L/C Issuer with respect to the obligations of Valley View Downs, LP pursuant to the Reimbursement Agreement, shall, notwithstanding the occurrence of the Effective Date, remain outstanding and be retained by Reorganized Centaur, LLC.

     (c)     **Treatment of Priority Tax Claims**

Each holder of an Allowed Priority Tax Claim will receive in full satisfaction of such holder's Allowed Priority Tax Claim, (a) on the Distribution Date, the amount of such holder's Allowed Priority Tax Claim in Cash, or (b) such other treatment as may be agreed upon in writing by such holder; provided, that such agreed-upon treatment may not provide such holder with a return having a present value as of the Effective Date that is greater than the amount of such holder's Allowed Priority Tax Claim. The Confirmation Order will enjoin any holder of an Allowed Priority Tax Claim from commencing or continuing any action or proceeding against any responsible person or officer of the Debtors that otherwise would be liable to such holder for payment of a Priority Tax Claim so long as the Debtors are in compliance with Section 6.3 of the Plan. So long as the holder of an Allowed Priority Tax Claim is enjoined from commencing or continuing any action or proceeding against any responsible person or officer under Section 6.3 of the Plan or pursuant to the Confirmation Order, the statute of limitations for commencing or continuing any such action or proceeding will be tolled.

     (d)     **Classified Claims and Equity Interests**

The classified Claims against, and Equity Interests in, the Debtors are classified in the Plan as follows:

i.      Class 1 — Priority Non-Tax Claims

ii.     Class 2 — First Lien Claims

iii.    Class 3 — Second Lien Claims

iv.    Class 4 — Other Secured Claims

v.     Class 5 — Valley View Downs Unsecured Claims

vi.    Class 6 — General Unsecured Claims

vii.   Class 7 — Convenience Claims

viii.  Class 8 — Intercompany Claims

ix.    Class 9 — Borrower Equity Interests

x.     Class 10 — Subsidiary Equity Interests

## C.    Treatment of Claims and Equity Interests

The treatment of each class of Claims and Equity Interests is summarized in Article IV.B – "Summary of Distributions Under the Plan."

## D.    Acceptance or Rejection of the Plan; Effect of Rejection by One or More Classes of Claims

(a)    **Classes Entitled to Vote**

Except for Priority Non-Tax Claims, Other Secured Claims, General Unsecured Claims, Convenience Claims, Intercompany Claims, Borrower Equity Interests, and Subsidiary Equity Interests, all classes of Claims and Equity Interests are entitled to vote on the Plan.

(b)    **Class Acceptance Requirement**

A class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such class that have voted on the Plan. A class of Equity Interests shall have accepted the Plan if it is accepted by holders of at least two-thirds (2/3) in amount of the Equity Interests in such class that actually vote on the Plan.

(c)    **Tabulation of Votes on a Non-Consolidated Basis**

The Balloting Agent will tabulate all votes on the Plan on a non-consolidated basis by class and by Debtor for the purpose of determining whether the Plan satisfies sections 1129(a)(8) and/or (10) of the Bankruptcy Code with respect to each Debtor.

(d) **Cramdown**

If all applicable requirements for confirmation of the Plan are met as set forth in section 1129(a) of the Bankruptcy Code, except subsection (8) thereof, the Plan shall be treated as a request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code, notwithstanding the failure to satisfy the requirements of section 1129(a)(8), on the basis that the Plan is fair and equitable and does not discriminate unfairly with respect to each class of Claims that is impaired under, and has not accepted, the Plan.

(e) **Feasibility**

The Bankruptcy Code conditions confirmation of a plan of reorganization on, among other things, a finding that it is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor. For purposes of determining whether the Plan satisfies this condition, the Debtors have analyzed the capacity of each Debtor to service its obligations under the Plan. Based upon its analysis of their Projections, the Debtors believe they will be able to make all payments required to be made under the Plan. See "Projections and Summary of Significant Assumptions," attached hereto as Exhibit "B".

(f) **Confirmation of All Cases**

Except as provided in Section 17.18 and Section 17.27 of the Plan, the Plan shall not be deemed to have been confirmed unless and until the Plan has been confirmed as to each of the Debtors.

**E.    The Letter of Credit**

As a condition precedent to the implementation and effectiveness of the Plan, prior to the expiration of the Existing L/C, the Renewal or Replacement L/C shall have been issued. Valley View Downs, LP shall be authorized, without further action under applicable law, regulation, order, or rule, to enter into the Renewal or Replacement L/C and such other documents as may be necessary to effectuate the issuance of the Renewal or Replacement L/C, in form and substance satisfactory to the Consenting First Lien Claimholders.

**F.    Management Incentive Plan**

On or after the Effective Date, NewCo shall be authorized to adopt and implement the Management Incentive Plan, subject to the satisfaction of the Consenting First Lien Claimholders and the Board of Managers, in exchange for Existing Management's entry into the Long Term Employment Agreements.

**G.    Means of Implementation of the Plan**

(a) **Operations between the Confirmation Date and the Effective Date**

Through the Effective Date, the Debtors shall continue to operate their businesses as Debtors-in-Possession, subject to the oversight of the Bankruptcy Court as provided in the

Bankruptcy Code, the Bankruptcy Rules, and all orders of the Bankruptcy Court that are then in full force and effect.

(b) **Certain Transactions on or Prior to the Effective Date**

a. Formation of NewCo

Pursuant to section 1123(a)(5) of the Bankruptcy Code, on or prior to the Effective Date, the Debtors or Reorganized Debtors, as the case may be, shall form NewCo as an Indiana limited liability company. The terms of the limited liability company operating agreement of NewCo are described more fully in Exhibit "H" to this Disclosure Statement.

b. Issuance of New Centaur, LLC Membership Interests to NewCo

Pursuant to section 1123(a)(5) of the Bankruptcy Code, on the Effective Date, Centaur, LLC or Reorganized Centaur, LLC, as the case may be, shall issue the New Centaur, LLC Membership Interests to NewCo. Upon issuance of the New Centaur, LLC Membership Interests to NewCo, Centaur, LLC or Reorganized Centaur, LLC, as the case may be, shall be a direct subsidiary of NewCo.

c. Restructuring Transactions

Pursuant to section 1123(a)(5) of the Bankruptcy Code, on the Effective Date, the Debtors or the Reorganized Debtors, as the case may be, shall take such actions as may be necessary or appropriate to effect the following: (i) the distribution by Hoosier Park, L.P. of all of its Assets (including Hoosier Park, L.P.'s gambling gaming license and the Subsidiary Equity Interests of HP Dining & Entertainment, LLC) to Centaur Racing, LLC; (ii) the dissolution of Hoosier Park, L.P.; (iii) the merger of Centaur Indiana, LLC into Centaur Racing, LLC; (iv) the execution and delivery of appropriate agreements or other documents of formation, incorporation, merger, consolidation, or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (v) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (vi) the amendment and restatement of constituent documents of the Reorganized Debtors in accordance with the terms of the Plan; (vii) the filing of appropriate organizational documents with the appropriate governmental authorities under applicable law; and (viii) all other actions that a Debtor or Reorganized Debtor determines are necessary or appropriate; provided, however, that in each case the documents necessary to effect such actions shall be in form and substance satisfactory to the Consenting First Lien Lenders.

Section 4-35-5-7 of the Indiana Code imposes a $50 million transfer fee on "an initial licensee" (e.g., Hoosier Park, L.P.) that sells or otherwise relinquishes a "controlling interest," as defined by Indiana Gaming Commission rules, in an Indiana gambling game license. However, no fee is payable if the gambling game license is transferred, among other reasons, "as a result of a bankruptcy, a receivership, or a debt adjustment initiated by or against the initial licensee or the substantial owners of the licensee." Ind. Code § 4-35-5-4. In connection with the consummation of the Plan, Hoosier Park, L.P.'s gambling game license will be transferred to

Centaur Racing, LLC and, because such initial transfer will occur as a result of a bankruptcy or debt adjustment, the transfer and any subsequent transfer will be exempt from the $50 million transfer fee under Section 4-35-5-7 of the Indiana Code.

### d. Entry into First Lien Take Back Documents and Exit Facility

Pursuant to section 1123(a)(5) of the Bankruptcy Code, on the Effective Date, NewCo, Reorganized Centaur, LLC and the Subsidiary Guarantors shall be authorized, without further act or action under applicable law, regulation, order, or rule, to enter into the First Lien Take Back Documents and Exit Facility. NewCo, Reorganized Centaur, LLC and the Subsidiary Guarantors are hereby authorized to enter into such agreements, collateral documents and other documents, and issue such instruments, including, without limitation, promissory notes, as may be necessary to effectuate their entry into such documents, in form and substance satisfactory to the Consenting First Lien Claimholders.

### e. Issuance of NewCo PIK Notes and NewCo Warrants

Pursuant to section 1123(a)(5) of the Bankruptcy Code, on the Effective Date, NewCo shall be authorized, without further act or action under applicable law, regulation, order or rule, to issue (i) the NewCo PIK Notes to holders of the Allowed First Lien Claims, Allowed Second Lien Claims, and Allowed Valley View Downs Unsecured Claims, and (ii) the NewCo Warrants to holders of the Allowed First Lien Claims, pursuant to the Plan. NewCo is hereby authorized to enter into such agreements and documents as may be necessary to effectuate the issuance of the NewCo PIK Notes and NewCo Warrants, in form and substance satisfactory to the Consenting First Lien Claimholders.

### f. Issuance of NewCo Membership Interests

Pursuant to section 1123(a)(5) of the Bankruptcy Code, on the Effective Date, NewCo shall be authorized, without further act or action, under applicable law, regulation, order, or rule, to issue the NewCo Membership Interests in a manner satisfactory to the Consenting First Lien Claimholders. NewCo and the Reorganized Debtors are hereby authorized to enter into such agreements as are necessary to effectuate the issuance of the NewCo Membership Interests, in form and substance satisfactory to the Consenting First Lien Claimholders.

The direct and indirect owners, directors and managers of the Debtors' racing and gaming operations in Indiana, Colorado and Pennsylvania are all subject to stringent regulatory and licensing requirements.[5] The scrutiny and qualifications to which Entities or Persons

---

[5]     See Ind. Code §§ 4-35-6.5-2, 4-35-6.5-4, 4-33-6-4 (dealing with Indiana licensing requirements for management of gaming facilities); Ind. Code §§ 4-35-5-1, 4-35-5-2.4, 4-35-5-2.5, 4-33-6-4 (dealing with Indiana licensing requirements for owners of gaming facilities); Ind. Code §§ 4-31-6-1, 4-31-6-5, 4-31-6-6, 4-31-6-7 (dealing with Indiana licensing requirements for management of racing facilities); Ind. Code §§ 4-31-5-1, 4-31-5-2 (dealing with Indiana licensing requirements for owners of racing facilities); 58 Pa. Code §§ 433a.2, 433a.8 (dealing with Pennsylvania licensing requirements for management of gaming facilities); 58 Pa. Code §§ 433a.3, 433a.4, 433a.8 (dealing with Pennsylvania licensing requirements for owners of gaming facilities); 58 Pa. Code §§ 183.2, 185.29, 185.33 (dealing with Pennsylvania licensing requirements for management of racing facilities); 58 Pa. Code 185.11, 185.32 (dealing with Pennsylvania licensing requirements for owners of racing facilities); Colo. Rev. Stat.

(continued...)

attempting to secure such licenses are subject are rigorous and time-consuming. For instance, Section 433a.3 of Title 58 of the Pennsylvania Code requires that any individual who has any direct ownership interest or even a right to any profit or distribution from an entity licensed to conduct gaming in Pennsylvania must be licensed as a principal of that entity. Similarly, Section 4-31-5-1 of the Indiana Code requires all individuals or entities to apply for a permit in order to "conduct, assist, or aid or abet in conducting a horse racing meeting."

The investigatory and licensure process may require an extended period of time. For example, the process in Indiana may take at least six to eight months once the completed applications from all substantial owners, management members and occupational licensees have been received. In addition, the process does not begin until the ownership structure is finalized and any changes to the structure may induce further delay. It is also important to note that if a regulatory authority determines that one of the applicants or a key person or substantial owner of an applicant has a problem, the process will stop until the problem is resolved. The other states in which the Debtors operate have similar processes, with similar or longer timeframes.

Because the Pennsylvania Gaming Control Board, Colorado Limited Gaming Control Commission and Indiana Horse Racing Commission all have the authority to investigate all aspects of ownership, at any level, owners and controlling persons of entities holding equity interests are also subject to investigation. In addition, a regulator may suggest an alternative structure if it believes that the proper investigation would be too time consuming and detrimental to the property and the state. The Indiana Gaming Commission could also activate the power of attorney filed with it, thereby installing a trustee. Such action would increase the licensee's expenses and could jeopardize the licenses issued by other regulators.

The holders of Allowed First Lien Claims may not, in all cases, be willing to satisfy these rigorous licensing requirements. The holders of Allowed First Lien Claims that do not satisfy these licensing requirements cannot own or control the entities operating the racing and gaming facilities. All holders of Allowed First Lien Claims will, however, receive NewCo Warrants on the Effective Date, which are exercisable in accordance with the terms of the NewCo Warrants.

(c)     **Corporate Action**

The entry of the Confirmation Order shall constitute authorization for the Debtors and the Reorganized Debtors (as the case may be) to take or cause to be taken all corporate actions necessary or appropriate to implement all provisions of, and to consummate, the Plan prior to, on and after the Effective Date and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act, or action under any applicable law, order, rule or regulation, <u>including</u> without limitation, any action required by the officers, members, managers, or general or limited partners of the Debtors and the Reorganized Debtors (as the case may be), <u>including</u>, among other things, (i) the

---

<span style="font-size:smaller">(…continued)</span>

§§ 12-47.1-501, 12-47.1-505, 12-47.1-506, 12-47.1-510 (dealing with Colorado licensing requirements for management and owners of gaming facilities).

adoption or amendment of any organizational documents; (ii) the termination and cancellation of any Original Debt Documents or any other outstanding instrument, document or agreement evidencing Debt Claims as required by the Plan; (iii) the issuance of the Plan Securities; (iv) all transfers of Assets that are to occur pursuant to the Plan; (v) the incurrence of all obligations contemplated by the Plan and the making of all Plan Distributions; (vi) the reinstatement and assumption of all indemnity obligations to the officers, members, managers, and general and limited partners of the Debtors; (vii) the implementation of all settlements and compromises as set forth in or contemplated by the Plan; (viii) taking of all actions to preserve and provide for the prosecution of the Avoidance Actions; and (ix) entering into any and all transactions, contracts, or arrangements permitted by applicable law, order, rule, or regulation.

The officers of the Debtors and the Reorganized Debtors, as the case may be, are authorized and directed to do all things and to execute and deliver all agreements, documents, instruments, notices and certificates as are contemplated by the Plan and to take all necessary action required in connection therewith, in the name of and on behalf of the Debtors. All obligations of the Debtors to indemnify and hold harmless their current and former officers, members, managers, general and limited partners and employees, whether arising under the Debtors' constituent documents, contract, law, or equity, shall be fully reinstated and assumed by the Debtors upon the occurrence of the Effective Date with the same effect as though such obligations constituted executory contracts that are assumed (or assumed and assigned, as applicable) under section 365 of the Bankruptcy Code, and all such obligations shall be fully enforceable on their terms from and after the Effective Date. Nothing in the Plan, including Sections 17.1 and 17.2, shall release any obligations of the Debtors to indemnify and hold harmless their current and former officers, members, managers, general and limited partners, and employees. Nothing in the Plan, including Section 17.22 of the Plan, shall enjoin any of the Debtors' current and former officers and employees from asserting any indemnity or hold harmless right against the Debtors, excluding any claim for payment of attorneys' fees arising out of or relating to the Chapter 11 Cases or investigations related thereto, except to the extent such attorneys' fees were incurred in the defense of a claim that was asserted or the subject of investigation or discovery after the Effective Date and which claim was released pursuant to Sections 17.1 and 17.2 of the Plan. The prosecution of any so-indemnified Cause of Action shall, upon the occurrence of the Effective Date, be enjoined and prohibited, except solely for the purpose of obtaining a recovery from the issuer of any available insurance policy proceeds.

The constituent documents of NewCo and the Reorganized Debtors shall, as of the Effective Date, prohibit or be amended to prohibit the issuance of non-voting equity securities by such Debtor as required by section 1123(a)(6) of the Bankruptcy Code, provided, however, that following the Effective Date, NewCo and the Reorganized Debtors shall be entitled to issue non-voting securities, in their sole discretion, and solely in accordance with the terms of the Plan Documents.

(d)     **Termination of Certain Debt Obligations**

Upon the occurrence of the Effective Date, the Original Debt Documents shall be cancelled and annulled (along with such other documents appurtenant thereto). Immediately upon the completion of all Plan Distributions to the holders of Allowed First Lien Claims and Allowed Second Lien Claims, the Reorganized Debtors shall be authorized and directed (without

further approval, act or other determination under applicable law, regulation, order or rule) to take such action as shall be necessary or appropriate to terminate and extinguish all of the Debtors' obligations under the Original Debt Documents.

(e)     **Continued Corporate Existence**

Except as provided in Section 10.2(c) of the Plan, the Debtors shall continue to exist, as Reorganized Debtors, after the Effective Date as separate entities, with all the powers available to such legal entities, in accordance with applicable law and pursuant to their constituent documents, as modified by the Plan.

(f)     **Re-vesting of Assets**

Upon the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Debtors' Estates and any property acquired by a Debtor or Reorganized Debtor under the Plan shall vest in the Reorganized Debtors free and clear of all Claims, liens, encumbrances, charges and other interests, except as provided in the Plan. On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, each Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for all fees, disbursements, expenses or related support services of Professionals (including fees relating to the preparation of professional fee applications) without application to, or approval of, the Bankruptcy Court.

(g)     **Initial Managers**

From and after the Effective Date, (i) NewCo shall be managed by the Board of Managers, and (b) the manager of each of the Reorganized Debtors, as applicable, shall be Reorganized Centaur, LLC. Thereafter, the managers of NewCo and the Reorganized Debtors shall be selected and determined in accordance with the provisions of the organizational documents of NewCo and such Reorganized Debtors and applicable law. The members of the Board of Managers shall be as identified in the Plan Supplement.

(h)     **Officers**

The current officers of each of the Debtors shall continue in such positions after the Effective Date in accordance with their respective employment agreements, if any, or, in the case of the Existing Management, the Long Term Employment Agreements, and applicable law. From and after the Effective Date, the officers of each of the Reorganized Debtors shall be selected and appointed by the respective members, managers, and partners of such entities, in accordance with, and pursuant to, the provisions of applicable law and their respective organizational documents. The officers of NewCo shall be as identified in the Plan Supplement.

(i)    **Retention of Causes of Action/Reservation of Rights**

Except as set forth in Sections 17.1 and 17.2 of the Plan, all Causes of Action belonging to any of the Debtors shall, upon the occurrence of the Effective Date, be vested in the Reorganized Debtors for the benefit of the Debtors and their Estates.  Except as set forth in Sections 17.1 and 17.2 of the Plan, the rights of the Reorganized Debtors to commence, prosecute, or settle such Causes of Action, respectively, shall be preserved notwithstanding the occurrence of the Effective Date.

**No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Committee will not pursue any and all available Causes of Action against them. The Debtors and the Estates, on their own behalf and on behalf of the Committee, expressly reserve all rights to prosecute any and all Causes of Action against any Person, except as otherwise provided in the Plan.**  Unless any Causes of Action against a Person are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Debtors, on their own behalf and on behalf of the Committee, expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon or after the confirmation or consummation of the Plan.

Except as set forth in Sections 17.1 and 17.2 of the Plan, nothing in the Plan or the Confirmation Order shall be deemed a waiver or relinquishment of any Claim, Cause of Action, right of setoff, or other legal or equitable defense which the Debtors had immediately prior to the Petition Date, against or with respect to any Claims left unimpaired by the Plan, except for avoidance actions pursuant to section 547 of the Bankruptcy Code (provided, however, that the Debtors' right to object to any Claim pursuant to section 502(d) of the Bankruptcy Code is fully preserved, including, without limitation, the right to object to any Claim of a recipient of a transfer that is avoidable under section 547 of the Bankruptcy Code).

(j)    **Appointment of the Disbursing Agent**

Upon the occurrence of the Effective Date, the Reorganized Debtors shall be appointed to serve as the Disbursing Agent and shall have all powers, rights, duties, and protections afforded the Disbursing Agent under the Plan.

**H.    Distribution Provisions**

(a)    **Plan Distributions**

Pursuant to the terms and provisions of the Plan, the Disbursing Agent shall make the required Plan Distributions specified under the Plan on the relevant Distribution Date therefor.

The Disbursing Agent shall make all distributions on account of Allowed First Lien Claims to the Prepetition First Lien Agent in its capacity as administrative agent for the Prepetition First Lien Claimholders, which distributions the Prepetition First Lien Agent shall

distribute to the Prepetition First Lien Claimholders on a Pro Rata basis. The Prepetition First Lien Agent shall be entitled to the exculpation protections provided in <u>Section 11.3</u> of the Plan with respect to any distributions the Prepetition First Lien Agent makes on account of Allowed First Lien Claims.

The Disbursing Agent shall make all distributions on account of Allowed Second Lien Claims to the Prepetition Second Lien Agent in its capacity as administrative agent for the Prepetition Second Lien Claimholders, which distributions the Prepetition Second Lien Agent shall distribute to the Prepetition Second Lien Claimholders on a Pro Rata basis. The Prepetition Second Lien Agent shall be entitled to the exculpation protections provided in <u>Section 11.3</u> of the Plan with respect to any distributions the Prepetition Second Lien Agent makes on account of Allowed Second Lien Claims.

(b)    **Timing of Plan Distributions**

Each Plan Distribution shall be made on the relevant Distribution Date therefor. In the event a Plan Distribution shall be payable on a day other than a Business Day, such Plan Distribution shall instead be paid on the immediately succeeding Business Day, but shall be deemed to have been made on the date otherwise due. A Plan Distribution shall be deemed to have been timely made if made on such date or within ten (10) days thereafter.

For federal income tax purposes, <u>except</u> to the extent a Plan Distribution is made in connection with reinstatement of an obligation pursuant to section 1124 of the Bankruptcy Code, a Plan Distribution will be allocated first to the principal amount of a Claim and then, to the extent the Plan Distribution exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest, <u>provided</u>, <u>however</u>, that notwithstanding all of the foregoing, the application of any distributions made on account of Allowed First Lien Claims and Allowed Second Lien Claims shall be governed by the Prepetition First Lien Credit Agreement and the Prepetition Second Lien Credit Agreement, respectively.

(c)    **Surrender and Cancellation of Instruments**

As a condition to receiving any Plan Distribution, on or before the Distribution Date, the holder of an Allowed Claim evidenced by a certificate, instrument, or note, other than any such certificate, instrument or note that is being reinstated or being left unimpaired under the Plan, shall (i) surrender such certificate, instrument or note representing such Claim, and (ii) execute and deliver such other documents as may be necessary to effectuate the Plan in the sole determination of the Disbursing Agent. Such certificate, instrument or note shall thereafter be cancelled and extinguished. The Disbursing Agent shall have the right to withhold any Plan Distribution to be made to or on behalf of any holder of such Claims unless and until (A) such certificates, instruments or notes are surrendered, or (B) any relevant holder provides to the Disbursing Agent an affidavit of loss or such other documents as may be required by the Disbursing Agent together with an appropriate indemnity in the customary form. Any such holder who fails to surrender such certificates, instruments or notes, or otherwise fails to deliver an affidavit of loss and indemnity prior to the second anniversary of the Effective Date, shall be deemed to have forfeited its Claims and shall not participate in any Plan Distribution. All property in respect of such forfeited Claims shall revert to the Reorganized Debtors.

**I.**     **Procedures for Resolving and Treating Contested Claims**

(a)     **Objection Deadline**

As soon as practicable, but in no event later than one hundred and eighty (180) days after the Effective Date (subject to being extended by the order of the Bankruptcy Court upon motion of the Disbursing Agent without notice or a hearing), objections to Claims shall be filed with the Bankruptcy Court and served upon the holders of each of the Claims to which objections are made.

(b)     **Prosecution of Contested Claims**

After the Effective Date, only the Reorganized Debtors may object to the allowance of Contested Claims filed with the Bankruptcy Court.  All objections that are filed and prosecuted as provided in the Plan shall be litigated to Final Order or compromised and settled in accordance with Section 13.3 of the Plan.

(c)     **Claims Settlement**

Notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, from and after the Effective Date, the Disbursing Agent shall have authority to settle or compromise all Claims and Causes of Action without further review or approval of the Bankruptcy Court.

(d)     **Entitlement to Plan Distributions Upon Allowance**

Notwithstanding any other provision of the Plan, if any portion of a Claim is a Contested Claim, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until such Claim becomes an Allowed Claim that is not a Contested Claim, subject to the setoff rights as provided in Section 17.19 of the Plan.  When a Claim that is not an Allowed Claim as of the Effective Date becomes an Allowed Claim, the holder of such Allowed Claim shall thereupon become entitled to receive the Plan Distributions in respect of such Claim the same as though such Claim had been an Allowed Claim on the Effective Date.

(e)     **Contested Claims Reserve**

The Debtors may establish a Contested Claims Reserve in a segregated account for the purpose of effectuating distributions to the holders of Contested Claims pending the allowance or disallowance of such Claims in accordance with the Plan.

(f)     **Estimation of Claims**

An Estimation Order may be used to calculate and establish the amount of the Contested Claims Reserve.  The Debtors and the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Contested Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation

concerning any objection to any Claim <u>including</u>, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Contested Claim, the amount so estimated shall constitute either (i) the Allowed amount of such Contested Claim, (ii) a maximum limitation on such Contested Claim, or (iii) in the event such Contested Claim is estimated in connection with the estimation of other Claims within the same class, a maximum limitation on the aggregate amount of Allowed Claims on account of such Contested Claims so estimated. If the estimated amount constitutes a maximum limitation on the amount of such Claim, or on more than one such Claim within a class of Claims, as applicable, the Debtors or the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claims. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or otherwise resolved by any mechanism approved by the Bankruptcy Court.

(g)     <u>No Recourse Against the Debtors or the Reorganized Debtors</u>

If a Contested Claims Reserve is established pursuant to <u>Section 13.5</u> of the Plan prior to the Effective Date, any holder of a Contested Claim that ultimately becomes an Allowed Claim shall be entitled to receive its applicable distribution under the Plan solely from the Contested Claims Reserve established on account of such Contested Claim. In no event shall any holder of a Contested Claim have any recourse with respect to distributions made, or to be made, under the Plan to holders of such Claims, to any Debtor or the Reorganized Debtors on account of such Contested Claim, regardless of whether such Contested Claim shall ultimately become an Allowed Claim, and regardless of whether sufficient Cash or other property remains available for distribution in the Contested Claims Reserve established on account of such Contested Claim at the time such Claim becomes entitled to receive a distribution under the Plan.

**J.     Conditions Precedent to Confirmation of Plan**

As conditions precedent to confirmation of the Plan, the Clerk of the Bankruptcy Court shall have entered an order or orders:

(i)     approving the Disclosure Statement as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code;

(ii)     authorizing the solicitation of votes with respect to the Plan;

(iii)     determining that all votes are binding and have been properly tabulated as acceptances or rejections of the Plan;

(iv)     reasonably acceptable, in form and substance, to the Debtors and the Consenting First Lien Claimholders and confirming and giving effect to the terms and provisions of the Plan;

(v)     determining that all applicable tests, standards and burdens in connection with the Plan have been duly satisfied and met by the Debtors and the Plan;

(vi)     approving the Plan Documents, which shall be in form and substance satisfactory to the Consenting First Lien Claimholders; and

(vii)     authorizing the Debtors to execute, enter into, and deliver the Plan Documents and to execute, implement, and to take all actions otherwise necessary or appropriate to give effect to, the transactions contemplated by the Plan and the Plan Documents.

## K.     Conditions Precedent to Occurrence of the Effective Date

The following are conditions precedent to the occurrence of the Effective Date:

(i)     The Confirmation Order shall have been entered by the Clerk of the Bankruptcy Court, be in full force and effect and not be subject to any stay or injunction;

(ii)     The closing of the Exit Facility shall have occurred;

(iii)     The forms of the NewCo PIK Notes and NewCo Warrants shall be in form and substance satisfactory to the Consenting First Lien Claimholders and shall have been issued pursuant to the Plan;

(iv)     The Renewal or Replacement L/C, in form and substance satisfactory to the Consenting First Lien Claimholders, shall have been issued pursuant to the Plan;

(v)     The composition of the Board of Managers shall be acceptable to the Consenting First Lien Claimholders and the Board of Managers shall have been seated; and

(vi)     All necessary consents, authorizations and approvals shall have been given for the transfers of property and the payments provided for or contemplated by the Plan, including, without limitation, (a) satisfaction or waiver of all conditions to the obligations of (1) the Debtors under the Plan and the Plan Documents, (2) the Debtors and the Prepetition First Lien Claimholders Under the First Lien Take Back Documents, and (b) the valid issuance of the Plan Securities or, in the case of regulatory consents, authorizations, or approvals, the status of any requests or applications for such consents, authorization, or approvals immediately preceding the Effective Date shall be satisfactory to the Consenting First Lien Claimholders.

## L.     Waiver of Conditions

The Debtors, with the written consent of the Consenting First Lien Claimholders, may waive any one or more of the conditions set forth in Section 15.1 or Section 15.2 of the Plan in a writing executed by each of them without notice or order of the Bankruptcy Court and without notice to any parties in interest.

## M.     Effect of Non-Occurrence of the Effective Date

If the Effective Date shall not occur, the Plan shall be null and void and nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims against or Equity Interests in a Debtor; (b) prejudice in any manner the rights of any party-in-interest; or

(c) constitute an admission, acknowledgement, offer, or undertaking by the Debtors or any other party-in-interest.

**N.  Exculpation of Debtors and Released Persons**

> **The Debtors and any Released Persons shall not be liable for any Cause of Action related to or arising in connection with or out of the administration of the Chapter 11 Cases, pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, <u>except</u> for gross negligence or willful misconduct as determined by Final Order of the Bankruptcy Court.  The Confirmation Order shall enjoin all holders of Claims and Equity Interests from asserting or prosecuting any Claim or Cause of Action against any Released Person as to which such Released Person has been exculpated from liability pursuant to the preceding sentence.**

**O.  Releases by the Debtors**

> **On the Effective Date, each of the Released Persons shall be released by each Debtor and their respective Estates, from any and all Claims, <u>including</u>, without limitation, Avoidance Actions, liens, encumbrances, security interests, obligations, suits, judgments, damages, rights, Causes of Action, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, that any Debtor is entitled to assert in its own right or on behalf of the holder of any Claim or Equity Interest or other Person, based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place on or prior to the Effective Date in any way relating to any Debtor, the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, implementation, administration, confirmation, or consummation of any of the Plan, or the property to be distributed under the Plan, the disclosure statement concerning the Plan, any contract, employee pension or other benefit plan, instrument, release or other agreement of document created, modified, amended, terminated, or entered into in connection with either the Plan or any agreement between the Debtors and any Released Person, or any other act taken or omitted to be taken in connection with the Debtors' bankruptcy.  Without limitation of the foregoing, each such Released Person shall be released and exculpated from any and all Claims, obligations, suits, judgments, damages, rights, Causes of Action, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing, or hereafter arising, in law, equity, or otherwise, that any holder of a Claim or Equity Interest is entitled to assert in its own right or on behalf of any other person, based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence relating to the Debtors and taking place prior to the Effective Date.**

**P.  Release of Released Persons by Other Released Persons**

> **On the Effective Date, <u>except</u> as expressly provided under the Plan with respect to (a) Plan Distributions on account of Allowed Claims or Allowed Equity Interests, if any, that any of the Released Persons may have against any of the Debtors' Estates, and (b) any other rights or obligations under the Plan or the Plan Documents, each of the**

Released Persons shall release each other from any and all Claims, **including**, without limitation, Avoidance Actions, liens, encumbrances, security interests, obligations, suits, judgments, damages, rights, Causes of Action, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, that any Released Person is entitled to assert against any other Released Person, based in whole or in part upon any act or omission, transaction, agreement, event, or occurrence taking place on or before the Effective Date in any way relating to any Debtor, the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, implementation, administration, confirmation, or consummation of any of the Plan, or the property to be distributed under the Plan, the disclosure statement concerning the Plan, any contract, employee pension or other benefit plan, instrument, release, or other agreement of document created, modified, amended, terminated, or entered into in connection with either the Plan or any agreement between the Debtors and any Released Person, or any other act taken or omitted to be taken in connection with the Debtors' bankruptcy. Notwithstanding any of the foregoing, the Plan shall not release any obligations of the Debtors to indemnify and hold harmless their current and former officers and employees, **except** for claims or Causes of Action against any current and former officers and employees resulting from the willful misconduct or gross negligence of such indemnified party, whether arising under the Debtors' constituent documents, contract, law, or equity.

**Q.    Indemnification of the Prepetition First Lien Agent**

From and at all times following the Effective Date, (a) each of NewCo and the Reorganized Debtors shall (and shall cause each of their present and future subsidiaries to), jointly and severally, and (b) each holder of an Allowed First Lien Claim (in the proportion that such holder's First Lien Claim bears to the total Allowed First Lien Claims but, subject thereto, jointly and severally with each Person specified in (a)), shall, on demand, advance and indemnify the Prepetition First Lien Agent and its respective officers, directors, principals, shareholders, parents, subsidiaries, members, auditors, accountants, financial advisors, predecessors, successors, servants, employees, agents, counsel, attorneys, partners, insurers, underwriters, administrators, executors, representatives or assigns against all Causes of Action and against all costs, liabilities, damages, obligations, expenses and disbursements (**including**, without limitation, the payment of any attorney or other advisory fees) and any duties, taxes and charges incurred or suffered by or awarded against them related to, in connection with or arising out of the performance by them of any actions required or contemplated by the Plan (including the implementation of any transactions contemplated by the Plan), the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan, **except** for gross negligence or willful misconduct as determined by Final Order of the Bankruptcy Court.

**R.    Executory Contracts and Unexpired Leases**

**(a)    Executory Contracts and Unexpired Leases**

The Bankruptcy Code entitles the Debtors, subject to the approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases. The Bankruptcy Code further entitles the Debtors, subject to satisfaction of certain conditions, to

assign assumed executory contracts and unexpired leases to another entity.  Rejection or assumption and assignment may be effected under a plan of reorganization.

      (b)      **Assumption and Rejection of Executory Contracts and Unexpired Leases**

      All executory contracts and unexpired leases of the Debtors shall be rejected pursuant to the provisions of section 365 of the Bankruptcy Code effective as of and subject to the occurrence of the Effective Date, unless another date is specified in the Plan <u>except</u>:  (i) any executory contracts and unexpired leases that are the subject of separate motions to assume or assume and assign filed pursuant to section 365 of the Bankruptcy Code by the Debtors before the Effective Date; (ii) contracts and leases listed in Schedule 2 attached hereto and any subsequently filed "Schedule of Assumed Executory Contracts and Unexpired Leases" to be filed by the Debtors with the Bankruptcy Court before the entry of, or as an exhibit to, the Confirmation Order; (iii) all executory contracts and unexpired leases assumed or assumed and assigned under the Plan or by order of the Bankruptcy Court entered before the Effective Date; (iv) any executory contract or unexpired lease that is the subject of a dispute over the amount or manner of cure pursuant to <u>Section 14.2</u> of the Plan and for which the Debtors make a motion to reject such contract or lease based upon the existence of such dispute filed at any time; (v) any agreement, obligation, security interest, transaction or similar undertaking that the Debtors believe is not executory or a lease that is later determined by the Bankruptcy Court to be an executory contract or unexpired lease that is subject to assumption or rejection under section 365 of the Bankruptcy Code; (vi) any oral or written joint defense agreements relating to actual, potential, or threatened litigation or investigations involving any of the Debtors, which shall be assumed; (vii) any guaranty or similar agreement executed by a third party which guarantees repayment or performance of an obligation owed to any of the Debtors or to indemnify the Debtors; and (viii) agreements with third parties regarding preservation of the confidentiality of documents produced by the Debtors.  Any order entered postconfirmation by the Bankruptcy Court, after notice and a hearing, authorizing the rejection of an executory contract or unexpired lease shall cause such rejection to be a prepetition breach under sections 365(g) and 502(g) of the Bankruptcy Code, as if such relief was granted and such order was entered preconfirmation.  The Debtors reserve the right to amend Disclosure Statement Schedule 2 or any "Schedule of Assumed Executory Contracts and Unexpired Leases" prior to the entry of the Confirmation Order.  Each executory contract and unexpired lease to be assumed by the Debtors shall include modifications, amendments, supplements, restatements, or other similar agreements made directly or indirectly by any agreement, instrument, or other document that affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is listed on Disclosure Statement Schedule 2 or any "Schedule of Assumed Executory Contracts and Unexpired Leases."

      The inclusion of a contract, lease or other agreement in <u>Section 14.1(a)</u> of the Plan or on Disclosure Statement Schedule 2 or any "Schedule of Assumed Executory Contracts and Unexpired Leases" shall not constitute an admission by the Debtors as to the characterization of whether any such included contract, lease, or other agreement is, or is not, an executory contract or unexpired lease or whether any claimants under any such contract, lease, or other agreement are time-barred from asserting Claims against the Debtors.  The Debtors reserve all rights with respect to the characterization of any such agreements.

The Plan shall constitute a motion to reject such executory contracts and unexpired leases rejected pursuant to <u>Section 14.1</u> of the Plan, and the Debtors shall have no liability thereunder <u>except</u> as is specifically provided in the Plan. Entry of the Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval of such rejections pursuant to section 365(a) of the Bankruptcy Code, subject to the occurrence of the Effective Date, and a finding by the Bankruptcy Court that each such rejected agreement, executory contract, or unexpired lease is burdensome and that the rejection thereof is in the best interests of the Debtors and their estates.

The Plan shall constitute a motion to assume and assign to the Reorganized Debtors such executory contracts and unexpired leases as set forth in Disclosure Statement Schedule 2 or any "Schedule of Assumed Executory Contracts and Unexpired Leases" or otherwise designated for assumption in <u>Section 14.1(a)</u> of the Plan. Entry of the Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval of such assumption and assignment pursuant to sections 365(a), (b) and (f) of the Bankruptcy Code, and a finding by the Bankruptcy Court that the requirements of section 365(f) of the Bankruptcy Code have been satisfied. **Any non-Debtor counterparty to an agreement listed on Disclosure Statement Schedule 2 or any "Schedule of Assumed Executory Contracts and Unexpired Leases" or any other contract or unexpired lease otherwise designated as being assumed or assumed and assigned in <u>Section 14.1(a)</u> of the Plan who disputes the assignment of an executory contract or unexpired lease must file with the Bankruptcy Court, and serve upon the Debtors and the Committee, a written objection to the assumption and assignment, which objection shall set forth the basis for the dispute by no later than ten (10) days prior to the Confirmation Hearing. The failure to timely object shall be deemed a waiver of any and all objections to the assumption and assignment of executory contracts and leases as set forth in Disclosure Statement Schedule 2 or any "Schedule of Assumed Executory Contracts and Unexpired Leases" or as otherwise designated as being assumed or assumed and assigned in <u>Section 14.1(a)</u> of the Plan.**

    (c)    **<u>Cure</u>**

At the election of the Debtors following consultation with the Consenting First Lien Claimholders, any monetary defaults under each executory contract and unexpired lease to be assumed under the Plan shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code: (a) by payment of the default amount in Cash on the Effective Date or as soon thereafter as practicable; or (b) on such other terms as agreed to by the parties to such executory contract or unexpired lease. In the event of a dispute regarding: (i) the amount of any cure payments; (ii) the ability to provide adequate assurance of future performance under the contract or lease to be assumed or assigned; or (iii) any other matter pertaining to assumption or assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving assumption or assignment, as applicable. Disclosure Statement Schedule 2 or any "Schedule of Assumed Executory Contracts and Unexpired Leases" attached to the Disclosure Statement set forth the Debtors' cure obligations for each agreement which a cure obligation must be satisfied as a condition to the assumption and assignment of such agreement. **Any non-Debtor counterparty to an agreement listed on the Disclosure Statement Schedule 2 or any "Schedule of Assumed Executory Contracts and Unexpired Leases" who disputes the scheduled cure obligation**

**(or objects to the omission of a scheduled cure obligation) must file with the Bankruptcy Court, and serve upon the Debtors and the Committee, a written objection to the cure obligation, which objection shall set forth the basis for the dispute, the alleged correct cure obligation, and any other objection related to the assumption or assumption and assignment of the relevant agreement by no later than ten (10) Business Days prior to the Confirmation Hearing. If a non-Debtor counterparty fails to file and serve an objection which complies with the foregoing, the cure obligation set forth on the Disclosure Statement Schedule 2 or any "Schedule of Assumed Executory Contracts and Unexpired Leases" shall be binding on the non-Debtor counterparty, and the non-Debtor counterparty shall be deemed to have waived any and all objections to the assumption and assignment of the relevant agreement as proposed by the Debtors.**

       (d)      **<u>Claims Arising from Rejected Contracts</u>**

Rejection Damage Claims must be submitted to the Claims Agent, with copies to counsel for the Debtors, by the first Business Day that is at least thirty (30) days following the Effective Date. The foregoing submission deadline applies only to Rejection Damage Claims arising out of executory contracts and unexpired leases that are rejected pursuant to the Plan. Nothing in the Plan shall alter the submission deadline for a party to an executory contract or unexpired lease that was rejected by separate motion or by operation of law. Properly submitted Rejection Damage Claims shall be treated as Valley View Downs Unsecured Claims, General Unsecured Claims, or Convenience Claims, as applicable, under the Plan subject to objection by the Reorganized Debtors. **ANY SUCH REJECTION DAMAGE CLAIMS THAT ARE NOT PROPERLY SUBMITTED PURSUANT TO <u>SECTION 14.3</u> OF THE PLAN WILL FOREVER BE BARRED FROM ASSERTION AND SHALL NOT BE ENFORCEABLE AGAINST THE REORGANIZED DEBTORS, THEIR RESPECTIVE ESTATES, AFFILIATES OR ASSETS.**

**S.**      **Retention of Jurisdiction**

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code the Bankruptcy Court shall retain and shall have exclusive jurisdiction over any matter (a) arising under the Bankruptcy Code, (b) arising in or related to the Chapter 11 Cases or the Plan, or (c) as otherwise set forth in the Plan.

**T.**      **Other Material Provisions of the Plan**

       (a)      **<u>Payment of Statutory Fees</u>**

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid by the Debtors on or before the Effective Date.

       (b)      **<u>Satisfaction of Claims</u>**

The rights afforded in the Plan and the treatment of all Claims and Equity Interests therein shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Equity Interests of any nature whatsoever, <u>including</u> any accrued postpetition

interest, against the Debtors and the Debtors-in-Possession, or any of their Estates, Assets, properties, or interests in property.  Except as otherwise expressly provided in the Plan, on the Effective Date, all Claims against and Equity Interests in the Debtors and the Debtors-in-Possession shall be satisfied, discharged, and released in full.  The Reorganized Debtors shall not be responsible for any pre-Effective Date obligations of the Debtors or the Debtors-in-Possession, except those expressly assumed by any Reorganized Debtor(s), as applicable.  Except as otherwise provided herein, all Persons and Entities shall be precluded and forever barred from asserting against the Reorganized Debtors, their respective successors or assigns, or their Estates, Assets, properties, or interests in property any event, occurrence, condition, thing, or other or further Claims or Causes of Action based upon any act, omission, transaction, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date, other than subordination of the First Lien Claims, whether or not the facts of or legal bases therefore were known or existed prior to the Effective Date.

(c)    **Third Party Agreements; Subordination**

The Plan Distributions to the various classes of Claims and Equity Interests thereunder shall not affect the right of any Person to levy, garnish, attach, or employ any other legal process with respect to such Plan Distributions by reason of any claimed subordination rights or otherwise.  All of such rights and any agreements relating thereto shall remain in full force and effect, except as compromised and settled pursuant to the Plan.  Plan Distributions shall be subject to and modified by any Final Order directing distributions other than as provided in the Plan.  The right of the Debtors to seek subordination of any lien, security interest, Claim or Equity Interest pursuant to section 510 of the Bankruptcy Code is fully reserved; and the treatment afforded any Claim or Equity Interest that becomes a Subordinated Claim or subordinated Equity Interest at any time shall be modified to reflect such subordination.  Unless the Confirmation Order provides otherwise, no Plan Distributions shall be made on account of a subordinated Claim or subordinated Equity Interest.

All contractual and subordination rights of the Prepetition First Lien Agent and other Prepetition First Lien Claimholders with respect to any Plan Distributions, including, without limitation, the subordination of the liens held by or on behalf of the Prepetition Second Lien Agent, the other Prepetition Second Lien Claimholders or any agent of trustee therefor to the liens held by or on behalf of the Prepetition First Lien Agent, the other Prepetition First Lien Claimholders or any agent or trustee therefor, as described in the Prepetition Intercreditor Agreement, shall be enforceable under the Plan, except if, and to the extent, compromised by the Plan.  The classification and manner of satisfying Claims under the Plan and the Plan Distributions take into consideration the contractual subordination rights that the Prepetition First Lien Agent and the other Prepetition First Lien Claimholders have against a holder of another Claim with respect to Plan Distributions.

(d)    **Discharge of Liabilities**

Except as otherwise provided in the Plan, upon the occurrence of the Effective Date, the Debtors shall be discharged from all Claims and Causes of Action to the fullest extent permitted by section 1141 of the Bankruptcy Code, and all holders of Claims and Equity Interests shall be precluded from asserting against the Reorganized Debtors, the Debtors, the

Estates, the Assets, or any property dealt with under the Plan, any further or other Cause of Action based upon any act or omission, transaction, event, thing, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date.

**EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, THE REORGANIZED DEBTORS SHALL NOT HAVE, AND SHALL NOT BE CONSTRUED TO HAVE OR MAINTAIN ANY LIABILITY, CLAIM, OR OBLIGATION, THAT IS BASED IN WHOLE OR IN PART ON ANY ACT, OMISSION, TRANSACTION, EVENT, OTHER OCCURRENCE, OR THING OCCURRING OR IN EXISTENCE ON OR PRIOR TO THE EFFECTIVE DATE OF THE PLAN (INCLUDING, WITHOUT LIMITATION, ANY LIABILITY OR CLAIMS ARISING UNDER APPLICABLE NON-BANKRUPTCY LAW AS A SUCCESSOR TO THE DEBTORS) AND NO SUCH LIABILITIES, CLAIMS, OR OBLIGATIONS FOR ANY ACTS SHALL ATTACH TO THE REORGANIZED DEBTORS.**

(e)     **Discharge of Debtors**

Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, without further notice or order, all Claims of any nature whatsoever shall be automatically discharged forever.  Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, the Debtors, their Estates, and all successors thereto shall be deemed fully discharged and released from any and all Claims, including, without limitation, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (a) a proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim based upon such debt is allowed under section 502 of the Bankruptcy Code, or (c) the holder of a Claim based upon such debt has accepted the Plan.  The Confirmation Order shall be a judicial determination of discharge of all liabilities of the Debtors, their Estates, and all successors thereto.  As provided in section 524 of the Bankruptcy Code, such discharge shall void any judgment against the Debtors, their Estates, or any successor thereto at any time obtained to the extent it relates to a Claim discharged, and operates as an injunction against the prosecution of any action against the Reorganized Debtors or property of the Debtors or their Estates to the extent it relates to a discharged Claim.

(f)     **Exemption from Transfer Taxes**

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, lien, pledge, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

(g)     **Retiree Benefits**

Pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

(h)     **Interest and Attorneys' Fees**

Interest accrued after the Petition Date will accrue and be paid on Claims only to the extent specifically provided for in the Plan, the Confirmation Order or as otherwise required by the Bankruptcy Court or by applicable law.

Except as set forth in the Plan or as ordered by the Bankruptcy Court, no award or reimbursement of attorneys' fees or related expenses or disbursements shall be allowed on, or in connection with, any Claim.

(i)     **Modification of the Plan**

As provided in section 1127 of the Bankruptcy Code, modification of the Plan may be proposed in writing by the Debtors at any time before confirmation, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors shall have complied with section 1125 of the Bankruptcy Code. The Debtors may modify the Plan at any time after confirmation and before substantial consummation, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified, under section 1129 of the Bankruptcy Code, and the circumstances warrant such modifications, provided further, that any modification of the Plan between the Confirmation Date and the Effective Date shall be subject to the satisfaction of the Consenting First Lien Claimholders. A holder of a Claim that has accepted the Plan shall be deemed to have accepted such Plan as modified if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim or Equity Interest of such holder.

(j)     **Revocation of the Plan**

The Debtors reserve the right to revoke and withdraw the Plan or to adjourn the Confirmation Hearing with respect to the Plan and/or submit any new plan of reorganization at such times and in such manner as they consider appropriate, subject to the provisions of the Bankruptcy Code. If the Debtors revoke or withdraw the Plan with respect to any one or more of the Debtors, or if the Effective Date does not occur as to any Debtor, then, as to such Debtor the Plan, all settlements and compromises set forth in the Plan and not otherwise approved by a separate Final Order shall be deemed null and void and nothing contained herein and no acts taken in preparation for consummation of the Plan shall be deemed to constitute a waiver or release of any Claims against or Equity Interests in such Debtor or to prejudice in any manner the rights of any of the Debtors or any other Person in any other further proceedings involving such Debtor.

In the event that the Debtors choose to adjourn the Confirmation Hearing with respect to any one or more of the Debtors, the Debtors reserve the right to proceed with confirmation of the Plan with respect to those Debtors in relation to which the Confirmation Hearing has not been adjourned. With respect to those Debtors with respect to which the Confirmation Hearing has been adjourned, the Debtors reserve the right to amend, modify, revoke or withdraw the Plan and/or submit any new plan of reorganization at such times and in such manner as they consider appropriate, subject to the provisions of the Bankruptcy Code.

(k)     **Setoff Rights**

In the event that any Debtor has a Claim of any nature whatsoever against the holder of a Claim against such Debtor, then such Debtor may, but is not required to, set off against the Claim (and any payments or other Plan Distributions to be made in respect of such Claim hereunder) such Debtor's Claim against such holder, subject to section 553 of the Bankruptcy Code.  Neither the failure to set off nor the allowance of any Claim under the Plan shall constitute a waiver or release of any Claims that any Debtor may have against the holder of any Claim.

(l)     **Compliance with Tax Requirements**

In connection with the Plan, the Debtors and the Disbursing Agent, as applicable, shall comply with all withholding and reporting requirements imposed by federal, state, local, and foreign taxing authorities and all Plan Distributions hereunder shall be subject to such withholding and reporting requirements.  Notwithstanding the above, each holder of an Allowed Claim or Equity Interest that is to receive a Plan Distribution shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any government unit upon it, including income, withholding, and other tax obligations, on account of such Plan Distribution, and no holder of an Allowed Claim or Equity Interest shall have responsibility for the satisfaction and payment of any tax obligations imposed by any government unit upon any other holder of an Allowed Claim or Equity Interest.  The Disbursing Agent has the right, but not the obligation, to not make a Plan Distribution until such holder has made arrangements satisfactory to the Disbursing Agent for payment of any such tax obligations.

(m)     **Injunctions**

**On the Effective Date and except as otherwise provided herein, all Persons who have been, are, or may be holders of Claims against or Equity Interests in the Debtors shall be permanently enjoined from taking any of the following actions against or affecting the Debtors, the Reorganized Debtors, the Estates, the Assets, the Disbursing Agent, or any of the Released Persons, or their respective assets and property, with respect to such Claims or Equity Interests (other than actions brought to enforce any rights or obligations under the Plan):**

i)     **commencing, conducting or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, all suits, actions, and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice);**

ii)     **enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order;**

iii)     **creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance; and**

iv)     **asserting any setoff, right of subrogation or recoupment of any kind;** **provided,** **that any defenses, offsets or counterclaims which the Debtors may have or assert in respect of the above referenced Claims are fully preserved in accordance with** <u>Section 17.19</u> **of the Plan.**

(n)     <u>**Binding Effect**</u>

The Plan shall be binding upon the Reorganized Debtors, the holders of all Claims and Equity Interests, parties in interest, Persons, and Entities and their respective successors and assigns.  To the extent any provision of the Disclosure Statement or any other solicitation document may be inconsistent with the terms of the Plan, the terms of the Plan shall be binding and conclusive.

(o)     <u>**Severability**</u>

**IN THE EVENT THE BANKRUPTCY COURT DETERMINES THAT ANY PROVISION OF THE PLAN IS UNENFORCEABLE EITHER ON ITS FACE OR AS APPLIED TO ANY CLAIM OR EQUITY INTEREST OR TRANSACTION, THE DEBTORS MAY MODIFY THE PLAN IN ACCORDANCE WITH** <u>SECTION 17.17</u> **OF THE PLAN SO THAT SUCH PROVISION SHALL NOT BE APPLICABLE TO THE HOLDER OF ANY SUCH CLAIM OR EQUITY INTEREST OR TRANSACTION. SUCH A DETERMINATION OF UNENFORCEABILITY SHALL NOT (A) LIMIT OR AFFECT THE ENFORCEABILITY AND OPERATIVE EFFECT OF ANY OTHER PROVISION OF THE PLAN OR (B) REQUIRE THE RESOLICITATION OF ANY ACCEPTANCE OR REJECTION OF THE PLAN.**

(p)     <u>**No Admissions**</u>

**AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER CAUSES OF ACTION OR THREATENED CAUSES OF ACTIONS, THE PLAN AND THE DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  NEITHER THE PLAN NOR THE DISCLOSURE STATEMENT SHALL BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, AND OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTORS OR THEIR AFFILIATES, AS DEBTORS AND DEBTORS-IN-POSSESSION IN THESE CHAPTER 11 CASES.**

(q)     <u>**Dissolution of the Committee**</u>

Effective on the Effective Date, the Committee shall dissolve automatically, whereupon its members, professionals, and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, <u>except</u> with respect to (i) applications for Fee Claims or reimbursement of expenses incurred as a member of the Committee, and (ii) any motions or other actions seeking enforcement or implementation of the

provisions of the Plan or the Confirmation Order or pending appeals of Orders entered in the Chapter 11 Cases.

(r) **Potential Exclusion of the Pennsylvania Debtors and/or Centaur Colorado, LLC from the Plan**

The Debtors reserve the right to (i) amend the Plan to treat the Pennsylvania Debtors and/or Centaur Colorado, LLC separately from the Indiana Debtors and Centaur, LLC and (ii) adjourn the confirmation hearing in respect of the Plan as to the Pennsylvania Debtors and/or Centaur Colorado, LLC until further notice or order of the Bankruptcy Court.  If this occurs, the Confirmation Order shall (A) authorize NewCo or its subsidiaries to operate the businesses of, and provide debtor-in-possession financing to, protected to the fullest extent permitted under sections 364(c) and (d) of the Bankruptcy Code, to the Pennsylvania Debtors and/or Centaur Colorado, LLC and (B) provide an extension of the periods in which the Pennsylvania Debtors and/or Centaur Colorado, LLC possess or possesses, as applicable, the exclusive right to file a plan of reorganization and solicit acceptances thereto for an additional 180 days without prejudice to the rights of the Pennsylvania Debtors and/or Centaur Colorado, LLC to seek additional extensions or the rights of parties in interest to seek to shorten or terminate such exclusive periods.  Such amendment shall be without prejudice to the Pennsylvania Debtors and/or Centaur Colorado, LLC to further amend, modify, or revoke the Plan and/or submit any new plan of reorganization as it relates to the Pennsylvania Debtors and/or Centaur Colorado, LLC.

(s) **Plan Controls**

Unless otherwise specified, all section, article, and exhibit references in the Plan are to the respective section in, article of, or exhibit to, the Plan, as the same may be amended, waived, or modified from time to time.  Words denoting the singular number shall include the plural number and vice versa, and words denoting one gender shall include the other gender. The Disclosure Statement may be referred to for purposes of interpretation to the extent any term or provision of the Plan is determined by the Bankruptcy Court to be ambiguous.

## XI.

## RISK FACTORS

A. **Certain Bankruptcy Considerations**

If the Plan is not confirmed and consummated, there can be no assurance that any alternative plan of reorganization would be on terms as favorable to the holders of Claims as the terms of the Plan.  In addition, if a protracted reorganization were to occur, there is a substantial risk that holders of Claims would receive less than they will receive under the Plan.  See Exhibit "G" to the Disclosure Statement for a liquidation analysis of the Debtors.

**B.      The Reorganized Debtors' Actual Financial Results may Vary Significantly from the Projections Included in this Disclosure Statement**

The financial projections included in this Disclosure Statement are dependent upon the successful implementation of the Reorganized Debtors' business plan and the validity of the numerous assumptions contained therein.  The significant assumptions underlying the Projections are discussed in greater detail in Exhibit "B" to this Disclosure Statement.

Many of these assumptions are beyond the control of the Debtors and may not materialize.  In addition, unanticipated events and circumstances occurring subsequent to the preparation of the projections may adversely affect the financial results of the Debtors.  Although the Debtors believe that the Projections and assumptions are reasonable, variations between the actual financial results and those projected may be material.

**C.      Plan Consideration Reserved for Contested Claims may be Insufficient to Satisfy all Secured Claims upon Liquidation**

The Plan authorizes, but does not require, the establishment of a Contested Claims Reserve for the purposes of satisfying Contested Claims.  The Debtors and the Reorganized Debtors reserve the right to seek estimation of such Contested Claims pursuant to section 503(c) of the Bankruptcy Code.  The actual amount at which such Contested Claims are ultimately allowed may differ from the estimates.  If a Contested Claims Reserve is established, holders of Contested Claims are entitled to receive distributions under the Plan upon allowance of such Claims solely from the Contested Claim Reserve established on account of such Claim.  If such Contested Claim is ultimately allowed and at the time of such allowance, insufficient Plan consideration is available for distribution from the Contested Claim Reserve, the distributions on account of such Allowed Claim will be limited to such available amounts and the holder of such Allowed Claim will have no recourse against the Debtors or the Reorganized Debtors for any deficiency that may arise.

**D.      The Reorganized Debtors may not be able to Raise Additional Financing on Terms Favorable to the Debtors**

The Reorganized Debtors' business is expected to require certain amounts of working capital and growth capital.  While the Projections assume that sufficient funds to meet these needs for the foreseeable future will be available from the cash generated by the business of the Reorganized Company, the ability of the Reorganized Company to gain access to additional capital on terms consistent with the terms assumed in the Projections, if needed, cannot be assured, particularly in light of current financial market conditions.

**E.      State Horse Racing and Gaming Laws and Regulations will Require that Holders of NewCo Membership Interests Become Licensed**

Many jurisdictions require any Entity or Person that is to acquire beneficial ownership of equity securities of a horse racing or gaming company to be licensed.  Any Entity or Person that is to acquire NewCo Membership Interests by converting their NewCo Warrants into NewCo Membership Interests or otherwise must be found suitable or qualified by a state

horse racing or gaming regulator.  The Plan provides that the NewCo Membership Interests will be issued only in compliance with state horse racing and gaming laws and regulations.  The failure by a holder of a Claim to comply with these laws and regulations may result in such holder not receiving NewCo Membership Interests pursuant to the Plan.

**F.      Consummation of the Plan may Result in a Small Number of Holders Owing a Significant Percentage of the NewCo Membership Interests**

Consummation of the Plan may result in a small number of holders owning a significant percentage of the NewCo Membership Interests.  These holders may, among other things, exercise a controlling influence over the business and affairs of the Reorganized Debtors and have the power to elect the Board of Managers.

**G.      Potential Changes in Legislation and Regulation**

From time to time, legislators and special interest groups propose legislation that would expand, restrict, or prevent gaming operations in the jurisdictions in which the Debtors operate.  Further, from time to time, individual jurisdictions have considered or enacted legislation and referenda, such as bans on smoking in casinos and other entertainment and dining facilities, that could adversely affect the Debtors' operations.  Any restriction on or prohibition relating to the Debtors' horse racing or gaming operations, or enactment of other adverse legislation or regulatory changes, could have a material adverse effect on the Debtors' businesses, financial condition, and results of operations.

**H.      Taxation and Fees**

The horse racing and casino entertainment industries represent a significant source of tax revenues to the various jurisdictions in which horse racing facilities and casinos operate.  Horse racing and gaming companies are currently subject to significant state and local taxes and fees in addition to the federal and state income taxes that typically apply to corporations, and such taxes and fees could increase at any time.  From time to time, various state and federal legislators and officials have proposed changes in tax laws or in the administration of such laws, including increases in tax rates, which would affect the horse racing and gaming industries.  Worsening economic conditions could intensify the efforts of state and local governments to raise revenues through increases in gaming taxes and fees.  In addition, state or local budget shortfalls could prompt tax or fee increases.  Any material increase in assessed taxes, or the adoption of additional taxes or fees in any of the Debtors' markets, could have a material adverse effect on the Debtors' businesses, financial condition, and results of operations.

**I.      The Debtors Could Lose Key Employees, Including Certain Members of the Existing Management**

The Debtors' success is substantially dependent upon the efforts and skills of the Existing Management and other members of the senior management team.  If the Debtors were to lose the services rendered by the Existing Management and other members of the senior management team, the Debtors' operations could be adversely affected.  In addition, the Debtors

compete with other potential employers for employees, and the Debtors may not succeed in hiring and retaining the executives and other employees that they need.  The inability to hire and retain qualified employees could adversely affect the Debtors' businesses, financial condition, and results of operations.

**J.      No Market for the Claim Securities**

There is no existing market for the NewCo PIK Notes to be issued to holders of Allowed First Lien Claims, Allowed Second Lien Claims and Allowed Valley View Downs Unsecured Claims or the NewCo Warrants to be issued to holders of Allowed First Lien Claims, and an active trading market may not develop for such securities.  Further, there is no existing market for the NewCo Membership Interests issuable upon the exercise of the NewCo Warrants (such NewCo Membership Interests, together with the NewCo PIK Notes and the NewCo Warrants, the "Claim Securities").  The NewCo PIK Notes and the NewCo Warrants to be issued in accordance with the Plan will not be listed for trading on any national securities exchange or quotation system at the time they are issued on the Effective Date of the Plan, and the Debtors do not anticipate that any of the Claim Securities will ever be listed or quoted on any national securities exchange or quotation system.  Even if an active trading market does develop, the Debtors cannot assure you that it will continue for any period of time or at what price or prices the Claim Securities will trade.  Lack of liquidity in the Claim Securities also may make it more difficult for the Reorganized Debtors to raise additional capital, if necessary, through equity financings or otherwise, to support their financing needs.

**XII.**

**SECURITIES LAW MATTERS**

**A.      Issuance of Claim Securities**

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act of 1933, as amended (the "Securities Act") and state securities laws if three principal requirements are satisfied:  (i) the securities must be offered and sold under a plan of reorganization by the debtor, an affiliate participating in a joint plan with the debtor or a successor to the debtor under the plan; (ii) the recipients of the securities must hold a claim against the debtor, an interest in the debtor or such affiliate, or a claim for an administrative expense against the debtor or such affiliate; and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor or such affiliate, or principally in exchange for such claim or interest and partly for cash or property.  Similarly, under section 1145(a)(2) of the Bankruptcy Code, the issuance of securities upon the exercise of warrants is exempt from registration assuming that the issuance of the warrants satisfied the requirements of section 1145(a)(1) of the Bankruptcy Code.  Except as noted below, the Debtors believe that the offer and sale of Claim Securities under the Plan to holders of Allowed First Lien Claims, Allowed Second Lien Claims and Allowed Valley View Downs Unsecured Claims, as applicable, satisfies the requirements of section 1145(a)(1) and (2) of the Bankruptcy Code and, therefore, are exempt from registration under the Securities Act and state securities laws.

**B.  Subsequent Transfers of Claim Securities**

    (a)    **<u>Section 1145 of the Bankruptcy Code</u>**

        Section 1145(c) of the Bankruptcy Code provides that the offer or sale of securities pursuant to section 1145(a) of the Bankruptcy Code is deemed to be a public offering. Accordingly, the Claim Securities to be issued under the Plan will not be deemed to be "restricted securities" under the Securities Act.  Therefore, the Claim Securities issued pursuant to a section 1145 exemption may (<u>except</u> as may be limited under any shareholder or other contractual agreement) generally be resold by any holder thereof without registration under the Securities Act pursuant to the exemption provided by section 4(1) thereof, unless the holder is an "underwriter" with respect to such securities, as such term is defined in section 1145(b)(1) of the Bankruptcy Code.

        Section 1145(b) of the Bankruptcy Code defines four types of "underwriters":

    (i)    persons who purchase a claim against, an interest in, or a claim for an administrative expense against the debtor with a view to distributing any security received in exchange for such claim or interest;

    (ii)    persons who offer to sell securities offered under a plan for the holders of such securities;

    (iii)    persons who offer to buy such securities from the holders of such securities, if the offer to buy is:

        (A)    with a view to distributing such securities; and

        (B)    under an agreement made in connection with the plan, the consummation of the plan, or with the offer or sale of securities under the plan; and

    (iv)    a person who is an "issuer" with respect to the securities as the term "issuer" is defined in Section 2(a)(11) of the Securities Act.

        Under section 2(a)(11) of the Securities Act, an "issuer" includes any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control of the issuer.  "Control" (as defined in Rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.  Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be "in control" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities.  Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns

at least ten percent of the voting securities of a reorganized debtor may be presumed to be a "control person."

Whether or not any particular person would be deemed to be an "underwriter" with respect to the Claim Securities or other security to be issued pursuant to the Plan would depend upon various facts and circumstances applicable to that person. Accordingly, the Debtors express no view as to whether any particular person receiving Claim Securities or other securities under the Plan would be an "underwriter" with respect to such Claim Securities or other securities.

GIVEN THE COMPLEX AND SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER, NONE OF THE DEBTORS OR THE REORGANIZED DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO TRADE IN OR DISPOSE OF THE CLAIM SECURITIES TO BE DISTRIBUTED UNDER THE PLAN. The Debtors recommend that potential recipients of the Claim Securities consult their own counsel concerning whether they may freely trade the Claim Securities under the Securities Act and/or state securities laws. The Debtors have not undertaken, and do not intend, to file a registration statement in respect of any Claim Securities held by a holder that is an underwriter.

(b) **Resales of Claim Securities/Rule 144, Rule 144A, "Section 4(1½) Exemption" and Regulation S**

To the extent that persons who receive Claim Securities are deemed to be "underwriters" (collectively, the "Restricted Holders"), resales of such securities by Restricted Holders would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Restricted Holders would, however, be permitted to sell Claim Securities without registration if they are able to comply with the applicable provisions of Rule 144 or Rule 144A under the Securities Act, the "Section 4(1½) exemption," or Regulation S under the Securities Act, each as described further below, or if such securities are registered with the SEC. Any person who is an "underwriter" but not an "issuer" with respect to an issuance of securities (other than a holder of restricted securities) is, in addition, entitled to engage in exempt "ordinary trading transactions" within the meaning of section 1145(b)(1) of the Bankruptcy Code.

Under certain circumstances, Restricted Holders may be entitled to resell Claim Securities pursuant to the limited safe harbor resale provisions of Rule 144. Generally, Rule 144 provides that if certain conditions are met (e.g., the availability of current public information with respect to the issuer of such securities, volume limitations, and notice and manner of sale requirements), specified persons who resell restricted securities or "affiliates" of an issuer of unrestricted securities seeking to resell such securities will not be deemed to be "underwriters" as defined in section 2(a)(11) of the Securities Act. Rule 144 provides that: (i) a non-affiliate who has not been an affiliate during the preceding three months may resell restricted or other securities after a six-month holding period if at the time of the sale there is current public information regarding the issuer available and after a one year holding period if there is not current public information regarding the issuer available at the time of the sale; and (ii) an affiliate may sell restricted or other securities after a six-month holding period if at the time of

the sale there is current public information regarding the issuer available, and also may sell restricted or other securities after a one-year holding period whether or not current public information regarding the issuer is available at the time of the sale, provided that in each case the affiliate otherwise complies with the volume, manner of sale and notice requirements of Rule 144.

Rule 144A provides a non-exclusive safe harbor exemption from the registration requirements of the Securities Act for resales to certain "qualified institutional buyers" of securities that are "restricted securities" within the meaning of the Securities Act. Irrespective of whether the seller of such securities purchased its securities with a view towards reselling such securities, if certain other conditions are met (e.g., the availability of information required by paragraph 4(d) of Rule 144A and certain notice provisions) the Rule 144A safe harbor exemption will be available. Under Rule 144A, a "qualified institutional buyer" is defined to include, among other persons, "dealers" registered as such pursuant to section 15 of the Securities Exchange Act or 1934, as amended (the "Exchange Act"), and entities that purchase securities for their own account or for the account of another qualified institutional buyer and that, in the aggregate, own and invest on a discretionary basis at least $100 million in the securities of unaffiliated issuers. Subject to certain qualifications, Rule 144A does not exempt the offer or sale of securities that, at the time of their issuance, were securities of the same class of securities then listed on a national securities exchange (registered as such pursuant to section 6 of the Exchange Act) or quoted in a United States automated inter-dealer quotation system.

Restricted Holders may transfer or sell such securities under the so-called "Section 4(1½) exemption" from the registration requirements of the Securities Act. The Section 4(1½) exemption is based on reading section 4(1) and section 4(2) under the Securities Act together to provide an exemption for private resales of restricted securities. Section 4(1) under the Securities Act provides that an investor may resell restricted securities in a non-public exempt transaction if such investor is not an issuer, underwriter or dealer under the Securities Act. This determination relies on whether the resale would meet the requirements of section 4(2) under the Securities Act regarding offers and sales not involving a public offering. Accordingly, to satisfy the Section 4(1½) exemption, a Restricted Holder must not have acquired the Claim Securities with a view to distribution in violation of the Securities Act and purchasers in the resale must be sophisticated and have access to all material information about the Reorganized Debtors. If such conditions are met, Restricted Holders may be permitted to transfer or sell such securities in private resales prior to the expiration of the required holding period under Rule 144.

Restricted Holders may also transfer or sell such securities under the exemption from registration provided under Regulation S of the Securities Act. To qualify for the exemption under Regulation S, such Restricted Holders must transfer or sell such securities in an offshore transaction outside the United States to non-U.S. persons (as such terms are defined in Regulation S), which includes dealers or other professional fiduciaries in the United States acting on a discretionary basis for non-U.S. beneficial owners (other than an estate or trust). Further, in order to qualify for the exemption under Regulation S, Restricted Holders may not engage in any directed selling efforts in the United States in contravention of the requirements of Rule 904(b) of Regulation S.

Certificates evidencing Claim Securities received by Restricted Holders will bear a legend substantially in the form below:

> THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR APPLICABLE STATE SECURITIES LAWS ("STATE ACTS") AND MAY NOT BE SOLD, ASSIGNED, PLEDGED OR TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR STATE ACTS COVERING SUCH SECURITIES OR THE SECURITIES ARE SOLD AND TRANSFERRED IN A TRANSACTION THAT IS EXEMPT FROM OR NOT SUBJECT TO THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF SUCH ACT.

Any holder of a certificate evidencing Claim Securities bearing such legend may present such certificate to the transfer agent for the Claim Securities for exchange for one or more new certificates not bearing such legend or for transfer to a new holder without such legend at such times as (i) such securities are sold pursuant to an effective registration statement under the Securities Act, (ii) in the case of securities issued under the Plan pursuant to the exemption from registration set forth in section 1145 of the Bankruptcy Code, such holder delivers to the Reorganized Debtors an opinion of counsel reasonably satisfactory to the Reorganized Debtors to the effect that such securities are no longer subject to the restrictions applicable to "underwriters" under section 1145 of the Bankruptcy Code or (iii) such holder delivers to the Reorganized Debtors an opinion of counsel reasonably satisfactory to the Reorganized Debtors to the effect that such securities are no longer subject to the restrictions pursuant to an exemption under the Securities Act and such securities may be sold without registration under the Securities Act, in which event the certificate issued to the transferee will not bear such legend.

In addition, all Claim Securities will bear such legends as are required by any applicable state gaming or racing laws and regulations.

## C.     Delivery of Disclosure Statement

Under section 1145(a)(4) of the Bankruptcy Code, "stockbrokers" (as that term is defined in section 101(53A) of the Bankruptcy Code) are required to deliver to their customers, for the first forty days after the Effective Date, a copy of this Disclosure Statement (and any information supplementing such Disclosure Statement ordered by the Bankruptcy Court) at or before the time of a transaction in any Claim Security issued under the Plan in order for such transaction to be exempt from the registration requirements of section 5 of the Securities Act.

# XIII.

## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

### A.      Certain U.S. Federal Tax Consequences

The following discussion is a summary of certain U.S. federal income tax consequences expected to result from the implementation of the Plan.  This discussion is based on the Internal Revenue Code, as in effect on the date of this Disclosure Statement and on U.S. Treasury Regulations ("Treasury Regulations") in effect (or in certain cases, proposed) on the date of this Disclosure Statement, as well as judicial and administrative interpretations thereof available on or before such date.  All of the foregoing are subject to change, which change could apply retroactively and could affect the tax consequences described below.  There can be no assurance that the IRS will not take a contrary view with respect to one or more of the issues discussed below, and no ruling from the IRS has been or will be sought with respect to any issues which may arise under the Plan.

The following summary is for general information only and discusses certain U.S. federal income tax consequences of the Plan to the Debtors, and Holders of Allowed Claims or Borrower Equity Interests and Holders of NewCo Membership Interests, First Lien Take Back Paper, NewCo PIK Notes and NewCo Warrants who receive such NewCo Membership Interests, First Lien Take Back Paper, NewCo PIK Notes and NewCo Warrants as a result of the Plan.

For purposes of this summary, a "U.S. Holder" is a beneficial owner of Allowed Claims, Borrower Equity Interests, NewCo Membership Interests, First Lien Take Back Paper, NewCo PIK Notes and NewCo Warrants that, for U.S. federal income tax purposes, is: (a) a citizen or resident of the U.S.; (b) a corporation created or organized in or under the laws of the United States or any state thereof (including the District of Columbia); (c) an estate the income of which is subject to U.S. federal income taxation regardless of its source; or (d) a trust if such trust validly elects to be treated as a U.S. person for U.S. federal income tax purposes, or if (I) a court within the U.S. is able to exercise primary supervision over its administration and (II) one or more U.S. persons have the authority to control all of the substantial decisions of such trust. This summary does not purport to address all of the U.S. federal income tax consequences that may be applicable to any particular holder.  Except as otherwise noted, the following discussion does not address state, local or foreign tax considerations that may be applicable to the Debtors and Holders of Allowed Claims, Borrower Equity Interests, NewCo Membership Interests, First Lien Take Back Paper, NewCo PIK Notes and NewCo Warrants.  This summary does not address tax considerations applicable to holders that may be subject to special tax rules, such as financial institutions, insurance companies, real estate investment trusts, regulated investment companies, grantor trusts, dealers or traders in securities or currencies, tax-exempt entities, persons that hold an equity interest or a security in a Debtor as a position in a "straddle" or as part of a "hedging," "conversion" or "integrated" transaction for U.S. federal income tax purposes, persons that have a "functional currency" other than the U.S. dollar, and persons who acquired an equity interest or other security in a Debtor in connection with the performance of services.

If a partnership (or any other entity treated as a partnership for U.S. federal income tax purposes) holds Allowed Claims, Borrower Equity Interests, NewCo Membership Interests, First Lien Take Back Paper, NewCo PIK Notes and NewCo Warrants, the tax treatment of a partner in such partnership generally will depend on the status of the partner and the activities of the partnership. Any such partner should consult its tax advisor as to its tax consequences.

EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISOR WITH RESPECT TO THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN. EACH HOLDER OF NEWCO MEMBERSHIP INTERESTS, FIRST LIEN TAKE BACK PAPER, NEWCO PIK NOTES AND NEWCO WARRANTS SHOULD CONSULT ITS OWN TAX ADVISOR WITH RESPECT TO THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE RECEIPT, OWNERSHIP AND DISPOSITION OF SUCH NEWCO MEMBERSHIP INTERESTS, FIRST LIEN TAKE BACK PAPER, NEWCO PIK NOTES AND NEWCO WARRANTS.

## U.S. INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE

PURSUANT TO U.S. INTERNAL REVENUE SERVICE CIRCULAR 230, WE HEREBY INFORM YOU THAT THE DESCRIPTION SET FORTH HEREIN WITH RESPECT TO U.S. FEDERAL TAX ISSUES WAS NOT INTENDED OR WRITTEN TO BE USED, AND SUCH DESCRIPTION CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING ANY PENALTIES THAT MAYBE IMPOSED ON THE TAXPAYER UNDER THE INTERNAL REVENUE CODE. THIS DESCRIPTION IS LIMITED TO THE U.S. FEDERAL TAX ISSUES DESCRIBED HEREIN. IT IS POSSIBLE THAT ADDITIONAL ISSUES MAY EXIST THAT COULD AFFECT THE U.S. FEDERAL TAX TREATMENT OF THE MATTER THAT IS THE SUBJECT OF THE DESCRIPTION NOTED HEREIN, AND THIS DESCRIPTION DOES NOT CONSIDER OR PROVIDE ANY CONCLUSIONS WITH RESPECT TO ANY SUCH ADDITIONAL ISSUES. TAXPAYERS SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

    (a)    **U.S. Federal Income Tax Consequences to the Debtors, Class 8 – Intercompany Claims, Class 9 – Borrower Equity Interests and Centaur Inc.**

The Debtors are all entities that are disregarded as separate from Centaur Inc. for U.S. federal income tax purposes. Therefore, it is anticipated that the Debtors will not recognize any material tax as a result of consummation of the Plan.

The cancellation of the Class 8 – Intercompany Claims should be ignored for U.S. federal income tax purposes because the Debtors are disregarded entities.

Although the matter is uncertain, it is expected that Centaur Inc., the indirect shareholder of the Debtors and holder or the Borrower Equity Interests for U.S. Federal income tax purposes, should not be required to recognize any material U.S. federal income tax liability as a result of the Plan.

(b)     **Certain U.S. Federal Income Tax Consequences to the Holders of Allowed Claims That Are Paid in Cash in Full**

Pursuant to the Plan, holders of the Class 7 – Convenience Claims will receive solely Cash in full satisfaction of their Allowed Claims. A holder who receives Cash in exchange for its Allowed Claim pursuant to the Plan generally will recognize income, gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (i) the amount of Cash received in exchange for its Allowed Claim, and (ii) the holder's adjusted tax basis in its Allowed Claim. The character of such income, gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, the nature of the Allowed Claim in such holder's hands, whether the Allowed Claim constitutes a capital asset in the hands of the holder, whether the Allowed Claim was purchased at a discount, and whether and to what extent the holder has previously claimed a bad debt deduction with respect to its Allowed Claim. To the extent that any amount received by a holder of an Allowed Claim is attributable to accrued interest, such amount should be taxable to the holder as interest income. Conversely, a holder of an Allowed Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the Allowed Claims was previously included in the holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

(c)     **Consequences to Pre-Bankruptcy Holders of Class 6 – General Unsecured Claims**

Pursuant to the Plan, all Class 6 – General Unsecured Claims will receive no distributions on account of such General Unsecured Claims. U.S. Holders of Class 6 – General Unsecured Claims will recognize a loss in an amount equal to such holder's adjusted tax basis, if any, in such General Unsecured Claims.

(d)     **U.S. Federal Income Tax Consequences to Holders of Allowed Claims That Are Paid Using Consideration Other Than Solely Cash**

Certain holders of Allowed Claims will receive First Lien Take Back Paper, NewCo PIK Notes and/or NewCo Warrants. The NewCo PIK Notes issued to holders of Allowed First Lien Claims will have NewCo Warrants attached that will not be detachable (the NewCo PIK Notes with the NewCo Warrants attached, the "Units"). The U.S. federal income tax treatment of assets that are attached together as a unit is unclear. For U.S. federal income tax purposes, an investment unit that comprises more than one financial instrument generally is treated as one instrument for U.S. federal income tax purposes if the underlying instruments are not separable. The Debtors expect to report the Units as one instrument that is a "contingent payment debt instrument" for U.S. federal income tax purposes. Alternatively, because the NewCo Warrants are not detachable, the Units could be treated as equity. Unless noted otherwise, the remainder of this discussion assumes that the Units will be treated as one instrument that is a "contingent payment debt instrument".

Pursuant to the Plan, holders of Class 2 – First Lien Claims will receive First Lien Take Back Paper and Units, holders of Class 3 – Second Lien Claims will receive NewCo PIK

Notes and holders of Class 1 – Priority Non-Tax Claims and Class 4 – Other Secured Claims, will have their rights reinstated.

    a.    <u>Holders of Class 2 – First Lien Claims</u>

Holders of Class 2 – First Lien Claims will receive First Lien Take Back Paper and Units.  A holder generally will recognize gain or loss on such exchange in an amount equal to (x) the sum of (i) the stated principal balance of the First Lien Take Back Paper received by such holder, (ii) the stated principal balance of the NewCo PIK Notes that are part of the Units received by such holder, and (iii) the fair market value of the NewCo Warrants (that are part of the Units) over (y) the holder's adjusted tax basis in such holder's First Lien Claim.  Any gain recognized generally will be capital gain and will be long-term capital gain if, at the time of the exchange, the First Lien Claim has been held for more than one year.  A holder will have a tax basis in the First Lien Take Back Paper equal to their stated principal balance and a tax basis in the Units equal to the sum of (i) the stated principal balance of the NewCo PIK Notes (which will be the holder's tax basis in the NewCo PIK Notes component of the Units) plus (ii) the fair market value of the NewCo Warrants (which will be the holder's tax basis in the NewCo Warrants component of the Units).  If the Units are treated as equity, the calculation of gain or loss will be different.  Holders should consult their tax advisors.

    b.    <u>Holders of Class 3 – Second Lien Claims</u>

Holders of Class 3 – Second Lien Claims will receive NewCo PIK Notes.  A holder generally will recognize gain or loss on such exchange in an amount equal to (x) the stated principal balance of the NewCo PIK Notes over (y) the holder's adjusted tax basis in such holder's Second Lien Claim.  Any gain recognized generally will be capital gain and will be long-term capital gain if, at the time of the exchange, the Second Lien Claim has been held for more than one year.  A holder will have a tax basis in the NewCo PIK Notes equal to their stated principal balance.

    c.    <u>Holders of Class 1 – Priority Non-Tax Claims, Class 4 – Other Secured Claims and Class 10 – Subsidiary Equity Interests</u>

Holders of Class 1 – Priority Non-Tax Claims and Class 4 – Other Secured Claims that have their Allowed Claims reinstated against an obligor organized in the U.S. generally should be treated as if they made a taxable exchange of their Allowed Claims for new claims.  Such holders generally should recognize gain or loss equal to the difference between their adjusted tax basis in the original Allowed Claim and the issue price of that new claim, which likely would be the face amount of that new claim.

Holders of Class 10 – Subsidiary Equity Interests that have their Allowed Equity Interests reinstated will not recognize any gain or loss because the reinstatement of the Subsidiary Equity Interests will be ignored for U.S. federal income tax purposes, since the Debtors are disregarded entities.

d.    Accrued but Unpaid Interest

In general, to the extent a holder of a debt instrument receives property in satisfaction of interest accrued during the holding period of such instrument, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, such holder may recognize a deductible loss to the extent that any accrued interest or original issue discount ("OID") was previously included in its gross income and is not paid in full. The extent to which property received by a holder of a debt instrument will be attributable to accrued but unpaid interest is unclear. Pursuant to the Plan, all distributions in respect of any Allowed Claim will be allocated first to the principal amount of such Allowed Claim, and thereafter to accrued but unpaid interest, if any. Certain legislative history indicates that an allocation of consideration between principal and interest provided in a bankruptcy plan of reorganization generally is binding for U.S. federal income tax purposes. However, there is no assurance that such allocation will be respected by the IRS for U.S. federal income tax purposes.

Each holder of an Allowed Claim is urged to consult its tax advisor regarding the inclusion in income of amounts received in satisfaction of accrued but unpaid interest, the allocation of consideration between principal and interest, and the deductibility of previously included unpaid interest and OID for tax purposes.

e.    Market Discount

If a holder of an Allowed Claim purchased the underlying debt obligation at a price less than its issue price, the difference would constitute "market discount" for U.S. federal income tax purposes. Any gain recognized by a holder on the exchange of its Allowed Claim on the Effective Date is treated as ordinary income to the extent of any market discount accrued on the underlying debt obligation by the holder on or prior to the Effective Date.

(e)    **Consequences of Ownership of NewCo Membership Interests, First Lien Take Back Paper, Units and NewCo PIK Notes Issued Pursuant to the Plan**

a.    U.S. Holders

The following is a description of the principal U.S. federal income tax consequences that may be relevant with respect to the ownership and disposition of the NewCo Membership Interests, First Lien Take Back Paper, Units and NewCo PIK Notes. This discussion addresses only the U.S. federal income tax considerations of U.S. Holders that will receive NewCo Membership Interests, First Lien Take Back Paper, Units, or NewCo PIK Notes under the Plan and that will hold such NewCo Membership Interests, First Lien Take Back Paper, Units or NewCo PIK Notes as capital assets.

(i)    Consequences of Ownership of NewCo Membership Interests Issued Pursuant to the Plan

(A)    Taxation of NewCo Operations Generally

It is expected that NewCo will be treated as a partnership for U.S. federal income tax purposes, and thus, NewCo generally will not pay U.S. federal income taxes. Instead, each

U.S. Holder will be required to report on its own tax return that U.S. Holder's allocable share (whether or not distributed) of NewCo's income, gains, losses, deductions and credits of the character specified in section 702 of the Internal Revenue Code. U.S. Holders may incur U.S. federal income tax liabilities without receiving sufficient distributions from NewCo to defray such tax liabilities. NewCo's taxable year will be the calendar year, or such other period as required by the Internal Revenue Code. Tax information will be delivered to all U.S. Holders as soon as reasonably practicable after the end of each fiscal year.

(B) Taxation of Distributions and Withdrawals

Cash non-liquidating distributions and withdrawals, to the extent they do not exceed a U.S. Holder's tax basis in its NewCo Membership Interests, will not result in taxable income to that U.S. Holder, but will reduce its tax basis in its NewCo Membership Interests by the amount distributed or withdrawn. Cash distributions to a U.S. Holder in excess of its tax basis in its NewCo Membership Interests generally are taxable as capital gains.

Upon the withdrawal of a U.S. Holder receiving a cash liquidating distribution from NewCo, such U.S. Holder generally will recognize capital gain or loss to the extent of the difference between the amount of the liquidating distributions and such U.S. Holder's adjusted tax basis in its NewCo Membership Interests. Such capital gain or loss will be short-term or long-term depending upon the U.S. Holder's holding period (or holding periods) for its NewCo Membership Interests. However, a withdrawing U.S. Holder will recognize ordinary income to the extent such U.S. Holder's allocable share of the NewCo's "unrealized receivables" exceeds the U.S. Holder's basis in such unrealized receivables (as determined pursuant to the Treasury Regulations).

Distributions of property other than cash generally will not result in income to a U.S. Holder. The U.S. Holder's tax basis in the distributed property will equal the lesser of NewCo's adjusted tax basis in such property and the holder's adjusted tax basis in its NewCo Membership Interests.

(ii) Consequences of Ownership of the Units Pursuant to the Plan

(A) Contingent Payment Debt Instruments

Units issued pursuant to the Plan will provide for a contingent payment and, therefore, are expected to be treated as contingent payment debt instruments ("CPDIs"). U.S. Treasury Regulations set forth special rules with respect to the taxation of debt instruments that: (1) provide for contingent payments, (2) are not publicly traded, and (3) are issued as consideration for non-publicly traded property (rather than Cash or publicly traded property) (the "Contingent Payment Regulations"). Under the Contingent Payment Regulations, such a CPDI is separated into its contingent and non-contingent components. For purposes of calculating OID, the non-contingent component and the contingent component will each be treated as a separate debt instrument. The non-contingent component of each Unit (i.e., the right to receive payments of principal and interest on the NewCo PIK Notes) generally will be subject to the OID rules for non-contingent debt instruments, as described below under the caption "Consequences

of Ownership of NewCo PIK Notes". Payments on the contingent component of each Unit are described below under the caption "Consequences of Exercising NewCo Warrants".

A U.S. Holder must allocate the amount realized from the sale, exchange or disposition of a Unit, first, to the non-contingent component (the NewCo PIK Notes) in an amount up to the adjusted issue price of the non-contingent component, and must allocate the remaining amount received, if any, to the contingent component (the NewCo Warrants). A U.S. Holder will generally recognize gain or loss on the non-contingent component equal to the difference between (i) the portion of the amount realized allocated to the non-contingent component and (ii) the U.S. Holder's adjusted tax basis in the non-contingent component. Such gain on a non-contingent component generally will be treated as U.S. source capital gain or loss. Capital gain of a non-corporate U.S. Holder that is recognized in taxable years beginning before January 1, 2011 is generally taxed at a maximum rate of 15 percent where the holder has a holding period greater than one year.

The amount allocated to a contingent component is treated as a contingent payment that is made on the date of the sale, exchange or other disposition with a portion of such payment treated as principal and the remainder as interest.

The application of the Contingent Payment Regulations is complex. Creditors are urged to consult their tax advisors regarding the tax consequences of the ownership and disposition of the Units.

(B)     Equity Instrument

It also is possible that instead of being treated a contingent payment debt instrument, the Unit will be treated as an equity interest in NewCo. If the Unit is treated as an equity interest in NewCo, the consequences to a holder generally will be as described under the caption "Consequences of Ownership of NewCo Membership Interests Issued Pursuant to the Plan".

[It is not clear whether section 483 of the Internal Revenue Code would apply to the Units and impute interest in addition to the interest described above. Holders are urged to consult their tax advisors regarding the application of section 483 of the Internal Revenue Code to the Units.]

(iii)     Consequences of Ownership of the First Lien Take Back Paper Issued Pursuant to the Plan

Interest that is payable on the First Lien Take Back Paper will be includible in a U.S. Holder's gross income as ordinary interest income in accordance with the U.S. Holder's usual method of tax accounting.

Upon the sale, exchange or retirement of the First Lien Take Back Paper, a U.S. Holder will recognize taxable gain or loss equal to the difference, if any, between the amount realized on the sale, exchange or retirement, other than amounts attributable to any accrued but unpaid interest which will be taxable as such, and such U.S. Holder's adjusted tax basis in the First Lien Take Back Paper. The character of any such gain or loss will depend upon whether

the market discount rules apply to the First Lien Take Back Paper.  The deductibility of capital losses is subject to limitations.  Holders are urged to consult their tax advisors concerning the federal, state, local, and other tax consequences.

Interest on the First Lien Take Back Paper will constitute income from sources within the U.S.

(iv)     Consequences of Exercising the NewCo Warrants

Although the matter is uncertain, exercise of the NewCo Warrant portion of the Units should be treated as a contingent payment on the Unit equal to the fair market value of the NewCo Membership Interest received less the exercise price paid.  Such contingent payment will be accounted for when received, with a portion of such contingent payment treated as principal and the remainder treated as interest.  The principal portion of the contingent payment is the present value of the payment determined by discounting the payment from the date it was made (or treated as made) to the Effective Date at the applicable U.S. federal rate that would apply to a debt instrument issued on the Effective Date and maturing on the date the contingent payment is made (or treated as made).  Any amount of the contingent payment in excess of the portion determined to be principal is treated as a payment of interest. To the extent the principal amount received exceeds a holder's adjusted tax basis in the NewCo Warrants, such excess will be recognized as a gain for U.S. federal income tax purposes.  To the extent the principal amount received is less than a holder's adjusted tax basis in the NewCo Warrants, the remaining adjusted tax basis in such holder's NewCo Warrants will be added to the holder's adjusted tax basis in the non-contingent component (i.e., the NewCo PIK Note portion of the Unit).  If the non-contingent component (i.e., the NewCo PIK Note) is no longer outstanding, then such remaining adjusted tax basis in a NewCo Warrant will be treated as a loss.  Any such gain or loss will be a treated as capital gain or loss if certain requirements are met.

U.S. Holders should have a tax basis in the NewCo Membership Interests equal to the fair market value of the NewCo Membership Interests received, less the portion, if any, of such holder's adjusted tax basis in the NewCo Warrants that is transferred to the non-contingent component.  U.S. Holders obtaining NewCo Membership Interests will become partners and will have tax consequences similar to those described above under the caption "Consequences of Ownership of NewCo Membership Interests Issued Pursuant to the Plan".

Alternatively, if the Units are treated as equity, the exercise of the NewCo Warrant generally will not be a taxable event for U.S. federal tax purposes because the U.S. Holder already will be treated as holding an equity interest in NewCo.  Any payments made to exercise the NewCo Warrant should increase a U.S. Holder's tax basis in its equity interest.

(v)     Consequences of Ownership of the NewCo PIK Notes

(A)     Original Issue Discount

Each NewCo PIK Note will be treated as issued with OID equal to the excess of the "stated redemption price at maturity" of the NewCo PIK Note over its "issue price."  For purposes of the foregoing, the general rule is that the stated redemption price at maturity of a

debt instrument is the sum of all payments provided by the debt instrument other than payments of "qualified stated interest." It is not expected that any of the payments on the NewCo PIK Note will constitute qualified stated interest.

Because each NewCo PIK Note will be issued with OID, each U.S. Holder will be required to include in income each year, without regard to whether any cash payments of interest are made with respect to the NewCo PIK Note and without regard to the U.S. Holder's method of accounting for U.S. federal income tax purposes, a portion of the OID on the NewCo PIK Note so as to provide a constant yield to maturity. The amount included in the income of a U.S. Holder each year in this way will be treated as ordinary income. Any amount of OID included in income will increase a U.S. Holder's adjusted tax basis in a NewCo PIK Note, and any payment on the NewCo PIK Note (other than payments of additional NewCo PIK Notes) will decrease a U.S. Holder's adjusted tax basis in such NewCo PIK Note.

(B)     Sale, Exchange or Retirement of the NewCo PIK Notes

Upon the disposition of a NewCo PIK Note by sale, exchange or retirement, a U.S. Holder generally will recognize gain or loss equal to the difference between (i) the amount of cash plus the fair market value of any other property received by the U.S. Holder and (ii) the U.S. Holder's adjusted tax basis in the NewCo PIK Note. A U.S. Holder's aggregate adjusted tax basis in an additional NewCo PIK Note paid with respect to a NewCo PIK Note generally will be equal to the issue price allocated to the NewCo PIK Note, increased by OID (and any accrued market discount) included in income through the date of disposition and decreased by any payments (other than payments of PIK Notes) on the NewCo PIK Note. A U.S. Holder's aggregate adjusted tax basis in a note and any NewCo PIK Notes received will be allocated among such notes and NewCo PIK Notes based upon their relative principal amounts.

Subject to the market discount rules discussed above, gain or loss recognized will be capital gain or loss and will be long-term capital gain or loss if the U.S. Holder has held such NewCo PIK Note for longer than one year. The distinction between capital gain or loss and ordinary income or loss is potentially significant because limitations apply to a U.S. Holder's ability to offset capital losses against ordinary income. In addition, long-term capital gain recognized by U.S. Holders who are individuals generally will be taxed at lower rates.

b.     Non-U.S. Holders

(i)     Consequences of Ownership of the First Lien Take Back Paper, Units and NewCo PIK Notes.

The following is a summary of certain U.S. federal income tax consequences that will apply to Non-U.S. Holders of First Lien Take Back Paper, Units and NewCo PIK Notes. A "Non-U.S. Holder" is a beneficial holder of First Lien Take Back Paper, Units or NewCo PIK Notes that is not a U.S. Holder or a partnership or an entity treated as a partnership for U.S. federal income tax purposes.

(A)     Payments of Interest

Interest (other than any interest portion of a contingent payment) that is not effectively connected with a U.S. trade or business will not be subject to U.S. federal income tax and withholding of U.S. federal income tax will not be required of a Non-U.S. Holder if such Non-U.S. Holder:

- is not a "10-percent shareholder" (within the meaning of sections 881(c)(3)(B) and 871(h)(3)(B) of the Internal Revenue Code) of NewCo;

- is not a controlled foreign corporation related to NewCo;

- is not a bank receiving interest on a loan entered into in the ordinary course of business within the meaning of section 881(c)(3)(A) of the Internal Revenue Code; and

- certifies on IRS Form W-8BEN, or an applicable substitute form, under penalties of perjury, that it is not a U.S. person for U.S. federal income tax purposes and provides its name and address.

The interest portion of a contingent payment and any interest that does not satisfy the foregoing exception will be subject to U.S. federal withholding tax, currently at a rate of thirty percent, unless:

- such tax is eliminated or reduced under an applicable U.S. income tax treaty and the Non-U.S. Holder provides a properly executed IRS Form W-8BEN establishing such reduction or exemption from withholding tax on interest; or

- such interest is effectively connected with a U.S. trade or business of the Non-U.S. Holder and the Non-U.S. Holder provides a properly executed IRS Form W-8ECI or W-8BEN claiming an exemption from withholding tax on such interest.

A Non-U.S. Holder whose interest income is effectively connected with a U.S. trade or business (and, if an income tax treaty applies, is attributable to a permanent establishment or fixed base such Non-U.S. Holder maintains in the U.S.) of the Non-U.S. Holder will be subject to regular U.S. federal income tax on such interest in generally the same manner as if it were a U.S. Holder.  A corporate Non-U.S. Holder may also be subject to an additional U.S. branch profits tax at a rate of thirty percent on its effectively connected earnings and profits attributable to such interest (unless reduced or eliminated by an applicable income tax treaty).

(B)     Sale, Exchange, Redemption, Retirement or Other Disposition of the First Lien Take Back Paper, Units and NewCo PIK Notes

Except with respect to accrued interest and the interest portion of a contingent payment (which will be taxable as such), a Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to gain recognized on a sale, taxable exchange, redemption, retirement or other taxable disposition of First Lien Take Back Paper, Units and NewCo PIK Notes unless:

- the gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and, if an income tax treaty applies, is attributable to a permanent establishment or fixed base maintained in the U.S.), in which event such gain will be subject to tax generally in the same manner as described above with respect to effectively connected interest; or

- the Non-U.S. Holder is an individual, who is present in the U.S. for 183 or more days in the taxable year of the disposition and certain other requirements are met, in which event the gain (net of certain U.S. source capital loss) will be subject to a thirty percent U.S. federal income tax.

      (ii)     Consequences of Exercising the NewCo Warrants

Non-U.S. Holders generally will have the same ramifications upon exercising the NewCo Warrants as described above under the caption "U.S. Holder - Consequences of Exercising the NewCo Warrants". Additionally, such holders would be required to file a tax return in the United States during any taxable year that they held the NewCo Membership Interests. Furthermore, pursuant to section 1446 of the Internal Revenue Code, any Non-U.S. Holder likely will be subject to U.S. withholding tax on all income effectively connected to a United States trade or business earned by NewCo (or its subsidiaries).

      (f)     **Information Reporting and Backup Withholding**

U.S. federal backup withholding tax and information reporting requirements generally apply to certain payments to certain non-corporate holders of the NewCo Membership Interests, First Lien Take Back Paper or NewCo PIK Notes (or Units) regardless of whether such stock or debt obligations existed prior to the Plan or were issued pursuant to the Plan. Information reporting generally will apply to payments under the Plan and to payments of dividends on, interest on, and proceeds from the sale or redemption of such NewCo Membership Interests or First Lien Take Back Paper or NewCo PIK Notes (or Units) made within the U.S. A payor will be required to withhold backup withholding tax from any payments made under the Plan, and payments of dividends on, interest on or the proceeds from the sale or redemption of, the NewCo Membership Interests, First Lien Take Back Paper or NewCo PIK Notes (or Units) within the U.S. to a holder, other than an exempt recipient, if such holder fails to furnish its correct taxpayer identification number or otherwise fails to comply with, or establish an exemption from, such backup withholding tax requirements. The backup withholding tax rate is currently twenty-eight percent.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

## XIV.

## ALTERNATIVES TO CONFIRMATION AND
## CONSUMMATION OF THE PLAN

The Debtors have evaluated numerous alternatives to the Plan, including, without limitation, the sale of the Debtors as a going concern, either as an entirety or on limited bases and the liquidation of the Debtors. After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries of holders of Claims and Equity Interests. The following discussion provides a summary of the analysis supporting the conclusion that a liquidation of the Debtors or an alternative plan of reorganization for the Debtors will not provide higher value to holders of Claims and Equity Interests.

### A.    Liquidation Under Chapter 7 of the Bankruptcy Code

If no plan of reorganization can be confirmed, the Chapter 11 Cases of the Debtors may be converted to cases under chapter 7, in which event a trustee would be elected or appointed to liquidate the properties and interests in property of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for under the Plan because of (1) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee for bankruptcy and professional advisors to such trustee; (2) the erosion in value of assets in the context of the expeditious liquidation required under chapter 7 and the "forced sale" environment in which such a liquidation would likely occur; (3) the adverse effects on the salability of business segments as a result of the likely departure of key employees and the loss of customers; and (4) the substantial increases in claims which would have to be satisfied on a priority basis or on parity with creditors in the Chapter 11 Cases. Accordingly, the Debtors have determined that confirmation of the Plan will provide each holder of a Claim or Equity Interest with a greater recovery than it would receive pursuant to liquidation of the Debtors under chapter 7.

Section 1129(a)(7) of the Bankruptcy Code provides that, with respect to impaired classes, each holder of a claim or interest of such class must receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount such holder would so receive or retain if the debtor liquidated under chapter 7 of this title on such date. As demonstrated by the Liquidation Analysis attached hereto as Exhibit "G", the Plan satisfies this standard.

### B.    Alternative Plans of Reorganization

If the Plan is not confirmed, any other party in interest could undertake to formulate a different plan of reorganization. Such a plan of reorganization might involve either (x) a reorganization and continuation of the business of the Debtors, (y) the sale of the Debtors as a going concern or (z) an orderly liquidation of the properties and interests in property of the Debtors. With respect to an alternative plan of reorganization, the Debtors have examined various other alternatives in connection with the process involved in the formulation and development of the Plan. The Debtors believe that the Plan, as described herein, enables holders

of Claims and Equity Interests to realize the best recoveries under the present circumstances. In a liquidation of the Debtors under chapter 11, the properties and interests in property would be sold in a more orderly fashion and over a more extended period of time than in a liquidation under chapter 7, probably resulting in marginally greater recoveries. Further, if a trustee were not appointed, since one is not required in a chapter 11 case, the expenses for professional fees would most likely be lower than in a chapter 7 case. However, although preferable to a chapter 7 liquidation, the Debtors believe that a liquidation under chapter 11 for the Debtors is a much less attractive alternative to holders of Claims and Equity Interests than the Plan because the recovery realized by holders of Claims and Equity Interests under the Plan is likely to be greater than the recovery under a chapter 11 liquidation.

# XV.

## CONCLUSION

The Debtors believe that the Plan is in the best interest of all holders of Claims and Equity Interests, and urge all holders of impaired Claims and Equity Interests in the Debtors to vote to accept the Plan and to evidence such acceptance by returning their Ballots in accordance with the instructions accompanying the Disclosure Statement.

Dated:  March 28, 2010                              Respectfully submitted,

**Centaur PA Land, LP**

By:  Centaur PA Land General Partner, LP,
     its general partner

 By:  Centaur PA Land Management, LLC,
      its general partner

 By:  Centaur, LLC, its manager

  By:  /s/ Kurt E. Wilson                          
      Name:  Kurt E. Wilson
       Title:  Executive Vice President, Chief
           Financial Officer, Treasurer and
           Secretary

**Centaur, LLC**

  By:  /s/ Kurt E. Wilson                          
      Name:  Kurt E. Wilson
       Title:  Executive Vice President, Chief
           Financial Officer, Treasurer and
           Secretary

**Centaur Colorado, LLC**

By:  Centaur, LLC, its manager

  By:  /s/ Kurt E. Wilson                          
      Name:  Kurt E. Wilson
       Title:  Executive Vice President, Chief
           Financial Officer, Treasurer and
           Secretary

**Centaur Indiana, LLC**

By:  Centaur, LLC, its manager

  By:  _/s/ Kurt E. Wilson_____
        Name:  Kurt E. Wilson
        Title:  Executive Vice President, Chief
            Financial Officer, Treasurer and
            Secretary

**Centaur Racing, LLC**

By:  Centaur, LLC, its manager

  By:  _/s/ Kurt E. Wilson_____
        Name:  Kurt E. Wilson
        Title:  Executive Vice President, Chief
            Financial Officer, Treasurer and
            Secretary

**Hoosier Park, L.P.**

By:  Centaur Indiana, LLC, its general partner

  By:  Centaur, LLC, its manager

  By:  _/s/ Kurt E. Wilson_____
        Name:  Kurt E. Wilson
        Title:  Executive Vice President, Chief
            Financial Officer, Treasurer and
            Secretary

**HP Dining & Entertainment, LLC**

By:  Centaur, LLC, its manager

  By:  _/s/ Kurt E. Wilson_____
        Name:  Kurt E. Wilson
        Title:  Executive Vice President, Chief
            Financial Officer, Treasurer and
            Secretary

**Centaur Pennsylvania, LLC**

By:  Centaur, LLC, its manager

  By:   /s/ Kurt E. Wilson
          Name:  Kurt E. Wilson
          Title:  Executive Vice President, Chief
               Financial Officer, Treasurer and
               Secretary

**VVD Properties General Partner, LLC**

By:  Centaur, LLC, its manager

  By:   /s/ Kurt E. Wilson
          Name:  Kurt E. Wilson
          Title:  Executive Vice President, Chief
               Financial Officer, Treasurer and
               Secretary

**Valley View Downs GP, LLC**

By:  Centaur, LLC, its manager

  By:   /s/ Kurt E. Wilson
          Name:  Kurt E. Wilson
          Title:  Executive Vice President, Chief
               Financial Officer, Treasurer and
               Secretary

**Valley View Downs, LP**

By:  Valley View Downs GP, LLC, its
     general partner

  By:  Centaur, LLC, its manager

  By:   /s/ Kurt E. Wilson
          Name:  Kurt E. Wilson
          Title:  Executive Vice President, Chief
               Financial Officer, Treasurer and
               Secretary

**VVD Properties, LP**

By:  VVD Properties General Partner, LLC,
     its general partner

  By:  Centaur, LLC, its manager

   By:   /s/ Kurt E. Wilson
         Name:  Kurt E. Wilson
         Title:  Executive Vice President, Chief
              Financial Officer, Treasurer and
              Secretary

**Centaur PA Land General Partner, LP**

By:  Centaur PA Land Management, LLC,
     its general partner

  By:  Centaur, LLC, its manager

   By:   /s/ Kurt E. Wilson
         Name:  Kurt E. Wilson
         Title:  Executive Vice President, Chief
              Financial Officer, Treasurer and
              Secretary

**Centaur PA Land Management, LLC**

By:  Centaur, LLC, its manager

   By:   /s/ Kurt E. Wilson
         Name:  Kurt E. Wilson
         Title:  Executive Vice President, Chief
              Financial Officer, Treasurer and
              Secretary

# SCHEDULE 1

# LIST OF DEBTORS

Centaur, LLC
Centaur Colorado, LLC
Centaur Indiana, LLC
Centaur Racing, LLC
Hoosier Park, L.P.
HP Dining & Entertainment, LLC
Centaur Pennsylvania, LLC
VVD Properties General Partner, LLC
Valley View Downs GP, LLC
VVD Properties, LP
Valley View Downs, LP
Centaur PA Land General Partner, LP
Centaur PA Land Management, LLC
Centaur PA Land, LP

# SCHEDULE 2

## ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES

[TO COME]

**EXHIBIT "A"**

**CHAPTER 11 PLAN OF REORGANIZATION**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | : Chapter 11 |
| | : |
| **CENTAUR, LLC, <u>et</u> <u>al.</u>,**[1] | : **Case No. 10-10799 (KJC)** |
| | : |
| Debtors. | : (Jointly Administered) |
| | : |
| In re | : Chapter 11 |
| | : |
| **CENTAUR PA LAND, LP, <u>et</u> <u>al.</u>,**[2] | : **Case No. 09-13760 (KJC)** |
| | : |
| Debtors. | : (Jointly Administered) |
| | : |

## JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR
## CENTAUR, LLC AND ITS AFFILIATED DEBTORS

Dated: March 28, 2010

WHITE & CASE LLP        -and-      FOX ROTHSCHILD LLP
Gerard H. Uzzi (admitted <u>pro</u> <u>hac</u> <u>vice</u>)      Jeffrey M. Schlerf (No. 3047)
1155 Avenue of the Americas           Eric M. Sutty (No. 4007)
New York, New York 10036            John H. Strock (No. 4965)
(212) 819-8200                   919 North Market Street, Suite 1600
                            Wilmington, Delaware 19801
Michael C. Shepherd (admitted <u>pro</u> <u>hac</u> <u>vice</u>)  (302) 654-7444
Lane E. Begy (admitted <u>pro</u> <u>hac</u> <u>vice</u>)
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131
(305) 371-2700

ATTORNEYS FOR THE DEBTORS AND DEBTORS-IN-POSSESSION

---

[1]     The Debtors in the cases jointly administered under Case No. 10-10799 (KJC), along with the last four digits of each Debtor's federal tax identification number, if applicable, are: Centaur, LLC (8148); Centaur Colorado, LLC (9131); Centaur Indiana, LLC; Centaur Racing, LLC; Hoosier Park, L.P. (0820); HP Dining & Entertainment, LLC; Centaur Pennsylvania, LLC; VVD Properties General Partner, LLC; Valley View Downs GP, LLC; VVD Properties, LP (6808); Centaur PA Land Management, LLC; and Centaur PA Land General Partner, LP.

[2]     The Debtors in the cases jointly administered under Case No. 09-13760 (KJC), along with the last four digits of each Debtor's federal tax identification number, if applicable, are: Valley View Downs, LP (1028) and Centaur PA Land, LP.

# TABLE OF CONTENTS

ARTICLE I. DEFINITIONS .............................................................................................................1

    1.1. "Administrative Expense Claim".....................................................................................1

    1.2. "Affiliate" ........................................................................................................................1

    1.3. "Allowed" ........................................................................................................................1

    1.4. "Assets"............................................................................................................................1

    1.5. "Avoidance Actions" .......................................................................................................1

    1.6. "Ballot" ............................................................................................................................1

    1.7. "Balloting Agent" ............................................................................................................1

    1.8. "Bankruptcy Code"..........................................................................................................1

    1.9. "Bankruptcy Court".........................................................................................................2

    1.10. "Bankruptcy Rules" .......................................................................................................2

    1.11. "Board of Managers" .....................................................................................................2

    1.12. "Borrower".....................................................................................................................2

    1.13. "Borrower Equity Interests" ..........................................................................................2

    1.14. "Business Day" ..............................................................................................................2

    1.15. "Cash".............................................................................................................................2

    1.16. "Causes of Action" ........................................................................................................2

    1.17. "Centaur Colorado, LLC Effective Date"......................................................................2

    1.18. "Chapter 11 Cases".........................................................................................................2

    1.19. "Claim" ...........................................................................................................................3

    1.20. "Claims Agent"..............................................................................................................3

    1.21. "Committee" ...................................................................................................................3

    1.22. "Confirmation Date".......................................................................................................3

    1.23. "Confirmation Hearing"..................................................................................................3

    1.24. "Confirmation Order" .....................................................................................................3

    1.25. "Consenting First Lien Claimholders"...........................................................................3

    1.26. "Contested Claim" ..........................................................................................................3

    1.27. "Contested Claims Reserve"...........................................................................................3

    1.28. "Convenience Claim" .....................................................................................................3

    1.29. "Convenience Class Election" ........................................................................................3

    1.30. "Cure Cost" .....................................................................................................................3

    1.31. "Debt Claim" ..................................................................................................................3

    1.32. "Debtor"..........................................................................................................................4

    1.33. "Debtor-in-Possession"...................................................................................................4

    1.34. "DIP Agent" ...................................................................................................................4

    1.35. "DIP Claim" ...................................................................................................................4

    1.36. "DIP Lender" ..................................................................................................................4

    1.37. "DIP Loan Facility".........................................................................................................4

    1.38. "DIP Order" ....................................................................................................................4

    1.39. "Disallowed" ...................................................................................................................4

    1.40. "Disbursing Agent".........................................................................................................4

    1.41. "Disclosure Statement" ...................................................................................................4

1.42. "Disclosure Statement Order"............................................................................4
1.43. "Distribution Date".....................................................................................4
1.44. "Effective Date".........................................................................................5
1.45. "Entity"....................................................................................................5
1.46. "Equity Interest".........................................................................................5
1.47. "Estate".....................................................................................................5
1.48. "Estimation Order"......................................................................................5
1.49. "Existing L/C"............................................................................................5
1.50. "Existing Management".................................................................................5
1.51. "Exit Facility"............................................................................................5
1.52. "Fee Application".........................................................................................5
1.53. "Fee Claim"...............................................................................................5
1.54. "Final Order".............................................................................................5
1.55. "First Lien Claim".......................................................................................6
1.56. "First Lien Take Back Documents"...................................................................6
1.57. "First Lien Take Back Paper"..........................................................................6
1.58. "Fortune Valley Sale Agreement"....................................................................6
1.59. "General Unsecured Claim"............................................................................6
1.60. "Guaranty"................................................................................................6
1.61. "Holdings".................................................................................................6
1.62. "Indiana Debtors".......................................................................................6
1.63. "Insider"...................................................................................................6
1.64. "Intercompany Claim"...................................................................................7
1.65. "Intercompany Financing Claim"......................................................................7
1.66. "Internal Revenue Code"...............................................................................7
1.67. "IRS".......................................................................................................7
1.68. "L/C Claim"...............................................................................................7
1.69. "L/C Issuer"..............................................................................................7
1.70. "Long Term Employment Agreements"..............................................................7
1.71. "Management Incentive Plan".........................................................................7
1.72. "New Centaur, LLC Membership Interests".........................................................7
1.73. "NewCo"...................................................................................................7
1.74. "NewCo Membership Interests".......................................................................8
1.75. "NewCo PIK Notes".....................................................................................8
1.76. "NewCo Warrants".......................................................................................8
1.77. "Notice of Confirmation"...............................................................................8
1.78. "Objection Deadline"....................................................................................8
1.79. "Original Debt Documents".............................................................................8
1.80. "Other Secured Claim"..................................................................................8
1.81. "Pennsylvania Debtors".................................................................................8
1.82. "Pennsylvania Gaming Control Board"...............................................................8
1.83. "Pennsylvania Gaming License Application"........................................................8
1.84. "Person"...................................................................................................8
1.85. "Petition Date"...........................................................................................9
1.86. "Plan"......................................................................................................9
1.87. "Plan Distribution".......................................................................................9

1.88. "Plan Documents"............................................................................................9
1.89. "Plan Securities".............................................................................................9
1.90. "Plan Supplement"..........................................................................................9
1.91. "Plan Support Agreement"..............................................................................9
1.92. "Prepetition First Lien Agent".........................................................................9
1.93. "Prepetition First Lien Claimholders"..............................................................9
1.94. "Prepetition First Lien Credit Agreement".......................................................9
1.95. "Prepetition Intercreditor Agreement".............................................................9
1.96. "Prepetition Second Lien Agent"...................................................................10
1.97. "Prepetition Second Lien Claimholders".........................................................10
1.98. "Prepetition Second Lien Credit Agreement"..................................................10
1.99. "Priority Non-Tax Claim"................................................................................10
1.100. "Priority Tax Claim".....................................................................................10
1.101. "Pro Rata Share".........................................................................................10
1.102. "Professional".............................................................................................10
1.103. "Rejection Damage Claim"...........................................................................10
1.104. "Released Persons" ....................................................................................10
1.105. "Renewal or Replacement L/C" ...................................................................10
1.106. "Reorganized Centaur, LLC".......................................................................11
1.107. "Reorganized Debtors" ...............................................................................11
1.108. "Restructuring Transactions".......................................................................11
1.109. "Schedules".................................................................................................11
1.110. "Second Lien Claim" ...................................................................................11
1.111. "Section 503(b)(9) Bar Date".......................................................................11
1.112. "Section 503(b)(9) Claims"..........................................................................11
1.113. "Secured Claim" ..........................................................................................11
1.114. "Specified Hedging Agreements".................................................................12
1.115. "Subordinated Claim" ..................................................................................12
1.116. "Subsidiary Debtors" ...................................................................................12
1.117. "Subsidiary Equity Interest".........................................................................12
1.118. "Subsidiary Guarantor".................................................................................12
1.119. "U.S. Trustee"..............................................................................................12
1.120. "Valley View Downs Unsecured Claim" .......................................................12

ARTICLE II. INTERPRETATION AND APPLICATION ..........................................12

2.1. Interpretation.................................................................................................12
2.2. Application of Definitions and Rules of Construction Contained in the
     Bankruptcy Code. .........................................................................................12
2.3. Other Terms. .................................................................................................13
2.4. Incorporation of Plan Documents. .................................................................13

ARTICLE III. CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS .........13

3.1. Administrative Expense Claims and Tax Claims. ............................................13
3.2. Claims and Equity Interests. ..........................................................................13
        (a)      Class 1 – Priority Non-Tax Claims...................................................14
        (b)      Class 2 – First Lien Claims..............................................................14

| | | |
|---|---|---|
| (c) | Class 3 – Second Lien Claims. | 14 |
| (d) | Class 4 – Other Secured Claims. | 14 |
| (e) | Class 5 – Valley View Downs Unsecured Claims. | 14 |
| (f) | Class 6 – General Unsecured Claims. | 14 |
| (g) | Class 7 – Convenience Claims. | 14 |
| (h) | Class 8 – Intercompany Claims. | 15 |
| (i) | Class 9 – Borrower Equity Interests. | 15 |
| (j) | Class 10 – Subsidiary Equity Interests. | 15 |

ARTICLE IV. IDENTIFICATION OF IMPAIRED CLASSES OF CLAIMS
AND EQUITY INTERESTS ........................................................................15

4.1. Impaired and Unimpaired Classes of Claims and Equity Interests..........15
4.2. Impairment Controversies.......................................................................15

ARTICLE V. PROVISIONS FOR TREATMENT OF CLAIMS AND EQUITY
INTERESTS UNDER THE PLAN ..............................................................15

5.1. Class 1 – Priority Non-Tax Claims...........................................................16
5.2. Class 2 – First Lien Claims......................................................................16
5.3. Class 3 – Second Lien Claims. ................................................................16
5.4. Class 4 – Other Secured Claims..............................................................16
5.5. Class 5 – Valley View Downs Unsecured Claims.....................................16
5.6. Class 6 – General Unsecured Claims.......................................................17
5.7. Class 7 – Convenience Claims.................................................................17
5.8. Class 8 – Intercompany Claims. ..............................................................17
5.9. Class 9 – Borrower Equity Interests. .......................................................17
5.10. Class 10 – Subsidiary Equity Interests...................................................17

ARTICLE VI. PROVISIONS FOR TREATMENT OF UNCLASSIFIED
CLAIMS UNDER THE PLAN ....................................................................17

6.1. Unclassified Claims. ...............................................................................17
6.2. Treatment of Administrative Expense Claims...........................................18

| | | |
|---|---|---|
| (a) | Time for Filing Administrative Expense Claims. | 18 |
| (b) | Time for Filing Fee Claims. | 18 |
| (c) | Time for Filing Section 503(b)(9) Claims. | 18 |
| (d) | Allowance of Administrative Expense Claims, Fee Claims, and Section 503(b)(9) Claims. | 18 |
| (e) | DIP Claims. | 19 |
| (f) | Payment of Allowed Administrative Expense Claims. | 19 |
| (g) | Intercompany Financing Claims. | 19 |

6.3. Treatment of Priority Tax Claims. ............................................................19

ARTICLE VII. ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF
REJECTION BY ONE OR MORE CLASSES OF CLAIMS OR EQUITY
INTERESTS ...............................................................................................20

7.1. Classes Entitled to Vote. .........................................................................20

    7.2. Class Acceptance Requirement.................................................................20

    7.3. Tabulation of Votes on a Non-Consolidated Basis....................................20

    7.4. Cramdown....................................................................................................20

    7.5. Confirmation of All Cases. ........................................................................20

ARTICLE VIII. LETTER OF CREDIT ....................................................................21

ARTICLE IX. MANAGEMENT INCENTIVE PLAN..............................................21

ARTICLE X. MEANS FOR IMPLEMENTATION OF THE PLAN ..........................21

    10.1. Operations Between the Confirmation Date and the Effective Date. ......21

    10.2. Certain Transactions On or Prior to the Effective Date............................21

        (a)       Formation of NewCo..................................................................21

        (b)      Issuance of New Centaur, LLC Membership Interests to NewCo............21

        (c)       Restructuring Transactions. .......................................................22

        (d)      Entry into First Lien Take Back Documents and Exit Facility.................22

        (e)      Issuance of NewCo PIK Notes and NewCo Warrants..............................22

        (f)       Issuance of NewCo Membership Interests. ................................22

    10.3. Corporate Action......................................................................................23

    10.4. Termination of Certain Debt Obligations. ................................................24

    10.5. Continued Corporate Existence. ...............................................................24

    10.6. Re-vesting of Assets. ................................................................................24

    10.7. Initial Managers. ......................................................................................24

    10.8. Officers. ...................................................................................................25

    10.9. Retention of Causes of Action/Reservation of Rights. .............................25

ARTICLE XI. THE DISBURSING AGENT ............................................................26

    11.1. Appointment of the Disbursing Agent......................................................26

    11.2. Powers and Duties....................................................................................26

    11.3. Exculpation. .............................................................................................26

ARTICLE XII. DISTRIBUTION PROVISIONS.......................................................27

    12.1. Sources of Cash for Plan Distributions.....................................................27

    12.2. Investment of Funds Held by the Disbursing Agent; Tax Reporting by the
         Disbursing Agent. ....................................................................................27

    12.3. Plan Distributions.....................................................................................27

    12.4. Timing of Plan Distributions. ...................................................................27

    12.5. Address for Delivery of Plan Distributions/Unclaimed Distributions.......28

    12.6. Time Bar to Cash Payments......................................................................28

    12.7. Manner of Payment under the Plan...........................................................28

    12.8. Expenses Incurred on or after the Effective Date and Claims of the Disbursing
         Agent.........................................................................................................29

    12.9. Fractional Plan Distributions. ...................................................................29

    12.10. Surrender and Cancellation of Instruments.............................................29

ARTICLE XIII. PROCEDURES FOR RESOLVING AND TREATING
    CONTESTED CLAIMS ......................................................................................29

    13.1. Prosecution of Contested Claims. ..........................................................29
    13.2. Objection Deadline. ................................................................................30
    13.3. Claims Settlement. ..................................................................................30
    13.4. Entitlement to Plan Distributions Upon Allowance..................................30
    13.5. Contested Claims Reserve. ......................................................................30
    13.6. Estimation of Claims. ..............................................................................30
    13.7. No Recourse Against the Debtors or the Reorganized Debtors.................31

ARTICLE XIV. TREATMENT OF EXECUTORY CONTRACTS AND
    UNEXPIRED LEASES ....................................................................................31

    14.1. Assumption and Rejection of Executory Contracts and Unexpired Leases. ............31
    14.2. Cure...........................................................................................................33
    14.3. Claims Arising from Rejected Contracts. .................................................33

ARTICLE XV. CONDITIONS PRECEDENT TO CONFIRMATION OF THE
    PLAN AND THE OCCURRENCE OF THE EFFECTIVE DATE ...................................34

    15.1. Conditions Precedent to Confirmation......................................................34
    15.2. Conditions Precedent to the Occurrence of the Effective Date. ...............34
    15.3. Waiver of Conditions................................................................................35
    15.4. Effect of Non-Occurrence of the Effective Date. .....................................35

ARTICLE XVI. RETENTION OF JURISDICTION ....................................................35

ARTICLE XVII. MISCELLANEOUS PROVISIONS .................................................37

    17.1. Releases by the Debtors. ...........................................................................37
    17.2. Release of Released Persons by Other Released Persons..........................37
    17.3. Third Party Agreements; Subordination. ..................................................38
    17.4. Payment of Statutory Fees. .......................................................................39
    17.5. Satisfaction of Claims. ..............................................................................39
    17.6. Exculpation. ..............................................................................................39
    17.7. Discharge of Liabilities..............................................................................39
    17.8. Discharge of Debtors. ...............................................................................40
    17.9. Notices. ......................................................................................................40
    17.10. Headings. .................................................................................................41
    17.11. Governing Law. .......................................................................................41
    17.12. Expedited Determination. .......................................................................41
    17.13. Exemption from Transfer Taxes. .............................................................41
    17.14. Retiree Benefits........................................................................................42
    17.15. Notice of Entry of Confirmation Order and Relevant Dates. ..................42
    17.16. Interest and Attorneys' Fees. ..................................................................42
    17.17. Modification of the Plan. .........................................................................42
    17.18. Revocation of Plan...................................................................................42
    17.19. Setoff Rights. ...........................................................................................43

17.20. Compliance with Tax Requirements........................................................................43

17.21. Rates.........................................................................................................................43

17.22. Injunctions...............................................................................................................43

17.23. Binding Effect..........................................................................................................44

17.24. Severability. ............................................................................................................44

17.25. No Admissions.........................................................................................................44

17.26. Dissolution of the Committee. ................................................................................45

17.27. Potential Exclusion of the Pennsylvania Debtors and/or Centaur Colorado,
LLC from the Plan. .............................................................................................45

17.28. Indemnification of the Prepetition First Lien Agent..............................................45

## EXHIBITS

Debtors…………………………………………………………………..…………...Exhibit "A"

Centaur, LLC and its affiliated debtors and debtors-in-possession in the above-captioned jointly administered chapter 11 cases, Case No. 10-10799 (KJC) (Jointly Administered) and Case No. 09-13760 (KJC) (Jointly Administered), hereby collectively propose the following joint chapter 11 plan of reorganization:

## ARTICLE I.

## DEFINITIONS

In the Plan, the following definitions apply:

**1.1.** **"Administrative Expense Claim"** means any right to payment, whether secured or unsecured, constituting a cost or expense of administration of any of the Chapter 11 Cases under sections 503(b) and 507(a)(2) of the Bankruptcy Code, <u>including</u>, without limitation, any actual and necessary costs and expenses of preserving the Debtors' estates, any actual and necessary costs and expenses of operating the Debtors' businesses, any indebtedness or obligations incurred or assumed by the Debtors, as debtors-in-possession, during the Chapter 11 Cases <u>including</u>, without limitation, for the acquisition or lease of property or an interest in property or the rendition of services, and any allowances of compensation and reimbursement of expenses to the extent allowed by Final Order under section 330 or 503 of the Bankruptcy Code.

**1.2.** **"Affiliate"** means, with respect to any Person, all Persons that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code, if such Person was a debtor in a case under the Bankruptcy Code.

**1.3.** **"Allowed"** means, with respect to a Claim: (i) any Claim against any Debtor which is listed by such Debtor in the Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of claim has been filed, (ii) any timely filed, liquidated, non-contingent Claim as to which the time for objection permitted by the Plan has expired and no objection has been interposed, or (iii) any Claim expressly allowed by a Final Order or by agreement in accordance with the provisions of the Plan, which include the DIP Claims, the First Lien Claims and the L/C Claim.

**1.4.** **"Assets"** means, with respect to any Debtor, all of such Debtor's right, title and interest of any nature in property of any kind, wherever located, as specified in section 541 of the Bankruptcy Code.

**1.5.** **"Avoidance Actions"** means all Causes of Action of the Estates that arise under chapter 5 of the Bankruptcy Code and any analogous Causes of Action arising under state law.

**1.6.** **"Ballot"** means those certain ballots sent to holders of Claims and Equity Interests for purposes of voting on the Plan.

**1.7.** **"Balloting Agent"** means AlixPartners, LLP.

**1.8.** **"Bankruptcy Code"** means the Bankruptcy Reform Act of 1978, as codified at title 11 of the United States Code, as amended from time to time and applicable to the Chapter 11 Cases.

**1.9. "Bankruptcy Court"** means the United States Bankruptcy Court for the District of Delaware, or such other court having jurisdiction over the Chapter 11 Cases.

**1.10. "Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure, as prescribed by the United States Supreme Court pursuant to section 2075 of title 28 of the United States Code and as applicable to the Chapter 11 Cases.

**1.11. "Board of Managers"** means the management board of NewCo, the composition of which shall be acceptable to the Consenting First Lien Claimholders.

**1.12. "Borrower"** means Centaur, LLC.

**1.13. "Borrower Equity Interests"** means any outstanding ownership interest in Borrower, including, without limitation, interests evidenced by common or preferred stock, membership interests and options or other rights to purchase or otherwise receive any ownership interest in Borrower and any right to payment or compensation based upon any such interest, whether or not such interest is owned by the holder of such right to payment or compensation.

**1.14. "Business Day"** means any day other than a Saturday, a Sunday or any other day on which commercial banks are required or authorized to close for business in New York, New York.

**1.15. "Cash"** means legal tender of the United States of America or readily marketable direct obligations of, or obligations guaranteed by, the United States of America.

**1.16. "Causes of Action"** means all claims, rights, actions, causes of action, liabilities, obligations, suits, debts, remedies, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages or judgments, whether known or unknown, liquidated or unliquidated, fixed or contingent, matured or unmatured, foreseen or unforeseen, asserted or unasserted, arising in law, equity or otherwise, including, without limitation, any claims, causes of action, rights or remedies created by or arising under the Bankruptcy Code, including, without limitation, transfers avoidable and/or recoverable under sections 542, 544, 547, 548, 549 and 550 of the Bankruptcy Code on behalf of the Debtors and their Estates.

**1.17. "Centaur Colorado, LLC Effective Date"** means the later of (a) the Effective Date and (b) the thirtieth (30th) Business Day (unless extended by the Debtors) following the earlier of (i) the closing date of the sale of substantially all of the Assets of Centaur Colorado, LLC pursuant to the Fortune Valley Sale Agreement and as authorized by Final Order of the Bankruptcy Court pursuant to section 363 of the Bankruptcy Code and (ii) the date of breach or termination of the Fortune Valley Sale Agreement, which breach or termination precludes the closing of such sale.

**1.18. "Chapter 11 Cases"** means the cases commenced under chapter 11 of the Bankruptcy Code pending before the Bankruptcy Court with respect to each of the Debtors styled as In re Centaur, LLC, et al., Case No. 10-10799 (KJC) (Jointly Administered) and In re Centaur PA Land, LP, et al., Case No. 09-13760 (KJC) (Jointly Administered).

2

**1.19. "Claim"** means (a) any right to payment, whether or not such right is known or unknown, reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right to an equitable remedy is known or unknown, reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

**1.20. "Claims Agent"** means the entity designated by order of the Bankruptcy Court to process proofs of claim.

**1.21. "Committee"** means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee in the Chapter 11 Cases.

**1.22. "Confirmation Date"** means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the dockets of the Chapter 11 Cases.

**1.23. "Confirmation Hearing"** means the hearing held by the Bankruptcy Court, as it may be continued from time to time, to consider confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

**1.24. "Confirmation Order"** means the order of the Bankruptcy Court confirming the Plan.

**1.25. "Consenting First Lien Claimholders"** means those Prepetition First Lien Claimholders that have signed the Plan Support Agreement.

**1.26. "Contested Claim"** means any Claim that is not an Allowed Claim or a Disallowed Claim.

**1.27. "Contested Claims Reserve"** means a reserve of Cash and NewCo PIK Notes created pursuant to Section 13.5.

**1.28. "Convenience Claim"** means a General Unsecured Claim or Valley View Downs Unsecured Claim (a) in an amount equal to or less than $[__], or (b) with respect to which the Person holding such Claim has made the Convenience Class Election; provided that Claims of Insiders may not be classified as Convenience Claims.

**1.29. "Convenience Class Election"** means the election by a Person holding a General Unsecured Claim or Valley View Downs Unsecured Claim to reduce its Allowed Claims, in their entirety, to $[__], and to thereby receive treatment in Class 7 – Convenience Claims in full satisfaction of all of its Allowed Claims. The Convenience Class Election may be made by submitting a properly completed ballot to the Solicitation Agent before the Voting Deadline.

**1.30. "Cure Cost"** means any amount payable by a Debtor pursuant to Section 14.2 and section 365(b)(1) of the Bankruptcy Code.

**1.31. "Debt Claim"** means a Claim against any of the Debtors arising under the Original Debt Documents.

NEWYORK 7413506 (2K)

**1.32. "Debtor"** means Centaur, LLC and its affiliated debtors and debtors-in-possession in the Chapter 11 Cases as identified on Exhibit "A" annexed hereto.

**1.33. "Debtor-in-Possession"** means any Debtor, in its capacity as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

**1.34. "DIP Agent"** means [_____] as agent for the DIP Lenders under the DIP Loan Facility.

**1.35. "DIP Claim"** means any Claim of the DIP Agent and DIP Lenders under the DIP Loan Facility, including reasonable fees and expenses of attorneys.

**1.36. "DIP Lender"** means a lender under the DIP Loan Facility.

**1.37. "DIP Loan Facility"** means any debtor-in-possession senior secured credit agreement entered into prior to the Effective Date by the Debtors that are parties thereto, as borrowers, the DIP Agent as lead arranger, and the DIP Lenders, together with all documents, instruments and agreements executed or entered into in connection therewith, and any amendments thereto, whereby the DIP Lenders will provide a term loan facility in an aggregate principal amount of $[__] million to the Debtors to (a) pay costs and expenses in connection with the Debtors' chapter 11 cases, and (b) provide financing for working capital, capital expenditures and other general corporate purposes of the Debtors in accordance with an approved budget.

**1.38. "DIP Order"** means any order entered by the Bankruptcy Court approving the DIP Loan Facility.

**1.39. "Disallowed"** when used with respect to a Claim, means a Claim, or such portion of a Claim, that has been disallowed by a Final Order.

**1.40. "Disbursing Agent"** means the Reorganized Debtors, in (a) making the Plan Distributions contemplated under the Plan, the Confirmation Order, or any other relevant Final Order, and (b) performing any other act or task that is or may be delegated to the Disbursing Agent under the Plan.

**1.41. "Disclosure Statement"** means the Disclosure Statement filed with respect to the Plan, as it may be amended or modified from time to time.

**1.42. "Disclosure Statement Order"** means the order entered by the Bankruptcy Court (a) approving the Disclosure Statement as containing adequate information required under section 1125 of the Bankruptcy Code, and (b) authorizing the use of the Disclosure Statement for soliciting votes on the Plan.

**1.43. "Distribution Date"** means, with respect to any Claim, (a) the Effective Date or a date that is as soon as reasonably practicable after the Effective Date, if such Claim is then an Allowed Claim, or (b) a date that is as soon as reasonably practicable after the date such Claim becomes Allowed, if not Allowed on the Effective Date.

NEWYORK 7413506 (2K)

**1.44. "Effective Date"** means (i) for the Debtors other than Centaur Colorado, LLC, a date selected by the Debtors which must be a Business Day that is no later than thirty (30) Business Days after all of the conditions specified in <u>Section 15.2</u> have been satisfied or waived (to the extent subject to waiver), and (ii) for Centaur Colorado, LLC, the Centaur Colorado, LLC Effective Date.

**1.45. "Entity"** means any person or organization created by law, <u>including</u>, without limitation, any individual, company, corporation, limited liability company, partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, or government or any political subdivision thereof.

**1.46. "Equity Interest"** means any outstanding ownership interest in any of the Debtors, <u>including</u>, without limitation, interests evidenced by common or preferred stock, membership interests and options or other rights to purchase or otherwise receive any ownership interests in any of the Debtors and any right to payment or compensation based upon any such interest, whether or not such interest is owned by the holder of such right to payment or compensation.

**1.47. "Estate"** means the estate of any Debtor created by section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

**1.48. "Estimation Order"** means an order or orders of the Bankruptcy Court (a) estimating or otherwise establishing the Allowed amounts of estimated Claims, and (b) entered by the Bankruptcy Court in connection with <u>Section 13.6</u>. The Estimation Order may be the Confirmation Order if the Confirmation Order grants the same relief that otherwise would have been granted in separate Estimation Order(s).

**1.49. "Existing L/C"** means the letter of credit extended by the L/C Issuer to Valley View Downs, LP on October 30, 2009, which expires by its terms on [_____] 29, 2010.

**1.50. "Existing Management"** means, collectively, the following members of the management of the Debtors: Roderick J. Ratcliff, Kurt E. Wilson, and James L. Brown.

**1.51. "Exit Facility"** means the first priority secured facility extended to Reorganized Centaur, LLC, as borrower, NewCo and the Subsidiary Guarantors, as guarantors, (a) as necessary to fund the Debtors' emergence from the Chapter 11 Cases, (b) in an amount agreed upon by the Debtors and the Consenting First Lien Claimholders, and (c) the proceeds of which shall be used to, among other things, repay any DIP Claims in full in Cash on the Effective Date and pay the costs associated with the Debtors' emergence from the Chapter 11 Cases. The terms of the Exit Facility are described more fully in Exhibit "D" to the Disclosure Statement. The Exit Facility shall be in substantially the form filed with the Bankruptcy Court as a Plan Document.

**1.52. "Fee Application"** means an application for allowance and payment of a Fee Claim.

**1.53. "Fee Claim"** means a Claim of a Professional.

**1.54. "Final Order"** means (a) an order or judgment of the Bankruptcy Court or any other court or adjudicative body as to which the time to appeal, petition for certiorari, or move for

reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing is then pending, or (b) in the event that an appeal, writ of certiorari, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court or any other court or adjudicative body shall have been affirmed by the highest court to which such order was appealed, or certiorari has been denied, or from which reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; <u>provided</u>, that no order shall fail to be a Final Order solely because of the possibility that a motion pursuant to section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be filed with respect to such order.

**1.55. "First Lien Claim"** means any Claim, whether a Secured Claim or an unsecured deficiency portion of any Claim, by a Prepetition First Lien Claimholder arising under the Prepetition First Lien Credit Agreement and/or the Specified Hedging Agreements.

**1.56. "First Lien Take Back Documents"** means the First Lien Take Back Paper, together with all documents, instruments and agreements executed or entered into in connection therewith, and any amendments thereto.

**1.57. "First Lien Take Back Paper"** means new first lien debt in an amount equal to $115 million, less the amount of the Exit Facility, which debt shall be structured in such a manner as to allow for the incurrence of senior debt pursuant to the Exit Facility. The terms of the First Lien Take Back Paper are described more fully in Exhibit "D" to the Disclosure Statement. The First Lien Take Back Paper shall be in substantially the form filed with the Bankruptcy Court as a Plan Document.

**1.58. "Fortune Valley Sale Agreement"** means that certain asset purchase agreement by and between Centaur Colorado, LLC, as seller, and [_____], as buyer, for the purchase and sale of substantially all of the Assets of Centaur Colorado, LLC as approved by Final Order of the Bankruptcy Court pursuant to section 363 of the Bankruptcy Code.

**1.59. "General Unsecured Claim"** means any unsecured Claim against a Debtor, other than an Administrative Expense Claim, a First Lien Claim, a Second Lien Claim, a Valley View Downs Unsecured Claim, a Convenience Claim, an Intercompany Claim, a Priority Tax Claim, or a Priority Non-Tax Claim.

**1.60. "Guaranty"** means any guaranty by one or more Debtors of an obligation of any other Debtors.

**1.61. "Holdings"** means Centaur Gaming, LLC.

**1.62. "Indiana Debtors"** means, collectively, Centaur Indiana, LLC; Centaur Racing, LLC; Hoosier Park, L.P.; and HP Dining & Entertainment, LLC.

**1.63. "Insider"** means, with respect to any Person, all Persons that would fall within the definition assigned to such terms in section 101(31) of the Bankruptcy Code.

**1.64. "Intercompany Claim"** means any Claim held by any Debtor against any other Debtor that occurred or came into existence prior to the Petition Date other than an Intercompany Financing Claim.

**1.65. "Intercompany Financing Claim"** means any Claim of Centaur, LLC against Valley View Downs, LP or Centaur PA Land, LP arising pursuant to (a) that certain Interim Order Pursuant to 11 U.S.C. §§ 105(a), 362, 363(b), 364(b) and 503(b)(1) and Fed. R. Bankr. P. 4002, (I) Authorizing the Debtors to Obtain Unsecured Post-petition Financing from Centaur, LLC; (II) Granting such Intercompany Financing Superpriority Administrative Expense Status; (III) Authorizing Payment of Certain Prepetition Expenses; and (IV) Providing Notice of and Scheduling a Final Hearing entered November 23, 2009; (b) that certain Final Order Pursuant to 11 U.S.C. §§ 105(a), 362, 363(b), 364(b) and 503(b)(1) and Fed. R. Bankr. P. 4002, (I) Authorizing the Debtors to Obtain Unsecured Post-petition Financing from Centaur, LLC; (II) Granting such Intercompany Financing Superpriority Administrative Expense Status; and (III) Authorizing Payment of Certain Prepetition Expenses entered December 4, 2009; and (c) that certain Order Supplementing the Intercompany Financing Order to Authorize the Debtors to Obtain Additional Availability Under the Intercompany Financing entered March 16, 2010.

**1.66. "Internal Revenue Code"** means the Internal Revenue Code of 1986, as amended, and any applicable rulings, regulations (including temporary and proposed regulations) promulgated thereunder, judicial decisions, and notices, announcements, and other releases of the United States Treasury Department or the IRS.

**1.67. "IRS"** means the United States Internal Revenue Service.

**1.68. "L/C Claim"** means any Claim of the L/C Issuer arising under the Existing L/C.

**1.69. "L/C Issuer"** means Credit Suisse AG, Cayman Islands Branch in its capacity as issuer of the Existing L/C.

**1.70. "Long Term Employment Agreements"** means, collectively, the employment agreements to be entered into on the Effective Date by and between NewCo or one or more of the Reorganized Debtors, on the one hand, and the Existing Management, on the other, which agreements shall be in form and substance satisfactory to the Consenting First Lien Claimholders.

**1.71. "Management Incentive Plan"** means that certain management incentive plan providing for [_____], the terms of which plan are to be determined and implemented on or after the Effective Date and which shall be in form and substance satisfactory to the Consenting First Lien Lenders and the Board of Managers.

**1.72. "New Centaur, LLC Membership Interests"** means the limited liability company membership units to be issued by Reorganized Centaur, LLC to NewCo on the Effective Date pursuant to the Plan.

**1.73. "NewCo"** means an [Indiana limited liability company] to be formed pursuant to Section 10.2 to serve as the direct parent of Reorganized Centaur, LLC.

**1.74.** **"NewCo Membership Interests"** means the limited liability company membership units to be issued by NewCo on the Effective Date pursuant to the Plan.

**1.75.** **"NewCo PIK Notes"** means the notes with an aggregate face amount of $[__] million to be issued by NewCo on the Effective Date pursuant to the Plan and which shall bear interest of [__] percent per annum. The terms of the NewCo PIK Notes are described more fully in Exhibit "E" to the Disclosure Statement. The NewCo PIK Notes shall be in substantially the form filed with the Bankruptcy Court as a Plan Document.

**1.76.** **"NewCo Warrants"** means the warrants to purchase up to [__] percent of the NewCo Membership Interests, calculated on a fully-diluted basis after the exercise of the NewCo Warrants, to be [(a) ]issued by NewCo on the Effective Date to the holders of Allowed First Lien Claims pursuant to the Plan[, (b) exercisable by the holder thereof in accordance with the terms of the NewCo Warrants and upon such holder becoming licensed by the [all required regulatory authorities], and (c) transferrable, subject to any applicable securities and other laws and in accordance with the terms of the NewCo Warrants]. The terms of the NewCo Warrants are described more fully in Exhibit "F" to the Disclosure Statement. The NewCo Warrants shall be in substantially the form filed with the Bankruptcy Court as a Plan Document.

**1.77.** **"Notice of Confirmation"** means the notice of entry of the Confirmation Order to be filed with the Bankruptcy Court and mailed by the Claims Agent to holders of Claims and Equity Interests.

**1.78.** **"Objection Deadline"** means the deadline for filing objections to Claims as set forth in Section 13.2.

**1.79.** **"Original Debt Documents"** means the Prepetition First Lien Credit Agreement, the Prepetition Second Lien Credit Agreement and the Specified Hedging Agreements.

**1.80.** **"Other Secured Claim"** means a Secured Claim other than a DIP Claim, a First Lien Claim or a Second Lien Claim.

**1.81.** **"Pennsylvania Debtors"** means, collectively, Centaur Pennsylvania, LLC; VVD Properties General Partner, LLC; Valley View Downs GP, LLC; VVD Properties, LP; Valley View Downs, LP; Centaur PA Land Management, LLC; Centaur PA Land General Partner, LP; and Centaur PA Land, LP.

**1.82.** **"Pennsylvania Gaming Control Board"** means the Pennsylvania state regulatory agency which oversees the slots casino industry in Pennsylvania, and which is currently reviewing the Pennsylvania Gaming License Application submitted by Valley View Downs, LP.

**1.83.** **"Pennsylvania Gaming License Application"** means the application by Valley View Downs, LP with the Pennsylvania Gaming Control Board for a license to offer casino-style gaming at the future Valley View Downs location in Lawrence County, Pennsylvania.

**1.84.** **"Person"** means an individual, corporation, partnership, limited liability company, joint venture, trust, estate, unincorporated association, unincorporated organization, governmental entity, or political subdivision thereof, or any other entity.

**1.85. "Petition Date"** means, with respect to any Debtor, the date on which the Chapter 11 Case of such Debtor was commenced.

**1.86. "Plan"** means this chapter 11 plan of reorganization, either in its present form or as it may be amended, supplemented, or otherwise modified from time to time, and the exhibits and schedules hereto, as the same may be in effect at the time such reference becomes operative.

**1.87. "Plan Distribution"** means the payment or distribution under the Plan of Cash, Assets, Plan Securities or instruments evidencing an obligation under the Plan to the holder of an Allowed Claim or Allowed Equity Interest.

**1.88. "Plan Documents"** means the documents that aid in effectuating the Plan as specifically identified as such herein and filed with the Bankruptcy Court as specified in Section 2.4 of the Plan.

**1.89. "Plan Securities"** means the New Centaur, LLC Membership Interests, the NewCo PIK Notes, the NewCo Membership Interests and the NewCo Warrants.

**1.90. "Plan Supplement"** means the compilation of Plan Documents or forms of documents specified in the Plan, including, without limitation, any exhibits or schedules to the Plan not included herewith, each in form and substance acceptable to the Debtors, which the Debtors shall, as provided in Section 2.4, file with the Bankruptcy Court on or before the date that is ten (10) Business Days prior to the Confirmation Hearing, all of which are incorporated herein by reference.

**1.91. "Plan Support Agreement"** means that certain Lender Direction and Restructuring Support Agreement entered into on [_____], or similar agreement, as applicable, among the Debtors and the required majorities of Prepetition First Lien Claimholders under section 1126(c) of the Bankruptcy Code.

**1.92. "Prepetition First Lien Agent"** means Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent under the Prepetition First Lien Credit Agreement.

**1.93. "Prepetition First Lien Claimholders"** means the Prepetition First Lien Agent and those lenders and holders of Claims arising under the Prepetition First Lien Credit Agreement and/or the Specified Hedging Agreements.

**1.94. "Prepetition First Lien Credit Agreement"** means that certain First Lien Revolving Credit and Term Loan Agreement, dated as of October 30, 2007 (as has been or may be further amended, restated, supplemented or otherwise modified from time to time) among the Borrower, as borrower, the Prepetition First Lien Agent and various lenders.

**1.95. "Prepetition Intercreditor Agreement"** means that certain Intercreditor Agreement, dated as of October 30, 2007 (as has been or may be further amended, restated, supplemented or otherwise modified from time to time) among the Borrower, the Prepetition First Lien Agent and the Prepetition Second Lien Agent and acknowledged and agreed to by Holdings and each of the Subsidiary Guarantors.

**1.96. "Prepetition Second Lien Agent"** means Wells Fargo Bank, N.A., as administrative agent and collateral agent under the Prepetition Second Lien Credit Agreement.

**1.97. "Prepetition Second Lien Claimholders"** means the Prepetition Second Lien Agent and those lenders and holders of Claims arising under the Prepetition Second Lien Credit Agreement.

**1.98. "Prepetition Second Lien Credit Agreement"** means that certain Second Lien Revolving Credit and Term Loan Agreement, dated as of October 30, 2007 (as has been or may be further amended, restated, supplemented or otherwise modified from time to time) among the Borrower, as borrower, the Prepetition Second Lien Agent and various lenders.

**1.99. "Priority Non-Tax Claim"** means any Claim entitled to priority in payment as specified in section 507(a)(3), (4), (5), (6), (7) or (9) of the Bankruptcy Code.

**1.100. "Priority Tax Claim"** means any Claim, whether secured or unsecured, entitled to priority under section 507(a)(8) of the Bankruptcy Code.

**1.101. "Pro Rata Share"** means the proportion that an Allowed Claim or Equity Interest bears to the aggregate amount of all Claims or Equity Interests in a class or classes, as appropriate, including Contested Claims or Equity Interests, but excluding Disallowed Claims, (a) as calculated by the Disbursing Agent, or (b) as determined or estimated by the Bankruptcy Court.

**1.102. "Professional"** means a Person retained or to be compensated for services rendered or costs incurred on or after the Petition Date and on or prior to the Effective Date pursuant to sections 327, 328, 329, 330, 331, 503(b), or 1103 of the Bankruptcy Code in these Chapter 11 Cases.

**1.103. "Rejection Damage Claim"** means any Claim arising out of the rejection of an executory contract or unexpired lease.

**1.104. "Released Persons"** means (a) (i) the Debtors and the Reorganized Debtors, (ii) [the Committee and the members thereof in their capacities as such], (iii) the Prepetition First Lien Agent, (iv) the Consenting First Lien Claimholders, (v) the DIP Agent, (vi) the DIP Lenders, (vii) the L/C Issuer, (viii) any holder of an Other Secured Claim and (ix) any holder of a Convenience Claim; (b) (i) any Prepetition First Lien Claimholder that is not also a Consenting First Lien Claimholder, (ii) [any Prepetition Second Lien Claimholder] and (iii) any holder of a Valley View Downs General Unsecured Claim, to the extent such Person votes in favor of the Plan; and (c) all affiliates, officers, directors, principals, shareholders, parents, subsidiaries, members, auditors, accountants, financial advisors, predecessors, successors, servants, employees, agents, counsel, attorneys, partners, insurers, underwriters, administrators, executors, representatives or assigns of each of the foregoing Persons listed in clauses (a) and (b), to the extent such Person is a Released Person.

**1.105. "Renewal or Replacement L/C"** means the renewal and extension of the Existing L/C that the L/C Issuer will provide to Valley View Downs, LP or any replacement thereof having a term of one year commencing [_____], 2010, which term will be automatically

renewed annually on [_____] of each succeeding year unless (a) the issuer provides notice of termination to Valley View Downs, LP at least thirty (30) days before the expiration date, or (b) the Pennsylvania Gaming Control Board draws upon the Renewal or Replacement L/C in accordance with the Valley View Downs, LP's Pennsylvania Gaming License Application.

**1.106. "Reorganized Centaur, LLC"** means Centaur, LLC from and after the Effective Date.

**1.107. "Reorganized Debtors"** means collectively, from and after the Effective Date, Centaur, LLC and its affiliated Debtors and any successors thereto by merger, consolidation, or otherwise.

**1.108. "Restructuring Transactions"** means, collectively, those formations, incorporations, mergers, consolidations, restructurings, dispositions, liquidations or dissolutions that the Debtors or Reorganized Debtors, as the case may be, determine to be necessary or appropriate to effect a corporate restructuring of their respective businesses or otherwise to simplify the overall corporate structure of the Reorganized Debtors, as described in greater detail in Section 10.2.

**1.109. "Schedules"** means the schedules of assets and liabilities and list of Equity Interests and the statements of financial affairs filed by each of the Debtors with the Bankruptcy Court, as required by section 521 of the Bankruptcy Code and in conformity with the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements have been or may be amended or supplemented by the Debtors from time to time in accordance with Bankruptcy Rule 1009.

**1.110. "Second Lien Claim"** means any Claim, including an unsecured deficiency portion of any Claim, by a Prepetition Second Lien Claimholder arising under the Prepetition Second Lien Credit Agreement.

**1.111. "Section 503(b)(9) Bar Date"** means the deadline for the filing of Section 503(b)(9) Claims established pursuant to an order of the Bankruptcy Court.

**1.112. "Section 503(b)(9) Claims"** means any Claims against any of the Debtors entitled to administrative expense status pursuant to section 503(b)(9) of the Bankruptcy Code.

**1.113. "Secured Claim"** means (a) a Claim secured by a lien on any Assets, which lien is valid, perfected, and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, and which is duly established in the Chapter 11 Cases, but only to the extent of the value of the holder's interest in the collateral that secures payment of the Claim, (b) a Claim against the Debtors that is subject to a valid right of recoupment or setoff under section 553 of the Bankruptcy Code, but only to the extent of the Allowed amount subject to recoupment or setoff as provided in section 506(a) of the Bankruptcy Code, and (c) a Claim deemed or treated under the Plan as a Secured Claim; provided, that, to the extent that the value of such interest is less than the amount of the Claim which has the benefit of such security, the unsecured portion of such Claim shall be treated as a General Unsecured Claim, unless, in any such case the class of which Claim is a part makes a valid and timely election in accordance with section 1111(b) of the Bankruptcy Code to have such Claim treated as a Secured Claim to the extent allowed.

NEWYORK 7413506 (2K)

**1.114.** **"Specified Hedging Agreements"** means those agreements among Credit Suisse International and Centaur, LLC, dated October 30, 2007, October 31, 2007, May 28, 2008, and June 2, 2008, the obligations under which are part of the First Lien Claims.

**1.115.** **"Subordinated Claim"** means a Claim against any Debtor (a) subordinated by a Final Order or (b) secured by a lien or security interest subordinated by a Final Order.

**1.116.** **"Subsidiary Debtors"** means the Debtors other than the Borrower.

**1.117.** **"Subsidiary Equity Interest"** means any Equity Interest in a Subsidiary Debtor.

**1.118.** **"Subsidiary Guarantor"** means those Debtors other than the Borrower that guaranteed the obligations of the Borrower under the Prepetition First Lien Credit Agreement, Specified Hedging Agreements and the Prepetition Second Lien Credit Agreement.

**1.119.** **"U.S. Trustee"** means the Office of the United States Trustee for Region 3, District of Delaware.

**1.120.** **"Valley View Downs Unsecured Claim"** means any unsecured Claim against Valley View Downs, LP, other than an Administrative Expense Claims, a First Lien Claim, a Second Lien Claim, a General Unsecured Claim, a Convenience Claim, an Intercompany Claim, a Priority Tax Claim or a Priority Non-Tax Claim.

**ARTICLE II.**

**INTERPRETATION AND APPLICATION**

**2.1.** <u>Interpretation</u>**.**

Unless otherwise specified, all section, article, exhibit and schedule references in the Plan are to the respective section in, article of, or exhibit or schedule to, the Plan, as the same may be amended, waived, or modified from time to time. Words denoting the singular number shall include the plural and vice versa, as appropriate, and words denoting one gender shall include the other gender. The Disclosure Statement may be referred to for purposes of interpretation to the extent any term or provision of the Plan is determined by the Bankruptcy Court to be ambiguous.

**2.2.** <u>Application of Definitions and Rules of Construction Contained in the Bankruptcy Code</u>**.**

Words and terms defined in section 101 of the Bankruptcy Code have the same meanings when used in the Plan, unless a different definition is set forth in <u>Article I</u> hereof. The rules of construction contained in section 102 of the Bankruptcy Code, other than section 102(5) of the Bankruptcy Code, apply to the construction of the Plan. For the purposes of construction of the Plan, "or" is disjunctive.

### 2.3. <u>Other Terms</u>.

The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan.

### 2.4. <u>Incorporation of Plan Documents</u>.

All appendices, exhibits and schedules to the Plan and the Plan Documents are incorporated into the Plan by this reference and are a part of the Plan as if set forth in full herein. All Plan Documents shall be filed with the Bankruptcy Court as part of the Plan Supplement not less than ten (10) Business Days prior to the commencement of the Confirmation Hearing; <u>provided</u>, <u>however</u>, that any Plan Documents that are or may be subject to confidentiality provisions or otherwise contain confidential or proprietary information may be filed in redacted form under seal.

Holders of Claims and Equity Interests may obtain a copy of the Plan Documents (in redacted form, as applicable, and excluding any Plan Documents that are filed under seal), once filed, by a written request sent to the following address:

> Centaur Gaming Restructuring
> c/o AlixPartners, LLP
> Attention: [_____]
> 2101 Cedar Springs Road, Suite 1100
> Dallas, Texas 75201
> Facsimile: (888) 369-8913

## ARTICLE III.

## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

<u>Except</u> as otherwise provided herein, for the purposes of organization, voting and all confirmation matters, all Claims and all Equity Interests in the Debtors will be classified as set forth in this <u>Article III</u>.

### 3.1. <u>Administrative Expense Claims and Tax Claims</u>.

As provided by section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims will not be classified under the Plan, and will instead be treated separately as unclassified Claims on the terms set forth in <u>Article VI</u>.

### 3.2. <u>Claims and Equity Interests</u>.

The Claims against and the Equity Interests in, with respect to and to the extent applicable for, each Debtor are classified under the Plan as follows:

13

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| 1. | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2. | First Lien Claims | Impaired | Entitled to Vote |
| 3. | Second Lien Claims | Impaired | Entitled to Vote |
| 4. | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 5. | Valley View Downs Unsecured Claims | Impaired | Entitled to Vote |
| 6. | General Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7. | Convenience Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 8. | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 9. | Borrower Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 10. | Subsidiary Equity Interests | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

(a) <u>Class 1 – Priority Non-Tax Claims</u>.

Class 1 shall consist of all Priority Non-Tax Claims.

(b) <u>Class 2 – First Lien Claims</u>.

Class 2 shall consist of all First Lien Claims.

(c) <u>Class 3 – Second Lien Claims</u>.

Class 3 shall consist of all Second Lien Claims.

(d) <u>Class 4 – Other Secured Claims</u>.

Class 4 shall consist of all Other Secured Claims.

(e) <u>Class 5 – Valley View Downs Unsecured Claims</u>.

Class 5 shall consist of all Valley View Downs Unsecured Claims.

(f) <u>Class 6 – General Unsecured Claims</u>.

Class 6 shall consist of all General Unsecured Claims.

(g) <u>Class 7 – Convenience Claims</u>.

Class 7 shall consist of all Convenience Claims.

NEWYORK 7413506 (2K)

(h)     Class 8 – Intercompany Claims.

Class 8 shall consist of all Intercompany Claims.

(i)     Class 9 – Borrower Equity Interests.

Class 9 shall consist of all Borrower Equity Interests.

(j)     Class 10 – Subsidiary Equity Interests.

Class 10 shall consist of all Subsidiary Equity Interests.

## ARTICLE IV.

## IDENTIFICATION OF IMPAIRED CLASSES OF CLAIMS AND EQUITY INTERESTS

### 4.1. Impaired and Unimpaired Classes of Claims and Equity Interests.

Priority Non-Tax Claims, Other Secured Claims, Convenience Claims and Subsidiary Equity Interests are not impaired under the Plan.  All other classes of Claims and Equity Interests are impaired under the Plan.

### 4.2. Impairment Controversies.

If a controversy arises as to whether any Claim or Equity Interest, or any class of Claims or Equity Interests, is impaired under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy.

## ARTICLE V.

## PROVISIONS FOR TREATMENT OF CLAIMS
## AND EQUITY INTERESTS UNDER THE PLAN

The classes of Claims against and Equity Interests in, with respect to and to the extent applicable for, each Debtor shall be treated under the Plan as follows:

NEWYORK 7413506 (2K)

**5.1. <u>Class 1 – Priority Non-Tax Claims</u>.**

Each Allowed Priority Non-Tax Claim shall be unimpaired under the Plan, and, pursuant to section 1124 of the Bankruptcy Code, all of the legal, equitable and contractual rights to which such Claim entitles the holder in respect of such Claim shall be fully reinstated and retained, and such Allowed Priority Non-Tax Claim (<u>including</u> any amounts to which such holder is entitled pursuant to section 1124(2) of the Bankruptcy Code) shall be paid in full in accordance with such reinstated rights on the Effective Date.

**5.2. <u>Class 2 – First Lien Claims</u>.**

Each holder of an Allowed First Lien Claim shall, on the Distribution Date, in full satisfaction of such holder's Allowed First Lien Claim, receive a Pro Rata Share, in accordance with that holder's Pro Rata Share of the First Lien Claims, of (a) the First Lien Take Back Paper, (b) [97.8] percent of the NewCo PIK Notes, and (c) the NewCo Warrants.

**5.3. <u>Class 3 – Second Lien Claims</u>.**

Each holder of an Allowed Second Lien Claim shall, on the Distribution Date, in full satisfaction of such holder's Allowed Second Lien Claim, receive a Pro Rata Share, in accordance with that holder's Pro Rata Share of the aggregate of (a) the Allowed Second Lien Claims, and (b) the Allowed Valley View Downs Unsecured Claims, of [2.2] percent of the NewCo PIK Notes.

**5.4. <u>Class 4 – Other Secured Claims</u>.**

<u>Except</u> to the extent that the holder of an Allowed Other Secured Claim agrees to less favorable treatment, each Allowed Other Secured Claim shall, on the Distribution Date, be reinstated or rendered unimpaired in accordance with section 1124 of the Bankruptcy Code as against the applicable Debtor or its successor in interest under the Plan, notwithstanding any contractual provisions or applicable nonbankruptcy law that entitles the holder of an Other Secured Claim to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of a default. All Allowed Other Secured Claims that are not due and payable on or before the Distributions Date shall, at the Debtors' option in consultation with the Consenting First Lien Claimholders, be paid (a) in the ordinary course of business in accordance with the course of practice between the Debtors and such holder with respect to such Claims, or (b) by transfer of the collateral securing such Claim to the holder of such Claim, each in full and complete satisfaction, settlement and release of, and in exchange for, such Claim.

**5.5. <u>Class 5 – Valley View Downs Unsecured Claims</u>.**

<u>Except</u> to the extent that the holder of an Allowed Valley View Downs Unsecured Claim agrees to less favorable treatment, each holder of an Allowed Valley View Downs Unsecured Claim shall, on the Effective Date, in full satisfaction of such holder's Allowed Valley View Downs Unsecured Claim, receive a Pro Rata Share, in accordance with such holder's Pro Rata Share of the aggregate of (a) the Allowed Second Lien Claims, and (b) the Allowed Valley View Downs Unsecured Claims, of [2.2] percent of the NewCo PIK Notes.

NEWYORK 7413506 (2K)

**5.6.  Class 6 – General Unsecured Claims.**

On the Effective Date, all General Unsecured Claims shall be cancelled and the holders of such General Unsecured Claims shall receive no distribution on account of such Claims.

**5.7.  Class 7 – Convenience Claims.**

Each holder of an Allowed Convenience Claim shall, on the Distribution Date in full satisfaction of such holder's Allowed Convenience Claim, receive a single Cash payment equal to 100 percent of its Allowed Convenience Claim.

**5.8.  Class 8 – Intercompany Claims.**

On the Effective Date, all Intercompany Claims shall be cancelled and the holders of such Intercompany Claims shall receive no distribution on account of such Claims.

**5.9.  Class 9 – Borrower Equity Interests.**

Borrower Equity Interests shall be cancelled and the holders of such Borrower Equity Interests shall receive no distribution on account of such interests.

**5.10.  Class 10 – Subsidiary Equity Interests.**

Each holder of an Allowed Subsidiary Equity Interest shall be unimpaired under the Plan and, pursuant to section 1124 of the Bankruptcy Code, all of the legal, equitable and contractual rights to which such Subsidiary Equity Interests entitle such holder in respect of such Subsidiary Equity Interests shall be fully reinstated and retained on and after the Effective Date.

**ARTICLE VI.**

**PROVISIONS FOR TREATMENT
OF UNCLASSIFIED CLAIMS UNDER THE PLAN**

**6.1.  Unclassified Claims.**

Administrative Expense Claims and Priority Tax Claims are treated in accordance with sections 1129(a)(9)(A) and 1129(a)(9)(C) of the Bankruptcy Code, respectively. Administrative Expense Claims and Priority Tax Claims are not designated as classes of Claims for the purposes of the Plan or for the purposes of sections 1123, 1124, 1125, 1126, or 1129 of the Bankruptcy Code.

NEW YORK 7413506 (2K)

**6.2. <u>Treatment of Administrative Expense Claims</u>.**

All Administrative Expense Claims shall be treated as follows:

(a)     <u>Time for Filing Administrative Expense Claims</u>.

The holder of an Administrative Expense Claim, other than (i) a DIP Claim, (ii) a Fee Claim, (iii) a liability incurred and payable after the Petition Date in the ordinary course of business by a Debtor (and not past due), (iv) a Section 503(b)(9) Claim, (v) an Intercompany Financing Claim, or (vi) an Administrative Expense Claim that has been Allowed on or before the Effective Date, must file with the Bankruptcy Court and serve on the Debtors, the Committee and the U.S. Trustee, notice of such Administrative Expense Claim within forty (40) days after service of Notice of Confirmation or such other specific date as may be established by the Bankruptcy Court.  Such notice must include at a minimum (A) the name of the Debtor(s) which are purported to be liable for the Claim, (B) the name of the holder of the Claim, (C) the amount of the Claim, and (D) the basis of the Claim (<u>including</u> any documentation evidencing or supporting such Claim).  **THE FAILURE TO FILE A NOTICE OF AN ADMINISTRATIVE CLAIM ON OR BEFORE THE ADMINISTRATIVE CLAIMS BAR DATE AND THE FAILURE TO SERVE SUCH NOTICE TIMELY AND PROPERLY SHALL RESULT IN THE ADMINISTRATIVE EXPENSE CLAIM BEING FOREVER BARRED, DISALLOWED, AND DISCHARGED WITHOUT FURTHER ORDER OF THE BANKRUPTCY COURT.**

(b)     <u>Time for Filing Fee Claims</u>.

Each Professional who holds or asserts a Fee Claim shall be required to file with the Bankruptcy Court, and serve on all parties required to receive notice, a Fee Application within forty-five (45) days after the Effective Date or such other specific date as may be established by the Bankruptcy Court.  **THE FAILURE TO FILE TIMELY AND SERVE SUCH FEE APPLICATION SHALL RESULT IN THE FEE CLAIM BEING FOREVER BARRED AND DISCHARGED.**

(c)     <u>Time for Filing Section 503(b)(9) Claims</u>.

Each holder of a Section 503(b)(9) Claim is required to submit to the Claims Agent, with copies to counsel for the Debtors, a request for allowance of such Section 503(b)(9) Claim prior to the Section 503(b)(9) Claim Bar Date.  **THE FAILURE TO SUBMIT SUCH REQUEST BY THE SECTION 503(B)(9) BAR DATE SHALL RESULT IN THE SECTION 503(B)(9) CLAIM BEING DEEMED DISALLOWED AS AN ADMINISTRATIVE EXPENSE CLAIM.**  Such disallowance does not prevent such Claim from being Allowed as a Claim other than as an Administrative Expense Claim to the extent otherwise allowable.

(d)     <u>Allowance of Administrative Expense Claims, Fee Claims, and Section 503(b)(9) Claims</u>.

An Administrative Expense Claim (other than a DIP Claim, a Fee Claim, an Intercompany Financing Claim, or Section 503(b)(9) Claim) with respect to which notice has

been properly filed and served pursuant to <u>Section 6.2(a)</u>, or a Section 503(b)(9) Claim with respect to which a request for allowance has been properly filed and served pursuant to <u>Section 6.2(c)</u>, shall become an Allowed Administrative Expense Claim if no objection is filed within thirty (30) days after the later of (i) the Effective Date, or (ii) the date of service of the applicable notice of Administrative Expense Claim or such later date as may be approved by the Bankruptcy Court on motion of a party in interest, without notice or a hearing. If an objection is filed within such 30-day period (or any extension thereof), the Administrative Expense Claim shall become an Allowed Administrative Expense Claim only to the extent allowed by Final Order. A Fee Claim in respect of which a Fee Application has been properly filed and served pursuant to <u>Section 6.2(b)</u> shall become an Allowed Administrative Expense Claim only to the extent allowed by Final Order.

(e)     <u>DIP Claims</u>.

All amounts due on account of DIP Claims have been Allowed as superpriority Administrative Expense Claims pursuant to the DIP Order or otherwise are Allowed pursuant to the Plan. All obligations of the Debtors under the DIP Loan Facility will be paid in full in Cash on the Effective Date from the proceeds of the Exit Facility.

(f)     <u>Payment of Allowed Administrative Expense Claims</u>.

On the Distribution Date, each holder of an Allowed Administrative Expense Claim, excluding DIP Claims, which shall be satisfied in accordance with <u>Section 6.2(e)</u> above, and Intercompany Financing Claims, which shall be treated in accordance with <u>Section 6.2(g)</u> below, shall receive in full satisfaction of such Claims (i) the amount of such holder's Allowed Administrative Expense Claim in one Cash payment, or (ii) such other treatment as may be agreed upon in writing by the Debtors and such holder; <u>provided</u>, that such treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Administrative Expense Claim; <u>provided</u>, <u>further</u>, that an Administrative Expense Claim representing a liability incurred in the ordinary course of business of the Debtors may be paid at the Debtors' election in the ordinary course of business.

(g)     <u>Intercompany Financing Claims</u>.

All Intercompany Financing Claims, which are superpriority Administrative Expense Claims junior only to the superpriority Administrative Expense Claim of the L/C Issuer with respect to the obligations of Valley View Downs, LP pursuant to that certain Amended and Restated Reimbursement Agreement, dated October 30, 2009, between Valley View Downs, LP and the L/C Issuer in respect of the Existing L/C, shall, notwithstanding the occurrence of the Effective Date, remain outstanding and be retained by Reorganized Centaur, LLC.

**6.3. <u>Treatment of Priority Tax Claims</u>.**

Each holder of an Allowed Priority Tax Claim shall receive in full satisfaction of such holder's Allowed Priority Tax Claim, (a) on the Distribution Date, the amount of such holder's Allowed Priority Tax Claim in Cash, or (b) such other treatment as may be agreed upon in writing by such holder; <u>provided</u>, that such agreed-upon treatment may not provide such holder with a return having a present value as of the Effective Date that is greater than the

amount of such holder's Allowed Priority Tax Claim. The Confirmation Order shall enjoin any holder of an Allowed Priority Tax Claim from commencing or continuing any action or proceeding against any responsible person or officer of the Debtors that otherwise would be liable to such holder for payment of a Priority Tax Claim so long as the Debtors are in compliance with this <u>Section 6.3</u>. So long as the holder of an Allowed Priority Tax Claim is enjoined from commencing or continuing any action or proceeding against any responsible person or officer under this <u>Section 6.3</u> or pursuant to the Confirmation Order, the statute of limitations for commencing or continuing any such action or proceeding shall be tolled.

**ARTICLE VII.**

**ACCEPTANCE OR REJECTION OF THE PLAN;
EFFECT OF REJECTION BY ONE OR MORE
CLASSES OF CLAIMS OR EQUITY INTERESTS**

**7.1. <u>Classes Entitled to Vote</u>.**

<u>Except</u> for Priority Non-Tax Claims, Other Secured Claims, General Unsecured Claims, Convenience Claims, Intercompany Claims, Borrower Equity Interests and Subsidiary Equity Interests, all classes of Claims and Equity Interests are entitled to vote on the Plan.

**7.2. <u>Class Acceptance Requirement</u>.**

A class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such class that have voted on the Plan. A class of Equity Interests shall have accepted the Plan if it is accepted by holders of at least two-thirds (2/3) in amount of the Equity Interests in such class that actually vote on the Plan.

**7.3. <u>Tabulation of Votes on a Non-Consolidated Basis</u>.**

The Balloting Agent will tabulate all votes on the Plan on a non-consolidated basis by class and by Debtor for the purpose of determining whether the Plan satisfies sections 1129(a)(8) and/or (10) of the Bankruptcy Code with respect to each Debtor.

**7.4. <u>Cramdown</u>.**

If all applicable requirements for confirmation of the Plan are met as set forth in section 1129(a) of the Bankruptcy Code, <u>except</u> subsection (8) thereof, the Plan shall be treated as a request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code, notwithstanding the failure to satisfy the requirements of section 1129(a)(8), on the basis that the Plan is fair and equitable and does not discriminate unfairly with respect to each class of Claims that is impaired under, and has not accepted, the Plan.

**7.5. <u>Confirmation of All Cases</u>.**

<u>Except</u> as provided in <u>Section 17.18</u>, the Plan shall not be deemed to have been confirmed unless and until the Plan has been confirmed as to each of the Debtors.

# ARTICLE VIII.

## LETTER OF CREDIT

As a condition precedent to the implementation and effectiveness of the Plan, prior to the expiration of the Existing L/C, the Renewal or Replacement L/C shall have been issued.  Valley View Downs, LP shall be authorized, without further act or action under applicable law, regulation, order, or rule, to enter into the Renewal or Replacement L/C and such other documents as may be necessary to effectuate the issuance of the Renewal or Replacement L/C, in form and substance satisfactory to the Consenting First Lien Claimholders.

## ARTICLE IX.

## MANAGEMENT INCENTIVE PLAN

On or after the Effective Date, NewCo shall be authorized to adopt and implement the Management Incentive Plan, subject to the satisfaction of the Consenting First Lien Claimholders and the Board of Managers, in exchange for Existing Management's entry into the Long Term Employment Agreements.

## ARTICLE X.

## MEANS FOR IMPLEMENTATION OF THE PLAN

### 10.1. **Operations Between the Confirmation Date and the Effective Date**.

Through the Effective Date, the Debtors shall continue to operate their businesses as Debtors-in-Possession, subject to the oversight of the Bankruptcy Court as provided in the Bankruptcy Code, the Bankruptcy Rules, and all orders of the Bankruptcy Court that are then in full force and effect.

### 10.2. **Certain Transactions On or Prior to the Effective Date**.

(a)     Formation of NewCo.

Pursuant to section 1123(a)(5) of the Bankruptcy Code, on or prior to the Effective Date, the Debtors or Reorganized Debtors, as the case may be, shall form NewCo as an [Indiana limited liability company].  The terms of the limited liability company operating agreement of NewCo are described more fully in Exhibit "H" to the Disclosure Statement.

(b)     Issuance of New Centaur, LLC Membership Interests to NewCo.

Pursuant to section 1123(a)(5) of the Bankruptcy Code, on the Effective Date, Centaur, LLC or Reorganized Centaur, LLC, as the case may be, shall issue the New Centaur, LLC Membership Interests to NewCo.  Upon issuance of the New Centaur, LLC Membership Interests to NewCo, Centaur, LLC or Reorganized Centaur, LLC, as the case may be, shall be a direct subsidiary of NewCo.

(c)　　Restructuring Transactions.

Pursuant to section 1123(a)(5) of the Bankruptcy Code, on the Effective Date, the Debtors or the Reorganized Debtors, as the case may be, shall take such actions as may be necessary or appropriate to effect the following: (i) the distribution by Hoosier Park, LP of all of its Assets (including the Subsidiary Equity Interests of HP Dining & Entertainment, LLC) to Centaur Racing, LLC; (ii) the dissolution of Hoosier Park, LP; (iii) the merger of Centaur Indiana, LLC into Centaur Racing, LLC; (iv) the execution and delivery of appropriate agreements or other documents of formation, incorporation, merger, consolidation, or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (v) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (vi) the amendment and restatement of constituent documents of the Reorganized Debtors in accordance with the terms of the Plan; (vii) the filing of appropriate organizational documents with the appropriate governmental authorities under applicable law; and (viii) all other actions that a Debtor or Reorganized Debtor determines are necessary or appropriate; provided, however, that in each case the documents necessary to effect such actions shall be in form and substance satisfactory to the Consenting First Lien Claimholders.

(d)　　Entry into First Lien Take Back Documents and Exit Facility.

Pursuant to section 1123(a)(5) of the Bankruptcy Code, on the Effective Date, NewCo, Reorganized Centaur, LLC and the Subsidiary Guarantors shall be authorized, without further act or action under applicable law, regulation, order, or rule, to enter into the First Lien Take Back Documents and Exit Facility. NewCo, Reorganized Centaur, LLC and the Subsidiary Guarantors are hereby authorized to enter into such agreements, collateral documents and other documents, and issue such instruments, including, without limitation, promissory notes, as may be necessary to effectuate their entry into such documents, in form and substance satisfactory to the Consenting First Lien Claimholders.

(e)　　Issuance of NewCo PIK Notes and NewCo Warrants.

Pursuant to section 1123(a)(5) of the Bankruptcy Code, on the Effective Date, NewCo shall be authorized, without further act or action under applicable law, regulation, order or rule, to issue (i) the NewCo PIK Notes to holders of the Allowed First Lien Claims, Allowed Second Lien Claims, and Allowed Valley View Downs Unsecured Claims, and (ii) the NewCo Warrants to holders of the Allowed First Lien Claims, pursuant to the Plan. NewCo is hereby authorized to enter into such agreements and documents as may be necessary to effectuate the issuance of the NewCo PIK Notes and NewCo Warrants, in form and substance satisfactory to the Consenting First Lien Claimholders.

(f)　　Issuance of NewCo Membership Interests.

Pursuant to section 1123(a)(5) of the Bankruptcy Code, on the Effective Date and only in compliance with state horse racing and gaming laws and regulations, NewCo shall be authorized, without further act or action, under applicable law, regulation, order, or rule, to issue

NEWYORK 7413506 (2K)

the NewCo Membership Interests in a manner satisfactory to the Consenting First Lien Claimholders. NewCo and the Reorganized Debtors are hereby authorized to enter into such agreements as are necessary to effectuate the issuance of the NewCo Membership Interests, in form and substance satisfactory to the Consenting First Lien Lenders.

**10.3. <u>Corporate Action.</u>**

(a) The entry of the Confirmation Order shall constitute authorization for the Debtors and the Reorganized Debtors (as the case may be) to take or cause to be taken all corporate actions necessary or appropriate to implement all provisions of, and to consummate, the Plan prior to, on and after the Effective Date and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act, or action under any applicable law, order, rule, or regulation, <u>including</u>, without limitation, any action required by the officer, members, managers, or general or limited partners of the Debtors and the Reorganized Debtors (as the case may be), <u>including</u>, among other things, (i) the adoption or amendment of any organizational documents; (ii) the termination and cancellation of any Original Debt Documents or any other outstanding instrument, document or agreement evidencing Debt Claims as required by the Plan; (iii) the issuance of the Plan Securities; (iv) all transfers of Assets that are to occur pursuant to the Plan; (v) the incurrence of all obligations contemplated by the Plan and the making of all Plan Distributions; (vi) the reinstatement and assumption of all indemnity obligations to the officers, members, managers and general and limited partners of the Debtors; (vii) the implementation of all settlements and compromises as set forth in or contemplated by the Plan; (viii) taking of all actions to preserve and provide for the prosecution of the Avoidance Actions; and (ix) entering into any and all transactions, contracts, or arrangements permitted by applicable law, order, rule, or regulation.

(b) The officers of the Debtors and the Reorganized Debtors, as the case may be, are authorized and directed to do all things and to execute and deliver all agreements, documents, instruments, notices, and certificates as are contemplated by the Plan and to take all necessary action required in connection therewith, in the name of and on behalf of the Debtors. All obligations of the Debtors to indemnify and hold harmless their current and former officers, members, managers, general and limited partners, and employees, whether arising under the Debtors' constituent documents, contract, law, or equity, shall be fully reinstated and assumed by the Debtors upon the occurrence of the Effective Date with the same effect as though such obligations constituted executory contracts that are assumed (or assumed and assigned, as applicable) under section 365 of the Bankruptcy Code, and all such obligations shall be fully enforceable on their terms from and after the Effective Date. Nothing in the Plan, <u>including</u> Sections 17.1 and <u>17.2</u>, shall release any obligations of the Debtors to indemnify and hold harmless their current and former officers, members, managers, general and limited partners, and employees. Nothing in the Plan, <u>including</u> Section 17.22, shall enjoin any of the Debtors' current and former officers and employees from asserting any indemnity or hold harmless right against the Debtors, excluding any claim for payment of attorneys' fees arising out of or relating to the Chapter 11 Cases or investigations related thereto, <u>except</u> to the extent such attorneys' fees were incurred in the defense of a claim that was asserted or the subject of investigation or discovery after the Effective Date and which claim was released pursuant to <u>Sections 17.1</u> and <u>17.2</u>. The prosecution of any so-indemnified Cause of Action shall, upon the occurrence of the

23

Effective Date, be enjoined and prohibited, <u>except</u> solely for the purpose of obtaining a recovery from the issuer of any available insurance policy proceeds.

(c)     The constituent documents of NewCo and the Reorganized Debtors shall, as of the Effective Date, prohibit or be amended to prohibit the issuance of non-voting equity securities by such Debtor as required by section 1123(a)(6) of the Bankruptcy Code, <u>provided</u>, <u>however</u>, that following the Effective Date, NewCo and the Reorganized Debtors shall be entitled to issue non-voting securities, in their sole discretion, and solely in accordance with the terms of the Plan Documents.

### 10.4. <u>Termination of Certain Debt Obligations</u>.

Upon the occurrence of the Effective Date, the Original Debt Documents shall be cancelled and annulled (along with such other documents appurtenant thereto).  Immediately upon the completion of all Plan Distributions to the holders of Allowed First Lien Claims and Allowed Second Lien Claims, the Reorganized Debtors shall be authorized and directed (without further approval, act or other determination under applicable law, regulation, order or rule) to take such action as shall be necessary or appropriate to terminate and extinguish all of the Debtors' obligations under the Original Debt Documents.

### 10.5. <u>Continued Corporate Existence</u>.

Except as provided in <u>Section 10.2(c)</u>, the Debtors shall continue to exist, as Reorganized Debtors, after the Effective Date as separate entities, with all the powers available to such legal entities, in accordance with applicable law and pursuant to their constituent documents, as modified by the Plan.

### 10.6. <u>Re-vesting of Assets</u>.

Upon the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Debtors' Estates and any property acquired by a Debtor or Reorganized Debtor under the Plan shall vest in the Reorganized Debtors free and clear of all Claims, liens, encumbrances, charges and other interests, <u>except</u> as provided herein.  On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order.  Without limiting the foregoing, each Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for all fees, disbursements, expenses or related support services of Professionals (<u>including</u> fees relating to the preparation of professional fee applications) without application to, or approval of, the Bankruptcy Court.

### 10.7. <u>Initial Managers</u>.

From and after the Effective Date, (a) NewCo shall be managed by the Board of Managers, and (b) the manager of each of the Reorganized Debtors, as applicable, shall be Reorganized Centaur, LLC.  Thereafter, the managers of NewCo and the Reorganized Debtors, as applicable, shall be selected and determined in accordance with the provisions of the

organizational documents of NewCo and such Reorganized Debtors and applicable law. The members of the Board of Managers shall be as identified in the Plan Supplement.

### 10.8. <u>Officers</u>.

The current officers of each of the Debtors shall continue in such positions after the Effective Date in accordance with their respective employment agreements, if any, or, in the case of the Existing Management, the Long Term Employment Agreements, and applicable law. From and after the Effective Date, the officers of each of the Reorganized Debtors shall be selected and appointed by the respective members, managers, and partners of such entities, in accordance with, and pursuant to, the provisions of applicable law and their respective organizational documents. The officers of NewCo shall be as identified in the Plan Supplement.

### 10.9. <u>Retention of Causes of Action/Reservation of Rights</u>.

<u>Except</u> as set forth in <u>Sections 17.1</u> and <u>17.2</u>, all Causes of Action belonging to any of the Debtors shall, upon the occurrence of the Effective Date, be vested in the Reorganized Debtors for the benefit of the Debtors and their Estates. <u>Except</u> as set forth in <u>Sections 17.1</u> and <u>17.2</u>, the rights of the Reorganized Debtors to commence, prosecute, or settle such Causes of Action, respectively, shall be preserved notwithstanding the occurrence of the Effective Date.

**No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors will not pursue any and all available Causes of Action against them. The Debtors and the Estates expressly reserve all rights to prosecute any and all Causes of Action against any Person, <u>except</u> as otherwise provided in the Plan.** Unless any Causes of Action against a Person are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Debtors expressly reserve all Causes of Action, for later adjudication, and therefore, no preclusion doctrine, <u>including</u>, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon or after the confirmation or consummation of the Plan.

<u>Except</u> as set forth in <u>Sections 17.1</u> and <u>17.2</u>, nothing in the Plan or the Confirmation Order shall be deemed a waiver or relinquishment of any Claim, Cause of Action, right of setoff, or other legal or equitable defense which the Debtors had immediately prior to the Commencement Date, against or with respect to any Claims left unimpaired by the Plan, <u>except</u> for avoidance actions pursuant to section 547 of the Bankruptcy Code (<u>provided</u>, <u>however</u>, that the Debtors' right to object to any Claim pursuant to section 502(d) of the Bankruptcy Code is fully preserved, <u>including</u>, without limitation, to the right to object to any Claim of a recipient of a transfer that is avoidable under section 547 of the Bankruptcy Code).

25

# ARTICLE XI.

## THE DISBURSING AGENT

**11.1. <u>Appointment of the Disbursing Agent</u>.**

Upon the occurrence of the Effective Date, the Reorganized Debtors shall be appointed to serve as the Disbursing Agent and shall have all powers, rights, duties, and protections afforded the Disbursing Agent under the Plan.

**11.2. <u>Powers and Duties</u>.**

Pursuant to the terms and provisions of the Plan, the Disbursing Agent shall be empowered and directed to (a) take all steps and execute all instruments and documents necessary to make Plan Distributions to holders of Allowed Claims and Equity Interests, (b) comply with the Plan and the obligations thereunder, (c) employ, retain, or replace professionals to represent it with respect to its responsibilities, (d) object to Claims as specified in <u>Article XI</u>, and prosecute such objections, (e) compromise and settle any issue or dispute regarding the amount, validity, priority, treatment, or allowance of any Claim as provided in <u>Article XI</u>, (f) make annual and other periodic reports regarding the status of distributions under the Plan to the holders of Allowed Claims that are outstanding at such time; such reports to be made available upon request to the holder of any Contested Claim, and (g) exercise such other powers as may be vested in the Disbursing Agent pursuant to the Plan, the Plan Documents, or order of the Bankruptcy Court.

**11.3. <u>Exculpation</u>.**

**<u>Except</u> as otherwise provided in this <u>Section 11.3</u>, the Disbursing Agent, together with its officers, members, managers, general and limited partners, employees, agents, and representatives, are exculpated pursuant to the Plan by all Persons, Entities, holders of Claims and Equity Interests, and all other parties in interest, from any and all Causes of Action arising out of the discharge of the powers and duties conferred upon the Disbursing Agent by the Plan, any Final Order of the Bankruptcy Court entered pursuant to or in the furtherance of the Plan, or applicable law, <u>except</u> solely for actions or omissions arising out of the Disbursing Agent's willful misconduct or gross negligence.  No holder of a Claim or an Equity Interest, or representative thereof, shall have or pursue any Cause of Action (a) against the Disbursing Agent or its officers, members, managers, general or limited partners, employees, agents, and representatives for making Plan Distributions in accordance with the Plan, or (b) against any holder of a Claim for receiving or retaining Plan Distributions as provided for by the Plan.  Nothing contained in this <u>Section 11.3</u> shall preclude or impair any holder of an Allowed Claim or Allowed Equity Interest from bringing an action in the Bankruptcy Court against any Debtor to compel the making of Plan Distributions contemplated by the Plan on account of such Claim or Equity Interest.**

NEWYORK 7413506 (2K)

# ARTICLE XII.

## DISTRIBUTION PROVISIONS

**12.1. <u>Sources of Cash for Plan Distributions</u>.**

All Cash necessary for the Disbursing Agent to make payments and Plan Distributions shall be obtained from the Cash of the Reorganized Debtors.

**12.2. <u>Investment of Funds Held by the Disbursing Agent; Tax Reporting by the Disbursing Agent</u>.**

The Disbursing Agent may, but shall not be required to, invest any funds held by the Disbursing Agent pending the distribution of such funds pursuant to the Plan in investments that are exempt from federal, state, and local taxes. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (<u>including</u> the receipt by the Disbursing Agent of a private letter ruling if the Disbursing Agent so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Disbursing Agent), the Disbursing Agent may (a) treat the funds and other property held by it as held in a single trust for federal income tax purposes in accordance with the trust provisions of the Internal Revenue Code (sections 641, <u>et seq.</u>), and (b) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.

**12.3. <u>Plan Distributions</u>.**

Pursuant to the terms and provisions of the Plan, the Disbursing Agent shall make the required Plan Distributions specified under the Plan on the relevant Distribution Date therefor.

The Disbursing Agent shall make all distributions on account of Allowed First Lien Claims to the Prepetition First Lien Agent in its capacity as administrative agent for the Prepetition First Lien Claimholders, which funds the Prepetition First Lien Agent shall distribute to the Prepetition First Lien Claimholders on a Pro Rata basis. The Prepetition First Lien Agent shall be entitled to the exculpation protections provided in <u>Section 11.3</u> with respect to any distributions the Prepetition First Lien Agent makes on account of Allowed First Lien Claims.

The Disbursing Agent shall make all distributions on account of Allowed Second Lien Claims to the Prepetition Second Lien Agent in its capacity as administrative agent for the Prepetition Second Lien Claimholders, which funds the Prepetition Second Lien Agent shall distribute to the Prepetition Second Lien Claimholders on a Pro Rata basis. The Prepetition Second Lien Agent shall be entitled to the exculpation protections provided in <u>Section 11.3</u> with respect to any distributions the Prepetition Second Lien Agent makes on account of Allowed Second Lien Claims.

**12.4. <u>Timing of Plan Distributions</u>.**

Each Plan Distribution shall be made on the relevant Distribution Date therefor. In the event a Plan Distribution shall be payable on a day other than a Business Day, such Plan

NEWYORK 7413506 (2K)

Distribution shall instead be paid on the immediately succeeding Business Day, but shall be deemed to have been made on the date otherwise due. A Plan Distribution shall be deemed to have been timely made if made on such date or within ten (10) days thereafter.

For federal income tax purposes, <u>except</u> to the extent a Plan Distribution is made in connection with reinstatement of an obligation pursuant to section 1124 of the Bankruptcy Code, a Plan Distribution will be allocated first to the principal amount of a Claim and then, to the extent the Plan Distribution exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest.

### 12.5. <u>Address for Delivery of Plan Distributions/Unclaimed Distributions</u>.

Subject to Bankruptcy Rule 9010, any Plan Distribution or delivery to a holder of an Allowed Claim shall be made at the address of such holder as set forth (a) in the Schedules, (b) on the proof of Claim filed by such holder, (c) in any notice of assignment filed with the Bankruptcy Court with respect to such Claim pursuant to Bankruptcy Rule 3001(e), or (d) in any notice served by such holder giving details of a change of address. If any Plan Distribution is returned to the Disbursing Agent as undeliverable, no Plan Distributions shall be made to such holder unless the Disbursing Agent is notified of such holder's then current address within ninety (90) days after such Plan Distribution was returned. After such date, if such notice was not provided, a holder shall have forfeited its right to such Plan Distribution, and the undeliverable Plan Distributions shall be returned to the Reorganized Debtors. Supplemental Plan Distributions may be made from time to time at the discretion of the Disbursing Agent.

### 12.6. <u>Time Bar to Cash Payments</u>.

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within one hundred and eighty (180) days after the date of issuance thereof. Requests for reissuance of any voided check shall be made directly to the Disbursing Agent by the holder of the Allowed Claim to whom such check was originally issued. Any claim in respect of such a voided check shall be made within one hundred and eighty (180) days after the date of issuance of such check. If no request is made as provided in the preceding sentence, any claims in respect of such void check shall be discharged and forever barred and such unclaimed Plan Distribution shall revert to the Reorganized Debtors.

### 12.7. <u>Manner of Payment under the Plan</u>.

Unless the Person receiving a Plan Distribution agrees otherwise, any Plan Distribution to be made in Cash under the Plan shall be made, at the election of the Disbursing Agent, by check drawn on a domestic bank or by wire transfer from a domestic bank. Cash payments to foreign creditors may, in addition to the foregoing, be made, at the option of the Disbursing Agent, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

NEW YORK 7413506 (2K)

**12.8. Expenses Incurred on or after the Effective Date and Claims of the Disbursing Agent.**

Except as otherwise ordered by the Bankruptcy Court or as provided in the Plan, the amount of any reasonable fees and expenses incurred (or to be incurred) by the Disbursing Agent on or after the Effective Date (including, without limitation, taxes) shall be paid when due. Professional fees and expenses incurred by the Disbursing Agent from and after the Effective Date in connection with the effectuation of the Plan shall be paid in the ordinary course of business. Any dispute regarding compensation shall be resolved by agreement of the parties or if the parties are unable to agree, as determined by the Bankruptcy Court.

**12.9. Fractional Plan Distributions.**

Notwithstanding anything to the contrary contained herein, no Plan Distributions of fractional shares or fractions of dollars (whether in Cash or Plan Securities) will be made. Fractional shares and fractions of dollars shall be rounded to the nearest whole unit (with any amount equal to or less than one-half share or one-half dollar, as applicable, to be rounded down).

**12.10. Surrender and Cancellation of Instruments.**

As a condition to receiving any Plan Distribution, on or before the Distribution Date, the holder of an Allowed Claim evidenced by a certificate, instrument, or note, other than any such certificate, instrument or note that is being reinstated or being left unimpaired under the Plan, shall (a) surrender such certificate, instrument or note representing such Claim, and (b) execute and deliver such other documents as may be necessary to effectuate the Plan in the sole determination of the Disbursing Agent. Such certificate, instrument or note shall thereafter be cancelled and extinguished. The Disbursing Agent shall have the right to withhold any Plan Distribution to be made to or on behalf of any holder of such Claims unless and until (i) such certificates, instruments or notes are surrendered, or (ii) any relevant holder provides to the Disbursing Agent an affidavit of loss or such other documents as may be required by the Disbursing Agent together with an appropriate indemnity in the customary form. Any such holder who fails to surrender such certificates, instruments or notes, or otherwise fails to deliver an affidavit of loss and indemnity prior to the second anniversary of the Effective Date, shall be deemed to have forfeited its Claims and shall not participate in any Plan Distribution. All property in respect of such forfeited Claims shall revert to the Reorganized Debtors.

**ARTICLE XIII.**

**PROCEDURES FOR RESOLVING
AND TREATING CONTESTED CLAIMS**

**13.1. Prosecution of Contested Claims.**

After the Effective Date, only the Reorganized Debtors may object to the allowance of Contested Claims filed with the Bankruptcy Court. All objections that are filed and prosecuted as provided herein shall be litigated to Final Order or compromised and settled in accordance with Section 13.3.

NEW YORK 7413506 (2K)

**13.2. <u>Objection Deadline</u>.**

As soon as practicable, but in no event later than one hundred and eighty (180) days after the Effective Date (subject to being extended by the order of the Bankruptcy Court upon motion of the Disbursing Agent without notice or a hearing), objections to Claims shall be filed with the Bankruptcy Court and served upon the holders of each of the Claims to which objections are made.

**13.3. <u>Claims Settlement</u>.**

Notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, from and after the Effective Date, the Disbursing Agent shall have authority to settle or compromise all Claims and Causes of Action without further review or approval of the Bankruptcy Court.

**13.4. <u>Entitlement to Plan Distributions Upon Allowance</u>.**

Notwithstanding any other provision hereof, if any portion of a Claim is a Contested Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Claim becomes an Allowed Claim that is not a Contested Claim, subject to the setoff rights as provided in <u>Section 17.19</u>. When a Claim that is not an Allowed Claim as of the Effective Date becomes an Allowed Claim, the holder of such Allowed Claim shall thereupon become entitled to receive the Plan Distributions in respect of such Claim the same as though such Claim had been an Allowed Claim on the Effective Date.

**13.5. <u>Contested Claims Reserve</u>.**

The Disbursing Agent may establish one or more Contested Claims Reserves for the purpose of effectuating distributions to holders of Contested Claims pending the allowance or disallowance of such Claims in accordance with the Plan.

**13.6. <u>Estimation of Claims</u>.**

An Estimation Order may be used to calculate and establish the amount of the Contested Claims Reserve. The Debtors and the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Contested Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim <u>including</u>, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Contested Claim, the amount so estimated shall constitute either (a) the Allowed amount of such Contested Claim, (b) a maximum limitation on such Contested Claim, or (c) in the event such Contested Claim is estimated in connection with the estimation of other Claims within the same class, a maximum limitation on the aggregate amount of Allowed Claims on account of such Contested Claims so estimated. If the estimated amount constitutes a maximum limitation on the amount of such Claim, or on more than one such Claim within a class of Claims, as applicable, the Debtors or the Reorganized Debtors may pursue

supplementary proceedings to object to the allowance of such Claims. All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or otherwise resolved by any mechanism approved by the Bankruptcy Court.

### 13.7. <u>No Recourse Against the Debtors or the Reorganized Debtors</u>.

If a Contested Claim Reserve is established pursuant to <u>Section 13.5</u>, any holder of a Contested Claim that ultimately becomes an Allowed Claim shall be entitled to receive its applicable distribution under the Plan solely from any Contested Claim Reserve established on account of such Contested Claims. In no event shall any holder of a Contested Claim have any recourse with respect to distributions made, or to be made, under the Plan to holders of such Claims, to any Debtor or the Reorganized Debtors on account of such Contested Claim, regardless of whether such Contested Claim shall ultimately become an Allowed Claim, and regardless of whether sufficient Cash or other property remains available for distribution in the Contested Claim Reserve established on account of such Contested Claims at the time such Claim becomes entitled to receive a distribution under the Plan.

## ARTICLE XIV.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 14.1. <u>Assumption and Rejection of Executory Contracts and Unexpired Leases</u>.

(a)     All executory contracts and unexpired leases of the Debtors shall be rejected pursuant to the provisions of section 365 of the Bankruptcy Code effective as of and subject to the occurrence of the Effective Date, unless another date is specified in the Plan <u>except</u>:  (i) any executory contracts and unexpired leases that are the subject of separate motions to assume or assume and assign filed pursuant to section 365 of the Bankruptcy Code by the Debtors before the Effective Date; (ii) contracts and leases listed in Schedule 2 attached to the Disclosure Statement and any subsequently filed "Schedule of Assumed Executory Contracts and Unexpired Leases" to be filed by the Debtors with the Bankruptcy Court before the entry of, or as an exhibit to, the Confirmation Order; (iii) all executory contracts and unexpired leases assumed or assumed and assigned under the Plan or by order of the Bankruptcy Court entered before the Effective Date; (iv) any executory contract or unexpired lease that is the subject of a dispute over the amount or manner of cure pursuant to the next section hereof and for which the Debtors make a motion to reject such contract or lease based upon the existence of such dispute filed at any time; (v) any agreement, obligation, security interest, transaction, or similar undertaking that the Debtors believe is not executory or a lease that is later determined by the Bankruptcy Court to be an executory contract or unexpired lease that is subject to assumption or rejection under section 365 of the Bankruptcy Code; (vi) any oral or written joint defense agreements relating to actual, potential, or threatened litigation or investigations involving any of the Debtors, which shall be assumed; (vii) any guaranty or similar agreement executed by a third party which guarantees repayment or performance of an obligation owed to any of the Debtors or to indemnify the Debtors; and (viii) agreements with third parties regarding preservation of the confidentiality of documents produced by the Debtors. Any order entered postconfirmation by the Bankruptcy Court, after notice and a hearing, authorizing the rejection of an executory

contract or unexpired lease shall cause such rejection to be a prepetition breach under sections 365(g) and 502(g) of the Bankruptcy Code, as if such relief was granted and such order was entered preconfirmation. The Debtors reserve the right to amend Disclosure Statement Schedule 2 or any "Schedule of Assumed Executory Contracts and Unexpired Leases" prior to the entry of the Confirmation Order. Each executory contract and unexpired lease to be assumed by the Debtors shall include modifications, amendments, supplements, restatements, or other similar agreements made directly or indirectly by any agreement, instrument, or other document that affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is listed on Disclosure Statement Schedule 2 or any "Schedule of Assumed Executory Contracts and Unexpired Leases."

(b) The inclusion of a contract, lease, or other agreement in <u>Section 14.1(a)</u> or on Disclosure Statement Schedule 2 or any "Schedule of Assumed Executory Contracts and Unexpired Leases" shall not constitute an admission by the Debtors as to the characterization of whether any such included contract, lease, or other agreement is, or is not, an executory contract or unexpired lease or whether any claimants under any such contract, lease, or other agreement are time-barred from asserting Claims against the Debtors. The Debtors reserve all rights with respect to the characterization of any such agreements.

(c) The Plan shall constitute a motion to reject such executory contracts and unexpired leases rejected pursuant to this <u>Section 14.1</u>, and the Debtors shall have no liability thereunder <u>except</u> as is specifically provided in the Plan. Entry of the Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval of such rejections pursuant to section 365(a) of the Bankruptcy Code, subject to the occurrence of the Effective Date, and a finding by the Bankruptcy Court that each such rejected agreement, executory contract, or unexpired lease is burdensome and that the rejection thereof is in the best interests of the Debtors and their estates.

(d) The Plan shall constitute a motion to assume and assign to the Reorganized Debtors such executory contracts and unexpired leases as set forth in Disclosure Statement Schedule 2 or any "Schedule of Assumed Executory Contracts and Unexpired Leases." Entry of the Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval of such assumption and assignment pursuant to sections 365(a), (b), and (f) of the Bankruptcy Code, and a finding by the Bankruptcy Court that the requirements of section 365(f) of the Bankruptcy Code have been satisfied. Any non-Debtor counterparty to an agreement listed on Disclosure Statement Schedule 2 or any "Schedule of Assumed Executory Contracts and Unexpired Leases" or any other contract or unexpired lease otherwise designated as being assumed or assumed and assigned in <u>Section 14.1(a)</u> who disputes the assignment of an executory contract or unexpired lease must file with the Bankruptcy Court, and serve upon the Debtor, a written objection to the assumption and assignment, which objection shall set forth the basis for the dispute by no later than ten (10) days prior to the Confirmation Hearing. The failure to timely object shall be deemed a waiver of any and all objections to the assumption and assignment of executory contracts and leases as set forth in Disclosure Statement Schedule 2 or any "Schedule of Assumed Executory Contracts and Unexpired Leases" or as otherwise designated as being assumed or assumed and assigned in <u>Section 14.1(a)</u>.

NEWYORK 7413506 (2K)

**14.2. <u>Cure</u>.**

At the election of the Debtors following consultation with the Consenting First Lien Claimholders, any monetary defaults under each executory contract and unexpired lease to be assumed under the Plan shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code: (a) by payment of the default amount in Cash on the Effective Date or as soon thereafter as practicable; or (b) on such other terms as agreed to by the parties to such executory contract or unexpired lease. In the event of a dispute regarding: (i) the amount of any cure payments; (ii) the ability to provide adequate assurance of future performance under the contract or lease to be assumed or assigned; or (iii) any other matter pertaining to assumption or assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving assumption or assignment, as applicable. Disclosure Statement Schedule 2 or any "Schedule of Assumed Executory Contracts and Unexpired Leases" attached to the Disclosure Statement set forth the Debtors' cure obligations for each agreement which a cure obligation must be satisfied as a condition to the assumption and assignment of such agreement. Any non-Debtor counterparty to an agreement listed on the Disclosure Statement Schedule 2 or any "Schedule of Assumed Executory Contracts and Unexpired Leases" who disputes the scheduled cure obligation (or objects to the omission of a scheduled cure obligation) must file with the Bankruptcy Court, and serve upon the Debtors, a written objection to the cure obligation, which objection shall set forth the basis for the dispute, the alleged correct cure obligation, and any other objection related to the assumption or assumption and assignment of the relevant agreement by no later than ten (10) Business Days prior to the Confirmation Hearing. If a non-Debtor counterparty fails to file and serve an objection which complies with the foregoing, the cure obligation set forth on the Disclosure Statement Schedule 2 or any "Schedule of Assumed Executory Contracts and Unexpired Leases" shall be binding on the non-Debtor counterparty, and the non-Debtor counterparty shall be deemed to have waived any and all objections to the assumption and assignment of the relevant agreement as proposed by the Debtors.

**14.3. <u>Claims Arising from Rejected Contracts</u>.**

Rejection Damage Claims must be submitted to the Claims Agent, with copies to counsel for the Debtors, by the first Business Day that is at least thirty (30) days following the Effective Date. Properly submitted Rejection Damage Claims shall be treated as Valley View Downs Unsecured Claims, General Unsecured Claims, or Convenience Claims, as applicable, under the Plan subject to objection by the Reorganized Debtors. **ANY SUCH REJECTION DAMAGE CLAIMS THAT ARE NOT PROPERLY SUBMITTED PURSUANT TO THIS <u>SECTION 14.3</u> WILL FOREVER BE BARRED FROM ASSERTION AND SHALL NOT BE ENFORCEABLE AGAINST THE REORGANIZED DEBTORS, THEIR RESPECTIVE ESTATES, AFFILIATES, OR ASSETS.**

NEWYORK 7413506 (2K)

## ARTICLE XV.

## CONDITIONS PRECEDENT TO
## CONFIRMATION OF THE PLAN AND
## THE OCCURRENCE OF THE EFFECTIVE DATE

**15.1. <u>Conditions Precedent to Confirmation.</u>**

As conditions precedent to confirmation of the Plan, the clerk of the Bankruptcy Court shall have entered an order or orders:

(i) approving the Disclosure Statement as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code;

(ii) authorizing the solicitation of votes with respect to the Plan;

(iii) determining that all votes are binding and have been properly tabulated as acceptances or rejections of the Plan;

(iv) reasonably acceptable, in form and substance, to the Debtors and the Consenting First Lien Claimholders and confirming and giving effect to the terms and provisions of the Plan;

(v) determining that all applicable tests, standards, and burdens in connection with the Plan have been duly satisfied and met by the Debtors and the Plan;

(vi) approving the Plan Documents, which shall be in form and substance satisfactory to the Consenting First Lien Claimholders; and

(vii) authorizing the Debtors to execute, enter into, and deliver the Plan Documents and to execute, implement, and to take all actions otherwise necessary or appropriate to give effect to, the transactions contemplated by the Plan and the Plan Documents.

**15.2. <u>Conditions Precedent to the Occurrence of the Effective Date.</u>**

The following are conditions precedent to the occurrence of the Effective Date:

(i) The Confirmation Order shall have been entered by the Clerk of the Bankruptcy Court, be in full force and effect and not be subject to any stay or injunction;

(ii) The closing of the Exit Facility shall have occurred;

(iii) The forms of the NewCo PIK Notes and NewCo Warrants shall be in form and substance satisfactory to the Consenting First Lien Claimholders and shall have been issued pursuant to the Plan;

(iv) The Renewal or Replacement L/C, in form and substance satisfactory to the Consenting First Lien Claimholders, shall have been issued pursuant to the Plan;

NEW YORK 7413506 (2K)

(v)     The composition of the Board of Managers shall be acceptable to the Consenting First Lien Claimholders and the Board of Managers shall have been seated; and

(vi)    All necessary consents, authorizations, and approvals shall have been given for the transfers of property and the payments provided for or contemplated by the Plan, <u>including</u>, without limitation, (a) satisfaction or waiver of all conditions to the obligations of (1) the Debtors under the Plan and the Plan Documents, (2) the Debtors and the First Lien Claimholders under the First Lien Take Back Documents, and (b) the valid issuance of the Plan Securities or, in the case of regulatory consents, authorizations, or approvals, the status of any requests or applications for such consents, authorizations, or approvals, immediately preceding the Effective Date shall be satisfactory to the Consenting First Lien Claimholders.

### 15.3.  <u>Waiver of Conditions</u>.

The Debtors, with the written consent of the Consenting First Lien Claimholders, may waive any one or more of the conditions set forth in <u>Section 15.1</u> or <u>Section 15.2</u> in a writing executed by each of them without notice or order of the Bankruptcy Court and without notice to any parties in interest.

### 15.4.  <u>Effect of Non-Occurrence of the Effective Date</u>.

If the Effective Date shall not occur, the Plan shall be null and void and nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims against or Equity Interests in a Debtor; (b) prejudice in any manner the rights of any party-in-interest; or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtors or any other party-in-interest.

## ARTICLE XVI.

## RETENTION OF JURISDICTION

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall retain and shall have exclusive jurisdiction over any matter (a) arising under the Bankruptcy Code, (b) arising in or related to the Chapter 11 Cases or the Plan, or (c) that relates to the following:

(i)     To hear and determine any and all motions or applications pending on the Confirmation Date or thereafter brought in accordance with <u>Article XIV</u> hereof for the assumption, assumption and assignment, or rejection of executory contracts or unexpired leases to which any of the Debtors is a party or with respect to which any of the Debtors may be liable, and to hear and determine any and all Claims and any related disputes (<u>including</u>, without limitation, the exercise or enforcement of setoff or recoupment rights, or rights against any third party or the property of any third party resulting therefrom or from the expiration, termination, or liquidation of any executory contract or unexpired lease);

35

(ii)     To determine any and all adversary proceedings, applications, motions, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Disbursing Agent or the Debtors, as applicable, after the Effective Date;

(iii)    To hear and determine any objections to the allowance of Claims, whether filed, asserted, or made before or after the Effective Date, including, without limitation, to hear and determine any objections to the classification of any Claim and to allow, disallow, or estimate any Contested Claim in whole or in part;

(iv)     To issue such orders in aid of execution of the Plan to the extent authorized or contemplated by section 1142 of the Bankruptcy Code;

(v)      To consider any modifications of the Plan, remedy any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(vi)     To hear and determine all Fee Applications and applications for allowances of compensation and reimbursement of any other fees and expenses authorized to be paid or reimbursed under the Plan or the Bankruptcy Code;

(vii)    To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with the Plan, the Plan Documents or their interpretation, implementation, enforcement, or consummation;

(viii)   To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with the Confirmation Order (and all exhibits to the Plan) or its interpretation, implementation, enforcement, or consummation;

(ix)     To the extent that Bankruptcy Court approval is required, to consider and act on the compromise and settlement of any Claim or Cause of Action by, on behalf of, or against the Estates;

(x)      To determine such other matters that may be set forth in the Plan, or the Confirmation Order, or that may arise in connection with the Plan, or the Confirmation Order;

(xi)     To hear and determine matters concerning state, local, and federal taxes, fines, penalties, or additions to taxes for which the Reorganized Debtors, the Debtors-in-Possession, or the Disbursing Agent may be liable, directly or indirectly, in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(xii)    To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with any setoff and/or recoupment rights of the Debtors or any Person under the Plan;

(xiii)   To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with Causes of Action of the Debtors (including

Avoidance Actions) commenced by the Disbursing Agent, the Debtors or any third parties, as applicable, before or after the Effective Date;

(xiv)    To enter an order or final decree closing the Chapter 11 Cases;

(xv)    To issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation, implementation, or enforcement of the Plan or the Confirmation Order; and

(xvi)    To hear and determine any other matters related hereto and not inconsistent with chapter 11 of the Bankruptcy Code.

## ARTICLE XVII.

## MISCELLANEOUS PROVISIONS

### 17.1. Releases by the Debtors.

On the Effective Date, each of the Released Persons shall be released by each Debtor, and their respective Estates, from any and all Claims, including, without limitation, Avoidance Actions, liens, encumbrances, security interests, obligations, suits, judgments, damages, rights, Causes of Action, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing, or hereafter arising, in law, equity, or otherwise, that any Debtor is entitled to assert in its own right or on behalf of the holder of any Claim or Equity Interest or other Person, based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place on or prior to the Effective Date in any way relating to any Debtor, the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, implementation, administration, confirmation, or consummation of any of the Plan, or the property to be distributed under the Plan, the disclosure statement concerning the Plan, any contract, employee pension or other benefit plan, instrument, release, or other agreement of document created, modified, amended, terminated, or entered into in connection with either the Plan or any agreement between the Debtors and any Released Person, or any other act taken or omitted to be taken in connection with the Debtors' bankruptcy.  Without limitation of the foregoing, each such Released Person shall be released and exculpated from any and all Claims, obligations, suits, judgments, damages, rights, Causes of Action, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing, or hereafter arising, in law, equity, or otherwise, that any holder of a Claim or Equity Interest is entitled to assert in its own right or on behalf of any other person, based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence relating to the Debtors and taking place prior to the Effective Date.

### 17.2. Release of Released Persons by Other Released Persons.

On the Effective Date, except as expressly provided under the Plan with respect to (a) Plan Distributions on account of Allowed Claims or Allowed Equity Interests, if any, that any of the Released Persons may have against any of the Debtors' Estates, and (b) any other rights or obligations under the Plan or the Plan Documents, each of the Released Persons shall release

each other from any and all Claims, <u>including</u>, without limitation, Avoidance Actions, liens, encumbrances, security interests, obligations, suits, judgments, damages, rights, Causes of Action, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, that any Released Person is entitled to assert against any other Released Person, based in whole or in part upon any act or omission, transaction, agreement, event, or occurrence taking place on or before the Effective Date in any way relating to any Debtor, the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, implementation, administration, confirmation, or consummation of any of the Plan, or the property to be distributed under the Plan, the disclosure statement concerning the Plan, any contract, employee pension or other benefit plan, instrument, release, or other agreement of document created, modified, amended, terminated, or entered into in connection with either the Plan or any agreement between the Debtors and any Released Person, or any other act taken or omitted to be taken in connection with the Debtors' bankruptcy. Notwithstanding any of the foregoing, the Plan shall not release any obligations of the Debtors to indemnify and hold harmless their current and former officers and employees, <u>except</u> for claims or Causes of Action against any current and former officers and employees resulting from the willful misconduct or gross negligence of such indemnified party, whether arising under the Debtors' constituent documents, contract, law, or equity.

### 17.3. <u>Third Party Agreements; Subordination.</u>

The Plan Distributions to the various classes of Claims and Equity Interests hereunder shall not affect the right of any Person to levy, garnish, attach, or employ any other legal process with respect to such Plan Distributions by reason of any claimed subordination rights or otherwise. All of such rights and any agreements relating thereto shall remain in full force and effect, <u>except</u> as compromised and settled pursuant to the Plan. Plan Distributions shall be subject to and modified by any Final Order directing distributions other than as provided in the Plan. The right of the Debtors to seek subordination of any, lien security interest, Claim or Equity Interest pursuant to section 510 of the Bankruptcy Code is fully reserved, and the treatment afforded any Claim or Equity Interest that becomes a Subordinated Claim or subordinated Equity Interest at any time shall be modified to reflect such subordination. Unless the Confirmation Order provides otherwise, no Plan Distributions shall be made on account of a subordinated Claim or subordinated Equity Interest.

All contractual and subordination rights of the Prepetition First Lien Agent and other Prepetition First Lien Claimholders with respect to any Plan Distributions, <u>including</u>, without limitation, the subordination of the liens held by or on behalf of the Prepetition Second Lien Agent, the other Prepetition Second Lien Claimholders or any agent of trustee therefor to the liens held by or on behalf of the Prepetition First Lien Agent, the other Prepetition First Lien Claimholders or any agent or trustee therefor, as described in the Intercreditor Agreement, shall be enforceable under the Plan, <u>except</u> if, and to the extent, compromised by the Plan. The classification and manner of satisfying Claims under the Plan and the Plan Distributions take into consideration the contractual subordination rights that the Prepetition First Lien Agent and the other Prepetition First Lien Claimholders have against a holder of another Claim with respect to Plan Distributions.

**17.4. <u>Payment of Statutory Fees</u>.**

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid by the Debtors on or before the Effective Date.

**17.5. <u>Satisfaction of Claims</u>.**

The rights afforded in the Plan and the treatment of all Claims and Equity Interests herein shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Equity Interests of any nature whatsoever, <u>including</u> any accrued postpetition interest, against the Debtors and the Debtors-in-Possession, or any of their Estates, Assets, properties, or interests in property.  <u>Except</u> as otherwise expressly provided in the Plan, on the Effective Date, all Claims against and Equity Interests in the Debtors and the Debtors-in-Possession shall be satisfied, discharged, and released in full.  The Reorganized Debtors shall not be responsible for any pre-Effective Date obligations of the Debtors or the Debtors-in-Possession, <u>except</u> those expressly assumed by any Reorganized Debtor(s), as applicable.  <u>Except</u> as otherwise provided herein, all Persons and Entities shall be precluded and forever barred from asserting against the Reorganized Debtors, their respective successors or assigns, or their Estates, Assets, properties, or interests in property any event, occurrence, condition, thing, or other or further Claims or Causes of Action based upon any act, omission, transaction, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date, other than subordination of the First Lien Claims, whether or not the facts of or legal bases therefore were known or existed prior to the Effective Date.

**17.6. <u>Exculpation</u>.**

**The Debtors and any Released Persons shall not be liable for any Cause of Action related to or arising in connection with or out of the administration of the Chapter 11 Cases, pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, <u>except</u> for gross negligence or willful misconduct as determined by Final Order of the Bankruptcy Court.  The Confirmation Order shall enjoin all holders of Claims and Equity Interests from asserting or prosecuting any Claim or cause of action against any Released Person as to which such Released Person has been exculpated from liability pursuant to the preceding sentence.**

**17.7. <u>Discharge of Liabilities</u>.**

<u>Except</u> as otherwise provided in the Plan, upon the occurrence of the Effective Date, the Debtors shall be discharged from all Claims and Causes of Action to the fullest extent permitted by section 1141 of the Bankruptcy Code, and all holders of Claims and Equity Interests shall be precluded from asserting against the Reorganized Debtors, the Debtors, the Estates, the Assets, or any property dealt with under the Plan, any further or other Cause of Action based upon any act or omission, transaction, event, thing, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date.

NEWYORK 7413506 (2K)

**EXCEPT** AS OTHERWISE PROVIDED IN THE PLAN, THE REORGANIZED DEBTORS SHALL NOT HAVE, AND SHALL NOT BE CONSTRUED TO HAVE OR MAINTAIN ANY LIABILITY, CLAIM, OR OBLIGATION, THAT IS BASED IN WHOLE OR IN PART ON ANY ACT, OMISSION, TRANSACTION, EVENT, OTHER OCCURRENCE, OR THING OCCURRING OR IN EXISTENCE ON OR PRIOR TO THE EFFECTIVE DATE OF THE PLAN (**INCLUDING**, WITHOUT LIMITATION, ANY LIABILITY OR CLAIMS ARISING UNDER APPLICABLE NON-BANKRUPTCY LAW AS A SUCCESSOR TO THE DEBTORS) AND NO SUCH LIABILITIES, CLAIMS, OR OBLIGATIONS FOR ANY ACTS SHALL ATTACH TO THE REORGANIZED DEBTORS.

### 17.8. Discharge of Debtors.

Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, without further notice or order, all Claims of any nature whatsoever shall be automatically discharged forever. Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, the Debtors, their Estates, and all successors thereto shall be deemed fully discharged and released from any and all Claims, including, without limitation, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (a) a proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim based upon such debt is allowed under section 502 of the Bankruptcy Code, or (c) the holder of a Claim based upon such debt has accepted the Plan. The Confirmation Order shall be a judicial determination of discharge of all liabilities of the Debtors, their Estates, and all successors thereto. As provided in section 524 of the Bankruptcy Code, such discharge shall void any judgment against the Debtors, their Estates, or any successor thereto at any time obtained to the extent it relates to a Claim discharged, and operates as an injunction against the prosecution of any action against the Reorganized Debtors or property of the Debtors or their Estates to the extent it relates to a discharged Claim.

### 17.9. Notices.

Any notices, requests, and demands required or permitted to be provided under the Plan, in order to be effective, shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

Centaur, LLC
Attention: Kurt Wilson, Executive Vice President, Chief Financial Officer,
 Treasurer and Secretary
10 West Market Street, Suite 200
Indianapolis, Indiana 46204
Telephone: (317) 656-8785
Facsimile: (317) 656-8780

and

White & Case LLP
Attention:  Gerard Uzzi
1155 Avenue of the Americas
New York, New York  10036
Telephone:  (212) 819-8200
Facsimile:  (212) 354-8113

and

Fox Rothschild LLP
Attn:  Jeffrey M. Schlerf
919 North Market Street, Suite 1600
Wilmington Delaware  19801
Telephone:  (302) 654-7444
Facsimile:  (302) 656-8920

### 17.10. <u>Headings</u>.

The headings used in the Plan are inserted for convenience only, and neither constitute a portion of the Plan nor in any manner affect the construction of the provisions of the Plan.

### 17.11. <u>Governing Law</u>.

Unless a rule of law or procedure is supplied by federal law (<u>including</u> the Bankruptcy Code and the Bankruptcy Rules), the laws of the State of Delaware, without giving effect to the conflicts of laws principles thereof, shall govern the construction of the Plan and any agreements, documents, and instruments executed in connection with the Plan, <u>except</u> as otherwise expressly provided in such instruments, agreements or documents.

### 17.12. <u>Expedited Determination</u>.

The Disbursing Agent is hereby authorized to file a request for expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed with respect to the Debtors.

### 17.13. <u>Exemption from Transfer Taxes</u>.

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, lien, pledge, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

NEWYORK 7413506 (2K)

### 17.14. <u>Retiree Benefits</u>.

Pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

### 17.15. <u>Notice of Entry of Confirmation Order and Relevant Dates</u>.

Promptly upon entry of the Confirmation Order, the Debtors shall publish as directed by the Bankruptcy Court and serve on all known parties in interest and holders of Claims and Equity Interests, notice of the entry of the Confirmation Order and all relevant deadlines and dates under the Plan.

### 17.16. <u>Interest and Attorneys' Fees</u>.

Interest accrued after the Petition Date will accrue and be paid on Claims only to the extent specifically provided for in the Plan, the Confirmation Order or as otherwise required by the Bankruptcy Court or by applicable law.

<u>Except</u> as set forth in the Plan or as ordered by the Bankruptcy Court, no award or reimbursement of attorneys' fees or related expenses or disbursements shall be allowed on, or in connection with, any Claim.

### 17.17. <u>Modification of the Plan</u>.

As provided in section 1127 of the Bankruptcy Code, modification of the Plan may be proposed in writing by the Debtors at any time before confirmation, <u>provided</u> that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors shall have complied with section 1125 of the Bankruptcy Code. The Debtors may modify the Plan at any time after confirmation and before substantial consummation, <u>provided</u> that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified, under section 1129 of the Bankruptcy Code, and the circumstances warrant such modifications, <u>provided further</u>, that any modification of the Plan between the Confirmation Date and the Effective Date shall be subject to the satisfaction of the Consenting First Lien Claimholders. A holder of a Claim that has accepted the Plan shall be deemed to have accepted such Plan as modified if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Claim or Equity Interest of such holder.

### 17.18. <u>Revocation of Plan</u>.

The Debtors reserve the right to revoke and withdraw the Plan or to adjourn the Confirmation Hearing with respect to any one or more of the Debtors prior to the occurrence of the Effective Date. If the Debtors revoke or withdraw the Plan with respect to any one or more of the Debtors, or if the Effective Date does not occur as to any Debtor, then, as to such Debtor, the Plan and all settlements and compromises set forth in the Plan and not otherwise approved by a separate Final Order shall be deemed null and void and nothing contained herein and no acts taken in preparation for consummation of the Plan shall be deemed to constitute a waiver or

NEWYORK 7413506 (2K)

release of any Claims against or Equity Interests in such Debtor or to prejudice in any manner the rights of any of the Debtors or any other Person in any other further proceedings involving such Debtor.

In the event that the Debtors choose to adjourn the Confirmation Hearing with respect to any one or more of the Debtors, the Debtors reserve the right to proceed with confirmation of the Plan with respect to those Debtors in relation to which the Confirmation Hearing has not been adjourned. With respect to those Debtors with respect to which the Confirmation Hearing has been adjourned, the Debtors reserve the right to amend, modify, revoke, or withdraw the Plan and/or submit any new plan of reorganization at such times and in such manner as they consider appropriate, subject to the provisions of the Bankruptcy Code.

### 17.19. **Setoff Rights.**

In the event that any Debtor has a Claim of any nature whatsoever against the holder of a Claim against such Debtor, then such Debtor may, but is not required to, set off against the Claim (and any payments or other Plan Distributions to be made in respect of such Claim hereunder) such Debtor's Claim against such holder, subject to section 553 of the Bankruptcy Code. Neither the failure to set off nor the allowance of any Claim under the Plan shall constitute a waiver or release of any Claims that any Debtor may have against the holder of any Claim.

### 17.20. **Compliance with Tax Requirements.**

In connection with the Plan, the Debtors and the Disbursing Agent, as applicable, shall comply with all withholding and reporting requirements imposed by federal, state, local, and foreign taxing authorities and all Plan Distributions hereunder shall be subject to such withholding and reporting requirements. Notwithstanding the above, each holder of an Allowed Claim or Equity Interest that is to receive a Plan Distribution shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any government unit upon it, including income, withholding, and other tax obligations, on account of such Plan Distribution, and no holder of an Allowed Claim or Equity Interest shall have responsibility for the satisfaction and payment of any tax obligations imposed by any government unit upon any other holder of an Allowed Claim or Equity Interest. The Disbursing Agent has the right, but not the obligation, to not make a Plan Distribution until such holder has made arrangements satisfactory to the Disbursing Agent for payment of any such tax obligations.

### 17.21. **Rates.**

The Plan does not provide for the change of any rate that is within the jurisdiction of any governmental regulatory commission after the occurrence of the Effective Date.

### 17.22. **Injunctions.**

**On the Effective Date and except as otherwise provided herein, all Persons who have been, are, or may be holders of Claims against or Equity Interests in the Debtors shall be permanently enjoined from taking any of the following actions against or affecting the Debtors, the Reorganized Debtors, the Estates, the Assets, the Disbursing Agent, or any**

of the Released Persons, or their respective assets and property, with respect to such Claims or Equity Interests (other than actions brought to enforce any rights or obligations under the Plan):

(i)     commencing, conducting or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, all suits, actions, and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice);

(ii)     enforcing, levying, attaching, collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order;

(iii)     creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance; and

(iv)     asserting any setoff, right of subrogation or recoupment of any kind; provided, that any defenses, offsets or counterclaims which the Debtors may have or assert in respect of the above referenced Claims are fully preserved in accordance with Section 17.19.

  17.23. **Binding Effect**.

The Plan shall be binding upon the Reorganized Debtors, the holders of all Claims and Equity Interests, parties in interest, Persons, and Entities, and their respective successors and assigns.  To the extent any provision of the Disclosure Statement or any other solicitation document may be inconsistent with the terms of the Plan, the terms of the Plan shall be binding and conclusive.

  17.24. **Severability**.

IN THE EVENT THE BANKRUPTCY COURT DETERMINES THAT ANY PROVISION OF THE PLAN IS UNENFORCEABLE EITHER ON ITS FACE OR AS APPLIED TO ANY CLAIM OR EQUITY INTEREST OR TRANSACTION, THE DEBTORS MAY MODIFY THE PLAN IN ACCORDANCE WITH SECTION 17.17 SO THAT SUCH PROVISION SHALL NOT BE APPLICABLE TO THE HOLDER OF ANY SUCH CLAIM OR EQUITY INTEREST OR TRANSACTION.  SUCH A DETERMINATION OF UNENFORCEABILITY SHALL NOT (A) LIMIT OR AFFECT THE ENFORCEABILITY AND OPERATIVE EFFECT OF ANY OTHER PROVISION OF THE PLAN OR (B) REQUIRE THE RESOLICITATION OF ANY ACCEPTANCE OR REJECTION OF THE PLAN.

  17.25. **No Admissions**.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER CAUSES OF ACTION OR THREATENED CAUSES OF ACTIONS, THE PLAN SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT

**MADE IN SETTLEMENT NEGOTIATIONS. THE PLAN SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, AND OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTORS OR THEIR AFFILIATES, AS DEBTORS AND DEBTORS-IN-POSSESSION IN THESE CHAPTER 11 CASES.**

   **17.26. <u>Dissolution of the Committee</u>.**

   Effective on the Effective Date, the Committee shall dissolve automatically, whereupon its members, professionals, and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, <u>except</u> with respect to (a) applications for Fee Claims or reimbursement of expenses incurred as a member of the Committee, and (b) any motions or other actions seeking enforcement or implementation of the provisions of the Plan or the Confirmation Order or pending appeals of orders entered in the Chapter 11 Cases.

   **17.27. <u>Potential Exclusion of the Pennsylvania Debtors and/or Centaur Colorado, LLC from the Plan</u>.**

   The Debtors reserve the right to (a) amend the Plan to treat the Pennsylvania Debtors and/or Centaur Colorado, LLC separately from the Indiana Debtors and Centaur, LLC and (b) adjourn the confirmation hearing in respect of the Plan as to the Pennsylvania Debtors and/or Centaur Colorado, LLC until further notice or order of the Bankruptcy Court. If this occurs, the Confirmation Order shall (i) authorize NewCo or its subsidiaries to operate the businesses of, and provide debtor-in-possession financing, protected to the fullest extent permitted under sections 364(c) and (d) of the Bankruptcy Code, to the Pennsylvania Debtors and/or Centaur Colorado, LLC and (ii) provide an extension of the periods in which the Pennsylvania Debtors and/or Centaur Colorado, LLC possess or possesses, as applicable, the exclusive right to file a plan of reorganization and solicit acceptances thereto for an additional 180 days without prejudice to the rights of the Pennsylvania Debtors and/or Centaur Colorado, LLC to seek additional extensions or the rights of parties in interest to seek to shorten or terminate such exclusive periods. Such amendment shall be without prejudice to the Pennsylvania Debtors and/or Centaur Colorado, LLC to further amend, modify, or revoke the Plan and/or submit any new plan of reorganization as it relates to the Pennsylvania Debtors and/or Centaur Colorado, LLC.

   **17.28. <u>Indemnification of the Prepetition First Lien Agent</u>.**

   From and at all times following the Effective Date, (a) each of NewCo and the Reorganized Debtors shall (and shall cause each of their present and future subsidiaries to), jointly and severally, and (b) each holder of an Allowed First Lien Claim (in the proportion that such holder's First Lien Claim bears to the total Allowed First Lien Claims but, subject thereto, jointly and severally with each Person specified in (a)), shall, on demand, advance and indemnify the Prepetition First Lien Agent and its respective officers, directors, principals, shareholders, parents, subsidiaries, members, auditors, accountants, financial advisors, predecessors, successors, servants, employees, agents, counsel, attorneys, partners, insurers, underwriters,

administrators, executors, representatives or assigns against all Causes of Action and against all costs, liabilities, damages, obligations, expenses and disbursements (<u>including</u>, without limitation, the payment of any attorney or other advisory fees) and any duties, taxes and charges incurred or suffered by or awarded against them related to, in connection with or arising out of the performance by them of any actions required or contemplated by the Plan (including the implementation of any transactions contemplated by the Plan), the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan, <u>except</u> for gross negligence or willful misconduct as determined by Final Order of the Bankruptcy Court.

NEWYORK 7413506 (2K)

Dated:  March 28, 2010                    Respectfully submitted,

**Centaur PA Land, LP**

By:  Centaur PA Land General Partner, LP,
    its general partner

 By:  Centaur PA Land Management, LLC,
     its general partner

 By:  Centaur, LLC, its manager

  By:   /s/ Kurt E. Wilson

      Name:  Kurt E. Wilson
      Title:  Executive Vice President, Chief
        Financial Officer, Treasurer and
        Secretary

Centaur, LLC

  By:   /s/ Kurt E. Wilson
      Name:  Kurt E. Wilson
      Title:  Executive Vice President, Chief
        Financial Officer, Treasurer and
        Secretary

**Centaur Colorado, LLC**

By:  Centaur, LLC, its manager

  By:   /s/ Kurt E. Wilson
      Name:  Kurt E. Wilson
      Title:  Executive Vice President, Chief
        Financial Officer, Treasurer and
        Secretary

**Centaur Indiana, LLC**

By:  Centaur, LLC, its manager

  By:   /s/ Kurt E. Wilson
      Name:  Kurt E. Wilson
      Title:  Executive Vice President, Chief
        Financial Officer, Treasurer and
        Secretary

NEWYORK 7413506 (2K)

**Centaur Racing, LLC**

By: Centaur, LLC, its manager

  By:   /s/ Kurt E. Wilson
         Name:  Kurt E. Wilson
         Title:  Executive Vice President, Chief Financial Officer, Treasurer and Secretary

**Hoosier Park, L.P.**

By: Centaur Indiana, LLC, its general partner

 By: Centaur, LLC, its manager

  By:   /s/ Kurt E. Wilson
         Name:  Kurt E. Wilson
         Title:  Executive Vice President, Chief Financial Officer, Treasurer and Secretary

**HP Dining & Entertainment, LLC**

By: Centaur, LLC, its manager

  By:   /s/ Kurt E. Wilson
         Name:  Kurt E. Wilson
         Title:  Executive Vice President, Chief Financial Officer, Treasurer and Secretary

**Centaur Pennsylvania, LLC**

By: Centaur, LLC, its manager

  By:   /s/ Kurt E. Wilson
         Name:  Kurt E. Wilson
         Title:  Executive Vice President, Chief Financial Officer, Treasurer and Secretary

**VVD Properties General Partner, LLC**

By: Centaur, LLC, its manager

  By:   /s/ Kurt E. Wilson
         Name: Kurt E. Wilson
         Title: Executive Vice President, Chief
               Financial Officer, Treasurer and
               Secretary

**Valley View Downs GP, LLC**

By: Centaur, LLC, its manager

  By:   /s/ Kurt E. Wilson
         Name: Kurt E. Wilson
         Title: Executive Vice President, Chief
               Financial Officer, Treasurer and
               Secretary

**Valley View Downs, LP**

By: Valley View Downs GP, LLC, its
     general partner

  By: Centaur, LLC, its manager

  By:   /s/ Kurt E. Wilson
         Name: Kurt E. Wilson
         Title: Executive Vice President, Chief
               Financial Officer, Treasurer and
               Secretary

**VVD Properties, LP**

By: VVD Properties General Partner, LLC,
     its general partner

  By: Centaur, LLC, its manager

  By:   /s/ Kurt E. Wilson
         Name: Kurt E. Wilson
         Title: Executive Vice President, Chief
               Financial Officer, Treasurer and
               Secretary

NEWYORK 7413506 (2K)

**Centaur PA Land General Partner, LP**

By:  Centaur PA Land Management, LLC,
       its general partner

 By:  Centaur, LLC, its manager

  By:   /s/ Kurt E. Wilson
             Name:  Kurt E. Wilson
             Title:  Executive Vice President, Chief
                       Financial Officer, Treasurer and
                       Secretary

**Centaur PA Land Management, LLC**

By:  Centaur, LLC, its manager

 By:   /s/ Kurt E. Wilson
           Name:  Kurt E. Wilson
           Title:  Executive Vice President, Chief
                     Financial Officer, Treasurer and
                     Secretary

50

# EXHIBIT "A"

| DEBTORS | |
|---|---|
| **1.** | **Centaur PA Land, LP** |
| 2. | Valley View Downs, LP |
| **3.** | **Centaur, LLC** |
| 4. | Centaur Colorado, LLC |
| **5.** | **Centaur Indiana, LLC** |
| 6. | Centaur Racing, LLC |
| **7.** | **Hoosier Park, LP** |
| 8. | HP Dining & Entertainment, LLC |
| **9.** | **Centaur Pennsylvania, LLC** |
| 10. | VVD Properties General Partner, LLC |
| **11.** | **Valley View Downs GP, LLC** |
| 12. | VVD Properties, LP |
| **13.** | **Centaur PA Land General Partner, LP** |
| 14. | Centaur PA Land Management, LLC |

# EXHIBIT "B"

## PROJECTIONS AND SUMMARY OF SIGNIFICANT ASSUMPTIONS

[TO COME]

# EXHIBIT "C"

# PRO FORMA STATEMENTS

[TO COME]

# EXHIBIT "D"

## TERMS OF FIRST LIEN TAKE BACK PAPER

[TO COME]

# EXHIBIT "E"

# TERMS OF NEWCO PIK NOTES

[TO COME]

# EXHIBIT "F"

# TERMS OF NEWCO WARRANTS

[TO COME]

# EXHIBIT "G"

# LIQUIDATION ANALYSIS

[TO COME]

# EXHIBIT "H"

## TERMS OF NEWCO OPERATING AGREEMENT

[TO COME]