# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **In re** | : **Chapter 11** |
| | : |
| **CENTAUR, LLC, et al.,**[1] | : **Case No. 10-10799 (KJC)** |
| | : |
| **Debtors.** | : **(Jointly Administered)** |
| | : |

---

## DISCLOSURE STATEMENT RELATING TO
## THE FOURTH AMENDED JOINT CHAPTER 11 PLAN OF
## REORGANIZATION FOR CENTAUR, LLC AND ITS AFFILIATED DEBTORS

---

Dated: September 3, 2010

WHITE & CASE LLP     -and-     FOX ROTHSCHILD LLP

| | |
|---|---|
| WHITE & CASE LLP | FOX ROTHSCHILD LLP |
| Gerard H. Uzzi (admitted pro hac vice) | Jeffrey M. Schlerf (No. 3047) |
| 1155 Avenue of the Americas | Eric M. Sutty (No. 4007) |
| New York, New York 10036 | Jay H. Strock (No. 4965) |
| (212) 819-8200 | 919 North Market Street, Suite 1600 |
| | Wilmington, Delaware 19801 |
| Michael C. Shepherd (admitted pro hac vice) | (302) 654-7444 |
| Lane E. Begy (admitted pro hac vice) | |
| 200 South Biscayne Boulevard, Suite 4900 | |
| Miami, Florida 33131 | |
| (305) 371-2700 | |

ATTORNEYS FOR THE DEBTORS AND DEBTORS-IN-POSSESSION

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE (THE "BANKRUPTCY COURT") UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE FOR USE IN THE SOLICITATION OF ACCEPTANCES OF THE PLAN DESCRIBED HEREIN. ACCORDINGLY, THE FILING AND DISTRIBUTION OF THIS DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS A SOLICITATION OF ACCEPTANCES OF SUCH PLAN. THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON FOR ANY PURPOSE BEFORE A DETERMINATION BY THE BANKRUPTCY COURT THAT THIS DISCLOSURE STATEMENT CONTAINS "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE.[2]

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, if applicable, are: Centaur, LLC (8148); Centaur Colorado, LLC (9131); Centaur Indiana, LLC; Centaur Racing, LLC; Hoosier Park, L.P. (0820); HP Dining & Entertainment, LLC; Centaur Pennsylvania, LLC; VVD Properties General Partner, LLC; Valley View Downs GP, LLC; VVD Properties, LP (6808); Valley View Downs, LP (1028); Centaur PA Land Management, LLC; Centaur PA Land General Partner, LP; and Centaur PA Land, LP. Debtors Centaur PA Land, LP and Valley View Downs, LP (the "Valley View Downs Debtors") filed their chapter 11 petitions on October 28, 2009. The remaining Debtors (the "Centaur Debtors") filed their chapter 11 petitions on March 6, 2010.

[2]     Legend to be removed upon entry by the Clerk of the Bankruptcy Court of Order of the Bankruptcy Court approving this Disclosure Statement.

# TABLE OF CONTENTS

Page

I. INTRODUCTION ...........................................................................................................1

II. NOTICE TO HOLDERS OF CLAIMS AND EQUITY INTERESTS.......................................2

III. EXPLANATION OF CHAPTER 11 ................................................................................4

IV. OVERVIEW OF THE PLAN............................................................................................4

    A.      Summary of the Terms of the Plan ........................................................................4

    B.      Summary of Distributions Under the Plan..............................................................8

    C.      Intercompany Claims Against the Debtors ...........................................................21

V. GENERAL INFORMATION ...........................................................................................24

    A.      The Businesses of the Debtors.............................................................................25

    B.      Management.......................................................................................................26

    C.      Prepetition Capital Structure...............................................................................26

                (a)      First Lien Debt ......................................................................................27

                (b)      Second Lien Debt...................................................................................28

                (c)      Pennsylvania Cash Collateralized L/C.....................................................28

    D.      Events Leading to the Commencement of the Chapter 11 Cases ...........................33

VI. THE REORGANIZED COMPANY ..................................................................................34

VII. SELECTED FINANCIAL INFORMATION ......................................................................35

    A.      Consolidated Unaudited Annual Financial Information for the Debtors...............35

VIII. FINANCIAL PROJECTIONS AND ASSUMPTIONS; VALUATION...............................38

    A.      Purpose and Objectives.......................................................................................38

    B.      Consolidated Pro Forma Statement of Financial Position .....................................39

    C.      Valuation...........................................................................................................39

                (a)      Reorganized Enterprise Value ................................................................40

|  |  | (b) | Reorganized Equity Value | 42 |

IX. THE CHAPTER 11 CASES ........................................................................................43

A. Commencement of the Chapter 11 Cases ..............................................................43

B. Continuation of Business after the Petition Date ..................................................43

    (a) Letter of Credit ..............................................................................................43

    (b) Intercompany Financing ...............................................................................44

    (c) Use of Cash Collateral .................................................................................45

    (d) Business Operations and Bankruptcy-Related Relief...................................45

C. Representation of the Debtors................................................................................48

D. Formation and Representation of the Committee ..................................................49

E. Representation of the First Lien Lenders...............................................................49

F. Representation of the Second Lien Lenders ..........................................................49

G. Matters Relating to Unexpired Leases and Executory Contracts ..........................49

H. Exclusivity ............................................................................................................50

I. Schedules, Bar Date and Section 503(b)(9) Bar Date...........................................50

J. Claim Objections ...................................................................................................51

K. Motion to Convert the Valley View Downs Debtors' Chapter 11 Cases to Cases Under Chapter 7 of the Bankruptcy Code ..................................................51

L. The Mediation........................................................................................................52

M. The Fortune Valley Sale Motion............................................................................54

N. The Committee's Motion for Standing ..................................................................55

O. Objection to PREIT's Claims ................................................................................57

P. VVD Transfer Motion............................................................................................58

Q. Prepetition First Lien Agent's Stay Relief Motion................................................59

X. THE CHAPTER 11 PLAN ........................................................................................60

A. Introduction...........................................................................................................60

B.    General Description of the Treatment of Claims and Equity Interests ................... 60

    (a)    Unclassified Claims ....................................................................... 60

    (b)    Treatment of Administrative Expense Claims and Intercompany Financing Claims ........................................................................ 60

    (c)    Treatment of Priority Tax Claims ................................................. 62

    (d)    Classified Claims and Equity Interests ....................................... 63

C.    Treatment of Claims and Equity Interests ............................................... 63

D.    Acceptance or Rejection of the Plan; Effect of Rejection by One or More Classes of Claims ................................................................................... 64

    (a)    Classes Entitled to Vote ............................................................... 64

    (b)    Class Acceptance Requirement .................................................... 64

    (c)    Tabulation of Votes on a Non-Consolidated Basis ...................... 64

    (d)    Cramdown .................................................................................... 64

    (e)    Feasibility .................................................................................... 64

    (f)    Confirmation of All Cases ........................................................... 64

E.    Means of Implementation of the Plan ..................................................... 65

    (a)    Operations between the Confirmation Date and the Effective Date .......... 65

    (b)    Certain Transactions on or Prior to the Effective Date ............... 65

    (c)    Corporate Action ......................................................................... 74

    (d)    Termination of Certain Debt Obligations .................................... 75

    (e)    Continued Corporate Existence ................................................... 75

    (f)    Re-vesting of Assets ..................................................................... 75

    (g)    Initial Managers and General Partners ........................................ 75

    (h)    Officers ........................................................................................ 76

    (i)    Retention of Causes of Action/Reservation of Rights ................ 76

    (j)    Appointment of the Disbursing Agent ........................................ 77

|     | (k) | Alternative Sale in the Event of Failure to Obtain Regulatory Consents, Authorizations and Approvals....................................................77 |

| F.  |     | Litigation Trust ...........................................................................................78 |

|     | (a) | The Designated Avoidance Actions...........................................................78 |
|     | (b) | Creation of the Litigation Trust and Appointment of the Litigation Trustee......................................................................................................79 |
|     | (c) | Property of the Litigation Trust ................................................................80 |
|     | (d) | Purpose of the Litigation Trust .................................................................80 |
|     | (e) | Powers of the Litigation Trustee...............................................................81 |
|     | (f) | Cooperation Between the Litigation Trustee and the Disbursing Agent.........................................................................................................81 |
|     | (g) | Distributions from the Litigation Trust.....................................................81 |
|     | (h) | Termination of the Litigation Trust ..........................................................82 |

| G.  |     | Management Incentive Plan.................................................................................82 |

| H.  |     | Distribution Provisions ........................................................................................82 |

|     | (a) | Plan Distributions.....................................................................................82 |
|     | (b) | Timing of Plan Distributions ....................................................................83 |
|     | (c) | Surrender and Cancellation of Instruments................................................83 |

| I.  |     | Procedures for Resolving and Treating Contested Claims ....................................84 |

|     | (a) | Objection Deadline ...................................................................................84 |
|     | (b) | Prosecution of Contested Claims...............................................................84 |
|     | (c) | Claims Settlement .....................................................................................84 |
|     | (d) | Entitlement to Plan Distributions Upon Allowance....................................84 |
|     | (e) | Contested Claims Reserve .........................................................................84 |
|     | (f) | Estimation of Claims.................................................................................84 |
|     | (g) | No Recourse Against the Debtors or the Reorganized Debtors.................85 |

| | | |
|---|---|---|
| J. | Conditions Precedent to Confirmation of Plan | 85 |
| K. | Conditions Precedent to Occurrence of the Effective Date | 86 |
| L. | Waiver of Conditions | 87 |
| M. | Effect of Non-Occurrence of the Effective Date | 87 |
| N. | Exculpation of Debtors and Released Persons | 87 |
| O. | Releases by the Debtors | 87 |
| P. | Release of Released Persons by Other Released Persons | 88 |
| Q. | Indemnification of the Prepetition First Lien Agent | 89 |
| R. | Additional Disclosure Regarding Releases and Indemnification | 89 |
| S. | Executory Contracts and Unexpired Leases | 92 |
| | (a) Executory Contracts and Unexpired Leases | 92 |
| | (b) Assumption and Rejection of Executory Contracts and Unexpired Leases | 92 |
| | (c) Cure | 93 |
| | (d) Claims Arising from Rejected Contracts | 94 |
| T. | Retention of Jurisdiction | 95 |
| U. | Other Material Provisions of the Plan | 95 |
| | (a) Payment of Statutory Fees | 95 |
| | (b) Satisfaction of Claims | 95 |
| | (c) Third Party Agreements; Subordination | 95 |
| | (d) Discharge of Liabilities | 96 |
| | (e) Discharge of Debtors | 96 |
| | (f) Exemption from Transfer Taxes | 97 |
| | (g) Retiree Benefits | 97 |
| | (h) Interest and Attorneys' Fees | 97 |
| | (i) Modification of the Plan | 97 |

(j) Revocation of the Plan ..................................................................98

(k) Setoff Rights ...............................................................................98

(l) Compliance with Tax Requirements...........................................98

(m) Injunctions.................................................................................99

(n) Binding Effect............................................................................99

(o) Severability ...............................................................................99

(p) No Admissions.........................................................................100

(q) Dissolution of the Committee .................................................100

(r) Potential Exclusion of the Pennsylvania Debtors from the Plan .............100

(s) Plan Controls...........................................................................101

XI. RISK FACTORS .......................................................................................101

A. Certain Bankruptcy Considerations ....................................................101

B. The Reorganized Debtors' Actual Financial Results may Vary Significantly from the Projections Included in this Disclosure Statement.................................101

C. Plan Consideration Reserved for Contested Claims may be Insufficient to Satisfy all Secured Claims upon Liquidation.......................................................101

D. The Face Amount of the NewCo PIK Notes may be Reduced to Satisfy Regulatory Requirements as to the Equity Value of the Reorganized Debtors...102

E. Resolution of Certain Churchill Downs Claims may Result in the Dilution of Recoveries of Holders of Allowed First Lien Claims...........................................102

F. The Reorganized Debtors may not be Able to Raise Additional Financing on Terms Favorable to the Debtors.........................................................................104

G. State Horse Racing and Gaming Laws and Regulations will Require that Holders of NewCo Membership Interests Become Licensed...............................104

H. Consummation of the Plan may Result in a Small Number of Holders Owing a Significant Percentage of the NewCo Membership Interests ...........................104

I. Potential Changes in Legislation and Regulation ................................104

J. Taxation and Fees ...............................................................................105

K.    The Debtors Could Lose Key Employees, Including Certain Members of the Existing Management ............................................................................................... 105

L.    No Market Exists for the Claim Securities ............................................................ 105

M.   If the Prepetition Second Lien Agent's Objection to the Inclusion of the Convenience Class in the Plan is Sustained, the Debtors will Remove the Convenience Class and Seek to Cramdown the Plan ............................................ 106

XII. SECURITIES LAW MATTERS ............................................................................................ 106

A.    Issuance of Claim Securities ................................................................................. 106

B.    Subsequent Transfers of Claim Securities ........................................................... 107

    (a)    Section 1145 of the Bankruptcy Code ..................................................... 107

    (b)    Resales of Claim Securities/Rule 144, Rule 144A, "Section 4(1½) Exemption" and Regulation S ................................................................. 108

    (c)    Legending of Claim Securities in Certain Cases ...................................... 110

C.    Delivery of Disclosure Statement ......................................................................... 111

XIII. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES ....................................... 111

A.    U.S. Federal Income Tax Consequences to the Debtors, Holders of Class 8 – Intercompany Claims, Holders of Class 9 – Equity Interests and Centaur, Inc ... 113

B.    U.S. Federal Income Tax Treatment of the Litigation Trust ................................ 113

C.    U.S. Federal Income Tax Consequences to the Holders of Allowed Claims That Are Paid in Cash in Full ............................................................................... 114

D.    U.S. Federal Income Tax Consequences if the Exchange to Holders of Allowed Claims That Are Paid Using Consideration Other Than Solely Cash .. 115

    (a)    Holders of Class 2 – Allowed First Lien Secured Claims ....................... 115

    (b)    Holders of Class 3 – Second Lien Claims and Holders of Class 5 – Valley View Downs Unsecured Claims ................................................... 116

    (c)    Holders of Class 1 – Priority Non-Tax Claims and Class 4 – Other Secured Claims .......................................................................................... 116

    (d)    Accrued but Unpaid Interest ..................................................................... 117

    (e)    Market Discount ........................................................................................ 117

    E.    Consequences of Ownership of NewCo Membership Interests, First Lien Take Back Paper, Units, NewCo PIK Notes and Litigation Trust Interests Issued Pursuant to the Plan ................................................................... 117

        (a)    U.S. Holders ............................................................................. 117

        (b)    Non-U.S. Holders ...................................................................... 123

    F.    Information Reporting and Backup Withholding ................................. 126

XIV. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ................................................................................................................ 126

    A.    Liquidation Under Chapter 7 of the Bankruptcy Code ........................ 126

    B.    Alternative Plans of Reorganization ................................................. 127

XV. CONCLUSION ................................................................................................ 128

## SCHEDULES AND EXHIBITS

List of Debtors .................................................................................................................Schedule 1

List of Assumed Executory Contracts and Unexpired Leases ..........................................Schedule 2

Chapter 11 Plan of Reorganization ................................................................................ Exhibit "A"

Projections and Summary of Significant Assumptions Related Thereto....................Exhibit "B"

Pro Forma Statements.................................................................................................... Exhibit "C"

Terms of First Lien Take Back Paper ........................................................................ Exhibit "D"

Terms of NewCo PIK Notes......................................................................................... Exhibit "E"

Terms of NewCo Warrants ........................................................................................... Exhibit "F"

Liquidation Analysis..................................................................................................... Exhibit "G"

Terms of NewCo Operating Agreement ...................................................................... Exhibit "H"

Designated Avoidance Actions...................................................................................... Exhibit "I"

# I.

## INTRODUCTION

**All capitalized terms used in this Disclosure Statement and not otherwise defined herein shall have the meanings ascribed thereto in the Fourth Amended Joint Chapter 11 Plan of Reorganization, dated September 3, 2010 (the "Plan") (see Article I of the Plan entitled "Definitions").**

THIS DISCLOSURE STATEMENT INCLUDES AND DESCRIBES THE PLAN, A COPY OF WHICH IS ATTACHED HERETO AS EXHIBIT "A", FILED BY CENTAUR, LLC AND ITS AFFILIATED DEBTORS LISTED IN SCHEDULE 1 (THE "DEBTORS"). OTHER THAN CLASS 1 – PRIORITY NON-TAX CLAIMS AND CLASS 4 – OTHER SECURED CLAIMS, WHICH ARE UNIMPAIRED UNDER THE PLAN AND ARE THEREFORE DEEMED TO HAVE ACCEPTED THE PLAN, AND CLASS 9 – EQUITY INTERESTS, WHICH ARE NOT ENTITLED TO A DISTRIBUTION UNDER THE PLAN AND ARE THEREFORE DEEMED TO HAVE REJECTED THE PLAN, ALL CLASSES ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN. ACCORDINGLY, THE DEBTORS ARE SOLICITING ACCEPTANCES OF THE PLAN FROM THE HOLDERS OF ALL CLAIMS AND INTERESTS, OTHER THAN THOSE HOLDING CLASS 1 – PRIORITY NON-TAX CLAIMS, CLASS 4 – OTHER SECURED CLAIMS AND CLASS 9 – EQUITY INTERESTS.

THE DEBTORS BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF AND PROVIDES THE HIGHEST AND MOST EXPEDITIOUS RECOVERIES TO HOLDERS OF ALL CLASSES OF CLAIMS AND EQUITY INTERESTS. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN ARE URGED TO VOTE IN FAVOR OF THE PLAN. TO BE COUNTED, YOUR BALLOT MUST BE DULY COMPLETED, EXECUTED AND RECEIVED BY **4:00 P.M., EASTERN TIME, ON [_____ \_\_], 2010** (THE "VOTING DEADLINE"). FOR THE AVOIDANCE OF DOUBT, THE DEBTORS RESERVE THE RIGHT TO OBJECT TO CLAIMS AFTER THE VOTING DEADLINE. MOREOVER, FOR THE AVOIDANCE OF DOUBT, IT IS POSSIBLE THAT HOLDERS OF CLAIMS, INCLUDING GENERAL UNSECURED CLAIMS, THAT DO NOT APPEAR ON THE DEBTORS' SCHEDULES AND ARE NOT ALLOWED CLAIMS, WILL NOT RECEIVE A DISTRIBUTION ON ACCOUNT OF SUCH CLAIMS UNTIL THE EXPIRATION OF THE TIME PERIOD WITHIN WHICH THE REORGANIZED DEBTORS MAY OBJECT TO CLAIMS REFERENCED IN "THE CHAPTER 11 PLAN – PROCEDURES FOR RESOLVING AND TREATING CONTESTED CLAIMS."

FOR YOUR ESTIMATED PERCENTAGE RECOVERY UNDER THE PLAN, PLEASE SEE THE CHART SET OUT IN "OVERVIEW OF THE PLAN – SUMMARY OF DISTRIBUTIONS UNDER THE PLAN."

THE COMMITTEE AND THE PREPETITION SECOND LIEN AGENT DO NOT SUPPORT THE PLAN AND WILL RECOMMEND THAT HOLDERS OF CLAIMS IN CLASSES 3, 5 AND 6 VOTE TO REJECT THE PLAN.[3]

## II.

### NOTICE TO HOLDERS OF CLAIMS AND EQUITY INTERESTS

The purpose of this Disclosure Statement is to enable you, as a creditor whose Claim is impaired under the Plan, to make an informed decision in exercising your right to accept or reject the Plan.

**THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN. PLEASE READ THIS DOCUMENT WITH CARE.**

**PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.**

**AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THE DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT**

---

[3] Various statements included herein and attributed to the Committee and the Prepetition Second Lien Agent represent the positions of the Committee and the Prepetition Second Lien Agent, respectively, and do not reflect the Debtors' positions and shall not be deemed admissions by the Debtors.

2

OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THE DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS AND DEBTORS-IN-POSSESSION IN THESE CHAPTER 11 CASES.

Each holder of a Claim entitled to vote to accept or reject the Plan should read this Disclosure Statement and the Plan in their entirety before voting. No solicitation of votes to accept or reject the Plan may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. Except for the Debtors and certain of the Professionals the Debtors have retained, no person has been authorized to use or promulgate any information concerning the Debtors, their businesses, or the Plan other than the information contained in this Disclosure Statement and if given or made, such information may not be relied upon as having been authorized by the Debtors. You should not rely on any information relating to the Debtors, their businesses, or the Plan other than that contained in this Disclosure Statement and the exhibits hereto.

After carefully reviewing this Disclosure Statement, including the attached exhibits, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed Ballot and return the same to the address set forth on the Ballot, in the enclosed, postage prepaid, return envelope so that it will be received by the Balloting Agent, no later than the Voting Deadline.

## DO NOT RETURN ANY OTHER DOCUMENTS WITH YOUR BALLOT.

You may be bound by the Plan if it is accepted by the requisite holders of Claims even if you do not vote to accept the Plan, or if you are the holder of an unimpaired Claim.

Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a Confirmation Hearing on [_____ __], 2010 at [__]:[__] [__].m., Eastern Time, before the Honorable Kevin J. Carey, Chief United States Bankruptcy Judge. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed and served on or before [_____ __], 2010 at 4:00 p.m. Eastern Time, in the manner described in the related order.

## THE DEBTORS SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF IMPAIRED CLAIMS TO ACCEPT THE PLAN.

## THE DEBTORS BELIEVE THAT AT LEAST A MAJORITY OF THE PREPETITION FIRST LIEN CLAIMHOLDERS SUPPORT THE PLAN. THE DEBTORS ANTICIPATE THE CLASS 2 – FIRST LIEN CLAIMS WILL VOTE TO ACCEPT THE PLAN PURSUANT TO SECTION 1126(c) OF THE BANKRUPTCY CODE.

3

## III.

## EXPLANATION OF CHAPTER 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code, pursuant to which a debtor-in-possession may reorganize its business for the benefit of its creditors, equity holders, and other parties in interest. The formulation of a plan of reorganization is the principal purpose of a chapter 11 case. The plan sets forth the means for satisfying the holders of claims against and interests in the debtor's estate.

Although referred to as a plan of reorganization, a plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of a debtor's assets. In either event, upon confirmation of the plan, it becomes binding on a debtor and all of its creditors and equity holders, and the obligations owed by a debtor to such parties are compromised and exchanged for the obligations specified in the plan.

After a plan of reorganization has been filed, the holders of impaired claims against and interests in a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires the debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. **This Disclosure Statement is presented to holders of Claims against and Equity Interests in the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code in connection with the solicitation of votes by the Debtors on the Plan.**

The bankruptcy court may confirm a plan of reorganization even though fewer than all the classes of impaired claims and equity interests accept such plan. For a plan of reorganization to be confirmed, despite its rejection by a class of impaired claims or equity interests, the plan must be accepted by at least one class of impaired claims (determined without counting the vote of insiders) and the proponent of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or equity interests that has not accepted the plan. **The Plan has been structured so that it will satisfy the foregoing requirements as to any rejecting class of Claims and can therefore be confirmed, if necessary, over the objection of any (but not all) classes of Claims.**

## IV.

## OVERVIEW OF THE PLAN

The Plan provides for the treatment of Claims against and Equity Interests in all of the Debtors in <u>In re Centaur, LLC, et al.</u>, Case No. 10-10799 (KJC) (Jointly Administered).

## A.    Summary of the Terms of the Plan

The Plan implements and is built around the following key elements:

- the Plan will restructure the obligations under the Prepetition First Lien Credit Agreement and the Specified Hedging Agreements through the cancellation of such obligations and, in exchange, each holder of an Allowed First Lien Claim shall in full satisfaction of such holder's: (a) Allowed First Lien Secured Claim, receive a distribution of (i) new first lien debt of the Reorganized Debtors in the amount of $115 million, less the amount of any exit financing necessary to fund the Debtors' emergence from chapter 11, (ii) new payable-in-kind notes projected to have an aggregate face amount of $155 million, less (y) the $3.0 million of new payable-in-kind notes to be issued to holders of Allowed Second Lien Claims if holders of Second Lien Claims vote in favor of the Plan pursuant to section 1126 of the Bankruptcy Code, and thus, Class 3 – Second Lien Claims accepts the Plan, and/or (z) the $400,000 of new payable-in-kind notes to be issued to holders of Allowed Valley View Downs Unsecured Claims if holders of Valley View Downs Unsecured Claims vote in favor of the Plan pursuant to section 1126 of the Bankruptcy Code, and thus, Class 5 – Valley View Downs Unsecured Claims accepts the Plan, (iii) non-detachable penny warrants to purchase new equity interests, (iv) the cash proceeds of (y) any Assets of Valley View Downs, LP, and (z) any sale that results in the transfer, directly or indirectly, of any Asset of Valley View Downs, LP, including through the sale of an Equity Interest, to the extent, in case of each of clauses (y) and (z), the Assets of Valley View Downs, LP are collateral or proceeds of collateral subject to the prepetition liens and security interests of the Prepetition First Lien Agent,[4] (v) the cash proceeds of the Assets of Centaur Colorado, LLC, (vi) the cash proceeds of (y) the Assets of Centaur PA Land, LP and (z) any sale that results in the transfer, directly or indirectly, of any Assets of Centaur PA Land, LP, and (vii) (y) if the holders of Second Lien Claims do not vote in favor of the Plan pursuant to section 1126 of the Bankruptcy Code, and thus, Class 3 – Second Lien Claims does not accept the Plan, those new payable-in-kind notes that would have been otherwise distributed to holders of Allowed Second Lien Claims pursuant to Section 5.3(a) of the Plan; and (z) if the holders of Valley View Downs Unsecured Claims do not vote in favor of the Plan pursuant to section 1126 of the Bankruptcy Code, and thus, Class 5 – Valley View Downs Unsecured Claims does not accept the Plan, those new payable-in-kind notes that would have been otherwise distributed to holders of Allowed Valley View Downs Unsecured Claims pursuant to Section 5.5(a) of the Plan and (b) Allowed First Lien Deficiency Claim, receive (i) a pro rata distribution of the cash proceeds remaining after payment of certain administrative expense claims of (y) any Assets of Valley View Downs, LP, and (z) any sale that results in the transfer, directly or indirectly, of any Asset of Valley View Downs, LP, including through the sale of an Equity Interest, to the

---

[4]   For the avoidance of doubt, (i) the Assets of Valley View Downs, LP include the Cash received by Valley View Downs, LP upon expiration of the Existing L/C or release, cancellation and return of the Existing L/C by the Pennsylvania Gaming Control Board to the L/C Issuer and (ii) for purposes of determining and making Plan Distributions, the "cash proceeds" of the Assets of Valley View Downs, LP shall include the Cash received by Valley View Downs, LP upon expiration of the Existing L/C or release, cancellation and return of the Existing L/C by the Pennsylvania Gaming Control Board to the L/C Issuer.

extent, in case of each of clauses (y) and (z), the Assets of Valley View Downs, LP are not collateral or proceeds of collateral subject to the prepetition liens and security interests of the Prepetition First Lien Agent and (ii) a pro rata distribution of Litigation Trust Interests;

- the Plan will restructure the obligations under the Prepetition Second Lien Credit Agreement through the cancellation of such obligations and (a) in the event that holders of such Claims vote to accept the Plan as a class, (i) a distribution of new payable-in-kind notes and (ii) a pro rata distribution of Litigation Trust Interests; or (b) in the event that holders of such Claims do not vote to accept the Plan as a class, each holder of such claims will receive (i) a pro rata distribution of the cash proceeds remaining after payment of certain administrative claims of (y) any Assets of Valley View Downs, LP, and (z) any sale that results in the transfer, directly or indirectly, of any Asset of Valley View Downs, LP, including through the sale of an Equity Interest, to the extent, in case of each of clauses (y) and (z), the Assets of Valley View Downs, LP are not collateral or proceeds of collateral subject to the prepetition liens and security interests of the Prepetition First Lien Agent, and (ii) a pro rata distribution of Litigation Trust Interests;

- the Plan provides that the obligations to holders of Other Secured Claims will be reinstated;

- the Plan provides that Valley View Downs Unsecured Claims will be cancelled and (a) in the event that holders of such Claims vote to accept the Plan, the holders of such Claims will receive (i) a distribution of new payable-in-kind notes and (ii) a pro rata distribution of Litigation Trust Interests; or (b) in the event that holders of such Claims do not vote to accept the Plan as a class, each holder of such Claims will receive (i) a pro rata distribution of a portion of the cash proceeds remaining after payment of certain administrative expense claims of (y) any Assets of Valley View Downs, LP, and (z) any sale that results in the transfer, directly or indirectly, of any Asset of Valley View Downs, LP, including through the sale of an Equity Interest, to the extent, in case of each of clauses (y) and (z), the Assets of Valley View Downs, LP are not collateral or proceeds of collateral subject to the prepetition liens and security interests of the Prepetition First Lien Agent, and (ii) a pro rata distribution of Litigation Trust Interests;

- the Plan provides that holders of unsecured claims (including Second Lien Claims and Valley View Downs Unsecured Claims) equal to or less than $10,000, or who elect to reduce the Allowed amount of their Claims to $10,000, will be paid 100 percent of their Claims in cash;

- the Plan provides that Intercompany Claims shall be cancelled and the holders of such Intercompany Claims shall receive no distribution on account of such Claims, provided, however, that if the holders of Second Lien Claims do not vote in favor of the Plan pursuant to section 1126 of the Bankruptcy Code, and thus, Class 3 – Second Lien Claims does not accept the Plan, and/or if the holders of Valley View Downs Unsecured Claims do not vote in favor of the Plan pursuant

to section 1126 of the Bankruptcy Code, and thus, Class 5 – Valley View Downs Unsecured Claims does not accept the Plan, each holder of an Allowed Intercompany Claim against Valley View Downs, LP shall, in the event the Bankruptcy Court determines by a Final Order that any Assets of Valley View Downs, LP are not collateral or proceeds of collateral subject to the prepetition liens and security interests of the Prepetition First Lien Agent or Prepetition Second Lien Agent, maintain such Claim and receive on the Distribution Date, in full satisfaction thereof, (i) a pro rata distribution of the cash proceeds remaining after payment of certain administrative expense claims of (y) any Assets of Valley View Downs, LP, and (z) any sale that results in the transfer, directly or indirectly, of any Asset of Valley View Downs, LP, including through the sale of an Equity Interest, to the extent, in case of each of clauses (y) and (z), the Assets of Valley View Downs, LP are not collateral or proceeds of collateral subject to the prepetition liens and security interests of the Prepetition First Lien Agent, and (ii) a pro rata distribution of Litigation Trust Interests; and

- the Plan provides that all other prepetition unsecured claims (other than priority claims) will be cancelled and shall receive a pro rata distribution of Litigation Trust Interests.

When evaluating the Plan, holders of Claims should be advised that the entire Plan is a compromise and settlement by the Prepetition First Lien Claimholders of their Claims against the Debtors, which the Debtors and the Prepetition First Lien Agent believe are secured by liens on all or substantially all of the Debtors' Assets including the Debtors' rights under that certain Letter of Credit and Reimbursement Agreement, dated October 30, 2007 (as amended, restated, extended or otherwise modified from time to time, the "Reimbursement Agreement") among Valley View Downs, LP and the L/C Issuer. The value of the Debtors' businesses and Assets, whether as a going concern or in liquidation, is significantly less than the amount that the Debtors owe to the Prepetition First Lien Claimholders. In the absence of the compromise and settlement that is embodied in the Plan and absent a successful Challenge, if any, to the prepetition liens of the Prepetition First Lien Agent and the Prepetition Second Lien Agent, there would not be any money, property or equity in the Reorganized Debtors available to distribute to other holders of Claims against the Debtors.

The Prepetition First Lien Agent and the other Prepetition First Lien Claimholders take the view that this is the Debtors' Disclosure Statement. Accordingly, the Prepetition First Lien Claimholders will not respond line by line to each statement and assertion of the Committee and the Prepetition Second Lien Agent included in the Disclosure Statement at the request of such constituencies, but the Prepetition First Lien Claimholders believe that such statements and assertions of these constituencies are misleading and inaccurate. Nothing herein shall be deemed to be an admission by any of the Prepetition First Lien Claimholders nor a waiver of the Prepetition First Lien Claimholders' rights to contest the veracity of the statements and assertions by the Committee and the Prepetition Second Lien Agent, the characterizations implied by the Committee and the Prepetition Second Lien Agent in support of their respective litigation positions, nor the propriety of the inclusion of such statements herein. All rights of the Prepetition First Lien Claimholders are expressly reserved.

It is the Prepetition Second Lien Agent's position that (a) the Letter of Credit and Reimbursement Agreement dated October 30, 2007 (the "Prepetition Reimbursement Agreement") was novated by the Amended and Restated Letter of Credit and Reimbursement Agreement dated as of October 30, 2009 (the "Postpetition Reimbursement Agreement"),[5] (b) any rights and obligations of Valley View Downs, LP under the Prepetition Reimbursement Agreement are not First Lien Collateral or proceeds of First Lien Collateral (as used herein, "First Lien Collateral" means collateral or proceeds of collateral subject to the liens and security interests of the Prepetition First Lien Agent or the other holders of First Lien Secured Claims) and (c) any rights and obligations of Valley View Downs, LP under the Postpetition Reimbursement Agreement are postpetition rights and obligations and are not First Lien Collateral. The Prepetition Second Lien Agent also notes that, on October 28, 2009 in the Emergency Motion to Approve Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Amend Expiring Letter of Credit in Support of Debtors' Gaming License Application to Extend Term Thereof, and (B) Collateralize Amended Letter of Credit with Cash Securing Expiring Letter of Credit, and (II) Providing Notice of and Scheduling a Final Hearing [Case No. 09-13760 (KJC), D.I. 3)] (the "L/C Motion"), Valley View Downs, LP and Centaur PA Land, LP stated the following: (i) "The L/C Cash is 'Excluded Collateral'." (L/C Motion n.2); and (ii) "The L/C Cash is currently encumbered solely by the liens of the Original L/C Issuer, which secure the Debtors' obligations under the Expiring L/C Agreement." (L/C Motion ¶ 26).

Pursuant to the Final Cash Collateral Order, the period has expired during which "the Committee . . . and all non-Debtor parties-in-interest [were] to investigate the validity, perfection, and enforceability of the Prepetition Liens and the amount and allowability of the Prepetition Indebtedness, or to object to or assert any other claims or causes of action against [the Prepetition First Lien Claimholders and Prepetition Second Lien Claimholders]." Final Cash Collateral Order ¶ 16.a. As described below, the Committee is the only party that has moved for standing to pursue challenges against the Prepetition First Lien Claimholders, and the Prepetition First Lien Claimholders have objected to such motion on the basis that, among other things, the costs of pursuing the proposed challenges outweigh any benefit the challenges could bring to the Debtors' Estates even if the Committee were successful on all of its challenges.

The Prepetition Second Lien Agent disagrees with the Debtors' description and characterization of the terms and effect of the Final Cash Collateral Order.

## B.    Summary of Distributions Under the Plan

The following is a summary of the distributions under the Plan. It is qualified in its entirety by reference to the full text of the Plan, which is attached to this Disclosure Statement as Exhibit "A".

---

[5]    For avoidance of doubt, the terms "Prepetition Reimbursement Agreement" and "Postpetition Reimbursement Agreement" used herein are defined terms included at the request of the Prepetition Second Lien Agent to describe its position with respect to the relative rights of creditors in the L/C Cash (as defined below). The Debtors have used the term "Reimbursement Agreement" to refer to the Letter of Credit and Reimbursement Agreement, dated October 30, 2007, as amended and restated by the Amended and Restated Letter of Credit and Reimbursement Agreement, dated October 30, 2009.

The claim amounts set forth below reflect what the Debtors believe to be reasonable estimates of the likely resolution of outstanding disputed Claims. The amounts utilized may differ from the outstanding filed claims amounts.

The following chart summarizes the distribution to unclassified and classified Claims under the Plan:

## UNCLASSIFIED CLAIMS

| Classes of Claims | Treatment of Classes of Claims |
|---|---|
| Administrative Expense Claims (costs or expenses of administration of any of the Chapter 11 Cases under sections 503(b) and 507(a)(2) of the Bankruptcy Code and any Allowed Claims under section 507(b) of the Bankruptcy Code including, without limitation, Fee Claims, Section 503(b)(9) Claims, Claims arising after the Petition Date, any actual and necessary costs and expenses of preserving the Debtors' Estates, any actual and necessary costs and expenses of operating the Debtors' businesses, Claims related to Adequate Protection Obligations (as defined in the Final Cash Collateral Order), any indebtedness or obligations incurred or assumed by the Debtors, as debtors-in-possession, during the Chapter 11 Cases, including, without limitation, any allowances of compensation and reimbursement of expenses to the extent allowed by Final Order under section 330 or 503 of the Bankruptcy Code, but not including Intercompany Financing Claims.<br><br>Estimated Claims:  Approximately $9.3 million | On the Distribution Date, each holder of an Allowed Administrative Expense Claim shall receive in full satisfaction of such Claim (i) the amount of such holder's Allowed Administrative Expense Claim in one Cash payment, or (ii) such other treatment as may be agreed upon in writing by the Debtors and such holder; provided, that such treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Administrative Expense Claim; provided further, that an Administrative Expense Claim representing a liability incurred postpetition in the ordinary course of business of the Debtors may be paid at the Debtors' election in the ordinary course of business.<br><br>**Estimated Recovery:  100% of Allowed Claim.** |

| | |
|---|---|
| Priority Tax Claims<br><br>Estimated Claims: Approximately $2.3 million | Each holder of an Allowed Priority Tax Claim will receive in full satisfaction of such holder's Allowed Priority Tax Claim, (i) on the Distribution Date, the amount of such holder's Allowed Priority Tax Claim in Cash; or (ii) such other treatment as may be agreed upon in writing by such holder; provided, that such agreed-upon treatment may not provide such holder with a return having a present value as of the Effective Date that is greater than the amount of such holder's Allowed Priority Tax Claim.<br><br>**Estimated Recovery: 100% of Allowed Claim.** |
| Intercompany Financing Claims<br><br>Estimated Claims: Approximately $1.4 million | All Intercompany Financing Claims shall, notwithstanding the occurrence of the Effective Date, remain outstanding and be retained by the Debtors or be paid in full in Cash on the Effective Date.<br><br>**Estimated Recovery: 100% of Allowed Claim.** |

## CLASSIFIED CLAIMS AND INTERESTS

| **Classes of Claims and Interests** | **Treatment of Classes of Claims and Interests** |
|---|---|
| Class 1 – Priority Non-Tax Claims<br><br>Estimated Claims: Undetermined | Unimpaired.<br><br>Each Allowed Priority Non-Tax Claim shall be unimpaired under the Plan, and, pursuant to section 1124 of the Bankruptcy Code, all of the legal, equitable and contractual rights to which such Claim entitles the holder in respect of such Claim shall be fully reinstated and retained, and such Allowed Priority Non-Tax Claim (including any amounts to which such holder is entitled pursuant to section 1124(2) of the Bankruptcy Code) shall be paid in full in accordance with such reinstated rights on the Effective Date.<br><br>**Estimated Recovery: 100% of Allowed Claim.** |

| Class 2 – First Lien Claims | Impaired. |
| --- | --- |

Estimated Claims: Approximately $405.1 million[6]

Each holder of an Allowed First Lien Claim shall, on the Distribution Date, in full satisfaction of such holder's: (a) Allowed First Lien Secured Claim, receive a Pro Rata Share, in accordance with that holder's Pro Rata Share of the Allowed First Lien Secured Claims, of (i) the First Lien Take Back Paper, (ii) the NewCo PIK Notes, which NewCo PIK Notes are designated as type "A" in Exhibit "E" to the Disclosure Statement, less (y) the $3.0 million aggregate face amount of NewCo PIK Notes to be distributed to holders of Allowed Second Lien Claims if the holders of Second Lien Claims vote in favor of the Plan pursuant to section 1126 of the Bankruptcy Code, and thus, Class 3 – Second Lien Claims accepts the Plan, and/or (z) the $400,000 aggregate face amount of NewCo PIK Notes to be distributed to holders of Allowed Valley View Downs Unsecured Claims if the holders of Valley View Downs Unsecured Claims vote in favor of the Plan pursuant to section 1126 of the Bankruptcy Code, and thus, Class 5 – Valley View Downs Unsecured Claims accepts the Plan, (iii) the NewCo Warrants, (iv) the Cash proceeds of (y) any Assets of Valley View Downs, LP, and (z) any sale that results in the transfer, directly or indirectly, of any Asset of Valley View Downs, LP, including through the sale of an Equity Interest, to the extent, in case of each of clauses (y) and (z), the Assets of Valley View Downs, LP are collateral or proceeds of collateral subject to the prepetition liens and security interests of the Prepetition First Lien Agent, (v) the Cash proceeds of the Assets of Centaur Colorado, LLC, (vi) the Cash proceeds of (y) the Assets of Centaur PA Land, LP and (z) any sale that results in the transfer, directly

---

[6]     Based upon the Debtors' valuation, as discussed in Section VIII.C. of this Disclosure Statement, the First Lien Claims are undersecured. If that was not the case and the First Lien Claims were fully secured, pursuant to section 506(b) of the Bankruptcy Code and the Final Cash Collateral Order, the Prepetition First Lien Claimholders would be entitled to receive fees and other costs, expenses, charges and postpetition interest, and the amount of the First Lien Claims as of the date of this Disclosure Statement would be not less than $421.8 million.

or indirectly, of any Assets of Centaur PA Land, LP, and (vii) (y) if the holders of Second Lien Claims do not vote in favor of the Plan pursuant to section 1126 of the Bankruptcy Code, and thus, Class 3 – Second Lien Claims does not accept the Plan, those NewCo PIK Notes that would have been otherwise distributed to holders of Allowed Second Lien Claims pursuant to Section 5.3(a) of the Plan; provided that those NewCo PIK Notes shall be of the type designated as type "A" rather than type "B", and (z) if the holders of Valley View Downs Unsecured Claims do not vote in favor of the Plan pursuant to section 1126 of the Bankruptcy Code, and thus, Class 5 – Valley View Downs Unsecured Claims does not accept the Plan, those NewCo PIK Notes that would have been otherwise distributed to holders of Allowed Valley View Downs Unsecured Claims pursuant to Section 5.5(a) of the Plan; provided that those NewCo PIK Notes shall be of the type designated as type "A" rather than type "B", and (b) Allowed First Lien Deficiency Claim, receive (i) a Pro Rata Share, in accordance with that holder's Pro Rata Share of the aggregate of the Allowed First Lien Deficiency Claims, Allowed Second Lien Claims, Allowed Valley View Downs Unsecured Claims and, if the holders of Second Lien Claims do not vote in favor of the Plan pursuant to section 1126 of the Bankruptcy Code, and thus, Class 3 – Second Lien Claims does not accept the Plan, and/or if the holders of Valley View Downs Unsecured Claims do not vote in favor of the Plan pursuant to section 1126 of the Bankruptcy Code, and thus, Class 5 – Valley View Downs Unsecured Claims does not accept the Plan, Allowed Intercompany Claims against Valley View Downs, LP, of the Cash proceeds remaining after payment of Allowed L/C Claims, Allowed Administrative Expense Claims and Allowed Intercompany Financing Claims against Valley View Downs, LP of (y) any Assets of Valley View Downs, LP, and (z) any sale that results in the transfer, directly or indirectly, of any Asset of Valley View Downs, LP, including through

the sale of an Equity Interest, to the extent, in case of each of clauses (y) and (z), the Assets of Valley View Downs, LP are not collateral or proceeds of collateral subject to the prepetition liens and security interests of the Prepetition First Lien Agent, and (ii) a Pro Rata Share, in accordance with the holder's Pro Rata Share of the aggregate of the Allowed First Lien Deficiency Claims, Allowed Second Lien Claims, Allowed Valley View Downs Unsecured Claims, Allowed General Unsecured Claims and, if the holders of Second Lien Claims do not vote in favor of the Plan pursuant to section 1126 of the Bankruptcy Code, and thus, Class 3 – Second Lien Claims does not accept the Plan, and/or if the holders of Valley View Downs Unsecured Claims do not vote in favor of the Plan pursuant to section 1126 of the Bankruptcy Code, and thus, Class 5 – Valley View Downs Unsecured Claims does not accept the Plan, Allowed Intercompany Claims against Valley View Downs, LP, of Litigation Trust Interests.  For purposes of determining and making Plan Distributions pursuant to <u>Section 5.2</u> of the Plan, the Assets of Valley View Downs, LP shall include the Cash received by Valley View Downs, LP upon expiration of the Existing L/C or release, cancellation and return of the Existing L/C by the Pennsylvania Gaming Control Board to the L/C Issuer, and the "Cash proceeds" of the Assets of Valley View Downs, LP shall also include that Cash.

For purposes of calculating the Plan Distributions to the holders of Allowed First Lien Claims, the Prepetition First Lien Claimholders shall have an Allowed First Lien Claim against each Debtor as of the applicable Petition Date equal to the amount of the First Lien Indebtedness (as defined in the Final Cash Collateral Order) without deduction for any Plan Distributions received from any other Debtor.

**Estimated Recovery: 83.3% of Allowed Claim.**

| Class 3 – Second Lien Claims | Impaired. |
| --- | --- |

Estimated Claims: Approximately $207.2 million[7]

(a) If the holders of Second Lien Claims vote in favor of the Plan pursuant to section 1126 of the Bankruptcy Code, and thus, Class 3 – Second Lien Claims accepts the Plan, each holder of an Allowed Second Lien Claim shall, on the Distribution Date, in full satisfaction of such holder's Allowed Second Lien Claim, receive (i) a Pro Rata Share, in accordance with such holder's Pro Rata Share of the Allowed Second Lien Claims, of $3.0 million aggregate face amount of the NewCo PIK Notes, which NewCo PIK Notes are designated as type "B" in Exhibit "E" to this Disclosure Statement and (ii) a Pro Rata Share, in accordance with that holder's Pro Rata Share of the aggregate of the Allowed First Lien Deficiency Claims, Allowed Second Lien Claims, Allowed Valley View Downs Unsecured Claims, Allowed General Unsecured Claims, and, if the holders of Valley View Downs Unsecured Claims do not vote in favor of the Plan pursuant to section 1126 of the Bankruptcy Code, and thus, Class 5 – Valley View Downs Unsecured Claims does not accept the Plan, Allowed Intercompany Claims against Valley View Downs, LP, of Litigation Trust Interests.

(b) If the holders of Second Lien Claims do not vote in favor of the Plan pursuant to section 1126 of the Bankruptcy Code, and thus, Class 3 – Second Lien Claims does not accept the Plan, each holder of an Allowed Second Lien Claim shall, on the Distribution Date, in full satisfaction of such holder's Allowed Second Lien Claim, receive (i) a Pro Rata Share, in accordance with that holder's Pro Rata Share of the aggregate of the Allowed First Lien

---

[7] Based upon the Debtors' valuation, as discussed in Section VIII.C. of this Disclosure Statement, the Second Lien Claims are unsecured. If that was not the case and the Second Lien Claims were fully secured, pursuant to section 506(b) of the Bankruptcy Code and the Final Cash Collateral Order, the Prepetition Second Lien Claimholders would be entitled to receive fees and other costs, expenses, charges and postpetition interest, and the amount of the Second Lien Claims as of the date of this Disclosure Statement would be not less than $[      ] million.

14

Deficiency Claims, Allowed Second Lien Claims, Allowed Valley View Downs Unsecured Claims and Allowed Intercompany Claims against Valley View Downs, LP, of the Cash proceeds remaining after payment of Allowed L/C Claims, Allowed Administrative Expense Claims and Allowed Intercompany Financing Claims against Valley View Downs, LP of (y) any Assets of Valley View Downs, LP, and (z) any sale that results in the transfer, directly or indirectly, of any Asset of Valley View Downs, LP, including through the sale of an Equity Interest, to the extent, in case of each of clauses (y) and (z), the Assets of Valley View Downs, LP are not collateral or proceeds of collateral subject to the prepetition liens and security interests of the Prepetition First Lien Agent, and (ii) a Pro Rata Share, in accordance with that holder's Pro Rata Share of the aggregate of the Allowed First Lien Deficiency Claims, Allowed Second Lien Claims, Allowed Valley View Downs Unsecured Claims, Allowed General Unsecured Claims and Allowed Intercompany Claims against Valley View Downs, LP, of Litigation Trust Interests. For purposes of determining and making Plan Distributions pursuant to Section 5.3(b) of the Plan, the Assets of Valley View Downs, LP shall include the Cash received by Valley View Downs, LP upon expiration of the Existing L/C or release, cancellation and return of the Existing L/C by the Pennsylvania Gaming Control Board to the L/C Issuer, and the "Cash proceeds" of the Assets of Valley View Downs, LP shall also include that Cash.

For purpose of calculating the Plan Distributions to the holders of Allowed Second Lien Claims, the Prepetition Second Lien Claims shall have an Allowed Second Lien Claim against each Debtor as of the applicable Petition Date equal to the amount of the Second Lien Indebtedness (as defined in the Final Cash Collateral Order) without deduction for any Plan Distributions received from any other Debtor.

**Estimated Recovery: 1.4% of Allowed Claim,**

**if the Plan is accepted.**

Class 4 – Other Secured Claims

Unimpaired.

Estimated Claims: Approximately $0[8]

Each holder of an Allowed Other Secured Claim shall, on the Distribution Date, be reinstated or rendered unimpaired in accordance with section 1124 of the Bankruptcy Code. All Allowed Other Secured Claims not due and payable shall, at the Debtors' option in consultation with the Consenting First Lien Claimholders, be paid (i) in the ordinary course of business or (ii) by transfer of the collateral securing the Other Secured Claims.

**Estimated Recovery: 100% of Allowed Claim.**

Class 5 – Valley View Downs Unsecured Claims

Impaired.

Estimated Claims: Approximately $0 to $61.2 million[9]

(a) If the holders of Valley View Downs Unsecured Claims vote in favor of the Plan pursuant to section 1126 of the Bankruptcy Code, and thus, Class 5 – Valley View Downs Unsecured Claims accepts the Plan, each holder of an Allowed Valley View Downs Unsecured Claim shall, on the Distribution Date, in full satisfaction of such holder's Allowed Valley View Downs Unsecured Claim, receive (a) a Pro Rata Share, in accordance with such holder's Pro Rata Share of the Allowed Valley View Downs Unsecured Claims, of $400,000 aggregate face amount of the NewCo PIK Notes, which NewCo PIK Notes are designated as type "B" in Exhibit "E" to this Disclosure Statement and (b) a Pro Rata Share, in accordance with that holder's Pro Rata Share of

---

[8] As of the date of this Disclosure Statement, the Debtors estimate that there are no allowable Other Secured Claims. To the extent, however, that a creditor asserting a right of set off or recoupment with respect to its Claim, or a portion thereof, is able to demonstrate that its right of setoff or recoupment is valid, such that its Claim, or a portion thereof, is a Secured Claim, such Claim, or portion thereof, shall be treated as an Allowed Other Secured Claim.

[9] As discussed in "The Chapter 11 Cases – Objection to PREIT's Claims", the Debtors believe the Valley View Downs Unsecured Claims of approximately $61.2 million asserted by PREIT (as defined below) are subject to, among other things, recharacterization as equity or disallowance in whole or in part. If, however, those Claims were Allowed in full, PREIT would hold an Allowed Valley View Downs Unsecured Claim of approximately $61.2 million.

the aggregate of the Allowed First Lien Deficiency Claims, Allowed Second Lien Claims, Allowed Valley View Downs Unsecured Claims, Allowed General Unsecured Claims, and, if the holders of Second Lien Claims do not vote in favor of the Plan pursuant to section 1126 of the Bankruptcy Code, and thus, Class 3 – Second Lien Claims does not accept the Plan, Allowed Intercompany Claims against Valley View Downs, LP, of Litigation Trust Interests.

(b) If the holders of Valley View Downs Unsecured Claims do not vote in favor of the Plan pursuant to section 1126 of the Bankruptcy Code, and thus, Class 5 – Valley View Downs Unsecured Claims does not accept the Plan, each holder of an Allowed Valley View Downs Unsecured Claim shall, on the Distribution Date, in full satisfaction of such holder's Allowed Valley View Downs Unsecured Claim, receive (i) a Pro Rata Share, in accordance with that holder's Pro Rata Share of the aggregate of the Allowed First Lien Deficiency Claims, Allowed Second Lien Claims, Allowed Valley View Downs Unsecured Claims and Allowed Intercompany Claims against Valley View Downs, LP, of the Cash proceeds remaining after payment of Allowed L/C Claims, Allowed Administrative Expense Claims and Allowed Intercompany Financing Claims against Valley View Downs, LP of (y) any Assets of Valley View Downs, LP, and (z) any sale that results in the transfer, directly or indirectly, of any Asset of Valley View Downs, LP, including through the sale of an Equity Interest, to the extent, in case of each of clauses (y) and (z), the Assets of Valley View Downs, LP are not collateral or proceeds of collateral subject to the prepetition liens and security interests of the Prepetition First Lien Agent, and (ii) a Pro Rata Share, in accordance with that holder's Pro Rata Share of the aggregate of the Allowed First Lien Deficiency Claims, Allowed Second Lien Claims, Allowed Valley View Downs Unsecured Claims, Allowed General Unsecured Claims and Allowed Intercompany Claims

against Valley View Downs, LP, of Litigation Trust Interests. For purposes of determining and making Plan Distributions pursuant to Section 5.5(b) of the Plan, the Assets of Valley View Downs, LP shall include the Cash received by Valley View Downs, LP upon expiration of the Existing L/C or release, cancellation and return of the Existing L/C by the Pennsylvania Gaming Control Board to the L/C Issuer, and the "Cash proceeds" of the Assets of Valley View Downs, LP shall also include that Cash.

**Estimated Recovery: 0.7% of asserted Claim, if that Claim is Allowed in the Amount asserted and the Plan is accepted.**

| | |
|---|---|
| Class 6 – General Unsecured Claims | Impaired. |
| Estimated Claims: Approximately $17.2 million | Each holder of an Allowed General Unsecured Claim shall, on the Distribution Date, in full satisfaction of such holder's Allowed General Unsecured Claim, receive a Pro Rata Share, in accordance with that holder's Pro Rata Share of the aggregate of the Allowed First Lien Deficiency Claims, Allowed Second Lien Claims, Allowed General Unsecured Claims, Allowed Valley View Downs Unsecured Claims and, if the holders of Second Lien Claims do not vote in favor of the Plan pursuant to section 1126 of the Bankruptcy Code, and thus, Class 3 – Second Lien Claims does not accept the Plan, and/or if the holders of Valley View Downs Unsecured Claims do not vote in favor of the Plan pursuant to section 1126 of the Bankruptcy Code, and thus, Class 5 – Valley View Downs Unsecured Claims does not accept the Plan, Allowed Intercompany Claims against Valley View Downs, LP, of Litigation Trust Interests. |

**Estimated Recovery: Undetermined.**

| | |
|---|---|
| Class 7 – Convenience Claims | Impaired. |

Estimated Claims: Approximately $450,000[10]

Each holder of an Allowed Convenience Claim shall receive a single Cash payment equal to 100 percent of its Allowed Convenience Claim.

**Estimated Recovery: 100% of Allowed Claim.[11]**

Class 8 – Intercompany Claims

Impaired.

Estimated Claims: Approximately $945 million[12]

On the Effective Date, all Intercompany Claims shall be cancelled, and the holders of such Intercompany Claims shall receive no distribution on account of such Claims; provided, however, that if the holders of Second Lien Claims do not vote in favor of the Plan pursuant to section 1126 of the Bankruptcy Code, and thus, Class 3 – Second Lien Claims does not accept the Plan, and/or if the holders of Valley View Downs Unsecured Claims do not vote in favor of the Plan pursuant to section 1126 of the Bankruptcy Code, and thus, Class 5 – Valley View Downs Unsecured Claims does not accept the Plan, each holder of an Allowed Intercompany Claim against Valley View

---

[10]  Pursuant to the Convenience Class Election, each holder of a Second Lien Claim, Valley View Downs Unsecured Claim or General Unsecured Claim may elect to reduce its Allowed Claims that exceed $10,000 to $10,000, and thereby receive treatment in Class 7 – Convenience Claims in full satisfaction of its Allowed Claims. As such, the estimated amount of Allowed Convenience Claims may increase based on the number of creditors electing the Convenience Class Election.

[11]  As shown by the analysis contained in Section VIII.C. of this Disclosure Statement, the Reorganized Enterprise Value (as defined below) of the Debtors is insufficient to permit the Prepetition First Lien Claimholders, who the Debtors believe have valid and perfected liens on substantially all of the Debtors' Assets, to receive a recovery in full on account of their Allowed First Lien Claims. Nevertheless, in order to obtain confirmation of the Plan and facilitate the reorganization of the Debtors, the Consenting First Lien Claimholders, by their votes to accept the Plan, will agree to carve out from the Prepetition First Lien Claimholders' recovery, on account of their collateral, value sufficient to permit the distributions contemplated by the Plan to holders of Allowed Convenience Claims that would otherwise be distributable to holders of Allowed First Lien Claims. The Committee has challenged the Prepetition First Lien Claimholders' liens on the Debtors' Assets as described below.

[12]  Intercompany Claims are comprised of: (i) a $3.3 million Claim of Centaur, LLC against Valley View Downs, LP; (ii) a $35.2 million Claim of Centaur, LLC against Centaur Colorado, LLC; (iii) a $387.3 million Claim of Centaur, LLC against Hoosier Park, L.P.; (iv) a $262.6 million claim of Centaur, LLC against Centaur Pennsylvania, LLC; (v) a $229.9 million Claim of Centaur Pennsylvania, LLC against Valley View Downs, LP; and (vi) a $26.3 million Claim of Centaur Pennsylvania, LLC against Centaur PA Land, LP. The Committee has challenged the characterization of the Intercompany Claims as debt as described below. It is the Prepetition Second Lien Agent's position that all Intercompany Claims are subordinated to the rights of holders of First Lien Claims and Second Lien Claims and, accordingly, are not entitled to any payment or distribution until the First Lien Claims and the Second Lien Claims are paid in full, in Cash.

Downs, LP shall, in the event the Bankruptcy Court determines by a Final Order that any Assets of Valley View Downs, LP are not collateral or proceeds of collateral subject to the prepetition liens and security interests of the Prepetition First Lien Agent or Prepetition Second Lien Agent, maintain such Claim and receive on the Distribution Date, in full satisfaction thereof, (i) a Pro Rata Share, in accordance with such holder's Pro Rata Share of the aggregate of Allowed First Lien Deficiency Claims, Allowed Second Lien Claims, Allowed Valley View Downs Unsecured Claims and Allowed Intercompany Claims against Valley View Downs, LP, of the Cash proceeds remaining after payment in full of Allowed L/C Claims, Allowed Administrative Expense Claims and Allowed Intercompany Financing Claims against Valley View Downs, LP, of (y) any Assets of Valley View Downs, LP, and (z) any sale that results in the transfer, directly or indirectly, of any Asset of Valley View Downs, LP, including through the sale of an Equity Interest, to the extent, in case of each of clauses (y) and (z), the Assets of Valley View Downs, LP are not collateral or proceeds of collateral subject to the prepetition liens and security interests of the Prepetition First Lien Agent, and (ii) a Pro Rata Share, in accordance with that holder's Pro Rata Share of the aggregate of the Allowed First Lien Deficiency Claims, Allowed Second Lien Claims, Allowed Valley View Downs Unsecured Claims, Allowed General Unsecured Claims and Allowed Intercompany Claims against Valley View Downs, LP, of Litigation Trust Interests. For purposes of determining and making Plan Distributions pursuant to Section 5.8 of the Plan, the Assets of Valley View Downs, LP shall include the Cash received by Valley View Downs, LP upon expiration of the Existing L/C or release, cancellation and return of the Existing L/C by the Pennsylvania Gaming Control Board to the L/C Issuer, and the "Cash proceeds" of the Assets of Valley View Downs, LP shall also include that Cash.

**Estimated Recovery: Undetermined.**

Class 9 – Equity Interests

Impaired.

Equity Interests will be cancelled and the holders of Equity Interests will receive no distribution on account of such interests.

**Estimated Recovery: None.**

## C.     Intercompany Claims Against the Debtors

Historically, the Debtors have booked intercompany transactions as debt through intercompany accounts, which has given rise certain "due to's" and "due from's" as between the Debtors. Set forth below are summaries of the transactions giving rise to Intercompany Claims against the three operating subsidiaries of Centaur, LLC, Hoosier Park, L.P., Centaur Colorado, LLC and Valley View Downs, LP.

As of the date the Centaur Debtors commenced their Chapter 11 Cases, Intercompany Claims totaling approximately $387.3 million were recorded as liabilities of Hoosier Park, L.P. in the Debtors' books and records. Those Intercompany Claims arose from the following:

| **Intercompany Claims Against Hoosier Park, L.P.** | |
|---|---|
| **Amount** | **Use or Purpose** |
| **Proceeds of Financings On-lent to Hoosier Park, L.P.** | |
| $150.0 million | Payment of first installment of Indiana gaming license fee |
| $100.0 million | Payment of second installment of Indiana gaming license fee |
| $97.5 million | Monies set aside for construction |
| $0.1 million | Funding of Indiana Cash Management Account |
| $1.9 million | Payment to architectural firm |
| $0.9 million | Payment to structural steel vendor |
| $0.9 million | Payment for real property |
| $4.7 million | Pay off of prior working capital facility |
| $0.5 million | Payment of closing costs |
| $13.6 million | Allocation of closing costs |
| $26.9 million | Accrued interest |
| **$397.0 million** | **Total amount on-lent to Hoosier Park, L.P.** |
| **Intercompany Funding** | |
| ($9.7) million | Intercompany funding by Hoosier Park, L.P. |
| **$387.3 million** | **Estimated total Intercompany Claims against Hoosier Park, L.P.** |

As of the date the Centaur Debtors commenced their Chapter 11 Cases, Intercompany Claims totaling approximately $35.2 million were recorded as liabilities of Centaur Colorado, LLC in the Debtors' books and records. Those Intercompany Claims arose from the following:

| **Intercompany Claims Against Centaur Colorado, LLC** | |
|---|---|
| **Amount** | **Use or Purpose** |
| **Proceeds of Financings On-lent to Centaur Colorado, LLC** | |
| $22.6 million | Pay off of prior financing facility |
| $5.2 million | Buy out of certain minority interest holders |
| $1.0 million | Allocation of closing costs |
| $5.9 million | Accrued interest |
| **$34.7 million** | **Total amount on-lent to Centaur, LLC** |
| **Intercompany Funding** | |
| $0.5 million | Intercompany funding by Centaur, LLC |
| **$35.2 million** | **Estimated total Intercompany Claims against Centaur Colorado, LLC** |

As of the date the Valley View Downs Debtors commenced their Chapter 11 Cases, Intercompany Claims totaling approximately $233.2 million were recorded as liabilities of Valley View Downs, LP in the Debtors' books and records. Those Intercompany Claims arose from the following:

| **Intercompany Claims Against Valley View Downs, LP** | |
|---|---|
| **Amount** | **Use or Purpose** |
| **Proceeds of Financings On-lent to Valley View Downs, LP** | |
| $50.0 million | Cash deposited in account in the name of L/C Issuer to secure the Existing L/C |
| $55.0 million | Purchase of outstanding shares of capital stock of Bedford Downs Management Corporation in connection with settlement of competing Pennsylvania gaming license applications |
| $16.7 million | Buy out of certain minority interest holders |
| $277.1 million | Monies set aside for construction and development |
| $15.5 million | Allocation of closing costs |
| $25.0 million | Proceeds of "greenshoe" financing used to pay increased project costs |
| $5.2 million | Pay down of revolver in connection with amendment |
| $1.8 million | Payment of amendment fee to Prepetition Second Lien Claimholders in connection with amendment |
| ($265.0) million | Repayment pursuant to amendment of monies set aside for construction and development |

| ($0.2) million | Relief from debt in connection with transfer of real property options to non-debtor Affiliate |
| --- | --- |
| ($0.2) million | Relief from debt in connection with transfer of real property options to non-debtor Affiliate |
| $49.0 million | Accrued interest |
| **$229.9 million** | **Total amount on-lent to Valley View Downs, LP** |
| **Allocations of Corporate Overhead** | |
| $3.3 million | Prepetition allocations of corporate overhead |
| **$233.2 million** | **Estimated total Intercompany Claims against Valley View Downs, LP** |

The Prepetition First Lien Agent has a lien on all Intercompany Claims, including the Intercompany Claims against Hoosier Park, L.P., Centaur Colorado, LLC and Valley View Downs, LP, and thus, any recovery on account of those Intercompany Claims by the Debtors to which those amounts are owed would inure to the benefit of the Prepetition First Lien Claimholders. The Committee has expressed concerns regarding the validity and enforceability of all of the Intercompany Claims against the Debtors.

While reflected in the Debtors' books and records as intercompany debt, the Intercompany Claims remain subject to a determination by the Bankruptcy Court as to their validity and enforceability. The Intercompany Claims may be subject to attack on the basis of recharacterization, subordination and/or disallowance, in whole or in part. In the event the Intercompany Claims are recharacterized, subordinated and/or disallowed, however, such a determination by the Bankruptcy Court will only have an impact on the recoveries contemplated by the Plan if the holders of Second Lien Claims do not vote in favor of the Plan pursuant to section 1126 of the Bankruptcy Code, and thus, Class 3 – Second Lien Claims does not accept the Plan, and/or if the holders of Valley View Downs Unsecured Claims do not vote in favor of the Plan pursuant to section 1126 of the Bankruptcy Code, and thus, Class 5 – Valley View Downs Unsecured Claims does not accept the Plan; in such event only Intercompany Claims against Valley View Downs, LP will be asserted and all other Intercompany Claims will be cancelled. If the holders of Second Lien Claims and Valley View Downs Unsecured Claims accept the Plan, all Intercompany Claims shall be cancelled.

The Committee has challenged the characterization of the Intercompany Claims as debt by the Debtors in the Standing Motion (as defined below) and the Committee Complaint (as defined below) and believes that such Intercompany Claims should not be treated as debt. See Committee Complaint, Count XVII. Further, the Committee has challenged the enforceability of certain of the Claims of the Prepetition First Lien Claimholders and the Prepetition Second Lien Claimholders based, in part, upon the Debtors' characterization of the Intercompany Claims as debt. See Committee Complaint, Counts XIII-XVI and XXIX and XXXII.

It is the Prepetition Second Lien Agent's position that all Intercompany Claims are subordinated to the rights of holders of Second Lien Claims and, accordingly, are not entitled to any payment or distribution until the Second Lien Claims are paid in full, in Cash. More specifically, Section 6.01(b) of each of the Prepetition First Lien Credit Agreement and Prepetition

Second Lien Credit Agreement provides that any "[i]ndebtedness of any Subsidiary Guarantor to the Borrower or to any other Subsidiary Guarantor, or of the Borrower to any Subsidiary Guarantor . . . shall be unsecured and subordinated in right of payment to the payment in full of the Obligations . . . " under the Prepetition First Lien Credit Agreement and Prepetition Second Lien Credit Agreement. In addition, Section 2.7 of each of the First Lien Subsidiary Guaranty dated as of October 30, 2007 and Second Lien Subsidiary Guaranty dated as of October 30, 2007 provides that "[a]ny Indebtedness of the Borrower or any Guarantor now or hereafter held by any Guarantor (the "Obligee Guarantor") is hereby subordinated in right of payment to the Guaranteed Obligations . . ." under the Prepetition First Lien Credit Agreement and Prepetition Second Lien Credit Agreement. Moreover, the Intercompany Subordinated Demand Promissory Note dated October 30, 2007 reads, in relevant part, as follows: "Each Payee agrees that any and all claims of such Payee against any Payor or any endorser of this Promissory Note respecting the Indebtedness represented by this Promissory Note . . . shall be subordinate and subject in right of payment to the Obligations of the" Prepetition First Lien Claimholders and the Prepetition Second Lien Claimholders and "any right of any Payee to ask, demand, sue for, take or receive any payment from any Payor . . . shall be and hereby are subordinated to the rights of the First Lien Collateral Agent and the Second Lien Collateral Agent in such assets."

**V.**

**GENERAL INFORMATION**

The Debtors consist of Centaur, LLC and thirteen (13) of its direct and indirect subsidiaries. The chart below depicts the corporate structure of non-debtor Centaur, Inc. and its subsidiaries, including the fourteen (14) Debtors, as of the date of this Disclosure Statement. The description in "General Information" of the Debtors and their businesses does not give effect to any changes in the corporate structure of the Debtors in connection with or under the Plan.



= Non-Debtor

## A. The Businesses of the Debtors

The Debtors are leading domestic horse racing, off-track betting ("OTB") and casino operators with approximately 219,000 square feet of combined gaming space. The Debtors currently own, operate, and/or have interests in racing and casino facilities in five distinct gaming markets in Indiana and Colorado, with a project in-progress in northwest Pennsylvania. The Debtors employ approximately 1,300 full and part-time individuals.

The Debtors own and operate a casino and horse racing track in Anderson, Indiana ("Hoosier Park"), along with three OTB facilities located in downtown Indianapolis, Fort Wayne, and Merrillville (collectively, the "OTB Facilities"). Hoosier Park is one of Indiana's two horse racing tracks with seating capacity for 2,750 racing patrons and offering 143 days of live racing per year. Fully integrated with Hoosier Park's racing facilities is a Las Vegas-style 92,000 square-foot casino building with nine bars and restaurants. The single-level casino floor features 2,000 slot machines and electronic table games including craps, poker, blackjack, and roulette. The three OTB Facilities average 22,500 square feet and seat 400 patrons, on average.

The Debtors also own the Fortune Valley Hotel & Casino in Central City, Colorado ("Fortune Valley"), located approximately 35 miles west of Denver. Fortune Valley's 37,000 square feet of gaming space offers nearly 750 slots, video poker, video keno, and live table games including craps, roulette, blackjack, and poker. The two-floor complex also offers

three restaurants, two bars and a multi-story hotel featuring 118 guest rooms and a parking garage.

The Debtors hold a racing, gaming, and entertainment development opportunity, to be known as "Valley View Downs", in Lawrence County, Pennsylvania, 55 miles northwest of Pittsburgh. The Debtors currently own approximately 250 acres of land upon which they plan to construct Valley View Downs. In September 2007, the Debtors secured a racing license for Valley View Downs which entitles the Debtors to a gaming license subject to securing certain necessary approvals. As of the Petition Date, the Debtors had not yet secured all necessary approvals and licenses for the completion of Valley View Downs.

## B.    Management

It is anticipated that the managers, limited and general partners, and officers of each of the Debtors who are serving as of the Confirmation Date will continue to serve in such capacities until the Effective Date. Entry of the Confirmation Order shall ratify and approve all actions taken by the managers, limited and general partners, and officers of the Debtors from the Petition Date through and until the Effective Date. Below is a list of the officers of the Debtors:

*Roderick J. Ratcliff.* Mr. Ratcliff currently serves as President and Chief Executive Officer of the Debtors. Mr. Ratcliff has served in this and other leadership positions within the Centaur group of companies since 1993.

*Kurt E. Wilson.* Mr. Wilson currently serves as Executive Vice President and Chief Financial Officer of the Debtors. Mr. Wilson has served in this and other leadership positions within the Centaur group of companies since 1993.

*Jeffrey M. Smith.* Mr. Smith currently serves as the General Manager of Racing at Hoosier Park and previously served as General Manager of Racing, Centaur, Inc. and Chief Executive Officer of Racing, Centaur, Inc. Mr. Smith has served as General Manager of Racing at Hoosier Park since 2001.

*James L. Brown.* Mr. Brown currently serves as the General Manager of Gaming at Hoosier Park. Mr. Brown has served in that position since 2007.

*Joseph M. DeRosa.* Mr. DeRosa currently serves as the General Manager of Gaming at Valley View Downs. Mr. DeRosa has served in that position since 2008.

*Phil Bainbridge.* Mr. Bainbridge currently serves as General Counsel of the Debtors. Mr. Bainbridge has served in that position since 2006.

## C.    Prepetition Capital Structure

Centaur, LLC is the operating company that coordinates and manages the Hoosier Park (and related OTB Facilities, dining establishments and bars) operations, the Fortune Valley operations and the proposed Valley View Downs operations. Centaur, LLC is wholly owned by

Holdings, which itself is wholly-owned by Centaur, Inc. Neither Centaur, Inc. nor Holdings is a Debtor in these Chapter 11 Cases.

In connection with guarantees of the First and Second Lien Debt (each as defined below) issued by Centaur, LLC's direct and indirect subsidiaries, there are thirteen restricted subsidiaries of Centaur, LLC, including Centaur Pennsylvania, LLC; VVD Properties General Partner, LLC; Valley View Downs GP, LLC; VVD Properties, LP; Valley View Downs, LP; Centaur PA Land Management, LLC; Centaur PA Land General Partner, LP; Centaur PA Land, LP; HP Dining & Entertainment, LLC; Hoosier Park, L.P.; Centaur Racing, LLC; Centaur Indiana, LLC; and Centaur Colorado, LLC (collectively, the "Restricted Subsidiaries"), and five unrestricted subsidiaries of Centaur, LLC (collectively, the "Unrestricted Subsidiaries"). The Restricted Subsidiaries own substantially all of the Debtors' material Assets. The Unrestricted Subsidiaries currently generate no revenue and hold no material Assets other than approximately 194 acres of land in Pennsylvania. The Unrestricted Subsidiaries are not Debtors in these Chapter 11 Cases.

(a)  **First Lien Debt**

On or about October 30, 2007, Holdings, Centaur, LLC and the Restricted Subsidiaries entered into the Prepetition First Lien Credit Agreement with Credit Suisse, Cayman Islands Branch ("Credit Suisse") as administrative agent and collateral agent and certain lenders from time to time party thereto (collectively, the "First Lien Lenders"). The Prepetition First Lien Credit Agreement, as amended and restated on or about September 17, 2008, is a revolving credit and term loan agreement in the amount of $610 million. The Prepetition First Lien Credit Agreement provides for (i) a first-lien security interest in, and lien on, substantially all property and Assets of Centaur, LLC and the Restricted Subsidiaries (collectively, the "Collateral"), (ii) a first-lien guarantee of all obligations under the Prepetition First Lien Credit Agreement and related documents by the Restricted Subsidiaries and (iii) a first-lien equity pledge by Holdings of all of its equity interests in Centaur, LLC. In addition, Centaur, LLC entered into certain Interest Rate Swap Agreements (collectively, the "Swap") with Credit Suisse to manage the risk associated with the variable interest rate under the Prepetition First Lien Credit Agreement. Obligations owing under the Swap are secured ratably with the obligations owing under the Prepetition First Lien Credit Agreement.

As of the date the Centaur Debtors commenced their Chapter 11 Cases, not less than $405,145,293.37 was outstanding under the Prepetition First Lien Credit Agreement, including an outstanding principal balance of $382,644,123.47, an amount of accrued and unpaid interest at the regular contract rates of $19,999,528.40, and an additional amount of accrued and unpaid interest at default rates of $2,501,641.50 (with all accrued but unpaid interest, costs, fees, charges and expenses owing under the First Lien Credit Agreement and the Swap, collectively, the "First Lien Debt").[13] The First Lien Debt had accelerated prior to the date the Valley View Downs Debtors commenced their chapter 11 cases.

---

[13]  As of the date the Valley View Downs Debtors commenced their Chapter 11 Cases, an amount of not less than $385,362,975.51 was outstanding under the Prepetition First Lien Credit Agreement and the Swap, including an outstanding principal balance of $376,820,201.51, an amount of accrued and unpaid interest at the regular contract rates of $8,503,994.97 and an additional amount of accrued and unpaid interest at default rates of $38,779.03.

(b)    **Second Lien Debt**

On or about October 30, 2007, Holdings, Centaur, LLC and the Restricted Subsidiaries entered into the Prepetition Second Lien Credit Agreement with Wells Fargo Bank, N.A. as successor administrative agent and collateral agent and certain lenders from time to time party thereto (collectively, the "Second Lien Lenders"). The Prepetition Second Lien Credit Agreement, as amended and restated on or about September 17, 2008, is a revolving term loan agreement in the amount of $180 million. The Prepetition Second Lien Credit Agreement provides for (i) a second-lien security interest in, and lien on, the Collateral, (ii) a second-lien guarantee of all obligations under the Prepetition Second Lien Credit Agreement and related documents by the Restricted Subsidiaries and (iii) a second-lien equity pledge by Holdings of all of its equity interests in Centaur, LLC.

As of the date the Centaur Debtors commenced their Chapter 11 Cases, not less than $207,190,876.43 was outstanding under the Prepetition Second Lien Credit Agreement, including an outstanding principal balance of $192,625,041.15, an amount of accrued and unpaid interest at the regular contract rates of $12,870,537.80, and an additional amount of accrued and unpaid interest at default rates of $1,419,806.10 (collectively, the "Second Lien Debt").[14] The Second Lien Debt had not accelerated as of the date the Valley View Downs Debtors commenced their chapter 11 cases.

(c)    **Pennsylvania Cash Collateralized L/C**

The Existing L/C was issued in October 2007 in the amount of $50 million to the Commonwealth of Pennsylvania in connection with the application for a gaming license in Pennsylvania to secure the Debtors' obligations thereunder. The L/C Issuer holds a $50 million cash deposit in an account in the name of the L/C Issuer to secure the Existing L/C (the "L/C Cash").

The Existing L/C was set to expire by its terms on October 30, 2009. The Debtors were unable to obtain an extension of the Existing L/C absent the grant of protections that only the Bankruptcy Court could provide. As a consequence, the Valley View Downs Debtors filed chapter 11 cases in the Bankruptcy Court on October 28, 2009. The Bankruptcy Court approved an initial amendment of the Existing L/C by the L/C Issuer to extend the term thereof until January 29, 2010 on an interim basis on October 30, 2009 [Case No. 09-13760 (KJC), D.I. 15] and a final basis on November 23, 2009 [Case No. 09-13760 (KJC), D.I. 50]. The Bankruptcy Court approved further amendments of the Existing L/C by the L/C Issuer to extend the term thereof for an additional ninety (90) days until April 29, 2010 by Order dated January 25, 2010 [Case No. 09-13760 (KJC), D.I. 82], to extend the term thereof for an additional ninety (90) days until July 28, 2010 by interim Orders dated April 26, 2010 [Case No. 09-13760 (KJC), D.I. 279, Case No. 10-10799 (KJC), D.I. 182] and to extend the term thereof for an additional ninety (90)

---

[14]    As of the date the Valley View Downs Debtors commenced their Chapter 11 Cases, an amount of not less than $195,649,936.35 was outstanding under the Prepetition Second Lien Credit Agreement, including an outstanding principal balance of $190,242,894.91, an amount of accrued and unpaid interest at the regular contract rates of $5,295,283.60 and an additional amount of accrued and unpaid interest at default rates of $21,623.05.

days until October 26, 2010 by Final Orders dated June 22, 2010 [Case No. 09-13760 (KJC), D.I. 287, Case No. 10-10799 (KJC), D.I. 357] .

Pursuant to Sections 2.1 and 2.2 of the First Lien Pledge and Security Agreement and the Second Lien Pledge and Security Agreement, each dated October 30, 2007 (as each may have been amended, restated or modified from time to time, the "Prepetition Security Agreements"), and each among Centaur, LLC, as borrower, Centaur, LLC and the Restricted Subsidiaries, as grantors, and Credit Suisse, as collateral agent, the First Lien Lenders' and Second Lien Lenders' security interests do not extend to certain "Excluded Collateral" (as defined in Section 2.2 of the Prepetition Security Agreements). The Prepetition First Lien Claimholders' and Prepetition Second Lien Claimholders' prepetition security interests do not presently extend to the L/C Cash to the extent that the L/C Cash falls within the definition of "Excluded Collateral."

The rights of Valley View Downs, LP to receive the L/C Cash are governed by the Reimbursement Agreement. The Prepetition First Lien Agent does not dispute that the L/C Cash is not subject to its security interests while it is maintained on deposit in a commingled account of the L/C Issuer at a third party depository bank in accordance with the Reimbursement Agreement to ensure that the L/C Issuer's credit exposure in connection with the Existing L/C is not affected by the prepetition security interests of the Prepetition First Lien Claimholders and Prepetition Second Lien Claimholders granted pursuant to the Prepetition Security Agreements until such exposure is terminated in accordance with the terms of the Reimbursement Agreement and all amounts due and payable to the L/C Issuer under the Reimbursement Agreement shall have been duly paid. The Reimbursement Agreement is personal property of Valley View Downs, LP and its contractual rights thereunder constitute "General Intangibles" (as defined in the Prepetition Security Agreements), which are subject to the prepetition security interests of the Prepetition First Lien Claimholders and Prepetition Second Lien Claimholders granted by, among others, Valley View Downs, LP pursuant to the Prepetition Security Agreements. The First Lien Agent asserts its liens would attach to the $50 million as proceeds of its prepetition Collateral should the L/C Cash be returned to Valley View Downs, LP.

The Prepetition Second Lien Agent and Goldman Sachs Specialty Lending Holdings, Inc. ("Goldman Sachs"), a Second Lien Lender, have taken the position that the L/C Cash is unencumbered. Moreover, the Debtors expect that the Prepetition Second Lien Agent will dispute the Prepetition First Lien Agent's contention that the Prepetition First Lien Agent and First Lien Lenders would have a first priority lien on the L/C Cash in the event it reverts back to Valley View Downs, LP by virtue of the Prepetition First Lien Agent's and First Lien Lenders' liens and security interests granted under the applicable Prepetition Security Agreement.

The relative rights and priorities of the Prepetition First Lien Agent and the First Lien Claimholders, on the one hand, and the Prepetition Second Lien Agent and the Second Lien Claimholders, on the other, with respect to certain shared collateral are set forth in the Prepetition Intercreditor Agreement. Pursuant to the terms of the Prepetition Intercreditor Agreement, the parties agreed that "notwithstanding the date, time, method, manner or order of . . . perfection of any Liens" granted to the Prepetition First Lien Claimholders and Prepetition Second Lien Claimholders and "notwithstanding any provision of the UCC, or any other

applicable law or the Second Lien Loan Documents or any defect or deficiencies in, or failure to perfect or lapse in perfection of, or avoidance as a fraudulent conveyance or otherwise of, the Liens," the Liens of the Prepetition First Lien Claimholders would be senior in all respects to the Liens of the Prepetition Second Lien Claimholders and that the Prepetition Second Lien Agent and the other Second Lien Claimholders expressly waived the right to contest "the priority, validity, perfection or enforceability of a Lien held by or on behalf of any of the First Lien Claimholders in the First Lien Collateral." See Prepetition Intercreditor Agreement §§ 2.1, 2.2. In addition, subject to certain other provisions of the Prepetition Intercreditor Agreement, the Prepetition Second Lien Agent and the Second Lien Claimholders waived their right to "object to the manner in which the First Lien Collateral Agent or the First Lien Claimholders seek to enforce or collect the First Lien Obligations or the Liens securing the First Lien Obligations granted in any of the First Lien Collateral undertaken in accordance with the Prepetition Intercreditor Agreement, regardless of whether any action or failure to act by or on behalf of the First Lien Collateral Agent or First Lien Claimholders is adverse to the interest of the Second Lien Claimholders." See Prepetition Intercreditor Agreement § 3.1(d)(2). Moreover, the Prepetition Intercreditor Agreement provides that the Prepetition Second Lien Claimholders' exercise of any rights they may hold as unsecured creditors must be in accordance with the Second Lien Loan Documents (as defined by the Prepetition Intercreditor Agreement), which by definition includes the Prepetition Intercreditor Agreement. See Prepetition Intercreditor Agreement § 3.1(e). Finally, the Prepetition Intercreditor Agreement requires that, "[s]o long as the Discharge of the First Lien Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced . . . , any Shared Collateral or proceeds thereof" and "all proceeds from the sale of one or more Licenses and all Going Concern Proceeds" received by the Second Lien Agent or any other Prepetition Second Lien Claimholder must "be segregated and held in trust and forthwith paid over to the First Lien Collateral Agent" and further, "if in any Insolvency or Liquidation Proceeding" any Prepetition Second Lien Claimholder receives "any distribution of money or other property in respect of Shared Collateral or any proceeds from the sale of any one or more Licenses or any Going Concern Proceeds, such money and other property shall be segregated and held in trust and forthwith paid over to the First Lien Collateral Agent . . . ." See Prepetition Intercreditor Agreement § 4.2(a)-(c).

In a preliminary objection to certain of the Debtors' first day motions filed on March 9, 2010 [Case No. 09-13760 (KJC), D.I. 128] (the "Goldman Sachs Preliminary Objection"), Goldman Sachs took the position that the Prepetition Intercreditor Agreement deals with "collateral" the definition of which in the Prepetition Intercreditor Agreement does not include the L/C Cash or any gaming or racing license of Valley View Downs, LP. See Goldman Sachs Preliminary Objection ¶ 9. Consequently, Goldman Sachs takes the view that Second Lien Lenders have the right to object to the grant of any lien in favor of the Prepetition First Lien Agent and the First Lien Lenders on the L/C Cash, any proceeds thereof or any right of Valley View Downs, LP (or any other person) to receive the L/C Cash. See id. Goldman Sachs has also asserted that the Second Lien Lenders and their agents are not prohibited from objecting to the terms of use of cash collateral where the Prepetition Second Lien Agent and the Second Lien Lenders are not provided the same adequate protection as the First Lien Lenders and that the Prepetition Intercreditor Agreement expressly permits the Second Lien Lenders to take any action and file any objection as unsecured creditors. See id. The acting duty judge, the

Honorable Mary F. Walrath, declined to take up or rule on the correct interpretation of the Prepetition Intercreditor Agreement during the first day hearing on interim use of cash collateral.

In the Committee's motion dated July 9, 2010 for an order granting leave, standing and authority to prosecute and, if appropriate, settle claims on behalf of the Debtors' Estates and for other relief [Case No. 10-10799 (KJC), D.I. 415] (the "Standing Motion"), the Committee has argued that the Prepetition First Lien Agent did not hold, as of October 28, 2009, a valid, enforceable, perfected and non-avoidable first lien security interest on the right, title and interest of Valley View Downs, LP in and to, in connection with, arising from or relating to the L/C Cash and/or any claims or rights of Valley View Downs, LP with respect to, in connection with, arising from or relating to the L/C Cash and/or any rights, general intangibles or payment intangibles arising under the Reimbursement Agreement or any and all other related orders entered ' with respect to or documents or agreements entered into in connection with or related to the Reimbursement Agreement (collectively, the "L/C Documents") (or any other applicable contract) to receive any repayment or return of the L/C Cash following the expiration or release and return of the Existing L/C and satisfaction of all other obligations owing to the L/C Issuer under the L/C Documents and/or any proceeds thereof (all such right, title and interest of Valley View Downs, LP in all such property and Assets and proceeds, collectively, the "L/C Cash Collateral Property"). Standing Motion ¶¶ 43, 49. Additionally, the Committee has also taken the position that any first lien security interest which the Prepetition First Lien Agent may have held in the L/C Cash Collateral Property as of October 28, 2009 was, as of or subsequent to October 28, 2009, released, novated, extinguished, terminated or waived, or that the Prepetition First Lien Agent is estopped from asserting any such first lien security interest, either by actions of the Prepetition First Lien Agent and/or the Debtors or by operation of applicable bankruptcy and/or non-bankruptcy law. Id. ¶¶ 43, 51, 52.

The Committee has also argued that the operation of section 552(a) of the Bankruptcy Code or any other provision of applicable bankruptcy and/or non-bankruptcy law has resulted in a circumstance such that the Prepetition First Lien Agent no longer holds a valid, enforceable, perfected and non-avoidable first lien security interest on the L/C Cash Collateral Property.[15] Id. ¶ 43. The Committee asserts that the L/C Documents create a property interest of Valley View Downs, LP in the L/C Cash and that this property interest and the L/C Cash and what it terms the L/C Cash Collateral Property would be unencumbered by the security interests of the Prepetition First Lien Agent and the Prepetition Second Lien Agent. Id. ¶ 47 & 50. In the Committee Complaint, the Committee asserts rights to the return of the L/C Cash to the Valley View Downs, LP Estate free and clear of the liens and security interests of the Prepetition First Lien Agent and Prepetition First Lien Claimholders under section 542 of the Bankruptcy Code and otherwise applicable law, including, without limitation, under UCC section 9-208 and by the imposition of a resulting trust on the account containing the L/C Cash in the amount of the L/C Cash. See Committee Complaint, Counts IV, XI-XII.

---

[15]     The Committee disagrees with the Debtors' recitation of the parties' positions regarding the Existing L/C. Information on the Committee's position on the Existing L/C can be found in the Committee Objection (as defined below), the Standing Motion and the Committee Complaint. Information on the Prepetition Second Lien Agent's position on the Existing L/C can be found in the Motion to Convert (as defined below) and the Wells Fargo Objection (as defined below).

It is the Prepetition Second Lien Agent's position that: (a) none of (i) the L/C Cash, (ii) the account in which the L/C Cash is deposited (the "Collateral Account") and (iii) the rights the Debtors may have to the return of the L/C Cash upon termination of the Existing L/C, are, or ever were, First Lien Collateral; (b) the L/C Cash, the Collateral Account and the Debtors' racing and gaming licenses (such licenses collectively, the "Licenses") were specifically included within the definition of "Excluded Collateral" under the Prepetition First Lien Credit Agreement and therefore do not constitute First Lien Collateral; and (c) the Prepetition Reimbursement Agreement was novated by the Postpetition Reimbursement Agreement and any rights and obligations of Valley View Downs, LP under the Postpetition Reimbursement Agreement are postpetition rights and obligations and are not First Lien Collateral.

In addition, it is the Prepetition Second Lien Agent's position that: (a) the Debtors have mischaracterized the (i) Prepetition Intercreditor Agreement and (ii) the rights and obligations of parties thereunder; (b) the Prepetition Intercreditor Agreement, including Section 2.2 thereof, does not prevent the Prepetition Second Lien Agent and the other Prepetition Second Lien Claimholders from arguing whether any property or Asset is not First Lien Collateral; (c) there is nothing in the Prepetition Intercreditor Agreement that precludes the Prepetition Second Lien Agent and Prepetition Second Lien Claimholders from seeking to enforce the relevant agreements as written, including seeking a determination from the Bankruptcy Court that the L/C Cash, the Collateral Account and any rights the Debtors may have to the return of the L/C Cash upon termination of the Existing L/C, are "Excluded Collateral," do not constitute First Lien Collateral and are thus not covered by the Prepetition Intercreditor Agreement at all; (d) the Debtors are neither a party to nor the beneficiary of the Prepetition Intercreditor Agreement; and (e) pursuant to the Prepetition Intercreditor Agreement, including Section 8.17 thereof, none of the Debtors (i) have any rights under the Prepetition Intercreditor Agreement and (ii) may rely on the terms of the Prepetition Intercreditor Agreement.[16]

---

[16]     The recitals to the Prepetition Intercreditor Agreement state that the Prepetition Intercreditor Agreement was "entered into by and among CENTAUR, LLC, . . . CREDIT SUISSE, CAYMAN ISLANDS BRANCH . . ., in its capacity as collateral agent for the First Lien Obligations . . . , including its successors and assigns from time to time . . . and CREDIT SUISSE, CAYMAN ISLANDS BRANCH, in its capacity as collateral agent for the Second Lien Obligations . . . including its successors and assigns from time to time . . . and acknowledged and agreed to by the other Grantors . . . ." The text above Centaur, LLC's signature line in the Prepetition Intercreditor Agreement states that the Prepetition Intercreditor Agreement was "[a]cknowledged and [a]greed to by" Centaur, LLC. Sections 8.16 and 8.17 of the Prepetition Intercreditor Agreement provide as follows:

> 8.16     No Third Party Beneficiaries. This Agreement and the rights and benefits hereof shall inure to the benefit of each of the parties hereto and its respective successors and assigns and shall inure to the benefit of each of the First Lien Claimholders and the Second Lien Claimholders. Nothing in this Agreement shall impair, as between the Company and the other Grantors and the First Lien Collateral Agent and the First Lien Claimholders, or as between the Company and the other Grantors and the Second Lien Collateral Agent and the Second Lien Claimholders, the obligations of the Company and the other Grantors to pay principal, interest, fees and other amounts as provided in the First Lien Loan Documents and the Second Lien Loan Documents, respectively.

(continued   )

## D.     Events Leading to the Commencement of the Chapter 11 Cases

The Debtors have suffered substantial delays related to the licensing and construction of Valley View Downs. The lack of cash flow from this project, combined with the payment of a $250 million licensing fee in Indiana and the weakened economy, have created a situation where operations do not generate sufficient cash flow to support the interest expense under the Prepetition First Lien Credit Agreement and the Prepetition Second Lien Credit Agreement.

On October 27, 2009, scheduled interest payments were due under the Prepetition First Lien Credit Agreement and the Prepetition Second Lien Credit Agreement to the First Lien Lenders and the Second Lien Lenders. The Debtors failed to make such interest payments because they did not have sufficient liquidity to cover the interest payments and operate their businesses. Since then, the Debtors had been operating in default of their obligations under the Prepetition First Lien Credit Agreement and the Prepetition Second Lien Credit Agreement while engaging in negotiations with the First Lien Lenders regarding a consensual, comprehensive restructuring of their debt and a recapitalization of their businesses.

Pursuant to the Prepetition Intercreditor Agreement, the Prepetition Second Lien Agent and Second Lien Lenders were prohibited from exercising any remedy for default under the Prepetition Second Lien Credit Agreement only until March 6, 2010—the 120th day following the date upon which the Prepetition Second Lien Agent declared the existence of an event of default under the Prepetition Second Lien Credit Agreement (the "Standstill Period"). The Debtors determined that, once the Standstill Period expired, it would no longer be prudent to continue operating without the protection of the Bankruptcy Court. Consequently, to preserve the Debtors' businesses as going concerns and to facilitate the restructuring of their debt, the Centaur Debtors commenced chapter 11 cases on March 6, 2010 to obtain the protection that only the Bankruptcy Court could provide.

---

(... continued)

> 8.17    Provisions Solely to Define Relative Rights. The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the First Lien Collateral Agent and the First Lien Claimholders on the one hand and the Second Lien Collateral Agent and the Second Lien Claimholders on the other hand. None of the Company, any other Grantor or any other creditor thereof shall have any rights hereunder and neither the Company nor any Grantor may rely on the terms hereof. Nothing in this Agreement is intended to or shall impair the obligations of the Company or any other Grantor, which are absolute and unconditional, to pay the First Lien Obligations and the Second Lien Obligations as and when the same shall become due and payable in accordance with their terms.

Prepetition Intercreditor Agreement §§ 8.16-8.17.

# VI.

## THE REORGANIZED COMPANY

Pursuant to the Plan, immediately following the Effective Date, the Reorganized Debtors will be direct and indirect subsidiaries of NewCo, a Delaware limited liability company managed by a Board of Managers, the composition of which shall be as described in Exhibit "H" to this Disclosure Statement and acceptable to the Consenting First Lien Claimholders. The members of the Board of Managers will be required to be licensed by all required regulatory authorities. The Board of Managers will have the authority to manage the business and direct the affairs of NewCo. The equity interests of NewCo will be distributed to the Existing Management in a manner and amount satisfactory to the Consenting First Lien Claimholders but will be subject to dilution upon the conversion of the NewCo Warrants to be issued to holders of Allowed First Lien Claims and for any NewCo Membership Interests issuable under the Management Incentive Plan.

The Plan also provided for the issuance by NewCo of the NewCo PIK Notes having an aggregate face amount of $155 million and bearing interest of 9 percent per annum, which shall be payable-in-kind. The face amount of the NewCo PIK Notes is within a range, of which $155 million is the midpoint, and may change subject to regulatory requirements. Certain of the holders of the NewCo PIK Notes will also receive non-detachable penny warrants to purchase up to 99.9 percent of the NewCo Membership Interests, calculated on a fully-diluted basis after the exercise of the NewCo Warrants, and subject to dilution for any NewCo Membership Interests issuable under the Management Incentive Plan, which will be (i) exercisable by a holder thereof in accordance with the terms of the NewCo Warrants and upon such holder becoming licensed by all required regulatory authorities, and (ii) transferrable, subject to any applicable securities and other laws and in accordance with the terms of the NewCo Warrants.

The Plan further contemplates that the Reorganized Debtors will issue the First Lien Take Back Paper, which will be new first lien debt in an amount equal to $115 million, less the amount of the Exit Financing. The terms of the First Lien Take Back Paper are described more fully in Exhibit "D" hereto. The First Lien Take Back Paper shall be in substantially the form filed with the Bankruptcy Court as a Plan Document.

Reorganized Centaur, LLC, as borrower and NewCo and the remaining Reorganized Debtors, as guarantors, will also, in the event and to the extent necessary, obtain the Exit Financing, which will be included in a single facility, and be pari passu with, the First Lien Take Back Paper. The Exit Financing, if any, will be in an amount agreed upon by the Debtors and the Consenting First Lien Claimholders, but regardless of the amount of the Exit Financing, the aggregate amount of the Exit Financing and the First Lien Take Back Paper will be $115 million. The proceeds of the Exit Financing, if any, will be used to, among other things, pay the costs associated with the Debtors' emergence from the Chapter 11 Cases. The terms of the Exit Financing, if any, will be the same as those of the First Lien Take Back Paper described in Exhibit "D" hereto.

# VII.

# SELECTED FINANCIAL INFORMATION

## A.    Consolidated Unaudited Annual Financial Information for the Debtors

**Centaur, LLC and Subsidiaries**
**Consolidated Statement of Operations**
*($)*

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2007 | 2008 | 2009 |
| Revenues: |  |  |  |
| Casino | $40,345,702 | $142,439,311 | $200,302,052 |
| Racing | 21,001,584 | 24,318,182 | 21,493,416 |
| Food and beverage | 5,514,916 | 10,208,938 | 11,601,420 |
| Lodging | 2,498,316 | 2,426,082 | – |
| Riverboat admissions subsidy | 8,025,080 | 2,124,046 | – |
| Other | 1,469,497 | 1,989,030 | 3,472,331 |
| Gross Revenue | 78,855,095 | 183,505,589 | 236,869,219 |
| Less: casino promotional allowances | (9,490,826) | (24,982,046) | (22,483,618) |
| Total net revenues | 69,364,269 | 158,523,543 | 214,385,601 |
| Operating expenses: |  |  |  |
| Casino | 18,823,977 | 68,067,243 | 102,982,984 |
| Racing | 23,381,487 | 26,822,132 | 23,439,634 |
| Food and beverage | 2,146,102 | 9,811,517 | 13,010,902 |
| Lodging | 957,772 | 905,021 | – |
| Marketing | 4,352,597 | 14,273,155 | 13,364,056 |
| Legal fees | 2,049,021 | 1,119,326 | 842,746 |
| Consulting fees | 1,049,429 | 2,896,101 | 230,048 |
| Professional fees | 1,717,193 | 1,056,093 | 2,175,868 |
| General and administrative | 21,997,631 | 22,078,523 | 20,399,161 |
| Depreciation and amortization | 11,784,127 | 10,671,678 | 11,744,301 |
| Debt extinguishment costs - due to loan amendment | – | 13,736,055 | – |
| Impairment of land held for sale | 3,602,074 | – | – |
| Impairment of goodwill - Fortune Valley | – | 12,013,984 | – |
| Impairment of construction in progress and licensing costs - Pennsylvania | – | 16,036,428 | – |
| Impairment of licensing costs - Hoosier Park | – | – | 49,642,779 |
| Impairment of land, construction in progress and licensing costs | – | – | 91,569,460 |
| Rent | 3,360,728 | 758,995 | 167,794 |
| Termination of contractual obligations | 24,645,252 | – | – |
| Pre-opening expenses | – | 12,808,770 | 6,052,070 |
| Other operating expenses | 1,008,663 | 267,203 | 1,530,180 |
| Loss on disposal of assets | 594,782 | 115,525 | – |
| Total operating expenses | 121,470,835 | 213,437,749 | 337,151,983 |
| Net loss from operations | (52,106,566) | (54,914,206) | (122,766,382) |
| RESTRUCTURING FEES | – | – | (160,566) |
| OTHER INCOME AND (EXPENSES) |  |  |  |
| Loss on Hoosier Park | (155,103) | – | – |
| Interest income | 4,388,129 | 10,250,542 | 486,355 |
| Interest expense | (15,367,604) | (72,405,441) | (80,613,449) |
| (Loss) / gain on derivative instruments | (15,625,222) | (22,183,235) | 10,635,955 |
| Amortization of deferred financing costs | (1,191,522) | (7,846,159) | (8,042,948) |
| Write off of deferred financing costs - due to loan amendment | – | (7,450,530) | – |
| Other income | 100,585 | – | – |
| Total other income and (expenses) | (27,850,737) | (99,634,823) | (77,534,087) |
| (Loss) from continuing operations | (79,957,303) | (154,549,029) | (200,461,035) |
| (LOSS) FROM DISCONTINUED OPERATIONS | – | – | (16,737,930) |
| Net loss | (\$79,957,303) | (\$154,549,029) | (\$217,198,965) |

## Centaur, LLC and Subsidiaries
## Consolidated Balance Sheet
*($)*

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2007 | 2008 | 2009 |
| **ASSETS** | | | |
| | | | |
| **CURRENT ASSETS** | | | |
| Cash and cash equivalents | $25,060,161 | $31,751,117 | $24,236,373 |
| Restricted cash (current) | – | 17,846,829 | 3,553,968 |
| Trade Receivables | 743,596 | 146,382 | 248,060 |
| Riverboat admissions subsidy | 5,393,375 | – | – |
| Accrued interest | 1,765,026 | 539,189 | – |
| Inventories | 318,604 | 698,717 | 493,365 |
| Note receivable due from related party | 5,562,501 | – | – |
| Prepaid expenses and other | 1,276,598 | 2,209,057 | 3,296,369 |
| Total current assets | 40,119,861 | 53,191,291 | 31,828,135 |
| | | | |
| PROPERTY AND EQUIPMENT | | | |
| Land and improvements | 30,692,663 | 48,757,506 | 19,471,107 |
| Building and improvements | 37,325,150 | 76,905,123 | 60,417,197 |
| Furniture, fixtures and equipment | 31,099,330 | 65,037,283 | 50,778,648 |
| Construction in progress | 11,822,915 | 5,231,290 | 2,630,958 |
| | 110,940,058 | 195,931,202 | 133,297,910 |
| Less accumulated depreciation | (25,588,132) | (35,834,322) | (34,924,136) |
| | 85,351,926 | 160,096,880 | 98,373,774 |
| | | | |
| ASSETS HELD FOR SALE | – | – | 13,457,471 |
| | | | |
| OTHER ASSETS | | | |
| Trademarks, net | 1,501,555 | 1,246,527 | 1,095,433 |
| Deferred financing costs, net | 35,954,715 | 31,811,412 | 23,603,770 |
| Licenses, net | 326,807,472 | 322,202,726 | 205,491,237 |
| Goodwill, net | 12,013,984 | – | – |
| Land held for sale | 958,880 | 958,880 | 958,880 |
| Restricted cash (noncurrent) | 462,862,862 | 50,000,000 | 51,625,106 |
| | 840,099,468 | 406,219,545 | 282,774,426 |
| | | | |
| **Total assets** | **$965,571,255** | **$619,507,716** | **$426,433,806** |
| | | | |
| **LIABILITIES AND MEMBERS' EQUITY (DEFICIT)** | | | |
| | | | |
| **CURRENT LIABILITIES** | | | |
| Accounts payable, trade and contracts | $8,078,402 | $5,308,673 | $3,162,995 |
| Prepetition payable | – | – | 10,010 |
| Accrued expenses | 7,261,140 | 11,426,948 | 8,741,981 |
| Purses and racing related payables | 2,539,419 | 10,060,227 | 9,877,997 |
| Revolving line of credit | – | 13,687,500 | 15,000,000 |
| Current maturities of long term debt | 5,000,000 | 16,375,000 | 571,982,748 |
| Due to the State of Indiana - gaming license | 100,000,000 | – | – |
| Crystallization of swap liability | – | – | 28,729,249 |
| **Total current liabilities** | **122,878,961** | **56,858,348** | **637,504,980** |
| | | | |
| LIABILITIES SUBJECT TO COMPROMISE | – | – | 29,976,894 |
| | | | |
| LONG-TERM BORROWINGS, LESS CURRENT MATURITIES | 688,104,272 | 553,664,654 | 1,400,000 |
| | | | |
| LIABILITIES HELD FOR SALE | – | – | 3,549,653 |
| | | | |
| DERIVATIVE INSTRUMENTS | 15,625,222 | 37,808,457 | – |
| | | | |
| **Total liabilities** | **826,608,455** | **648,331,459** | **672,431,527** |
| | | | |
| MEMBERS' EQUITY (DEFICIT) | 138,962,800 | (28,823,743) | (245,997,721) |
| | | | |
| **Total liabilities and members' (deficit)** | **$965,571,255** | **$619,507,716** | **$426,433,806** |

**Centaur, LLC and Subsidiaries**
**Consolidated Statement of Cash Flows**
*($)*

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2007 | 2008 | 2009 |
| CASH FLOWS FROM OPERATING ACTIVITIES | | | |
| Net (loss) | ($79,957,303) | ($154,549,029) | ($217,198,965) |
| (Loss) from discontinued operations | | | 16,737,930 |
| Adjustments to reconcile net (loss) to net cash (used in) operating activities: | | | |
| Depreciation and amortization | 12,975,649 | 18,517,837 | 19,787,249 |
| Loss on disposal of assets | 594,782 | 115,525 | – |
| Loss on Hoosier Park | 155,103 | – | – |
| Impairment on Hoosier Park | – | – | 49,642,779 |
| Loss / (gain) on derivative instruments | 15,625,222 | 22,183,235 | (10,635,955) |
| Impairment of construction in progress, land and licensing costs | – | – | 91,569,460 |
| PIK Interest expense (Lenders Post Filing in PA), PREIT, 2nd Lien | – | – | 11,831,619 |
| PIK Interest expense and development fees included in current maturities | – | – | 25,498,505 |
| Equity related compensation | 24,987 | 24,987 | – |
| Impairment of land held for sale | 3,602,074 | – | – |
| Impairment of construction in progress and licensing costs - Pennsylvania | – | 16,036,428 | – |
| Write off of deferred financing costs - due to loan amendment | – | 7,450,530 | – |
| Impairment of goodwill associated with buyout of minority interest in Fortune Valley | – | 12,013,984 | – |
| Interest expense and development fees included in long-term debt | – | 8,901,440 | – |
| Other income | (100,585) | – | – |
| Changes in assets and liabilities | | | |
| Accounts receivable - trade | 182,570 | 597,214 | 1,439,357 |
| Riverboat admissions subsidy receivable | (159,209) | 5,393,375 | – |
| Accrued interest receivable | (1,525,040) | 1,225,837 | – |
| Accrued management fee receivable | 17,187 | – | – |
| Inventories | 45,873 | (380,113) | (36,542) |
| Prepaid expenses and other | 87,220 | (932,459) | (1,221,117) |
| Accounts payable, trade and contracts | 4,802,369 | (2,769,729) | (5,319,100) |
| Prepetition payable | | | 10,010 |
| Accrued expenses | 363,011 | 4,165,808 | (244,522) |
| Purses and racing related payables | (3,405,258) | 7,520,808 | 2,878,429 |
| Net cash (used in) operating activities | (46,671,348) | (54,484,322) | (15,260,863) |
| | | | |
| CASH FLOWS FROM INVESTING ACTIVITIES | | | |
| Purchase of property and equipment | (42,754,514) | (95,216,979) | (284,127) |
| Decrease in restricted cash | – | – | 12,667,755 |
| Proceeds from sale of property and equipment | 6,300 | 2,969 | – |
| Options and land rights write-off, net | (9,800) | – | – |
| Purchase of 15% minority interest in Valley View Downs | (17,658,544) | – | – |
| Purchase of Beaver County land | (4,560,954) | – | – |
| Purchase of licenses and additional capitalizable costs | (197,336,629) | (1,494,801) | – |
| Disbursement for note receivable | (5,562,501) | – | – |
| Cash received in purchase of Hoosier Park | 9,431,190 | – | – |
| (Increase) decrease in restricted cash | (462,862,862) | 388,316,033 | – |
| Net cash provided by (used in) investing activities | (721,308,314) | 291,607,222 | 12,383,628 |
| | | | |
| CASH FLOWS FROM FINANCING ACTIVITIES | | | |
| Proceeds of long-term debt and convertible notes payable | 679,867,427 | 33,185,625 | – |
| Payments on long-term debt and convertible notes payable | (40,302,030) | (265,151,683) | (2,844,741) |
| Debt issuance costs | (37,773,067) | (11,153,386) | – |
| Payments for preferred interest | (5,000,000) | – | – |
| Cash distributions to Centaur Gaming, LLC | – | (1,000,000) | – |
| Cash distributions to Centaur, Inc. stockholders | (134,388) | – | – |
| Draws on revolving line of credit | – | 13,687,500 | 1,312,500 |
| Capital contributions to Centaur, LLC | 190,685,485 | – | – |
| Net cash (used in) continuing financing activities | 787,343,427 | (230,431,944) | (1,532,241) |

**Centaur, LLC and Subsidiaries**
**Consolidated Statement of Cash Flows**
*($)*

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2007** | **2008** | **2009** |
| CASH FLOWS FROM DISCONTINUED OPERATIONS | | | |
| Operating cash flows | – | – | 900,636 |
| Investing cash flows | – | – | (2,505,904) |
| Financing cash flows | – | – | – |
| Net cash used in discontinued operations | – | – | (1,605,268) |
| (Decrease) in cash and cash equivalents | $19,363,765 | $6,690,956 | ($6,014,744) |
| CASH AND CASH EQUIVALENTS | | | |
| Beginning of year | 5,696,396 | 25,060,161 | 30,251,117 [1] |
| End of year | 25,060,161 | 31,751,117 | 24,236,373 |

[1] Beginning cash balance in 2009 reduced by $1.5 million due to the reclassification of Fortune Valley's cage cash as Assets held for sale.

# VIII.

## FINANCIAL PROJECTIONS AND ASSUMPTIONS; VALUATION

### A. Purpose and Objectives

The Debtors' long term business plan (the "Business Plan") and the underlying projections and assumptions serve as the basis for the Plan. The Debtors believe that the assumptions that underlie the projections are reasonable under the circumstances and that achieving the projections set forth herein will maximize the value of the Debtors' businesses. The Debtors have prepared the projected operating and financial results (the "Projections") on a consolidated basis for the Reorganized Debtors for the five years ending December 31, 2010, 2011, 2012, 2013 and 2014. Given the disposition contemplated by the Plan, however, the Projections are based entirely on the anticipated performance of Hoosier Park. The Projections and a summary of significant assumptions related thereto are attached to this Disclosure Statement as Exhibit "B".

**THE PROJECTIONS ATTACHED TO HERETO AS EXHIBIT "B" WERE NOT PREPARED TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. THE DEBTORS' INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE ACCOMPANYING PROJECTIONS AND ACCORDINGLY DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE PROJECTIONS, ASSUME NO RESPONSIBILITY FOR THE PROJECTIONS AND DISCLAIM ANY ASSOCIATION WITH THE PROJECTIONS. EXCEPT FOR PURPOSES OF THIS DISCLOSURE STATEMENT, THE DEBTORS DO NOT PUBLISH PROJECTIONS OF ITS ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS. THE DEBTORS DO NOT INTEND TO UPDATE OR OTHERWISE REVISE THESE PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE OF THIS**

DISCLOSURE STATEMENT OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS.

THE DEBTORS BELIEVE THAT THE PROJECTIONS ARE BASED ON ESTIMATES AND ASSUMPTIONS THAT ARE REASONABLE. THE ESTIMATES AND ASSUMPTIONS MAY NOT BE REALIZED, HOWEVER, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. NO REPRESENTATIONS CAN BE OR ARE MADE AS TO WHETHER THE ACTUAL RESULTS WILL BE WITHIN THE RANGE SET FORTH IN THE PROJECTIONS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE, AND EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED, OR MAY BE UNANTICIPATED, AND THEREFORE MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER. THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. SEE ARTICLE XI., "RISK FACTORS."

B.    Consolidated Pro Forma Statement of Financial Position

The Debtors have prepared consolidated pro forma statements of the financial position of the Reorganized Debtors (the "Pro Forma Statements"). The Pro Forma Statements are attached hereto as Exhibit "C" and reflect the Projections with respect to the consolidated financial position of the Reorganized Debtors assuming the effects of certain transactions that will occur in connection with and upon consummation of the Plan.

C.    Valuation

In conducting its valuation analysis, Blackstone Advisory Partners L.P. ("Blackstone"), among other things:

- reviewed certain available business and historical financial information relating to the Debtors;

- reviewed certain internal financial information and other data relating to the business and financial prospects of the Reorganized Debtors, including financial projections through 2014 prepared by the Debtors' management (of which projection years 2010-2014 are set forth in Exhibit B to this Disclosure Statement), which were provided to Blackstone by the Debtors;

- conducted discussions with members of the Debtors' senior management concerning the business and financial prospects of Reorganized Debtors;

- reviewed industry research reports and other publicly-available financial information with respect to certain other companies in lines of business

Blackstone believed to be comparable in certain respects of the Reorganized Debtors' businesses;

- considered certain industry and economic information relevant to the Reorganized Debtors' businesses;

- reviewed the Plan and the information in this Disclosure Statement as of July 22, 2010; and

- conducted such other financial studies, proprietary analyses and investigations and considered such other information, as Blackstone deemed necessary.

Blackstone has also assumed, with the Debtors' management's consent, among other things, the following (as to which Blackstone makes no representation):

- The Plan will be confirmed and consummated in accordance with its terms, and the Debtors will be reorganized as set forth in the Plan;

- For purposes of the Blackstone analysis, the Effective Date will be March 31, 2011;

- The Reorganized Debtors will be able to obtain all future financings, on the terms and at the times, necessary to achieve the Projections;

- Neither the Debtors nor the Reorganized Debtors will engage in any material asset sales or strategic transactions other than those set forth in the Plan and the Disclosure Statement;

- All governmental, regulatory or other consents and approvals necessary for the consummation of the Plan will be obtained without any material adverse effect on the Reorganized Debtors or the Plan;

- There will not be any material change in the business, condition (financial or otherwise), results of operations, assets, liabilities or prospects of the Debtors other than as reflected in the Projections; and

- There will not be any material change in economic, market, financial and other conditions.

(a) **Reorganized Enterprise Value**

In conjunction with formulating the Plan, the Debtors have estimated the post-confirmation going-concern enterprise value of the Reorganized Debtors (the "Reorganized Enterprise Value"). At the Debtors' request, Blackstone performed an analysis of the estimated reorganization value of Reorganized Debtors on a going-concern basis.

Blackstone utilized a sum-of-the-parts valuation analysis to determine Reorganized Enterprise Value given the discrete nature of the Assets comprising the Reorganized Debtors. For the valuation of Hoosier Park, Blackstone considered two valuation methodologies to determine its reorganization value: (i) comparable public company analysis based on trading multiples, and (ii) discounted cash flow analysis using the terminal EBITDA multiple method. The methodologies rely on the financial projections developed by management of the Debtors. Based on these methodologies, the estimated Hoosier Park reorganization value is approximately $250 to $310 million.

There are currently no existing operations for the Debtors' third property, Valley View Downs. Due to uncertainty surrounding the future of this property, Blackstone determined the equity value of Valley View Downs to be $50 million, reflecting the current amount of restricted Cash associated with the entity.

This sum-of-the-parts valuation analysis indicates a Reorganized Enterprise Value range of approximately $300 to $360 million.

The Debtors are in the midst of a sale process for the Fortune Valley property. Thus, Blackstone relied on the results of the ongoing sale process to conclude that the value of this property is approximately $10 million, representing the net proceeds due to the Debtors' Estates. The Cash proceeds from the sale will likely be distributed at emergence pursuant to the Plan and hence not included in the Reorganized Enterprise Value. To the extent the sale closes after emergence, this value would increase the Reorganized Enterprise Value upon emergence.

a. Comparable Public Company Analysis

In conducting its Comparable Public Company Analysis, Blackstone examined the value of comparable companies as a multiple of their key operating statistics and then applied a range of multiples to the projected 2010 and 2011 EBITDA of the Reorganized Debtors. The estimated revenue and EBITDA for comparable companies are based on consensus estimates by equity analysts as compiled by Capital IQ / Reuters.

A key factor to the Comparable Public Company Analysis approach is the selection of companies with relatively similar business and operational characteristics to the Reorganized Debtors. The selection of truly comparable companies is often difficult and subject to interpretation. Criteria for selecting comparable companies include, among other relevant characteristics, lines of business, business risks, key business drivers, growth prospects, maturity of businesses, market presence and brands, size and scale of operations.

Blackstone selected a range of 5.5x to 7.5x for 2010 EBITDA of the Reorganized Debtors and 5.0x to 7.0x for 2011 EBITDA of the Reorganized Debtors. Such ranges reflect unique growth and risk characteristics of the Reorganized Debtors relative to comparable companies.

b. Discounted Cash Flow Analysis

The Discounted Cash Flow Analysis estimates value by calculating the present value of projected future cash flows. The present value is obtained by discounting the future

cash flows by the weighted average cost of capital ("WACC") of the Reorganized Debtors. The WACC was calculated as the average of the cost of equity and the after-tax cost of debt, weighted by the ratios of total equity to capitalization and total debt to capitalization. Blackstone selected a WACC range of between 12.0 percent and 16.0 percent for the purposes of this analysis.

The Reorganized Enterprise Value was determined using the terminal EBITDA multiple method, and is calculated as the sum of the present value of the cash flows for fiscal years 2010 through 2014, plus the estimated value of cash flows beyond the projection.

(b)    **Reorganized Equity Value**

In order to calculate the equity value of the Reorganized Debtors (the "Reorganized Equity Value"), the Reorganized Enterprise Value was reduced by the face amount of up to $115 million of the First Lien Take Back Paper, and $155 million of NewCo PIK Notes. The Reorganized Equity Value is estimated to be approximately $30 to $90 million.

**THE DEBTORS BELIEVE THAT THE FOREGOING VALUATION ACCURATELY REFLECTS THE REORGANIZED ENTERPRISE VALUE. HOWEVER, THE FOREGOING VALUATION IS BASED UPON A NUMBER OF ESTIMATES AND ASSUMPTIONS WHICH ARE INHERENTLY SUBJECT TO SIGNIFICANT UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS AND BLACKSTONE. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE RANGES REFLECTED IN THE ESTIMATED VALUATION WOULD BE REALIZED IF THE PLAN WERE TO BECOME EFFECTIVE, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE. ADDITIONALLY, THE REORGANIZED ENTERPRISE VALUE ESTIMATED BY BLACKSTONE DOES NOT NECESSARILY REFLECT, AND SHOULD NOT BE CONSTRUED AS REFLECTING, VALUES THAT WILL BE ATTAINED IN THE PUBLIC OR PRIVATE MARKETS. THE VALUE DESCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET TRADING VALUE. SUCH TRADING VALUE MAY BE MATERIALLY DIFFERENT FROM THE REORGANIZED ENTERPRISE VALUE RANGES ASSOCIATED WITH THE DEBTORS' VALUATION ANALYSIS.**

## IX.

## THE CHAPTER 11 CASES

### A.    Commencement of the Chapter 11 Cases

On October 28, 2009, the Valley View Downs Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, the Honorable Kevin J. Carey presiding. On March 6, 2010, the Centaur Debtors each filed a voluntary petition under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

### B.    Continuation of Business after the Petition Date

Since October 28, 2009 and March 6, 2010, the Valley View Downs Debtors and the Centaur Debtors, respectively, have continued to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. As discussed in this section, during the period immediately following the date the Valley View Downs Debtors commenced their Chapter 11 Cases and the date the Centaur Debtors commenced their Chapter 11 Cases, the Debtors sought and obtained authority from the Bankruptcy Court with respect to a number of matters deemed by the Debtors to be essential to their smooth and efficient transition into chapter 11 and the stabilization of their operations. As also described below, the Debtors intend to seek authority to obtain debtor-in-possession financing.

#### (a)    **Letter of Credit**

In October 2007, the Debtors contracted with the L/C Issuer, to provide the $50 million Existing L/C to the Commonwealth of Pennsylvania for the purpose of securing the Debtors' application for a gaming license in Pennsylvania related to Valley View Downs. The Existing L/C was scheduled to expire on October 30, 2009. The Debtors were unable to obtain an extension of the Existing L/C absent the grant of protections that only the Bankruptcy Court could provide.

As mentioned above, the Bankruptcy Court approved an initial amendment of the Existing L/C by the L/C Issuer to extend the term thereof until January 29, 2010 on an interim basis on October 30, 2009 [Case No. 09-13760 (KJC), D.I. 15] and a final basis on November 23, 2009 [Case No. 09-13760 (KJC), D.I. 50]. The Bankruptcy Court approved further amendments of the Existing L/C by the L/C Issuer to extend the term thereof for an additional ninety (90) days until April 29, 2010 by Order dated January 25, 2010 [Case No. 09-13760 (KJC), D.I. 82] and to extend the term thereof for an additional ninety (90) days until July 28, 2010 by interim Orders dated April 26, 2010 [Case No. 09-13760 (KJC), D.I. 279, Case No. 10-10799 (KJC), D.I. 182] and to extend the term thereof for an additional ninety (90) days until October 26, 2010 by Final Orders dated June 22, 2010 [Case No. 09-13760 (KJC), D.I. 287, Case No. 10-10799 (KJC), D.I. 357].

It is the Prepetition Second Lien Agent's position that the document it refers to as the Prepetition Reimbursement Agreement was novated by the document it refers to as the

Postpetition Reimbursement Agreement and any rights and obligations of Valley View Downs, LP under the Postpetition Reimbursement Agreement are postpetition rights and obligations and are not First Lien Collateral. More specifically, among other things, Section 11(b) of the Postpetition Reimbursement Agreement reads, in relevant part, as follows: "This Agreement and the Letter of Credit (including the related letter of credit application) are the only agreements that have been entered into among us with respect to the Letter of Credit and set forth the entire understanding of the parties with respect thereto. This Agreement amends and restates in its entirety that certain [Prepetition] Reimbursement Agreement pursuant to which the Original Letter of Credit was issued."

    (b)    **Intercompany Financing**

        The Bankruptcy Court, by interim and Final Orders, dated November 23, 2009 [Case No. 09-13760 (KJC), D.I. 49] and December 4, 2009 [Case No. 09-13760 (KJC), D.I. 60] (the "Final Intercompany Financing Order"), respectively, authorized the Valley View Downs Debtors to obtain unsecured postpetition financing from the Valley View Downs Debtors' indirect parent company, Centaur, LLC, to enable the Valley View Downs Debtors to continue to incur, on a postpetition basis, certain limited, but necessary, operating costs, obligations to vendors, consultants, and regulatory authorities related to the pending Pennsylvania Gaming License Application, and to satisfy certain nominal prepetition expenses, including expenses related to the gaming license application (the "Intercompany Financing"). On January 25, 2010, the Bankruptcy Court entered an Order supplementing the Final Intercompany Financing Order [Case No. 09-13760 (KJC), D.I. 82], and, inter alia, authorizing up to an additional $100,000 of Intercompany Financing to compensate the L/C Issuer for agreeing to amend the Existing L/C and extend the term thereof until April 29, 2010. On March 10, 2010 the Bankruptcy Court entered an Order granting the relief requested in the Cash Management Motion as modified in the Centaur Debtors' Chapter 11 Cases [Case No. 10-10799 (KJC), D.I. 30] and on March 11, 2010, the Bankruptcy Court entered an interim Order granting the relief requested in the Cash Management Motion as modified in the Valley View Downs Debtors' Chapter 11 Cases [Case No. 09-13760 (KJC), D.I. 153] approving, among other things, administrative priority for intercompany transactions provided that any intercompany funding by any of the Debtors to Centaur PA Land, LP and/or Valley View Downs, LP subsequent to the date of the Order does not exceed $165,000. On or about March 16, 2010, the Bankruptcy Court entered an Order supplementing the Final Intercompany Financing Order, and, inter alia, authorizing the Valley View Downs Debtors to obtain up to an additional $165,000 of Intercompany Financing [Case No. 09-13760 (KJC), D.I. 164]. On April 26, 2010, the Bankruptcy Court entered interim Orders [Case No. 09-13760 (KJC), D.I. 279, Case No. 10-10799 (KJC), D.I. 182] further supplementing the Final Intercompany Financing Order, and, inter alia, authorizing Centaur, LLC to advance to Valley View Downs, LP up to an additional $100,000 of Intercompany Financing to compensate the L/C Issuer for agreeing to amend the Existing L/C and extend the term thereof until July 28, 2010. On June 22, 2010, the Bankruptcy Court entered Final Orders [Case No. 09-13760 (KJC), D.I. 287, Case No. 10-10799 (KJC), D.I. 357] further supplementing the Final Intercompany Financing Order, and inter alia, authorizing Centaur, LLC to advance to Valley View Downs, LP up to an additional $100,000 to compensate the L/C Issuer for agreeing to amend the Existing L/C to extend the term thereof until October 26, 2010.

The Intercompany Financing is necessary to maintain the Valley View Downs Debtors' relationships with their vendors, consultants and regulatory authorities and will permit the Debtors to preserve the value of their Assets at Valley View Downs. Such intercompany borrowings are reflected on the Valley View Downs Debtors' books as a loan and are subordinate in right of payment to the obligations of the First Lien Lenders and Second Lien Lenders pursuant to the terms of an Intercompany Subordinated Demand and Promissory Note dated October 30, 2007. The Intercompany Financing Claim is junior only to the superpriority Administrative Expense Claim of the L/C Issuer with respect to the Valley View Downs Debtors' obligations pursuant to the Reimbursement Agreement. All receivables arising from the Intercompany Financing are pledged to the Prepetition First Lien Agent and the First Lien Lenders.

(c)     **Use of Cash Collateral**

By motion filed shortly after the date the Centaur Debtors commenced their Chapter 11 Cases (the "Cash Collateral Motion"), the Debtors sought emergency relief (i) authorizing the use of the First Lien Lenders' and Second Lien Lenders' cash collateral, (ii) granting adequate protection and (iii) scheduling a final hearing. As of the Petition Date, the Debtors' only source of liquidity was the First Lien Lenders' and Second Lien Lenders' cash collateral and the income generated by the Debtors' business operations. Given that the Debtors believe that substantially all of the Debtors' Assets are encumbered by the First Lien Lenders' and Second Lien Lenders' liens, the Debtors would have been unable to continue their business operations or fund their Chapter 11 Cases absent some form of immediate relief from the Bankruptcy Court. The Cash Collateral Motion also proposed that certain adequate protection be provided to the First Lien Lenders' and Second Lien Lenders' including (i) replacement liens, (ii) superpriority claims under section 507(b) of the Bankruptcy Code, and (iii) certain financial reporting by the Debtors.

By interim Orders entered March 11, 2010 [Case No. 10-10799 (KJC), D.I. 39], March 22, 2010 [Case No. 09-13760 (KJC), D.I. 175], March 29, 2010 [Case No. 09-13760 (KJC), D.I. 198, Case No. 10-10799 (KJC), D.I. 89] and April 16, 2010 [Case No. 09-13760 (KJC), D.I. 273, Case No. 10-10799 (KJC), D.I. 168], the Bankruptcy Court granted the relief requested in the Cash Collateral Motion with some modifications. By a Final Order entered on April 30, 2010 [Case No. 10-10799 (KJC), D.I. 205], the Bankruptcy Court granted the relief requested in the Cash Collateral Motion with some modifications.

(d)     **Business Operations and Bankruptcy-Related Relief**

The Debtors sought various types of "first day" relief, including, among other things, orders (i) authorizing the Debtors to continue to use their existing cash management systems; (ii) authorizing the Debtors to pay certain prepetition obligations owing to the Debtors' employees, independent contractors and other third parties; (iii) prohibiting the Debtors' utility companies from altering, refusing or discontinuing service; (iv) authorizing the Debtors to honor certain prepetition customer programs; (v) authorizing the Debtors to pay certain prepetition taxes owed to taxing and regulating authorities in the ordinary course of business; (vi) authorizing the Debtors to pay certain obligations to maintain their insurance programs and

insurance premium financing arrangements; and (vii) authorizing the Debtors to pay prepetition claims of certain essential suppliers.

The Debtors filed a motion (the "Cash Management Motion") pursuant to sections 363(c) and 345 of the Bankruptcy Code, seeking authority to, among other things, continue use of their current cash management systems (the "Cash Management Systems"). The Debtors also sought, among other things, (i) approval of the Debtors' continued use of their prepetition bank accounts and business forms, (ii) authority for the Debtors' banks to honor certain transfers and (iii) authority to continue certain intercompany transactions. The Cash Management Systems are ordinary course, essential business practices of the Debtors and in light of certain regulatory requirements imposed due to the nature of the Debtors' racing and gaming operations, any disruption in their cash management procedures would hamper the Debtors' efforts to preserve the value of their Estates. On March 10, 2010 the Bankruptcy Court entered an Order granting the relief requested in the Cash Management Motion as modified in the Centaur Debtors' Chapter 11 Cases [Case No. 10-10799 (KJC), D.I. 30]. On March 11, 2010, the Bankruptcy Court entered an interim Order granting the relief requested in the Cash Management Motion as modified in the Valley View Downs Debtors' Chapter 11 Cases [Case No. 09-13760 (KJC), D.I. 153]. Following entry of an Order that jointly administered the Valley View Downs Debtors' Chapter 11 Cases with those of the Centaur Debtors, on May 6, 2010, the Debtors tendered to the Bankruptcy Court under certification of counsel [Case No. 10-10799 (KJC), D.I. 230] a single proposed Order that both (i) grants final relief on the Cash Management Motion as to the Valley View Downs Debtors and (ii) modifies the Final Order entered on the Cash Management Motion as to the Centaur Debtors.

The Debtors also filed a motion (the "Employee Motion") for authority to, inter alia, pay certain prepetition obligations owing to the Debtors' employees, independent contractors and other third parties. Among other things, the Debtors requested authority to pay or otherwise honor (i) prepetition employee wages, salaries, tips, vacation time and other accrued compensation (collectively, the "Compensation"); (ii) obligations relating to employee benefits provided by the Debtors; (iii) amounts owed to administrators or providers of services with respect to the Debtors' payroll and employee benefits programs; (iv) certain workers' compensation obligations; and (v) other miscellaneous employee related expenses. By the Employee Motion, the Debtors also asked for authority to continue in the ordinary course, pay and otherwise honor any Compensation in the form of unused paid vacation time that, as of the Petition Date, had accrued but was not yet payable, if and when such Compensation becomes due and to pay cash in lieu of unused vacation time only where the Debtors believe they are required to do so by applicable state law. Moreover, the Debtors requested authority to remit prepetition amounts withheld or deducted from their employees' wages to the appropriate third parties and to make further payments in the ordinary course of or with respect to Compensation, employee benefits, workers' compensation obligations and obligations to administrative service providers. The Debtors deemed much of the relief sought in the Employee Motion critical to employee morale and future business needs. By Order entered March 10, 2010 in the Centaur Debtors' Chapter 11 Cases, the Bankruptcy Court granted the relief requested in the Employee Motion as modified [Case No. 10-10799 (KJC), D.I. 22].

The Debtors also filed a motion (the "Utilities Motion") seeking entry of an order pursuant to sections 105(a) and 366(b) of the Bankruptcy Code, prohibiting utility companies

from altering, refusing or discontinuing service to the Debtors, providing for the payment of certain deposits as adequate assurance of future payment to those utility companies and establishing certain procedures for addressing requests by utility companies for additional adequate assurance. If the Debtors' utility companies are allowed to alter, refuse or discontinue service to the Debtors, the Debtors' ability to continue their operations and reorganize will be jeopardized. By interim Order dated March 10, 2010 [Case No. 10-10799 (KJC), D.I. 23], and by Final Order dated April 13, 2010 [Case No. 10-10799 (KJC), D.I. 143], the Bankruptcy Court granted the relief requested in the Utilities Motion in the Centaur Debtors' Chapter 11 Cases.

The Debtors also filed a motion (the "Customer Programs Motion") seeking entry of an order pursuant to sections 105(a) and 363 of the Bankruptcy Code, authorizing, but not directing, the Debtors, in their business judgment, to continue to honor prepetition (i) obligations to customers and otherwise continue customer programs, and (ii) Horsemen Accounts (as defined below) that the Debtors maintained prior to the Petition Date to help the Debtors remain competitive in the markets in which they operate. Among other things, the Debtors requested authority to honor prepetition obligations related to outstanding wagering obligations, progressive slot and poker liabilities, cage accounts, patron reward programs, gift certificates and coupons and promotions. These customer programs are essential to provide the level of customer satisfaction and loyalty on which the Debtors' operations depend. As part of the Customer Programs Motion, the Debtors also asked for authority to honor obligations owed to, and continue to operate, accounts (the "Horsemen Accounts") set up for the owners (the "Horsemen") of the horses that win the races held at Hoosier Park. This relief is necessary to ensure that the Horsemen will continue to enter their horses in the races at Hoosier Park. By Order entered March 10, 2010 in the Centaur Debtors' Chapter 11 Cases, the Bankruptcy Court granted the relief requested in the Customer Programs Motion [Case No. 10-10799 (KJC), D.I. 21].

The Debtors also filed a motion (the "Taxes and Fees Motion") seeking entry of an order pursuant to sections 105(a) and 363 of the Bankruptcy Code, authorizing, but not directing, the Debtors, in their business judgment, to continue to honor prepetition obligations owed to federal, state and local taxing and regulating authorities including, but not limited to, gaming and racing taxes and fees, hotel taxes, sales and use taxes, and "winnings" taxes (collectively, the "Taxes and Fees"). The Debtors operate racing, gaming and hotel facilities that are heavily regulated and which require periodic payment of the Taxes and Fees to maintain the licenses and rights to operate those facilities in the respective states. If the Debtors fail to timely pay the necessary Taxes and Fees, their regulatory authorizations to operate their racing, gaming and hotel facilities could be suspended or revoked. On March 10, 2010, the Bankruptcy Court entered an Order granting the relief requested in the Taxes and Fees Motion in the Centaur Debtors' Chapter 11 Cases [Case No. 10-10799 (KJC), D.I. 24].

The Debtors also filed a motion (the "Insurance Motion") seeking entry of an order pursuant to sections 105(a) and 363 of the Bankruptcy Code, authorizing, but not directing, the Debtors, in their business judgment, to continue their insurance programs and to pay certain prepetition obligations owed in connection therewith. In connection with the daily operation of their businesses, the Debtors maintain certain insurance policies in respect of, among other things, property, commercial general liability, automobile and garagekeepers, participant accident, excess liability, criminal liability, employment practices and fiduciary liability and

directors and officers liability. A portion of the premiums is financed through premium financing arrangements. The continuation of these insurance policies and premium financing arrangements is necessary to allow the Debtors to maintain a comprehensive range of coverage in full force and effect for the Debtors, their businesses and their properties. By Order entered March 10, 2010 in the Centaur Debtors' Chapter 11 Cases [Case No. 10-10799 (KJC), D.I. 29] and by Order entered March 11, 2010 in the Valley View Downs Debtors' Chapter 11 Cases [Case No. 09-13760 (KJC), D.I. 154], the Bankruptcy Court granted the relief requested in the Insurance Motion.

The Debtors also filed a motion (the "Essential Supplier Motion") for, among other things, authority to pay prepetition claims of certain parties who supply goods or services critical to the continued operation of the Debtors' businesses (collectively, the "Essential Suppliers"). The Essential Suppliers that the Debtors sought to pay include (i) a supplier of goods and services related to simulcasting and wagering, (ii) a supplier of tickets and programs necessary in connection with simulcasting and wagering and (iii) a provider of specialized direct mail services. Based on the lack of any executory contract with any of the Essential Suppliers and the importance of each Essential Supplier to the Debtors' operations, it is the Debtors' position that authorization to pay the claims of the Essential Suppliers, in the event they refuse to continue to provide goods and services, is necessary to prevent immediate and irreparable damage to the Debtors' business operations (and customer confidence therein), going concern value and ability to reorganize that would result from the Debtors' inability to obtain indispensable goods and services. By the Essential Supplier Motion, the Debtors also sought authority to require, as a condition to any payment to an Essential Supplier, that the Essential Supplier agree to provide the Debtors with goods or services on credit, pricing or payment terms and order limits that are equal to, or better than, those provided to the Debtors prepetition (the "Trade Terms") and proposed consequences that will ensue if an Essential Supplier accepts an essential supplier payment and thereafter fails to provide the agreed upon Trade Terms. On March 10, 2010, the Bankruptcy Court entered an Order granting the relief requested in the Essential Supplier Motion in the Centaur Debtors' Chapter 11 Cases [Case No. 10-10799 (KJC), D.I. 28].

## C.    Representation of the Debtors

In September 2009, the Debtors retained White & Case LLP as lead bankruptcy counsel to the Debtors in connection with the Chapter 11 Cases. The Debtors also retained Fox Rothschild LLP to serve as bankruptcy co-counsel. By separate Orders entered January 25, 2010 in the Valley View Downs Debtors' Chapter 11 Cases, the Bankruptcy Court approved the retention applications of White & Case LLP [Case No. 09-13760 (KJC), D.I. 84] (the "White & Case Retention Order") and Fox Rothschild LLP [Case No. 09-13760 (KJC), D.I. 83] (the "Fox Rothschild Retention Order"). By Order entered March 10, 2010 in the Centaur Debtors' Chapter 11 Cases, the Bankruptcy Court made the White & Case Retention Order and the Fox Rothschild Retention Order applicable in the Centaur Debtors' Chapter 11 Cases [Case No. 10-10799 (KJC), D.I. 25].

By Orders dated April 26, 2010 [Case No. 09-13760 (KJC), D.I. 280, Case No. 10-10799 (KJC), D.I. 183], the Bankruptcy Court approved the Debtors' applications to retain Blackstone as the Debtors' investment banker and financial advisor. By Order dated April 27,

2010, the Bankruptcy Court approved the Centaur Debtors' application to retain Innovation Capital, LLC as financial advisor for Centaur, LLC and Centaur Colorado, LLC in connection with the sale of certain Assets including Fortune Valley [Case No. 10-10799 (KJC), D.I. 197].

## D. Formation and Representation of the Committee

On or about March 17, 2010, the U.S. Trustee appointed the Committee [Case No. 09-13760 (KJC), D.I. 186, Case No. 10-10799 (KJC), D.I. 80]. By Orders dated April 15, 2010 [Case No. 09-13760 (KJC), D.I. 262, Case No. 10-10799 (KJC), D.I. 158], the Bankruptcy Court approved the Committee's application to retain as counsel the law firm of Blank Rome LLP. In addition, on April 16, 2010, the Committee filed an application [Case No. 10-10799 (KJC), D.I. 169] to retain Deloitte Financial Advisory Services LLP as its financial advisor. The current members of the Committee include: PR Valley View Downs, L.P. ("PR Valley") and PREIT-RUBIN, Inc. ("PREIT-RUBIN," and collectively with PR Valley, "PREIT"), Ames Construction, Inc. ("Ames"), U.S. Food Service, Inc. and WMS Gaming, Inc.[17]

## E. Representation of the First Lien Lenders

Credit Suisse, as Prepetition First Lien Agent, retained Latham & Watkins LLP and Duane Morris LLP as legal counsel in connection with the Chapter 11 Cases.

## F. Representation of the Second Lien Lenders

Wells Fargo Bank, N.A., as Prepetition Second Lien Agent, retained Ropes & Gray LLP, Schulte Roth and Zabel LLP, Richards, Layton & Finger, P.A., and Potter Anderson & Corroon LLP as legal counsel in connection with the Chapter 11 Cases.

## G. Matters Relating to Unexpired Leases and Executory Contracts

Section 365 of the Bankruptcy Code grants a debtor the power, subject to the approval of the bankruptcy court, to assume or reject executory contracts and unexpired leases. As amended, section 365(d)(4) of the Bankruptcy Code provides that if a debtor does not assume or reject an unexpired lease of nonresidential real property under which the debtor is the lessee (i) within 120 days after the petition date (the "365(d)(4) Deadline"), (ii) within an additional 90-day period as the bankruptcy court, for cause, may allow, or (iii) within such additional time as the bankruptcy court may permit with the consent of the landlord of the leased premises, then such lease is deemed rejected.

By Order of the Bankruptcy Court entered February 23, 2010 [Case No. 09-13760 (KJC), D.I. 101], the Bankruptcy Court extended the initial 365(d)(4) Deadline for the Valley View Downs Debtors through and including May 26, 2010. By Order entered May 21, 2010 [Case No. 10-10799 (KJC), D.I. 272], the Bankruptcy Court further extended the 365(d)(4) Deadline for the Valley View Downs Debtors through and including August 24, 2010. The

---

[17]     Although the Committee originally included Churchill Downs, Inc., according to a revised appointment notice filed by the U.S. Trustee on July 6, 2010 [Case No. 10-10799 (KJC), D.I. 397], Churchill Downs, Inc. is no longer a member of the Committee.

Debtors filed a motion on July 7, 2010 [Case No. 10-10799 (KJC), D.I. 400] seeking an additional ninety (90) day extension of the 365(d)(4) Deadline for the Valley View Downs Debtors through and including November 22, 2010.

By Order entered June 18, 2010 [Case No. 10-10799 (KJC), D.I. 345], the Debtors extended the initial 365(d)(4) Deadline for the Centaur Debtors through and including October 4, 2010.

The Debtors are party to approximately 400 executory contracts and unexpired leases. By Order entered by the Bankruptcy Court on May 21, 2010 [Case No. 10-10799 (KJC), D.I. 273], the Bankruptcy Court granted the Debtors' first omnibus motion to reject certain of the Debtors' executory contracts as of May 3, 2010. The Plan contemplates the automatic rejection of certain executory contracts and unexpired leases, as of and subject to the occurrence of the Effective Date, except for any executory contract or unexpired lease specifically designated for assumption.

With respect to the executory contracts and unexpired leases set forth on Schedule 2, the Plan contemplates the assumption, as amended, of such contracts as of the Effective Date.

## H.    Exclusivity

Pursuant to sections 1121(b) and (c)(3) of the Bankruptcy Code, the Debtors have a certain amount of time within which (a) to file their Plan; and (b) to solicit acceptances of their timely filed Plan (the "Solicitation Period") before other parties in interest are permitted to file plans. The Debtors filed the Plan and this Disclosure Statement on September 3, 2010. Accordingly, no other party may file a plan unless the Solicitation Period expires or the Bankruptcy Court orders otherwise. By Order entered March 17, 2010 [Case No. 09-13760 (KJC), D.I. 166], the Valley View Downs Debtors received an extension of their Solicitation Period, through and including June 25, 2010. The Debtors filed a motion on June 25, 2010 [Case No. 10-10799 (KJC), D.I. 368], seeking to extend the Solicitation Period for both the Valley View Downs Debtors and the Centaur Debtors through and including September 30, 2010.

## I.    Schedules, Bar Date and Section 503(b)(9) Bar Date

The Valley View Downs Debtors filed their Schedules [Case No. 09-13760 (KJC), D.I. 203, 204] on March 31, 2010 and the Centaur Debtors filed their Schedules on May 5, 2010 [Case No. 10-10799 (KJC), D.I. 216-227]. The Schedules for the Valley View Downs Debtors were amended on June 18, 2010 [Case No. 10-10799 (KJC), D.I. 341, 343].

By order entered May 25, 2010 [Case No. 10-10799 (KJC), D.I. 280], the Bankruptcy Court fixed June 30, 2010 at 4:00 p.m. Eastern Time, as the deadline for certain holders of alleged Claims against the Debtors to file proofs of claim against the Debtors (the "Bar Date").

By order entered May 21, 2010 [Case No. 10-10799 (KJC), D.I. 274], the Bankruptcy Court fixed June 30, 2010 at 4:00 p.m. Eastern Time, as the deadline for the filing of administrative expense claims asserted against the Centaur Debtors under section 503(b)(9) of the Bankruptcy Code (the "Section 503(b)(9) Bar Date").

### J. Claim Objections

In the ordinary course of business, the Debtors maintain books and records (the "Books and Records") that reflect, among other things, the Debtors' liabilities and the amounts owed to their creditors in connection with such liabilities. The Debtors, the Disbursing Agent and their Professionals will review the proofs of claim submitted in the Chapter 11 Cases, including any supporting documentation, and compare the Claims asserted in the proofs of claim with the Books and Records to determine the validity of such Claims. The Debtors and the Disbursing Agent may file procedural and substantive objections based upon such review both before and after the deadline for voting on the Plan set in conjunction with the Bankruptcy Court's approval of this Disclosure Statement and before and after the Effective Date.

### K. Motion to Convert the Valley View Downs Debtors' Chapter 11 Cases to Cases Under Chapter 7 of the Bankruptcy Code

On March 25, 2010, the Prepetition Second Lien Agent filed a motion for an order pursuant to section 1112 of the Bankruptcy Code to convert the Valley View Downs Debtors' Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code [Case No. 09-13760 (KJC), D.I. 189] (the "Motion to Convert"). The Prepetition Second Lien Agent asserts that conversion of the Valley View Downs Debtors' Chapter 11 Cases is warranted because the Valley View Downs Debtors have no operations and conduct no business. The Prepetition Second Lien Agent also argues that (i) the Valley View Downs Debtors are unable to avail themselves of the development opportunity at Valley View Downs, (ii) the costs of preserving that opportunity is consistently and materially eroding creditor recoveries, and (iii) the Centaur Debtors, specifically Centaur, LLC through its claims against the Valley View Downs Debtors pursuant to the Intercompany Financing, are attempting to subsidize the costs of their Chapter 11 Cases by gaining access to the L/C Cash.

On April 8, 2010, the Valley View Downs Debtors filed an objection to the Motion to Convert [Case No. 09-13760 (KJC), D.I. 234]. The Valley View Downs Debtors believe that the Motion to Convert is a tactic being employed by the Prepetition Second Lien Agent, who is dissatisfied with the proposed treatment of the Second Lien Claims under the Plan, in order to gain leverage over the Prepetition First Lien Agent in Plan negotiations. The Valley View Downs Debtors believe that the Motion to Convert should be denied because the Valley View Downs Debtors have the opportunity to realize value in excess of the amount of the L/C Cash through the continued prosecution of their cases under chapter 11. Conversion is also unwarranted because the Motion to Convert rests entirely on the disputed premise that the L/C Cash would be unencumbered if returned to the Valley View Downs Debtors' Estates. Regardless of who might be entitled to receive the value of the Assets of the Valley View Downs Debtors, if the Bankruptcy Court grants the Motion to Convert, any value in excess of the L/C Cash would undoubtedly be lost. Although Administrative Expense Claims are being incurred to preserve the Valley View Downs opportunity, the Valley View Downs Debtors believe that such expenses are essential to provide the Valley View Downs Debtors with adequate time to explore all reasonable means of realizing value in excess of the L/C Cash. For the foregoing reasons, the Valley View Downs Debtors believe that conversion of the Valley View Downs Debtors' Chapter 11 Cases to cases under chapter 7 is not in the best interests of creditors or the Valley View Downs Debtors' Estates. On April 8, 2010, the Prepetition First Lien Agent filed a

statement in support of the Valley View Downs Debtors' objection to the Motion to Convert [Case No. 09-13760 (KJC), D.I. 235], reiterating the arguments made by the Valley View Downs Debtors and asserting that the Second Lien Lenders waived their right to seek liquidation of the Valley View Downs Debtors' Estates pursuant to the terms of the Prepetition Intercreditor Agreement.

Also on April 8, 2010, the Committee and PREIT responded and/or objected to the Motion to Convert. The Committee objected to the Motion to Convert [Case No. 09-13760 (KJC), D.I. 224, Case No. 10-10799 (KJC), D.I. 110] as then premature, noting at the time its objection was filed that necessary protections in respect of the return of the L/C Cash and in respect of other Valley View Downs collateral subject to challenge can be implemented through orders in respect of the Debtors' use of the First Lien Lenders' and Second Lien Lenders' cash collateral and otherwise. PREIT, in its response [Case No. 09-13760 (KJC), D.I. 228], contended that the Motion to Convert was premature, and argued that more time is needed to evaluate the Valley View Downs Debtors' ability to reorganize.

The Motion to Convert was originally scheduled to be heard on April 15, 2010, but the hearing has been adjourned until October 5, 2010.

## L.  The Mediation

Based upon the Debtors' valuation, there is not sufficient value to pay the First Lien Debt in full. Accordingly, absent the claimed material infirmities in the Prepetition First Lien Claimholders' collateral package that are the subject of the challenges the Committee seeks standing to bring, the Debtors believe that the Prepetition Second Lien Claimholders and most of the Debtors' unsecured creditors do not have Claims that would be paid in any liquidation in any amount. Indeed, most of the challenges the Committee seeks standing to bring, which the Debtors believe are subject to important and compelling defenses, in the Debtors' view shift value to unsecured creditors of less than $15 million. The Committee believes that the challenges the Committee seeks standing to bring are colorable, important and viable and could shift as much as $84 million to unsecured creditors. The Debtors, with the support of the Claimholders filed the Plan, which proposes to pay approximately 95 percent in number of unsecured creditors in full and what the Debtors view as an appropriate dividend to the Prepetition Second Lien Claimholders and certain other general unsecured creditors. The Committee and the Prepetition Second Lien Claimholders do not view the Plan as a reasonable resolution of the challenges the Committee seeks standing to bring, the Debtors' value or other issues arising under applicable bankruptcy law as the Claims of the Prepetition Second Lien Claimholders, PREIT and Ames would receive little or no meaningful distribution under the Plan.

The Prepetition Second Lien Agent has provided the Debtors with an analysis demonstrating its position that solely with respect to the L/C Cash, the shift in value will exceed $17.6 million ($15.5 million for holders of Second Lien Claims and $2.1 million for PREIT) if the Committee's and the Prepetition Second Lien Agent's position with respect to the L/C Cash is correct.

52

Although the Debtors hoped the original and first amended plan of reorganization would serve as a platform for negotiations, negotiations did not ensue, and the Debtors were unable to elicit a counteroffer from either the Committee or the Prepetition Second Lien Agent. The Committee asserts that the original and first amended plan of reorganization were filed without consultation with the Committee and that the Committee was not in a position to make a counteroffer at that time because it had not been provided with adequate information to do so. On May 18, 2010, the Prepetition Second Lien Agent filed an objection to the Disclosure Statement [Case No. 10-10799 (KJC), D.I. 262] (the "Wells Fargo Objection"). On May 19, 2010, the Committee filed an objection the Disclosure Statement [Case No. 10-10799 (KJC), D.I. 264] (the "Committee Objection"). On May 21, 2010, the Prepetition First Lien Agent filed a limited response to the Wells Fargo Objection [Case No. 10-10799 (KJC), D.I. 276] (the "Credit Suisse Response"). In the Debtors' view, the Wells Fargo Objection, the Committee Objection and the Credit Suisse Response highlighted the following disputed issues that threatened to delay confirmation of the Plan and result in the incurrence of a significant amount of administrative expenses:

1.      Whether the Prepetition First Lien Claimholders and the Prepetition Second Lien Claimholders (collectively, the "Prepetition Secured Parties") have a lien on the Debtors' reversionary interest in the L/C Cash via their purported liens on the Debtors' rights under the Reimbursement Agreement among Valley View Downs, LP and the L/C Issuer, or whether the Debtors' reversionary interest in the L/C Cash is unencumbered.[18]

2.      Whether and to what extent the Intercompany Claims against Valley View Downs, LP and the Centaur Debtors are valid or whether they are subject to recharacterization, subordination and/or disallowance in whole or in part.

3.      Whether there is any basis to set aside the guarantees securing the First Lien Debt and the Second Lien Debt as fraudulent transfers or conveyances.

4.      Whether the Debtors' Licenses and any proceeds thereof are encumbered by the Prepetition Secured Parties' liens and whether the Debtors' Licenses would have any value in a chapter 7 liquidation.[19]

5.      Whether the Debtors' liquidation analysis is flawed because it does not ascribe any value to the Debtors' Avoidance Actions and whether the Plan was unconfirmable because it did not assess in any way the value of such Avoidance Actions but nevertheless conveyed the value to the Reorganized Debtors, which were to be owned by the Prepetition First Lien Claimholders, directly or indirectly.

---

[18]      The Committee disputes this characterization.

[19]      The Debtors have not separately valued each of the Licenses.

6.   Whether the Plan was unripe for consideration given the failure to achieve consensus or to organize the resolution of the Committee's and the Prepetition Second Lien Agent's challenges in respect of the L/C Cash, the Licenses, the fraudulent transfer issues and other challenges.

7.   Whether the Plan was facially unconfirmable due to its use of what the Committee and the Prepetition Second Lien Agent characterized as an irregular and unjustifiable species of substantive consolidation, a failure to honor the absolute priority rule by virtue of Existing Management's acquisition of equity in NewCo and otherwise.

The Debtors had been, were and remain concerned that the administrative costs of analyzing and preparing to resolve plan disputes through litigation would substantially erode value that could otherwise be made available to stakeholders, particularly unsecured creditors and that no attempts to reach agreement regarding a plan and a global resolution to these Chapter 11 Cases had occurred. As a consequence, at a status conference, the Debtors requested that the Bankruptcy Court submit the disputed issues to non-binding mediation prior to the issues being formally joined. Each of the Committee, the Prepetition First Lien Agent and the Prepetition Second Lien Agent agreed to and were invited by the Bankruptcy Court to participate in the Mediation (as defined below).

By Order dated June 8, 2010 [Case No. 10-10799 (KJC), D.I. 314], the Bankruptcy Court ordered a non-binding mediation of the disputed issues in connection with the Plan and related matters (the "Mediation") and appointed the Honorable Christopher S. Sontchi as "Mediator." The Mediation ultimately took place on June 30, 2010 beginning at 1:00 p.m. (Eastern Time) before the Mediator. The Debtors, the Prepetition First Lien Agent, the Prepetition Second Lien Agent and the Committee (collectively, the "Mediation Participants") all participated in the Mediation. Despite the efforts of the Mediator and the Mediation Participants, the Mediation Participants were unable to agree on a consensual resolution of the disputed issues.

## M. The Fortune Valley Sale Motion

On June 29, 2010, the Debtors filed a motion with the Bankruptcy Court [Case No. 10-10799 (KJC), D.I. 379] (the "Fortune Valley Sale Motion") seeking, among other things, (a) authority to sell substantially all of the assets of Centaur Colorado, LLC (the "Fortune Valley Assets") free and clear of all liens, claims, interests and encumbrances (the "Fortune Valley Sale Transaction"); (b) approval of certain procedures (the "Fortune Valley Bid Procedures") for the solicitation of bids with respect to the Fortune Valley Sale Transaction (the "Fortune Valley Bid Procedures Relief"); (c) approval of certain procedures (the "Fortune Valley Assignment Procedures") in connection with the identification and assumption of certain contracts and intellectual property rights in connection with the Fortune Valley Sale Transaction; and (d) scheduling of a final hearing with the Bankruptcy Court for approval of the Fortune Valley Sale Transaction (the "Fortune Valley Sale Hearing").

Centaur Colorado, LLC, as seller, and Luna Gaming Central City LLC, as buyer ("Luna"), have entered into that certain Asset Purchase Agreement (including all exhibits, schedules and ancillary agreements related thereto, the "Luna Purchase Agreement"), which contemplates the sale of substantially all of Centaur Colorado, LLC's Assets, defined as the "Purchased Assets" in Section 2.01 of the Luna Purchase Agreement, to the Purchaser, subject to higher and better offers made pursuant to the Fortune Valley Bid Procedures. Pursuant to the Luna Purchase Agreement, Luna has offered approximately $10 million of consideration for the Purchased Assets consisting of, among other things, cash, a note secured by a first priority lien and security interest and certain assumed liabilities.

After a hearing on July 28, 2010 at 11:00 a.m. (Eastern Time), the Bankruptcy Court entered an order approving the Fortune Valley Bid Procedures Relief and the Fortune Valley Assignment Procedures (the "Fortune Valley Bid Procedures Order").

Pursuant to the Fortune Valley Bid Procedures, in the event there are any qualified bidders under the Fortune Valley Bid Procedures (each, a "Fortune Valley Qualified Bidder") in addition to Luna, each Fortune Valley Qualified Bidder was to be invited to participate in an auction (the "Fortune Valley Auction") at the office of Fox Rothschild LLP, 919 North Market Street, Suite 1300, Wilmington, Delaware 19801, which was to commence at 10:00 a.m. (Eastern Time) on August 23, 2010. However, because there were no Fortune Valley Qualified Bidders, no Fortune Valley Auction was held for the Fortune Valley Assets. Accordingly, Centaur Colorado, LLC, in consultation with the Committee, determined that the stalking horse bidder, Luna, made the highest and best offer for the Fortune Valley Assets.

A hearing on the proposed Fortune Valley Sale Transaction was held on August 25, 2010 at 11:00 a.m. (Eastern Time) before the Bankruptcy Court. Following the hearing, the Bankruptcy Court entered an order, with revisions by the Bankruptcy Court, approving the Luna Purchase Agreement and the Fortune Valley Sale Transaction [Case No. 10-10799 (KJC), D.I. 609].

## N. The Committee's Motion for Standing

By letters dated June 3, 2010 and July 2, 2010 (the "Demand Letters"), the Committee formally demanded that the Debtors (i) confirm that they would not be initiating certain claims, challenges or causes of action enumerated in the Demand Letters against the First Lien Lenders, the L/C Issuer and the Second Lien Lenders and (ii) advise the Committee by July 7, 2010, whether or not the Debtors would consent to the standing of the Committee to assert such claims.

The Debtors notified the Committee that they would not prosecute the claims, challenges and causes of action listed in the Demand Letters but that they did not unconditionally consent to the Committee's standing to prosecute such claims on behalf of the Debtors' Estates.

On July 9, 2010, to comply with the deadline established in the Final Cash Collateral Order for the assertion of Challenges, the Committee filed the Standing Motion, which includes, as an exhibit, a complaint, substantially in the form of the complaint that the Committee intends to file if it obtains the relief requested in the Standing Motion (the

"Committee Complaint"). The Committee Complaint asserts Claims against each Prepetition First Lien Claimholder and each Prepetition Second Lien Claimholder. In the Standing Motion and the Committee Complaint, the Committee outlines the legal Challenges to the claims, liens and interests of the First Lien Claimholders that the Committee seeks standing to prosecute.[20] Recipients of this Disclosure Statement should refer to the Standing Motion, the Committee Complaint and related papers for a detailed recitation of the Committee's position in respect of the asserted challenges, which are summarized below. Among other things, the Committee raises various legal challenges to the Prepetition First Lien Claimholders' liens and/or security interests, including, without limitation, declaratory relief, turnover, collateral refund, resulting trust and novation, under applicable bankruptcy law and non-bankruptcy law and in equity, in (i) the L/C Cash, (ii) Valley View Downs, LP's claim or rights to a refund of the L/C Cash, (iii) the Licenses, which the Committee contends Blackstone, on behalf of the Debtors, advised the Committee's financial advisor will have a pro forma adjusted value at emergence of $131 million,[21] (iv) the Pennsylvania Gaming License Application and (v) any proceeds of the Licenses and Pennsylvania Gaming License Application. See Standing Motion ¶¶ 43, 50, 51, 55-57; Complaint ¶13. Additionally, based on its investigation of the October 2007 financing transactions, the use of the proceeds thereof and the Debtors' own valuation of certain key assets, the Committee seeks to avoid the guarantees and liens granted by the Subsidiary Guarantors to the Prepetition First Lien Claimholders as fraudulent transfers and conveyances and seeks recharacterization of the Intercompany Claims as equity and argues that such Claims cannot be enforced as debt claims comprising Collateral. See Standing Motion ¶ 43. Generally, the Committee characterizes the October 2007 financing as improperly overleveraging certain Debtors in connection with an overly aggressive business plan that the Debtors allegedly knew or should have known was likely to fail.

The Committee also asserts various other miscellaneous challenges. For instance, the Committee argues that the Prepetition First Lien Claimholders are not entitled to postpetition interest and that the amount of the Prepetition First Lien Claimholders' Claims against Valley View Downs, LP are incorrectly stated in the Final Cash Collateral Order. The Committee also takes the position that pursuant to section 544(a) of the Bankruptcy Code, the Prepetition First Lien Claimholders have no lien on (a) an aggregate of approximately $10 million of cage cash held by Hoosier Park, L.P. and Centaur Colorado, LLC as of the date the Centaur Debtors commenced their Chapter 11 Cases and (b) $1,275,500 cash that Hoosier Park, L.P. held in a deposit account as of the Centaur Petition Date. See Standing Motion ¶¶ 43, 54.

In the Standing Motion, the Committee asserts that the challenges that it seeks standing to bring are colorable, and therefore, could create $84 million of additional value for unsecured creditors holding, by the Committee's estimate, approximately $240 million of

---

[20] The Committee indicates that the Claims it would bring against the Prepetition Second Lien Claimholders are similar in nature. Standing Motion ¶ 43.

[21] The Debtors dispute that such representation was made. The calculation of value of the Licenses provided by the Debtors to the Committee was merely a mathematical calculation of the value of the Licenses on a book value basis prior to impairments detailed in the Debtors' 2009 audit.

unsecured claims that receive a $3.35 million recovery under the Plan as presently structured. The Debtors and the Prepetition First Lien Agent challenge this view.

On July 21, 2010, the Debtors filed a limited response to the Standing Motion [Case No. 10-10799 (KJC), D.I. 447] (the "Debtor Limited Response"), reserving their right to challenge the cost-beneficial nature of any Challenges and to settle any Challenges. The causes of action that the Committee seeks derivative standing to pursue are property of the Debtors' Estates. The Debtors believe that even if the Bankruptcy Court grants the Standing Motion, the Debtors should retain the right to settle such causes of action, so long as the Bankruptcy Court determines that any such settlement is fair and reasonable pursuant to Bankruptcy Rule 9019. See In re Exide Techs., 303 B.R. 48, 67 (Bankr. D. Del. 2003) (Carey, J.) ("[Section] 1123(b)(3)(A) authorizes the Debtor to propose a settlement of the Creditors Committee's Adversary Proceeding in its plan."); see also Smart World Techs., LLC v. Juno Online Servs., Inc. (In re Smart World Techs., LLC), 423 F.3d 166, 175 (2d Cir. 2005) (although not foreclosing the possibility that under certain circumstances creditor standing to settle a debtors' claims may be appropriate, noting that "[i]n making the debtor-in-possession accountable for the estate's legal claims, Congress vested the debtor with the responsibility to determine how best to handle those claims."); Official Comm. of Equity Sec. Holders v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.), 371 B.R. 660, 670 (S.D.N.Y. 2007) (noting that nowhere did the Smart World decision suggest that "where derivative standing *does* exist, a debtor-in-possession is irreversibly stripped of its authority to settle that litigation absent the consent of the standing committee") (emphasis in original).

The Committee has noted that its challenges are necessitated by the Debtors' acknowledgements of the Claims and liens of the Prepetition First Lien Claimholders and the Prepetition Second Lien Claimholders contained in the Final Cash Collateral Order and that the challenges have not yet been tested in any kind of litigative process, despite the Committee's position that the Challenges are colorable. Based upon theses facts and the present context, the Committee disputes the Debtors' position based upon, among other things, Exide Technologies and Adelphia, each supra.

On July 23, 2010, the Prepetition First Lien Agent filed its objection to the Standing Motion [Case No. 10-10799 (KJC), D.I. 461] (the "First Lien Standing Objection") challenging both the colorable nature of the challenges and the Committee's view as to the benefit that will accrue to the Debtors' Estates and creditors if the Standing Motion was granted. On July 26, 2010, the Committee filed its reply to the Debtor Standing Response and the First Lien Standing Objection. On July 28, 2010, upon request of the Debtors and the Prepetition First Lien Agent, the Committee agreed to the adjournment of the hearing on the Standing Motion and related matters to September 7, 2010.

## O.   Objection to PREIT's Claims

The largest of the unsecured Claims against the Debtors (other than deficiency claims and Intercompany Claims) are the Claims of PR Valley and PREIT-RUBIN. PREIT's alleged $60 million Claims against Valley View Downs, LP, arise out of (i) the Debtors' purported obligation to pay a termination fee of $57 million (the "Termination Fee") to buy out PR Valley's interest in a sale/lease back agreement with respect to the property upon which

Valley View Downs was to be constructed and (ii) an agreement by which PREIT-RUBIN was to provide management services for all aspects of the development and construction phases of the Valley View Downs racetrack and casino (the "Development Agreement"). On June 29, 2010, PREIT-RUBIN filed Proof of Claim No. 222 (the "PREIT-RUBIN Claim") against Valley View Downs, LP in the amount of $3 million asserting Claims relating to the alleged obligations of Valley View Downs, LP under the Development Agreement. On June 29, 2010, PR Valley filed Proof of Claim No. 224 (the "PR Valley Claim," together with the PREIT-RUBIN Claim, the "PREIT Claims") against Valley View Downs, LP in the amount of $58,186,857.02 asserting Claims relating to the alleged obligations of Valley View Downs, LP and Centaur Pennsylvania, LLC as applicable, under certain other agreements, including the obligation to pay the Termination Fee. The Debtors believe that the PREIT Claims are likely unenforceable in whole or in part, including pursuant to sections 502(d) and 502(b)(2) of the Bankruptcy Code and due to lack of consideration. The Debtors also believe that the PREIT Claims are subject to, among other things, recharacterization as equity. The Debtors intend to file an adversary proceeding challenging the PREIT Claims on these bases.

## P. VVD Transfer Motion

On August 10, 2010, the Debtors filed a motion with the Bankruptcy Court [Case No. 10-10799 (KJC), D.I. 531] (the "VVD Transfer Motion") seeking, among other things, (a) authority to transfer (the "VVD Transaction") the equity interests (the "Transferred Interests") in Reorganized Valley View Downs, LP, Reorganized Centaur PA Land Management, LLC, Reorganized Centaur PA Land General Partner, LP and Reorganized Centaur PA Land, LP (collectively, the "Conveyed Entities") to be issued on the Effective Date of the Plan; (b) approval of the Bidding Procedures in connection with the VVD Transaction (the "Bidding Procedures Relief"); (c) scheduling of a hearing to approve and authorize the Debtors to offer certain bidding protections to the buyer (the "VVD Buyer") submitting the highest or otherwise best offer, to be determined prior to the Sale Hearing and the form of Purchase Agreement (including all exhibits, schedules and ancillary agreements related thereto, by and between Centaur Pennsylvania, LLC as seller and the VVD Buyer; (d) scheduling of an auction (the "VVD Auction") on October 20, 2010, to the extent necessary, under the Bidding Procedures, and the Sale Hearing on the VVD Transaction on the same date as the hearing on confirmation of the Plan; and (e) approval of the form and manner of notice of the VVD Transaction, the Bidding Procedures, the VVD Auction and the Sale Hearing. A hearing on the VVD Bidding Procedures Relief was held before the Bankruptcy Court on August 25, 2010, and on August 31, 2010, the Bankruptcy Court entered an Order approving the Bidding Procedures Relief as modified [Case No. 10-10799 (KJC), D.I. 621].

Prior to the filing of the Debtors' voluntary petitions for relief under the Bankruptcy Code, the Debtors marketed the Valley View Downs opportunity. Beginning in September 2008, as part of the amendment of their Prepetition First Lien Credit Agreement and Prepetition Second Lien Credit Agreement in 2008, the Debtors committed to using their best efforts to obtain a buyer for the Valley View Downs opportunity. In conjunction with the Debtors' former financial advisor and investment banker, the Debtors contacted several potential buyers over the period of September 2008 through early 2009.

While reviewing various strategic alternatives with regard to Valley View Downs, the Debtors renewed their efforts to market the Valley View Downs opportunity in September 2009 when they retained Blackstone as financial advisor and investment banker. Those efforts resulted in initial indications of interest, but only one proposed buyer whose offer resulted in an exchange of actual term sheets. That proposed buyer has since withdrawn its offer. Since that time, the Debtors have entertained in-bound offers and indications of interest, but have been unable to reach mutually agreeable terms with any interested parties.

Upon the closing of the VVD Transaction, the proceeds shall be deemed attributable to the Assets of the Conveyed Entities and delivered to Centaur Pennsylvania, LLC or Reorganized Centaur Pennsylvania, LLC, as the case may be, and deposited by Centaur Pennsylvania, LLC or Reorganized Centaur Pennsylvania, LLC, as the case may be, in a segregated account established by the Disbursing Agent or other entity appointed to make Plan Distributions, wherein such proceeds shall be held by such Disbursing Agent or other entity for the benefit of, and solely for the purpose of making Plan Distributions to, holders of Claims against the Conveyed Entities (the "Conveyed Entities Distribution Account"). Notwithstanding anything to the contrary in any Order entered approving the VVD Transaction, (i) any and all Claims of any third parties and/or creditors against the estates of the Conveyed Entities and/or any rights of such third parties and/or creditors to receive distributions from or on account of the Assets of the Conveyed Entities, including but not limited to, any Challenges which relate to the Conveyed Entities and/or their Assets shall not be extinguished by the transfer of the Transferred Interests to the VVD Buyer but shall instead be fully preserved and attach to the proceeds and (ii) the proceeds shall be distributed to the holders of such Claims against the Conveyed Entities in accordance with the Plan or as otherwise ordered by the Bankruptcy Court.

Upon the closing of the VVD Transaction and the receipt by Valley View Downs, LP of the distribution of the $50 million of L/C Cash in connection with the termination of the Existing L/C, the L/C Cash shall be deposited into an account in accordance with the terms of the Sale Order.

The allocation of the proceeds between the Estates of the Conveyed Entities and/or any particular Assets of the Conveyed Entities shall be resolved by further order of the Bankruptcy Court.

Upon the closing of the VVD Transaction, the VVD Buyer shall take title to and possession of the Transferred Interests. Except as provided in the Plan, the transfer of title to the Transferred Interests shall be free and clear of liens pursuant to section 1123 of the Bankruptcy Code. Moreover, pursuant to sections 524 and 1141(d) of the Bankruptcy Code, Claims against the Conveyed Entities will be discharged and the proceeds of the VVD Transaction will be distributed to the holders of those Claims against the Conveyed Entities in accordance with the Plan.

## Q. Prepetition First Lien Agent's Stay Relief Motion

On August 23, 2010, the Prepetition First Lien Agent filed a motion with the Bankruptcy Court seeking an order granting relief from the automatic stay for the purpose of foreclosing on certain personal property and real property of Valley View Downs, LP and

Centaur PA Land, LP and exercising any and all available remedies in respect thereof [Case No. 10-10799 (KJC), D.I. 594] (the "Lift Stay Motion"). The Prepetition First Lien Agent asserts that relief is appropriate because, among other things, (i) the Valley View Downs Debtors do not have equity in the personal and real property and (ii) the personal and real property are unnecessary for an effective reorganization. Furthermore, the Prepetition First Lien Agent asserts that the Debtors have not demonstrated the ability to successfully sell the Valley View Downs opportunity within a reasonable time, and therefore, relief from the automatic stay should be granted. The Lift Stay Motion was originally scheduled to be heard on September 23, 2010, but the hearing has been adjourned by consent of the parties until October 5, 2010.

## X.

## THE CHAPTER 11 PLAN

### A.    Introduction

The following is a summary of certain terms and provisions of the Plan. This summary of the Plan is qualified in its entirety by reference to the full text of the Plan, which is annexed to this Disclosure Statement as Exhibit "A".

### B.    General Description of the Treatment of Claims and Equity Interests

(a)    **Unclassified Claims**

Administrative Expense Claims and Priority Tax Claims are treated in accordance with sections 1129(a)(9)(A) and 1129(a)(9)(C) of the Bankruptcy Code. Administrative Expense Claims, Intercompany Financing Claims and Priority Tax Claims are not designated as classes of Claims for the purposes of the Plan or for the purposes of sections 1123, 1124, 1125, 1126 or 1129 of the Bankruptcy Code.

(b)    **Treatment of Administrative Expense Claims and Intercompany Financing Claims**

a.    Administrative Expense Claims Defined

Administrative Expense Claims are rights to payment, whether secured or unsecured, constituting a cost or expense of administration of any of the Chapter 11 Cases under sections 503(b) and 507(a)(2) of the Bankruptcy Code and any Allowed Claims under section 507(b) of the Bankruptcy Code, including, without limitation, any actual and necessary costs and expenses of preserving the Debtors' Estates, any actual and necessary costs and expenses of operating the Debtors' businesses, Claims related to Adequate Protection Obligations (as defined in the Final Cash Collateral Order), any indebtedness or obligations incurred or assumed by the Debtors, as debtors-in-possession, during the Chapter 11 Cases, including, without limitation, for the acquisition or lease of property or an interest in property or the rendition of services and any allowances of compensation and reimbursement of expenses to the extent allowed by Final Order under section 330 or 503 of the Bankruptcy Code and any fees or charges assessed against the Estates of the Debtors under 28 U.S.C. § 1930. Administrative Expense Claims do not include Intercompany Financing Claims.

b.    Time for Filing Administrative Expense Claims

The holder of an Administrative Expense Claim, other than (i) a Fee Claim, (ii) a liability incurred and payable after the Petition Date in the ordinary course of business by a Debtor (and not past due), (iii) a Section 503(b)(9) Claim or (iv) an Administrative Expense Claim that has been Allowed on or before the Effective Date, must file with the Bankruptcy Court and serve on the Debtors, the Committee, and the U.S. Trustee, notice of such Administrative Expense Claim within forty (40) days after service of Notice of Confirmation or such other specific date as may be established by the Bankruptcy Court. Such notice must include at a minimum (w) the name of the Debtor(s) which are purported to be liable for the Claim, (x) the name of the holder of the Claim, (y) the amount of the Claim and (z) the basis of the Claim (including any documentation evidencing or supporting such Claim). **THE FAILURE TO FILE NOTICE OF AN ADMINISTRATIVE EXPENSE CLAIM ON OR BEFORE THE ADMINISTRATIVE EXPENSE CLAIMS BAR DATE SHALL RESULT IN SUCH ADMINISTRATIVE EXPENSE CLAIM BEING FOREVER BARRED, DISALLOWED AND DISCHARGED WITHOUT FURTHER ORDER OF THE BANKRUPTCY COURT.**

c.    Time for Filing Fee Claims

Each Professional who holds or asserts a Fee Claim shall be required to file with the Bankruptcy Court, and serve on all parties required to receive notice, a Fee Application within forty-five (45) days after the Effective Date or such other specific date as may be established by the Bankruptcy Court. **THE FAILURE TO FILE TIMELY AND SERVE SUCH FEE APPLICATION SHALL RESULT IN THE FEE CLAIM BEING FOREVER BARRED AND DISCHARGED.**

d.    Time For Filing Section 503(b)(9) Claims

Each holder of a Section 503(b)(9) Claim was required to file with the Claims Agent a request for allowance of such Section 503(b)(9) Claim prior to the Section 503(b)(9) Bar Date. **THE FAILURE TO FILE SUCH REQUEST BY THE SECTION 503(B)(9) BAR DATE SHALL RESULT IN THE SECTION 503(B)(9) CLAIM BEING DEEMED DISALLOWED AS AN ADMINISTRATIVE EXPENSE CLAIM.** Such disallowance does not prevent such Claim from being Allowed as a Claim other than as an Administrative Expense Claim to the extent otherwise allowable.

e.    Allowance of Administrative Expense Claims, Fee Claims and Section 503(b)(9) Claims

An Administrative Expense Claim (other than a Fee Claim or a Section 503(b)(9) Claim) with respect to which notice has been properly filed and served pursuant to Section 6.2(a) of the Plan, or a Section 503(b)(9) Claim with respect to which a request for allowance has been properly submitted pursuant to Section 6.2(c) of the Plan, shall become an Allowed Administrative Expense Claim if no objection is filed within sixty (60) days after the later of (i) the Effective Date, or (ii) the date of service of the applicable notice of Administrative Expense Claim or such later date as may be approved by the Bankruptcy Court on motion of a

party in interest, without notice or a hearing. If an objection is filed within such 60-day period (or any extension thereof), the Administrative Expense Claim shall become an Allowed Administrative Expense Claim only to the extent allowed by Final Order. A Fee Claim in respect of which a Fee Application has been properly filed and served pursuant to Section 6.2(b) of the Plan shall become an Allowed Administrative Expense Claim only to the extent allowed by Final Order.

### f.    Payment of Allowed Administrative Expense Claims

On the Distribution Date, each holder of an Allowed Administrative Expense Claim shall receive in full satisfaction of such Claims (i) the amount of such holder's Allowed Administrative Expense Claim in one Cash payment or (ii) such other treatment as may be agreed upon in writing by the Debtors and such holder; provided that such treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Administrative Expense Claim; provided further, that an Administrative Expense Claim representing a liability incurred in the ordinary course of business of the Debtors may be paid at the Debtors' election in the ordinary course of business.

### g.    Intercompany Financing Claims

All Intercompany Financing Claims, which are (i) in the case of advances by Centaur, LLC to the Valley View Downs Debtors, superpriority administrative expense claims junior only to the superpriority Administrative Expense Claim of the L/C Issuer with respect to the obligations of Valley View Downs, LP pursuant to the Reimbursement Agreement and (ii) in all other cases, administrative expense claims, shall, notwithstanding the occurrence of the Effective Date, remain outstanding and be retained by the Debtors or be paid in full in Cash on the Effective Date.

### (c)    **Treatment of Priority Tax Claims**

Each holder of an Allowed Priority Tax Claim will receive in full satisfaction of such holder's Allowed Priority Tax Claim, (a) on the Distribution Date, the amount of such holder's Allowed Priority Tax Claim in Cash, or (b) such other treatment as may be agreed upon in writing by such holder; provided, that such agreed-upon treatment may not provide such holder with a return having a present value as of the Effective Date that is greater than the amount of such holder's Allowed Priority Tax Claim. The Confirmation Order will enjoin any holder of an Allowed Priority Tax Claim from commencing or continuing any action or proceeding against any responsible person or officer of the Debtors that otherwise would be liable to such holder for payment of a Priority Tax Claim so long as the Debtors are in compliance with Section 6.3 of the Plan. So long as the holder of an Allowed Priority Tax Claim is enjoined from commencing or continuing any action or proceeding against any responsible person or officer under Section 6.3 of the Plan or pursuant to the Confirmation Order, the statute of limitations for commencing or continuing any such action or proceeding will be tolled.

(d)     **Classified Claims and Equity Interests**

The classified Claims against, and Equity Interests in, the Debtors are classified in the Plan as follows:

i.      Class 1 — Priority Non-Tax Claims

ii.     Class 2 — First Lien Claims

iii.    Class 3 — Second Lien Claims

iv.     Class 4 — Other Secured Claims

v.      Class 5 — Valley View Downs Unsecured Claims

vi.     Class 6 — General Unsecured Claims

vii.    Class 7 — Convenience Claims

viii.   Class 8 — Intercompany Claims

ix.     Class 9 — Equity Interests

## C.     Treatment of Claims and Equity Interests

The treatment of each class of Claims and Equity Interests is summarized in Article IV.B – "Summary of Distributions Under the Plan." Although the Plan classifies Claims against different Debtors, other than Valley View Downs, LP, jointly, the Debtors' position is that this does not result in substantive consolidation. Rather, the Debtors believe that their classification scheme serves the need for administrative efficiency, while reflecting the economic reality of the Chapter 11 Cases, where all or substantially all of the Reorganized Enterprise Value, in the Debtors' view, is subject to the liens and security interests of the Prepetition First Lien Claimholders. For example, even if the Debtors were to separately classify General Unsecured Claims against each Debtor (other than Valley View Downs, LP), the treatment of those Claims would remain the same—the holders of those Claims would receive no recovery other than Litigation Trust Interests. This results from the Prepetition First Lien Claimholders being grossly undersecured notwithstanding their lien on substantially all of the Debtors' Assets. The Committee has sought standing to assert challenges to the liens and claims of the Prepetition First Lien Claimholders. Each of the Prepetition Second Lien Agent and the Committee have challenged this position as violating applicable bankruptcy law relating to the standard for the imposition of the extraordinary remedy of substantive consolidation, especially where the unsecured creditors have been denied the benefit of substantive consolidation. Accordingly, in light of this dispute, for purposes of determining whether the Plan satisfies sections 1129(a)(8) and/or (10) of the Bankruptcy Code with respect to each Debtor, the Balloting Agent will tabulate all votes on the Plan on a non-consolidated basis by class and by Debtor.

**D.      Acceptance or Rejection of the Plan; Effect of Rejection by One or More Classes of Claims**

      (a)      **Classes Entitled to Vote**

      Except for Class 1 – Priority Non-Tax Claims, Class 4 – Other Secured Claims and Class 9 – Equity Interests, all classes of Claims and Equity Interests are entitled to vote on the Plan.

      (b)      **Class Acceptance Requirement**

      A class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such class that have voted on the Plan. A class of Equity Interests shall have accepted the Plan if it is accepted by holders of at least two-thirds (2/3) in amount of the Equity Interests in such class that actually vote on the Plan.

      (c)      **Tabulation of Votes on a Non-Consolidated Basis**

      The Balloting Agent will tabulate all votes on the Plan on a non-consolidated basis by class and by Debtor for the purpose of determining whether the Plan satisfies sections 1129(a)(8) and/or (10) of the Bankruptcy Code with respect to each Debtor.

      (d)      **Cramdown**

      If all applicable requirements for confirmation of the Plan are met as set forth in section 1129(a) of the Bankruptcy Code, except subsection (8) thereof, the Plan shall be treated as a request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code, notwithstanding the failure to satisfy the requirements of section 1129(a)(8), on the basis that the Plan is fair and equitable and does not discriminate unfairly with respect to each class of Claims that is impaired under, and has not accepted, the Plan.

      (e)      **Feasibility**

      The Bankruptcy Code conditions confirmation of a plan of reorganization on, among other things, a finding that it is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor. For purposes of determining whether the Plan satisfies this condition, the Debtors have analyzed the capacity of each Debtor to service its obligations under the Plan. Based upon its analysis of their Projections, the Debtors believe they will be able to make all payments required to be made under the Plan. See "Projections and Summary of Significant Assumptions," attached hereto as Exhibit "B".

      (f)      **Confirmation of All Cases**

      Except as provided in Section 17.18 and Section 17.27 of the Plan, the Plan shall not be deemed to have been confirmed unless and until the Plan has been confirmed as to each of the Debtors.

## E. Means of Implementation of the Plan

### (a) Operations between the Confirmation Date and the Effective Date

Through the Effective Date, the Debtors shall continue to operate their businesses as Debtors-in-Possession, subject to the oversight of the Bankruptcy Court as provided in the Bankruptcy Code, the Bankruptcy Rules, and all orders of the Bankruptcy Court that are then in full force and effect.

### (b) Certain Transactions on or Prior to the Effective Date

#### a. Formation of NewCo

Pursuant to section 1123(a)(5) of the Bankruptcy Code, on or prior to the Effective Date, the Debtors or Reorganized Debtors, as the case may be, shall form NewCo as a Delaware limited liability company. The terms of the NewCo Operating Agreement are described more fully in Exhibit "H" to this Disclosure Statement.

#### b. Issuance of New Centaur, LLC Membership Interests to NewCo

Pursuant to section 1123(a)(5) of the Bankruptcy Code, on the Effective Date, Centaur, LLC or Reorganized Centaur, LLC, as the case may be, shall issue the New Centaur, LLC Membership Interests to NewCo. Upon issuance of the New Centaur, LLC Membership Interests to NewCo, Centaur, LLC or Reorganized Centaur, LLC, as the case may be, shall be a direct subsidiary of NewCo.

#### c. Restructuring Transactions

Pursuant to section 1123(a)(5) of the Bankruptcy Code, on the Effective Date, the Debtors or the Reorganized Debtors, as the case may be, shall take such actions as may be necessary or appropriate to effect the following: (i) the formation by Reorganized Centaur, LLC of Hoosier Park, LLC as a wholly-owned Indiana limited liability company; (ii) the issuance by Reorganized HP Dining & Entertainment, LLC of 100 percent of its membership interests to Hoosier Park, LLC; (iii) the transfer by Hoosier Park, L.P. of all of its Assets to Hoosier Park, LLC pursuant to section 1123(a)(5)(B) of the Bankruptcy Code followed by the dissolution of Hoosier Park, L.P.; (iv) the transfer by Centaur Indiana, LLC of all of its Assets, if any, to Hoosier Park, LLC pursuant to section 1123(a)(5)(B) of the Bankruptcy Code followed by the dissolution of Centaur Indiana, LLC; (v) the transfer by Centaur Racing, LLC of all of its Assets, if any, to Hoosier Park, LLC pursuant to section 1123(a)(5)(B) of the Bankruptcy Code followed by the dissolution of Centaur Racing, LLC; (vi) the issuance by Reorganized Centaur PA Land, LP of 11 percent of its partnership interests to Reorganized Centaur PA Land General Partner, LP, as general partner, and 89 percent of its partnership interests to Reorganized VVD Properties, LP, as limited partner; (vii) the issuance by Reorganized Centaur PA Land General Partner, LP of 0.1 percent of its partnership interests to Reorganized Centaur PA Land Management, LLC, as general partner, and 99.9 percent of its partnership interests to Reorganized VVD Properties, LP, as limited partner; (viii) the issuance by Reorganized Centaur PA Land Management, LLC of 100 percent of its membership interests to Reorganized VVD

Properties, LP; (ix) the issuance by Reorganized VVD Properties, LP of 0.1 percent of its partnership interests to Reorganized VVD Properties General Partner, LLC, as general partner, and 99.9 percent of its partnership interests to Reorganized Centaur Pennsylvania, LLC, as limited partner; (x) the issuance by Reorganized VVD Properties General Partner, LLC of 100 percent of its membership interests to Reorganized Centaur Pennsylvania, LLC; (xi) the issuance by Reorganized Valley View Downs, LP of 1 percent of its partnership interests to Reorganized Valley View Downs GP, LLC, as general partner, and 99 percent of its partnership interests to Reorganized Centaur Pennsylvania, LLC, as limited partner; (xii) the issuance by Reorganized Valley View Downs GP, LLC of 100 percent of its membership interests to Reorganized Centaur Pennsylvania, LLC; (xiii) the issuance by Reorganized Centaur Pennsylvania, LLC of 100 percent of its membership interests to Reorganized Centaur, LLC; (xiv) the issuance by Reorganized Centaur Colorado, LLC of 100 percent of its membership interests to Reorganized Centaur, LLC; (xv) the execution and delivery of appropriate agreements or other documents of formation, incorporation, merger, consolidation, dissolution or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (xvi) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any property, right, liability, duty or obligation on terms consistent with the terms of the Plan; (xvii) the amendment and restatement of constituent documents of the Reorganized Debtors in accordance with the terms of the Plan; (xviii) the filing of appropriate organizational documents with the appropriate governmental authorities under applicable law; and (xix) all other actions that a Debtor or Reorganized Debtor determines are necessary or appropriate; provided, however, that in each case the documents necessary to effect such actions shall be in form and substance satisfactory to the Consenting First Lien Claimholders.

Section 4-35-5-7 of the Indiana Code imposes a $50 million transfer fee on "an initial licensee" (e.g., Hoosier Park, L.P.) that sells or otherwise relinquishes a "controlling interest," as defined by Indiana Gaming Commission rules, in an Indiana gambling game license. However, no fee is payable if the gambling game license is transferred, among other reasons, "as a result of a bankruptcy, a receivership, or a debt adjustment initiated by or against the initial licensee or the substantial owners of the licensee." Ind. Code § 4-35-5-4. In connection with the consummation of the Plan, Hoosier Park, L.P.'s gambling game license will be transferred to Hoosier Park, LLC and, because such initial transfer will occur as a result of a bankruptcy or debt adjustment, the transfer and any subsequent transfer will be exempt from the $50 million transfer fee under Section 4-35-5-7 of the Indiana Code.

### d. Entry into First Lien Take Back Documents and Exit Financing

Pursuant to section 1123(a)(5) of the Bankruptcy Code, on the Effective Date, NewCo, Reorganized Centaur, LLC and the Reorganized Debtors shall be authorized, without further act or action under applicable law, regulation, order or rule, to enter into the First Lien Take Back Documents and Exit Financing. Under the Plan, NewCo, Reorganized Centaur, LLC and the Reorganized Debtors will be authorized to enter into such agreements, collateral documents and other documents, and issue such instruments, including, without limitation, promissory notes, as may be necessary to effectuate their entry into such documents, in form and substance satisfactory to the Consenting First Lien Claimholders.

e. Issuance of NewCo PIK Notes and NewCo Warrants

Pursuant to section 1123(a)(5) of the Bankruptcy Code, on the Effective Date, NewCo shall be authorized, without further act or action under applicable law, regulation, order or rule, to issue (i) the NewCo PIK Notes designated as type "A" in Exhibit "E" hereto to holders of the Allowed First Lien Claims, (ii) the NewCo PIK Notes designated as type "B" in Exhibit "E" hereto to holders of Allowed Second Lien Claims and Allowed Valley View Downs Unsecured Claims, but only in the event the holders of Allowed Second Lien Claims and Allowed Valley View Downs Unsecured Claims are entitled to receive such NewCo PIK Notes in accordance with Section 5.3 and Section 5.5 of the Plan, respectively, and (iii) the NewCo Warrants to holders of the Allowed First Lien Claims, pursuant to the Plan. NewCo will be authorized under the Plan to enter into such agreements and documents as may be necessary to effectuate the issuance of the NewCo PIK Notes and NewCo Warrants, in form and substance satisfactory to the Consenting First Lien Claimholders.

f. Issuance of NewCo Membership Interests

Pursuant to section 1123(a)(5) of the Bankruptcy Code, on the Effective Date, NewCo shall be authorized, without further act or action, under applicable law, regulation, order, or rule, to issue the NewCo Membership Interests to Existing Management and the members of the Board of Managers in a manner and amount satisfactory to the Consenting First Lien Claimholders. NewCo and the Reorganized Debtors will be authorized under the Plan to enter into such agreements as are necessary to effectuate the issuance of the NewCo Membership Interests, in form and substance satisfactory to the Consenting First Lien Claimholders.

The direct and indirect owners, directors and managers of the Debtors' racing and gaming operations in Indiana, Colorado and Pennsylvania are all subject to stringent regulatory and licensing requirements.[22] The scrutiny and qualifications to which Entities or Persons attempting to secure such licenses are subject are rigorous and time-consuming. For instance, section 433a.3 of title 58 of the Pennsylvania Code requires that any individual who has any direct ownership interest or even a right to any profit or distribution from an entity licensed to conduct gaming in Pennsylvania must be licensed as a principal of that entity. Similarly, section 4-31-5-1 of the Indiana Code requires all individuals or entities to apply for a permit in order to "conduct, assist, or aid or abet in conducting a horse racing meeting."

---

[22] See Ind. Code §§ 4-35-6.5-2, 4-35-6.5-4, 4-33-6-4 (dealing with Indiana licensing requirements for management of gaming facilities); Ind. Code §§ 4-35-5-1, 4-35-5-2.4, 4-35-5-2.5, 4-33-6-4 (dealing with Indiana licensing requirements for owners of gaming facilities); Ind. Code §§ 4-31-6-1, 4-31-6-5, 4-31-6-6, 4-31-6-7 (dealing with Indiana licensing requirements for management of racing facilities); Ind. Code §§ 4-31-5-1, 4-31-5-2 (dealing with Indiana licensing requirements for owners of racing facilities); 58 Pa. Code §§ 433a.2, 433a.8 (dealing with Pennsylvania licensing requirements for management of gaming facilities); 58 Pa. Code §§ 433a.3, 433a.4, 433a.8 (dealing with Pennsylvania licensing requirements for owners of gaming facilities); 58 Pa. Code §§ 183.2, 185.29, 185.33 (dealing with Pennsylvania licensing requirements for management of racing facilities); 58 Pa. Code 185.11, 185.32 (dealing with Pennsylvania licensing requirements for owners of racing facilities); Colo. Rev. Stat. §§ 12-47.1-501, 12-47.1-505, 12-47.1-506, 12-47.1-510 (dealing with Colorado licensing requirements for management and owners of gaming facilities).

The investigatory and licensure process may require an extended period of time. For example, the process in Indiana may take at least six to eight months once the completed applications from all substantial owners, management members and occupational licensees have been received. In addition, the process does not begin until the ownership structure is finalized and any changes to the structure may induce further delay. It is also important to note that if a regulatory authority determines that one of the applicants or a key person or substantial owner of an applicant has a problem, the process will stop until the problem is resolved. The other states in which the Debtors operate have similar processes, with similar or longer timeframes.

Because the Pennsylvania Gaming Control Board, Colorado Limited Gaming Control Commission and Indiana Horse Racing Commission all have the authority to investigate all aspects of ownership, at any level, owners and controlling persons of entities holding equity interests are also subject to investigation. In addition, a regulator may suggest an alternative structure if it believes that the proper investigation would be too time consuming and detrimental to the property and the state. The Indiana Gaming Commission could also activate the power of attorney filed with it, thereby installing a trustee. Such action would increase the licensee's expenses and could jeopardize the licenses issued by other regulators.

The holders of Allowed First Lien Claims may not, in all cases, be willing to satisfy these rigorous licensing requirements. The holders of Allowed First Lien Claims that do not satisfy these licensing requirements cannot own or control the entities operating the racing and gaming facilities. All holders of Allowed First Lien Claims will, however, receive NewCo Warrants on the Effective Date, which are exercisable in accordance with the terms of the NewCo Warrants.

Because, among other things, (i) several of the holders of Allowed First Lien Claims are unwilling to satisfy the applicable licensing requirements and (ii) those holders of Allowed First Lien Claims that are willing to satisfy those requirements are not presently, and may not on the Effective Date be, licensed, the Plan provides for the NewCo Membership Interests to be distributed to Existing Management and the members of the Board of Managers in a manner and amount satisfactory to the Consenting First Lien Claimholders. This distribution is being made to the Existing Management and the members of the Board of Managers in order to facilitate the timely implementation of the Plan and not on account of Mr. Ratcliff's or Mr. Wilson's equity interests in Centaur, LLC's ultimate parent, Centaur, Inc.[23] As stated in Exhibit "H" to this Disclosure Statement, the business and affairs of NewCo (and indirectly, its subsidiaries) shall be exclusively managed and controlled by the Board of Managers, in all cases to the exclusion of equity holders, except to the extent of the selection of a single manager by the

---

[23] Centaur, Inc. currently has 5,214,268 issued and outstanding shares. Roderick J. Ratcliff owns 1,209,925 shares of Centaur, Inc. and, subject to receipt of required regulatory approvals, acquired an additional 262,379 shares, which in the aggregate represent 28.24% of the issued and outstanding shares. Mr. Ratcliff also has unexercised options and warrants that permit him to acquire an additional 582,728 shares of Centaur, Inc. and a grantor retained annuity trust established by Mr. Ratcliff owns unexercised warrants to acquire 59,000 shares of Centaur, Inc. Kurt E. Wilson owns 68,109 shares of Centaur, Inc. and, subject to receipt of required regulatory approvals, acquired an additional 550,931 shares of Centaur, Inc., which in the aggregate represent 11.87% of the issued and outstanding shares. Mr. Wilson also has unexercised options to acquire an additional 274,448 shares of Centaur, Inc. James L. Brown is not a shareholder of Centaur, Inc.

holders of NewCo Membership Interests. The manager appointed by the holders of NewCo Membership Interests will have one vote and any affirmative vote of the Board of Managers will be required to pass by a margin of at least two votes, and the manager appointed by the holders of NewCo Membership Interests will not be permitted to be present for, or vote with respect to, discussions related to employee compensation. Further, as shown in the analysis contained in Section VIII.C. hereof, the Reorganized Enterprise Value of the Debtors is insufficient to enable the Prepetition First Lien Claimholders, who have valid and perfected liens on substantially all of the Debtors' Assets, to receive a recovery in full on account of their Allowed First Lien Claims. Nevertheless, in order to facilitate confirmation and consummation of the Plan, the Consenting First Lien Claimholders by their votes to accept the Plan, will agree to carve out from the Prepetition First Lien Claimholders' recovery and to permit the distribution of value in the form of the NewCo Membership Interests, which would otherwise be distributable to holders of Allowed First Lien Claims, to Existing Management and the members of the Board of Managers.

Each of the Committee and the Prepetition Second Lien Agent assert that the transfer of value by the Consenting First Lien Claimholders to equity security holders, directly or indirectly in the Debtors, by the Plan violates applicable bankruptcy law, including, without limitation, the "absolute priority rule."

After the Confirmation Date, the members of the Board of Managers, as well as certain holding companies formed by holders of Allowed First Lien Claims for the purpose of appointing members to the Board of Managers, will be required to be licensed by all required regulatory authorities prior to the occurrence of the Effective Date. The Debtors estimate that satisfaction of the various licensing requirements could be achieved within three to six months following confirmation of the Plan.

### *General Indiana Licensing Requirements*

Both the Indiana Gaming Commission ("Gaming Commission") and the Indiana Horse Racing Commission ("HR Commission" and together with the Gaming Commission, the "Commissions") require entities acquiring an interest in a permit holder or in a gambling games at race track license, respectively, to complete an application for the transfer of the ownership interest to the new entity. As a part of the respective processes, each of the Commissions require that the individuals exercising control over the entity, whether direct or indirect, and entities acquiring an interest in a permit holder or in a gambling games at race track license, be found suitable and licensed by each of the Commissions. The background investigation process is very thorough and involves a detailed review by the Commissions of information provided in a lengthy application submitted by the individual or entity being investigated and reviewed. Prior to the enactment of the Indiana Gambling Games at Racetracks Act ("Act")[24] each Commission conducted its own investigations with the HR Commission using independent third parties and the Gaming Commission using its investigative staff. Subsequent to the passage of the Act, the respective Commissions have worked in comity for licensing purposes, but with each retaining

---

[24] See Ind. Code § 4-35-1-1, et seq. for the statute and 68 Ind. Admin. Code 1-1-1, et seq. for the rules.

jurisdiction over its area of expertise along with the licensing of individuals in the respective areas. It is unknown to what extent the two Commissions will share information or in efforts to investigate the transfer of the ownership interests in this situation or in the background investigations of the members of the Board of Managers. While the Commissions share many of the same considerations, as each Commission has considerations unique to each industry, the considerations of each Commission are separately set forth below.

### Indiana Gaming Commission

The Gaming Commission is vested with oversight of the Act and what positions and occupations related to gambling games at racetracks are to be licensed. Members of the Board of Managers are included in the definition of a "key person"[25] and therefore are subject to the suitability and licensing requirements of the Gaming Commission. While the overall focus is on the applicant's suitability to participate in the management, operations and direction of the company, at both a corporate and property level, the statute and rules sets forth specific considerations which the Gaming Commission is to consider.

The Act allows the Gaming Commission to issue an occupational license to an individual who has applied for a license, paid the applicable fees and is found to be eligible for the license. The Gaming Commission is statutorily prohibited from issuing a license to any individual that is less than eighteen (18) years of age (elevated to twenty-one (21) years of age by rule), has been convicted of a felony that is not waived after following designated procedures, fails to demonstrate an appropriate level of skill for the position applied for and fails to meet other "standards adopted by the [Gaming C]ommission for the holding of an occupational license."[26] Those standards and the procedures for determining the suitability of an applicant for an occupational license are set forth in the rules.

The rules require members of the Board of Managers to apply for an "Occupational License, Level 1." All applicants are required to file a "Personal Disclosure Form 1" (PD 1) which is an extensive verified questionnaire requiring exhibits, including tax returns, schedules of assets and other financial information. In sum, the application requires disclosure of (i) personal information such as a current name, addresses, telephone numbers and social security number; (ii) educational history dating back to secondary school; (iii) residences for the past fifteen (15) years; (iv) work history for the past twenty (20) years; (v) businesses owned or involved with; (vi) military history; (vii) gaming history; (viii) family history and information; (ix) litigation to which the applicant has been a party; (x) criminal history; (xi) financial information; (xii) assets and liabilities; (xiii) taxes and various financial schedules and (xiv) a net worth calculation. A photograph of the applicant taken within three months of the application, a birth certificate and fingerprints either taken by an interviewing investigator or by another third

---

[25] By rule, "key person" means any: (1) officer; (2) director; (3) executive; (4) employee; (5) trustee (6) substantial owner; (7) independent contractor; or (8) agent of a business entity, having the power to exercise, either alone or in conjunction with others, management or operating authority over a business entity or an affiliate thereof.

[26] See Ind. Code § 4-35-6.5-3.

70

party designated by the Gaming Commission are also requirements of the application. Failure to provide complete disclosure of all information required by the application is reason to find an applicant unsuitable.

Upon completion of the background investigation, a final report is prepared for review by the Executive Director of the Gaming Commission and other members of the executive staff. The Executive Director of the Gaming Commission has the authority to grant the license if the background investigation does not produce any disqualifying or questionable information which may cause the Gaming Commission to determine this is not the type of person the state wants in a position of control or authority in the casino industry in Indiana. The Executive Director of the Gaming Commission may also defer to a vote of the full Gaming Commission for the approval of the license. While deferral to the full Gaming Commission was common practice in the past, recent rule changes and delegations to the Executive Director of the Gaming Commission have resulted in the Gaming Commission making the suitability and licensing determination in instances where the Executive Director of the Gaming Commission has recused himself or the applicant's background causes concerns. Regardless of the decision making entity, the license will be issued only if the investigative factors establish that the licensing of the individual is in the best interest of the public, the gaming industry and the integrity of gaming. Once licensed the individual has a continuing duty to advise the Gaming Commission of any changes in the application that may reflect on the licensee's suitability (e.g., arrest, bankruptcy, etc.) as well as personal information such as name change due to marriage or divorce, change of address and other identifying information.

It is the general position of the Gaming Commission that a period of at least six (6) months is the common or standard time that elapses from the receipt of a completed application to the issuance of the license.

### Indiana Horse Racing Commission

The HR Commission reviews the suitability of the individual Members of the Board of Managers as part of the overall consideration of an application for a Permit to Conduct Recognized Meeting ("Meeting Permit"). The integrity of the applicant, its owners, officers, directors, policy makers and other designated individuals is an articulated consideration in determining the suitability of the Meeting Permit applicant.[27] Factors set forth as part of the integrity consideration include (i) the applicant's criminal record; (ii) whether the applicant has been a party to litigation with respect to its business practices; (iii) whether disciplinary actions have been taken over an applicant's business license or permit; (iv) a prior refusal by an agency to renew an applicant's license or permit; and (v) whether an applicant has been a participant in bankruptcy proceedings or a proceeding in which unfair labor practices, discrimination or government regulation of pari-mutuel wagering was an issue. The failure to satisfy judgments, orders or decrees, delinquency in filing of tax reports or remitting taxes and any other indices related to the integrity of the applicant which the HR Commission considers important or relevant will be part of its decision making process.

---

[27]     See 71 Ind. Admin. Code 11-1-6(b)(1).

In addition to the consideration of the personal aspects of each member of the Board of Managers, the management ability of the applicant is also part of the overall consideration. Management ability includes, but is not limited to, the qualifications to develop, own or operate a pari-mutuel facility, along with specific considerations such as a security plan, human and animal safety, marketing promotion and advertising and any other indices related to management ability which the HR Commission deems relevant to its consideration.

The HR Commission is required to approve all aspects of ownership transfers. Timing of approval will be similar to the timing of the Gaming Commission.

g. Sale of Partnership Interests of Reorganized Valley View Downs, LP, Reorganized Centaur PA Land General Partner, LP and Reorganized Centaur PA Land, LP and Membership Interests of Reorganized Centaur PA Land Management, LLC or, Alternatively, Withdrawal of the Pennsylvania Gaming License Application

After considering the capital requirements of the Valley View Downs project, the Debtors have determined that they are unable to develop Valley View Downs themselves. The Debtors have ceased development of Valley View Downs and have, since late 2008, been in the process of marketing the Valley View Downs opportunity for sale. The Debtors believe that a sale of the opportunity to develop Valley View Downs would likely generate more than $50 million, but the amount of additional value is uncertain at this time. Although the Debtors have received a number of promising expressions of interest, the Debtors have yet to obtain a commitment from any party to acquire the Valley View Downs opportunity. As a result, and in order to ensure that every reasonable effort is made to maximize the value of the Valley View Downs opportunity for the benefit of Valley View Downs, LP's creditors, the Debtors have decided to conduct a blind auction through the Plan of the Valley View Downs opportunity and the related real property upon which Valley View Downs would be constructed. However, to the extent that the Debtors are unable to sell the Valley View Downs opportunity through the Plan, the value of the Assets of Valley View Downs, LP will be limited to the L/C Cash once it is returned to the estate of Valley View Downs, LP. The Debtors estimate that in such event less than the $50 million of L/C Cash will be available for distribution to creditors of Valley View Downs, LP after payment of Administrative Expense Claims and Intercompany Financing Claims against Valley View Downs, LP. The Debtors currently estimate, based on Administrative Expense Claims and Intercompany Financing Claims incurred to date (including, without limitation, amounts paid or expected, based upon applications filed to date, to be payable to retained Professionals, ordinary course professionals, and to the L/C Issuer, but excluding Adequate Protection Obligations (as defined in the Final Cash Collateral Order)) and assuming the Confirmation Date occurs in the fourth quarter of 2010, approximately $44.5 million to $45.5 million will be available for distribution to creditors of Valley View Downs, LP. This, however, is only the Debtors' estimate, and the amount actually available for distribution may be more or less that this estimated amount depending upon the amount of the Administrative Expense Claims and Intercompany Financing Claims Allowed against the Valley View Downs, LP estate.

As provided in the Plan, on the Effective Date (or as otherwise provided in the Sale Documents), pursuant to the Sale Documents, the Winning Competitive Bidder shall purchase the Transferred Interests. The transfer of the Transferred Interests to the Winning

Competitive Bidder pursuant to the Sale Documents will be in accordance with the Bidding Procedures and subject to approval by the Bankruptcy Court at the Sale Hearing and pursuant to the Sale Order.

Upon the closing of the VVD Transaction, the proceeds shall be deemed attributable to the Assets of the Conveyed Entities and delivered to Centaur Pennsylvania, LLC or Reorganized Centaur Pennsylvania, LLC, as the case may be, and deposited by Centaur Pennsylvania, LLC or Reorganized Centaur Pennsylvania, LLC, as the case may be, in the Conveyed Entities Distribution Account. Notwithstanding anything to the contrary in any Order entered approving the VVD Transaction, (i) any and all Claims of any third parties and/or creditors against the estates of the Conveyed Entities and/or any rights of such third parties and/or creditors to receive distributions from or on account of the Assets of the Conveyed Entities, including but not limited to, any Challenges which relate to the Conveyed Entities and/or their Assets shall not be extinguished by the transfer of the Transferred Interests to the VVD Buyer but shall instead be fully preserved and attach to the proceeds and (ii) the proceeds shall be distributed to the holders of such Claims against the Conveyed Entities in accordance with the Plan or as otherwise ordered by the Bankruptcy Court.

Upon the closing of the VVD Transaction and the receipt by Valley View Downs, LP of the $50 million of L/C Cash in connection with the termination of the Existing L/C, the L/C Cash shall be deposited into an account in accordance with the terms of the Sale Order.

The allocation of the proceeds between the Estates of the Conveyed Entities and/or any particular Assets of the Conveyed Entities shall be resolved by further order of the Bankruptcy Court.

Upon the closing of the VVD Transaction, the VVD Buyer shall take title to and possession of the Transferred Interests. Except as provided in the Plan, the transfer of title to the Transferred Interests shall be free and clear of liens pursuant to section 1123 of the Bankruptcy Code. Moreover, pursuant to sections 524 and 1141(d) of the Bankruptcy Code, Claims against the Conveyed Entities will be discharged and the proceeds of the VVD Transaction will be distributed to the holders of those Claims against the Conveyed Entities in accordance with the Plan.

In the absence of identification of a Winning Competitive Bidder pursuant to the Bidding Procedures at the Sale Hearing and/or a transfer of the Transferred Interests to the Winning Competitive Bidder, Valley View Downs, LP or Reorganized Valley View Downs, LP, as the case may be, will (i) withdraw the Pennsylvania Gaming License Application, (ii) cause the release, cancellation and return to the L/C Issuer of the Existing L/C and (iii) following payment of any L/C Claims from the Cash supporting the Existing L/C and disbursement by the L/C Issuer of the remaining Cash supporting the Existing L/C to Valley View Downs, LP or Reorganized Valley View Downs, LP, as the case may be, distribute that Cash in accordance with the Plan.

### (c)    **Corporate Action**

The entry of the Confirmation Order shall constitute authorization for the Debtors and the Reorganized Debtors, as the case may be, to take or cause to be taken all corporate actions necessary or appropriate to implement all provisions of, and to consummate, the Plan prior to, on and after the Effective Date and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act, or action under any applicable law, order, rule or regulation, including without limitation, any action required by the officers, members, managers, or general or limited partners of the Debtors and the Reorganized Debtors, as the case may be, including, among other things, (i) the adoption or amendment of any organizational documents; (ii) the termination and cancellation of any Original Debt Documents or any other outstanding instrument, document or agreement evidencing Debt Claims as required by the Plan; (iii) the issuance of the Plan Securities; (iv) all transfers of Assets that are to occur pursuant to the Plan; (v) the incurrence of all obligations contemplated by the Plan and the making of all Plan Distributions; (vi) the reinstatement and assumption of all indemnity obligations to the officers, members, managers, and general and limited partners of the Debtors; (vii) the implementation of all settlements and compromises as set forth in or contemplated by the Plan; (viii) taking of all actions to preserve and provide for the prosecution of the Avoidance Actions; and (ix) entering into any and all transactions, contracts or arrangements permitted by applicable law, order, rule, or regulation; provided, however, that such actions taken following entry of the Confirmation Order but prior to the Effective Date shall be agreeable to the Consenting First Lien Claimholders and such actions taken on or after the Effective Date shall be agreeable to the Board of Managers.

The officers of the Debtors and the Reorganized Debtors, as the case may be, are authorized and directed to do all things and to execute and deliver all agreements, documents, instruments, notices and certificates as are contemplated by the Plan and to take all necessary action required in connection therewith, in the name of and on behalf of the Debtors. All obligations of the Debtors to indemnify and hold harmless their current and former officers, members, managers, general and limited partners and employees, whether arising under the Debtors' constituent documents, contract, law, or equity, shall be fully reinstated and assumed by the Reorganized Debtors upon the occurrence of the Effective Date with the same effect as though such obligations constituted executory contracts that are assumed (or assumed and assigned, as applicable) under section 365 of the Bankruptcy Code, and all such obligations shall be fully enforceable on their terms from and after the Effective Date. Nothing in the Plan, including Sections 17.1 and 17.2, shall release any obligations of the Debtors to indemnify and hold harmless their current and former officers, members, managers, general and limited partners, and employees. Nothing in the Plan, including Section 17.22 of the Plan, shall enjoin any of the Debtors' current and former officers and employees from asserting any indemnity or hold harmless right against the Debtors, excluding any claim for payment of attorneys' fees arising out of or relating to the Chapter 11 Cases or investigations related thereto, except to the extent such attorneys' fees were incurred in the defense of a Claim that was asserted or the subject of investigation or discovery after the Effective Date and which Claim was released pursuant to Sections 17.1 and 17.2 of the Plan. The prosecution of any so-indemnified Causes of Action shall, upon the occurrence of the Effective Date, be enjoined and prohibited, except solely for the purpose of obtaining a recovery from the issuer of any available insurance policy proceeds.

The constituent documents of NewCo and the Reorganized Debtors shall, as of the Effective Date, prohibit or be amended to prohibit the issuance of non-voting equity securities by such Entities as required by section 1123(a)(6) of the Bankruptcy Code, provided, however, that following the Effective Date, NewCo and the Reorganized Debtors shall be entitled to issue non-voting securities, in their sole discretion, and solely in accordance with the terms of the Plan Documents.

(d)     **Termination of Certain Debt Obligations**

Upon the occurrence of the Effective Date, the Original Debt Documents shall be cancelled and annulled (along with such other documents appurtenant thereto) as to all Debtors other than Centaur Colorado, LLC. Upon the occurrence of the Centaur Colorado, LLC Effective Date, the Original Debt Documents shall be cancelled and annulled (along with such other documents appurtenant thereto) as to Centaur Colorado, LLC. Immediately upon the completion of all Plan Distributions to the holders of Allowed First Lien Claims and Allowed Second Lien Claims, the Reorganized Debtors shall be authorized and directed (without further approval, act or other determination under applicable law, regulation, order or rule) to take such action as shall be necessary or appropriate to terminate and extinguish all of the Debtors' obligations under the Original Debt Documents.

(e)     **Continued Corporate Existence**

Except as provided in Section 8.2(c) of the Plan, the Debtors shall continue to exist, as Reorganized Debtors, after the Effective Date as separate entities, with all the powers available to such legal entities, in accordance with applicable law and pursuant to their constituent documents, as modified by the Plan.

(f)     **Re-vesting of Assets**

Upon the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Debtors' Estates and any property acquired by a Debtor or Reorganized Debtor under the Plan shall vest in the Reorganized Debtors free and clear of all Claims, liens, encumbrances, charges and other interests, except as provided in the Plan. On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire or dispose of property and compromise or settle any claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, each Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for all fees, disbursements, expenses or related support services of Professionals (including fees relating to the preparation of professional fee applications) without application to, or approval of, the Bankruptcy Court.

(g)     **Initial Managers and General Partners**

From and after the Effective Date, (i) NewCo shall be managed by the Board of Managers, (ii) NewCo shall be the manager of Reorganized Centaur, LLC, (iii) Reorganized Centaur, LLC shall be the manager of all of its subsidiaries that are limited liability companies and (iv) the general partners of Reorganized Centaur, LLC's subsidiaries that are limited

partnerships shall manage such partnerships. Thereafter, the managers and general partners, as applicable, of NewCo and the Reorganized Debtors shall be selected and determined in accordance with the provisions of the organizational documents of NewCo and such Reorganized Debtors and applicable law. The members of the Board of Managers shall be as identified in the Plan Supplement.

### (h) **Officers**

The current officers of each of the Debtors shall continue in such positions after the Effective Date in accordance with their respective employment agreements, if any, or, in the case of the Existing Management, the Long Term Employment Agreements, and applicable law. From and after the Effective Date, the officers of each of the Reorganized Debtors shall be selected and appointed by the respective members, managers, and partners of such entities, in accordance with, and pursuant to, the provisions of applicable law and their respective organizational documents. The officers of NewCo shall be as identified in the Plan Supplement.

### (i) **Retention of Causes of Action/Reservation of Rights**

Except as set forth in Sections 17.1 and 17.2 of the Plan, all Causes of Action other than the Designated Avoidance Actions belonging to any of the Debtors shall, upon the occurrence of the Effective Date, be vested in the Reorganized Debtors for the benefit of the Debtors and their Estates. Except as set forth in Sections 17.1 and 17.2 of the Plan, the rights of the Reorganized Debtors to commence, prosecute, or settle such Causes of Action other than the Designated Avoidance Actions shall be preserved notwithstanding the occurrence of the Effective Date.

**No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Committee will not pursue any and all available Causes of Action against them. The Debtors and the Estates, on their own behalf and on behalf of the Committee, expressly reserve all rights to prosecute any and all Causes of Action against any Person, except as otherwise provided in the Plan.** Unless any Causes of Action against a Person are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Final Order, the Debtors, on their own behalf and on behalf of the Committee, expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon or after the confirmation or consummation of the Plan.

Except as set forth in Sections 17.1 and 17.2 of the Plan, nothing in the Plan or the Confirmation Order shall be deemed a waiver or relinquishment of any Claim, Cause of Action, right of setoff, or other legal or equitable defense which the Debtors had immediately prior to the Petition Date, against or with respect to any Claims left unimpaired by the Plan, except for avoidance actions pursuant to section 547 of the Bankruptcy Code (provided, however, that the Debtors' right to object to any Claim pursuant to section 502(d) of the Bankruptcy Code is fully preserved, including, without limitation, the right to object to any Claim of a recipient of a transfer that is avoidable under section 547 of the Bankruptcy Code).

(j)     **Appointment of the Disbursing Agent**

Upon the occurrence of the Effective Date, the Reorganized Debtors shall be appointed to serve as the Disbursing Agent and shall have all powers, rights, duties, and protections afforded the Disbursing Agent under the Plan.

(k)     **Alternative Sale in the Event of Failure to Obtain Regulatory Consents, Authorizations and Approvals**

The Plan provides that, if the required regulatory authorities have not (i) approved of the Plan, the corporate governance structure contemplated by the Plan and as described in Exhibit "H" to this Disclosure Statement, the transfer of ownership and control of Hoosier Park, L.P.'s gaming facility and gaming license in connection with the consummation of the Plan and the post-Effective Date capital structure of the Reorganized Debtors by the 120th day after the Confirmation Date, which approval shall include, without limitation, a resolution, ruling or finding, as applicable, by the Indiana Gaming Commission that, because of the transfer of ownership and control of Hoosier Park, L.P.'s gaming facility and gaming license in connection with consummation of the Plan and as a result of a bankruptcy or debt adjustment, any subsequent transfer of ownership and control of such gaming facility and gaming license will be exempt from any transfer fee under Section 4-35-5-7 of the Indiana Code or other applicable gaming law or statute, which resolution, ruling or finding shall be in form and substance satisfactory to the Required Lenders in their sole discretion; or (ii) approved the background checks of, and granted licenses to, the members of the Board of Managers by the 270th day after the Confirmation Date, the Required Lenders may direct the Debtors to market for sale, in a good faith and expeditious manner, the Assets of the Debtors (including the Assets of Centaur Colorado, LLC, if any, to the extent such Assets are not then subject to the Fortune Valley Sale Agreement). Any such sale shall be subject to Bankruptcy Court approval pursuant to section 363 of the Bankruptcy Code, and upon consummation of such sale, all liens and security interests shall attach solely to the proceeds of such sale with the same validity, priority, force and effect as presently exists with respect to the Assets sold immediately prior to the closing of such sale. The proceeds of such sale (and the proceeds, if any, of the sale of those Assets of Centaur Colorado, LLC pursuant to the Fortune Valley Sale Agreement or such sale pursuant to section 363 of the Bankruptcy Code) shall be distributed in full satisfaction of all liens, security interests and Claims of the Prepetition First Lien Agent, the Prepetition Second Lien Agent and other holders of Claims against the Debtors' Estates up to payment in full. In the event that any proceeds of such sale remain after payment in full of all Secured Claims against the Debtors in their order of priority, such excess proceeds shall be distributed strictly in accordance with the "absolute priority rule" without the necessity of confirmation of a plan of reorganization or liquidation pursuant to section 1129 of the Bankruptcy Code.

Notwithstanding the foregoing, the Committee opposes the implementation of any materially different Plan based alternative transaction without further disclosure and resolicitation and opposes any Plan alternative transaction, which if implemented, could impair the Challenges or the viability of the Committee Complaint and related litigation.

## F. Litigation Trust

### (a) **The Designated Avoidance Actions**

The Debtors have performed a preliminary evaluation of the Avoidance Actions and have concluded that pursuit of the Avoidance Actions is not likely to yield substantial value and that any value realized would likely be substantially offset by the costs associated with pursuing such actions.

#### a. Preferences

The Debtors analyzed potential preferential transfers.[28] The transfer data indicates that all transfers within 90 days of the date the Valley View Downs Debtors commenced their Chapter 11 Cases or the date the Centaur Debtors commenced their Chapter 11 Cases, as applicable, originated either at Centaur, LLC, Hoosier Park, L.P., Centaur Colorado, LLC or Valley View Downs, LP, as follows:

| | | |
|---|---|---|
| i. | Centaur, LLC | approximately $4.3 million |
| ii. | Hoosier Park, L.P. | approximately $34.8 million |
| iii. | Centaur Colorado, LLC | approximately $2.7 million |
| iv. | Valley View Downs, LP | approximately $900,000 |

The data also indicates that transfers to Insiders within one year of the date the Valley View Downs Debtors commenced their Chapter 11 Cases or the date the Centaur Debtors commenced their Chapter 11 Cases, as applicable, were limited to transfers to Insiders for salary and reimbursable business expenses, which were made in the ordinary course of business.

Applying available defenses that require little judgment in their application (e.g., section 547(c)(9), the "new value" defense, absence of antecedent debt (such as retainers paid to professionals) and transfers that would otherwise be paid as Cure Costs) and excluding prepetition payments made to Professionals found by the Bankruptcy Court to be disinterested and to governmental authorities (e.g., taxing, gaming and racing) which are presumably ordinary course transfers, the possible pool of preferential transfers is reduced as follows:

| | | |
|---|---|---|
| i. | Centaur, LLC | approximately $1.2 million |
| ii. | Hoosier Park, L.P. | approximately $4.6 million |
| iii. | Centaur Colorado, LLC | approximately $900,000 |
| iv. | Valley View Downs, LP | approximately $700,000 |

Application of less objective defenses such as "contemporaneous exchange" and "ordinary course" would certainly further diminish the already reduced pool of potential preferential transfers. The Debtors believe that once all defenses are considered, the likely recovery from

---

[28] The transfer data that the Debtors used in their analysis was taken from the Debtors' Statements of Financial Affairs filed on March 31, 2010 in the case of the Valley View Downs Debtors and May 5, 2010 in the case of the Centaur Debtors.

preference claims will be de minimis at best and would impact disproportionately, if not entirely, trade creditors with which the Debtors continue to trade in the ordinary course of business. Consequently, no potential preference actions are included within the Designated Avoidance Actions.

> b. Fraudulent Transfers

The Committee has raised issues with respect to transfers that occurred at the time the Debtors entered into the Prepetition First Lien Credit Agreement and the Prepetition Second Lien Credit Agreement, by which certain equity interests in the Debtors, Centaur, Inc. and Bedford Downs Management Corporation were redeemed.[29] Based upon the Debtors' analysis, those transfers aggregate, by Debtor, as follows:

|      |                       |                              |
| ---- | --------------------- | ---------------------------- |
| i.   | Centaur, LLC          | approximately $7.5 million   |
| ii.  | Centaur Colorado, LLC | approximately $5.2 million   |
| iii. | Valley View Downs, LP | approximately $96.5 million  |

With respect to these transfers, the equity interests redeemed or the property received were not formally appraised at the time of the transfers. Instead, the amounts paid were heavily negotiated by the Debtors who were informed in their negotiations by the share price ascribed to the stock of Centaur, Inc. as part of the heavily negotiated and nearly consummated sale of a 30 percent stake in Centaur, Inc. during summer 2007.[30] As a result, without incurring substantial expense, the Debtors cannot rule out entirely the possibility of constructively fraudulent transfers having occurred. Consequently, actions with respect to these transfers are among the Designated Avoidance Actions, summarized in Exhibit "I" to this Disclosure Statement, that the Debtors intend to transfer to the Litigation Trust as set forth in the Plan. Other than Centaur, Inc. and Holdings, as initial or mediate transferees, the Debtors do not believe that any Released Person would be a defendant with respect to a Designated Avoidance Action. As to those entities, the Designated Avoidance Actions are excluded from the Claims to be released pursuant to Sections 17.1 and 17.2 of the Plan.

> (b) **Creation of the Litigation Trust and Appointment of the Litigation Trustee**

Pursuant to the Plan, on the Effective Date, the Litigation Trust shall be created pursuant to the Litigation Trust Declaration. The Litigation Trust Declaration shall be in substantially the form filed with the Bankruptcy Court as a Plan Document. The Litigation Trust shall be administered by the Litigation Trustee. The Litigation Trustee shall be selected by the

---

[29] Before being acquired by the Debtors, Bedford Downs Management Corporation (now one of the Debtors' Unrestricted Subsidiaries but not a Debtor in these Chapter 11 Cases) was the entity competing with Valley View Downs, LP for one of the limited harness racing licenses in Pennsylvania. The transfers to former equity holders of Bedford Downs Management Corporation were made in connection with a settlement that effectively removed Bedford Downs Management Corporation's competing Pennsylvania harness racing license application from consideration.

[30] Other transfers were made to redeem debt, and thus, were for "value" within the meaning of section 548(d)(2)(A) of the Bankruptcy Code.

Debtors or, if no Litigation Trustee has been appointed by the Debtors within thirty (30) days following the Effective Date, the beneficiaries of the Litigation Trust, as set forth in the Litigation Trust Declaration; provided, however, that, in any event, the Litigation Trustee shall (i) be independent of, hold no interest in or adverse to, not be an employee of, or be an advisor retained, directly or indirectly during the five years immediately preceding the Effective Date, by, the Debtors, the Prepetition First Lien Claimholders, the Prepetition Second Lien Claimholders or the Committee or any member thereof and (ii) have no interest in or adverse to the Designated Avoidance Actions. The Litigation Trustee shall be subject to removal for "cause" by the beneficiaries of the Litigation Trust as set forth in the Litigation Trust Declaration.

The Litigation Trust Interests shall be issued to holders of Allowed First Lien Deficiency Claims, Allowed Second Lien Claims, Allowed Valley View Downs Unsecured Claims and Allowed General Unsecured Claims, and, in certain circumstances, holders of Allowed Intercompany Claims against Valley View Downs, LP as provided in Sections 5.2, 5.3, 5.5, 5.6 and 5.8 of the Plan.

The costs and expenses of the Litigation Trust shall not be borne by the Debtors or the Reorganized Debtors. Rather, the costs and expenses of the Litigation Trust and the Litigation Trustee shall be paid from the proceeds of any Designated Avoidance Actions prior to any distributions being made to the beneficiaries of the Litigation Trust; provided, however, that any one or more of the beneficiaries of the Litigation Trust may agree to fund the costs and expenses of the Litigation Trust and shall be entitled to reimbursement from the proceeds of any Designated Avoidance Actions prior to any distributions being made to beneficiaries of the Litigation Trust.

The Committee advises creditors that the failure to fund the Litigation Trust as intended here and as set forth above will make it difficult and perhaps impossible to identify a Litigation Trustee.

(c) **Property of the Litigation Trust**

Notwithstanding any prohibition of assignability under applicable non-bankruptcy law, on the Effective Date, the Debtors shall be deemed to have automatically transferred to the Litigation Trust all of their right, title and interest in and to the Designated Avoidance Actions. In accordance with section 1141 of the Bankruptcy Code, the transfer of the Designated Avoidance Actions shall be free and clear of all Claims and interests and for the benefit of the holders of Litigation Trust Interests.

(d) **Purpose of the Litigation Trust**

The Litigation Trust shall be established for the primary purpose of liquidating its assets in accordance with Treas. Reg. § 301.7701-4(d) with no objective to continue to engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Litigation Trust. Accordingly, the Litigation Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the Designated Avoidance Actions, make timely distributions to the holders of Litigation Trust Interests of Cash and

property and not unduly prolong its duration. The Litigation Trust shall not be deemed a successor-in-interest of the Debtors or the Reorganized Debtors for any purpose other than as specifically set forth herein or in the Litigation Trust Declaration. The Litigation Trust is intended to qualify as a "grantor trust" for federal income tax purposes with the holders of Litigation Trust Interests treated as grantors and owners of the Litigation Trust. As soon as practicable after the Effective Date, the Litigation Trustee (to the extent that the Litigation Trustee deems it necessary or appropriate in his or her sole discretion) shall value the assets of the Litigation Trust based on the good faith determination of the Litigation Trustee. The valuation shall be used consistently for all parties for all federal income tax purposes. The Bankruptcy Court shall resolve any dispute regarding such valuation.

(e)    **Powers of the Litigation Trustee**

The Litigation Trustee shall have the power to administer the assets of the Litigation Trust in a manner consistent with the Litigation Trust Declaration and the Litigation Trustee shall be the estate representative to prosecute any and all Designated Avoidance Actions transferred to the Litigation Trust. Without limiting the generality of the foregoing, the Litigation Trustee shall (a) hold, administer and prosecute the assets of the Litigation Trust and any proceeds thereof, (b) have the power and authority to retain, as an expense of the Litigation Trust, attorney, advisors, other professionals and employees as may be appropriate to perform the duties required of the Litigation Trustee under the Plan or in the Litigation Trust Declaration, (c) make periodic distributions as provided in the Plan and Litigation Trust Declaration, and (d) provide periodic reports and updates regarding the status of the administration of the Litigation Trust; provided, however, that the Litigation Trustee shall not be permitted to retain any professionals retained by any of the Debtors, the Prepetition First Lien Claimholders, the Prepetition Second Lien Claimholders or the Committee or Persons that were at any time members of the Committee in connection with these Chapter 11 Cases. The Litigation Trustee shall be deemed a Disbursing Agent under the Plan when making distributions to holders of Litigation Trust Interests pursuant to the Litigation Trust Declaration.

(f)    **Cooperation Between the Litigation Trustee and the Disbursing Agent**

The Litigation Trustee and the Disbursing Agent shall consult and cooperate reasonably in the performance of their duties under the Plan. The Reorganized Debtors shall provide the Litigation Trustee with reasonable access to the books and records of the Debtors concerning the Designated Avoidance Actions.

(g)    **Distributions from the Litigation Trust**

Holders of Litigation Trust Interests that received such interests pursuant to Section 5.2, Section 5.3 or Section 5.6 of the Plan on account of Claims against a particular Debtor (other than Valley View Downs, LP) shall receive distributions from the Litigation Trust of the proceeds of only those Designated Avoidance Actions that result in the recovery of property transferred, or the value of the property transferred, by that Debtor, and each such holder shall receive a pro rata share (by amount) of each such distribution in accordance with such holder's pro rata share (by amount) of the aggregate amount of the Allowed First Lien

Deficiency Claims, Allowed Second Lien Claims and Allowed General Unsecured Claims against that Debtor.

Holders of Litigation Trust Interests that received such interests pursuant to Section 5.2, Section 5.3, Section 5.5 or Section 5.8 of the Plan on account of Claims against Valley View Downs, LP shall receive distributions from the Litigation Trust of the proceeds of only those Designated Avoidance Actions that result in the recovery of property transferred, or the value of the property transferred, by Valley View Downs, LP, and each such holder shall receive a pro rata share (by amount) of each such distribution in accordance with such holder's pro rata share (by amount) of the aggregate amount of the Allowed First Lien Deficiency Claims, Allowed Second Lien Claims and Allowed Valley View Downs Unsecured Claims.

(h) **Termination of the Litigation Trust**

The Litigation Trust shall exist for an initial term of five (5) years following the Effective Date (subject to extension under certain circumstances). On or prior to the date of termination, the Bankruptcy Court, upon motion by a party in interest, may extend the term of the Litigation Trust for a finite period, if such extension is necessary to liquidate the assets of the Litigation Trust or for other good cause. Multiple extensions of the termination of the Litigation Trust may be obtained so long as Bankruptcy Court approval is obtained prior to the expiration of each extended term and the Litigation Trustee receives an opinion of counsel or a favorable ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Litigation Trust as a "grantor trust" for federal income tax purposes. Notwithstanding the foregoing or any other provision of the Plan or the Litigation Trust Declaration, the Litigation Trustee may make distributions of Cash and property held by the Litigation Trust to the holders of Litigation Trust Interests at such time as the Litigation Trustee shall determine.

## G. Management Incentive Plan

On or after the Effective Date, NewCo shall be authorized to adopt and implement the Management Incentive Plan, subject to the satisfaction of the Consenting First Lien Claimholders and the Board of Managers, in exchange for Existing Management's entry into the Long Term Employment Agreements. The terms of the Management Incentive Plan and the Long Term Employment Agreements are the subject of further on-going negotiations between the Debtors, Existing Management and the Prepetition First Lien Claimholders. The Debtors will file documents containing the terms of the Management Incentive Plan and the Long Term Employment Agreements as part of the Plan Supplement prior to the Confirmation Hearing.

## H. Distribution Provisions

(a) **Plan Distributions**

Pursuant to the terms and provisions of the Plan, the Disbursing Agent shall make the required Plan Distributions specified under the Plan on the relevant Distribution Date therefor.

The Disbursing Agent may make all distributions on account of Allowed First Lien Claims to the Prepetition First Lien Agent in its capacity as administrative agent for the First Lien Lenders, which distributions the Prepetition First Lien Agent shall distribute to the First Lien Lenders on a pro rata basis. The Prepetition First Lien Agent shall be entitled to the exculpation protections provided in Section 11.3 of the Plan with respect to any distributions the Prepetition First Lien Agent makes on account of Allowed First Lien Claims.

The Disbursing Agent may make all distributions on account of Allowed Second Lien Claims to the Prepetition Second Lien Agent in its capacity as administrative agent for the Second Lien Lenders, which distributions the Prepetition Second Lien Agent shall distribute to the Second Lien Lenders on a pro rata basis. The Prepetition Second Lien Agent shall be entitled to the exculpation protections provided in Section 11.3 of the Plan with respect to any distributions the Prepetition Second Lien Agent makes on account of Allowed Second Lien Claims.

(b)     **Timing of Plan Distributions**

Each Plan Distribution shall be made on the relevant Distribution Date therefor. In the event a Plan Distribution shall be payable on a day other than a Business Day, such Plan Distribution shall instead be paid on the immediately succeeding Business Day, but shall be deemed to have been made on the date otherwise due. A Plan Distribution shall be deemed to have been timely made if made on such date or within ten (10) days thereafter.

For federal income tax purposes, except to the extent a Plan Distribution is made in connection with reinstatement of an obligation pursuant to section 1124 of the Bankruptcy Code, a Plan Distribution will be allocated first to the principal amount of a Claim and then, to the extent the Plan Distribution exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest, provided, however, that notwithstanding all of the foregoing, the application of any Plan Distribution made on account of Allowed First Lien Claims and Allowed Second Lien Claims shall be governed by the Prepetition First Lien Credit Agreement and the Prepetition Second Lien Credit Agreement, respectively.

(c)     **Surrender and Cancellation of Instruments**

As a condition to receiving any Plan Distribution, on or before the Distribution Date, the holder of an Allowed Claim evidenced by a certificate, instrument or note, other than any such certificate, instrument or note that is being reinstated or being left unimpaired under the Plan, shall (i) surrender such certificate, instrument or note representing such Claim, and (ii) execute and deliver such other documents as may be necessary to effectuate the Plan in the sole determination of the Disbursing Agent. Such certificate, instrument or note shall thereafter be cancelled and extinguished. The Disbursing Agent shall have the right to withhold any Plan Distribution to be made to or on behalf of any holder of such Claims unless and until (A) such certificates, instruments or notes are surrendered, or (B) any relevant holder provides to the Disbursing Agent an affidavit of loss or such other documents as may be required by the Disbursing Agent together with an appropriate indemnity in the customary form. Any such holder who fails to surrender such certificates, instruments or notes, or otherwise fails to deliver an affidavit of loss and indemnity prior to the second anniversary of the Effective Date, shall be

deemed to have forfeited its Claims and shall not participate in any Plan Distribution. All property in respect of such forfeited Claims shall revert to the Reorganized Debtors.

## I. Procedures for Resolving and Treating Contested Claims

### (a) **Objection Deadline**

As soon as practicable, but in no event later than one hundred and eighty (180) days after the Effective Date (subject to being extended by order of the Bankruptcy Court upon motion of the Disbursing Agent without notice or a hearing), objections to Claims shall be filed with the Bankruptcy Court and served upon the holders of each of the Claims to which objections are made.

### (b) **Prosecution of Contested Claims**

After the date the Confirmation Order becomes a Final Order, only the Reorganized Debtors may object to the allowance of Contested Claims filed with the Bankruptcy Court. All objections that are filed and prosecuted as provided in the Plan shall be litigated to Final Order or compromised and settled in accordance with Section 13.3 of the Plan.

### (c) **Claims Settlement**

Notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, from and after the Effective Date, the Disbursing Agent shall have authority to settle or compromise all Claims and Causes of Action without further review or approval of the Bankruptcy Court.

### (d) **Entitlement to Plan Distributions Upon Allowance**

Notwithstanding any other provision of the Plan, if any portion of a Claim is a Contested Claim, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until such Claim becomes an Allowed Claim that is not a Contested Claim, subject to the setoff rights as provided in Section 17.19 of the Plan. When a Claim that is not an Allowed Claim as of the Effective Date becomes an Allowed Claim, the holder of such Allowed Claim shall thereupon become entitled to receive the Plan Distributions in respect of such Claim the same as though such Claim had been an Allowed Claim on the Effective Date.

### (e) **Contested Claims Reserve**

The Debtors may establish a Contested Claims Reserve in a segregated account for the purpose of effectuating distributions to the holders of Contested Claims pending the allowance or disallowance of such Claims in accordance with the Plan.

### (f) **Estimation of Claims**

An Estimation Order may be used to calculate and establish the amount of the Contested Claims Reserve. The Debtors and the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any contingent, unliquidated or Contested Claim pursuant to

section 502(c) of the Bankruptcy Code, regardless of whether the Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated or Contested Claim, the amount so estimated shall constitute either (i) the Allowed amount of such Contested Claim, (ii) a maximum limitation on such Contested Claim or (iii) in the event such Contested Claim is estimated in connection with the estimation of other Claims within the same class, a maximum limitation on the aggregate amount of Allowed Claims on account of such Contested Claims so estimated. If the estimated amount constitutes a maximum limitation on the amount of such Claim, or on more than one such Claim within a class of Claims, as applicable, the Debtors or the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claims. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or otherwise resolved by any mechanism approved by the Bankruptcy Court.

(g)     **No Recourse Against the Debtors or the Reorganized Debtors**

If a Contested Claims Reserve is established pursuant to Section 13.5 of the Plan prior to the Effective Date, any holder of a Contested Claim that ultimately becomes an Allowed Claim shall be entitled to receive its applicable distribution under the Plan solely from the Contested Claims Reserve established on account of such Contested Claim. In no event shall any holder of a Contested Claim have any recourse with respect to distributions made, or to be made, under the Plan to holders of such Claims, to any Debtor or the Reorganized Debtors on account of such Contested Claim, regardless of whether such Contested Claim shall ultimately become an Allowed Claim, and regardless of whether sufficient Cash or other property remains available for distribution in the Contested Claims Reserve established on account of such Contested Claim at the time such Claim becomes entitled to receive a distribution under the Plan.

## J.     Conditions Precedent to Confirmation of Plan

As conditions precedent to confirmation of the Plan, the Clerk of the Bankruptcy Court shall have entered an order or orders:

(i)     approving the Disclosure Statement as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code;

(ii)     authorizing the solicitation of votes with respect to the Plan;

(iii)     determining that all votes are binding and have been properly tabulated as acceptances or rejections of the Plan;

(iv)     reasonably acceptable, in form and substance, to the Debtors and the Consenting First Lien Claimholders and confirming and giving effect to the terms and provisions of the Plan;

(v)    determining that all applicable tests, standards and burdens in connection with the Plan have been duly satisfied and met by the Debtors and the Plan;

(vi)    approving the Plan Documents, which shall be in form and substance satisfactory to the Consenting First Lien Claimholders;

(vii)    authorizing the Debtors to execute, enter into, and deliver the Plan Documents and to execute, implement, and to take all actions otherwise necessary or appropriate to give effect to, the transactions contemplated by the Plan and the Plan Documents; and

(viii)    resolving any Challenges brought by the Committee, which shall be a Final Order or Final Orders.

## K.    Conditions Precedent to Occurrence of the Effective Date

The following are conditions precedent to the occurrence of the Effective Date:

(i)    the Confirmation Order shall have been entered by the Clerk of the Bankruptcy Court, be in full force and effect and not be subject to any stay or injunction;

(ii)    the closing of any Exit Financing shall have occurred;

(iii)    the forms of the NewCo PIK Notes and NewCo Warrants shall be in form and substance satisfactory to the Consenting First Lien Claimholders and shall have been issued pursuant to the Plan;

(iv)    the aggregate face amount of the NewCo PIK Notes shall not be materially less than $155 million;

(v)    the composition of the Board of Managers shall be acceptable to the Consenting First Lien Claimholders and the Board of Managers shall have been seated;

(vi)    all necessary regulatory consents, authorizations and approvals of the post-Effective Date capital structure of the Reorganized Debtors shall have been given;

(vii)    all necessary consents, authorizations and approvals shall have been given for the transfers of property and the payments provided for or contemplated by the Plan, including, without limitation, (a) satisfaction or waiver of all conditions to the obligations of (1) the Debtors under the Plan and the Plan Documents, (2) the Debtors and the Prepetition First Lien Claimholders under the First Lien Take Back Documents, and (b) the valid issuance of the Plan Securities or, in the case of regulatory consents, authorizations, or approvals, the status of any requests or applications for such consents, authorization, or approvals immediately preceding the Effective Date shall be satisfactory to the Consenting First Lien Claimholders;

(viii)    payment of all Intercompany Financing Claims; provided, however, that payment of such Claims may be waived in accordance with Section 15.3 of the Plan on a Debtor by Debtor basis; and

(ix)    the Debtors shall have received a resolution, ruling or finding, as applicable, by the Indiana Gaming Commission that, because of the transfer of ownership and control of Hoosier Park, L.P.'s gaming facility and gaming license in connection with consummation of the Plan and as a result of a bankruptcy or debt adjustment, any subsequent transfer of ownership and control of such gaming facility and gaming license will be exempt from any transfer fee under Section 4-35-5-7 of the Indiana Code or other applicable gaming law or statute, which resolution, ruling or finding shall be in form and substance satisfactory to the Required Lenders in their sole discretion.

**L.    Waiver of Conditions**

The Debtors (a) with the written consent of the Consenting First Lien Claimholders, may waive any one or more of the conditions set forth in clauses (i) through (vii) of Section 15.1 or the conditions set forth in clauses (i) through (viii) of Section 15.2 of the Plan, and (b) with the consent of the Required Lenders, may waive the condition set forth in clause (ix) of Section 15.2 of the Plan, in a writing executed by each of them without notice or order of the Bankruptcy Court and without notice to any parties in interest. The Debtors may seek to waive in its entirety or as to any particular Challenge the condition set forth in clause (viii) of Section 15.1 of the Plan by separate motion, and that condition shall be deemed waived only upon entry by the Bankruptcy Court of an order granting such motion.

**M.    Effect of Non-Occurrence of the Effective Date**

If the Effective Date shall not occur, the Plan shall be null and void and nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims against or Equity Interests in a Debtor; (b) prejudice in any manner the rights of any party in interest; or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtors or any other party in interest.

**N.    Exculpation of Debtors and Released Persons**

**The Debtors and any Released Persons shall not be liable for any Cause of Action related to or arising in connection with or out of the administration of the Chapter 11 Cases, pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for gross negligence or willful misconduct as determined by Final Order of the Bankruptcy Court. The Confirmation Order shall enjoin all holders of Claims and Equity Interests from asserting or prosecuting any Claim or Cause of Action against any Released Person as to which such Released Person has been exculpated from liability pursuant to the preceding sentence.**

**O.    Releases by the Debtors**

**On the Effective Date, each of the Released Persons shall be released by each Debtor and their respective Estates, from any and all Claims (other than, in the case of each of Centaur, Inc. and Holdings, the Designated Avoidance Actions), including, without limitation, Avoidance Actions, liens, encumbrances, security interests, obligations, suits, judgments, damages, rights, Causes of Action and liabilities whatsoever, whether known or**

unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that any Debtor is entitled to assert in its own right or on behalf of the holder of any Claim or Equity Interest or other Person, based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence taking place on or prior to the Effective Date in any way relating to any Debtor, the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, implementation, administration, confirmation or consummation of any of the Plan, or the property to be distributed under the Plan, the disclosure statement concerning the Plan, any contract, employee pension or other benefit plan, instrument, release or other agreement or document created, modified, amended, terminated or entered into in connection with either the Plan or any agreement between the Debtors and any Released Person, or any other act taken or omitted to be taken in connection with the Debtors' bankruptcy. Without limitation of the foregoing, each such Released Person shall be released and exculpated from any and all Claims, obligations, suits, judgments, damages, rights, Causes of Action and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that any holder of a Claim or Equity Interest is entitled to assert in its own right or on behalf of any other person, based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence relating to the Debtors and taking place prior to the Effective Date.

P.      Release of Released Persons by Other Released Persons

On the Effective Date, except as expressly provided under the Plan with respect to (a) Plan Distributions on account of Allowed Claims or Allowed Equity Interests, if any, that any of the Released Persons may have against any of the Debtors' Estates, and (b) any other rights or obligations under the Plan or the Plan Documents, each of the Released Persons shall release each other from any and all Claims (other than, in the case of each of Centaur, Inc. and Holdings, the Designated Avoidance Actions), including, without limitation, Avoidance Actions, liens, encumbrances, security interests, obligations, suits, judgments, damages, rights, Causes of Action, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that any Released Person is entitled to assert against any other Released Person, based in whole or in part upon any act or omission, transaction, agreement, event or occurrence taking place on or before the Effective Date in any way relating to any Debtor, the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, implementation, administration, confirmation or consummation of any of the Plan, or the property to be distributed under the Plan, the disclosure statement concerning the Plan, any contract, employee pension or other benefit plan, instrument, release or other agreement or document created, modified, amended, terminated, or entered into in connection with either the Plan or any agreement between the Debtors and any Released Person, or any other act taken or omitted to be taken in connection with the Debtors' bankruptcy. Notwithstanding any of the foregoing, the Plan shall not release any obligations of the Debtors to indemnify and hold harmless their current and former officers and employees, except for claims or Causes of Action against any current and former officers and employees resulting from the willful misconduct or gross negligence of such indemnified party, whether arising under the Debtors' constituent documents, contract, law or equity.

## Q. Indemnification of the Prepetition First Lien Agent

From and at all times following the Effective Date, (a) each of NewCo and the Reorganized Debtors shall (and shall cause each of their present and future subsidiaries to), jointly and severally, and (b) each holder of an Allowed First Lien Claim (in the proportion that such holder's First Lien Claim bears to the total Allowed First Lien Claims but, subject thereto, jointly and severally with each Person specified in (a)), shall, on demand, advance and indemnify the Prepetition First Lien Agent and its respective officers, directors, principals, shareholders, parents, subsidiaries, affiliates, members, auditors, accountants, financial advisors, predecessors, successors, servants, employees, agents, counsel, attorneys, partners, insurers, underwriters, administrators, executors, representatives or assigns (each an "Indemnified Person") against all Causes of Action, regardless of whether any such Indemnified Person is a party thereto (and regardless of whether such matter is initiated by a third party or by NewCo, any Reorganized Debtor or any of their respective affiliates or shareholders), and against all losses, costs, liabilities, damages, obligations, expenses and disbursements (including, without limitation, the payment of any attorney or other advisory fees) and any duties, taxes and charges incurred or suffered by or awarded against them related to, in connection with or arising out of the performance by them of any actions required or contemplated by the Plan (including the implementation of any transactions contemplated by the Plan), the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan, except to the extent resulting primarily from the gross negligence or willful misconduct of such Indemnified Person as determined by Final Order of the Bankruptcy Court.

## R. Additional Disclosure Regarding Releases and Indemnification

The Bankruptcy Court for the District of Delaware has concluded that releases by debtors of non-debtor third parties are permitted in certain circumstances. See In re Coram Healthcare Corp., 315 B.R. 321, 335 (Bankr. D. Del. 2004); In re Zenith Elecs. Corp., 241 B.R. 92, 110 (Bankr. D. Del. 1999). Specifically, the Bankruptcy Court for the District of Delaware has found the following five factors to be relevant to the determination of whether releases of non-debtor third parties by debtors are permissible:

> (1) the identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate; (2) substantial contribution by the non-debtor of assets to the reorganization; (3) the essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success; (4) an agreement by a substantial majority of creditors to support the injunction, specifically if the impacted class or classes 'overwhelmingly' votes to accept the plan; and (5) provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction.

In re Exide Techs., 303 B.R. 48, 72 (Bankr. D. Del. 2003) (citing In re Zenith Elecs. Corp., 241 B.R. at 110); see also In re Coram Healthcare Corp., 315 B.R. at 335. These five factors "are neither exclusive nor are they a list of conjunctive requirements" but rather "are helpful in

weighing the equities of the particular case after a fact-specific review." In re Exide Techs., 303 B.R. at 72 (citing In re Master Mortg. Inv. Fund, Inc., 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994)).

Courts in this District applying these factors have upheld releases of claims held by the debtor. See In re Coram Healthcare Corp., 315 B.R. at 328, 335-36 (holding that the debtors could appropriately release noteholders and their officers, directors, and employees from potential claims held by the debtors); In re Zenith Elecs. Corp., 241 B.R. at 110-11 (allowing the release of debtor's officers and directors, debtor's largest shareholder and creditor and its related companies, and a bondholders' committee and its professionals from claims potentially held by the debtor).

The Debtors submit that, based on the facts and circumstances of these Chapter 11 Cases that are discussed briefly and summarily below, the releases by the Debtors contained in Section 17.1 of the Plan (the "Section 17.1 Releases") are not impermissible as a matter of law and are warranted based on the facts and circumstances of these Chapter 11 Cases.

First, the officers and managers of the Debtors (collectively, the "Officers and Managers") share an identity of interest with the Debtors as a result of indemnification rights against the Debtors. In re Coram Healthcare Corp., 315 B.R. at 335 (identifying existence of indemnification agreements between officers and directors and the debtor as a basis for finding identity of interest). The Released Persons, including, without limitation, the Officers and Managers, the Prepetition First Lien Agent, the Consenting First Lien Claimholders and the L/C Issuer, all share a common goal of achieving a reorganization of the Debtors. See In re Zenith Elecs. Corp., 241 B.R. at 110 (finding identity of interest among officers and directors, supporting creditors and Debtors based upon shared interest in "seeing that the Plan succeed and the company reorganize.").

Second, the Released Persons under Section 17.1 of the Plan have made a substantial contribution to the Debtors' chapter 11 restructuring to be achieved through the Plan. The Officers and Managers were instrumental in negotiating the financial restructuring of the Debtors and maintaining, during the pendency of these Chapter 11 Cases, the Debtors' businesses as a going concern for the benefit of the Debtors' creditors. Existing Management is facilitating the reorganization by entering into the Long Term Employment Agreements and taking distributions of the equity interests of NewCo since such equity interests cannot be distributed to holders of Claims that do not satisfy, or have chosen not to subject themselves to, the rigorous licensing and regulatory requirements. Notably, without the agreement of the Consenting First Lien Claimholders and the Prepetition First Lien Agent to support the Plan, the Debtors would have likely been forced to liquidate, which, as evidenced by the liquidation analysis set forth in Exhibit "G" to the Disclosure Statement, would result in no recovery to holders of Claims junior in priority to those of the Prepetition First Lien Claimholders. Each of these components—the extraordinary efforts of the Officers and Managers and Existing Management and the support of the Consenting First Lien Claimholders and the Prepetition First Lien Agent—constitutes a separate and necessary contribution to the Debtors' reorganization. See, e.g., id. at 111 (finding a substantial contribution to have been made by (i) the officers and directors in effectuating operational and financial restructurings, (ii) the largest shareholder by funding the plan and agreeing to compromise its claim, and (iii) the committee of bondholders by

negotiating and supporting the plan); In re Genesis Health Ventures, Inc., 266 B.R. 591, 607 n.16 (Bankr. D. Del. 2001) (finding secured lenders' "donation" of value to junior classes to be noteworthy contribution supporting debtor release of senior lenders), disagreed with on other grounds by In re Armstrong World Indus., 320 B.R. 523, 539-40 (D. Del. 2005).

Third, it should be noted that the Section 17.1 Releases in favor of the Prepetition First Lien Claimholders were an integral part of the Prepetition First Lien Agent's and the Consenting First Lien Claimholders' agreement to support the Plan. The Consenting First Lien Claimholders and the Prepetition First Lien Agent would not support the Plan in the absence of the requirement therein that the Plan include a release by the Debtors of claims against the Prepetition First Lien Claimholders. Because the Plan cannot be confirmed in the absence of the support of the Consenting First Lien Claimholders, the inclusion of the Section 17.1 Releases in the Plan is necessary in order for the Debtors to successfully reorganize.

Finally, although the Plan does not provide for payment of all of the claims of classes affected by the reorganization, it provides for some distributions to creditors that are junior to holders of Allowed First Lien Claims—a substantially better result than would be achieved through liquidation and a result that would not have been achieved without the contributions of the Released Persons. See, e.g., In re Genesis Health Ventures, Inc., 266 B.R. at 607 n.16 (concluding that distributions to creditors that, in liquidation, would not have received a distribution, constituted distributions to creditors affected by, and in exchange for, releases).

For the same reasons that the Section 17.1 Releases are warranted and appropriate, the Debtors believe that it is warranted and appropriate to (i) extend the injunction contained in Section 17.22 (the "Section 17.22 Injunction") of the Plan to the Released Persons and to (ii) extend the indemnity contained in Section 17.28 of the Plan to the Prepetition First Lien Agent (the "Section 17.28 Indemnity"). As set forth above, parties benefiting from these provisions gave consideration. Moreover, these provisions were integral parts of agreements by key constituents to support the Plan. Accordingly, given the circumstances of these Chapter 11 Cases, the Debtors submit that the Section 17.1 Releases, the Section 17.22 Injunction and the Section 17.28 Indemnity are appropriate.

Unlike the Section 17.1 Releases discussed above, the Bankruptcy Court need not consider the five-factor test adopted by the Zenith Electronics court in evaluating the Release of Released Persons by Other Released Persons contained in Section 17.2 of the Plan (the "Section 17.2 Releases"). The Section 17.2 Releases are consensual—they only bind holders of Claims that vote in favor of the Plan. See In re Conseco, Inc., 301 B.R. 525, 527 (Bankr. N.D. Ill. 2003) (concluding that release provision of plan that applied to creditors that agreed to be bound, either by voting for the plan or by choosing not to opt out of the release, was a purely consensual release); cf. In re Exide Techs., 303 B.R. at 74 (noting that since the "Release by Holders of Claims" provision would bind only those creditors and equity holders that accepted the terms of the plan, such release was consensual and the Bankruptcy Court did not need to consider it under the Zenith factors). Therefore, the Bankruptcy Court need not consider whether the Section 17.2 Releases are appropriate or permissible.

**S. Executory Contracts and Unexpired Leases**

    (a)    **Executory Contracts and Unexpired Leases**

        The Bankruptcy Code entitles the Debtors, subject to the approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases. The Bankruptcy Code further entitles the Debtors, subject to satisfaction of certain conditions, to assign assumed executory contracts and unexpired leases to another entity. Rejection or assumption and assignment may be effected under a plan of reorganization.

    (b)    **Assumption and Rejection of Executory Contracts and Unexpired Leases**

        All executory contracts and unexpired leases of the Debtors shall be rejected pursuant to the provisions of section 365 of the Bankruptcy Code effective as of and subject to the occurrence of the Effective Date, unless another date is specified in the Plan except: (i) any executory contracts and unexpired leases that are the subject of separate motions to assume or assume and assign filed pursuant to section 365 of the Bankruptcy Code by the Debtors before the Effective Date; (ii) contracts and leases listed in Schedule 2 attached hereto and any subsequently filed "Schedule of Assumed Executory Contracts and Unexpired Leases" to be filed by the Debtors with the Bankruptcy Court before the entry of, or as an exhibit to, the Confirmation Order; (iii) all executory contracts and unexpired leases assumed or assumed and assigned under the Plan or by order of the Bankruptcy Court entered before the Effective Date; (iv) any executory contract or unexpired lease that is the subject of a dispute over the amount or manner of cure pursuant to Section 14.2 of the Plan and for which the Debtors make a motion to reject such contract or lease based upon the existence of such dispute filed at any time; (v) any agreement, obligation, security interest, transaction or similar undertaking that the Debtors believe is not executory or a lease that is later determined by the Bankruptcy Court to be an executory contract or unexpired lease that is subject to assumption or rejection under section 365 of the Bankruptcy Code; (vi) any oral or written joint defense agreements relating to actual, potential, or threatened litigation or investigations involving any of the Debtors, which shall be assumed; (vii) any guaranty or similar agreement executed by a third party which guarantees repayment or performance of an obligation owed to any of the Debtors or to indemnify the Debtors; and (viii) agreements with third parties regarding preservation of the confidentiality of documents produced by the Debtors. Any order entered postconfirmation by the Bankruptcy Court, after notice and a hearing, authorizing the rejection of an executory contract or unexpired lease shall cause such rejection to be a prepetition breach under sections 365(g) and 502(g) of the Bankruptcy Code, as if such relief was granted and such order was entered preconfirmation. The Debtors reserve the right to amend Disclosure Statement Schedule 2 or any "Schedule of Assumed Executory Contracts and Unexpired Leases" prior to the entry of the Confirmation Order. Each executory contract and unexpired lease to be assumed by the Debtors shall include modifications, amendments, supplements, restatements, or other similar agreements made directly or indirectly by any agreement, instrument or other document that affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is listed on Disclosure Statement Schedule 2 or any "Schedule of Assumed Executory Contracts and Unexpired Leases."

The inclusion of a contract, lease or other agreement in <u>Section 14.1(a)</u> of the Plan or on Disclosure Statement Schedule 2 or any "Schedule of Assumed Executory Contracts and Unexpired Leases" shall not constitute an admission by the Debtors as to the characterization of whether any such included contract, lease, or other agreement is, or is not, an executory contract or unexpired lease or whether any claimants under any such contract, lease or other agreement are time-barred from asserting Claims against the Debtors. The Debtors reserve all rights with respect to the characterization of any such agreements.

The Plan shall constitute a motion to reject such executory contracts and unexpired leases rejected pursuant to <u>Section 14.1</u> of the Plan, and the Debtors shall have no liability thereunder <u>except</u> as is specifically provided in the Plan. Entry of the Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval of such rejections pursuant to section 365(a) of the Bankruptcy Code, subject to the occurrence of the Effective Date, and a finding by the Bankruptcy Court that each such rejected agreement, executory contract, or unexpired lease is burdensome and that the rejection thereof is in the best interests of the Debtors and their Estates.

The Plan shall constitute a motion to assume and assign to the Reorganized Debtors such executory contracts and unexpired leases as set forth in Disclosure Statement Schedule 2 or any "Schedule of Assumed Executory Contracts and Unexpired Leases" or otherwise designated for assumption in <u>Section 14.1(a)</u> of the Plan. Entry of the Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval of such assumption and assignment pursuant to sections 365(a), (b) and (f) of the Bankruptcy Code, and a finding by the Bankruptcy Court that the requirements of section 365(f) of the Bankruptcy Code have been satisfied. **Any non-Debtor counterparty to an agreement listed on Disclosure Statement Schedule 2 or any "Schedule of Assumed Executory Contracts and Unexpired Leases" or any other contract or unexpired lease otherwise designated as being assumed or assumed and assigned in <u>Section 14.1(a)</u> of the Plan who disputes the assignment of an executory contract or unexpired lease must file with the Bankruptcy Court, and serve upon the Debtors and the Committee, a written objection to the assumption and assignment, which objection shall set forth the basis for the dispute by no later than ten (10) Business Days prior to the Confirmation Hearing. The failure to timely object shall be deemed a waiver of any and all objections to the assumption and assignment of executory contracts and leases as set forth in Disclosure Statement Schedule 2 or any "Schedule of Assumed Executory Contracts and Unexpired Leases" or as otherwise designated as being assumed or assumed and assigned in <u>Section 14.1(a)</u> of the Plan.**

  (c)  <u>**Cure**</u>

At the election of the Debtors following consultation with the Consenting First Lien Claimholders, any monetary defaults under each executory contract and unexpired lease to be assumed under the Plan shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code: (a) by payment of the default amount in Cash on the Effective Date or as soon thereafter as practicable; or (b) on such other terms as agreed to by the parties to such executory contract or unexpired lease. In the event of a dispute regarding: (i) the amount of any cure payments; (ii) the ability to provide adequate assurance of future performance under the contract or lease to be assumed or assumed and assigned; or (iii) any other matter pertaining to assumption or

assumption and assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving assumption or assignment, as applicable. Disclosure Statement Schedule 2 or any "Schedule of Assumed Executory Contracts and Unexpired Leases" attached to the Disclosure Statement set forth the Debtors' cure obligations for each agreement for which cure obligations must be satisfied as a condition to the assumption and assignment of such agreement. **Any non-Debtor counterparty to an agreement listed on the Disclosure Statement Schedule 2 or any "Schedule of Assumed Executory Contracts and Unexpired Leases" who disputes the scheduled cure obligation (or objects to the omission of a scheduled cure obligation) must file with the Bankruptcy Court, and serve upon the Debtors and the Committee, a written objection to the cure obligation, which objection shall set forth the basis for the dispute, the alleged correct cure obligation, and any other objection related to the assumption or assumption and assignment of the relevant agreement by no later than ten (10) Business Days prior to the Confirmation Hearing. If a non-Debtor counterparty fails to file and serve an objection which complies with the foregoing, the cure obligation set forth on the Disclosure Statement Schedule 2 or any "Schedule of Assumed Executory Contracts and Unexpired Leases" shall be binding on the non-Debtor counterparty, and the non-Debtor counterparty shall be deemed to have waived any and all objections to the assumption or assumption and assignment of the relevant agreement as proposed by the Debtors.**

(d)  **Claims Arising from Rejected Contracts**

Rejection Damage Claims must be submitted to the Claims Agent, with copies to counsel for the Debtors, by the first Business Day that is at least thirty (30) days following the Effective Date. The foregoing submission deadline applies only to Rejection Damage Claims arising out of executory contracts and unexpired leases that are rejected pursuant to the Plan. Nothing in the Plan shall alter the submission deadline for a party to an executory contract or unexpired lease that was rejected by separate motion or by operation of law. Properly submitted Rejection Damage Claims shall be treated as Valley View Downs Unsecured Claims, General Unsecured Claims or Convenience Claims, as applicable, under the Plan subject to objection by the Reorganized Debtors. **ANY SUCH REJECTION DAMAGE CLAIMS THAT ARE NOT PROPERLY SUBMITTED PURSUANT TO <u>SECTION 14.3</u> OF THE PLAN WILL FOREVER BE BARRED FROM ASSERTION AND SHALL NOT BE ENFORCEABLE AGAINST THE REORGANIZED DEBTORS, THEIR RESPECTIVE ESTATES, AFFILIATES OR ASSETS.**

While the Debtors may reject certain executory contracts and unexpired leases pursuant to the Plan, the Debtors do not anticipate that Rejection Damage Claims will have a material impact on the recoveries of any holders of Claims. The Debtors are currently marketing the Valley View Downs opportunity for sale. The decisions of any potential purchaser of the Valley View Downs opportunity may have an impact on the aggregate amount of Rejection Damage Claims. Class 5 – Valley View Downs Unsecured Claims is the only class of Claims in which the recovery by one holder may materially affect another. Thus, the only Debtor whose creditors' recoveries the Debtors think may be diluted by Rejection Damage Claims is Valley View Downs, LP. While there can be no assurances, as of the date of this Disclosure Statement the Debtors do not believe that any such dilution will be material.

**T.    Retention of Jurisdiction**

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall retain and shall have exclusive jurisdiction over any matter (a) arising under the Bankruptcy Code, (b) arising in or related to the Chapter 11 Cases or the Plan, or (c) as otherwise set forth in the Plan.

**U.    Other Material Provisions of the Plan**

(a)    **Payment of Statutory Fees**

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid by the Debtors on or before the Effective Date.

(b)    **Satisfaction of Claims**

The rights afforded in the Plan and the treatment of all Claims and Equity Interests therein shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any accrued postpetition interest, against the Debtors and the Debtors-in-Possession, or any of their Estates, Assets, properties, or interests in property.  Except as otherwise expressly provided in the Plan, on the Effective Date, all Claims against and Equity Interests in the Debtors and the Debtors-in-Possession shall be satisfied, discharged and released in full.  The Reorganized Debtors shall not be responsible for any pre-Effective Date obligations of the Debtors or the Debtors-in-Possession, except those expressly assumed by any Reorganized Debtor(s), as applicable.  Except as otherwise provided herein, all Persons and Entities shall be precluded and forever barred from asserting against the Reorganized Debtors, their respective successors or assigns, or their Estates, Assets, properties, or interests in property any event, occurrence, condition, thing, or other or further Claims or Causes of Action based upon any act, omission, transaction, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date, other than subordination of the First Lien Claims, whether or not the facts of or legal bases therefore were known or existed prior to the Effective Date.

(c)    **Third Party Agreements; Subordination**

The Plan Distributions to the various classes of Claims and Equity Interests thereunder shall not affect the right of any Person to levy, garnish, attach or employ any other legal process with respect to such Plan Distributions by reason of any claimed subordination rights or otherwise.  All such rights and any agreements relating thereto shall remain in full force and effect, except as compromised and settled pursuant to the Plan.  Plan Distributions shall be subject to and modified by any Final Order directing distributions other than as provided in the Plan.  The right of the Debtors to seek subordination of any lien, security interest, Claim or Equity Interest pursuant to section 510 of the Bankruptcy Code is fully reserved and the treatment afforded any Claim or Equity Interest that becomes a Subordinated Claim or subordinated Equity Interest at any time shall be modified to reflect such subordination.  Unless the Confirmation Order provides otherwise, no Plan Distributions shall be made on account of a Subordinated Claim or subordinated Equity Interest.

All contractual and subordination rights of the Prepetition First Lien Agent and other Prepetition First Lien Claimholders with respect to any Plan Distributions, including, without limitation, the subordination of the liens held by or on behalf of the Prepetition Second Lien Agent, the other Prepetition Second Lien Claimholders or any agent or trustee therefor to the liens held by or on behalf of the Prepetition First Lien Agent, the other Prepetition First Lien Claimholders or any agent or trustee therefor, as described in the Prepetition Intercreditor Agreement, shall be enforceable under the Plan, except if, and to the extent, expressly compromised by the Plan. The classification and manner of satisfying Claims under the Plan and the Plan Distributions take into consideration the contractual subordination rights that the Prepetition First Lien Agent and the other Prepetition First Lien Claimholders have against holders of other Claims with respect to Plan Distributions.

(d)    **Discharge of Liabilities**

Except as otherwise provided in the Plan, upon the occurrence of the Effective Date, the Debtors shall be discharged from all Claims and Causes of Action to the fullest extent permitted by section 1141 of the Bankruptcy Code, and all holders of Claims and Equity Interests shall be precluded from asserting against the Reorganized Debtors, the Debtors, the Estates, the Assets, or any property dealt with under the Plan, any further or other Cause of Action based upon any act or omission, transaction, event, thing, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date.

**EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, THE REORGANIZED DEBTORS SHALL NOT HAVE, AND SHALL NOT BE CONSTRUED TO HAVE OR MAINTAIN ANY LIABILITY, CLAIM, OR OBLIGATION, THAT IS BASED IN WHOLE OR IN PART ON ANY ACT, OMISSION, TRANSACTION, EVENT, OTHER OCCURRENCE, OR THING OCCURRING OR IN EXISTENCE ON OR PRIOR TO THE EFFECTIVE DATE OF THE PLAN (INCLUDING, WITHOUT LIMITATION, ANY LIABILITY OR CLAIMS ARISING UNDER APPLICABLE NON-BANKRUPTCY LAW AS A SUCCESSOR TO THE DEBTORS) AND NO SUCH LIABILITIES, CLAIMS, OR OBLIGATIONS FOR ANY ACTS SHALL ATTACH TO THE REORGANIZED DEBTORS.**

(e)    **Discharge of Debtors**

Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, without further notice or order, all Claims of any nature whatsoever shall be automatically discharged forever. Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, the Debtors, their Estates, and all successors thereto shall be deemed fully discharged and released from any and all Claims, including, without limitation, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim based upon such debt is allowed under section 502 of the Bankruptcy Code or (c) the holder of a Claim based upon such debt has accepted the Plan. The Confirmation Order shall be a judicial determination of discharge of all liabilities of the Debtors, their Estates and all successors thereto. As provided in section 524 of the Bankruptcy Code, such discharge shall

void any judgment against the Debtors, their Estates, or any successor thereto at any time obtained to the extent it relates to a Claim discharged, and operates as an injunction against the prosecution of any action against the Reorganized Debtors or property of the Debtors or their Estates to the extent it relates to a discharged Claim.

(f)     **Exemption from Transfer Taxes**

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, lien, pledge, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording or other similar tax.

(g)     **Retiree Benefits**

Pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

(h)     **Interest and Attorneys' Fees**

Interest accrued after the Petition Date will accrue and be paid on Claims only to the extent specifically provided for in the Plan, the Confirmation Order or as otherwise required by the Bankruptcy Court or by applicable law, provided, however, pursuant to the Prepetition Intercreditor Agreement, interest, fees, expenses, and other charges shall continue to accrue from the Petition Date on the First Lien Claims and such amounts shall, if the Prepetition Second Lien Claimholders receive any proceeds from any collateral securing the First Lien Claims, be payable by the Prepetition Second Lien Claimholders to the Prepetition First Lien Claimholders, pursuant to the Prepetition Intercreditor Agreement, until the First Lien Obligations (as defined in the Prepetition Intercreditor Agreement) have been paid in full.

Except as set forth in the Plan or as ordered by the Bankruptcy Court, no award or reimbursement of attorneys' fees or related expenses or disbursements shall be allowed on, or in connection with, any Claim.

(i)     **Modification of the Plan**

As provided in section 1127 of the Bankruptcy Code, modification of the Plan may be proposed in writing by the Debtors at any time before confirmation, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors shall have complied with section 1125 of the Bankruptcy Code. The Debtors may modify the Plan at any time after confirmation and before substantial consummation, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified, under section 1129 of the Bankruptcy Code, and the circumstances warrant such modifications, provided further, that any modification of the Plan between the Confirmation Date and the Effective Date shall be subject to the satisfaction of the Consenting First Lien Claimholders. A holder of a Claim that has accepted the Plan shall be deemed to have accepted

such Plan as modified if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim or Equity Interest of such holder.

(j)   **Revocation of the Plan**

The Debtors reserve the right to revoke and withdraw the Plan or to adjourn the Confirmation Hearing with respect to the Plan and/or to submit any new plan of reorganization at such times and in such manner as they consider appropriate, subject to the provisions of the Bankruptcy Code. If the Debtors revoke or withdraw the Plan with respect to any one or more of the Debtors, or if the Effective Date does not occur as to any Debtor, then, as to such Debtor the Plan and all settlements and compromises set forth in the Plan and not otherwise approved by a separate Final Order shall be deemed null and void and nothing contained herein and no acts taken in preparation for consummation of the Plan shall be deemed to constitute a waiver or release of any Claims against or Equity Interests in such Debtor or to prejudice in any manner the rights of any of the Debtors or any other Person in any other further proceedings involving such Debtor.

In the event that the Debtors choose to adjourn the Confirmation Hearing with respect to any one or more of the Debtors, the Debtors reserve the right to proceed with confirmation of the Plan with respect to those Debtors in relation to which the Confirmation Hearing has not been adjourned. With respect to those Debtors with respect to which the Confirmation Hearing has been adjourned, the Debtors reserve the right to amend, modify, revoke or withdraw the Plan and/or submit any new plan of reorganization at such times and in such manner as they consider appropriate, subject to the provisions of the Bankruptcy Code. The Committee does not acknowledge that the Debtors have the power to or are otherwise permitted to proceed in this fashion.

(k)   **Setoff Rights**

In the event that any Debtor has a Claim of any nature whatsoever against the holder of a Claim against such Debtor, then such Debtor may, but is not required to, set off against the Claim (and any payments or other Plan Distributions to be made in respect of such Claim hereunder) such Debtor's Claim against such holder, subject to section 553 of the Bankruptcy Code. Neither the failure to set off nor the allowance of any Claim under the Plan shall constitute a waiver or release of any Claims that any Debtor may have against the holder of any Claim.

(l)   **Compliance with Tax Requirements**

In connection with the Plan, the Debtors and the Disbursing Agent, as applicable, shall comply with all withholding and reporting requirements imposed by federal, state, local, and foreign taxing authorities and all Plan Distributions hereunder shall be subject to such withholding and reporting requirements. Notwithstanding the foregoing, each holder of an Allowed Claim or Equity Interest that is to receive a Plan Distribution shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any government unit upon it, including income, withholding and other tax obligations, on account of such Plan Distribution, and no holder of an Allowed Claim or Equity Interest shall have

responsibility for the satisfaction and payment of any tax obligations imposed by any government unit upon any other holder of an Allowed Claim or Equity Interest. The Disbursing Agent has the right, but not the obligation, to not make a Plan Distribution until such holder has made arrangements satisfactory to the Disbursing Agent for payment of any such tax obligations.

(m) **Injunctions**

**On the Effective Date and _except_ as otherwise provided herein, all Persons who have been, are, or may be holders of Claims against or Equity Interests in the Debtors shall be permanently enjoined from taking any of the following actions against or affecting the Debtors, the Reorganized Debtors, the Estates, the Assets, the Disbursing Agent, or any of the Released Persons, or their respective Assets and property, with respect to such Claims or Equity Interests (other than actions brought to enforce any rights or obligations under the Plan):**

i) **commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (_including_, without limitation, all suits, actions and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice);**

ii) **enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order;**

iii) **creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance; and**

iv) **asserting any setoff, right of subrogation or recoupment of any kind; _provided_, that any defenses, offsets or counterclaims which the Debtors may have or assert in respect of the above referenced Claims are fully preserved in accordance with _Section 17.19_ of the Plan.**

(n) **Binding Effect**

The Plan shall be binding upon the Reorganized Debtors, the holders of all Claims and Equity Interests, parties in interest, Persons and Entities and their respective successors and assigns. To the extent any provision of the Disclosure Statement or any other solicitation document may be inconsistent with the terms of the Plan, the terms of the Plan shall be binding and conclusive.

(o) **Severability**

**IN THE EVENT THE BANKRUPTCY COURT DETERMINES THAT ANY PROVISION OF THE PLAN IS UNENFORCEABLE EITHER ON ITS FACE OR AS APPLIED TO ANY CLAIM OR EQUITY INTEREST OR TRANSACTION, THE DEBTORS MAY MODIFY THE PLAN IN ACCORDANCE WITH _SECTION 17.17_ OF THE PLAN SO THAT SUCH PROVISION SHALL NOT BE APPLICABLE TO THE HOLDER OF ANY SUCH CLAIM OR EQUITY INTEREST OR TRANSACTION.**

**SUCH A DETERMINATION OF UNENFORCEABILITY SHALL NOT (A) LIMIT OR AFFECT THE ENFORCEABILITY AND OPERATIVE EFFECT OF ANY OTHER PROVISION OF THE PLAN OR (B) REQUIRE THE RESOLICITATION OF ANY ACCEPTANCE OR REJECTION OF THE PLAN.**

    (p)    <u>No Admissions</u>

    **AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER CAUSES OF ACTION OR THREATENED CAUSES OF ACTIONS, THE PLAN AND THE DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. NEITHER THE PLAN NOR THE DISCLOSURE STATEMENT SHALL BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, AND OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTORS OR THEIR AFFILIATES, AS DEBTORS AND DEBTORS-IN-POSSESSION IN THESE CHAPTER 11 CASES.**

    (q)    <u>Dissolution of the Committee</u>

    On the Effective Date, the Committee shall dissolve automatically, whereupon its members, Professionals and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, <u>except</u> with respect to (i) applications for Fee Claims or reimbursement of expenses incurred as a member of the Committee, and (ii) any motions or other actions seeking enforcement or implementation of the provisions of the Plan or the Confirmation Order or pending appeals of Orders entered in the Chapter 11 Cases.

    (r)    <u>Potential Exclusion of the Pennsylvania Debtors from the Plan</u>

    The Debtors reserve the right, with the prior consent of the Consenting First Lien Claimholders, to (i) amend the Plan to treat the Pennsylvania Debtors separately from the Indiana Debtors, Centaur, LLC or Centaur Colorado, LLC and (ii) adjourn the Confirmation Hearing in respect of the Plan as to the Pennsylvania Debtors until further notice or order of the Bankruptcy Court. If this occurs, the Confirmation Order shall (A) authorize NewCo or its subsidiaries to operate the businesses of, and provide debtor-in-possession financing, protected to the fullest extent permitted under sections 364(c) and (d) of the Bankruptcy Code, to the Pennsylvania Debtors and (B) provide an extension of the periods in which the Pennsylvania Debtors possess the exclusive right to file a plan of reorganization and solicit acceptances thereto for an additional 180 days without prejudice to the rights of the Pennsylvania Debtors to seek additional extensions or the rights of parties in interest to seek to shorten or terminate such exclusive periods. Such amendment shall be without prejudice to the Pennsylvania Debtors to further amend, modify or revoke the Plan and/or submit any new plan of reorganization as it relates to the Pennsylvania Debtors. The Committee does not acknowledge that the Debtors have the power to or are otherwise permitted to proceed in this fashion.

(s) **Plan Controls**

Unless otherwise specified, all section, article, and exhibit references in the Plan are to the respective section in, article of, or exhibit to, the Plan, as the same may be amended, waived, or modified from time to time. Words denoting the singular number shall include the plural number and vice versa, and words denoting one gender shall include the other gender. The Disclosure Statement may be referred to for purposes of interpretation to the extent any term or provision of the Plan is determined by the Bankruptcy Court to be ambiguous.

## XI.

## RISK FACTORS

**A. Certain Bankruptcy Considerations**

If the Plan is not confirmed and consummated, there can be no assurance that any alternative plan of reorganization would be on terms as favorable to the holders of Claims as the terms of the Plan. In addition, if a protracted reorganization were to occur, there is a substantial risk that holders of Claims would receive less than they will receive under the Plan. See Exhibit "G" to the Disclosure Statement for a liquidation analysis of the Debtors.

**B. The Reorganized Debtors' Actual Financial Results may Vary Significantly from the Projections Included in this Disclosure Statement**

The financial projections included in this Disclosure Statement are dependent upon the successful implementation of the Reorganized Debtors' business plan and the validity of the numerous assumptions contained therein. The significant assumptions underlying the Projections are discussed in greater detail in Exhibit "B" to this Disclosure Statement.

Many of these assumptions are beyond the control of the Debtors and may not materialize. In addition, unanticipated events and circumstances occurring subsequent to the preparation of the Projections may adversely affect the financial results of the Debtors. Although the Debtors believe that the Projections and assumptions are reasonable, variations between the actual financial results and those projected may be material.

**C. Plan Consideration Reserved for Contested Claims may be Insufficient to Satisfy all Secured Claims upon Liquidation**

The Plan authorizes, but does not require, the establishment of a Contested Claims Reserve for the purposes of satisfying Contested Claims. The Debtors and the Reorganized Debtors reserve the right to seek estimation of such Contested Claims pursuant to section 502(c) of the Bankruptcy Code. The actual amount at which such Contested Claims are ultimately allowed may differ from the estimates. If a Contested Claims Reserve is established, holders of Contested Claims are entitled to receive distributions under the Plan upon allowance of such Claims solely from the Contested Claims Reserve established on account of such Claim. If such Contested Claim is ultimately allowed and at the time of such allowance, insufficient Plan consideration is available for distribution from the Contested Claims Reserve, the distributions on account of such Allowed Claim will be limited to such available amounts and the holder of

101

such Allowed Claim will have no recourse against the Debtors or the Reorganized Debtors for any deficiency that may arise.

### D. The Face Amount of the NewCo PIK Notes may be Reduced to Satisfy Regulatory Requirements as to the Equity Value of the Reorganized Debtors

Due to certain regulatory requirements, it is necessary that state horse racing or gaming regulators be satisfied that the Reorganized Equity Value be at a sufficient level. The Debtors anticipate that the Reorganized Equity Value described in Section VIII.C. hereof will satisfy those requirements. In the event, however, that it is determined by those regulators that the Reorganized Equity Value is insufficient or otherwise unsatisfactory, the face amount of the NewCo PIK Notes may be reduced in order to increase the value of the NewCo Membership Interests to an amount deemed sufficient by those regulators.

### E. Resolution of Certain Churchill Downs Claims may Result in the Dilution of Recoveries of Holders of Allowed First Lien Claims

On December 13, 2006, Anderson Park, Inc., Churchill Downs Management Company ("CDMC"), and Churchill Downs Incorporated ("CDI"), as sellers, and Centaur Racing, LLC, Centaur, LLC, and Centaur Indiana, LLC, as buyers, entered into that certain Partnership Interest Purchase Agreement (the "Purchase Agreement") for the transfer of the sellers' partnership interest in Hoosier Park, L.P.[31]

Under the Purchase Agreement, Centaur Racing, LLC agreed, among other things, to pay to CDMC an amount up to $15 million in the event legislation authorizing Casino Style Gaming[32] at the Racetrack or any other Hoosier Park OTB is enacted no later than seven years[33] from the closing date of the Purchase Agreement. Specifically, eighteen calendar months

---

[31]     On March 30, 2007, in connection with the transfer of CDI's partnership interest in Hoosier Park, L.P., Roderick J. Ratcliff and Michael V. Raisor, members of the board of directors of Centaur, Inc., and R. Michael O'Malley, one of the shareholders of Centaur, Inc. (collectively, the "Makers"), entered into a promissory note (the "Promissory Note") payable to Centaur, Inc. in the original principal amount of $4,000,000 plus interest on the unpaid principal at 8.25 percent per annum. Under the terms of the Promissory Note, the Makers were jointly and severally liable, and the Makers consented to the assignment of the Promissory Note to certain parties, including Centaur Racing, LLC, Hoosier Park, L.P. and CDMC. The entire unpaid balance and all accrued and unpaid interest due under the Promissory Note was due and payable on March 30, 2010. On March 30, 2007, as a condition to the closing of the Purchase Agreement, in accordance with the terms of that certain Loan Payment Agreement dated March 30, 2007, between Hoosier Park, L.P., CDMC and Centaur Racing, LLC, the Promissory Note was assigned to CDMC.

[32]     The Purchase Agreement defines "Casino Style Gaming" as slot machines or other electronic gaming devices that function in the same manner as slot machines and authorized gaming devices authorized and being utilized under the Indiana Riverboat Gambling Act (I.C. 4-33-1-1 et seq.) (each such slot machine or authorized gaming device, a "Gaming Machine") provided that such slot machines or other such electronic gaming devices are authorized and become operational at the horse racing track and related pari-mutuel horse race wagering facility in Anderson, Indiana (the "Racetrack"), or other such various simulcast off-track pari-mutuel horserace wagering facilities in the State of Indiana operated by Hoosier Park, L.P. (the "Hoosier Park OTBs").

[33]     For purposes of the time bar, enactment includes enacted and signed into law; the time period is subject to extension if a subsequent legal challenge delays the effectiveness of the legislation until such period is due to expire.

after the date on which Casino Style Gaming first becomes operational at the Racetrack or other Hoosier Park OTB (the "Gaming Commencement Date"), Centaur Racing, LLC would pay CDMC the sum of $10,000 per Gaming Machine that is operational on the Gaming Commencement Date, subject to a minimum payment of $10 million and maximum payment of $15 million. In addition, within five years following the Gaming Commencement Date, if additional Gaming Machines become operational at the Racetrack or other Hoosier Park OTBs, such that the number of Gaming Machines then operational exceeds the greater of the number of Gaming Machines that were operational on the Gaming Commencement Date or 1,000 (each, an "Additional Machine"), then Centaur Racing, LLC would pay CDMC the sum of $10,000 per Additional Machine on the date that is eighteen calendar months after each such Additional Machine becomes operational, subject to the aforementioned maximum aggregate amount of $15 million.

On March 30, 2007, which coincided with the closing of the Purchase Agreement, (i) CDI d/b/a Churchill Downs Simulcast Network CDSN ("CDSN") and Hoosier Park, L.P. entered into the Simulcasting Network Letter Agreement (the "Simulcast Agreement") for the continued provision of simulcast services by CDSN to Hoosier Park, L.P., (ii) Churchill Downs Simulcast Productions, LLC ("CDSP") and Hoosier Park, L.P. entered into the Simulcasting Productions Agreement (the "Equipment Agreement") for the sale of certain equipment and the provision of certain services by CDSP to Hoosier Park, L.P. and (iii) Anderson Park, Inc., CDMC, CDI, Centaur Racing, LLC and Centaur Indiana, LLC entered into the Non-Competition, Non-Solicitation and Confidentiality Agreement (the "Non-compete Agreement") for, among other things, the protection of the parties against unfair competition and improper use or disclosure of certain sensitive information.

To the extent they are executory, the Debtors may decide to reject the Purchase Agreement but assume the Simulcast Agreement, the Equipment Agreement and/or the Non-compete Agreement. The Debtors believe that CDMC, CDI or any of their aforementioned affiliates (collectively, "Churchill Downs") intend to argue that the four agreements are integrated and that the Debtors therefore must assume or reject all four agreements together. If Churchill Downs is correct, and if the Debtors decide to assume the Purchase Agreement, the Debtors believe that Churchill Downs intends to assert a cure claim thereunder in an amount up to $15 million.

If the Debtors are able to reject the Purchase Agreement, the $15 million claim will be a General Unsecured Claim. If, on the other hand, the Debtors are required to assume the Purchase Agreement, in order to assume the Simulcast Agreement, Equipment Agreement and/or the Non-compete Agreement, the Debtors may be required to pay Churchill Downs up to $15 million on or shortly after the Effective Date as a Cure Cost. In such event, (i) the equity value that the Debtors will distribute to the holders of the Allowed First Lien Claims under the Plan through the NewCo Warrants may be reduced and/or (ii) the face amount of the NewCo PIK Notes issued to holders of Allowed First Lien Claims, Allowed Second Lien Claims and/or Valley View Downs Unsecured Claims may be reduced to the extent necessary to preserve equity value sufficient to satisfy regulatory requirements. Alternatively, the Debtors may choose to reject the Purchase Agreement, Simulcast Agreement, Equipment Agreement and Non-compete Agreement rather than pay the $15 million Cure Cost.

The disclosures contained in this section shall not constitute an admission by the Debtors as to the characterization of (i) whether the Purchase Agreement, the Simulcast Agreement, the Equipment Agreement and/or the Non-compete Agreement is, or is not, an executory contract, (ii) whether each of the four agreements is integrated with or severable from the other agreements or (iii) whether any claimants under such agreements are time-barred from asserting Claims against the Debtors. The Debtors reserve all rights with respect to the characterization of any such agreements.

## F.    The Reorganized Debtors may not be Able to Raise Additional Financing on Terms Favorable to the Debtors

The Reorganized Debtors' business is expected to require certain amounts of working capital and growth capital. While the Projections assume that sufficient funds to meet these needs for the foreseeable future will be available from the Cash generated by the business of the Reorganized Company, the ability of the Reorganized Company to gain access to additional capital on terms consistent with the terms assumed in the Projections, if needed, cannot be assured, particularly in light of current financial market conditions.

## G.    State Horse Racing and Gaming Laws and Regulations will Require that Holders of NewCo Membership Interests Become Licensed

Many jurisdictions require any Entity or Person that is to acquire beneficial ownership of equity securities of a horse racing or gaming company to be licensed. Any Entity or Person that is to acquire NewCo Membership Interests by converting their NewCo Warrants into NewCo Membership Interests or otherwise must be found suitable or qualified by a state horse racing or gaming regulator. The Plan provides that the NewCo Membership Interests will be issued only in compliance with state horse racing and gaming laws and regulations. The failure by a holder of a Claim to comply with these laws and regulations may result in such holder not receiving NewCo Membership Interests pursuant to the Plan.

## H.    Consummation of the Plan may Result in a Small Number of Holders Owing a Significant Percentage of the NewCo Membership Interests

Consummation of the Plan may result in a small number of holders owning a significant percentage of the NewCo Membership Interests. These holders may, among other things, exercise a controlling influence over the business and affairs of the Reorganized Debtors and have the power to elect the Board of Managers.

## I.    Potential Changes in Legislation and Regulation

From time to time, legislators and special interest groups propose legislation that would expand, restrict, or prevent gaming operations in the jurisdictions in which the Debtors operate. Further, from time to time, individual jurisdictions have considered or enacted legislation and referenda, such as bans on smoking in casinos and other entertainment and dining facilities, that could adversely affect the Debtors' operations. Any restriction on or prohibition relating to the Debtors' horse racing or gaming operations, or the enactment of any other adverse

legislation or regulatory changes, could have a material adverse effect on the Debtors' businesses, financial condition, and results of operations.

## J.    Taxation and Fees

The horse racing and casino entertainment industries represent a significant source of tax revenues to the various jurisdictions in which horse racing facilities and casinos operate. Horse racing and gaming companies are currently subject to significant state and local taxes and fees in addition to the federal and state income taxes that typically apply to corporations, and such taxes and fees could increase at any time. From time to time, various state and federal legislators and officials have proposed changes in tax laws or in the administration of such laws, including increases in tax rates, which would affect the horse racing and gaming industries. Worsening economic conditions could intensify the efforts of state and local governments to raise revenues through increases in gaming taxes and fees. In addition, state or local budget shortfalls could prompt tax or fee increases. Any material increase in assessed taxes, or the adoption of additional taxes or fees in any of the Debtors' markets, could have a material adverse effect on the Debtors' businesses, financial condition, and results of operations.

## K.    The Debtors Could Lose Key Employees, Including Certain Members of the Existing Management

The Debtors' success is substantially dependent upon the efforts and skills of the Existing Management and other members of the senior management team. If the Debtors were to lose the services rendered by the Existing Management and other members of the senior management team, the Debtors' operations could be adversely affected. In addition, the Debtors compete with other potential employers for employees, and the Debtors may not succeed in hiring and retaining the executives and other employees that they need. The inability to hire and retain qualified employees could adversely affect the Debtors' businesses, financial condition, and results of operations.

## L.    No Market Exists for the Claim Securities

There is no existing market for the NewCo PIK Notes to be issued to holders of Allowed First Lien Claims, Allowed Second Lien Claims and Allowed Valley View Downs Unsecured Claims or the NewCo Warrants to be issued to holders of Allowed First Lien Claims, and an active trading market may not develop for such securities. Further, there is no existing market for the NewCo Membership Interests issuable upon the exercise of the NewCo Warrants (such NewCo Membership Interests, together with the NewCo PIK Notes and the NewCo Warrants, the "Claim Securities"). The NewCo PIK Notes and the NewCo Warrants to be issued in accordance with the Plan will not be listed for trading on any national securities exchange or quotation system at the time they are issued on the Effective Date of the Plan, and the Debtors do not anticipate that any of the Claim Securities will ever be listed or quoted on any national securities exchange or quotation system. Even if an active trading market does develop, the Debtors cannot assure that it will continue for any period of time or at what price or prices the Claim Securities will trade. Lack of liquidity in the Claim Securities also may make it more

difficult for the Reorganized Debtors to raise additional capital, if necessary, through equity financings or otherwise, to support their financing needs.

**M.    If the Prepetition Second Lien Agent's Objection to the Inclusion of the Convenience Class in the Plan is Sustained, the Debtors will Remove the Convenience Class and Seek to Cramdown the Plan**

By its objection to the adequacy of the Disclosure Statement, the Prepetition Second Lien Agent has challenged the confirmability of the Plan on the basis that the Plan unfairly discriminates in violation of section 1129(b)(1) of the Bankruptcy Code by paying some unsecured creditors in full (i.e., holders of Convenience Claims) while providing less favorable treatment to other unsecured creditors (i.e., holders of Second Lien Claims and General Unsecured Claims). While the Debtors disagree that the inclusion of a convenience class pursuant to section 1122(b) of the Bankruptcy Code and as provided in the Plan constitutes unfair discrimination, in the event that the Bankruptcy Court sustains the Prepetition Second Lien Agent's objection to the Plan on this basis, the Debtors will proceed to remove the Convenience Class from the Plan, treat the holders of Convenience Claims as holders of Second Lien Claims, General Unsecured Claims or Valley View Downs Unsecured Claims, as applicable, and deem them to have rejected the Plan and seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code.

## XII.

## SECURITIES LAW MATTERS

**A.    Issuance of Claim Securities**

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act of 1933, as amended (the "Securities Act"), and state securities laws if the following three principal requirements are satisfied: (i) the securities must be offered and sold under a plan of reorganization by the debtor, an affiliate participating in a joint plan with the debtor or a successor to the debtor under the plan; (ii) the recipients of the securities must hold a claim against, an interest, or a claim for an administrative expense in the case concerning, the debtor or such affiliate; and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor or such affiliate, or principally in exchange for such claim or interest and partly for cash or property. In addition, under section 1145(a)(2) of the Bankruptcy Code, the issuance of securities upon the exercise of warrants is exempt from registration assuming that the issuance of the warrants satisfied the requirements of section 1145(a)(1) of the Bankruptcy Code.

Except as noted below, the Debtors believe that the offer and sale of Claim Securities under the Plan to holders of Allowed First Lien Claims, Allowed Second Lien Claims or Allowed Valley View Downs Unsecured Claims, as applicable, satisfies the requirements of section 1145(a)(1) and (2) of the Bankruptcy Code and, therefore, are exempt from registration under the Securities Act and state securities laws.

**B.** **Subsequent Transfers of Claim Securities**

(a) **Section 1145 of the Bankruptcy Code**

Section 1145(c) of the Bankruptcy Code provides that the offer or sale of securities pursuant to section 1145(a)(1) of the Bankruptcy Code is deemed to be a public offering. Accordingly, the Claim Securities to be issued under the Plan will not be deemed to be "restricted securities" under the Securities Act. Therefore, the Claim Securities issued pursuant to a section 1145 exemption may generally be resold by any holder thereof without registration under the Securities Act pursuant to the exemption provided by section 4(1) thereof, unless the holder is an "underwriter" with respect to such securities, as such term is defined in section 1145(b)(1) of the Bankruptcy Code. However, the section 1145 exemption does not provide exemptions from any applicable shareholder or similar agreement or any other contractual agreement to which Claim Securities may be subject, which may restrict transferability of such securities.

Section 1145(b)(1) of the Bankruptcy Code defines four types of "underwriters":

(i) persons who purchase a claim against, an interest in, or a claim for an administrative expense against the debtor with a view to distributing any security received or to be received in exchange for such claim or interest;

(ii) persons who offer to sell securities offered under a plan for the holders of such securities;

(iii) persons who offer to buy such securities from the holders of such securities, if the offer to buy is:

(A) with a view to distributing such securities; and

(B) under an agreement made in connection with the plan, the consummation of the plan, or with the offer or sale of securities under the plan; or

(iv) a person who is an "issuer" with respect to the securities as the term "issuer" is defined in section 2(a)(11) of the Securities Act.

Under section 2(a)(11) of the Securities Act, an "issuer" includes any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control of the issuer. "Control" (as defined in Rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be "in control" of such debtor or successor. In addition, ownership of a significant percentage of the reorganized debtor's or its

successor's voting securities may be deemed to constitute "control." Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns at least ten percent of the voting securities of a reorganized debtor may be presumed to be a "control person."

Whether or not any particular person would be deemed to be an "underwriter" with respect to the Claim Securities or other security to be issued pursuant to the Plan would depend upon various facts and circumstances applicable to that person. Accordingly, the Debtors express no view as to whether any particular person receiving Claim Securities or other securities under the Plan would be an "underwriter" with respect to such Claim Securities or other securities.

GIVEN THE COMPLEX AND SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER, NONE OF THE DEBTORS OR THE REORGANIZED DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO TRADE IN OR DISPOSE OF THE CLAIM SECURITIES TO BE DISTRIBUTED UNDER THE PLAN. The Debtors recommend that potential recipients of the Claim Securities consult their own counsel concerning whether they may freely trade the Claim Securities under the Securities Act and/or state securities laws. The Debtors have not undertaken, and do not intend, to file a registration statement in respect of any Claim Securities held by a holder that is an underwriter.

(b) **Resales of Claim Securities/Rule 144, Rule 144A, "Section 4(1½) Exemption" and Regulation S**

To the extent that persons who receive Claim Securities are deemed to be "underwriters" (collectively, the "Restricted Holders"), resales of such securities by Restricted Holders would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Restricted Holders would, however, be permitted to sell Claim Securities without registration if they are able to comply with the applicable provisions of Rule 144 or Rule 144A under the Securities Act, the "Section 4(1½) exemption," or Regulation S under the Securities Act, each as described further below, or if such securities are registered with the SEC. Any person who is an "underwriter" but not an "issuer" with respect to an issuance of securities (other than a holder of restricted securities) is, in addition, entitled to engage in exempt "ordinary trading transactions" within the meaning of section 1145(b)(1) of the Bankruptcy Code.

Under certain circumstances, Restricted Holders may be entitled to resell Claim Securities pursuant to the limited safe harbor resale provisions of Rule 144. Generally, Rule 144 provides that if certain conditions are met (e.g., the availability of current public information with respect to the issuer of such securities, volume limitations, and notice and manner of sale requirements), specified persons who resell restricted securities or "affiliates" of an issuer of unrestricted securities seeking to resell such securities will not be deemed to be "underwriters" as defined in section 2(a)(11) of the Securities Act. Rule 144 provides that: (i) a non-affiliate who has not been an affiliate during the preceding three months may resell other securities after a six-month holding period if at the time of the sale there is current public information regarding the issuer available and after a one year holding period if there is not current public information

108

regarding the issuer available at the time of the sale, and (ii) an affiliate may sell restricted or other securities after a six-month holding period if at the time of the sale there is current public information regarding the issuer available, and also may sell restricted or other securities after a one-year holding period whether or not current public information regarding the issuer is available at the time of the sale, provided that in each case the affiliate otherwise complies with the volume, manner of sale and notice requirements of Rule 144. However, the Debtors do not intend to make publicly available the requisite public information regarding the Reorganized Debtors necessary to allow resales prior to the satisfaction of the one-year holding period. As a result, Rule 144 is not expected to be available to Restricted Holders for resales of Claim Securities prior to the satisfaction of the one-year holding period in accordance with Rule 144.

Rule 144A provides a non-exclusive safe harbor exemption from the registration requirements of the Securities Act for resales to certain "qualified institutional buyers" of securities. Irrespective of whether the seller of such securities purchased its securities with a view towards reselling such securities, if certain other conditions are met (e.g., the availability of information required by paragraph 4(d) of Rule 144A and certain notice provisions), the Rule 144A safe harbor exemption will be available. Under Rule 144A, a "qualified institutional buyer" is defined to include, among other persons, "dealers" registered as such pursuant to section 15 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and entities that purchase securities for their own account or for the account of another qualified institutional buyer and that, in the aggregate, own and invest on a discretionary basis at least $100 million in the securities of unaffiliated issuers. Subject to certain qualifications, Rule 144A does not exempt the offer or sale of securities that, at the time of their issuance, were securities of the same class of securities then listed on a national securities exchange (registered as such pursuant to section 6 of the Exchange Act) or quoted in a United States automated inter-dealer quotation system. Because none of the Debtors' securities are so listed or so quoted nor do the Debtors anticipate that any of the Claim Securities will ever be so listed or so quoted, the Debtors believe that the Claim Securities will be eligible for resale by Restricted Holders under Rule 144A, subject to compliance with the other provisions of Rule 144A.

Restricted Holders may transfer or sell such securities under the so-called "Section 4(1½) exemption" from the registration requirements of the Securities Act. The Section 4(1½) exemption is based on reading section 4(1) and section 4(2) under the Securities Act together to provide an exemption for private resales of restricted securities. Section 4(1) under the Securities Act provides that an investor may resell restricted securities in a non-public exempt transaction if such investor is not an issuer, underwriter or dealer under the Securities Act. This determination relies on whether the resale would meet the requirements of section 4(2) under the Securities Act regarding offers and sales not involving a public offering. Accordingly, to satisfy the Section 4(1½) exemption, a Restricted Holder must not have acquired the Claim Securities with a view to distribution in violation of the Securities Act and purchasers in the resale must be sophisticated and have access to all material information about the Reorganized Debtors. If such conditions are met, Restricted Holders (other than any deemed to be an "issuer" described under subsection B(a) above) may be permitted to transfer or sell such securities in private 4(1½) resales prior to the expiration of the required holding period under Rule 144.

Restricted Holders (other than any deemed to be an "issuer" described under subsection B(a) above) may also transfer or sell such securities under the exemption from

registration provided under Regulation S of the Securities Act. To qualify for the exemption under Regulation S, such Restricted Holders must transfer or sell such securities in an offshore transaction outside the United States to non-U.S. persons (as such terms are defined in Regulation S), which includes dealers or other professional fiduciaries in the United States acting on a discretionary basis for non-U.S. beneficial owners (other than an estate or trust). Further, in order to qualify for the exemption under Regulation S, Restricted Holders may not engage in any directed selling efforts (as defined in Regulation S) in the United States in contravention of the requirements of Regulation S.

(c)     **Legending of Claim Securities in Certain Cases**

Claim Securities will be issued bearing a restrictive legend in substantially the following form if they are issued to (i) persons who are Restricted Holders or (ii) persons who request legended certificates for Claim Securities who certify that they may be deemed to be underwriters within the meaning of section 1145 of the Bankruptcy Code:

> THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE BEEN ISSUED IN RELIANCE ON THE EXEMPTION FROM REGISTRATION PROVIDED UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR APPLICABLE STATE SECURITIES LAWS ("STATE ACTS") AND MAY NOT BE SOLD, ASSIGNED, PLEDGED OR TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR STATE ACTS COVERING SUCH SECURITIES OR THE SECURITIES ARE SOLD AND TRANSFERRED IN A TRANSACTION THAT IS EXEMPT FROM OR NOT SUBJECT TO THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE ACT IN EACH CASE IN COMPLIANCE WITH STATE ACTS.

Any holder of a certificate evidencing Claim Securities bearing such legend may present such certificate to the transfer agent for the Claim Securities for exchange for one or more new certificates not bearing such legend or for transfer to a new holder without such legend at such times as (i) such securities are sold pursuant to an effective registration statement under the Securities Act or (ii) such holder delivers to the Reorganized Debtors an opinion of counsel or other evidence reasonably satisfactory to the Reorganized Debtors stating to the effect that such securities are no longer subject to the restrictions pursuant to an exemption under the Securities Act and such securities may be sold without registration under the Securities Act, in which event the certificate issued to the transferee will not bear such legend. In addition, any person who would otherwise receive legended Claim Securities pursuant to the Plan may instead receive certificates evidencing Claim Securities without such legend if, prior to the Effective Date, such person delivers to the Reorganized Debtors an opinion of counsel or other evidence reasonably satisfactory to the Reorganized Debtors to the effect that the Claim Securities to be

received by such person may be freely resold by such person without registration under the Securities Act.

In addition, all Claim Securities will bear such legends as are required by any applicable state gaming or racing laws and regulations.

## C.    Delivery of Disclosure Statement

Under section 1145(a)(4) of the Bankruptcy Code, "stockbrokers" (as that term is defined in section 101(53A) of the Bankruptcy Code) are required to deliver to their customers, for the first 40 days after the Effective Date, a copy of this Disclosure Statement (and any information supplementing such Disclosure Statement ordered by the Bankruptcy Court) at or before the time of a transaction in any Claim Security issued under the Plan in order for such transaction to be exempt from the registration requirements of section 5 of the Securities Act.

## XIII.

## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

The following discussion is a summary of certain U.S. federal income tax consequences expected to result from the implementation of the Plan. This discussion is based on the Internal Revenue Code, as in effect on the date of this Disclosure Statement and on U.S. Treasury Regulations ("Treasury Regulations") in effect (or in certain cases, proposed) on the date of this Disclosure Statement, as well as judicial and administrative interpretations thereof available on or before such date. All of the foregoing are subject to change, which change could apply retroactively and could affect the tax consequences described below. There can be no assurance that the IRS will not take a contrary view with respect to one or more of the issues discussed below, and no ruling from the IRS has been or will be sought with respect to any issues which may arise under the Plan.

The following summary is for general information only and discusses certain U.S. federal income tax consequences of the Plan to the Debtors, and holders of Allowed Claims or Equity Interests and holders of NewCo Membership Interests, First Lien Take Back Paper, NewCo PIK Notes, NewCo Warrants and Litigation Trust Interests who receive such NewCo Membership Interests, First Lien Take Back Paper, NewCo PIK Notes, NewCo Warrants and Litigation Trust Interests as a result of the Plan. If the First Lien take Back Paper is issued by Centaur, LLC or Reorganized Centaur, LLC, as the case may be, NewCo will be treated as the issuer of the First Lien Take Back Paper for U.S. federal income tax purposes because Centaur, LLC or Reorganized Centaur, LLC, as the case may be, will be an entity disregarded as separate from NewCo after implementation of the Plan.

For purposes of this summary, a "U.S. Holder" is a beneficial owner of Allowed Claims, Equity Interests, NewCo Membership Interests, First Lien Take Back Paper, NewCo PIK Notes, NewCo Warrants or Litigation Trust Interests that, for U.S. federal income tax purposes, is: (a) a citizen or resident of the United States; (b) a corporation created or organized in or under the laws of the United States or any state thereof (including the District of Columbia); (c) an estate the income of which is subject to U.S. federal income taxation

regardless of its source; or (d) a trust if such trust validly elects to be treated as a U.S. person for U.S. federal income tax purposes, or if (I) a court within the United States is able to exercise primary supervision over its administration and (II) one or more United States persons have the authority to control all of the substantial decisions of such trust. This summary does not purport to address all of the U.S. federal income tax consequences that may be applicable to any particular holder. Except as otherwise noted, the following discussion does not address state, local or foreign tax considerations that may be applicable to the Debtors and holders of Allowed Claims, Equity Interests, NewCo Membership Interests, First Lien Take Back Paper, NewCo PIK Notes, NewCo Warrants or Litigation Trust Interests. This summary does not address tax considerations applicable to holders that may be subject to special tax rules, such as financial institutions, insurance companies, real estate investment trusts, regulated investment companies, grantor trusts, dealers or traders in securities or currencies, tax-exempt entities, persons that hold an equity interest or a security in a Debtor as a position in a "straddle" or as part of a "hedging," "conversion" or "integrated" transaction for U.S. federal income tax purposes, persons that have a "functional currency" other than the U.S. dollar, and persons who acquired an equity interest or other security in a Debtor in connection with the performance of services.

If a partnership (or any other entity treated as a partnership for U.S. federal income tax purposes) holds Allowed Claims, Equity Interests, NewCo Membership Interests, First Lien Take Back Paper, NewCo PIK Notes, NewCo Warrants or Litigation Trust Interests, the tax treatment of a partner in such partnership generally will depend on the status of the partner and the activities of the partnership. Any such partner should consult its tax advisor as to its tax consequences.

EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISOR WITH RESPECT TO THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN. EACH HOLDER OF NEWCO MEMBERSHIP INTERESTS, FIRST LIEN TAKE BACK PAPER, NEWCO PIK NOTES, NEWCO WARRANTS OR LITIGATION TRUST INTERESTS SHOULD CONSULT ITS OWN TAX ADVISOR WITH RESPECT TO THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE RECEIPT, OWNERSHIP AND DISPOSITION OF SUCH NEWCO MEMBERSHIP INTERESTS, FIRST LIEN TAKE BACK PAPER, NEWCO PIK NOTES, NEWCO WARRANTS OR LITIGATION TRUST INTERESTS.

## U.S. INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE

PURSUANT TO U.S. INTERNAL REVENUE SERVICE CIRCULAR 230, WE HEREBY INFORM YOU THAT THE DESCRIPTION SET FORTH HEREIN WITH RESPECT TO U.S. FEDERAL TAX ISSUES WAS NOT INTENDED OR WRITTEN TO BE USED, AND SUCH DESCRIPTION CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING ANY PENALTIES THAT MAY BE IMPOSED ON THE TAXPAYER UNDER THE INTERNAL REVENUE CODE. THIS DESCRIPTION IS LIMITED TO THE U.S. FEDERAL TAX ISSUES DESCRIBED HEREIN. IT IS POSSIBLE THAT ADDITIONAL ISSUES MAY EXIST THAT COULD AFFECT THE U.S. FEDERAL TAX TREATMENT OF THE MATTER THAT IS THE SUBJECT OF THE DESCRIPTION NOTED HEREIN, AND THIS DESCRIPTION DOES NOT CONSIDER OR PROVIDE ANY

CONCLUSIONS WITH RESPECT TO ANY SUCH ADDITIONAL ISSUES. TAXPAYERS SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

**A.      U.S. Federal Income Tax Consequences to the Debtors, Holders of Class 8 – Intercompany Claims, Holders of Class 9 – Equity Interests and Centaur, Inc.**

The Debtors are all entities that are disregarded as separate from Centaur, Inc. for U.S. federal income tax purposes. Therefore, it is anticipated that the Debtors will not recognize any material tax as a result of consummation of the Plan.

Whether Class 8 – Intercompany Claims are cancelled or maintained should be ignored for U.S. federal income tax purposes because the Debtors are disregarded entities.

Although the matter is uncertain, it is expected that Centaur, Inc., the indirect shareholder of the Debtors and the holder of the Equity Interests for U.S. federal income tax purposes, should not be required to recognize any material U.S. federal income tax liability as a result of the Plan.

**B.      U.S. Federal Income Tax Treatment of the Litigation Trust**

It is intended that the Litigation Trust will be treated as a "grantor trust" for U.S. federal income tax purposes. In general, a grantor trust is not a separate taxable entity. In Revenue Procedure 94-45, 1994-2 C.B. 684 ("Rev Proc 94-45"), the IRS set forth the general criteria for obtaining an advanced ruling as to grantor trust status of a liquidating trust under a chapter 11 plan. Consistent with the requirements of Rev Proc 94-45, the Litigation Trust Declaration will require all relevant parties to treat, for U.S. federal income tax purposes, the transfer of the Designated Avoidance Actions to the Litigation Trust as (i) a transfer of the Designated Avoidance Actions to the holders of Allowed Claims who receive Litigation Trust Interests (the "LT Beneficiaries"), which transfer should be taxable to each such holder in its taxable year that includes the Effective Date (as discussed below under the caption "D. U.S. Federal Income Tax Consequences of the Exchange to Holders of Allowed Claims That Are Paid Using Consideration Other Than Solely Cash"), followed by (ii) a transfer of the Designated Avoidance Actions to the Litigation Trust, with the LT Beneficiaries being treated as the grantors and owners of the Litigation Trust.

The Plan generally provides that the LT Beneficiaries must value the Designated Avoidance Actions consistently with the values determined by the Litigation Trustee for all U.S. federal income tax purposes. As soon as practicable after the Effective Date, the Litigation Trustee will determine the fair market value of the Designated Avoidance Actions, based upon his good faith determination, and will establish appropriate means to apprise the LT Beneficiaries of such valuation. The valuation will be used consistently by all parties (including, without limitation, the Debtors, the Litigation Trust and the LT Beneficiaries) for all U.S. federal income tax purposes.

Consistent with the treatment of the Litigation Trust as a grantor trust, the Litigation Trust Declaration will require each LT Beneficiary to report on its U.S. federal income tax return its allocable share of the Litigation Trust's income. Therefore, an LT Beneficiary may

incur U.S. federal income tax liability with respect to its allocable share of the income of the Litigation Trust whether or not the Litigation Trust has made any distributions to such LT Beneficiary. The character of items of income, gain, deduction and credit to any LT Beneficiary and the ability of such LT Beneficiary to benefit from any deduction or losses may depend on the particular situation of such LT Beneficiary.

In general, a distribution of Designated Avoidance Actions from the Litigation Trust to an LT Beneficiary may not be taxable to such LT Beneficiary because such LT Beneficiary is already regarded for U.S. federal income tax purposes as owning its allocable share of such assets. Holders of Litigation Trust Interests are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of distributions from the Litigation Trust.

The Litigation Trustee will file with the IRS tax returns for the Litigation Trust as a grantor trust pursuant to Treasury Regulations Section 1.671-4(a) and will also send each LT Beneficiary a separate statement setting forth such LT Beneficiary's share of items of the Litigation Trust's income, gain, loss, deduction or credit. Each such LT Beneficiary will be required to report such items on its U.S. federal income tax return.

This discussion assumes the Litigation Trust will be respected as a grantor trust for U.S. federal income tax purposes. If the IRS were to challenge successfully such classification, the U.S. federal income tax consequences to the Litigation Trust and the LT Beneficiaries could differ materially from those discussed herein (including the possible imposition of an entity-level tax on all income of the Litigation Trust).

## C. U.S. Federal Income Tax Consequences to the Holders of Allowed Claims That Are Paid in Cash in Full

Pursuant to the Plan, holders of Class 7 – Convenience Claims will receive solely Cash in full satisfaction of their Allowed Claims. A holder who receives Cash in exchange for its Allowed Claim pursuant to the Plan generally will recognize income, gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (i) the amount of Cash received in exchange for its Allowed Claim, and (ii) the holder's adjusted tax basis in its Allowed Claim. The character of such income, gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, the nature of the Allowed Claim in such holder's hands, whether the Allowed Claim constitutes a capital asset in the hands of the holder, whether the Allowed Claim was purchased at a discount, and whether and to what extent the holder has previously claimed a bad debt deduction with respect to its Allowed Claim. To the extent that any amount received by a holder of an Allowed Claim is attributable to accrued interest, such amount should be taxable to the holder as interest income. Conversely, a holder of an Allowed Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the Allowed Claims was previously included in the holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

**D. U.S. Federal Income Tax Consequences if the Exchange to Holders of Allowed Claims That Are Paid Using Consideration Other Than Solely Cash**

Certain holders of Allowed Claims will receive First Lien Take Back Paper, NewCo PIK Notes, NewCo Warrants, Litigation Trust Interests and/or Cash. The NewCo PIK Notes issued to holders of Allowed First Lien Secured Claims will have NewCo Warrants attached that will not be detachable (the NewCo PIK Notes with the NewCo Warrants attached, the "Units"). The U.S. federal income tax treatment of assets that are attached together as a unit is unclear. For U.S. federal income tax purposes, an investment unit that comprises more than one financial instrument generally is treated as one instrument for U.S. federal income tax purposes if the underlying instruments are not separable. The Debtors intend to report the Units as one instrument that is a "contingent payment debt instrument" for U.S. federal income tax purposes. Alternatively, because the NewCo Warrants are not detachable, the Units could be treated as equity. Unless noted otherwise, the remainder of this discussion assumes that the Units will be treated as one instrument that is a "contingent payment debt instrument."

Pursuant to the Plan, holders of Class 2 – Allowed First Lien Secured Claims will receive First Lien Take Back Paper, Units, Litigation Trust Interests and Cash; holders of Class 3 – Second Lien Claims will receive NewCo PIK Notes and Litigation Trust Interests (if holders of Class 3 – Second Lien Claims vote in favor of the Plan) or Cash and Litigation Trust Interests (if holders of Class 3 – Second Lien Claims do not vote in favor of the Plan); holders of Class 5 – Valley View Downs Unsecured Claims will receive NewCo PIK Notes and Litigation Trust Interests (if holders of Class 5 – Valley View Downs Unsecured Claims vote in favor of the Plan) or Cash and Litigation Trust Interests (if holders of Class 5 – Valley View Downs Unsecured Claims do not vote in favor of the Plan); holders of Class 6 – General Unsecured Claims will receive Litigation Trust Interests; holders of Class 1 – Priority Non-Tax Claims and Class 4 – Other Secured Claims will have their rights reinstated.

The U.S. federal income tax consequences of the Plan to holders of First Lien Claims and Second Lien Claims depend, in part, on whether such claims constitute "securities" for U.S. federal income tax purposes. The term "security" is not defined in the Internal Revenue Code or in the Treasury Regulations issued thereunder and has not been clearly defined by judicial decisions. The determination of whether a particular debt constitutes a security depends on an overall evaluation of the nature of the debt, with the term of the obligation usually regarded as one of the most significant factors. In general, debt obligations issued with a term of five years or less have generally not qualified as securities, whereas debt obligations with a term of ten years or more generally have qualified as securities.

Although the matter is not free from doubt, the Debtors intend to take the position that the First Lien Debt and Second Lien Debt do not constitute securities for U.S. federal income tax purpose. Consequently, the Debtors intend to report the exchanges as taxable transactions.

(a) **Holders of Class 2 – Allowed First Lien Secured Claims**

Holders of Class 2 – Allowed First Lien Secured Claims will receive First Lien Take Back Paper, Litigation Trust Interests, Units and/or Cash. A holder generally will

recognize gain or loss on such exchange in an amount equal to (x) the sum of (i) the issue price of the First Lien Take Back Paper received by such holder, (ii) the stated principal balance of the NewCo PIK Notes (that are part of the Units received by such holder) received, (iii) the fair market value of the NewCo Warrants (that are part of the Units) received, (iv) any Cash received and (v) the fair market value of the holder's share of the Designated Avoidance Actions transferred to the Litigation Trust (as described under B. above), over (y) the holder's adjusted tax basis in such holder's First Lien Claim. Any gain recognized generally will be capital gain and will be long-term capital gain if, at the time of the exchange, the Allowed First Lien Secured Claim has been held for more than one year. A holder will have an initial tax basis in the First Lien Take Back Paper equal to its issue price (which is expected to be based on the price of the Exit Facility at issuance) and an initial tax basis in the Units equal to the sum of (i) the stated principal balance of the NewCo PIK Notes received (which will be the issue price of and the holder's initial tax basis in the NewCo PIK Notes component of the Units) plus (ii) the fair market value of the NewCo Warrants received (which will be the holder's initial tax basis in the NewCo Warrants component of the Units). If the Units are treated as equity, the calculation of gain or loss will be different. Holders should consult their tax advisors.

### (b) Holders of Class 3 – Second Lien Claims and Holders of Class 5 – Valley View Downs Unsecured Claims

Holders of Class 3 – Second Lien Claims will receive NewCo PIK Notes and Litigation Trust Interests (if they vote in favor of the Plan) or Cash and Litigation Trust Interests (if they do not vote in favor of the Plan). Holders of Class 5 – Valley View Downs Unsecured Claims will receive NewCo PIK Notes and Litigation Trust Interests (if they vote in favor of the Plan) or Cash and Litigation Trust Interests (if they do not vote in favor of the Plan). A holder generally will recognize gain or loss on such exchange in an amount equal to (x) the sum of (i) (A) the stated principal balance of the NewCo PIK Notes received or (B) the amount of Cash received, and (ii) the fair market value of the holder's share of the Designated Avoidance Actions transferred to the Litigation Trust (as described under B. above), over (y) the holder's adjusted tax basis in such holder's claim. Any gain recognized generally will be capital gain and will be long-term capital gain if, at the time of the exchange, the claim has been held for more than one year. Any NewCo PIK Notes received will have an issue price equal to their stated principal balance. A holder will have an initial tax basis in any NewCo PIK Notes received equal to their stated principal balance and will be treated for U.S. federal income tax purposes as owning its share of the Designated Avoidance Actions transferred to the Litigation Trust (as described under B. above).

### (c) Holders of Class 1 – Priority Non-Tax Claims and Class 4 – Other Secured Claims

Holders of Class 1 – Priority Non-Tax Claims and Class 4 – Other Secured Claims that have their Allowed Claims reinstated against an obligor organized in the United States generally should be treated as if they made a taxable exchange of their Allowed Claims for new claims. Such holders generally should recognize gain or loss equal to the difference between their adjusted tax basis in the original Allowed Claim and the issue price of that new claim, which likely would be the face amount of that new claim.

(d)     **Accrued but Unpaid Interest**

In general, to the extent a holder of a debt instrument receives property in satisfaction of interest accrued during the holding period of such instrument, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, such holder may recognize a deductible loss to the extent that any accrued interest or original issue discount ("OID") was previously included in its gross income and is not paid in full. The extent to which property received by a holder of a debt instrument will be attributable to accrued but unpaid interest is unclear. Pursuant to the Plan, all distributions in respect of any Allowed Claim will be allocated first to the principal amount of such Allowed Claim, and thereafter to accrued but unpaid interest, if any. Certain legislative history indicates that an allocation of consideration between principal and interest provided in a bankruptcy plan of reorganization generally is binding for U.S. federal income tax purposes. However, there is no assurance that such allocation will be respected by the IRS for U.S. federal income tax purposes.

Each holder of an Allowed Claim is urged to consult its tax advisor regarding the inclusion in income of amounts received in satisfaction of accrued but unpaid interest, the allocation of consideration between principal and interest, and the deductibility of previously included unpaid interest and OID for tax purposes.

(e)     **Market Discount**

If a holder of an Allowed Claim purchased the underlying debt obligation at a price less than its issue price, the difference would constitute "market discount" for U.S. federal income tax purposes. Any gain recognized by a holder on the exchange of its Allowed Claim on the Effective Date is treated as ordinary income to the extent of any market discount accrued on the underlying debt obligation by the holder on or prior to the Effective Date.

**E.     Consequences of Ownership of NewCo Membership Interests, First Lien Take Back Paper, Units, NewCo PIK Notes and Litigation Trust Interests Issued Pursuant to the Plan**

(a)     **U.S. Holders**

The following is a description of the principal U.S. federal income tax consequences that may be relevant with respect to the ownership and disposition of NewCo Membership Interests, First Lien Take Back Paper, Units, NewCo PIK Notes and Litigation Trust Interests. This discussion addresses only the U.S. federal income tax considerations of U.S. Holders that will receive NewCo Membership Interests, First Lien Take Back Paper, Units, NewCo PIK Notes or Litigation Trust Interests under the Plan and that will hold such NewCo Membership Interests, First Lien Take Back Paper, Units, NewCo PIK Notes or Litigation Trust Interests as capital assets.

a. Consequences of Ownership of NewCo Membership Interests Issued Pursuant to the Plan

i. Issuance of the NewCo Membership Interests

The NewCo Membership Interests will be issued to Existing Management and the members of the Board of Managers on the Effective Date. As a result, such recipients will recognize income equal to the fair market value of the NewCo Membership Interests on the Effective Date and have an initial tax basis in the NewCo Membership Interests equal to the fair market value of the NewCo Membership Interests on the Effective Date.

ii. Distributions

It is expected that NewCo will elect to be treated as a corporation for U.S. federal income tax purposes. Consequently, distributions made with respect to NewCo Membership Interests generally will constitute dividends for U.S. federal income tax purposes to the extent paid from NewCo's current or accumulated earnings and profits, as determined under U.S. federal income tax principles. References in the remainder of this discussion to "dividends" will be to distributions that are treated as dividends for U.S. federal tax purposes. Distributions in excess of NewCo's current or accumulated earnings and profits, referred to herein as "non-dividend distributions," generally will constitute a return of capital to the extent of the recipient's adjusted tax basis in its NewCo Membership Interests and will be applied against and reduce such adjusted tax basis. To the extent that a non-dividend distribution exceeds the recipient's adjusted tax basis in its NewCo Membership Interests, the excess will be treated as gain realized on the sale or other disposition of the NewCo Membership Interests.

iii. Sale or Exchange or Other Taxable Disposition

A U.S. Holder generally will recognize gain or loss on the sale or exchange of NewCo Membership Interests equal to the difference between the amount realized on such sale or exchange and such holder's adjusted tax basis in its NewCo Membership Interests. Gain or loss recognized will be capital gain or loss and will be long-term capital gain or loss if the U.S. Holder has held such NewCo Membership Interests for longer than one year. The distinction between capital gain or loss and ordinary income or loss is potentially significant because limitations apply to a U.S. Holder's ability to offset capital losses against ordinary income. In addition, long-term capital gain recognized by U.S. Holders who are individuals generally will be taxed at lower rates.

b. Consequences of Ownership of Units Issued Pursuant to the Plan

i. Contingent Payment Debt Instruments

Units issued pursuant to the Plan will provide for a contingent payment and, therefore, are expected to be treated as contingent payment debt instruments ("CPDIs"). Treasury Regulations set forth special rules with respect to the taxation of debt instruments that: (1) provide for contingent payments, (2) are not publicly traded, and (3) are issued as consideration for non-publicly traded property (rather than Cash or publicly traded property) (the "Contingent Payment Regulations"). Under the Contingent Payment Regulations, such a CPDI

is separated into its contingent and non-contingent components. For purposes of calculating OID, the non-contingent component and the contingent component will each be treated as a separate debt instrument. The non-contingent component of each Unit (i.e., the right to receive payments of principal and interest on the NewCo PIK Notes) generally will be subject to the OID rules for non-contingent debt instruments, as described below under the caption "Consequences of Ownership of The NewCo PIK Notes." Payments on the contingent component of each Unit are described below under the caption "Consequences of Exercising NewCo Warrants."

A U.S. Holder must allocate the amount realized from the sale, exchange or disposition (including exercise of the holder put right) of a Unit, first, to the non-contingent component (the NewCo PIK Notes) in an amount up to the adjusted issue price of the non-contingent component, and must allocate the remaining amount received, if any, to the contingent component (the NewCo Warrants). A U.S. Holder generally will recognize gain or loss on the non-contingent component equal to the difference between (i) the portion of the amount realized allocated to the non-contingent component and (ii) the U.S. Holder's adjusted tax basis in the non-contingent component. Such gain on a non-contingent component generally will be treated as U.S. source capital gain or loss. Capital gain of a non-corporate U.S. Holder that is recognized in taxable years beginning before January 1, 2011 is generally taxed at a maximum rate of 15 percent where the holder has a holding period greater than one year. The maximum rate is scheduled to increase to 20 percent for capital gain recognized thereafter.

The amount allocated to a contingent component is treated as a contingent payment that is made on the date of the sale, exchange or other disposition, with a portion of such payment treated as principal and the remainder as interest.

The application of the Contingent Payment Regulations is complex. Holders are urged to consult their tax advisors regarding the tax consequences of the ownership and disposition of Units.

        ii.      Treatment of Units as an Equity Interest

It also is possible that instead of being treated as a contingent payment debt instrument, Units will be treated as an equity interests in NewCo. If Units are treated as an equity interest in NewCo, the consequences to a holder generally will be as described above under the caption "a. Consequences of Ownership of NewCo Membership Interests Issued Pursuant to the Plan."

It is not clear whether section 483 of the Internal Revenue Code would apply to the Units and impute interest in addition to the interest described above. Holders are urged to consult their tax advisors regarding the application of section 483 of the Internal Revenue Code to the Units.

        c.      Consequences of Ownership of First Lien Take Back Paper Issued Pursuant to the Plan

The First Lien Take Back Paper will be issued in the same tranche as the Exit Financing. Consequently, the First Lien Take Back Paper will be treated as issued with OID if the Exit Financing constitutes a substantial amount of the tranche and is issued with more than a

de minimis amount of OID. If the First Lien Take Back Paper is treated as being issued with OID, each U.S. Holder will be required to include in income each year, in addition to payments of stated interest and without regard to the U.S. Holder's method of accounting for U.S. federal income tax purposes, a portion of the OID on the First Lien Take Back Paper so as to provide a constant yield to maturity. The amount included in the income of a U.S. Holder each year in this way will be treated as ordinary income. Any amount of OID included in income will increase a U.S. Holder's adjusted tax basis in its First Lien Take Back Paper, and any payment (other than stated interest) on the First Lien Take Back Paper will decrease a U.S. Holder's adjusted tax basis in such First Lien Take Back Paper.

If the First Lien Take Back Paper is not treated as being issued with OID, interest that is payable on the First Lien Take Back Paper will be includible in a U.S. Holder's gross income as ordinary interest income in accordance with the U.S. Holder's usual method of tax accounting. Additionally, upon the sale, exchange or retirement of the First Lien Take Back Paper, a U.S. Holder will recognize taxable gain or loss equal to the difference, if any, between the amount realized on the sale, exchange or retirement, other than amounts attributable to any accrued but unpaid interest which will be taxable as such, and such U.S. Holder's adjusted tax basis in the First Lien Take Back Paper. The character of any such gain or loss will depend upon whether the market discount rules apply to the First Lien Take Back Paper. The deductibility of capital losses is subject to limitations. Holders are urged to consult their tax advisors concerning the federal, state, local, and other tax consequences.

Interest on the First Lien Take Back Paper will constitute income from sources within the United States.

      d.    Consequences of Exercising NewCo Warrants

Although the matter is uncertain, exercise of the NewCo Warrant portion of the Units should be treated as a contingent payment on the Unit, in an amount equal to the fair market value of the NewCo Membership Interest received, less the exercise price paid. Such contingent payment will be included in income when received, with a portion of such contingent payment treated as principal and the remainder treated as interest. The principal portion of the contingent payment is the present value of the payment determined by discounting the payment from the date it was made (or treated as made) to the Effective Date at the applicable U.S. federal rate that would apply to a debt instrument issued on the Effective Date and maturing on the date the contingent payment is made (or treated as made). Any amount of the contingent payment in excess of the portion determined to be principal is treated as a payment of interest. To the extent the principal amount received exceeds a holder's adjusted tax basis in the NewCo Warrants, such excess will be recognized as a gain for U.S. federal income tax purposes. To the extent the principal amount received is less than a holder's adjusted tax basis in the NewCo Warrants, the remaining adjusted tax basis in such holder's NewCo Warrants will be added to the holder's adjusted tax basis in the non-contingent component (i.e., the NewCo PIK Note portion of the Unit). If the non-contingent component (i.e., the NewCo PIK Note portion) is no longer outstanding, then such remaining adjusted tax basis in a NewCo Warrant will be treated as a loss. Any such gain or loss will be a treated as capital gain or loss if certain requirements are met.

U.S. Holders should have a tax basis in the NewCo Membership Interests received upon exercise equal to the fair market value of the NewCo Membership Interests received, less the portion, if any, of such holder's adjusted tax basis in the NewCo Warrants that is transferred to the non-contingent component. U.S. Holders obtaining NewCo Membership Interests will have tax consequences similar to those described above under the caption "a. Consequences of Ownership of NewCo Membership Interests Issued Pursuant to the Plan."

Alternatively, if the Units are treated as equity, the exercise of the NewCo Warrant portion of a Unit generally will not be a taxable event for U.S. federal tax purposes because the U.S. Holder already will be treated as holding an equity interest in NewCo. Any payments made to exercise the NewCo Warrants should increase a U.S. Holder's tax basis in its equity interest.

     e.     Consequences of Ownership of NewCo PIK Notes Issued Pursuant to the Plan

     i.     Original Issue Discount

Each NewCo PIK Note will be issued with OID equal to the excess of the "stated redemption price at maturity" of the NewCo PIK Note over its "issue price." For purposes of the foregoing, the stated redemption price at maturity will equal the sum of all payments provided by the NewCo PIK Note other than payments of "qualified stated interest." It is not expected that any of the payments on the NewCo PIK Notes will constitute qualified stated interest.

Because each NewCo PIK Note will be issued with OID, each U.S. Holder will be required to include in income each year, without regard to whether any cash payments of interest are made with respect to the NewCo PIK Note and without regard to the U.S. Holder's method of accounting for U.S. federal income tax purposes, a portion of the OID on the NewCo PIK Note so as to provide a constant yield to maturity. The amount included in the income of a U.S. Holder each year in this way will be treated as ordinary income. Any amount of OID included in income will increase a U.S. Holder's adjusted tax basis in a NewCo PIK Note, and any payment on a NewCo PIK Note (other than payments of additional NewCo PIK Notes) will decrease a U.S. Holder's adjusted tax basis in such NewCo PIK Note.

Interests (including OID) on NewCo PIK Notes will constitute income from sources within the United States.

     ii.     Sale, Exchange or Retirement of the NewCo PIK Notes

Upon the disposition of a NewCo PIK Note by sale, exchange or retirement, a U.S. Holder generally will recognize gain or loss equal to the difference between (i) the amount of cash plus the fair market value of any other property received by the U.S. Holder and (ii) the U.S. Holder's adjusted tax basis in the NewCo PIK Note. If a U.S. Holder received additional NewCo PIK Notes (each, as "Additional NewCo PIK Note") with respect to and as payment on a NewCo PIK Note (an "Original NewCo PIK Note"), such holder's aggregate adjusted tax basis in the Original NewCo PIK Note and the Additional NewCo PIK Note generally will equal the issue price of the Original NewCo PIK Note, increased by OID (and any accrued market

discount) included in income with respect to the Original NewCo PIK Notes and Additional NewCo PIK Notes through the date of disposition, and decreased by any payments (other than payments in the form of Additional NewCo PIK Notes) received on the Original NewCo PIK Note and Additional NewCO PIK Notes through the date of disposition. A U.S. Holder's aggregate adjusted tax basis in an Original NewCo PIK Note and any Additional NewCo PIK Notes received thereon will be allocated among such NewCo PIK Notes based upon their relative principal amounts.

Subject to the market discount rules discussed above, gain or loss recognized will be capital gain or loss and will be long-term capital gain or loss if the U.S. Holder has held such NewCo PIK Note for longer than one year. The distinction between capital gain or loss and ordinary income or loss is potentially significant because limitations apply to a U.S. Holder's ability to offset capital losses against ordinary income. In addition, long-term capital gain recognized by U.S. Holders who are individuals generally will be taxed at lower rates.

      f.    <u>Consequences of Ownership of Litigation Trust Interests Issued Pursuant to the Plan</u>

In addition to recognizing gain or loss on the Effective Date in respect of its share of the Designated Avoidance Actions as described above, an LT Beneficiary should generally recognize its allocable share of the income, gain, loss and deductions recognized by the Litigation Trust on an annual basis, whether or not the Litigation Trust has made any distributions to such LT Beneficiary. The character of items of income, gain, deduction and credit to any beneficiary and the ability of such beneficiary to benefit from any deduction or losses may depend on the particular situation of such beneficiary.

Because such holder's ultimate amount realized with respect to the Designated Avoidance Actions will not be determinable on the Effective Date due to, among other things, the inability on the Effective Date to ascertain the ultimate value of the Designated Avoidance Actions, such holder should recognize additional or offsetting gain or loss if, and to the extent that, the aggregate amount of cash and fair market value of assets ultimately received by such holder from the Litigation Trust is greater or less than the amount used in initially determining gain or loss in accordance with the procedures described above.

It is possible the IRS may assert that any loss should not be recognizable until the Litigation Trustee makes its final distribution of the assets of the Litigation Trust. Holders should consult their tax advisors regarding the possibility that the recognition of gain or loss may be deferred until the final distribution of the assets of the Litigation Trust.

      g.    <u>New Legislation</u>

Recently enacted legislation requires certain U.S. Holders who are individuals, estates or trusts to pay a 3.8 percent tax (in addition to taxes they would otherwise be subject to) on net investment income, <u>including</u> interest and capital gains, for taxable years beginning after December 31, 2012.

(b) **Non-U.S. Holders**

      a.     Consequences of Ownership of First Lien Take Back Paper, Units, NewCo PIK Notes and Litigation Trust Interests Issued Pursuant to the Plan

      The following is a summary of certain U.S. federal income tax consequences that will apply to Non-U.S. Holders of First Lien Take Back Paper, Units, NewCo PIK Notes and Litigation Trust Interests. A "Non-U.S. Holder" is a beneficial holder of First Lien Take Back Paper, Units, NewCo PIK Notes or Litigation Trust Interests that is not a U.S. Holder or a partnership or an entity treated as a partnership for U.S. federal income tax purposes.

      i.     Payments of Interest

      Interest (other than any interest portion of a contingent payment), including OID, that is not effectively connected with a U.S. trade or business will not be subject to U.S. federal income tax, and withholding of U.S. federal income tax will not be required of a Non-U.S. Holder if such Non-U.S. Holder:

- is not a "10-percent shareholder" (within the meaning of sections 881(c)(3)(B) and 871(h)(3)(B) of the Internal Revenue Code) of NewCo;

- is not a controlled foreign corporation related to NewCo;

- is not a bank receiving interest on a loan entered into in the ordinary course of business within the meaning of section 881(c)(3)(A) of the Internal Revenue Code; and

- certifies on IRS Form W-8BEN, or an applicable substitute form, under penalties of perjury, that it is not a U.S. person for U.S. federal income tax purposes and provides its name and address.

      The interest portion of a contingent payment and any interest that does not satisfy the foregoing exception will be subject to U.S. federal withholding tax, currently at a rate of 30 percent, unless:

- such tax is eliminated or reduced under an applicable U.S. income tax treaty and the Non-U.S. Holder provides a properly executed IRS Form W-8BEN establishing such reduction or exemption from withholding tax on interest; or

- such interest is effectively connected with a U.S. trade or business of the Non-U.S. Holder and the Non-U.S. Holder provides a properly executed IRS Form W-8ECI or W-8BEN claiming an exemption from withholding tax on such interest.

      A Non-U.S. Holder whose interest income is effectively connected with a U.S. trade or business (and, if an income tax treaty applies, is attributable to a permanent establishment or fixed base such Non-U.S. Holder maintains in the United States) of the Non-U.S. Holder will be subject to regular U.S. federal income tax on such interest in generally the same manner as if it were a U.S. Holder. A corporate Non-U.S. Holder may also be subject to an

additional U.S. branch profits tax at a rate of 30 percent on its effectively connected earnings and profits attributable to such interest (<u>unless</u> reduced or eliminated by an applicable income tax treaty).

ii.     Distributions From the Litigation Trust Interests

Holders of Litigation Trust Interests are treated as holding their share of the Designated Avoidance Actions for U.S. federal income tax purposes. Holders of Litigation Trust Interests are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of distributions from the Litigation Trust.

iii.     Sale, Exchange, Redemption, Retirement or Other Disposition of First Lien Take Back Paper, Units, NewCo PIK Notes and Litigation Trust Interests

Except with respect to accrued interest and the interest portion of a contingent payment (which will be taxable as such), a Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to gain recognized on a sale, taxable exchange, redemption, retirement or other taxable disposition of First Lien Take Back Paper, Units, NewCo PIK Notes and Litigation Trust Interests unless:

- the gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and, if an income tax treaty applies, is attributable to a permanent establishment or fixed base maintained in the United States), in which event such gain will be subject to tax generally in the same manner as described above with respect to effectively connected interest; or

- the Non-U.S. Holder is an individual, who is present in the United States for 183 or more days in the taxable year of the disposition and certain other requirements are met, in which event the gain (net of certain U.S. source capital loss) will be subject to a 30 percent U.S. federal income tax.

b.     <u>Consequences of Exercising the NewCo Warrants</u>

Non-U.S. Holders generally will have the same ramifications upon exercising the NewCo Warrants as described above under the caption "(a) U.S. Holder – d. Consequences of Exercising the NewCo Warrants."

c.     <u>Consequences of Ownership of Units (if Units Are Treated as Equity) and of NewCo Membership Interests</u>

i.     Dividends

If the Units are treated as equity for U.S. tax purposes, interest payments received generally will constitute dividends for U.S. federal income tax purposes to the extent paid from accumulated earnings and profits, as determined under U.S. federal income tax principles. References in the remainder of this discussion to "dividends" will be to distributions that are treated as dividends for U.S. federal tax purposes. Distributions in excess of current or accumulated earnings and profits, referred to hereinafter as "non-dividend distributions,"

generally will constitute a return of capital to the extent of the recipient's adjusted tax basis in the Units and will be applied against and reduce such adjusted tax basis. To the extent that a non-dividend distribution exceeds the recipient's adjusted tax basis in the Units, the excess will be treated as gain realized on the sale of other disposition of the Units and will be treated, for Non-U.S. Holders, as described under "ii. Disposition of NewCo Membership Interests and/or Units That Are Treated as Equity," below.

Dividends paid to a Non-U.S. Holder that are treated as effectively connected with a Non-U.S. Holder's conduct of a trade or business in the United States, or, if an applicable income tax treaty applies, that are attributable to a permanent establishment or fixed base maintained by the Non-U.S. Holder in the United States, generally are not subject to the U.S. withholding tax. To obtain this exemption, prior to the payment of a dividend, a Non-U.S. Holder must provide NewCo with IRS Form W-8ECI (or successor form) properly certifying this exemption. Such effectively connected dividends or dividends attributable to a permanent establishment, together with other U.S. trade or business income, net of specified deductions and credits, generally are subject to U.S. federal income tax at rates applicable to U.S. persons. In addition, such dividends received by a corporate Non-U.S. Holder that are effectively connected with a U.S. trade or business, or dividends attributable to a corporate Non-U.S. Holder's permanent establishment in the United States, if an income tax treaty applies, may be subject to an additional "branch profits tax" at a 30 percent rate, or such lower rate as may be specified by an applicable income tax treaty.

Regardless of whether the distribution is treated as effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States, if NewCo is or becomes a "United States real property holding corporation" (see "ii. Disposition of NewCo Membership Interests and/or Units That Are Treated as Equity," below), NewCo may be required to withhold 10 percent of the gross amount of a non-dividend distribution (i.e., not made out of earnings and profits). Consequently, NewCo may withhold at a 10 percent rate in circumstances in which withholding at a 30 percent rate, or lower rate as specified in an applicable income tax treaty, does not apply. Although NewCo does not believe that it will be a United States real property holding corporation on the Effective Date and does not expect to become a United States real property holding corporation, it is possible that NewCo could become a United States real property holding corporation. Accordingly, although it is not expected that NewCo will become a United States real property holding corporation, no assurances can be made in this regard.

ii. Disposition of NewCo Membership Interests and/or Units That Are Treated as Equity

A Non-U.S. Holder generally will not be subject to U.S. federal income tax, including by way of withholding, on gain recognized on a sale, exchange or other taxable disposition of NewCo Membership Interests or Units that are treated as equity. If, however, any one of the following applies, a Non-U.S. Holder generally will be subject to tax at the rates to which U.S. persons are subject:

- The Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of the sale, exchange or other taxable disposition and certain other conditions are met;

- The gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States or (if an applicable tax treaty requires) attributable to a U.S. permanent establishment or fixed base of such Non-U.S. Holder, which gain, in the case of a corporate Non-U.S. Holder, must also be taken into account for branch profits purposes; or

- Subject to certain exceptions, if NewCo is a "United States real property holding corporation."

## F.    Information Reporting and Backup Withholding

U.S. federal backup withholding tax and information reporting requirements generally apply to certain payments to certain holders of the NewCo Membership Interests, First Lien Take Back Paper, NewCo PIK Notes, Units or Litigation Trust Interests. Information reporting generally will apply to payments under the Plan and to payments (including of dividends and interest) on and proceeds from the sale or redemption of such NewCo Membership Interests, First Lien Take Back Paper, NewCo PIK Notes, Units or Litigation Trust Interests made within the United States. A payor will be required to withhold backup withholding tax from any payments made under the Plan, and payments (including of dividends and interest) on or the proceeds from the sale or redemption of, the NewCo Membership Interests, First Lien Take Back Paper, NewCo PIK Notes, Units or Litigation Trust Interests within the United States to a holder, other than an exempt recipient, if such holder fails to furnish its correct taxpayer identification number or otherwise fails to comply with, or establish an exemption from, such backup withholding tax requirements. The backup withholding tax rate is currently 28 percent.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

## XIV.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors have evaluated numerous alternatives to the Plan, including, without limitation, the sale of the Debtors as a going concern, either as an entirety or on limited bases and the liquidation of the Debtors. After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries of holders of Claims and Equity Interests. The following discussion provides a summary of the analysis supporting the conclusion that a liquidation of the Debtors or an alternative plan of reorganization for the Debtors will not provide higher value to holders of Claims and Equity Interests.

## A.    Liquidation Under Chapter 7 of the Bankruptcy Code

If no plan of reorganization can be confirmed, the Chapter 11 Cases of the Debtors may be converted to cases under chapter 7, in which event a trustee would be elected or

appointed to liquidate the properties and interests in property of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for under the Plan because of (1) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee for bankruptcy and professional advisors to such trustee; (2) the erosion in value of Assets in the context of the expeditious liquidation required under chapter 7 and the "forced sale" environment in which such a liquidation would likely occur; (3) the adverse effects on the salability of business segments as a result of the likely departure of key employees and the loss of customers; and (4) the substantial increases in Claims which would have to be satisfied on a priority basis or on parity with creditors in the Chapter 11 Cases. Accordingly, the Debtors have determined that confirmation of the Plan will provide each holder of a Claim or Equity Interest with a greater recovery than it would receive pursuant to a liquidation of the Debtors under chapter 7.

Section 1129(a)(7) of the Bankruptcy Code provides that, with respect to impaired classes, each holder of a claim or interest of such class must receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount such holder would so receive or retain if the debtor liquidated under chapter 7 of title 11 on such date. As demonstrated by the liquidation analysis attached hereto as Exhibit "G", the Plan satisfies this standard.

The Committee and the Prepetition Second Lien Agent dispute the foregoing particularly in light of the potential disposition of the L/C Cash in a chapter 7 compared to its proposed disposition in the Plan.

## B. Alternative Plans of Reorganization

If the Plan is not confirmed, any other party in interest could undertake to formulate a different plan of reorganization. Such a plan of reorganization might involve either (x) a reorganization and continuation of the business of the Debtors, (y) the sale of the Debtors as a going concern or (z) an orderly liquidation of the properties and interests in property of the Debtors. With respect to an alternative plan of reorganization, the Debtors have examined various other alternatives in connection with the process involved in the formulation and development of the Plan. The Debtors believe that the Plan, as described herein, enables holders of Claims and Equity Interests to realize the best recoveries under the present circumstances. In a liquidation of the Debtors under chapter 11, the properties and interests in property would be sold in a more orderly fashion and over a more extended period of time than in a liquidation under chapter 7, probably resulting in marginally greater recoveries. Further, if a trustee were not appointed, since one is not required in a chapter 11 case, the expenses for professional fees would most likely be lower than in a chapter 7 case. However, although preferable to a chapter 7 liquidation, the Debtors believe that a liquidation under chapter 11 for the Debtors is a much less attractive alternative to holders of Claims and Equity Interests than the Plan because the recovery realized by holders of Claims and Equity Interests under the Plan is likely to be greater than the recovery under a chapter 11 liquidation.

# XV.

## CONCLUSION

The Debtors believe that the Plan is in the best interest of all holders of Claims and Equity Interests, and urge all holders of impaired Claims and Equity Interests in the Debtors to vote to accept the Plan and to evidence such acceptance by returning their Ballots in accordance with the instructions accompanying the Disclosure Statement.

Dated:  September 3, 2010                    Respectfully submitted,

**Centaur PA Land, LP**

By:  Centaur PA Land General Partner, LP,
      its general partner

By:  Centaur PA Land Management, LLC,
      its general partner

By:  Centaur, LLC, its manager

By:  /s/ Kurt E. Wilson
    Name:  Kurt E. Wilson
    Title:  Executive Vice President, Chief
           Financial Officer, Treasurer and
           Secretary

**Centaur, LLC**

By:  /s/ Kurt E. Wilson
    Name:  Kurt E. Wilson
    Title:  Executive Vice President, Chief
           Financial Officer, Treasurer and
           Secretary

**Centaur Colorado, LLC**

By:  Centaur, LLC, its manager

By:  /s/ Kurt E. Wilson
    Name:  Kurt E. Wilson
    Title:  Executive Vice President, Chief
           Financial Officer, Treasurer and
           Secretary

**Centaur Indiana, LLC**

By: Centaur, LLC, its manager

By:  /s/ Kurt E. Wilson
   Name:  Kurt E. Wilson
   Title:  Executive Vice President, Chief
         Financial Officer, Treasurer and
         Secretary

**Centaur Racing, LLC**

By: Centaur, LLC, its manager

By:  /s/ Kurt E. Wilson
Name:  Kurt E. Wilson
   Title:  Executive Vice President, Chief
         Financial Officer, Treasurer and
         Secretary

**Hoosier Park, L.P.**

By: Centaur Indiana, LLC, its general partner

By: Centaur, LLC, its manager

By:  /s/ Kurt E. Wilson
   Name:  Kurt E. Wilson
   Title:  Executive Vice President, Chief
         Financial Officer, Treasurer and
         Secretary

**HP Dining & Entertainment, LLC**

By: Centaur, LLC, its manager

By:  /s/ Kurt E. Wilson
   Name:  Kurt E. Wilson
   Title:  Executive Vice President, Chief
         Financial Officer, Treasurer and
         Secretary

**Centaur Pennsylvania, LLC**

By:  Centaur, LLC, its manager

By:   /s/ Kurt E. Wilson
   Name:  Kurt E. Wilson
   Title:  Executive Vice President, Chief
         Financial Officer, Treasurer and
         Secretary

**VVD Properties General Partner, LLC**

By:  Centaur, LLC, its manager

By:   /s/ Kurt E. Wilson
   Name:  Kurt E. Wilson
   Title:  Executive Vice President, Chief
         Financial Officer, Treasurer and
         Secretary

**Valley View Downs GP, LLC**

By:  Centaur, LLC, its manager

By:   /s/ Kurt E. Wilson
   Name:  Kurt E. Wilson
   Title:  Executive Vice President, Chief
         Financial Officer, Treasurer and
         Secretary

**Valley View Downs, LP**

By:  Valley View Downs GP, LLC, its
general partner

By:  Centaur, LLC, its manager

By:   /s/ Kurt E. Wilson
   Name:  Kurt E. Wilson
   Title:  Executive Vice President, Chief
         Financial Officer, Treasurer and
         Secretary

**VVD Properties, LP**

By:  VVD Properties General Partner, LLC, its general partner

By:  Centaur, LLC, its manager

By:  /s/ Kurt E. Wilson
   Name:  Kurt E. Wilson
   Title:  Executive Vice President, Chief
         Financial Officer, Treasurer and
         Secretary

**Centaur PA Land General Partner, LP**

By:  Centaur PA Land Management, LLC, its general partner

By:  Centaur, LLC, its manager

By:  /s/ Kurt E. Wilson
   Name:  Kurt E. Wilson
   Title:  Executive Vice President, Chief
         Financial Officer, Treasurer and
         Secretary

**Centaur PA Land Management, LLC**

By:  Centaur, LLC, its manager

By:  /s/ Kurt E. Wilson
   Name:  Kurt E. Wilson
   Title:  Executive Vice President, Chief
         Financial Officer, Treasurer and
         Secretary