UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re : | CHAPTER 11 |
| : | |
| CENTAUR, LLC., *et al.*[1] : | |
| Debtors : | Case No. 10-10799 (KJC) |
| : | |

# MEMORANDUM[2]

## BY:  KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

Before the Court is the "Motion Of The Official Committee of Unsecured Creditors Of Centaur, *et al.*, Pursuant To 11 U.S.C. §§ 105(a), 1103(c) And 1109(b), For Entry Of An Order Granting Leave, Standing And Authority To Prosecute And, If Appropriate, Settle Claims On Behalf Of The Debtors' Estates And For Other Relief" (D.I. 415) (the "Standing Motion"). In the Standing Motion, the Committee seeks an order authorizing it to prosecute certain claims and causes of action against the First Lien Lenders and the Second Lien Lenders[3] related to, among

---

[1]The Debtors in these cases are: Centaur, LLC, Centaur Colorado, LLC; Centaur Indiana, LLC; Centaur Racing, LLC; Hoosier Park, LP; HP Dining & Entertainment, LLC; Centaur Pennsylvania, LLC; VVD Properties General Partner, LLC; Valley View Downs GP, LLC; VVD Properties, LP; Valley View Downs, LP; Centaur PA Land Management, LLC; Centaur PA Land General Partner, LP; and Centaur PA Land, LP. (collectively referred to as the "Debtors"). Centaur PA Land, LP and Valley View Downs, LP filed their chapter 11 petitions on October 28, 2009 (the "2009 Petition Date"). The remaining Debtors filed their chapter 11 petitions on March 6, 2010 (the "2010 Petition Date").

[2]This Court has jurisdiction to decide the motion before it pursuant to 28 U.S.C. § 1334 and §157(a). This is a core proceeding pursuant to 28 U.S.C. §157(b)(1) and (b)(2)(A) and (O).

[3]The Committee's draft complaint describes the First Lien Lenders as Credit Suisse AG, Cayman Islands Branch ("Credit Suisse"), as administrative agent and collateral agent (Credit Suisse, in such capacities, the "First Lien Agent"), and certain lenders from time to time party to the First Lien Revolving Credit and Term Loan Agreement, dated as of October 30, 2007, which was amended and restated pursuant to an Amended and Restated First Lien Revolving Credit and Term Loan Agreement dated as of September 17, 2008 (the "First Lien Credit Agreement") between Centaur, LLC and the other

other things, the validity and enforceability of the liens of the First Lien Lenders and the Second Lien Lenders in and against the Debtors' assets. The Committee asserts in its Motion, among other things, that approximately $192 million of assets have been expressly excluded from the First Lien Lenders' and Second Lien Lenders' collateral, or if subject to such liens, those liens are unperfected and avoidable. (Standing Motion, p.2 ¶3).[4] The Committee also argues that the upstream guaranties and liens provided by certain Debtors with respect to the First Lien Credit Facility were fraudulent transfers that should be avoided for the benefit of the unsecured creditors.[5]

The Debtors filed a limited response to the Committee's Standing Motion (D.I. 447), questioning whether the cost of pursuing the Committee's proposed Claims outweighs any potential benefit to the estate. The Debtors ask that any order granting the Committee standing also include compressed scheduling to ensure that the litigation is managed quickly and efficiently. Furthermore, the Debtors argue that the Committee should not be granted sole authority to settle the Claims against the First Lien Lenders and the Second Lien Lenders,

---

Debtors and the First Lien Lenders regarding the term loan and revolving credit facility, originally in the amount of $590 million and later amended and restated and increased to $610 million (the "First Lien Facility").

The Committee's draft complaint describes the Second Lien Lenders as Wells Fargo Bank, N.A. ("Wells Fargo"), as successor administrative agent and successor collateral agent (Wells Fargo, in such capacities, the "Second Lien Agent") and certain lenders from time to time party to the Second Lien Term Loan Agreement dated October 30, 2007, which was amended and restated on September 17, 2008 pursuant to an Amended and Restated Second Lien Term Loan Agreement (the "Second Lien Term Loan Agreement") between Centaur, LLC and the other Debtors regarding a $180 million term loan credit facility, as later amended and restated (the "Second Lien Facility").

[4] I am unable to determine the source of the $192 million figure.

[5] The claims and causes of action set forth in the Committee's draft complaint, attached as Exhibit A to the Standing Motion (the "Draft Complaint"), which was filed under seal, are referred to herein as the "Claims."

because the Debtors should retain the ability to settle those Claims.

Credit Suisse, as First Lien Agent, filed an objection to the Committee's Standing Motion (D.I. 461), arguing that the Claims are not colorable and there is no proof that the Debtors unjustifiably refused to bring such Claims. The First Lien Agent's main argument against the Standing Motion, however, is that the Committee has failed to demonstrate that the "protracted and costly litigation" is in the best interests of the estate and unsecured creditors, because it is unlikely that the Claims will result in any recovery for unsecured creditors.

On September 7, 2010, the Court held a hearing on the Standing Motion, at which time the parties presented expert testimony regarding the cost/benefit analysis of the Committee's proposed litigation. For the reasons given below, the Standing Motion will be granted, in part, and denied, in part.

## BACKGROUND[6]

(a)  <u>Debtor entities</u>

Centaur LLC, an Indiana limited liability company, is a holding company that is the direct or indirect owner of 100% of the equity interests of all of the other Debtors and also certain non-debtor entities. The Debtors can be divided into three groups: the Hoosier Park Debtors, the Fortune Valley Debtor, and the Valley View Downs Debtors.

The Hoosier Park Debtors consist of four Indiana companies that either own or operate or serve as holding companies/general partner for the entities that own or operate both the Hoosier Park race track and casino in Anderson, Indiana (the "Hoosier Park Facility") and three off-track betting facilities in downtown Indianapolis, Fort Wayne, and Merrillville, Indiana (the "OTB

---

[6]The Background is taken from the facts alleged by the Committee in the Draft Complaint.

Facilities"). The assets relating to the Hoosier Park Facility and the OTB Facilities include a racing license that enables Hoosier Park, LP to conduct thoroughbred, harness and quarterhorse racing with pari-mutuel wagering at the OTB Facilities (the "Indiana Racing License") and a gaming license that authorizes Hoosier Park LP to conduct slot machine and electronic table gaming, including video poker, blackjack, and roulette at the Hoosier Park Facility (the "Indiana Gaming License").

The Fortune Valley casino and hotel business in Center City, Colorado (the "Fortune Valley Facility") is owned by debtor Centaur Colorado, LLC, a Delaware limited liabilty company. Its assets include, without limitation, a gaming license which authorizes it to operate slot machines, table games, and bingo at the Fortune Valley Facility (the "Colorado Gaming License").

The Valley View Down Debtors consist of a group of eight companies organized under Delaware or Pennsylvania law, that either own or serve as holding companies/general partners for the entities that own certain assets that the Debtors intended to use to develop, construct, and eventually operate a harness race track and casino business to be located in Lawrence County, Pennsylvania (the "Valley View Downs Project"). Valley View Downs, LP was intended to be the primary operating entity, and its assets consist of:

    (i)    an interest in $50 million of Letter of Credit Cash and other subject Letter of Credit Property,

    (ii)    a harness racing license that enables Valley View Downs to develop a racetrack and conduct pari-mutel wagering at that facility (the "PA Racing License"), and

    (iii)    a "Category 1" gaming license application that, if granted, would enable Valley

View Downs to conduct slot machine and electronic table gaming at the proposed Valley View Downs facility (the "PA Gaming Application").[7]

Centaur PA Land, LP is the only other Valley View Downs debtor that has any significant assets (other than equity interests in another Valley View Downs entity) and those assets consist primarily of certain undeveloped real property in Lawrence County, Pennsylvania on which the Debtors intend to construct the Valley View Downs Project.

On October 20, 2010, the Debtors held an auction of Valley View Downs, with any such sale to be completed in connection with a confirmed plan.[8] At the conclusion of the auction, a Winning Competitive Bidder (as defined in the approved bidding procedures (D.I. 621)) was selected. The Debtors intend to seek approval of the sale transaction and purchase agreement on December 13, 2010.

(B)     The October 30, 2007 Loan Transactions

To increase liquidity, on or about October 30, 2007, Centaur LLC, as borrower, and the other Debtors entered into the First Lien Credit Agreement, originally in the amount of $590 million and later amended, restated, and increased to $610 million with Credit Suisse and the First Lien Lenders.

All of the Debtors (other than Centaur LLC) have given upstream guaranties in connection with the First Lien Facility. In connection with the entry of the Final Cash Collateral Order, the Debtors stipulated to joint and several liability to the First Lien Lenders in an amount

---

[7]The Indiana Racing License, the Indiana Gaming License, the Colorado Gaming License and the PA Gaming License will be referred to herein as the "Licenses."

[8]The facts set forth in this paragraph are not taken from the Committee's Draft Complaint, but from the Debtors' notice regarding the Valley View Downs sale transaction (D.I. 826).

of not less than $405,145,293 (as of the 2010 Petition Date).[9]

Also, on or about October 30, 2007, Centaur LLC, as borrower, and the other Debtors entered into the Second Lien Term Loan Agreement, for a $180 million term loan credit facility, as later amended and restated, with Wells Fargo and the Second Lien Lenders.

All of the Debtors (other than Centaur LLC) have given upstream guaranties in connection with the Second Lien Facility. In connection with the entry of the Final Cash Collateral Order, the Debtors stipulated to joint and several liability to the Second Lien Lenders in an amount of not less than $207,190,876.43 (as of the 2010 Petition Date).[10]

(C)     <u>Cage Cash</u>

As part of their normal course of business, Centaur Colorado, LLC and Hoosier Park, LP maintained on each of their racing, gaming, and off-track betting locations property in the form of cash currency (or "money" as defined in Article 9 of the UCC), referred to as the "Cage Cash." Upon information and belief, as of the 2010 Petition Date, Centaur Colorado LLC had approximately $1.6 million in Cage Cash and Hoosier Park, LP had approximately $8.2 million in Cage Cash. The Cage Cash was at that time in the possession and control of the Debtor and was not in the direct or indirect possession of either the First Lien Agent or the Second Lien Agent.

(D)     <u>The Valley View Downs Letter of Credit Matters</u>

On or about October 30, 2007, Credit Suisse in its capacity as the letter of credit issuing

---

[9] The stipulated indebtedness to the First Lien Lenders as of the 2009 Petition Date was $385,362,975.51.

[10] The stipulated indebtedness to the First Lien Lenders as of the 2009 Petition Date was $195,649,936.35.

bank (the "L/C Issuer") extended a letter of credit (the "L/C") for the account of Valley View Downs in the amount of $50 million to the Commonwealth of Pennsylvania in connection with the Pennsylvania gaming application pursuant to a Letter of Credit and Reimbursement Agreement dated as of October 2007 (the "Original L/C Agreement"). Pursuant to the Original L/C Agreement, Valley View Downs agreed to provide cash collateral to the L/C Issuer to secure Valley View Downs' reimbursement obligation, and Valley View Downs did provide to the L/C Issuer cash collateral in the amount of $50 million (the "L/C Cash"). Although the Original L/C Agreement required the L/C Cash to be deposited in a "special cash collateral account," the L/C Cash was placed, instead, into an account owned by Credit Suisse and maintained at Bank of New York (the "Credit Suisse BONY Account") where it was commingled with general Credit Suisse funds.

(E)     The Bankruptcy Cases

Centaur PA Land, LP and Valley View Downs, LP filed their chapter 11 petitions on October 28, 2009. The remaining Debtors filed their chapter 11 petitions on March 6, 2010. On March 17, 2010, the United States Trustee appointed the Committee.[11]

On October 20, 2010, the Court entered an order (D.I. 783) (I) approving the Debtors' Disclosure Statement relating to the Fourth Amended Joint Chapter 11 Plan of Reorganization for Centaur LLC and its Affiliated Debtors; (II) Approving Form of Ballots and Proposed Solicitation, Voting and Tabulation Procedures for the Plan and Plan Confirmation Process; (III) Approving the Solicitation Packages and Prescribing the Form and Manner of Notice and

---

[11] The Committee currently consists of the following four members: (i) Ames Construction, Inc.; (ii) U.S. Foodservice, Inc.; (iii) WMS Gaming Inc. And (iv) PREIT-Rubin, Inc. & PR Valley View Downs, LP.

Distribution Thereof; and (IV) Scheduling a Hearing on Plan Confirmation. The deadline for voting on and objecting to the Fourth Amended Joint Chapter 11 Plan of Reorganization for Centaur LLC and its Affiliated Debtors (D.I. 764) (the "Plan") is December 3, 2010. A hearing to consider confirmation of the Plan is set for December 13, 2010.

(F)   <u>The Committee's Proposed Claims</u>

The Committee prepared the Draft Complaint that contains thirty-two (32) counts. (*See* Ex. A to the Standing Motion.). The Committee agrees that the Claims can be categorized as follows:

(i)   claims that challenge the First Lien Lenders' ability to obtain allocable value from "Excluded Collateral" on which the First Lien Lenders do not possess liens, such as the Licenses and the L/C Cash;

(ii)   claims that challenge the First Lien Lender's perfection in the "cage cash";

(iii)   claims that seek to recharacterize intercompany debt as equity;

(iv)   claims for a declaration that the First Lien Lenders are undersecured and, therefore, cannot include interest, costs, and expenses in their secured claim under Bankruptcy Code §506(b); and

(v)   claims for a declaration that the upstream guaranties and lien from the subsidiaries in favor of the First Lien Lenders should be avoided in whole or in part as fraudulent transfers.

## DISCUSSION

There is no dispute that under *Official Comm. Of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548 (3d Cir. 2003), the Third Circuit has held that bankruptcy courts

can confer derivative standing upon creditors' committees to bring actions to recover property for the benefit of the estate. The Third Circuit expressed its agreement with guidelines established by the Second and Seventh Circuits that entitlement to derivative standing requires (1) a colorable claim; (2) that the trustee unjustifiably refused to pursue the claim, and (3) permission of the bankruptcy court to initiate the action. *In re Yes! Entertainment Corp.*, 316 B.R. 141, 145 (D.Del. 2004).

In deciding whether there is a colorable claim, the court should undertake the same analysis as when a defendant moves to dismiss a complaint for failure to state a claim. *America's Hobby Center, Inc. v. Official Comm. of Unsecured Creditors (In re America's Hobby Center, Inc.)*, 223 B.R. 275, 282 (Bankr.S.D.N.Y. 1998) citing *Tennessee Valley Steel Corp. v. B.T. Commercial Corp. (In re Tennessee Valley Steel Corp.)*, 183 B.R. 795 (Bankr.E.D.Tenn. 1995). The standard courts apply when considering a motion to dismiss under Fed.R.Civ.P. 12(b)(6) is related to the pleading requirements of Fed.R.Civ.P. 8. *Official Comm. Of Unsecured Creditors v. Goldman Sachs Credit Partners, L.P. (In re Fedders North America, Inc.)*, 405 B.R. 527, 537 (Bankr.D.Del. 2009)(Shannon, J.) citing *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008). In *Fedders*, Judge Shannon enunciated the standard as follows:

> Rule 8(a) of the Federal Rules of Civil Procedure . . . requires only that a complaint contain "a short statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a). The statement must provide "the defendant [with] fair notice of what the claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). Under Rule 8, a complaint "does not need detailed factual allegations, [but] a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . ." *[Bell Atl. Corp. v.] Twombly*, 550 U.S. 544, 555 (2007). In other words, "Rule 8(a)(2) requires a "showing" rather than a blanket assertion of an entitlement to relief . . . [W]ithout some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only "fair notice" but also the

"grounds" on which the claim rests." *Phillips*, 515 F.3d at 232 (citing *Twombly*, 550 U.S. at 556 n.3).

*Fedders*, 405 B.R. at 537.

Here, the Committee has demonstrated that the Claims are colorable; however, whether the Committee should be allowed to prosecute the Claims turns on the outcome of a cost/benefit analysis. *Official Comm. of Unsecured Creditors v. Clark (In re Nat'l Forge Co.)*, 326 B.R. 532, 548 (W.D.Pa. 2005) ("In determining whether a [d]ebtor's refusal is unjustified, courts generally perform a cost-benefit analysis of the claims to determine whether the creditors' claims have colorable merit and whether, in light of the probable costs of litigation, the claims would likely benefit the estate if pursued.").[12]

The Committee has estimated that it will cost between $2.5 and $5 million to litigate its claims. (Tr. 75:16 - 75:23). The Debtors and First Lien Lenders argue that the estimated cost to the Debtors' estate should also include the Debtors' and First Lien Lenders' costs to defend the claim, totaling another $2.5 to $5 million. (Tr. 75:24-76:11).

At the September 7, 2010 hearing, the Committee presented expert witness testimony of Daniel Polsky to quantify the potential recovery for unsecured creditors that could result from pursuing the Committee's Claims. If the Committee was successful on all of its Claims, the expert testified that the unsecured creditors could share in a distribution of over $85 million. (*See* Comm. Ex. 2, p. 1). The Committee further contends that any recovery may be up to $14 million higher, based on Mr. Polsky's use of "conservative" numbers. (Tr. 50:20-51:9; 72:21-

---

[12]The debtor's "unjustified" failure to bring the suit does not require an improper motive. "Rather, a debtor's failure to bring a claim is deemed to be unjustifiable when the committee has presented a colorable claim that on appropriate proof would support recovery, and the action is likely to benefit the reorganization estate. *Adelphia Commc'n Corp. v. Bank of America, N.A. (In re Adelphia Commc'n Corp.)*, 330 B.R. 364, 374 n.19 (Bankr.S.D.N.Y. 2005)(citations omitted).

10

73:7).

The Debtors and the First Lien Agent argue that the Committee's proposed recoveries are illusory because, under Mr. Polsky's analysis, the lion's share of any recovery would be paid to the Second Lien Lenders and, pursuant to the Pay Over Provision of the Intercreditor Agreement, the Second Lien Lenders would be required to turn over any value received to the First Lien Lenders.[13] The Second Lien Lenders argue that the Pay Over Provision is limited to "Shared Collateral" and, therefore, the Intercreditor Agreement would not extend to any recovery from Excluded Collateral or other assets not subject to the First Lien Lenders' liens.

To further rebut the Committee's benefit analysis, the Debtors presented expert testimony of Steven Zelin. He testified that the Committee's fraudulent transfer claims are based upon a faulty marshaling assumption. (Tr. 131:21 - 132:20). The Debtors and the First Lien Agent also argue that the Committee's fraudulent transfer analysis does not consider whether the guarantor subsidiaries received any indirect benefits, such as access to funds for the construction of the Valley View Downs Project. (Tr. 102:23 - 104:7). The Committee's own exhibit shows that if the fraudulent transfer claims are not successful, the potential recovery would be reduced to $66 million, with $59.2 million being distributed to the Second Lien Lenders. (*See* Comm. Ex. 2, p.1). Under this scenario, the recovery for unsecured creditors (other than the Second Lien Lenders) is approximately $6.55 million, which is not much more than the Committee's estimated costs.

---

[13]The Intercreditor Agreement, dated October 30, 2007, was entered into by and among Centaur LLC, Credit Suisse (in its capacity as collateral agent for the First Lien Lenders) and Credit Suisse (in its capacity as collateral agent for the Second Lien Lenders) and was attached as part of Exhibit B to the Standing Motion, which was filed under seal. The Pay Over Provision is Section 4.2 of the Intercreditor Agreement.

Mr. Zelin also testified that the potential recovery for unsecured creditors is further dissipated when other factors are considered, such as the Debtors' planned objection to the claim of PREIT[14] or settlement with other disputed unsecured creditors. (Tr. 140:2 - 144:2). Mr. Zelin also criticized the Committee's recovery analysis, which did not include any independent valuation of the Licenses but, instead, relied on information provided to the Committee that was "mislabeled." (Tr. 133:11 - 133:19). The Committee mistakenly relied upon documents which should have identified that value as belonging to all "general intangibles," not just the Licenses. The Committee replies that the disclosure statement dated May 7, 2010, as revised on July 22, 2010, lists the Licenses as having significant value. (Tr. 119:8 - 120:7; 191:19-193:6; Comm. Ex. 4).[15]

The Debtors' expert adjusted several of the assumptions in the Committee's cost/benefit analysis and then, based on his adjustments, compared the potential unsecured creditors' recovery under the litigation against the proposed unsecured creditors' recovery under the Debtors' Plan. (*See* Debtors' Ex. 3, p. 26; Tr. 161:7 - 163:25). In most of his scenarios, the individual unsecured creditors, except for the Second Lien Lenders and PREIT, would recover more under the Debtors' proposed Plan than the Committee's proposed litigation. (*Id.*).

Not surprisingly, Mr. Zelin's testimony demonstrated that tweaking the underlying assumptions of the Committee's expert could significantly alter the potential unsecured creditor

---

[14] PREIT is the Pennsylvania Real Estate Investment Trust and is an unsecured creditor of Valley View Downs. PREIT filed a proof of claim in the amount of $61 million, but the Debtors' scheduled PREIT's claim $29,977,000. (Tr. 54:18-54:23). The Debtors have argued that PREIT's claim should be recharacterized as equity. (Tr. 140:12-140:16).

[15] In the disclosure statement for the Restated Second Amended Plan, filed July 27, 2010, the Debtors wrote down the value of the Licenses to zero. (Comm. Ex. 4).

recoveries. However, the adjustments made by Mr. Zelin are contrary to the documents provided by the Debtors to the Committee, such as the value for the Licenses (*see* Comm. Ex. 5) and the Flow of Funds Memorandum (*see* Comm. Ex. 6).[16] The *Nat'l Forge* Court wrote that legal challenges to a complaint are more appropriately decided by way of a Rule 56 Motion, and factual disputes are more appropriately resolved after a record is fully developed. *Nat'l Forge*, 326 B.R. at 548. The *Adelphia* Court decided that it should not hold a *de facto* mini-trial on the merits to determine whether claims have a "probability of success." *Adelphia*, 330 B.R. at 375-76. Still, the *Adelphia* Court noted, that "at least some consideration of the possibilities of success" should be considered before granting or denying a standing motion. *Adelphia*, 330 B.R. at 375-76.

As a result, while I conclude that the Committee's proposed claims are plausible, the respective experts' views are so fundamentally at odds that I am left, on this record, without an adequate basis for quantifying, with any reasonable certainty (even within a range), potential benefit to the estate from prosecution of the Claims. Under these circumstances, and understanding there may indeed be some benefit to the estate if some or all of the claims are prosecuted successfully, and to achieve the appropriate balance between allowing pursuit of colorable Claims and ensuring benefit to the estate, I will grant the Committee's request for standing to prosecute the Claims, but will limit recovery of the Committee's professional fees incurred in pursuing the Claims to any cash proceeds or other quantifiable value received by the

---

[16] The Flow of Funds Memorandum, dated October 30, 2007, sets forth information regarding the sources and order of payments to be made in connection with the loan transactions which occurred on that date pursuant to the First Lien Credit Agreement and the Second Lien Credit Agreement.

estate as a result of the litigation.[17]  "Value" would not include any recovery that is paid to the Second Lien Lenders, only to be turned over to the First Lien Lenders under the Intercreditor Agreement, since such a recovery would not confer any value to the estate.  On the other hand, "value" is not limited to cash proceeds, since the estate may benefit from a lien avoidance or recharacterization of intercompany debt.

The Committee's Standing Motion also seeks authority to settle its Claims on behalf of the Debtors' estates. While granting the Committee standing includes authority to settle the Claims, subject to Court approval, that authority is not exclusive.  A grant of derivative standing does not strip a debtor of ownership of the Claims and, accordingly, the Debtors continue to have the right, subject to Court approval, to settle the Claims.  *Official Comm. of Equity Security Holders v. Adelphia Commc'n Corp. (In re Adelphia Connc'n Corp.)*, 371 B.R. 660, 670-71 (S.D.N.Y. 2007), *In re Exide Tech.*, 303 B.R. 48, 66 (Bankr.D.Del. 2003).

## CONCLUSION

The Committee's Standing Motion will be granted, in part, to authorize the Committee to prosecute the Claims, although payment of the Committee's professionals in connection with prosecuting the Claims is limited to any cash proceeds or other quantifiable value to the estate which results from the litigation.  The Committee's Standing Motion is denied, in part, to the extent it seeks exclusive authority to settle the Claims.

---

[17]The professional fees for pursuing the Claims does not include those professional fees already incurred during the Committee's investigation of the Claims or in bringing the Standing Motion.

14

An appropriate order follows.

BY THE COURT:

_____
KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

Dated: November 5, 2010