## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re** | : | **Chapter 11** |
| | : | |
| **CENTAUR, LLC et al.,** [1] | : | **Case No. 10-10799 (KJC)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | **Objection Deadline: January 3, 2011 at 4:00 p.m. (ET)** |
| | : | **Hearing Date: January 13, 2011 at 11:00 a.m. (ET)** |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER (A) APPROVING SETTLEMENT AGREEMENT BY AND AMONG THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND THE PREPETITION FIRST LIEN AGENT PURSUANT TO RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND (B) IN THE EVENT THE COURT REQUIRES ADDITIONAL DISCLOSURE WITH RESPECT TO THE PLAN MODIFICATIONS RESULTING FROM THE SETTLEMENT AGREEMENT, DEEMING THE NOTICE OF THE PROPOSED PLAN MODIFICATIONS TO BE ADEQUATE DISCLOSURE AND FIXING A DEADLINE TO AMEND VOTING ON THE PROPOSED MODIFIED FOURTH AMENDED JOINT PLAN OF REORGANIZATION OF CENTAUR, LLC AND ITS AFFILIATED DEBTORS

The affiliated debtors and debtors in possession in the above-captioned chapter 11

cases (collectively, the "Debtors") file this motion (the "Motion") for entry of an order

(a) approving the settlement agreement (in the form attached to the Proposed Order (as defined

below) as Exhibit 1, the "Settlement Agreement") by and among (i) the Debtors; (ii) the Official

Committee of Unsecured Creditors appointed in the Debtors' chapter 11 cases (the

"Committee"); and (iii) Credit Suisse AG, Cayman Islands Branch, as administrative and

collateral agent (the "Prepetition First Lien Agent") under that certain First Lien Revolving

Credit and Term Loan Agreement, dated as of October 30, 2007 (as has been or may be further

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, if applicable, are: Centaur, LLC (8148); Centaur Colorado, LLC (9131); Centaur Indiana, LLC; Centaur Racing, LLC; Hoosier Park, L.P. (0820); HP Dining & Entertainment, LLC; Centaur Pennsylvania, LLC; VVD Properties General Partner, LLC; Valley View Downs GP, LLC; VVD Properties, LP (6808); Valley View Downs, LP (1028); Centaur PA Land Management, LLC; Centaur PA Land General Partner, LP; and Centaur PA Land, LP.

amended, restated, supplemented or otherwise modified from time to time, the "Prepetition First Lien Credit Agreement") among Centaur, LLC, the Prepetition First Lien Agent and various lenders from time to time party thereto (the "First Lien Lenders" and, together with the Prepetition First Lien Agent, the "Prepetition First Lien Claimholders"), pursuant to Rule 9019(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),[2] and (b) in the event the Court requires additional disclosure with respect to the modifications to the Fourth Amended Joint Plan of Reorganization of Centaur, LLC and Its Affiliated Debtors, filed October 18, 2010 [D.I. 764] (as may be amended from time to time, the "Plan") resulting from the Settlement Agreement (the "Modifications"), deeming the notice of the Modifications, substantially in the form attached hereto as Exhibit B (the "Notice of Modifications") to be adequate disclosure and fixing January 31, 2011, as the deadline to amend voting on the proposed modified Plan (as modified by the Modifications, the "Modified Plan") for certain classes of creditors. In support of the Motion, the Debtors respectfully represent as follows:

## Background

### A. Procedural Background

1. On October 28, 2009, Valley View Downs, LP and Centaur PA Land, LP each commenced a chapter 11 case in this Court by filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"). On March 6, 2010, the Centaur Debtors each commenced a chapter 11 case in this Court by filing a voluntary petition for relief under the Bankruptcy Code.

---

Debtors Centaur PA Land, LP and Valley View Downs, LP filed their chapter 11 petitions on October 28, 2009. The remaining Debtors (collectively, the "Centaur Debtors") filed their chapter 11 petitions on March 6, 2010.

[2] A proposed order approving the Settlement Agreement is attached hereto as Exhibit A (the "Proposed Order").

2

2.       The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.       On March 17, 2010, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the Committee in these chapter 11 cases.[3] No examiner or trustee has been requested or appointed in any of the Debtors' chapter 11 cases.

4.       By Order dated April 15, 2010 [D.I. 166], all of the Debtors' chapter 11 cases are being jointly administered for procedural purposes only.

5.       Additional background facts on the Debtors, including a detailed overview of the Debtors' businesses, information on the Debtors' corporate structure, information on the Debtors' debt structure and information on the events leading up to the Debtors' chapter 11 cases are contained in the Declaration of Kurt E. Wilson in Support of First Day Motions, filed on March 8, 2010 [Case No. 09-13760 (KJC), D.I. 122].

## B.       The Plan Process, the Challenges, the Settlement Negotiations and the Resulting Settlement Agreement

6.       In the final Order entered by the Court on April 30, 2010 authorizing, among other things, the Debtors' use of cash collateral [D.I. 205] (the "Final Cash Collateral Order"), the Debtors stipulated that the Prepetition First Lien Claimholders hold valid, perfected and enforceable prepetition liens on substantially all of the Debtors' assets (the "Liens and Security Interests") and further stipulated as to the amount of the prepetition indebtedness owed to the Prepetition First Lien Claimholders under, inter alia, the Prepetition First Lien Credit Agreement and certain hedging agreements (collectively, the "Prepetition First Lien Debt") as of

3

the dates the Debtors commenced their chapter 11 cases. See Final Cash Collateral Order, at ¶ E(i)-(v).

       7.    Under the Final Cash Collateral Order, the Committee and all other non-Debtor parties-in-interest were given until 100 days after the formation of the Committee (the "Challenge Period") to investigate the validity, perfection and enforceability of the prepetition liens of the Prepetition Secured Parties (as defined below) and the amount and allowability of the Prepetition Indebtedness (as defined in the Final Cash Collateral Order), or to object to or assert any other claims or causes of action against any of the Prepetition Secured Parties (each, a "Challenge"). See id. at ¶ 16. The Committee and other non-Debtor parties-in-interest were required under the Final Cash Collateral Order to commence prosecution of any objection to or claim challenging, inter alia, the Liens and Security Interests and/or the Prepetition First Lien Debt on or before the expiration of the Challenge Period (the "Challenge Period Termination Date").[4] See id. The Final Cash Collateral Order specifically provides in pertinent part that:

> [u]pon either the Challenge Period Termination Date without the filing of a Challenge or, in the event that a Challenge is timely filed, the Court rules against the party asserting such Challenge, each stipulation, admission and agreement contained in this Final Order, including, without limitation, the Debtors' Stipulations, shall be irrevocably binding on the Debtors and their estates (and any successor thereto), the Committee and all parties-in-interest . . . without further action by any party or this Court and the Committee and any other party-in-interest . . . under all circumstances and for all purposes.

Id. (emphasis added).

---

[3]    On July 6, 2010, the U.S. Trustee filed a revised notice of appointment of the Committee [D.I. 397], which indicates that one of the original members of the Committee, Churchill Downs, Inc., is no longer a member of the Committee.

[4]    By Order dated June 25, 2010 [D.I. 367], the Challenge Period Termination Date was extended to July 9, 2010, solely as to the Committee.

4

8. During its investigation period, the Committee identified various assets with respect to which the Committee believed the Prepetition Secured Parties' liens and security interests could be challenged, including, but not limited to, (i) the $50 million in cash that, pursuant to the terms of a certain letter of credit reimbursement agreement, was deposited in an account of Credit Suisse AG, Cayman Islands Branch, in its capacity as issuer (the "L/C Issuer"), at The Bank of New York Mellon (the "L/C Cash"), or the Debtors' right to receive the L/C Cash upon cancellation of the undrawn letter of credit (together with the L/C Cash, the "L/C Interests"), (ii) the Debtors' various racing and gaming licenses (collectively, the "Licenses") and the proceeds of the Licenses and (iii) an aggregate of approximately $10 million of cage cash held by Hoosier Park, L.P. and Centaur Colorado, LLC as of the date the Centaur Debtors commenced their chapter 11 cases (collectively, the "Cage Cash"). The Committee also identified various theories pursuant to which the Committee believed it could, on behalf of the Debtors' estates, (i) avoid as fraudulent transfers the guarantees and liens granted by the subsidiary guarantors of Centaur, LLC's obligations to the Prepetition Secured Parties (collectively, the "Guarantees") in connection with the financing the Debtors first obtained in October 2007 and (ii) advocate that certain intercompany claims asserted as between the Debtors (the "Intercompany Claims") be recharacterized as equity interests or otherwise held unenforceable.

9. By letters dated June 3, 2010 and July 2, 2010 (together, the "Demand Letters"), the Committee formally demanded that the Debtors (i) confirm that they would not be initiating certain lien challenges and other claims and causes of action enumerated in the Demand Letters against the First Lien Lenders, the L/C Issuer and the lenders (the "Second Lien Lenders") under the Debtors' prepetition second lien credit facility and (ii) advise the Committee

5

by July 7, 2010, whether the Debtors would consent to the standing of the Committee to assert such claims.

10. The Debtors notified the Committee that they would not prosecute the claims, challenges and causes of action listed in the Demand Letters, but stated that they did not unconditionally consent to the Committee's standing to prosecute such claims on behalf of the Debtors' estates.

11. The Debtors were concerned that the administrative costs of resolving the claims outlined in the Demand Letters, which the Debtors believed were Plan disputes, through litigation would substantially erode value that could otherwise be made available to stakeholders, particularly unsecured creditors, and that no attempts to reach agreement on a plan and a global resolution to the Debtors' chapter 11 cases had occurred. As a consequence, at a status conference in late May 2010, the Debtors requested that the Court submit the disputed issues previewed in the Demand Letters to non-binding mediation prior to the issues being formally joined. The Committee, the Prepetition First Lien Agent and the administrative and collateral agent under the Debtors' prepetition second lien credit facility (the "Prepetition Second Lien Agent" and, together with the Second Lien Lenders and the Prepetition First Lien Claimholders, the "Prepetition Secured Parties") all agreed to participate in a mediation.

12. By Order dated June 8, 2010 [D.I. 314], the Court ordered a non-binding mediation of the disputed issues in connection with the Plan and related matters (the "Mediation") and appointed the Honorable Christopher S. Sontchi as "Mediator." The Mediation ultimately took place on June 30, 2010 before the Mediator. The Debtors, the Prepetition First Lien Agent, the Prepetition Second Lien Agent and the Committee (collectively, the "Mediation Participants") all participated in the Mediation. Despite the efforts of the

6

Mediator and the Mediation Participants, the Mediation Participants were unable to agree on a consensual resolution of the disputed issues.

13. By motion dated July 9, 2010 – the Challenge Period Termination Date for the Committee – the Committee sought an order granting, inter alia, leave, standing and authority to prosecute and, if appropriate, settle various claims on behalf of the Debtors' estates including its Challenges with respect to the Liens and Security Interests [D.I. 415] (the "Standing Motion"). Among other things, the Committee sought authority in the Standing Motion to (i) challenge the Liens and Security Interests in the L/C Interests, the Licenses and the Cage Cash, (ii) seek to avoid the Guarantees as fraudulent transfers and (iii) advocate that the Intercompany Claims should be recharacterized as equity interests or otherwise held unenforceable.

14. No other non-Debtor parties-in-interest filed any objection with respect to the Liens and Security Interests or the Prepetition First Lien Debt by the Challenge Period Termination Date.

15. On July 21, 2010, the Debtors filed a limited response to the Standing Motion [D.I. 447] disputing whether the benefit of any Challenges outweighed the associated costs and seeking to preserve their right to settle any Challenges. On July 23, 2010, the Prepetition First Lien Agent filed its objection to the Standing Motion [D.I. 461] challenging both the validity of the Challenges and the Committee's view as to the benefit that would accrue to the Debtors' estates and creditors if the Standing Motion was granted. On July 26, 2010, the Committee filed a reply to these responses [D.I. 476].

16. On August 23, 2010, the Prepetition First Lien Agent filed a motion with the Court seeking an order granting relief from the automatic stay for the purpose of foreclosing

7

on certain personal property and real property of Valley View Downs, LP and Centaur PA Land, LP and exercising any and all available remedies in respect thereof [D.I. 594] (the "First Lift Stay Motion"). The Prepetition First Lien Agent argued that stay relief was appropriate because, among other things, (i) the Valley View Downs Debtors did not have equity in the personal and real property and (ii) the personal and real property was unnecessary for an effective reorganization. The Committee, the Prepetition Second Lien Agent and the Debtors each opposed the relief sought in the First Lift Stay Motion on various grounds, including that the personal property upon which the Prepetition First Lien Agent was seeking to foreclose included "general intangibles" and the Court had not yet made the threshold determination of whether the L/C Interests were included within the general intangibles subject to the lien of the Prepetition First Lien Agent. The Prepetition First Lien Agent filed an amended version of the First Lift Stay Motion on October 26, 2010 [D.I. 828] (as amended, the "Amended First Lift Stay Motion").

17.     On September 7, 2010, the Court held a hearing on the Standing Motion. At the conclusion of the hearing, the Court requested that the Debtors, the Prepetition First Lien Agent and the Committee submit additional position statements to the Court on the issue of standing by no later than September 17, 2010. On September 17, 2010, the Debtors, the Prepetition First Lien Agent, the Prepetition Second Lien Agent and the Committee filed letters with the Court discussing their respective positions as to the relief requested in the Standing Motion [D.I. 667, 668, 666, 669].

18.     On October 15, 2010, Credit Suisse AG, Cayman Islands Branch ("Credit Suisse") filed a motion for entry of an order (a) authorizing relief from stay to permit setoff of certain prepetition amounts owed and (b) granting related relief [D.I. 758] (the "Second Lift Stay

8

Motion" and together with the Amended First Lift Stay Motion, the "Lift Stay Motions"). By the Second Lift Stay Motion, Credit Suisse sought relief from the stay to set off its $10.5 million claim as a First Lien Lender, that it could recover from Valley View Downs, LP as guarantor of the borrower's obligations under the Prepetition First Lien Credit Agreement, against what Credit Suisse described in the Second Lift Stay Motion as Valley View Downs, LP's general unsecured claim against Credit Suisse, as L/C Issuer, for the $50 million in L/C Cash that, pursuant to the terms of a certain letter of credit reimbursement agreement, was deposited in an account of the L/C Issuer at The Bank of New York Mellon. The Committee and the Prepetition Second Lien Agent each opposed the relief sought in the Second Lift Stay Motion on various grounds, including that adjudication of the Second Stay Relief Motion would result in piecemeal litigation of the issue of entitlement to the L/C Cash.

19.     On October 18, 2010, the Debtors filed the Plan and a disclosure statement related to the Plan [D.I. 766] (the "Disclosure Statement").

20.     On October 20, 2010, the Court entered an Order, among other things, approving the Disclosure Statement [D.I. 783] (the "Disclosure Statement Order"). The Disclosure Statement Order also approved the Debtors' solicitation and voting procedures and set December 3, 2010, as the deadline for voting on the Plan. Pursuant to the Disclosure Statement Order, the deadline for filing objections to the Plan was set for December 3, 2010, and a hearing on the confirmation of the Plan (the "Confirmation Hearing") was scheduled to commence on December 13, 2010 and continue through December 14, 2010.

21.     The deadline for voting on the Plan and objecting to the Plan was later extended by Order of the Court dated November 24, 2010 [D.I. 985], which had been submitted

9

under certification of counsel, to January 3, 2011, and the Confirmation Hearing was continued to January 13, 2011.

22.    On November 5, 2010, the Court entered an Order granting in part and denying in part the Standing Motion [D.I. 915] (the "Standing Order") and issued a memorandum decision in connection with the Standing Order [D.I. 914] (the "Standing Decision"). The Court granted the Standing Motion in part to authorize the Committee to prosecute the Challenges set forth in the draft complaint attached to the Standing Motion (the "Draft Complaint"), but limited payment of the Committee's professionals in connection with prosecuting the Challenges set forth in the Draft Complaint to the cash proceeds or other quantifiable value to the Debtors' estates resulting from the litigation. See Standing Order, at 1; Standing Decision, at 14. The Court denied the Standing Motion to the extent it sought exclusive authority to settle the Challenges set forth in the Draft Complaint. See Standing Order, at 2; Standing Decision, at 14.

23.    By separate notices dated November 9, 2010 [D.I. 924, 925], Credit Suisse withdrew the Amended First Lift Stay Motion and the Second Lift Stay Motion, both without prejudice.

24.    On November 15, 2010, the Committee commenced the adversary case Official Committee of Unsecured Creditors v. Credit Suisse AG, Cayman Islands Branch, Case No. 10-55358 (KJC) by filing a complaint [D.I. 941, Adv. Pro. No. 10-55358 (KJC), D.I. 1] (the "Adversary Complaint"), which asserted, with minor modifications, each of the Challenges set forth in the Draft Complaint (the "Committee Challenges").

25.    After the filing of the Adversary Complaint, the Debtors, the Committee and the Prepetition First Lien Agent entered into arm's length negotiations in the hopes of

10

avoiding a drawn out and expensive litigation of the Committee Challenges and proceeding toward an expedited emergence for the Debtors from chapter 11 for the benefit of all stakeholders.

26.     Prior to the Confirmation Hearing, the Debtors, the Committee and the Prepetition First Lien Agent entered into an agreement in principle to modify the Plan to, among other things, settle the Committee Challenges and improve recoveries for holders of claims in Classes 3, 5 and 6. The terms of the Modifications are summarized in the notice attached hereto as Exhibit B and are memorialized in the Settlement Agreement substantially in the form attached to the Proposed Order as Exhibit 1.

## Jurisdiction

27.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

28.     By this Motion, pursuant to Bankruptcy Rule 9019, the Debtors seek entry of an order approving the Settlement Agreement as fair, reasonable and in the best interests of the Debtors' estates.

29.     Furthermore, in the event the Court requires additional disclosure with respect to the Modified Plan, the Debtors request that the Court deem the Notice of Modifications substantially in the form attached hereto as Exhibit B to be adequate disclosure and fix January 31, 2011 as the deadline for creditors in Classes 2, 3, 5 and 6 (the "Voting Classes") under the Plan to amend voting on the Modified Plan.

11

## Basis for Relief

### A. The Settlement Agreement

30.    Bankruptcy Rule 9019(a) provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). Compromises are favored in bankruptcy because they minimize the costs of litigation and further the parties' interests in expediting administration of a bankruptcy estate. Myers v. Martin (In re Martin), 91 F.3d 389, 393 (3d Cir. 1996); 10 COLLIER ON BANKRUPTCY, ¶ 9019.01 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2010). In deciding whether to approve a compromise under Bankruptcy Rule 9019, the Court must determine if the settlement is "fair, reasonable, and in the interest of the estate." In re Key3Media Group, Inc., 336 B.R. 87, 92 (Bankr. D. Del. 2005) (citing In re Louise's, Inc., 211 B.R. 798, 801 (D. Del. 1997)). This test is known as the "best interests" test.

31.    Under the "best interests" test, a debtor must show that a compromise or settlement is "fair and equitable" to the estate. Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968) (hereinafter cited as "TMT"); Will v. Northwestern Univ. (In re Nutraquest, Inc.), 434 F.3d 639, 645 (3d Cir. 2006) (discussing application of fair and equitable standard); Martin, 91 F.3d at 394 (same); In re Marvel Entm't Group, Inc., 222 B.R. 243, 250 (D. Del. 1998) (proposed settlement held to be in best interest of the estate). Under this standard and as further articulated by courts within the Third Circuit, the reasonableness of a proposed compromise and settlement is determined by considering the following four factors:

- the probability of success in the litigation;
- the difficulty in collecting after obtaining a judgment in the litigation;

12

- the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and

- the paramount interest of creditors and stockholders with a proper deference to their reasonable views of the settlement.

Martin, 91 F.3d at 393 (following TMT and clarifying four-factor test); see also Nutraquest, 434 F.3d at 644-45; In re RNI Wind Down Corp., 348 B.R. 286, 297-99 (Bankr. D. Del. 2006); Law Debenture Trust Co. v. Kaiser Aluminum Corp. (In re Kaiser Aluminum Corp.), 339 B.R. 91, 96-97 (D. Del. 2006). In applying the Martin/TMT-based four-factor test, the reasonableness of a proposed compromise and settlement does not depend on a determination that the settlement reached is the best that could possibly be obtained, but rather, whether the settlement "falls below the lowest point in the range of reasonableness." Official Unsecured Creditors' Comm. of Pa. Truck Lines, Inc. v. Pa. Truck Lines, Inc. (In re Pa. Truck Lines, Inc.), 150 B.R. 595, 598 (E.D. Pa. 1992), aff'd, 8 F.3d 812 (3d Cir. 1993); Key3Media, 336 B.R. at 92-93 (court is not required to determine that settlement is best possible compromise).

32.     The Martin/TMT factors weigh heavily in favor of approving the Settlement Agreement. The parties to the Settlement Agreement in good faith and at arm's length negotiated a compromise and settlement of potentially lengthy litigation, which was one of the few remaining obstacles to confirmation. This compromise results in improvement in the treatment of claims of three classes of unsecured creditors – Classes 3, 5 and 6 – while enabling the Debtors and their stakeholders to avoid the expense of the litigation of the Committee Challenges.[5] Because the Committee was the only party-in-interest that challenged the Prepetition First Lien Agent's liens by the Challenge Period Termination Date, the resolution of

---

[5]     The Committee's expert and the Debtors' expert in connection with the proceedings on the Standing Motion agreed that the cost of litigating the Committee Challenges could be between $5 million and $10 million. See September 7, 2010 Hr'g Tr. at 76:5-11; 160:18-161:4.

13

the Committee Challenges will eliminate the major impediment to confirmation of the Modified Plan and allow the Debtors to emerge expeditiously from chapter 11. Thus, the Debtors believe that entering into the Settlement Agreement not only will enable unsecured creditors to receive additional consideration, but also represents a major step toward the goal of concluding the Debtors' chapter 11 cases.

33.     The Debtors have exercised sound business judgment in agreeing to the terms of the Settlement Agreement and believe that the terms of the Settlement Agreement are fair, equitable and in the best interests of the Debtors' estates. The Debtors' decision to enter into the Settlement Agreement that will put an end to the litigation of the Committee Challenges was not one that was made with haste. On the contrary, the Debtors' decision to settle was made only after each of the key parties to the disputes had been given a sufficient opportunity to develop its legal positions and obtain some fact discovery. Indeed, the issues underlying the Committee Challenges had been framed for the Court in various papers filed in the Debtors' chapter 11 cases, including, but not limited to, the Disclosure Statement, the Standing Motion, the Lift Stay Motions and the various objections, responses and replies related to each of the aforementioned filings. These various filings reflecting the positions on the issues of, among others, the Debtors, the Committee, the Prepetition First Lien Agent and the Prepetition Second Lien Agent, foreshadowed complex, time consuming and expensive litigation, which the Settlement Agreement will now allow all parties-in-interest to avoid.

34.     Without the Settlement Agreement, which was negotiated by the parties thereto in good faith and at arm's length, the additional time and money required to litigate the Committee Challenges and keep the Debtors' chapter 11 cases open could significantly reduce the Debtors' resources, and there can be no certainty that such litigation would result in more

14

favorable Plan treatment for claims in Classes 3, 5 and 6 than that which is provided by the terms of the Settlement Agreement. Moreover, any recovery that the Committee could gain for its constituents in litigation of the Committee Challenges would be significantly diminished as a result of the Court's Standing Decision, which requires that the costs of the Committee's pursuit of the Committee Challenges be paid solely from the proceeds, if any, of those challenges.[6] Furthermore, given the possibility that the Committee would be unsuccessful in the litigation of the Committee Challenges, the Settlement Agreement removes the risk that certain unsecured creditors will receive nothing under the Plan but a contingent recovery. Accordingly, the Settlement Agreement falls well within the range of reasonableness, is in the best interests of the Debtors and their estates and should be approved pursuant to Bankruptcy Rule 9019(a).

## B. The Modifications to the Plan Resulting From the Settlement Agreement Constitute Permissible Modifications Under Section 1127(a) of the Bankruptcy Code, and Additional Disclosure with Respect to the Modified Plan is Not Required

35. The Debtors do not believe that additional formal disclosure with respect to, or resolicitation of, the Modified Plan is required. Section 1127(a) of the Bankruptcy Code allows the proponent of a reorganization plan to modify it "at any time before confirmation," provided that the modified plan adheres to the requirements of sections 1122 and 1123 of the Bankruptcy Code. 11 U.S.C. § 1127(a). Where proposed modifications to a reorganization plan

---

6      By separate applications dated December 3, 2010, the Committee sought to retain Lamonica Herbst & Maniscalco LLP ("LH&M") as special litigation counsel and Flaster/Greenberg P.C. ("FG") as local special litigation counsel in connection with the litigation of the Committee Challenges nunc pro tunc to November 10, 2010 [D.I. 1014, 1015] (respectively, the "LH&M Application" and the "FG Application"). By the LH&M Application and the FG Application, the Committee asked the Court to approve a contingency arrangement for compensation of LH&M and FG whereby, among other things, (i) if the matter proceeds through expert discovery or dispositive motion practice, LH&M would be paid, as authorized by the Court, 25% of any Recovery (as defined in the LH&M Application) and FG would be paid, as authorized by the Court, the greater of (a) its hourly rates and (b) 1.875% of any Recovery and (ii) if the matter proceeds to trial, LH&M would be paid, as authorized by the Court, 33% of any Recovery, and FG would be paid, as authorized by the Court, the greater of (x) its hourly rates and (y) 2.475% of any Recovery. See LH&M Application, at ¶ 19; FG Application, at ¶ 19.

15

will not materially and adversely affect the claim of any creditor or the interest of any security holder who has not approved the changes, the proponent of the modifications is not required to provide additional disclosure statements to, or resolicit votes from, creditors or interest holders. See, e.g., In re G-I Holdings Inc., 420 B.R. 216, 256 (D.N.J. 2009). Indeed, courts in the Third Circuit have routinely approved preconfirmation modifications to plans of reorganization without requiring additional disclosure statements or resolicitation of votes on the plans in cases where the proposed modifications are non-material or beneficial to creditors. See, e.g., In re Century Glove, Inc., Nos. 90-400-SLR, 90-401-SLR, 1993 WL 239489, at *3-*4 (D. Del. Feb. 10, 1993) (affirming the bankruptcy court's finding that section 1127 of the Bankruptcy Code did not require additional disclosure and resolicitation where the proposed modification did not impact the claims of the parties who voted for the plan in a material or adverse fashion); In re Aleris Int'l, Inc., No. 09-10478 (BLS), 2010 WL 3492664, at *32 (Bankr. D. Del. May 13, 2010) (unpublished order) (finding that a debtor was not obligated to execute further disclosure statements or resolicit acceptances of the modified plan where the modifications did not adversely impact the rights of non-consenting creditors); In re Sacred Heart Hosp. of Norristown, 182 B.R. 413, 425 (Bankr. E.D. Pa. 1995) (finding that debtor was not required to resolicit acceptances of amended plan of reorganization because modifications did not adversely affect the treatment of any claimholder). In the instant case, the Modified Plan does not adversely affect the holders of claims in Classes 3, 5 and 6; instead, the Modified Plan improves the treatment of holders of claims in Classes 3, 5 and 6. Thus, the Debtors need not provide additional disclosure to these claimants or resolicit their votes on the Modified Plan.

16

36. Under the terms of the Modified Plan, only the interests of holders of claims in Class 2 are arguably adversely affected. However, the Debtors need not provide holders of claims in Class 2 with additional disclosure or resolicit their votes. First, any adverse impact on holders of claims in Class 2 is not material. The holders of claims in Class 2 will receive the same distributions as they would under the Plan except that additional distributions from the Debtors' cash-on-hand will be made to holders of Allowed Valley View Downs Unsecured Claims[7] and Allowed General Unsecured Claims, thereby reducing the amount of cash-on-hand at emergence.[8] This concession will be in exchange for the benefit of avoiding the risk and cost of litigation, which would surely delay confirmation and increase the administrative expenses borne by the Debtors' estates. Second, the Prepetition First Lien Agent, the actions of which are directed by a requisite majority (in amount) of First Lien Lenders under the Prepetition First Lien Credit Agreement, was represented by sophisticated counsel that was actively involved in the settlement negotiations that led to the Settlement Agreement and the Modifications. A number of courts have noted that section 1127 of the Bankruptcy Code does not require the submission of a revised disclosure statement or the resolicitation of votes where the only party negatively affected by the modification of a reorganization plan was fully apprised of the effects of the modification. In re Sentinel Mgmt. Group, Inc., 398 B.R. 281, 301 (Bankr. N.D. Ill. 2008) (noting that where preconfirmation changes to a reorganization plan "are minor, impact only a creditor who has been fully involved, and do not adversely impact any other creditor[,]" it is not necessary to furnish new disclosure statements or solicit new acceptances);

---

[7] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

[8] This reduction in the amount of cash-on-hand will reduce the recovery of the Prepetition First Lien Claimholders by approximately .45 percent.

17

In re Am. Trailer & Storage, Inc., 419 B.R. 412, 419-20 (Bankr. W.D. Mo. 2009) (finding that

the proponent of a modified reorganization plan did not need to solicit new acceptances or

provide an additional disclosure statement where the proposed preconfirmation modifications

were non-material and only adversely affected the interests of a creditor that had been "fully

involved" and previously voted to reject the plan); Fairfax Sav. v. Sherwood Square Assocs. (In

re Sherwood Square Assocs.), 87 B.R. 388, 390 (Bankr. D. Md. 1988) (finding that it was not

necessary to solicit new acceptances of a modified plan where the only party adversely affected

by the alteration of the plan was "fully involved" in the bankruptcy proceedings). Here, it is

clear that holders of claims in Class 2 are or should have been fully aware of the consequences of

the Modified Plan because the Prepetition First Lien Agent and certain of the First Lien Lenders

comprising a requisite majority (in amount) were fully involved in the settlement negotiations

that resulted in the Modifications.

37. For the foregoing reasons, the Debtors need not provide additional

disclosure to any holders of claims against or equity interests in the Debtors or resolicit their

votes on the Modified Plan.

**C. In the Event the Court Requires Additional Disclosure with Respect to the Modified Plan, the Debtors Request that the Court Deem the Notice of Modifications to Be Adequate Disclosure and Fix a Shortened Solicitation Period**

38. If, however, the Court finds that additional disclosure with respect to the

Modified Plan is required, the Debtors respectfully request that the Court deem the Notice of

Modifications attached hereto as Exhibit B to be adequate disclosure. The form of notice

attached hereto as Exhibit B (together with the form of Settlement Agreement attached to the

Proposed Order as Exhibit 1) adequately apprises holders of claims in the Voting Classes of the

consequences of the Modified Plan and should be received by the holders of claims in the Voting

18

Classes sufficiently in advance of both the proposed January 31, 2011 deadline for such creditors to amend voting on the Modified Plan and the Confirmation Hearing, if continued to the February 16, 2011 omnibus hearing in these chapter 11 cases.

39.    Section 1127(d) of the Bankruptcy Code provides in pertinent part that "[a]ny holder of a claim or interest that has accepted or rejected a plan is deemed to have accepted or rejected, as the case may be, such plan as modified, unless, within the time fixed by the court, such holder changes such holder's previous acceptance or rejection." 11 U.S.C. § 1127(d). Section 105(a) of the Bankruptcy Code provides that the Court is authorized to, among other things, "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

40.    The alternative relief requested in the Motion is consistent with these provisions of the Bankruptcy Code. If required by the Court to resolicit the Modifications, the Debtors propose to notify holders of claims in the Voting Classes of the time period to alter their votes by service of an order granting the alternative relief requested in the Motion, if entered, within three (3) days after entry of such order, and to notify the Court of any amended votes by affidavit or declaration to be submitted to the Court by the Debtors' claims, noticing and balloting agent, AlixPartners, LLP. This procedure will enable the Debtors to fully apprise creditors of their rights under section 1127(d) of the Bankruptcy Code, while allowing the Debtors to avoid unduly delaying the confirmation of the Modified Plan.

41.    Holders of claims in the Voting Classes will not suffer prejudice if the Debtors are not required to provide such claimants with an entirely new approved disclosure statement and resolicit the Modified Plan on standard notice. As discussed above, the Modifications proposed in the Motion result in improved treatment for claims in Classes 3, 5 and

19

6 and do not alter the treatment of the remaining classes, other than Class 2. Although the

Modified Plan indirectly requires concessions on the part of holders of claims in Class 2, the

concessions are roughly comparable to the benefit that holders of claims in Class 2 will receive

in avoiding the risk and expense of litigation of the Committee Challenges. Moreover, the

Prepetition First Lien Agent, the actions of which are directed by a requisite majority (in amount)

of the First Lien Lenders under the Prepetition First Lien Credit Agreement, has been actively

involved in all stages of the Debtors' chapter 11 cases, including the negotiations leading up to

the Settlement Agreement and is a signatory to the Settlement Agreement. Thus, holders of

claims in Class 2 should be well aware of the consequences of the Modifications. Finally, since

the voting deadline was continued to January 3, 2011, it is likely that a substantial majority of

holders of claims in Class 2 and all of the other Voting Classes will receive the Notice of

Modifications before ever releasing their ballots in the first instance. For the foregoing reasons,

requiring the Debtors to submit and seek Court approval of a new disclosure statement and

formally resolicit the votes of the Voting Classes on standard notice will needlessly delay

confirmation of the Modified Plan and deplete resources of the Debtors' estates to the detriment

of all creditor constituencies.

### Notice

42.     Notice of this Motion has been provided to (a) the U.S. Trustee;

(b) counsel to the Committee; (c) Credit Suisse AG, Cayman Islands Branch, as issuer of a letter

of credit in favor of the Commonwealth of Pennsylvania; (d) counsel to the respective

administrative agents under the Debtors' prepetition secured credit facilities; (e) the

Pennsylvania Gaming Control Board of the Commonwealth of Pennsylvania; (f) the

Pennsylvania Harness Racing Commission; (g) the Indiana Horse Racing Commission; (h) the

20

Indiana Gaming Commission; (i) the Colorado Limited Gaming Control Commission; (j) the Internal Revenue Service; (k) all parties requesting notices pursuant to Bankruptcy Rule 2002; and (l) all parties entitled to vote on the Plan. The Debtors submit that under the circumstances no other or further notice is necessary.

WHEREFORE, the Debtors respectfully request entry of an order (i) granting the relief requested herein and (ii) granting the Debtors such other and further relief as the Court deems just and proper.

Dated: December 7, 2010
Wilmington, Delaware

FOX ROTHSCHILD LLP

Jeffrey M. Schlerf (No. 3047)
Eric M. Sutty (No. 4007)
John H. Strock (No. 4965)
919 North Market Street, Suite 1600
Wilmington, Delaware 19801
(302) 654-7444

-and-

Gerard Uzzi (admitted pro hac vice)
WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036
(212) 819-8200

-and-

Michael C. Shepherd (admitted pro hac vice)
Lane E. Begy (admitted pro hac vice)
WHITE & CASE LLP
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131
(305) 371-2700

Attorneys for the Debtors and
Debtors in Possession

21